# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| ACCURIDE CORPORATION, *et al.*,[1] | Case No. 24-12289 (___) |
| Debtors. | (Joint Administration Requested) |

## MOTION OF DEBTORS FOR ENTRY OF
## INTERIM AND FINAL ORDERS (I) AUTHORIZING
## THE DEBTORS TO PAY CERTAIN PREPETITION CLAIMS OF
## (A) CRITICAL VENDORS, (B) FOREIGN VENDORS, (C) LIEN CLAIMANTS,
## AND (D) 503(B)(9) CLAIMANTS, (II) CONFIRMING ADMINISTRATIVE EXPENSE
## PRIORITY OF OUTSTANDING ORDERS, AND (III) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>")

respectfully state as follows in support of this motion:[2]

### Relief Requested

1.       The Debtors seek entry of interim and final orders, substantially in the forms

attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "<u>Interim Order</u>" and "<u>Final Order</u>"):

(a) authorizing the Debtors to pay certain prepetition claims of (i) Critical Vendors, (ii) Foreign

Vendors, (iii) Lien Claimants, and (iv) 503(b)(9) Claimants (each as defined herein) (collectively,

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Accuride Corporation (9077); Accuride Group Holdings, Inc. (4531); Accuride Intermediate Co., Inc. (9045); Accuride Distributing, LLC (3124); Accuride EMI, LLC (0389); Accuride Erie L.P. (4862); Accuride Henderson Limited Liability Company (8596); AKW General Partner, L.L.C. (4861); AOT, LLC (3088); Armor Parent Corp. (6684); Bostrom Holdings, Inc. (9282); Bostrom Seating, Inc. (7179); Gunite Corporation (9803); KIC LLC (6356); Transportation Technologies Industries, Inc. (2791); and Truck Components, Inc. (5407). The location of the Debtors' service address is: 38777 Six Mile Road, Suite 410, Livonia, MI 48152.

[2]     A detailed description of the Debtors and their businesses, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Charles M. Moore, Chief Restructuring Officer of Accuride Corporation, in Support of Chapter 11 Petitions and First Day Motions* (the "<u>First Day Declaration</u>"), filed contemporaneously herewith. Capitalized terms used but not defined in this motion have the meanings ascribed to them in the First Day Declaration.

the "Key Trade Vendors," and the claims thereof, the "Key Trade Claims"); (b) confirming the administrative expense priority status of Outstanding Orders (as defined herein); and (c) granting related relief. In addition, the Debtors request that the United States Bankruptcy Court for the District of Delaware (the "Court") schedule a final hearing to consider entry of the Final Order.

## Jurisdiction and Venue

2.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding pursuant to 28. U.S.C. § 157(b)(2), and the Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested herein are sections 105(a), 363, 503, 1107(a), and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 9013-1.

## Background

5.      The Debtors, together with their non-Debtor affiliates, are a global leader in steel and aluminum wheels and wheel-end components and assemblies, supplying innovative products to over 1,000 customers in the commercial vehicles, passenger cars, agriculture, construction and

industrial equipment markets. Headquartered in Livonia, Michigan, the Debtors are part of a global enterprise that employs approximately 3,600 individuals at facilities in the United States, Canada, Mexico, Germany, France, Turkey, Russia, and China.

6.     On October 9, 2024 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committees have been appointed or designated.

## The Debtors' Key Trade Vendors and the Key Trade Claims

7.     As discussed in more detail in the First Day Declaration, the Debtors produce wheels and wheel end products primarily for the medium- to heavy-duty commercial truck and trailer markets.  In order to perform successfully in these markets, the Debtors depend on the uninterrupted flow of raw materials and other component parts through the Debtors' supply chain and distribution networks.

8.     Broadly speaking, the Debtors rely on, among others, suppliers of raw materials such as aluminum and steel, producers of component parts necessary for the Debtors' manufacturing processes, and various distribution services to transport the Debtors' wheels and related products to customers throughout North America.  These Key Trade Vendors provide such materials and services on favorable trade terms, and maintaining these trade terms is critical to the

Debtors' ability continue operations, ensure sufficient inventory to meet customer demand, and distribute such inventory across the United States. The Key Trade Vendors cannot be easily replaced or substituted by alternative vendors on similar terms, and certain of the Key Trade Vendors are located outside of the United States and may not fully understand the implications of chapter 11. Any interruption in the supply of such materials and services—however brief—would disrupt the Debtors' operations and could potentially cause irreparable harm to their business.

9. After a thorough analysis of their operations, supply chain, existing agreements with Key Trade Vendors, business relationships, and potential replacement options (if any) for the Key Trade Vendors, the Debtors believe that the harm to their estates from certain Key Trade Vendors declining to continue doing business with the Debtors is likely to outweigh the cost of payment (on negotiated terms) of certain Key Trade Claims.

10. The following table summarizes the estimated prepetition amounts outstanding of the Key Trade Claims that the Debtors request authorization to pay pursuant to this motion:

| Category | Description of Services Provided | Interim | Final[3] |
|---|---|---|---|
| Critical Vendors | Specialized suppliers of goods and services that are critical to maintain the Debtors' operations but that are not Foreign Vendors, Lien Claimants, or 503(b)(9) Claimants. | $2,202,000 | $2,128,000 |
| Foreign Vendors | Specialized foreign suppliers of goods and services that are critical to maintain the Debtors' operations but that are not Critical Vendors, Lien Claimants, or 503(b)(9) Claimants. | $1,500,000 | $1,020,000 |
| Lien Claimants | Suppliers of goods or services that may benefit from liens under applicable law. | $3,183,000 | $2,117,000 |
| § 503(b)(9) Claimants | Suppliers that provided goods to the Debtors that were received within 20 days before the Petition Date. | $5,100,000 | $2,750,000 |
| Total: | | $11,985,000 | $8,015,000 |

---

[3] The amounts the Debtors request authority to pay pursuant to the Final Order are in addition to the amounts the Debtors request authority to pay pursuant to the Interim Order.

32228147.2

11.     The Debtors believe the amounts listed above are necessary to pay to each category of Key Trade Vendor to ensure the Debtors' ordinary course operations continue.  However, in an exercise of their business judgment, the Debtors may decide that it is prudent to pay more or less to a specific category of Key Trade Vendor.  As such, the Debtors request authority to allocate the foregoing amounts in their discretion, in the reasonable exercise of their business judgment, in an aggregate amount not to exceed approximately $11,985,000 upon entry of the Interim Order and an additional approximately $8,015,000 upon entry of the Final Order.  For avoidance of doubt, the Debtors shall not exceed the aggregate totals identified in the foregoing sentence.

