## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ACCURIDE CORPORATION, *et al.*,[1] | ) | Case No. 24-12289 (___) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

## DECLARATION OF CHARLES MOORE,
## CHIEF RESTRUCTURING OFFICER OF ACCURIDE CORPORATION,
## IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Charles Moore, hereby declare under penalty of perjury:

1.     I am the Chief Restructuring Officer of Accuride Group Holdings, Inc., its 100%-owned subsidiary Armor Parent Corp., and its 100%-owned subsidiary Accuride Corporation (collectively and together with their affiliated debtors and debtors in possession, the "Debtors," and together with their direct and indirect non-debtor subsidiaries, "Accuride").

2.     I provide this declaration to assist the Court and the parties in understanding the circumstances that compelled the commencement of these chapter 11 cases, to explain the path forward for the business and its stakeholders, and to support the Debtors' chapter 11 petitions and near-term relief we are seeking.

### Background and Qualifications

3.     I have served as the Chief Restructuring Officer of Accuride since June 26, 2024. I have thirty years of experience providing turnaround consulting and advisory services to

---

1     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Accuride Corporation (9077); Accuride Group Holdings, Inc. (4531); Accuride Intermediate Co., Inc. (9045); Accuride Distributing, LLC (3124); Accuride EMI, LLC (0389); Accuride Erie L.P. (4862); Accuride Henderson Limited Liability Company (8596); AKW General Partner, L.L.C. (4861); AOT, LLC (3088); Armor Parent Corp. (6684); Bostrom Holdings, Inc. (9282); Bostrom Seating, Inc. (7179); Gunite Corporation (9803); KIC LLC (6356); Transportation Technologies Industries, Inc. (2791); and Truck Components, Inc. (5407).  The location of the Debtors' service address is:  7140 Office Circle, Evansville, IN 47715.

organizations in a variety of industries, including as Managing Director at Alvarez & Marsal, the Debtors' proposed financial advisor.  I received my bachelor's degree and MBA from Michigan State University.  I am a Certified Public Accountant, a Certified Turnaround Professional, and am certified in Financial Forensics.  Prior to joining A&M, I was a Senior Managing Director at Conway MacKenzie, Inc., served as Chief Financial Officer for Horizon Technology Group (an automotive supplier), and began my career in the Management Solutions & Services group at Deloitte & Touche LLP.

4.      I have substantial experience serving either in senior management positions or as a restructuring advisor in large organizations and in assisting companies with stabilizing their financial condition, analyzing their operations, and developing a business plan to accomplish restructuring objectives.  I am recognized for my work in the automotive industry and have advised more than seventy-five companies in the industry across all parts segments.  I regularly advise Tier I and Tier II automotive suppliers, along with secured lenders and equity investors, on matters such as liquidity management, cost reductions, mergers & acquisitions, negotiations with customers and unions, and strategic planning.  I have served as Chief Restructuring Officer, for, among others, FirstEnergy Solutions, The Budd Company, Cynergy Data, Inc. and National Real Estate Information Services, Inc.   Additionally, I served as Chief Restructuring Advisor to Greektown Holdings, LLC and Greektown Casino, LLC during their chapter 11 proceeding and as Lead Operational Restructuring Advisor to the City of Detroit during its chapter 9 proceeding.

5.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Delaware (the "Court").  To minimize the adverse effects on their business, the Debtors have filed certain

motions and pleadings seeking various types of "first day" relief (the "<u>First Day Motions</u>"), which will allow the Debtors to meet necessary obligations and fulfill their duties as debtors in possession.

6.      As Chief Restructuring Officer, I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  I submit this declaration to assist the Court and the parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and the First Day Motions filed contemporaneously herewith.

7.      Except as otherwise indicated, all facts set forth in this declaration are based upon my experience and personal knowledge, my discussions with other members of the Debtors' management team and advisors, and my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives.  I am over the age of 18 and am authorized to submit this declaration on behalf of the Debtors.  If called as a witness, I would testify as follows.

### <u>Introduction</u>

8.      Accuride is among the largest and most diversified manufacturers and suppliers of wheels and wheel end components in the world.  Every day, millions of drivers rely on Accuride's wheels to get them and the goods they transport to their destination.  Through popular brands such as Accuride, Gunite, and KIC, Accuride supplies high-quality wheels to a global customer base that requires durable wheels and wheel end components.  By successfully meeting this need, Accuride has been able to distinguish itself as a leader in the highly competitive automotive parts market.

32228560.1

9.      Over the past several months, the Debtors have pursued various alternatives to address near-term liquidity and operational difficulties and file these chapter 11 cases with the support of the term loan lenders, ABL lenders, and equity sponsors.  Critically, the Debtors secured commitments from an *ad hoc* group of the Debtors' first lien term loan lenders (the "Ad Hoc Group") to provide a a $103 million senior secured superpriority term loan facility and negotiated consensual access to cash collateral with the Ad Hoc Group and the prepetition ABL lenders.  The Debtors also have agreed with the Ad Hoc Group on the framework, memorialized in the restructuring term sheet attached hereto as **Exhibit A**, for a consensual restructuring of the Debtors' indebtedness on a quick and value-maximizing timeline.  Specifically, the Debtors anticipate implementing a deleveraging restructuring transaction via an equitization of their prepetition term loan obligations and raising incremental exit financing from the Ad Hoc Group to fund the go-forward business upon emergence.  The Debtors anticipate pursuing confirmation and consummation of such a deleveraging restructuring transaction through a plan of reorganization before the end of the year.  To keep with this timeline, the Debtors expect to file a plan and disclosure statement with the support of the lenders in the first 25 days of the case.

10.     The Debtors comprise the domestic operations of Accuride, a global leader in wheels and wheel end products, especially in the medium- to heavy-duty commercial truck and trailer markets.  Accuride produces more than twenty million wheels per year globally and constitutes approximately 40% of the North American steel and aluminum wheel market for commercial vehicles.  Founded in 1986 through a carve-out acquisition from Firestone Tire & Rubber Company, Accuride's strong business performance is driven by the high quality of its products and loyalty of its customers.  The Debtors intend to use this process to right-size their

balance sheet and emerge from chapter 11 with renewed focus on the commercial vehicle wheels market.