## II.     Critical Vendors.

12.     In the ordinary course of business, the Debtors engage a limited number of vendors for many of the critical products and services the Debtors depend upon to operate their businesses (the "Critical Vendors").  The Critical Vendors are irreplaceable because they provide specialized equipment, raw materials, and component pieces specific to the Debtors' products, processes, requirements, and infrastructure.  The Critical Vendors include, most significantly, suppliers of raw materials who do business with the Debtors on superior terms to what the Debtors would otherwise realize in the market.  The goods and services provided by the Critical Vendors are essential for the Debtors to operate in the ordinary course during the pendency of these chapter 11 cases and to maintain the going-concern value of the Debtors' business.  Failure to pay prepetition claims held by the Critical Vendors and accrued in the ordinary course of business (the "Critical Vendor Claims") could cause such Critical Vendors to refuse to provide the goods and services necessary for the Debtors' business operations.

### A. The Debtors' Process for Identifying Critical Vendors.

13. Prior to filing these chapter 11 cases, the Debtors, with the assistance of their advisors, reviewed their books and records, consulted operations management and purchasing personnel, reviewed contracts and supply agreements (where applicable), and analyzed relevant laws, regulations, and historical practices to identify a limited number of vendors and suppliers that are integral to the Debtors' go-forward operations. The loss of such vendors or suppliers would materially harm the Debtors' businesses, shrink their market share, reduce their enterprise value, and impair going concern viability.

14. Specifically, in identifying the Critical Vendors, the Debtors examined each of their vendor relationships with the following criteria in mind:

- whether an agreement exists by which the Debtors could compel a vendor to continue performing on prepetition terms;

- whether failure to pay a particular vendor could result in contraction of trade terms as a matter of applicable non-bankruptcy law or regulation;

- whether a vendor is a sole-source, limited-source, or high-volume supplier of goods or services critical to the Debtors' business operations;

- whether alternative vendors are available that can provide requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to continue operating while transitioning business thereto;

- whether certain specifications or contract requirements prevent, directly or indirectly, the Debtors from obtaining goods or services from alternative sources;

- the degree to which replacement costs (including pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition claim;

- the likelihood that a temporary break in the vendor's relationship with the Debtors could be remedied through use of the tools available in these chapter 11 cases; and

- whether failure to pay all or part of a particular vendor's claim could cause the vendor to hold goods owned by the Debtors, refuse to ship inventory, or refuse to provide critical services on a postpetition basis.

15. In addition to these factors, the Debtors and their advisors considered the health of each vendor relationship, each vendor's familiarity with the chapter 11 process, and the extent to which each vendor's prepetition claims could be satisfied elsewhere in the chapter 11 process.

16. In summary, the Debtors balanced preserving relationships with the vendors most important to maintaining ordinary course of business operations with limiting the expenditure of estate resources. The Debtors undertook a careful analysis to determine which vendors and suppliers are most vital to the Debtors' operations and thus properly deemed Critical Vendors. The Debtors will only make payments they determine are necessary and value-maximizing. Paying Critical Vendors benefits the Debtors' estates by limiting operational disruptions, bolstering the Debtors' most important vendor and supplier relationships at this critical juncture, and preserving the Debtors' supply chain and distribution networks during the chapter 11 cases.

17. Accordingly, the Debtors seek authority, in their discretion and business judgment, to make payments on account of Critical Vendor Claims in an aggregate amount of approximately $4,330,000, of which approximately $2,202,000 shall be available upon entry of the Interim Order and the remaining approximately $2,128,000 available upon entry of the Final Order, which amounts represent the Debtors' best estimate as to what aggregate amounts must be paid to the Critical Vendors to continue an uninterrupted supply of critical goods and services.

## III. Foreign Vendors.

18. As part of a multinational company, the Debtors' supply chain includes Key Trade Vendors that are foreign vendors (collectively, the "<u>Foreign Vendors</u>") that provide materials and

parts, including, for example, slack components for braking systems. These materials are sourced for their effectiveness and adherence to the Debtors' and their customers' standards and are just as critical to the Debtors' business as the goods and services supplied by the domestic Critical Vendors described above.

19.     Based on the reactions of foreign suppliers in other chapter 11 cases, the Debtors believe there is a material risk that the nonpayment of even a single invoice could cause a Foreign Vendor to stop shipping goods and supplies to the Debtors on a timely basis or completely sever its business relationship with the Debtors. Suppliers and vendors located in foreign countries are often unfamiliar with the chapter 11 process and react skeptically to its debtor protections. Short of severing their relations with the Debtors, nonpayment of prepetition amounts owed to Foreign Vendors (the "Foreign Vendor Claims") may also cause Foreign Vendors to take other harmful actions, including delaying shipments of goods. Timely shipment of inventory is critical to the Debtors' business, and the Debtors can ill afford any delays or interruptions of this nature. The Debtors have determined that continuing to receive goods and services from the Foreign Vendors is necessary to operate and restructure their business as a going concern and, ultimately, to maximize the value of their estates.

20.     In addition, prepetition, the Debtors entered into several parental guarantee agreements with certain vendors of the Debtors' wholly-owned non-Debtor subsidiaries in Europe and Asia (the "AWEA Subsidiaries"). Pursuant to these agreements, Debtor Accuride Corporation agreed to guarantee the obligations of the AWEA Subsidiaries to such vendors in exchange for such vendors offering favorable payment terms (the "Foreign Vendor Guarantees"). The Foreign Vendor Guarantees provide significant value to the AWEA Subsidiaries and the Debtors, and the

Debtors intend to continue honoring their obligations thereunder in the ordinary course of business.[4]

21.     The Debtors will only make payments they determine are necessary and value-maximizing.   Paying Foreign Vendors benefits the Debtors' estates by limiting operational disruptions, bolstering the Debtors' most important vendor and supplier relationships at this juncture, and preserving the Debtors' supply chain and distribution networks during the chapter 11 cases.

22.     Accordingly, the Debtors seek authority, in their discretion and business judgment, to make payments on account of Foreign Vendor Claims in an aggregate amount of approximately $2,520,000, of which approximately $1,500,000 shall be available upon entry of the Interim Order and the remaining approximately $1,020,000 available upon entry of the Final Order, which amounts represent the Debtors' best estimate as to what aggregate amounts must be paid to the Foreign Vendors to continue an uninterrupted supply of critical goods and services.