11.     A restructuring is necessary for several reasons.  The Debtors have faced significant headwinds from the lingering effects of the COVID-19 pandemic on the Debtors' business, operational difficulties, business integration challenges, inflation, supply chain disruption, and other geopolitical and macroeconomic forces that depressed revenue and increased costs.  The COVID-19 pandemic left the Debtors reeling, with the sudden seizure of commercial transportation (other than essential goods and services) driving softness in the commercial vehicle market compounded by long-term elevation in labor and materials costs.  During and after the pandemic, operational and business integration challenges at certain non-Debtor affiliates required capital support from the Debtors.

12.     Then, as inflation swelled beginning in 2021, the Federal Reserve reacted by raising interest rates to the highest level seen in decades.  This sea change in the global macroeconomic environment contributed to a major decrease in demand for imports and finished manufactured goods; this caused a resulting depression in the freight industry and knock-on effects on freight vehicle manufacturing, which comprises an irreplaceable portion of the Debtors' customer base.  On top of these challenges, Russia's invasion of Ukraine, and the resultant sanctions regimes against the Russian Federation, left the Debtors unable to access cash at their non-Debtor Russian affiliate—a business that was otherwise an operational bright spot.

13.     To navigate these challenges, the Debtors pursued a series of operational initiatives directed at eliminating drags on profitability and extending runway to allow demand for the Debtors' products to improve.  These initiatives, while successful, proved insufficient to buy enough time for there to be a recovery in the commercial vehicle market; to buy additional time,

the Debtors began carefully managing their trade payables, working with their vendors to implement alternative payment schedules or, in some instances, "stretching" vendors significantly beyond agreed payment terms. The Debtors also divested certain of their assets through a series of liquidity-enhancing transactions. Unfortunately, operational and market recovery did not come soon or strongly enough, and the Debtors appreciate the sacrifices that their vendor base has shared.

14.     The Debtors accelerated engagement with the Ad Hoc Group in June 2024. With the support of the Ad Hoc Group, the Debtors began exploring strategic alternatives and launched a marketing process concerning a significant investment in or purchase of all or some of Accuride's assets. During this prepetition marketing process, which began in earnest in early August 2024, Perella Weinberg Partners, proposed investment banker to the Debtors, contacted 51 parties regarding Accuride; ultimately, 31 parties went under NDA and 7 parties provided indications of interest in acquiring parts of Accuride's business or assets.

15.     Based on these indications of interest, the Debtors determined that a transaction with the Ad Hoc Group implemented via a chapter 11 plan would best position the Debtors for long-term success, allowing the Debtors to restore and maintain relationships with key suppliers, preserve jobs, and otherwise maximize value for their stakeholders.

16.     To better familiarize the Court with the Debtors, their business, the circumstances leading to these chapter 11 cases, and the relief the Debtors seek in the First Day Motions, this declaration is organized as follows:

- **Part I** provides an overview of the Debtors' corporate history and business operations;

- **Part II** describes the Debtors' organizational and prepetition capital structures;

- **Part III** offers detailed information on the events preceding the commencement of these chapter 11 cases, the Restructuring Transactions, and the Debtors' contemplated path forward; and

32228560.1

- **Part IV** provides the factual support for the petitions and the First Day Motions.

## Part I: Corporate History and Business Operations

**A.      Corporate History.**

17.     Accuride traces its origins back almost 150 years to when Gunite was founded in 1854 as a manufacturer of bicycle, wagon, and buggy tires.  Many tire and wheel companies were, over time, incorporated into the Firestone Tire and Rubber Company conglomerate.  In 1986, Accuride was formed as a vehicle to acquire Firestone's wheel and wheel ends businesses. Accuride's specialization in wheel and wheel end components allowed it to produce high quality products at a significantly reduced margin, which fostered continued growth throughout the next decade.  In January 2005, Accuride merged with Transportation Technologies Industries, Inc., acquiring one of the largest North American producers of truck components for the heavy and medium-duty trucking industry and the Gunite brand.  The newly-combined Accuride became a dominant parts supplier to the medium to heavy trucking industry and, in April 2005, debuted as a public company through an initial public offering.

18.     Accuride's steady growth and expansion was curtailed by the Great Recession. While Accuride experienced a period of extremely high demand through 2007 due to many trucking fleets purchasing trucks prior to the implementation of revised EPA standards, the combination of a severe, global economic downturn and excess capacity among trucking fleets drastically reduced demand for Accuride's products.  In October 2009, Accuride sought chapter 11 protection to alleviate liquidity pressure and implement a broader restructuring of their debt portfolio via a prepackaged plan of reorganization.[2]   Accuride emerged from chapter 11 five

---

[2]   These prior jointly administered chapter 11 cases were styled as *In re Accuride Corporation, et al.*, Case No. 09-13449 (BLS) (Bankr. D. Del. Oct. 8, 2009).

months later as a privately-owned company and relisted on the New York Stock Exchange in December of 2010.

19.     Reorganized Accuride's renewed focus on operational excellence drove significant growth.   In 2014, 2015, and 2016, Accuride won awards from the American Society for Manufacturing Excellence for its quality and supply chain system methodologies and high standards of performance.   During this time, Accuride divested many non-core businesses, including its specialty axle and seating business.   Based on this record of success and recovery, Accuride was acquired by Crestview AQ Holdings, L.P. ("AQ Holdings") and Crestview Partners III (Co-Investment B), L.P. ("Partners III") in November 2016.

20.     Accuride augmented its product offerings and market reach through two major acquisitions.   In May 2017, Accuride acquired KIC LLC ("KIC"), which greatly expanded Accuride's wheel end offerings for medium and heavy-duty trucks and trailers.   Through KIC, which utilized a primarily foreign supplier base, Accuride was able to offer a significantly expanded selection of brake drums, rotors, hub and drum assemblies, steel wheels and aluminum wheels to both original equipment manufacturers and aftermarket distributors, as well as reaching more price-sensitive customers.   Then, in June 2018, Accuride acquired Mefro wheels GmbH ("Mefro"), a major wheels manufacturer with 5,000 employees and eight factories supplying wheels throughout Europe, Russia, and Asia for the passenger automotive, commercial, and agricultural vehicle sectors.   This acquisition effectively doubled Accuride's core wheels business and transformed Accuride into a worldwide industry leader.   Accuride promptly invested capital and implemented lean manufacturing and quality control processes to bring operations in both acquired companies up to the standard of Accuride's award-winning North American factories.