## IV.     Lien Claimants.

23.     As discussed above, the Debtors' business depends on the uninterrupted flow of raw materials and other goods through the Debtors' supply chain and distribution networks. Generally speaking, raw materials and other goods flow from the suppliers to the Debtors' manufacturing facilities, then to the Debtors' distribution centers, and ultimately to the Debtors' customers.   As a result, the Debtors depend significantly on the services of various freight

---

[4]     The Foreign Vendor Guarantees are described in more detail in the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Perform Intercompany Transactions, and (II) Granting Related Relief*, filed contemporaneously herewith.

forwarders, common carriers, shippers, and truckers, among other logistics providers (collectively, the "Shippers"). In the ordinary course of business, Shippers regularly have possession of the Debtors' raw material, inventory, and other goods.

24. The Debtors also from time to time use various independent contractors, repair companies, and maintenance companies to install, repair, and provide parts for specialized equipment and conduct repairs and improvements to the Debtors' plants and other property (collectively, the "Mechanics and Materialmen," and together with the Shippers, the "Lien Claimants"). The services of these Mechanics and Materialmen are also essential to the Debtors' operations, and the claims of such Mechanics and Materialmen could give rise to a lien against the Debtors' equipment, facilities, or construction projects.

25. Under certain non-bankruptcy laws, the Lien Claimants may be able to assert liens on the goods in their possession to secure payment of the charges or expenses incurred in connection with the shipping or storage of the Debtors' goods, maintenance or servicing of the Debtors' facilities or equipment, and other related charges (collectively, the "Lien Claims").[5] In the event the Lien Claims remain unpaid, certain Lien Claimants may attempt to assert such possessory liens and may refuse to deliver or release goods in their possession until their claims are satisfied and their liens redeemed. Other Lien Claimants may be able to assert liens against the Debtors' property for the costs of labor and materials incurred in completing maintenance, repairs, and similar services for the Debtors. The Lien Claimants' retention of the Debtors' raw

---

[5] For example, section 7-307 of the Uniform Commercial Code provides, in pertinent part, that "[a] carrier has a lien on the goods covered by a bill of lading or on the proceeds thereof in its possession for charges after the date of the carrier's receipt of the goods for storage or transportation, including demurrage and terminal charges, and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law." *See* U.C.C. § 7-307(a) (2003).

10

materials, goods, and other inventory would disrupt the Debtors' supply chain and impede the Debtors' ability to generate revenue and administer these chapter 11 cases. The cost of such disruption to the Debtors' estates would likely be greater than the applicable Lien Claims.

26. Further, pursuant to section 363(e) of the Bankruptcy Code, the Lien Claimants may be entitled to adequate protection of any valid possessory lien, which would drain estate assets. Accordingly, the Debtors seek authority to satisfy the Lien Claims, including any prepetition amounts that may be outstanding, in the ordinary course of business on a postpetition basis. The Debtors intend to pay prepetition Lien Claims only where they believe, in their business judgment, that the benefits to their estates from making such payments will exceed the costs, including the expenses and delay of contesting asserted liens, to their estates.

27. Accordingly, the Debtors seek authority, in their discretion and business judgment, to make payments on account of Lien Claims in an aggregate amount of approximately $5,300,000, of which approximately $3,183,000 shall be available upon entry of the Interim Order and the remaining approximately $2,117,000 available upon entry of the Final Order, which amounts represent the Debtors' best estimate as to what aggregate amounts must be paid to the Lien Claimants to continue an uninterrupted supply of critical goods and services.

**V.      503(b)(9) Claimants.**

28. The Debtors may have received certain raw materials and goods from various vendors (collectively, the "503(b)(9) Claimants") within the twenty-day period immediately preceding the Petition Date, thereby giving rise to claims that may be accorded administrative priority under section 503(b)(9) of the Bankruptcy Code (the "503(b)(9) Claims"). Many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term contracts.

Rather, the Debtors obtain inventory, goods, or other materials from such claimants on an order-by-order basis. As a result, a 503(b)(9) Claimant may refuse to supply new orders without payment of its 503(b)(9) Claims. Such refusal would negatively affect the Debtors' estates as the Debtors' business is dependent on the steady flow of raw materials to satisfy manufacturing obligations. The Debtors do not seek to accelerate or modify existing payment terms with respect to 503(b)(9) Claims. Rather, the Debtors propose to pay the applicable 503(b)(9) Claims as they come due in the ordinary course of business and consistent with past practice.

29.     Accordingly, the Debtors seek authority, in their discretion and business judgment, to make payments on account of the undisputed 503(b)(9) Claims as and when they come due, in an aggregate amount of approximately $7,850,000, of which approximately $5,100,000 shall be available upon entry of the Interim Order and the remaining approximately $2,750,000 available upon entry of the Final Order, which amounts represent the Debtors' best estimate as to what aggregate amounts must be paid in order for the 503(b)(9) Claimants to continue supplying new orders.

## VI.     Customary Trade Terms.

30.     Subject to the Court's approval, the Debtors intend to pay Key Trade Claims using the amounts requested in this motion only to the extent that Key Trade Vendors agree to supply goods or provide services, as applicable, on the terms that were in place during the twelve months prior to the Petition Date or are otherwise acceptable to the Debtors in light of customary industry practices, or on negotiated terms no less favorable to the Debtors than the foregoing (the "Customary Trade Terms"). The Debtors reserve the right to require, at their discretion, that

32228147.2

the Customary Trade Terms condition to payment of prepetition Key Trade Claims be made in writing.

31.     In addition, the Debtors request that if any party accepts payment pursuant to the relief requested by this motion and thereafter does not continue to provide goods or services on Customary Trade Terms, then:  (a) such payment may be deemed to be an improper postpetition transfer on account of a prepetition claim, and therefore, immediately recoverable by the Debtors in cash upon written request; (b) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment had not been made; and (c) if there exists an outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested by this motion to such outstanding postpetition balance and such supplier or vendor will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

**VII.    Payment of Outstanding Orders.**

32.     Prior to the Petition Date and in the ordinary course of business, the Debtors may have ordered goods that will not be delivered until after the Petition Date (collectively, the "Outstanding Orders").  Certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to Outstanding Orders unless they have comfort that such Outstanding Orders would be treated as administrative expenses of the Debtors' estates. To prevent any disruption to the Debtors' business operations, and given that goods delivered after the Petition Date are afforded administrative expense priority under section 503(b) of the Bankruptcy Code, the Debtors seek an order (a) confirming administrative expense priority under

section 503(b) of the Bankruptcy Code to all undisputed obligations of the Debtors arising from the acceptance of goods subject to Outstanding Orders, and (b) authorizing the Debtors to satisfy such obligations in the ordinary course of business and consistent with past practice.