**B.     Business Operations.**

21.     Today, Accuride is a leading supplier of wheels and wheel end solutions in the

medium to heavy-duty commercial vehicle market.  Accuride distributes its products to original equipment manufacturers of trucks and trailers and to aftermarket distributors.  Because of its high-quality products and strong business relationships, Accuride captured significant market share amongst a wide variety of blue-chip automotive manufacturers, including some of the largest producers of commercial trucks and trailers.

22.     Accuride organizes its business into three divisions: "Accuride Wheels North America" ("Wheels North America"),[3] "Accuride Wheel End Solutions" ("Wheel Ends"), and "Accuride Wheels Europe and Asia" ("AWEA").  The Debtors comprise the Wheel Ends business as well as the U.S. entities in the Wheels North America business.

### 1.     Wheels North America

23.     As part of Accuride's Wheels North America division, the Debtors provide high-quality steel and aluminum wheels to more than a thousand commercial vehicle manufacturers and aftermarket distributors.  The Debtors produce wheels in three manufacturing facilities that are strategically located to facilitate efficient customer service and reduce customer freight charges:  Erie, Pennsylvania; Henderson, Kentucky; and Springfield, Ohio.  Accuride's facilities in London, Ontario and Monterrey, Mexico are operated by non-Debtors.  Each facility uses Accuride's award-winning lean manufacturing and distribution principles.   In total, Accuride's wheels manufacturing operations (Debtor and non-Debtor) can produce approximately 20 million wheels per year and employs approximately 3,600 people.

---

[3]     Wheels North America also includes non-Debtors Accuride Canada Inc. ("Accuride Canada"), Accuride de Mexico, S.A. de CV, Accuride Monterrey S.De F.L. de C.V., and Accuride del Norte, S.A. de C.V.  None of the AWEA entities are Debtors.

24.    <u>Steel Wheels</u>.  The Debtors are the largest producer of medium and heavy-duty steel wheels and demountable rims in North America.  The Debtors' designed disc wheels are standard products for all truck and trailer manufacturers and are sold broadly to aftermarket distributors.  The Debtors primarily produce two

*The Accu-Lite® steel wheel*



*The Steel Armor™ wheel*



types of proprietary steel wheels – the Accu-Lite®, which consists of high-strength, low-alloy steel that weighs less than comparable models sold by its competitors, and the Steel-Armor™, which utilizes a powder coat, epoxy e-coat, and zinc phosphate pre-treatment to adapt wheels for all weather conditions.  The Debtors have a strong position in the steel wheels market, with 56% market share for original manufacturers of medium to heavy-duty trucks, 51% for trailers, and 33% of the aftermarket.  The Debtors have also developed key supply relationships with many of the largest commercial vehicle manufacturers, with several almost completely relying on Accuride for their steel wheel inventory.

25.    <u>Aluminum Wheels</u>.  The Debtors also have a strong position in the market for aluminum wheels, which are significantly lighter than steel wheels and are used by commercial, agricultural, and construction vehicle manufacturers.  The Debtors primarily produce two types of

aluminum wheels – the Accu-Lite®, which uses the Debtors'

*The DupleX-One aluminum wheel*

proprietary Quantum 99 alloy to create a light, yet highly durable wheel, and the DupleX-One, which reduces fuel expense and increases total payload by replacing dual-wheel sets with a single wheel.  The Debtors' aluminum wheels are

heavily relied upon by several blue-chip commercial vehicle manufacturers, and, all told, the Debtors supply 28% of the aluminum wheel market for original manufacturers of medium to heavy-duty trucks, 29% of the aluminum wheels market for trailer manufacturers, and 30% of the total aluminum wheel aftermarket.

### 2.  Wheel Ends

26.    Certain of the Debtors produce wheel end solutions for truck and trailer manufacturers and aftermarket distributors.  These wheel end solutions consist of a set of products—including brake drums, disc wheel hubs, hub and drum assemblies, slack adjusters, and rotor and spoke wheels—designed to assist a vehicle's braking capacity and are complementary to the Debtors' core wheel offerings.  The Debtors sell these products under two brands: "Gunite," which focuses on premium offerings for truck and trailer manufacturers, and "KIC," which focuses on manufacturers of smaller commercial vehicles and aftermarket distributors.

27.    The Debtors produce wheel end components through a set of domestic foundry and in-house machining capabilities that are complemented by offshore casting and machining partners.  The Debtors manufacture wheel ends components at a manufacturing facility in Rockford, Illinois, which boasts significant automation capabilities and an in-house foundry with a 250-thousand-ton yearly melt capacity.  As a result, the Rockford facility has the capacity to produce approximately 2.2 million brake drums and 845,000 slack adjusters annually.  The Debtors also partner with select offshore partners to produce wheel end products using the Debtors' designs and technology.  These offshore partners both deliver finished products to the Debtors for distribution and sell these products in their home region, with the Debtors paid a licensing fee.  The Debtors distribute domestically-produced and imported wheel ends products from a distribution center in Joliet, Illinois.

28.    <u>Brake Drums</u>.   A brake drum is a closed cylinder attached to a vehicle's wheel, against which the brake presses to slow or stop a moving truck or trailer.  The Debtors produces more than 950 configurations of brake drum to fit almost any vehicle-type or application.  The Debtors' brake drums are lighter than most competitors, with an average cumulative weight savings of 170 pounds, and high levels of reliability.  This high standard of manufacturing quality has led to the Debtors' brake drum designs being approved by many of the largest transit authorities and government procurement departments for purchase.

29.    <u>Disc Wheel Hubs</u>.   A disc wheel hub serves as the mounting location for brake components and is located between the drive axle and the brake drums.  The Debtors' array of disc wheel hubs, including Ductilite iron hubs, are lighter than comparable models offered by the Debtors' competitors while offering similar levels of reliability.  The Debtors also sell combined disc wheel hubs and brake drum assemblies, primarily to truck and trailer manufacturers.  These include the KIC-branded Rolliant bearing system, which uses a proprietary design to improve the durability of a truck's brake assembly.