## Basis for Relief

**I.  The Court Should Grant the Relief Requested in this Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code.**

33.     Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. *See, e.g.*, *In re Just for Feet, Inc.*, 242 B.R. 821, 825–26 (D. Del. 1999).  In so doing, these courts acknowledge that several legal theories rooted in sections 105(a) and 363(b) of the Bankruptcy Code support the payment of prepetition claims outside of a chapter 11 plan.

34.     Section 363(b) of the Bankruptcy Code permits a bankruptcy court, after notice and a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  "In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions."  *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) (collecting cases); *see also In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (authorizing the debtor's proposed transaction under section 363(b) because a "good business reason" justified the sale).

35.     Courts also authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code.  Section 105(a) of the Bankruptcy Code codifies a bankruptcy court's inherent equitable powers to "issue any order, process, or judgment that is

32228147.2

necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a), courts may authorize pre-plan payments of prepetition obligations when essential to the continued operation of a debtor's businesses. *See In re Just for Feet*, 242 B.R. at 825−26. Specifically, a court may use its power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity"). *See In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (stating that courts may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (noting that debtors may pay prepetition claims that are essential to the continued operation of the business).

36.     Allowing the Debtors to pay the Key Trade Claims is especially appropriate where, as here, doing so is consistent with the "two recognized policies" of chapter 11—preserving going-concern value and maximizing the value of property available to satisfy creditors. *See Bank of Am. Nat'l Trust Savs. Ass'n v. 203 N. LaSalle St. P'Ship.*, 526 U.S. 434, 453 (1999). Based on these circumstances, the Debtors submit that the relief requested herein represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is therefore justified under sections 105(a) and 363(b) of the Bankruptcy Code.

37.     The relief requested herein is appropriate and warranted under the circumstances. The authority to satisfy the Key Trade Claims in the initial days of these cases without disrupting the Debtors' operations will maintain the integrity of the Debtors' supply chain, facilitate the sale of the Debtors' products, and allow the Debtors to efficiently administer these chapter 11 cases.

32228147.2

Failure to pay the Key Trade Claims could potentially destroy value that would otherwise inure to the benefit of the Debtors' estates. Where, as here, debtors have shown that the payment of prepetition claims is critical to maximize the value of their estates, courts in this district have routinely authorized payments to vendors. *See, e.g.*, *In re SunPower Corp.*, No. 24-11649 (CTG) (Bankr. D. Del. Aug. 28, 2024) (authorizing the debtors to pay certain prepetition and postpetition trade claims); *In re Vyaire Med., Inc.,* No. 24-11217 (BLS) (Bankr. D. Del. July 9, 2024) (same); *In re Express, Inc.*, No. 24-10831 (KBO); (Bankr. D. Del. May 14, 2024) (same); *In re Sientra, Inc.*, Case No. 24-10245 (JTD) (Bankr. D. Del. Mar. 11, 2024) (same); *In re MVK FarmCo LLC*, No. 23-11721 (LSS) (Bankr. D. Del. Nov. 13, 2023) (same).[6]

## II. The Court Should Authorize the Payment of the Critical Vendor Claims and the Foreign Vendor Claims.

38. As described above, the Debtors require a steady stream of goods and services from their Critical Vendors to maintain operational stability as the Debtors transition into chapter 11. Without the goods and services provided by the Critical Vendors, the Debtors would be forced to cease or substantially curtail operations enterprise wide while they searched for substitute vendors and service providers, which could cause the Debtors to forego existing favorable trade terms.

39. Recognizing that payment of prepetition claims of certain essential suppliers and vendors is critical to a debtor's ability to continue operating, thus preserving value and maximizing creditor recovery, courts in this district regularly grant relief consistent with that which the Debtors are seeking in this motion. *See, e.g.*, *In re SunPower Corp.*, No. 24-11649 (CTG) (Bankr. D. Del. Aug. 28, 2024) (authorizing the debtors to pay critical vendor claims on a final basis); *In re Vyaire*

---

[6]   Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

*Med., Inc.*, No. 24-11217 (BLS) (Bankr. D. Del. July 9, 2024) (same); *In re Express*, Inc., No. 24-10831 (KBO) (Bankr. D. Del. May 14, 2024) (same); *In re Sientra, Inc.*, No. 24-10245 (JTD) (Bankr. D. Del. Mar. 11, 2024) (same); *In re MVK FarmCo LLC*, No. 23-11721 (LSS) (Bankr. D. Del. Nov. 13, 2023) (same).

40. Additionally, Foreign Vendors may refuse to do business with the Debtors unless and until they receive payment on account of their prepetition claims. The Foreign Vendors may take other actions against the Debtors based on the incorrect belief that they are not bound by the automatic stay. As a result, the Debtors would be unable to procure related products and services, potentially causing the Debtors to fail or delay providing products to their customers. Courts in this jurisdiction routinely grant authorization for debtors to pay claims owing to foreign entities against which the automatic stay cannot be enforced readily in the United States and as to which it would be unduly time-consuming and expensive to seek enforcement of an order of the bankruptcy court in the creditor's home country. *See, e.g.*, *In re Vyaire Medical, Inc.*, No. 24-11217 (BLS) (Bankr. D. Del. July 9, 2024) (authorizing payment of certain prepetition foreign vendor claims); *In re Yellow Corp*, No. 23-11069 (CTG) (Bankr. D. Del. Sept. 13, 2023) (same); *In re SiO2 Med. Prods., Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. Mar. 30, 2023) (same); *In re Alex and Ani, LLC*, No. 21-10918 (CTG) (Bankr. D. Del. July 14, 2021) (same); *In re Extraction Oil and Gas, Inc.*, No. 20-11548 (CSS) (Bankr. D. Del. July 13, 2020) (same).[7]

41. Any disruption to the Debtors' business operations could result in a significant loss of operational efficiency, decreasing the value of the Debtors' businesses, which would impair

---

[7] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

stakeholder value at this critical juncture in these chapter 11 cases. The resulting harm to the Debtors' estates far outweighs the cost associated with paying a portion of the Debtors' prepetition obligations to the Critical Vendors and Foreign Vendors. The Debtors' other creditors will be no worse off if the Debtors are empowered to negotiate such payments to achieve a smooth transition into bankruptcy with minimal disruption to their operations. The relief sought in this motion will help the Debtors preserve and maximize the value of their estates, and it is appropriate for the Court to authorize the Debtors to satisfy the Critical Vendor Claims and Foreign Vendor Claims as set forth herein.