30.    <u>Slack Adjusters</u>.  Slack adjusters regulate the distance a brake pad travels to apply pressure to the wheel, which reduces overall wear on brake pads and the risk of brake failure. While the Debtors produce a variety of slack adjuster configurations, its proprietary Gunite slack



*Gunite Front (Steer) Axle Automatic Slack Adjuster*

adjusters utilize a unique clearance-sensing design to accurately read the brake pad to brake drum clearance and thereby reduce total brake wear.  The Debtors sells slack adjusters to both original manufacturers and aftermarket distributors in roughly equal measure.

32228560.1

### 3.    Accuride Wheels Europe and Asia.

31.    Accuride's AWEA division provides high-quality steel wheels for medium and heavy-duty and off-road commercial vehicles and passenger vehicles, with many of the largest commercial vehicle manufacturers and aftermarket distributors in Europe being long-term Accuride customers.[4]   Accuride produces wheels in five manufacturing facilities spread throughout Eurasia including:  Troyes, France; Solingen and Ronnenberg in Germany; Bilecik, Turkey; and Jining Shi, China.  Accuride is a leading producer of wheels in Europe, with a market share of approximately 45% among commercial vehicle manufacturers.  Accuride's high-quality production methods have resulted in highly durable relationships with automotive manufacturers, with the average relationship lasting more than twelve years and certain relationships spanning more than thirty years.  In total, Accuride's international wheels manufacturing operations can produce approximately 12 million wheels per year and employs approximately 2,000 employees.

32.    The AWEA division also includes a wheel production business in Russia ("Accuride Russia").  Accuride Russia employs more than 540 employees at two factories in Togliatti and Zainsk.  Accuride Russia is not a Debtor in these chapter 11 cases.  To ensure compliance with economic sanctions imposed against the Russian Federation and certain individuals, industries, and entities therein by the United States and the European Union, Accuride Russia is currently entirely self-funding and self-managing; in other words, no capital travels between Accuride Russia and the rest of Accuride.  From a management and infrastructure perspective, Accuride has taken steps to "ring-fence" the Russian business in order to maintain compliance with United States and European Union sanction requirements.

---

4    The Accuride Wheels Europe and Asia division is not included in these chapter 11 proceedings.

32228560.1

## Part II: The Debtors' Organizational and Prepetition Capital Structure

**A.    Organizational Structure.**

33.    As set forth on the structure chart attached hereto as **Exhibit B**, Debtor Accuride Group Holdings, Inc. has thirty-four wholly owned direct, and indirect subsidiaries, of which fifteen are also Debtors.

**B.    Prepetition Capital Structure.**

34.    As of the Petition Date, the Debtors have approximately $485 million in total third-party funded debt obligations:

| Maturity | Facility | Interest Rates | Funded Debt Outstanding as of the Petition Date |
|---|---|---|---|
| May, 2026 | U.S. Revolving Loans – Base Rate | P + 250 | $52,800,000 |
| | U.S. Revolving Loans – SOFR | S + 360[5] | |
| | French Revolving Loans – Eur Base Rate | EURIBOR + 450 | $25,100,000 |
| | French Revolving Loans – Eur (Tranche) | EURIBOR + 350 | |
| | German Revolving Loans – Eur Base Rate | EURIBOR + 450 | |
| | German Revolving Loans – Eur (Tranche) | EURIBOR + 350 | |
| N/A | Letters of Credit | N/A | $20,300,000 |
| May, 2026 | 2023 Extended Term Loans | S + 687[6] | $294,600,000 |
| October, 2024 | Amendment No. 14 Loans | S + 1,000 | $40,000,000 |
| | Amendment No. 15 Loans | | $16,800,000 |
| | Amendment No. 16 Loans | | $16,600,000 |
| N/A | Finance Leases and Other Debt | N/A | $19,400,000 |
| **TOTAL** | | | **$485,600,000** |

---

[5]    Includes 10 bps spread adjustment.

[6]    Term Loan interest composed of 100 bps cash pay and 587 bps PIK.

1.      **The Prepetition ABL Facility.**

35.      Accuride Corporation is the U.S. borrower (in this capacity, the "<u>Prepetition ABL</u> <u>U.S. Borrower</u>") under that certain Amended and Restated ABL Credit Agreement, dated as of June 1, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "<u>Prepetition ABL Credit Agreement</u>," together with the other "Loan Documents," as defined therein, the "<u>Prepetition ABL Documents</u>;" the revolving credit facilities under the Prepetition ABL Credit Agreement, the "<u>Prepetition ABL Facility</u>," and the Debtors' prepetition obligations under the Prepetition ABL Documents, the "<u>Prepetition ABL</u> <u>Obligations</u>"),[7] by and among the Prepetition ABL U.S. Borrower, Holdings, the foreign borrowers from time to time party thereto[8] (the "<u>Prepetition ABL Foreign Borrowers</u>" and together with the ABL U.S. Borrower, the "<u>Prepetition ABL Borrowers</u>"), the lenders from time to time party thereto (the "<u>Prepetition ABL Lenders</u>"), Bank of America, N.A., as administrative agent and collateral (the "<u>Prepetition ABL Agent</u>" and, together with the Prepetition ABL Lenders, the "<u>Prepetition ABL Secured Parties</u>") and the other parties thereto.  The Prepetition ABL U.S. Borrower, Holdings, and each of the Prepetition ABL U.S. Borrower's Debtor-subsidiaries (the foregoing, the "<u>Prepetition ABL U.S. Guarantors</u>") are also party to that certain Amended and Restated Guaranty, dated as of June 1, 2018 (as amended, restated, amended and restated,

---

[7]      The Prepetition ABL Credit Agreement has been amended by that certain Amendment No. 1, dated as of April 18, 2019, Amendment No. 2, dated as of September 8, 2020, Amendment No. 3, dated as of December 23, 2021, Amendment No. 4, dated as of December 31, 2021, Amendment No. 5, dated as of June 7, 2022, Amendment No. 6, dated as of March 31, 2023, Amendment No. 7, dated as of May 31, 2023, Amendment No. 8, dated as of June 30, 2023, Amendment No. 9, dated as of July 7, 2023.