### III.    The Court Should Authorize the Payment of Lien Claims.

42.    As noted above, certain Lien Claimants may be entitled under applicable non-bankruptcy law to assert possessory or other statutorily-arising liens on the Debtors' goods, equipment, or other property (notwithstanding the automatic stay under section 362 of the Bankruptcy Code) in an attempt to secure payment of their prepetition claim. Under section 362(b)(3) of the Bankruptcy Code, the act of perfecting such liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay.[8] As a result, the Debtors anticipate that certain of the Lien Claimants may assert or perfect liens, simply refuse to turn over goods in their possession, or stop performing their ongoing obligations. Even absent a valid lien, to the extent certain Lien Claimants have possession of the Debtors' inventory, equipment, or products, mere possession or retention would disrupt the Debtors' operations.

---

[8]    *See* 11 U.S.C. § 546(b)(1)(A) (providing that a debtor's lien avoidance powers "are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection").

43.    Furthermore, paying the Lien Claims should not impair unsecured creditor recoveries in these chapter 11 cases.  In instances where the amount owed to a Lien Claimant is less than the value of the goods that could be held to secure a Lien Claim, such parties may be fully-secured creditors of the Debtors' estates.  In such instances, payment simply provides such parties with what they might be entitled to receive under a plan of reorganization, only without any interest costs that might otherwise accrue during these chapter 11 cases.

44.    For these reasons, courts in this jurisdiction have authorized the payment of prepetition lien claims under similar circumstances in recent chapter 11 cases.  *See*, *e.g.*, *In re SunPower Corp.*, No. 24-11649 (CTG) (Bankr. D. Del. Aug. 28, 2024) (authorizing payment of certain lienholder claims); *In re Vyaire Med., Inc.*, No. 24-11217 (BLS) (Bankr. D. Del. July 9, 2024) (same); *In re Express, Inc.*, No. 24-10831 (KBO) (Bankr. D. Del. May 14, 2024) (same); *In re MVK FarmCo LLC*, No. 23-11721 (LSS) (Bankr. D. Del. Nov. 13, 2023) (same); *In re Yellow Corp.*, No. 23-11069 (CTG) (Bankr. D. Del. Sept. 13, 2023).

## IV.    The Court Should Authorize the Payment of 503(b)(9) Claims.

45.    Section 503(b)(9) provides administrative priority for the "value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which goods have been sold to the debtor in the ordinary course of such debtor's business." These 503(b)(9) Claims must be paid in full for the Debtors to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(A).  Consequently, payment of such claims now only provides such parties with what they would be entitled to receive under a chapter 11 plan.  Moreover, the timing of such payments also lies squarely within the Court's discretion.  *See In re Global Home Prods., LLC*, No. 06-10340 (KG), 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006) (agreeing with

parties that "the timing of the payment of that administrative expense claim is left to the discretion of the Court"). The Debtors' ongoing ability to obtain inventory and other goods as provided herein is key to their survival and necessary to preserve the value of their estates. Absent payment of the 503(b)(9) Claims at the outset of these chapter 11 cases—which merely accelerates the timing of payment and not the ultimate treatment of such claims—the Debtors could be denied access to the inventory and other goods necessary to maintain the Debtors' business operations and maximize the value of the Debtors' estates.

46. For these reasons, courts in this district have regularly authorized the payment of claims arising under section 503(b)(9) of the Bankruptcy Code in the ordinary course of business. *See*, *e.g.*, *In re SunPower Corp.*, No. 24-11649 (CTG) (Bankr. D. Del. Aug. 28, 2024) (authorizing payment to parties with section 503(b)(9) claims); *In re Vyaire Med., Inc.*, No. 24-11217 (BLS) (Bankr. D. Del. July 9, 2024) (same); *In re Express, Inc.*, No. 24-10831 (KBO) (Bankr. D. Del. May 14, 2024) (same); *In re MVK FarmCo LLC*, No. 23-11721 (LSS) (Bankr. D. Del. Nov. 13, 2023) (same); *In re Yellow Corp.*, No. 23-11069 (CTG) (Bankr. D. Del. Sept. 13, 2023).

## V. The Court Should Confirm that Outstanding Orders Are Administrative Expense Priority Claims and that Payment of Such Claims Is Authorized.

47. Pursuant to section 503(b)(1) of the Bankruptcy Code, obligations that arise in connection with the postpetition delivery of goods and services, including goods ordered prepetition, are administrative expense priority claims because they benefit the estate postpetition. *See* 11 U.S.C. § 503(b)(1)(A) (providing that the "actual [and] necessary costs and expenses of preserving the estate" are administrative expenses); *see also In re Bluestem Brands, Inc.*, No. 20-10566 (MFW), 2021 WL 3174911, at *6 (Bankr. D. Del. July 27, 2021) (holding that goods ordered prepetition but delivered postpetition are entitled to administrative priority); *In re John*

*Clay & Co.*, 43 B.R. 797, 809–10 (Bankr. D. Utah 1984) (same). Thus, the granting of the relief sought herein with respect to the Outstanding Orders will not afford such claimants any greater priority than they otherwise would have if the relief requested herein were not granted and will not prejudice any other party in interest.

48.     Absent such relief, however, the Debtors may be required to expend substantial time and effort reissuing the Outstanding Orders to provide certain suppliers with assurance of such administrative priority status. The attendant disruption to the continuous and timely flow of critical raw materials and other goods to the Debtors would force the Debtors to potentially halt operations and production, damage the Debtors' business reputation, erode the Debtors' customer base, and ultimately lead to a loss of revenue, all to the detriment of the Debtors and their creditors. Accordingly, the Debtors submit that the Court should confirm the administrative expense priority status of the Outstanding Orders and should authorize the Debtors to pay the Outstanding Orders in the ordinary course of business and consistent with past practice.