[8]      Non-debtor Accuride Wheels Troyes SAS (f/k/a mefro Wheels France SAS) is party to the Prepetition ABL Credit Agreement as the "ABL French Borrower."  Non-debtor Accuride Wheels Solingen GmbH (f/k/a KRONPRINZ GmbH) is party to the Prepetition ABL Credit Agreement as the "ABL Solingen Borrower."  Accuride Wheels Ebersbach GmbH (f/k/a Südrad GmbH Radtechnik) is party to the Prepetition ABL Credit Agreement as the "ABL Ebersbach Borrower."  Wheels EbersbachRonneburg GmbH (f/k/a mefro Räderwerk Ronneburg GmbH) is party to the Prepetition ABL Credit Agreement as the "ABL Ronneburg Borrower."  The foregoing entities are collectively the "<u>Prepetition ABL Foreign Borrowers</u>."

supplemented and/or otherwise modified from time to time, the "<u>Prepetition ABL U.S. Guaranty</u>")
with the Prepetition ABL Agent, pursuant to which the Prepetition ABL U.S. Guarantors guarantee
the Prepetition ABL U.S. Obligations.

36.    The Prepetition ABL Facility comprises commitments from the applicable
Prepetition ABL Lenders to provide revolving loans in local currency (the "<u>Prepetition ABL</u>
<u>Loans</u>") to each Prepetition ABL Borrower—Prepetition ABL Loans in U.S. dollars to the
Prepetition ABL U.S. Borrower and Prepetition ABL Loans in Euros to each of the Prepetition
ABL Foreign Borrowers.  The unpaid principal amounts of the Prepetition ABL Loans bear interest
at variable rates based on the currency in which such Prepetition ABL Loans were made, as set
forth in the summary table above.  The Prepetition ABL Facility matures on the earlier of (a) May
18, 2026, and (b) ninety-one (91) days prior to the maturity date of the 2023 Extended Term Loans
(as defined below).  The Prepetition ABL Secured Parties have liens (the "<u>Prepetition ABL Liens</u>")
on substantially all the assets and property of the borrowers and guarantors with respect to the
Prepetition ABL Facility, other than certain "Excluded Property" under the Prepetition ABL Credit
Agreement.  The Prepetition ABL Liens are first-priority liens on the ABL Priority Collateral (as
defined in the Prepetition ABL Credit Agreement, the "<u>Prepetition ABL Priority Collateral</u>") and
second-priority liens on the Term Priority Collateral (as defined in the Prepetition ABL Credit
Agreement, the "<u>Term Priority Collateral</u>").

## 2.    The Prepetition Term Loan Facility.

37.    Accuride Corporation is the borrower (in this capacity, the "<u>Prepetition Term</u>
<u>Borrower</u>") under that certain Term Loan Credit Agreement, dated as of November 18, 2016 (as
amended, restated, amended and restated, supplemented or otherwise modified from time to time
prior to the date hereof, the "<u>Prepetition Term Credit Agreement</u>" and the term loan credit facilities
under the Prepetition Term Loan Credit Agreement, the "<u>Prepetition Term Facility</u>," and the loans

32228560.1

made thereunder, the "Prepetition Term Loans," and the Prepetition Term Loans, together with the

Debtors' other prepetition obligations under the Prepetition Term Loan Credit Agreement,

the "Prepetition Term Obligations"),[9] by and among Holdings, the lenders from time to time party

thereto (the "Prepetition Term Loan Lenders"), Alter Domus (US), LLC (as successor in interest

to Royal Bank of Canada), as administrative agent and collateral agent (the "Prepetition Term

Loan Agent" and, together with the Prepetition Term Loan Lenders, the "Prepetition Term Loan

Secured Parties") and the other parties thereto (the parties described in this paragraph, collectively,

the "Prepetition Term Loan Parties").  The Prepetition Term Borrower, Holdings, and each of the

Prepetition Term Borrower's Debtor-subsidiaries (the foregoing, the "Prepetition Term

Guarantors") are also party to that certain Guaranty, dated as of November 18, 2016 (as amended,

restated, amended and restated, supplemented and/or otherwise modified from time to time, the

"Prepetition Term Guaranty") with the Prepetition Term Agent, pursuant to which the Prepetition

Term Guarantors guarantee the Prepetition Term Obligations.

38.    On May 10, 2023, certain of the Prepetition Term Loan Parties entered into that

certain Amendment No. 11 to Term Loan Credit Agreement, pursuant to which certain of the

Prepetition Term Loan Lenders agreed to extend the maturities applicable to certain of the

Prepetition Term Loans (the "Extended 2023 Term Loans") to May 18, 2026.[10]  On July 5, 2024,

the Prepetition Term Loan Parties entered into that certain Amendment No. 14 to Term Loan Credit

---

[9]    The Prepetition Term Loan Credit Agreement has been amended from time to time, most recently by that certain
Amendment No. 16., dated as of September 19, 2024 (the "Sixteenth Term Loan Amendment").  The Prepetition
Term Loan Credit Agreement, together with the other "Loan Documents," as defined therein, are the "Prepetition
Term Documents."  The Prepetition Term Loan Credit Agreement, together with the Prepetition ABL Credit
Agreement, are the "Prepetition Credit Agreements."  The Prepetition Term Loan Credit Documents, together
with the Prepetition ABL Credit Documents, are the "Prepetition Debt Documents."

[10]   As of the Petition Date, all Prepetition Term Loans other than the Prepetition Bridge Loans were Extended 2023
Term Loans.

Agreement (the "<u>Fourteenth Term Loan Amendment</u>"), pursuant to which certain of the Prepetition Term Lenders committed to provide approximately $35 million in additional Prepetition Term Loans (the "<u>Amendment No. 14 Term Loans</u>").  On August 21, 2024, certain of the Prepetition Term Loan Parties entered into the Amendment No. 15 to Term Loan Credit Agreement (the "<u>Fifteenth Term Loan Amendment</u>" and, together with the Fourteenth Term Loan Amendment and the Sixteenth Term Loan Amendment, the "<u>Bridge Loan Amendments</u>"), pursuant to which certain of the Prepetition Term Lenders committed to provide approximately $15 million in additional Prepetition Term Loans (the "<u>Amendment No. 15 Term Loans</u>").  On September 19, 2024, the certain of the Prepetition Term Loan Parties entered into the Sixteenth Term Loan Amendment pursuant to which certain of the Prepetition Term Lenders committed to provide approximately $15 million in additional Prepetition Term Loans (the "<u>Amendment No. 15 Term Loans</u>" and, together with the Amendment No. 14 Term Loans and the Amendment No. 15 Term Loans, the "<u>Prepetition Bridge Loans</u>").  Pursuant to the Intercreditor Annex attached to the Prepetition Term Credit Agreement, the Prepetition Bridge Loans are senior in priority of payment to all other Prepetition Term Obligations.