**Processing of Checks and Electronic Fund Transfers Should Be Authorized**

49.     The Debtors have sufficient funds to pay the amounts described in this motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to any authorized payment in respect of the relief requested herein. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Therefore, the Debtors respectfully request that the Court authorize all

applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this motion.

## The Requirements of Bankruptcy Rule 6003 Are Satisfied

50.     Bankruptcy Rule 6003 empowers a court to grant certain relief within the first twenty-one days after the petition date only "to the extent that relief is necessary to avoid immediate and irreparable harm."  For the reasons discussed above, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations, and the failure to receive the requested relief during the first twenty-one days of these chapter 11 cases would severely disrupt the Debtors' operations at this important juncture.  The requested relief is necessary for the Debtors to operate their businesses in the ordinary course, preserve the ongoing value of their operations, and maximize the value of their estates for the benefit of all stakeholders. The Debtors have demonstrated that the requested relief is "necessary to avoid immediate and irreparable harm," as contemplated by Bankruptcy Rule 6003, and the Court should grant the requested relief.

## Waiver of Bankruptcy Rules 6004(a) and 6004(h)

51.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h) for the reasons set forth herein.

## Reservation of Rights

52.     Nothing contained in this motion or any order granting the relief requested in this motion, and no action taken pursuant to the relief requested or granted (including any payment made in accordance with any such order), is intended as or shall be construed or deemed to be:

(a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this motion or any order granting the relief requested by this motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver or limitation of any claims, causes of action or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## **Notice**

53. The Debtors will provide notice of this motion to the following parties or their respective counsel: (a) the U.S. Trustee for the District of Delaware; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the Ad Hoc Group of Term Loan Lenders; (d) counsel to the Prepetition ABL Agent; (e) the office of the attorney general for each of the states in which the Debtors operate; (f) the United States Attorney's Office for the District of Delaware; (g) the Internal Revenue Service; (h) the United States Securities and Exchange Commission; and (i) any party that has requested notice pursuant to

Bankruptcy Rule 2002.  As this motion is seeking "first day" relief, within two business days of the hearing on this motion, the Debtors will serve copies of this motion and any order entered in respect to this motion as required by Local Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of page intentionally left blank*]

32228147.2

WHEREFORE, the Debtors respectfully request entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, granting the relief requested herein and such other relief as is just and proper.

Dated: October 10, 2024
Wilmington, Delaware

/s/ Joseph Barry
_____
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Joseph Barry (Del. Bar No. 4221)
Kenneth J. Enos (Del. Bar No. 4544)
Jared W. Kochenash (Del. Bar. No. 6557)
Andrew A. Mark (Del. Bar No. 6861)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:       (302) 571-6600
Facsimile:       (302) 571-1253
Email:           jbarry@ycst.com
                 kenos@ycst.com
                 jkochenash@ycst.com
                 amark@ycst.com

*Proposed Co-Counsel for the Debtors
and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Ryan Blaine Bennett, P.C. (*pro hac vice* pending)
Alexander D. McCammon (*pro hac vice* pending)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:       (312) 862-2000
Facsimile:       (312) 862-2200
Email:           ryan.bennett@kirkland.com
                 alex.mccammon@kirkland.com

-and-

Derek I. Hunter (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900
Email:           derek.hunter@kirkland.com

*Proposed Co-Counsel for the Debtors
and Debtors in Possession*

**<u>Exhibit A</u>**

**Proposed Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| ACCURIDE CORPORATION, *et al.*,[1] | ) Case No. 24-12289 (___) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |
|  | ) **Re: Docket No. _** |

## INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO PAY CERTAIN PREPETITION CLAIMS OF (A) CRITICAL VENDORS, (B) FOREIGN VENDORS, (C) LIEN CLAIMANTS, AND (D) 503(B)(9) CLAIMANTS, (II) CONFIRMING ADMINISTRATIVE EXPENSE PRIORITY OF OUTSTANDING ORDERS, AND (III) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an interim order (this "Interim Order") (a) authorizing the Debtors to pay certain prepetition Key Trade Claims, (b) confirming the administrative expense priority status of Outstanding Orders, (c) scheduling a final hearing to consider approval of the Motion on a final basis, and (d) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this Court may enter a final order consistent with Article III of the United States Constitution; and this

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Accuride Corporation (9077); Accuride Group Holdings, Inc. (4531); Accuride Intermediate Co., Inc. (9045); Accuride Distributing, LLC (3124); Accuride EMI, LLC (0389); Accuride Erie L.P. (4862); Accuride Henderson Limited Liability Company (8596); AKW General Partner, L.L.C. (4861); AOT, LLC (3088); Armor Parent Corp. (6684); Bostrom Holdings, Inc. (9282); Bostrom Seating, Inc. (7179); Gunite Corporation (9803); KIC LLC (6356); Transportation Technologies Industries, Inc. (2791); and Truck Components, Inc. (5407). The location of the Debtors' service address is: 38777 Six Mile Road, Suite 410, Livonia, MI 48152.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted on an interim basis as set forth in this Interim Order.

2.      The final hearing (the "Final Hearing") on the Motion shall be held on _____, 2024, at__:__ _.m., prevailing Eastern Time.  Any objections or responses to entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time, on _____, 2024 and shall be served on: (a) the Debtors, Accuride Corporation, 38777 Six Mile Road, Suite 410, Livonia, MI 48152; (b) proposed co-counsel to the Debtors, (i) Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654, Attn:  Ryan Blaine Bennett P.C. (ryan.bennett@kirkland.com), Alexander D. McCammon (alex.mccammon@kirkland.com), and Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn:  Derek I. Hunter (derek.hunter@kirkland.com) and (ii) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn:  Joseph Barry (jbarry@ycst.com) and Kenneth J. Enos (kenos@ycst.com); (c) co-counsel to the Ad Hoc Group of Term Loan Lenders (i) Weil Gotshal & Manges LLP, 767 5th Ave, New York, New York 10153 Attn: Matt

Barr (matt.barr@weil.com), David Griffiths (david.griffiths@weil.com), and F. Gavin Andrews (f.gavin.andrews@weil.com) and (ii) Richards, Layton & Finger, P.A., 920 N. King Street, Wilmington, Delaware 19801 Attn: Zachary I. Shapiro (shapiro@rlf.com); (d) co-counsel to the Prepetition ABL Agent (i) Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017, Attn: Eli J. Vonnegut (eli.vonnegut@davispolk.com) and Stephanie Massman (stephanie.massman@davispolk.com) and (ii) Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 16th Floor, P.O. Box 1347, Wilmington, DE 19899, Attn: Robert J. Dehney, Sr. (RDehney@morrisnichols.com) and Tamara K. Mann (tmann@morrisnnichols.com); (e) Office of The United States Trustee, 844 King Street, Suite 2207, LockBox 35, Wilmington, Delaware 19801, Attn:  Jonathan W. Lipshie (Jon.Lipshie@usdoj.gov); and (f) any statutory committee appointed in these chapter 11 cases.  In the event no objections to entry of a final order on the Motion are timely received, this Court may enter such final order without need for the Final Hearing.