39.     The Prepetition Term Secured Parties have liens (the "<u>Prepetition Term Liens</u>") on substantially all the assets and property of the borrowers and guarantors with respect to the Prepetition Term Facility, other than certain "Excluded Property" under the Prepetition Term Credit Agreement.  The Prepetition Term Liens are first-priority liens on the Term Loan Priority Collateral and second-priority liens on the ABL Priority Collateral.

### 3.     Common and Preferred Equity Interests.

40.     The equity of parent Debtor Accuride Group Holdings, Inc. ("<u>Holdings</u>") consists of several series of preferred equity units plus common equity units.  As of the Petition Date, approximately 46,686 of Holdings's Class Series A preferred equity units (the "<u>Series A Preferred</u>

Units"), 47,625 of its Series B preferred equity units (the "<u>Series B Preferred Units</u>"), and 55,022 of its Series C preferred equity units (the "<u>Series C Preferred Units</u>", and together with the Series A Preferred Units and Series B Preferred Units, collectively, the "<u>Preferred Units</u>") and 287,104 common units (the "<u>Common Units</u>") were issued and outstanding.  As of the Petition Date, the majority of the Series A Preferred Units, Series B Preferred Units, Series C Preferred Units, and Common Units were held by AQ Holdings and Partners III.  The Common Units are not listed on a national securities exchange.

### Part III: Events Leading to the Commencement of These Chapter 11 Cases

41.    Over the last several years, the Debtors' business performance has suffered despite steady growth and a significantly expanded product and geographic footprint.  Supply chain distortions and a steep rise in the cost of several key inputs for the Debtors' products stressed the Debtors' cost structure.  At the same time, slower-than-anticipated integration of Mefro and longer-than-expected "new business" holds placed on Mefro by potential customers left the Debtors covering liquidity shortfalls in AWEA.  In addition, the Debtors' Wheel Ends business has underperformed, and non-Debtor Accuride Canada's plant in London, Ontario has failed to reach profitability on a standalone basis, despite the Debtors' and their affiliates' efforts.  These pressures depleted liquidity and demanded the Debtors' attention, preventing the Debtors from investing in continued growth.

**A.    Business Challenges.**

42.    <u>Demand Shocks</u>.  During the COVID-19 pandemic, consumer demand for goods increased sharply due to increased leisure time produced by work from home polices and governmental stimulus support.  This resulted in an increased need to transport goods to consumers and a corresponding increase in the size of trucking fleets.  This had a positive impact on the Debtors' performance, as shipping companies purchased increasing number of medium to heavy-

32228560.1

duty trucks and trailers to cope with demand.  However, the medium to heavy duty truck and trailer market served by the Debtors is highly cyclical, and, over the last two years, demand for freight transportation has plummeted.  Due to inflation and a corresponding increase in benchmark interest rates, consumer demand has dropped, with a corresponding major negative impact on manufacturing output and volumes of imported goods.  Less domestic production and fewer imported goods means less freight to transport; this is a situation, known popularly as the "freight recession," in which freight companies have outsized, costly truck fleets and a significantly diminished amount of freight demand to sustain them.  Trucking companies have responded to this sharp downturn in demand by relying on capital reserves that may otherwise have been deployed to upgrade their trucking fleets.

43.     As a result, the "freight recession" has impacted truck manufacturers—the Debtors' primary customers—even more severely than the freight industry.  Many freight carriers have, from their perspective, too many trucks, and they are unlikely to buy more until demand rises commensurate with their fleet capacity and their existing trucks accumulate sufficient wear to merit replacement.  The net result is that demand for new commercial trucks, and therefore demand for the Debtors' products, has plummeted, despite the Debtors' continued high market share among vehicle manufacturers.

44.     <u>Supply Pressures</u>.  During and after the COVID-19 pandemic, the Debtors also experienced significant strains on their supply chain infrastructure and a corresponding increase in costs.  Specifically, interruptions in the production and supply of the Debtors' products, particularly for the Wheel Ends Debtors' foreign suppliers, worldwide supply chain disruptions and shortages in the availability of raw materials and labor, and a corresponding increase in related manufacturing and ocean-freight costs all continued after the most severe economic effects of the

COVID-19 pandemic had abated in the United States, due to trailing impacts of closures by industrial suppliers, and continued suppressed ocean freight capacity.  For example, between 2020 and 2022 the cost of aluminum, a vital product ingredient, almost doubled, and ocean freight costs nearly quintupled.  The price of steel, a key input for the Debtors' steel wheels, also experienced significant volatility, rising by nearly a third between 2022 and 2023.  These supply chain distortions continue to be costly to the Debtors.

45.     <u>Vendor Relationships and Prepetition Litigation</u>.  The Debtors' management attempted to navigate these significant business headwinds through careful attention to liquidity and vendor relationships.  The Debtors "stretched" trade payables beyond agreed payment terms and moved procurement between suppliers of commoditized goods to different players to maintain their ability to manufacture and ship product.  Eventually, certain vendors began significantly tightening terms, demanding cash in advance, or otherwise pursuing payment of their outstanding amounts, including via litigation:  on May 21, 2024, a major aluminum supplier filed a complaint and motion for summary judgment in the Circuit Court for Baltimore County asserting that Debtor Accuride Corporation owed more than $4 million for orders of aluminum.  On August 29, 2024, summary judgment was entered in the vendor's favor for the entire claimed amount.