3.      The Debtors are authorized, in the reasonable exercise of their business judgment, in consultation with the Ad Hoc Group of Term Loan Lenders and the Prepetition ABL Agent, to honor, pay, or otherwise satisfy, on a case-by-case basis, all or part of the Key Trade Claims; *provided*, *however*, that such amounts shall not exceed $11,985,000 in the aggregate, pending entry of the Final Order.

4.      The Debtors are authorized, but not directed, in consultation with the Ad Hoc Group of Term Loan Lenders and the Prepetition ABL Agent, to pay all undisputed amounts related to the Outstanding Orders in the ordinary course of business consistent with the parties' past practices in effect prior to the Petition Date.

5.     All undisputed obligations related to the Outstanding Orders are granted administrative expense priority status in accordance with section 503(b)(1)(A) of the Bankruptcy Code; *provided*, that the Debtors may terminate any Outstanding Orders prior to delivery and such canceled Outstanding Orders shall not be afforded administrative priority.

6.     The Debtors are authorized, but not directed, in consultation with the Ad Hoc Group of Term Loan Lenders and the Prepetition ABL Agent, to condition payment of the Key Trade Claims upon the holder of such Key Trade Claim agreeing to Customary Trade Terms and if any such holder accepts payment hereunder and does not continue supplying goods or services to the Debtors in accordance with Customary Trade Terms, then subject to the entry of a final order on the Motion from this Court:  (a) any payment on account of a prepetition claim received by such party shall be deemed, in the Debtors' discretion, an improper postpetition transfer and, therefore, immediately recoverable by the Debtors in cash upon written request by the Debtors; (b) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment had not been made; and (c) if there exists an outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested by the Motion to such outstanding postpetition balance and such supplier or vendor will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.  Notwithstanding anything to the contrary herein or in the Motion, a Key Trade Vendor's agreement to the Customary Trade Terms does not affect the priority of any Key Trade Claim that remains at the end of these chapter 11 cases, including that of claims arising under section 503(b)(9) of the Bankruptcy Code.

7. The Debtors reserve the right to require, at their discretion, that the Customary Trade Terms condition to payment be made in writing. The Debtors further reserve the right, in consultation with the Ad Hoc Group of Term Loan Lenders and the Prepetition ABL Agent, to require additional favorable trade terms with any Key Trade Vendor as a condition to payment of any Key Trade Claim; *provided* that the Debtors' failure to request such an acknowledgement shall not be, and shall not be deemed to be, a waiver of the Debtors' rights hereunder.

8. Any party that accepts payment from the Debtors on account of all or a portion of any Key Trade Claim pursuant to this Interim Order shall be deemed to (a) agree to the terms and provisions of this Interim Order, and (b) have waived, to the extent so paid, any and all prepetition claims, of any type, kind, or priority (including any reclamation claim), against the Debtors, their assets, and properties. Notwithstanding anything to the contrary herein, prior to making any payment pursuant to this Interim Order, the Debtors shall provide such Key Trade Vendor with a copy of this Interim Order (unless previously provided to such Key Trade Vendor).

9. Nothing herein shall impair or prejudice the Debtors' ability to contest, in their discretion, the extent, perfection, priority, validity, or amounts of any claims held by any holder of a Key Trade Claim. The Debtors do not concede that any claims satisfied pursuant to this Interim Order are valid, and the Debtors expressly reserve all rights to contest the extent, validity, or perfection or seek the avoidance of all such liens or the priority of such Key Trade Claims.

10. The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors'

designation of any particular check or electronic payment request as approved by this Interim Order.

11.     Nothing contained in the Motion or this Interim Order, and no action taken pursuant to the relief requested or granted (including any payment made in accordance with this Interim Order), is intended as or shall be construed or deemed to be: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in the Motion or this Interim Order; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver or limitation of any claims, causes of action or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law.

12.     The Debtors are authorized, but not directed, to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with the relief granted herein.

13.     Nothing in this Interim Order authorizes the Debtors to pay the claims of "insiders" (as that term is defined in Section 101(31) of the Bankruptcy Code), employees, attorneys/law firms, or "professional persons" (as that phrase appears in Section 327(a) of the Bankruptcy Code).

14.     Notwithstanding anything to the contrary herein, any payment made or to be made under this Interim Order shall not impair the Prepetition ABL Agent's rights under the order of the Court approving the use of cash collateral in these chapter 11 cases.

15.     Notwithstanding the relief granted in this Interim Order, any payment made or to be made by the Debtors pursuant to the authority granted herein shall be subject to the DIP Documents, and in accordance with, the DIP Order.[3]  Nothing herein is intended to modify, alter, or waive, in any way, any terms, provisions, requirements, or restrictions of the DIP Documents or the DIP Order.  To the extent there is any inconsistency between the terms of the DIP Order or the DIP Documents and the terms of this Interim Order or any actions taken or proposed to be taken hereunder, the terms of the DIP Order or the DIP Documents, as applicable, shall control.

16.     The Debtors have demonstrated that the requested relief is "necessary to avoid immediate and irreparable harm," as contemplated by Bankruptcy Rule 6003.

17.     Nothing in this Interim Order authorizes any party to accelerate any payments not otherwise due.

18.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

19.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

---

[3]     "DIP Order" refers to that interim or final order, as applicable, approving the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Senior Secured Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. [●]].

20.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order in accordance with the Motion.

21.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order.