46.     <u>International Challenges</u>.  The Debtors have also been forced to navigate significant operational and legal issues in their international (non-Debtor) production lines.  ***First***, following the Debtors' acquisition of Mefro, numerous passenger and commercial vehicle manufacturers in Europe placed holds on new purchase orders from Mefro.  These holds were much broader and lasted longer than the Debtors anticipated and were only lifted after significant effort was expended by the Debtors' management team to negotiate with key customers.  In addition, significant time and capital needed to be invested in AWEA by the Debtors before it could return to profitability.

32228560.1

***Second***, operational challenges have consistently arisen at non-Debtor Accuride Canada's London, Ontario facility, which produces wheels primarily for the medium-duty truck market. The London, Ontario facility has consistently failed to operate at a profit and has fallen behind in manufacturing technology compared to peer factories operated by the Debtors' competitors. As a result, these non-Debtor operations in Canada have required regular capital support from the Debtors. While non-Debtor Accuride Wheels RUSSIA ("Accuride Russia") has experienced significant success, sanctions placed on the Russian Federation and businesses operating inside of it in response to the Russian Federation's invasion of Ukraine have prevented the Debtors from legally accessing excess cash at Accuride Russia.

47.    Wheels-Related Dumping.    On June 20, 2024, one of the Debtors' competitors, Webb Wheel Products, Inc. ("Webb"), filed petitions against the imports of certain brake drums from the People's Republic of China and the Republic of Türkiye alleging that brake drums from these countries were being sold in the United States at less than full value. The net impact of these petitions on the Debtors' business remains to be seen. Debtor KIC, LLC, purchases brake drums from certain Chinese manufacturing partners. Antidumping and countervailing duties, if imposed, would significantly increase the cost of Wheel Ends' imported products. At the same time, Debtor Gunite, LLC may face increased demand for its domestic production capacity for wheel end products. The uncertainty resulting from the outstanding petitions filed by Webb appear to have contributed to discouraging potential acquirers of Wheel Ends from transacting at a price that would be profitable for the Debtors (net of projected wind-down and exit costs).

48.    Balance Sheet and Liquidity Constraints.    The impact of these operational headwinds was compounded by the need for the Debtors to fund significant capital to certain non-Debtor affiliates to remain "in formula" under the Prepetition ABL Facility. Despite the infusion

of $65 million in Bridge Loans between July 5, 2024 and the Petition Date, approximately $17.6 million went to keeping the Prepetition ABL Facility in formula, and much of the remainder has been spent simply keeping operations running while the Debtors explored potential transaction alternatives.  As of the Petition Date, the Debtors are down to approximately $6 million in available cash.  As one condition to continuing to fund the Debtors' business operations and restructuring initiatives, the Ad Hoc Group required that the Debtors commence these chapter 11 cases so that further financing could be supplied in the form of a super-priority DIP facility.

**B.**     **Restructuring Initiatives and the Path Forward.**

49.     As the Debtors' liquidity tightened in early to mid-2024, they sought to implement a series of initiatives to bolster liquidity and chart a path forward in conjunction with their lenders. These initiatives included the retention of advisors and a refresh of the Debtors' corporate governance to provide expert guidance as the Debtors navigated the difficult and operational and financial decisions the Debtors were required to make prior to the Petition Date.  The Debtors also decided to launch a sale and marketing process for their assets.  While these efforts have not yet borne fruit in the form of an actionable bid, they have served as a basis for the Debtors and their lender to coalesce around a path forward.

50.     <u>Advisor Retention</u>.  On June 1, 2024, the Debtors retained Perella Weinberg Partners ("<u>PWP</u>"), as investment banker, and on June 20, 2024, the Debtors retained Kirkland & Ellis LLP ("<u>Kirkland & Ellis</u>"), as legal counsel.  On June 11, 2024, the Debtors retained A&M as financial advisor.  Subsequently, on June 26, 2024, I was appointed Chief Restructuring Officer. On August 8, 2024, the Debtors retained Young Conaway Stargatt & Taylor, LLP ("<u>Young Conaway</u>") as local counsel.  On September 20, 2024, after soliciting proposals from three qualified claims and noticing firms pursuant to the Court's *Protocol for the Employment of Claims*

*and Noticing Agents Under 28 U.S.C. § 156(c)*, the Debtors retained Omni Agent Solutions, Inc. as claims and noticing agent and as a consulting and administrative services provider.

51.    <u>Corporate Governance</u>.  On June 19, 2024, the Debtors appointed Ted Stenger to the Debtors' board as an independent, disinterested director to assist the board in the Debtors' review of strategic alternatives, and on June 26, 2024, the Debtors formed a special committee of the board (the "<u>Special Committee</u>"), initially comprised solely of Mr. Stenger.  Subsequently, on July 9, 2024, the Debtors appointed Steve Panagos as a second independent, disinterested director to the board and the Special Committee.  The Special Committee operates under a broad delegation of authority to undertake any action the Special Committee deems appropriate with respect to any matter in which a conflict of interest is likely to exist between Accuride and its related parties, including any transaction between Accuride and its related parties, and the investigation and settlement of any claims held by Accuride against any of Accuride's related parties.  The Special Committee has been conducting an investigation into any potential claims or causes of action belonging to the estates and such investigation is ongoing.

52.    Ted Stenger has more than four decades of experience as a financial professional specializing in restructuring and turnaround management, including 31 years as a Managing Director at AlixPartners, a leading restructuring advisory firm.  He brings a deep experience in managing large organizations through major financial headwinds, expansion and growth, including Team, Inc., Suzuki Motor of America, Inc., and General Motors.  Steven Panagos is a turnaround expert with experience leading complex financial and operational restructurings for organizations across a spectrum of industries and spent a decade as Vice Chairman and Managing Director of the Recapitalization & Restructuring Group at Moelis & Company.  He has served as an independent director to companies undergoing significant changes, including SVB Financial

Group, Legacy IMBDS, Inc., Vital Pharmaceuticals, Inc., and American Consolidated Natural Resources.

53. <u>Engagement with Lenders</u>. The Debtors' prepetition engagement with the Ad Hoc Group and other stakeholders centered around the terms of a capital infusion to support the business and extend runway to explore strategic alternatives. As part of these discussions, the Debtors explored the possibility of implementing a consensual restructuring or sale transaction on an out-of-court basis, pivoting to an in-court chapter 11 process, or pursuing both paths simultaneously. To that end, the Debtors, with the assistance of PWP, launched a marketing process in early August 2024 to engage potential interested parties concerning a significant investment in or purchase of some or all of the Debtors' or non-Debtor affiliates' assets. As part of the marketing process, PWP contacted 51 parties regarding Accuride, including 23 strategic and 28 financial partners. Ultimately, 31 parties went under NDA and 7 parties provided indications of interest in acquiring parts of Accuride's business or assets.