**Exhibit B**

**Proposed Final Order**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| ACCURIDE CORPORATION, *et al.*,[1] | ) Case No. 24-12289 (___) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |
|  | ) **Re: Docket Nos. _ & _** |

**FINAL ORDER (I) AUTHORIZING THE
DEBTORS TO PAY CERTAIN PREPETITION CLAIMS OF
(A) CRITICAL VENDORS, (B) FOREIGN VENDORS, (C) LIEN CLAIMANTS,
AND (D) 503(B)(9) CLAIMANTS, (II) CONFIRMING ADMINISTRATIVE EXPENSE
PRIORITY OF OUTSTANDING ORDERS, AND (III) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession

(collectively, the "Debtors") for entry of an final order (this "Final Order") (a) authorizing the

Debtors to pay prepetition Key Trade Claims, (b) confirming the administrative expense priority

status of Outstanding Orders, and (c) granting related relief, all as more fully set forth in the

Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter

pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States

District Court for the District of Delaware, dated February 29, 2012; and this Court having found

that this Court may enter a final order consistent with Article III of the United States Constitution;

and this Court having found that venue of this proceeding and the Motion in this district is proper

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Accuride Corporation (9077); Accuride Group Holdings, Inc. (4531); Accuride Intermediate Co., Inc. (9045); Accuride Distributing, LLC (3124); Accuride EMI, LLC (0389); Accuride Erie L.P. (4862); Accuride Henderson Limited Liability Company (8596); AKW General Partner, L.L.C. (4861); AOT, LLC (3088); Armor Parent Corp. (6684); Bostrom Holdings, Inc. (9282); Bostrom Seating, Inc. (7179); Gunite Corporation (9803); KIC LLC (6356); Transportation Technologies Industries, Inc. (2791); and Truck Components, Inc. (5407). The location of the Debtors' service address is: 38777 Six Mile Road, Suite 410, Livonia, MI 48152.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing, if any, before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1. The Motion is granted on a final basis as set forth in this Final Order.

2. The Debtors hereby are authorized, in the reasonable exercise of their business judgment, in consultation with the Ad Hoc Group of Term Loan Lenders and the Prepetition ABL Agent, to honor, pay, or otherwise satisfy, on a case-by-case basis, all or part of the Key Trade Claims; *provided* that such payments shall not exceed $20,000,000 in the aggregate absent further order of the Court.

3. The Debtors are authorized, but not directed, in consultation with the Ad Hoc Group of Term Loan Lenders and the Prepetition ABL Agent, to pay all undisputed amounts related to the Outstanding Orders in the ordinary course of business consistent with the parties' past practices in effect prior to the Petition Date.

4. All undisputed obligations related to the Outstanding Orders are granted administrative expense priority status in accordance with section 503(b)(1)(A) of the Bankruptcy Code; *provided*, that the Debtors may terminate any Outstanding Orders prior to delivery and such canceled Outstanding Orders shall not be afforded administrative priority.

5.     The Debtors are authorized, in consultation with the Ad Hoc Group of Term Loan Lenders and the Prepetition ABL Agent, to condition payment of the Key Trade Claims upon the holder of such Key Trade Claim agreeing to Customary Trade Terms and if any such holder accepts payment hereunder and does not continue supplying goods or services to the Debtors in accordance with Customary Trade Terms, then:  (a) any payment on account of a prepetition claim received by such party shall be deemed, in the Debtors' discretion, an improper postpetition transfer and, therefore, immediately recoverable by the Debtors in cash upon written request by the Debtors; (b) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment had not been made; and (c) if there exists an outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested by the Motion to such outstanding postpetition balance and such supplier or vendor will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.  Notwithstanding anything to the contrary herein or in the Motion, a Key Trade Vendor's agreement to the Customary Trade Terms does not affect the priority of any Key Trade Claim that remains at the end of these chapter 11 cases, including that of claims arising under section 503(b)(9) of the Bankruptcy Code.

6.     The Debtors reserve the right to require, at their discretion, that the Customary Trade Terms condition to payment be made in writing.  The Debtors further reserve the right, in consultation with the Ad Hoc Group of Term Loan Lenders and the Prepetition ABL Agent, to require additional favorable trade terms with any Key Trade Vendor as a condition to payment of any Key Trade Claim; *provided* that the Debtors' failure to request such an acknowledgement shall not be, and shall not be deemed to be, a waiver of the Debtors' right hereunder.

7.     Any party that accepts payment from the Debtors on account of all or a portion of any Key Trade Claim pursuant to this Final Order shall be deemed to (a) agree to the terms and provisions of this Final Order and (b) have waived, to the extent so paid, any and all prepetition claims, of any type, kind, or priority (including any reclamation claim), against the Debtors, their assets, and properties.  Notwithstanding anything to the contrary herein, prior to making any payment pursuant to this Final Order, the Debtors shall provide such Key Trade Vendor with a copy of this Final Order (unless previously provided to such Key Trade Vendor).

8.     Nothing herein shall impair or prejudice the Debtors' ability to contest, in their discretion, the extent, perfection, priority, validity, or amounts of any claims held by any holder of a Key Trade Claim.  The Debtors do not concede that any claims satisfied pursuant to this Final Order are valid, and the Debtors expressly reserve all rights to contest the extent, priority, validity, or perfection or seek the avoidance of all such liens or the priority of such claims.

9.     The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Final Order.

10.    Nothing contained in the Motion or this Final Order, and no action taken pursuant to the relief requested or granted (including any payment made in accordance with this Final Order), is intended as or shall be construed or deemed to be:  (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an

implication, admission or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in the Motion or this Final Order; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver or limitation of any claims, causes of action or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law.

11. The Debtors are authorized, but not directed, to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with the relief granted herein.

22. Notwithstanding anything to the contrary herein, any payment made or to be made under this Final Order shall not impair the Prepetition ABL Agent's rights under the order of the Court approving the use of cash collateral in these chapter 11 cases.

12. Nothing in this Final Order authorizes any party to accelerate any payments not otherwise due.

13. Notwithstanding the relief granted in this Final Order, any payment made or to be made by the Debtors pursuant to the authority granted herein shall be subject to the DIP Documents, and in accordance with, the DIP Order.[3] Nothing herein is intended to modify, alter,

---

[3] "DIP Order" refers to that interim or final order, as applicable, approving the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Senior Secured Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. [●]].

or waive, in any way, any terms, provisions, requirements, or restrictions of the DIP Documents or the DIP Order. To the extent there is any inconsistency between the terms of the DIP Order or the Debt Documents and the terms of this Final Order or any actions taken or proposed to be taken hereunder, the terms of the DIP Order or the DIP Documents, as applicable, shall control.

14. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

15. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order are immediately effective and enforceable upon its entry.

16. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.

17. This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order.