54. During the prepetition period, the Debtors and the Ad Hoc Group discussed solutions to provide a runway to market Accuride's business units and assets and ultimately agreed on the parameters of a restructuring transaction. To provide runway to prepare the Debtors' businesses for a chapter 11 process, the Debtors closed their first amendment to the Term Loan Agreement with the Ad Hoc Group on July 5, 2024, which provided for an initial $35 million of bridge financing, and the Debtors and the Ad Hoc Group negotiated and executed two more amendments to the Term Loan Agreement that provided the Debtors with an incremental $30 million in new-money financing.

55. While the Debtors welcome any alternative transaction proposals, the existing bids have not generated sufficient value to present an attractive opportunity to transact. The Debtors

and the Ad Hoc Group have therefore pivoted to negotiation of a standalone restructuring transaction, which has culminated in an agreement on the terms of a consensual restructuring of the Debtors' indebtedness.  The Debtors intend to use these chapter 11 cases to expeditiously proceed to solicitation of votes on and confirmation of a chapter 11 plan.  The Debtors will also consider any additional third-party bids that emerge, whether for all or part of the Debtors, or their non-Debtor affiliates, assets or business units.  The terms of the Debtors agreement with the Ad Hoc Group preserves flexibility for the Debtors to, in the exercise of their fiduciary duties, pursue higher or otherwise better proposals than the contemplated transaction.

56.     <u>CCAA Proceeding</u>.  Concurrently with the commencement of these Chapter 11 Proceedings, the Debtors' non-Debtor affiliate, Accuride Canada intend to make an application to the Ontario Superior Court of Justice (Commercial List) seeking protection pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "<u>CCAA</u>" and the related proceedings, the "<u>CCAA Proceedings</u>").  Accuride Canada intends to use the breathing space afforded by the CCAA Proceedings to allow the pre-petition marketing process conducted by the Debtors to continue for a brief period to determine if there a potential for a going concern transaction for some or all of Accuride Canada's business, failing which Accuride Canada will conduct an orderly wind-down of its operations.  Accuride Canada's operations are not self-funding and will require an infusion of capital from the Debtors on a postpetition basis, as discussed more fully in the Cash Management Motion (defined below).

## Part VI: Evidence in Support of First Day Motions

57.     Contemporaneously with the filing of this declaration, the Debtors filed the following First Day Motions:

- **DIP Motion**. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II)*

*Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing and (V) Granting Related Relief.*

- **Automatic Stay Enforcement Motion**.  *Motion of Debtors Seeking Entry of an Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of the Bankruptcy Code, (II) Approving the Form and Manner of Notice, and (III) Granting Related Relief.*

- **Cash Management Motion**.  *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate the Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Perform Intercompany Transactions, and (II) Granting Related Relief.*

- **Customer Programs Motion**.  *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain and Administer Their Customers Programs and (B) Honor Certain Prepetition Business Practices Related Thereto, and (II) Granting Related Relief.*

- **Insurance Motion**.  *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Insurance and Surety Coverage Entered into Prepetition and Pay Related Prepetition Obligations, and (B) Renew, Supplement, Modify, or Purchase Insurance and Surety Coverage, and (II) Granting Related Relief.*

- **NOL Motion**.  *Motion of Debtors for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and Preferred Stock and (II) Granting Related Relief.*

- **Schedules/SOFAs Motion**.  *Motion of Debtors for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Financial Reports and (II) Granting Related Relief.*

- **Taxes Motion**.  *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees and (II) Granting Related Relief.*

- **Utilities Motion**.  *Motion of Debtors for Entry of Interim and Final Orders (I) Determining Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief.*

- **Critical Vendors**. *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Critical Vendors, (B) Foreign Vendors, (C) Lien Claimants, and (D) 503(b)(9) Claimants, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief.*

- **Wages Motion**. *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses, and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief.*

- **Omni 156(c) Retention Application**. *Application of Debtors for Entry of an Order (I) Authorizing and Approving the Appointment of Omni Agent Solutions, Inc. as Claims and Noticing Agent and (II) Granting Related Relief.*

- **Creditor Matrix Motion**. *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for each Debtor, (B) File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors; (C) Serve Certain Parties in Interest by Email, and (D) Redact Certain Personally Identifiable Information of Individuals; (II) Approving the Form and Manner of Service of Notice of Commencement; and (III) Granting Related Relief.*

- **Joint Administration Motion**. *Motion of Debtors for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief.*

58.    I have reviewed and am familiar with the content of each of the First Day Motions and have consulted with the Debtors' advisors to ensure that I understand each First Day Motion and the relief requested therein.  To the best of my knowledge and belief, the factual statements contained in each of the First Day Motions are true and accurate and each such factual statement is incorporated herein by reference.

59.    Based on my knowledge, and after reasonable inquiry, I believe that the approval of the relief requested in the First Day Motions is:  (a) necessary to enable the Debtors to transition into, and operate efficiently and successfully in, chapter 11 with minimal disruption or loss of productivity and value; (b) critical to the Debtors' achieving a successful restructuring, as it would not be prudent, or even possible, to administer these chapter 11 estates without access to the critical

liquidity provided by the DIP Facilities and access to Cash Collateral in light of the Debtors' cash on hand as of the Petition Date; and (c) in the best interest of the Debtors' estates and their stakeholders.  I believe that, if the Court does not grant the relief requested by the Debtors in the First Day Motions, the Debtors' business and their estates will suffer immediate and irreparable harm.  Accordingly, for the reasons set forth herein and in the First Day Motions, the Court should grant the relief requested in each of the First Day Motions.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  October 10, 2024   /s/  *Charles M. Moore*
            Name: Charles M. Moore

            Title: Chief Restructuring Officer
               Accuride Corporation

## Exhibit A

**Restructuring Term Sheet**

**[To be filed subsequently]**

**Exhibit B**

**Corporate Structure Chart**

