**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ACCURIDE CORPORATION, *et al.*,[1] | ) | Case No. 24-12289 (JKS) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND
FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) OBTAIN
POSTPETITION SENIOR SECURED FINANCING AND (B) USE CASH
COLLATERAL, (II) GRANTING ADEQUATE PROTECTION, (III) GRANTING
LIENS AND SUPERPRIORITY CLAIMS, (IV) MODIFYING THE AUTOMATIC
STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state

as follows in support of this motion:[2]

**Preliminary Statement**

1.      To fund these chapter 11 cases and facilitate an expeditious deleveraging

restructuring transaction with the support of their stakeholders, the Debtors require immediate

access to capital.  The Debtors commence these chapter 11 cases with the commitments from an

*ad hoc* group of the Debtors' first lien term loan lenders (the "Ad Hoc Group") to provide a $103

million senior secured superpriority term loan facility to fund these chapter 11 cases.  The Debtors

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Accuride Corporation (9077); Accuride Group Holdings, Inc. (4531); Accuride Intermediate Co., Inc. (9045); Accuride Distributing, LLC (3124); Accuride EMI, LLC (0389); Accuride Erie L.P. (4862); Accuride Henderson Limited Liability Company (8596); AKW General Partner, L.L.C. (4861); AOT, LLC (3088); Armor Parent Corp. (6684); Bostrom Holdings, Inc. (9282); Bostrom Seating, Inc. (7179); Gunite Corporation (9803); KIC LLC (6356); Transportation Technologies Industries, Inc. (2791); and Truck Components, Inc. (5407).  The location of the Debtors' service address is:  38777 Six Mile Road, Suite 410, Livonia, MI 48152.

[2]    A detailed description of the Debtors and their businesses, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Charles M. Moore, Chief Restructuring Officer of Accuride Corporation, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith.  Capitalized terms used but not defined in this motion have the meanings ascribed to them in the First Day Declaration or in the Interim Order (as defined below), as applicable.

have also negotiated consensual access to cash collateral with the Ad Hoc Group and the lenders under the Debtors' prepetition asset-based loan facility. The DIP Facility is necessary at the outset of these chapter 11 cases to stabilize the Debtors' operations, fund these chapter 11 cases, and avoid irreparable harm to the Debtors' estates.

2.      The DIP Facility consists of: (a) new money term loans in an aggregate principal amount of up to $30 million, up to $20 million of which will be available upon entry of the Interim Order (as defined below), and (b) DIP Roll-Up Loans (as defined below) in an aggregate principal amount of approximately $73 million representing the roll-up upon entry of the Interim Order of the corresponding amount of the principal of, and accrued interest, fees, and other amounts on, or with respect to, the Prepetition Bridge Loans. The Prepetition Bridge Loans subject to the roll-up were funded in the months preceding these chapter 11 cases to facilitate the Debtors' prepetition marketing efforts, evaluation of restructuring alternatives, and preparation for an orderly landing in these chapter 11 cases.

3.      In the face of persistent industry headwinds and other operational pressures, the Debtors have been carefully managing liquidity and working capital in the period leading up to the filing of these chapter 11 cases. The Debtors, with the assistance of their advisors, engaged with the Ad Hoc Group and other stakeholders regarding a capital infusion to support the Debtors' business and extend runway to explore strategic alternatives. Among the alternatives discussed was the possibility of implementing a consensual restructuring or sale transaction on an out-of-court basis, an in-court chapter 11 process, or pursuing both paths in parallel. These prepetition discussions were productive; in addition to the proposed DIP Facility, the Debtors also have agreed

with the Ad Hoc Group on the framework for a consensual restructuring of the Debtors' balance sheet.[3]

4.      Specifically, the Debtors anticipate implementing a deleveraging restructuring transaction via an equitization of their prepetition term loan obligations and raising incremental exit financing from the Ad Hoc Group to fund the go-forward business upon emergence.  The Debtors anticipate pursuing confirmation and consummation of such a deleveraging restructuring transaction through a plan of reorganization before the end of the year.  To keep with this timeline, the Debtors expect to file a plan and disclosure statement with the support of the Ad Hoc Group in the first 25 days of the case, which is consistent with milestones required by the DIP Facility.

5.      The Debtors seek to provide the following forms of adequate protection to the Prepetition Secured Parties:[4]  (a) replacement liens on DIP Collateral and Prepetition Collateral; (b) superpriority administrative expense claims; (c) payment of certain fees and expenses; (d) financial reporting and covenants; and (e) waivers of certain of the Debtors' statutory and equity claims with respect to the DIP Collateral and the Prepetition Collateral.  The Debtors submit that the proposed forms of adequate protection are appropriate under the circumstances of these chapter 11 cases.

6.      Further, the DIP Facility and the Interim Order contain various fees expressly required by the DIP Lenders as a condition to provide financing and by the Prepetition ABL Secured Parties as a condition to consenting to the use of Cash Collateral and forbearing from exercising remedies with respect to non-Debtor obligors under the Prepetition ABL Facility.  Each of the fees was the subject of arms'-length and good-faith negotiations between the Debtors and

---

[3]      The terms of this restructuring framework are set forth in the restructuring term sheet (the "Restructuring Term Sheet") attached to the First Day Declaration as Exhibit A to the First Day Declaration.

[4]      The Debtors do not seek to non-consensually prime any creditors through the DIP Facility.

the Prepetition Lenders, is an integral component of the overall terms of the DIP Facility, and is required by the DIP Lenders and Prepetition ABL Lenders as consideration for the extension of postpetition financing and consensual use of Cash Collateral.

7.     The Debtors would suffer immediate and irreparable harm if they were unable to secure the financing needed to sustain ongoing business operations at the outset of these chapter 11 cases and to ultimately bridge to consummation of the transactions outlined in the Restructuring Term Sheet.  Obtaining access to the proposed DIP Facility will send a strong signal to the Debtors' employees, customers, and trade partners that the Debtors' operations will continue on a postpetition business-as-usual basis.  Absent immediate access to the DIP Facility and Cash Collateral, the Debtors' ability to successfully reorganize will be severely endangered, as the Debtors would be unable to operate their business, satisfy employee, vendor, and other supplier obligations, or administer these chapter 11 cases.

8.     As described below and in the DIP Declarations, the Debtors' proposed DIP Facility is the product of hard-fought, good-faith, arms'-length negotiations with their existing lenders.  The Debtors sought postpetition financing proposals from outside their existing capital structure and were unable to generate interest in third-party postpetition financing.  In the Debtors' case, obtaining access to postpetition financing was difficult because substantially all the Debtors' material assets are encumbered by valid and perfected first-priority liens.  To avoid a protracted and expensive priming fight, the Debtors would need to either (a) obtain consent of all of the Prepetition Secured Parties or (b) locate a third-party lender willing to provide postpetition financing on a junior secured or unsecured basis.  Because neither option was available, the Debtors, in an exercise of their business judgment, negotiated extensively with the Prepetition

Secured Parties for the terms of the DIP Facility in parallel with the negotiation of the Restructuring Term Sheet.

9.      For these reasons, and for the reasons set forth below, in the DIP Declarations, and the First Day Declaration, the Debtors believe that entering into the DIP Credit Agreement (as defined below) to provide access to the DIP Facility and the use of Cash Collateral will maximize the value of the Debtors' estates and is a sound exercise of the Debtors' business judgment.

## **Relief Requested**

10.      The Debtors seek entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim Order") and a final order (the "Final Order," and together with the Interim Order, the "DIP Orders"):[5]

a.      ***DIP Facility***.  Authorizing (x) the DIP Borrower to obtain senior secured postpetition financing on a superpriority basis in the aggregate principal amount of up to $103 million (the "DIP Facility"), consisting of (1) up to $30 million of new money term loans (the "DIP New Money Loans") and (2) roll-up loans in an aggregate principal amount of approximately $73 million representing a roll-up and conversion in full, on a cashless, dollar-for-dollar basis, of principal of, and accrued interest, fees, and other amounts on, or with respect to, the Prepetition Bridge Loans (as defined below), (the "DIP Roll-Up Loans" and, together with the DIP New Money Loans, the "DIP Loans") upon entry of this interim order (this "Interim Order"), in each case, pursuant to the terms and conditions of that certain *Senior Secured Superpriority Debtor-in-Possession Credit Agreement* (as the same may be amended, restated, amended and restated, supplemented, waived and/or otherwise modified from time to time, the "DIP Credit Agreement" and, together with any exhibits and schedules attached thereto and the other Loan Documents (as defined in the DIP Credit Agreement) the "DIP Documents"), by and among Accuride Corporation, as the "Borrower" (in such capacity, the "DIP Borrower"), Armor Parent Corp., as "Holdings" (in such capacity, "Holdings"), Accuride Intermediate Co., Inc., Accuride Group Holdings, Inc., Alter Domus (US) LLC, as administrative agent and collateral agent (in such capacities, the "DIP Agent"), and the lenders party thereto from time to time (in such capacities, the "DIP Lenders" and, together with the DIP Agent, the "DIP Secured Parties"), substantially in the form attached to the Interim Order as Exhibit

---

[5]      The Debtors will file the form of the Final Order prior to the Final Hearing (as defined herein).

1 and (y) each of the Debtors other than the DIP Borrower (collectively, in such capacities, the "DIP Guarantors"), to guaranty the DIP Borrower's (and each other DIP Guarantors') obligations under the DIP Facility and under, or secured by, the DIP Documents (such obligations, together with all "Obligations" as defined in the DIP Credit Agreement, the "DIP Obligations");

b.  **DIP Documents**:  Authorizing the Debtors to execute and enter into the DIP Documents and to perform such other acts as may be necessary or appropriate in connection with the same;

c.  **Interim New Money Loans**:  Authorizing the DIP Borrower to borrow up to $20 million of DIP New Money Loans (the "Interim New Money Loans") upon entry of this Interim Order to avoid immediate and irreparable harm to the Debtors' estates;

d.  **Additional New Money Loans**.  Authorizing the DIP Borrower to borrow up to the remaining $10 million of DIP New Money Loans upon entry of the Final Order.

e.  **DIP Roll-Up Loans**:   Authorizing the roll-up and conversion of approximately $73 million in aggregate principal amount (together with all accrued and unpaid interest, fees, and expenses with respect thereto) of Prepetition Bridge Loans into DIP Roll-Up Loans upon entry of this Interim Order;

f.  **Security and Priority**:  Granting the DIP Obligations the status of allowed superpriority administrative expense claims in each of the Chapter 11 Cases, which, for the avoidance of doubt, shall be subject to the Carve Out (as defined below) in all respects;

g.  **DIP Liens**:  Granting to the DIP Agent, for the benefit of the DIP Secured Parties, to secure the DIP Obligations, valid, enforceable, binding, non-avoidable, and fully perfected first priority priming liens on and security interests in all of the DIP Collateral (as defined below), including, without limitation, all property constituting "cash collateral" as defined in section 363(a) of the Bankruptcy Code (the "Cash Collateral"), which liens shall have the priorities set forth herein and shall be subject only to (1) the Carve Out and (2) with respect to the ABL Priority Collateral (as defined below), (a) the ABL Adequate Protection Liens (as defined below) and (b) the Prepetition ABL Liens (as defined below); provided that in no event shall DIP include Excluded Property (as defined in the DIP Credit Agreement) or funds held in the Carve Out Reserves (other than the Debtors' reversionary interest, if any, therein, after all Professional Fees benefitting from the Carve Out have been indefeasibly paid in full, in cash);

h.    ***Postpetition ABL Obligations***.   Authorizing the Debtors to continue to renew outstanding Letters of Credit and obtain Cash Management Services (each as defined in the Prepetition ABL Credit Agreement) from the Prepetition ABL Secured Parties, and to satisfy obligations thereunder. Upon entry of the Interim Order, all obligations of the Debtors, including all Obligations (as defined in the Prepetition ABL Credit Agreement), under or relating to any Letters of Credit (such Obligations solely to the extent relating to Letters of Credit, the "L/C Obligations") or Cash Management Services (such Obligations solely to the extent related to Cash Management Services, the "Cash Management Obligations" and, together with the L/C Obligations, the "Postpetition ABL Obligations;" the Postpetition ABL Obligations, together with the Prepetition ABL Obligations, the "ABL Obligations") provided by Prepetition ABL Secured Parties shall be enforceable in accordance with their terms against the Debtors, their estates and any successors thereto in each of the Chapter 11 Cases and any Successor Cases and have the claim and lien priorities set forth in the Interim Order.  The Postpetition ABL Obligations shall be due and payable without notice or demand on the Termination Date (as defined below).

i.    ***Postpetition ABL Superpriority Claims***.   Granting the Postpetition ABL Obligations the status of allowed superpriority administrative expense claims in each of the Chapter 11 Cases, which, for the avoidance of doubt, shall be subject to the Carve Out (as defined below) (other than with respect to the Post-Carve Out Reserve and Post-Carve Out Amounts) and *pari passu* with the DIP Superpriority Claims.

j.    ***Cash Management Liens***.   Granting to the Prepetition ABL Agent for the benefit of the Cash Management Banks, to secure the Cash Management Obligations, valid, enforceable, binding, non-avoidable, and fully perfected first priority priming liens on and security interests in all of the DIP Collateral (other than the DIP Account), including, without limitation, all Cash Collateral, which liens shall be subject and subordinate to the Carve Out and with respect to the Term Priority Collateral (other than the DIP Account and amounts drawn under the DIP Facility pursuant to the DIP Loans) *pari passu* with the DIP Liens in all respects.

k.    ***Fees and Interest***: Authorizing and directing the Debtors to pay the principal, interest, premiums, fees, expenses, and other amounts payable under the DIP Documents as such become due and payable;

l.    ***Adequate Protection***:   Authorizing the Debtors to use the Prepetition Collateral (as defined below) of the Prepetition Secured Parties (as defined below), including the Cash Collateral, and provide adequate protection to the Prepetition Secured Parties solely to the extent of the diminution in value, if any, of their respective interests in the Prepetition Collateral as of the Petition Date, including, as applicable, with respect to the Cash Collateral ("Diminution in Value"), resulting from (a) the imposition of the

automatic stay, (b) the Debtors' postpetition use, sale, or lease of the Prepetition Collateral, including Cash Collateral, (c) the priming of the Prepetition ABL Secured Parties' (as defined below) liens on the ABL Priority Collateral by the Carve Out or (d) the priming (including by the Carve Out) of (i) the Prepetition ABL Secured Parties' liens on the Term Priority Collateral (as defined below) and (ii) the Prepetition Term Secured Parties' (as defined below) liens on the Prepetition Term Collateral (as defined below);

m.      ***Automatic Stay***:  Lifting and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents;

n.      ***Waivers***:  Subject to entry of the Final Order, finding that none of the DIP Lenders or the Prepetition Secured Parties shall be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral; and

o.      ***Final Hearing***:  scheduling a date for the hearing (the "<u>Final Hearing</u>") to consider the Motion on a final basis and the entry of the Final Order authorizing and approving the transactions described in the foregoing clauses and the Motion.

In support of this Motion, the Debtors file contemporaneously herewith the *Declaration of Alexander Svoyskiy in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "<u>Svoyskiy Declaration</u>") and the *Declaration of Charles M. Moore in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "<u>Moore Declaration</u>" and, together with the Svoyskiy Declaration, the "<u>DIP Declarations</u>"), and the First Day Declaration.

**Jurisdiction and Venue**

11.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the

*Amended Standing Order of Reference* from the United States District Court for the District of

Delaware, dated February 29, 2012.  The Debtors confirm their consent, pursuant to rule 9013-1(f)

of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court

for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in

connection with this Motion to the extent that it is later determined that the Court, absent consent

of the parties, cannot enter final orders or judgments in connection herewith consistent with Article

III of the United States Constitution.

12.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

13.     The statutory bases for the relief requested herein are sections 105, 361, 362, 363,

364, 503, 506, 507, and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532

(the "Bankruptcy Code"), rules 2002, 4001, 6003, and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1, 4001-2, and 9013-1.

**Background**

14.     The Debtors, together with their non-Debtor affiliates, are a global leader in steel

and aluminum wheels and wheel-end components and assemblies, supplying innovative products

to over 1,000 customers in the commercial vehicles, passenger cars, agriculture, construction and

industrial equipment markets.  Headquartered in Livonia, Michigan, the Debtors are part of a

global enterprise that employs approximately 3,600 individuals at facilities in the United States,

Canada, Mexico, Germany, France, Turkey, Russia, and China.

15.     On October 9, 2024 (the "Petition Date"), each Debtor filed a voluntary petition for

relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their business and

managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.  Concurrently with the filing of this motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committees have been appointed or designated.

### Concise Statement Pursuant to Bankruptcy Rules 4001(b) and 4001(c), and Local Rule 4001-2

16.    The below chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2.[6]

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| **DIP Borrowers**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Accuride Corporation<br><br>*See* DIP Credit Agreement, Preamble. |
| **DIP Guarantors**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Holdings, Accuride Intermediate Co., Inc., Accuride Group Holdings, Inc., and each Subsidiary of Accuride Group Holdings, Inc. that is a Guarantor.<br><br>*See* DIP Credit Agreement § 1.01 "Guarantors," "Loan Parties." |
| **DIP Lenders**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Each lender from time to time party to the DIP Credit Agreement.<br><br>*See* DIP Credit Agreement, Preamble. |
| **DIP Agent**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Alter Domus (US) LLC.<br><br>*See* DIP ABL Credit Agreement, Preamble. |
| **Term**<br><br>Bankruptcy Rules 4001(b)(l)(B)(iii), 4001(c)(1)(B) | The earliest of:<br><br>(i)   the date that is 100 days after the Closing Date, as such date may be extended pursuant to Section 2.19 of the DIP Credit Agreement; |

---

6   The summaries contained in this motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Documents, as applicable.

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| Local Rule 4001-2(a)(ii) | (ii)  the date on which all Loans are accelerated and all unfunded Term Commitments (if any) have been terminated in accordance with this Agreement, by operation of law or otherwise; <br><br> (iii)  the date the Bankruptcy Court orders a conversion of the Chapter 11 Cases to a chapter 7 liquidation or the dismissal of the chapter 11 case of any Debtor; <br><br> (iv)  the closing of any sale of assets pursuant to Section 363 of the Bankruptcy Code, which when taken together with all other sales of assets since the Closing Date, constitutes a sale of all or substantially all of the assets of the Loan Parties and; <br><br> (v)  the Plan Consummation Date; _provided_ that if any such day is not a Business Day, the Maturity Date shall be the Business Day immediately preceding such day. <br><br> _See_ DIP Credit Agreement § 1.01, "Maturity Date" |
| **Commitments** <br><br> Bankruptcy Rule 4001(c)(1)(B) <br><br> Local Rules 4001-2(a)(i)(A), (O) | DIP New Money Loans:  $30 million <br><br> DIP Roll-Up Loans:  Equal to the amount of all of the principal of, and accrued interest, fees, and other amounts on, or with respect to, the Prepetition Amendment No. 14 Incremental Term Loans held on the Closing Date by the Term Lenders. <br><br> _See_ DIP Credit Agreement § 2.01. |
| **Interest Rates** <br><br> Bankruptcy Rule 4001(c)(1)(B) <br><br> Local Rule 4001-2(a)(i)(B) | The obligations in respect of the DIP Loans shall bear interest as follows: <br><br> (i)   each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Rate; and <br><br> (ii)  each Term SOFR Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to Term SOFR for such Interest Period plus the Applicable Rate; <br><br> _See_ DIP Credit Agreement §§ 1.01, 2.08. |
| **Conditions of Borrowing** <br><br> Bankruptcy Rule 4001(c)(1)(B) <br><br> Local Rule 4001-2(a)(i)(E) | The DIP Documents include conditions to closing and to each borrowing that are customary and appropriate for similar debtor-in-possession financings of this type. <br><br> _See_ DIP Credit Agreement §§ 4.01, 4.02. |
| **Use of DIP Facility and Cash Collateral** <br><br> Bankruptcy Rule 4001(b)(l)(B)(ii) <br><br> Local Rules 4001-2(a)(i)(D), 4001(a)(ii) | The Loan Parties shall use the proceeds of the Loans to (i) pay fees, interest and other amounts payable under this Agreement, (ii) provide working capital for, and for other general corporate purposes of, the Borrower and its Subsidiaries, including for funding the Carve Out, in each case of clauses (i) and (ii), in accordance with, and subject to, the DIP Order and the Approved 13-Week Cash Flow (subject to any Permitted Variance), and (iii) in the case of the Roll-Up Loans in exchange for (and to satisfy and discharge) the Prepetition Amendment No. 14 Incremental Loans and all accrued and unpaid interest, fees and other amounts thereon. |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | *See* DIP Credit Agreement § 5.17; Interim Order ¶ 11. |
| **Entities with Interests in Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(l)(B)(i) | The following secured parties have an interest in Cash Collateral:  the Prepetition Secured Parties.<br><br>*See* Interim Order ¶ F.ix. |
| **Fees**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(B) | The DIP Facility also includes the following fees.<br><br>(i)   *Upfront Fee.*  As consideration for the Lenders funding the New Money First Draw, the New Money Second Draw and the New Money Third Draw, on the Closing Date, the New Money Second Draw Funding Date or the New Money Third Draw Funding Date, as applicable, the Borrower agrees to pay to the Administrative Agent, for the ratable account of each of the Lenders, a non-refundable fee (the "Upfront Fee") equal to 5.00% of the aggregate principal amount of the New Money Loans funded by such Lenders pursuant to the New Money First Draw, the New Money Second Draw and the New Money Third Draw, as applicable, which fee shall be earned, due and payable in kind in the form of additional New Money Loans on the New Money First Draw Funding Date, the New Money Second Draw Funding Date and the New Money Third Draw Funding Date, as applicable.  The amounts so paid-in-kind in accordance with the immediately preceding sentence shall be treated as principal for all purposes of this Agreement and bear interest in accordance with the terms hereof from (and including) the applicable date on which such Upfront Fee was paid in kind.<br><br>(ii)   *Exit Fee.*  The Borrower agrees to pay in cash to the Administrative Agent, for the ratable account of each of the Lenders, on the Maturity Date or on any other date that the Term Loans are repaid (whether through a mandatory prepayment, voluntarily prepayment, acceleration or otherwise) a non-refundable fee equal to 2.00% of the aggregate principal amount of the Term Loans repaid on such applicable date, which fee shall be earned, due and payable on such date.<br><br>(iii)   *Backstop Fee.*  The Borrower shall pay the fees set forth in that certain Senior Secured Superpriority DIP Credit Agreement Fee Letter, dated as of [●], 2024 (the "Backstop Fee Letter"), by and among the Borrower and Jefferies Capital Services, LLC, as a fronting lender (a copy of which shall be provided to the Agents), in the amounts and at the times set forth therein.<br><br>(iv)   *Sale Premium.*  If at any time, one or more Sale Transactions which would (individually or in the aggregate) result in the sale of all or substantially all of the assets or the equity of Topco and its Subsidiaries are consummated, the Lenders with respect to the Term Commitments and New Money Loans shall receive a fee (the "Sale Premium") in an aggregate amount equal to 10.00% of the sum of (x) the aggregate amount of all the Term Commitments (prior to giving effect to the New Money First Draw) provided on the Closing Date by all Lenders in the aggregate plus (y) the aggregate principal amount of all of the Roll-Up Loans deemed funded on the Closing Date by all Lenders in the aggregate, which Sale Premium shall be earned, due and payable in cash on the date of consummation of such Sale Transaction (or in the case of multiple Sale Transactions, the last such Sale Transaction) (the "Sale Consummation Date") from the proceeds of such Sale Transactions, |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | and allocated on a pro rata basis among such Lenders holding Term Commitments and New Money Loans, in accordance with the amount of Term Commitments and principal amount of Term Loans (including both New Money Loans and Roll-Up Loans) held by such Lender and certain of such Lender's Affiliates (which Affiliates shall designated, and the pro rata calculation confirmed, to the Administrative Agent in writing by the Lender Advisors (which may be by email), upon which the Administrative Agent may rely without further investigation or inquiry) prior to the date such Sale Premium is paid) on the Sale Consummation Date.<br><br>*See* DIP Credit Agreement § 2.09.<br><br>*ABL Fee Letters.* The Debtors are authorized to enter into the ABL Fee Letters, and the prior execution thereof is hereby ratified, approved, and authorized. The Debtors are further authorized to comply with the terms of the ABL Fee Letters and to take any and all actions necessary to implement the terms thereof and pay the fees, expenses, and indemnity obligations set forth in the ABL Fee Letters, including, without limitation, any fees and expenses incurred prior to the date of this Interim Order, in each case, pursuant to the terms and conditions set forth in the ABL Fee Letters without further notice, hearing, or order of this Court. The Debtors and the Prepetition ABL Secured Parties are authorized to enter into any amendment, modification, supplement, or waiver to any provision of the ABL Fee Letters in accordance with the terms thereof without further notice, hearing, or order of this Court. Any such material amendment, modification, supplement, or waiver shall be provided to counsel of the Prepetition Term Lenders. The Debtors' obligations in respect of the fees, expenses, and indemnity obligations pursuant to the ABL Fee Letters shall constitute ABL Obligations.<br><br>*See* Interim Order ¶ 13. |
| **Budget**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rules 4001-2(a)(i)(E) and 4001-2(a)(iii) | The Debtors will use the proceeds of the DIP Facility and Cash Collateral in accordance with the Initial Approved 13-Week Cash Flow, attached to the Interim Order as <u>Exhibit 2</u>, and each subsequent Approved 13-Week Cash Flow.<br><br>*See* DIP Credit Agreement § 6.11; Interim Order ¶¶ 18–19, <u>Exhibit 2</u>. |
| **Variance Covenant**<br><br>Local Rules 4001-2(a)(i)(E) and 4001-2(a)(iii) | Every other Thursday (provided if Thursday is not a Business Day, such date shall extend to the immediately succeeding Business Day) commencing on October 24, 2024 (and testing for the two-week period ending October 24, 2024), the Permitted Variances shall be tested for the immediately preceding cumulative two-week period ending on the Friday immediately prior to such Thursday (provided if Thursday is not a Business Day, such date shall extend to the immediately succeeding Business Day) (the "<u>Initial Variance Testing Period</u>" and, each two-week period thereafter, a "<u>Variance Testing Period</u>") against the Approved 13-Week Cash Flow, and the Borrower shall not permit: (a) Total Disbursements to be more than 110% of the Total Disbursements in the Approved 13-Week Cash Flow for the Initial Variance Testing Period and each Variance Testing Period thereafter; (b) the professional fees paid to any professional or advisor retained by the Loan Parties to be more than 110% of the professional or advisor fees budgeted to be paid to such professional or advisor in the Approved 13-Week Cash Flow for the Variance Testing Period and each Variance Testing Period thereafter; (c) Total Receipts to be less than 90% of the Total Receipts in the Approved 13-Week Cash Flow for the Initial Variance Testing Period and each Variance Testing Period thereafter (on an aggregate basis); and (d) total cash flow to be less than the total cash flow shown in |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | the Approved 13-Week Cash Flow for the Initial Variance Testing Period and each Variance Testing Period thereafter, in each case, by an amount in excess of 15% of the Total Receipts shown in the Approved 13-Week Cash Flow for such Variance Testing Period (on an aggregate basis) (clauses (a) through (d), the "Permitted Variances"). *See* DIP Credit Agreement § 7.13; Interim Order ¶ 18. |
| **Chapter 11 Milestones** <br><br> Bankruptcy Rule 4001(c)(1)(B) <br><br> Local Rule 4001-2(a)(i)(H) | The following milestones (the "Milestones") shall apply to the DIP Credit Agreement unless extended or waived in writing (e-mail being sufficient) by the Company Parties and the Required Consenting Term Lenders: <br><br> (i)     by the date that is no later than 3 days after the Petition Date, the Debtors shall have obtained entry of the Interim Order; <br><br> (ii)     by the date that is no later than 25 days after the Petition Date, the Debtors shall have filed the (x) the Disclosure Statement and (y) an Acceptable Plan; <br><br> (iii)     by the date that is no later than 28 days after the Petition Date, the Debtors shall have obtained entry of the Final Order <br><br> (iv)     by the date that is no later than 55 days after the Petition Date, the Debtors shall have obtained entry of an order of the Bankruptcy Court approving (x) the Disclosure Statement and (y) related procedures for soliciting votes on the Disclosure Statement, in each case in form and substance reasonably satisfactory to the Required Lenders; <br><br> (v)     by the date that is no later than 95 days after the Petition Date, the Debtors shall have obtained entry of an order confirming an Acceptable Plan in form and substance satisfactory to the Required Lenders (and with respect to any provisions that affect the rights or duties of the Agents, to the Agent); and <br><br> (vi)     by the date that is no later than 100 days after the Petition Date, the Acceptable Plan confirmed pursuant to clause (d) above shall have been consummated in all material respects in accordance with the terms thereof (with only such amendments thereto as are consented to in writing by the Required Lenders) (and with respect to any provisions that affect the rights or duties of the Agents, to the Agent). <br><br> *See* DIP Credit Agreement § 6.21; Interim Order ¶ 33. |
| **Liens and Priorities** <br><br> Bankruptcy Rule 4001(c)(l)(B)(i) <br><br> Local Rule 4001-2(a)(i)(G) | The liens contemplated by the DIP Credit Agreement and granted in connection with the Interim Order will follow the priorities set forth in the Interim Order. <br><br> *See* DIP Credit Agreement § 2.18; Interim Order ¶¶ 8, 14, 15. |
| **Carve Out** <br><br> Bankruptcy Rule 4001(c)(1)(B) <br><br> Local Rule 4001-2(a)(i)(F) | The Interim Order provides a "Carve Out" of certain statutory fees and allowed professional fees of the Debtors pursuant to section 1103 of the Bankruptcy Code. <br><br> *See* Interim Order ¶ 42. |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| **Repayment Features / Provisions Limiting Repayment**<br><br>Local Rule 4001-2(a)(i)(I) | <u>Optional Prepayments</u>:  The Borrower may, upon notice to the Administrative Agent by the Borrower, at any time or from time to time voluntarily prepay any Borrowing of any Class in whole or in part without premium or penalty (except as set forth in Section 2.09(b)(ii)); *provided* that (1) such notice must be received by the Administrative Agent not later than 1:00 p.m., New York City time (A) three (3) Business Days prior to any date of prepayment of Term SOFR Loans and (B) one (1) Business Day prior to any date of prepayment of Base Rate Loans and (2) any prepayment of Term SOFR Loans shall be in a principal amount of the Borrowing Minimum or a whole multiple of the Borrowing Multiple in excess thereof, in each case, the entire principal amount thereof then outstanding.   Each such notice shall specify the date and amount of such prepayment and the Class(es) and Type(s) of Loans to be prepaid.  The Administrative Agent will promptly notify each Appropriate Lender of its receipt of each such notice, and of the amount of such Lender's Applicable Percentage of such prepayment.  If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.  Any prepayment of a Term SOFR Loan shall be accompanied by all accrued interest thereon, together with any additional amounts required pursuant to Section 3.04.  Each prepayment of the Loans pursuant to this Section 2.05(a) shall be applied ratably to each outstanding Class of Term Loans and shall be paid to the Appropriate Lenders in accordance with their respective Applicable Percentages.<br><br>*See* DIP Credit Agreement § 2.05(a).<br><br><u>Mandatory Prepayments</u>:<br><br>(i)    [Reserved].<br><br>(ii)    (A) If following the Closing Date (x) the Borrower or any Subsidiary Disposes of any property or assets to any Person that is not a Loan Party (other than any Disposition of any property or assets (1) in the ordinary course of business, consistent with past practice or (2) with the consent of the Required Lenders (which consent shall not be unreasonably withheld or delayed, and may be communicated via e-mail from the Lender Advisors), the Permitted German Sale Leaseback), or (y) any Casualty Event occurs, which in the aggregate results in the realization or receipt by the Borrower or such Subsidiary of Net Cash Proceeds, the Borrower shall make a prepayment, in accordance with <u>Section 2.05(b)(ii)(C)</u>, of an aggregate principal amount of Term Loans equal to 100% (such percentage, the "<u>Asset Percentage</u>") of all such Net Cash Proceeds realized or received (other than any portion of such Net Cash Proceeds constituting proceeds from the Disposition of ABL Priority Collateral (as defined in the DIP Order), which shall be applied, and only to the extent applied, in accordance with the Prepetition Intercreditor Agreement to the payment or cash collateralization of the ABL Obligations (as defined in the DIP Order) until the ABL Obligations (as defined in the DIP Order) are either paid in full in cash or fully cash collateralized in the Borrowing Base Account (as defined in the DIP Order)); <u>provided</u> that no such prepayment shall be required pursuant to this <u>Section 2.05(b)(ii)(A)</u> (I) with respect to such portion of such Net Cash Proceeds in respect of Casualty Events that the Borrower shall have, on or prior to such date, given written notice to the Administrative Agent of its intent to reinvest in accordance with <u>Section 2.05(b)(ii)(B)</u> (which notice may only be provided if no Event of Default has occurred and is then continuing). |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | (B) With respect to any Net Cash Proceeds realized or received with respect to any Casualty Event, at the option of the Borrower, the Borrower may reinvest an amount equal to all or any portion of such Net Cash Proceeds to replace assets subject to such Casualty Event) within three (3) months following receipt of such Net Cash Proceeds; *provided* that (i) so long as an Event of Default shall have occurred and be continuing, the Borrower shall not be permitted to make any such reinvestments and (ii) if any Net Cash Proceeds are not so reinvested by the deadline specified above, or if any such Net Cash Proceeds are no longer intended to be or cannot be so reinvested at any time after delivery of a notice of reinvestment election, 100% of such Net Cash Proceeds shall be applied, in accordance with Section 2.05(b)(ii)(C), to the prepayment of the Term Loans as set forth in this Section 2.05. |
| | (C) On each occasion that the Borrower must make a prepayment of the Term Loans pursuant to this Section 2.05(b)(ii), the Borrower shall, within five (5) Business Days after the date of realization or receipt of such Net Cash Proceeds, make a prepayment, in accordance with Section 2.05(b)(v) below, of the principal amount of Term Loans in an amount equal to the Asset Percentage of such Net Cash Proceeds realized or received. |
| | (iii)    If, following the Closing Date, the Borrower or any Subsidiary incurs or issues any (A) [reserved], (B) [reserved] or (C) Indebtedness not expressly permitted to be incurred or issued pursuant to Section 7.03, the Borrower shall cause to be prepaid an aggregate principal amount of Term Loans equal to 100% of all Net Cash Proceeds received therefrom on or prior to the date which is five (5) Business Days after the receipt of such Net Cash Proceeds. |
| | (iv)    Each prepayment of Term Loans pursuant to this Section 2.05(b) shall be applied, subject to the DIP Order, to the outstanding Term Loans of each Class, ratably, following the applicable prepayment event. |
| | (v)    The Borrower shall notify the Administrative Agent in writing of any mandatory prepayment of Term Loans required to be made pursuant to clauses (ii) and (iii) of this Section 2.05(b) prior to 1:00 p.m. at least five (5) Business Days on the date of such prepayment.  Each such notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the amount of such prepayment.  The Administrative Agent will promptly notify each Appropriate Lender of the contents of the Borrower's prepayment notice and of such Appropriate Lender's Applicable Percentage of the prepayment with respect to the Term Loans. |
| | (vi)    Notwithstanding any other provision of this Section 2.05(b), to the extent that any or all of the Net Cash Proceeds of any Disposition by a Subsidiary that is a Foreign Subsidiary otherwise giving rise to a prepayment pursuant to Section 2.05(b)(ii) (a "Restricted Disposition") or the Net Cash Proceeds of any Casualty Event of a Subsidiary that is a Foreign Subsidiary (a "Restricted Casualty Event") would be prohibited or delayed by applicable local law from being distributed or otherwise transferred to the Borrower, the Borrower shall not be required to make a prepayment at the time provided in Section 2.05(b)(ii), for so long, but only so long, as the applicable local law will not permit such distribution or transfer (the Borrower hereby agreeing to cause the applicable Subsidiary to promptly take all commercially reasonable |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | actions available under the applicable local law to permit such repatriation), and once distribution or transfer of any of such affected Net Cash Proceeds is permitted under the applicable local law, the amount of such Net Cash Proceeds permitted to be distributed or transferred (net of additional taxes payable or reserved against as a result thereof) will be promptly (and in any event not later than two (2) Business Days after such distribution or transfer is permitted) taken into account in measuring the Borrower's obligation to repay the Term Loans pursuant to this Section 2.05(b) to the extent provided herein. *See* DIP Credit Agreement § 2.05(b). |
| **Stipulations to Prepetition Liens and Claims** Bankruptcy Rule 4001(c)(1)(B)(iii) Local Rule 4001-2(a)(i)(Q) | Without prejudice to the rights of any other party in interest specifically set forth in, and subject to the limitations thereon contained in, paragraph 45 of the Interim Order, the Debtors admit, acknowledge, agree, and stipulate to the following, which stipulations shall be binding on the Debtors, their estates, and all parties in interest. *See* Interim Order ¶ F. |
| **Challenge Period** Bankruptcy Rule 4001(c)(l)(B) Local Rule 4001-2(a)(i)(Q) | The Stipulations shall also be binding on all creditors and all other parties in interest and all of their respective successors and assigns, including, without limitation, a Committee (if appointed) unless, and solely to the extent that, a party in interest with standing and requisite authority: (i)    has timely commenced an appropriate proceeding or contested matter required under the Bankruptcy Code and Bankruptcy Rules, including, without limitation, as required pursuant to Part VII of the Bankruptcy Rules (in each case subject to the limitations set forth in this paragraph 40) (A)    objecting to or challenging the amount, validity, or enforceability of the Prepetition Obligations or the perfection or priority of the Prepetition Liens; or (B)    otherwise asserting or prosecuting any action for preferences, fraudulent conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses against the Prepetition Secured Parties or any of such parties' affiliates, representatives, attorneys, or advisors in connection with matters related to the Prepetition Debt Documents, the Prepetition Term Obligations, and the Prepetition Collateral (each such proceeding or contested matter, a "Challenge") by no later than seventy-five (75) calendar days following the entry of the Interim Order (the "Challenge Period"), as such deadline may be extended in writing from time to time in the sole discretion of the Prepetition ABL Agent (with respect to the Prepetition ABL Liens and Prepetition ABL Obligations), or the Prepetition Term Agent, acting at the direction of the Prepetition Term Secured Parties (with respect to the Prepetition Term Liens and Prepetition Term Obligations) (the "Challenge Deadline"); provided that if the Chapter 11 Cases are converted to chapter 7 or a chapter 7 or chapter 11 trustee is appointed or |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | elected prior to the expiration of the Challenge Period, any such trustee shall have the longer of (1) the remaining Challenge Period and (2) twenty-one (21) calendar days after their appointment, to commence a Challenge in accordance with this paragraph 40; and<br><br>(ii) the Court enters judgment in favor of the plaintiff or movant in any such timely and properly commenced Challenge and any such judgment has become a final judgment that is not subject to any further review or appeal, and then only to the extent of any such final judgment.  Notwithstanding the foregoing, the Challenge Deadline set forth herein shall be tolled if a party-in-interest (including the Committee, if any) files a motion seeking standing to bring a Challenge (a "Standing Motion"), which attaches one or more draft complaints that detail the alleged Challenge(s) that the applicable party in interest seeks to file, until such time as the Court decides the Standing Motion and solely with respect to (i) the party-in-interest that files the Standing Motion and (ii) the contents of the complaint(s) attached to the Standing Motion.<br><br>*See* Interim Order ¶ 40. |
| **Limitation on Estate Funds Related to the Challenge Period**<br>Local Rule 4001-2(a)(i)(L) | No proceeds of the DIP Facility, the DIP Collateral, or the Prepetition Collateral, in each case, including Cash Collateral may be used in connection with paying allowed fees and expenses in an amount in excess of $50,000 in the aggregate incurred by Committee Professionals (if a Committee is appointed), in investigating (but not prosecuting or challenging) the validity, enforceability, perfection, priority, or extent of the Prepetition Liens before the Challenge Deadline.<br><br>*See* Interim Order ¶ 44. |
| **Adequate Protection**<br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii)<br>Local Rule 4001-2(a)(i)(B), (G), (K) | Adequate Protection for the Prepetition Secured Parties.  The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(c)(2), 363(e), 503, and 507 of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral as of the Petition Date, including the Cash Collateral, solely to the extent of Diminution in Value, if any, of their interests in the Prepetition Collateral as of the Petition Date (the "Adequate Protection Claim").  As adequate protection, the Prepetition Secured Parties are hereby granted the following (the "Adequate Protection Obligations"):<br><br>(i) ABL Adequate Protection Liens.  Subject to the Carve Out in all respects, as security for the payment of the Prepetition ABL Secured Parties' Adequate Protection Claims, if any, the Prepetition ABL Agent (for itself and for the benefit of the Prepetition ABL Lenders) is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements, or other agreements) a valid, perfected replacement security interest in and lien on all of the DIP Collateral of each of the Debtors (the "ABL Adequate Protection Liens"), subject and subordinate only to (i) the Carve Out (as defined below) in all respects; (ii) with respect to the Term Priority Collateral, in order of priority (1) the Term Permitted Liens; (2) the DIP Liens, (3) the Term Adequate Protection Liens (as defined below); (4) the Prepetition Term Liens, and; and (iii) with respect to ABL Priority Collateral, the ABL Permitted Liens. |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | (ii) <u>ABL Section 507(b) Claims</u>.  From and after entry of this Interim Order, the Prepetition ABL Agent, on behalf of itself and the Prepetition ABL Lenders, shall receive current cash payment during the Chapter 11 Cases of all accrued interest on the Prepetition ABL Obligations under the Prepetition ABL Credit Agreement as such interest becomes due and payable and as set forth in the following sentence, at the applicable contractual non-default rate thereunder and in the amounts specified in the Prepetition ABL Credit Agreement; <u>provided</u> <u>that</u>, all parties' rights regarding the treatment of default interest under the Prepetition ABL Credit Agreement are preserved. The first such interest payment date shall be [●], 2024, and thereafter, the last business day of every calendar month. |
| | (iii) <u>ABL Postpetition Interest Payments</u>.  From and after entry of this Interim Order, the Prepetition ABL Agent, on behalf of itself and the Prepetition ABL Lenders, shall receive current cash payment during the Chapter 11 Cases of all accrued interest on the Prepetition ABL Obligations under the Prepetition ABL Credit Agreement as such interest becomes due and payable and as set forth in the following sentence, at the applicable contractual non-default rate thereunder and in the amounts specified in the Prepetition ABL Credit Agreement; *provided that*, all parties' rights regarding the treatment of default interest under the Prepetition ABL Credit Agreement are preserved.  The first such interest payment date shall be [●], 2024, and thereafter, the last business day of every calendar month. |
| | (iv) <u>Term Adequate Protection Liens</u>.  Subject in all respects to the Carve Out, as security for the payment of the Prepetition Term Secured Parties' Adequate Protection Claims, if any, the Prepetition Term Agent (for itself and for the benefit of the Prepetition Term Secured Parties) is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements, or other agreements) a valid, perfected replacement security interest in and lien on all of the DIP Collateral of each of the Debtors (including, subject to entry of the Final Order, Avoidance Action Proceeds) (the "<u>Term Adequate Protection Liens</u>" together with the ABL Adequate Protection Liens, the "<u>Adequate Protection Liens</u>"), subject and subordinate only to (i) (1) the Carve Out (as defined below), (2) the Permitted Term Liens, and (3) the DIP Liens (and any liens permitted by the DIP Documents to be senior to the DIP Liens); and (ii) with respect to the ABL Priority Collateral, (1) the Permitted ABL Liens, (2) the ABL Adequate Protection Liens and (2) the Prepetition ABL Liens. |
| | (v) <u>Term Section 507(b) Claims</u>.  Subject to the Carve Out in all respects, the Prepetition Term Agent (for itself and for the benefit of the Prepetition Term Lenders) is hereby granted an allowed superpriority claim against each of the Debtors as provided in sections 503 and 507(b) of the Bankruptcy Code (the "<u>Term 507(b) Claims</u>" and, together with the ABL 507 Claims, the "<u>507(b) Claims</u>") in the amount of the Prepetition Term Secured Parties' Adequate Protection Claims, if any, with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, or 1114 of the Bankruptcy Code, subject and subordinate only to (1) the Carve Out and (2) the DIP Superpriority Claims granted in respect of the DIP Obligations.  Except to |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | the extent expressly set forth in this Interim Order, the Prepetition Term Secured Parties shall not receive or retain any payments, property, or other amounts in respect of the Term 507(b) Claims unless and until (x) the Carve Out is funded and (y) all DIP Obligations shall have been indefeasibly paid in full in cash. Only the Prepetition Term Agent, acting at the direction of the Required Lenders (as defined in the Prepetition Term Credit Agreement), may assert the Term 507(b) Claims against the Debtors.<br><br>(vi) Fees and Expenses. The Debtors are authorized to pay, as adequate protection, all accrued and unpaid fees and reasonable and documented disbursements (but not success fees, transaction fees, or similar fees) incurred, whether accrued before, on, or after the Petition Date, by (i) one primary counsel, (ii) one local counsel, and (iii) one financial advisor (the "Approved Fee Party Advisors") retained by the (v) DIP Lenders, (w) Prepetition Term Lenders (which shall be the same Approved Fee Party Advisors as the DIP Lenders'), (x) Prepetition ABL Lenders, (y) Prepetition Term Agent, and (z) Prepetition ABL Agent (collectively, the "Approved Fee Parties"). The Approved Fee Party Advisors shall not be required to comply with the U.S. Trustee fee guidelines; however, any time that such professionals seek payment of fees and expenses from the Debtors, each professional shall provide summary copies of its fee and expense statements or invoices (which shall not be required to contain time entries but shall include a general description of the nature of the matters for which services were performed, a list of professionals who worked on the matter, their hourly rate (if such professionals bill at an hourly rate) and the number of hours each professional billed and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work-product doctrine) to the U.S. Trustee and counsel to the Committee (if appointed), contemporaneously with the delivery of such fee and expense statements to the Debtors. After delivery of a fee and expense statement or invoice, the Debtors, the U.S. Trustee, and the Committee (if appointed) shall have ten (10) calendar days to raise an objection thereto. Any objections raised by the Debtors, the U.S. Trustee, or a Committee (if appointed) with respect to the Debtors' payment of the amounts in such invoices must be in writing and state with particularity the grounds therefor and must be submitted to the applicable professional. If an objection is timely raised, such objection shall be subject to resolution by the Court. Pending such resolution, the undisputed portion of any such fee and expense statement or invoice shall be paid promptly by the Debtors. Notwithstanding the foregoing, the Debtors are authorized to pay upon entry of this Interim Order all reasonable and documented fees, costs, and out-of-pocket expenses (but not any "success", "transaction", or similar fees) of the legal and financial advisors to the Approved Fee Parties incurred on or prior to such date without the need for any professional engaged by such parties to first deliver a copy of its invoice as provided for herein. Any and all fees, costs, and expenses paid prior to the Petition Date by any of the Debtors to the Approved Fee Parties are hereby approved in full. For the avoidance of doubt, the fees set forth in any engagement letter executed by any of the Debtors prior to the Petition Date with any of the legal or financial advisors to the Approved Fee Parties shall be deemed reasonable for all purposes |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | under this Order, including, without limitation, under paragraph 15(f) of the Interim Order.<br><br>*See* Interim Order ¶ 15. |
| **Termination Events/ Events of Default**<br><br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-2(a)(i)(M), (S) | The DIP Facility contains events of default that are usual and customary for debtor-in-possession financing.<br><br>*See* DIP Credit Agreement § 8.01; Interim Order ¶¶ 30, 32. |
| **Remedies Notice Period and Emergency Hearing**<br><br>Local Rule 4001-2(a)(i)(S), (T) | The automatic stay is hereby modified so that five (5) business days after the date a DIP Termination Declaration or ABL Cash Collateral Termination Declaration is delivered (such five (5) business day period, the "Remedies Notice Period"), (a) the DIP Agent, acting at the direction of the Required DIP Lenders, shall be entitled to exercise its applicable rights and remedies in accordance with the DIP Documents and this Interim Order, subject in all respects to the Carve Out (as defined below); provided that the DIP Agent shall not be permitted to exercise rights and remedies with respect to ABL Priority Collateral without the consent of the Prepetition ABL Agent and (b) the Prepetition ABL Agent, acting at the direction of the Required ABL Lenders, shall be entitled to exercise its applicable rights and remedies with respect to the Postpetition ABL Obligations in accordance with this Interim Order, subject in all respects to the Carve Out (as defined below); provided that the Prepetition ABL Agent shall not be permitted to exercise rights and remedies with respect to Term Priority Collateral without the consent of the Prepetition Term Agent and the DIP Agent. During the Remedies Notice Period, the Debtors and/or any other party in interest shall be entitled to seek an emergency hearing from the Court and the sole issue that may be contested by the Debtors at such hearing shall be whether an Event of Default (hereunder and/or under the DIP Credit Agreement) or an ABL Cash Collateral Termination Event has occurred and/or is continuing.<br><br>Unless the Court rules that an Event of Default or ABL Cash Collateral Termination Event has not occurred during the Remedies Notice Period, at the end of the Remedies Notice Period (a) the automatic stay shall automatically be terminated, without further notice or order, as to the DIP Agent, the DIP Lenders, the Prepetition ABL Agent and Cash Management Banks (as defined in the Prepetition ABL Credit Agreement), subject to the Carve Out (as defined below) and (b) the Debtors' authorization to use Cash Collateral will terminate. Upon expiration of the Remedies Notice Period, the DIP Agent, the Prepetition ABL Agent, and any liquidator or other professional retained by either of the foregoing will have the right to access and utilize, at no cost or expense, any trade names, trademarks, copyrights, or other intellectual property of the Debtors to the extent necessary or appropriate in order to sell, lease, or otherwise dispose of any of the DIP Collateral, including pursuant to any Court-approved sale process. Notwithstanding the foregoing, the DIP Secured Parties shall have no right to exercise rights and remedies with respect to the ABL Priority Collateral without the consent of the Prepetition ABL Agent. Any ABL Priority Collateral or proceeds thereof received by any DIP Secured Party or Prepetition Secured Party, whether in connection with the exercise of any right or remedy (including setoff) relating to the ABL Priority Collateral or otherwise received by a DIP Secured Party or Prepetition Secured Party, shall be segregated and held in trust for the benefit of and forthwith paid over to the Prepetition ABL Agent, for the benefit of the Prepetition ABL Secured Parties, in the same form as received, with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct. The Prepetition ABL Agent is hereby authorized to make any such |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | endorsements as agent for any such DIP Secured Parties or Prepetition Secured Parties, as applicable.  This authorization is coupled with an interest and is irrevocable.  From and after an ABL Cash Collateral Termination Event, any payments, property, or other amounts in respect of the DIP Obligations shall be paid ratably to the applicable Prepetition ABL Secured Parties on account of the Cash Management Obligations until such Cash Management Obligations have been indefeasibly paid in full in cash. *See* Interim Order ¶¶ 36–37. |
| **Waiver/Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) Local Rule 4001-2(a)(i)(S) | The automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to (a) permit the Debtors to grant the DIP Liens, Adequate Protection Liens, DIP Superpriority Claims, Postpetition ABL Superpriority Claims and 507(b) Claims; (b) permit the Debtors to perform such acts as the DIP Agent, the Prepetition ABL Agent, and the Prepetition Term Agent each may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Agent, DIP Lenders, and Prepetition Secured Parties under the DIP Documents, the DIP Facility, the Letters of Credit, the Cash Management Services and this Interim Order, as applicable; and (d) authorize the Debtors to pay, and the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties to retain and apply, payments made in accordance with the terms of this Interim Order. *See* Interim Order ¶ 22. |
| **Liens on Avoidance Actions** Bankruptcy Rule 4001(c)(1)(B)(xi) Local Rule 4001-2(a)(i)(U) | Subject and subordinate to the Carve Out in all respects, as set forth in this Interim Order and effective immediately upon entry of this Interim Order, pursuant to, as applicable, sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted, in order to secure the DIP Obligations, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on (collectively, the "DIP Liens") all real and personal property, whether now existing or hereafter arising and wherever located, tangible or intangible, of each of the Debtors (the "DIP Collateral"), including, subject to entry of the Final Order, the proceeds of any avoidance actions brought pursuant to chapter 5 of the Bankruptcy Code or section 724(a) of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code or applicable state law equivalents (the "Avoidance Action Proceeds"), but not the actions themselves. *See* Interim Order ¶¶ 7. |
| **506(c) Waiver; Section 552(b) Waiver** Bankruptcy Rule 4001(c)(1)(B)(x) Local Rules 4001-2(a)(i)(V) 4001-2(a)(i)(W) | *Section 506(c) Claims*.  Subject to entry of the Final Order, and except to the extent of the Carve Out, no costs or expenses of administration that have been or may be incurred in the Chapter 11 Cases at any time shall be charged against the DIP Agent, the DIP Lenders, the Prepetition ABL Agent, the Prepetition ABL Secured Parties; Prepetition Term Agent, the Prepetition Term Lenders, the DIP Collateral, or the Prepetition Collateral pursuant to section 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Agent (acting at the direction of the Required DIP Lenders), the Prepetition Term Agent (acting at the direction of the requisite Prepetition Term Lenders), or the Prepetition ABL Agent, as applicable, and no such consent shall be implied from any action, inaction, or acquiescence by any party. *See* Interim Order ¶ 46. |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
|  | **Section 552(b)**.  Subject to entry of the Final Order, the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception thereunder shall not apply to any of them.<br><br>*See* Interim Order ¶ 48. |
| **Marshaling Provision**<br><br>Local Rule 4001-2(a)(i)(X) | Subject to entry of the Final Order, in no event shall any of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral.<br><br>*See* Interim Order ¶ 47. |
| **Release**<br><br>Bankruptcy Rule 4001(c)(1)(B)(viii) | Effective as of the date of entry of this Interim Order, each Debtor and, subject to paragraph 45 of the Interim Order with respect to the Prepetition Obligations, the Prepetition Liens and the Prepetition Lenders and their Representatives (as defined below), each of the Debtors' estates, on their own behalf and on behalf of their past, present, and future predecessors, successors, heirs, subsidiaries and assigns hereby unconditionally, irrevocably, and fully forever release, remise, acquit, relinquish, irrevocably waive, and discharge (the "Release") each of the DIP Secured Parties, the Prepetition ABL Secured Parties, the Prepetition Term Agent, and the Prepetition Term Lenders, and each of their respective affiliates, former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, assigns, and predecessors in interest, each in their capacity as such (collectively, the "Representatives"), of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, statute, or regulation or by contract, of every nature and description that exist on the date hereof or hereafter arising for or by reason of any act, omission, cause or thing whatsoever at any time on or prior to the date of this Interim Order, with respect to or relating to the DIP Obligations, the DIP Liens (as defined below), the DIP Documents, the ABL Obligations, the Prepetition ABL Liens, the ABL Adequate Protection Liens, the Prepetition ABL Documents, the Prepetition Term Obligations, the Prepetition Term Liens, or the Prepetition Term Documents, as applicable, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code or applicable non-bankruptcy law, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection, or avoidability of the liens or claims of the DIP Secured Parties, the Prepetition ABL Secured Parties or the Prepetition Secured Parties.<br><br>*See* Interim Order ¶ 32. |

**Explanation for Inclusion of Significant Provisions Pursuant to Local Rule 4001-2(a)(i)**

**II. The Significant Provisions Are Appropriate and Justified Under the Circumstances of These Chapter 11 Cases.**

17.     Local Rule 4001-2(a)(i) requires that the Debtors explain the reason for including certain significant provisions described in Local Rules 4001-2(a)(i)(N)–(X) (collectively, the "Significant Provisions").[7]  The Debtors believe that each of the Significant Provisions and the Carve Out is justified and necessary in the context and circumstances of these chapter 11 cases.

**A.     The Roll-Up Is Appropriate.**

18.     Local Rule 4001-2(a)(i)(O) requires explicit disclosure of provisions that apply the proceeds of postpetition financing to pay, in whole or in part, prepetition debt or which otherwise has the effect of converting prepetition debt to postpetition debt.  *See* Local Rule 4001-2(a)(i)(O). Here, the Roll-Up consists of a roll-up and conversion via the DIP Roll-Up Loans, on a cashless, dollar-for-dollar basis upon the entry of the Interim Order, of all of the outstanding principal of, and accrued interest, fees, and other amounts on, or with respect to, the Prepetition Bridge Loans, which will automatically be deemed exchanged and converted into and constitute DIP Obligations.

19.     As discussed in further detail below, the Roll-Up is a key condition for the DIP Lenders to provide the DIP Facility.  The Prepetition Term Lenders provided emergency short-term funding to the Debtors through the Prepetition Bridge Loans, which bridged the Debtors to an orderly chapter 11 filing.  The Prepetition Term Lenders required the Roll-Up as an integral term of the DIP Facility and the Debtors understand that the DIP Lenders would not have extended new money financing to the Debtors without a roll-up of the Prepetition Bridge Loans.  Without agreeing to the Roll-Up, the Debtors also would not have been able to secure the support of the

---

[7]     Local Rules 4001-2(a)(i)(C), (J), (K), (N), and 4001-2(a)(i)(P) are not applicable.  Local Rules 4001-2(a)(i)(U)–(X) are only applicable upon entry of the Final Order.

Ad Hoc Group for the comprehensive restructuring contemplated in the Restructuring Term Sheet, which is a crucial step towards ensuring a smooth transition into these chapter 11 cases. Given these circumstances, the Roll-Up is reasonable, appropriate, a sound exercise of the Debtors' business judgment, and the Debtors submit that it should be approved.

**B.     The Findings of Validity, Perfection, or Amount of Prepetition Liens and Challenge Period Are Appropriate.**

20.     Local Rule 4001-2(a)(i)(Q) requires explicit disclosure of provisions that bind the estate or other parties in interest with respect to the validity, perfection, or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order to investigate such matters. *See* Local Rule 4001-2(a)(i)(Q). Here, the Interim Order complies with this requirement by providing any statutory committee appointed in these chapter 11 cases, and all parties in interest in each case, with requisite standing to file an adversary proceeding challenging the validity, extent, perfection, or priority of the Prepetition Liens on the Prepetition Collateral, the validity, allowability, priority, or amount of the Prepetition Secured Obligations, or the Stipulations by seventy-five (75) days after the entry of the Interim Order. *See* Interim Order ¶ 43(a).

**C.     The Provisions Immediately Approving All Terms and Conditions of the DIP Facility Are Appropriate.**

21.     Local Rule 4001-2(a)(i)(R) requires explicit disclosure of provisions that immediately approve all terms and conditions of the underlying loan agreement. *See* Local Rule 4001-2(a)(i)(R). Here, the Interim Order provides that upon entry, the parties to the DIP Facility are authorized to enter into their respective obligations and that, upon execution, the DIP Documents shall constitute valid and binding obligations of the Debtors. Moreover, to the extent the DIP Documents conflict with the Interim Order, the Interim Order controls. *See* Interim Order ¶ 57. This provision is necessary and appropriate for the Debtors to access the

DIP Facility and to provide all parties with the assurances that the Debtors' postpetition entry into the DIP Facility is valid. Without this provision, the Debtors would be unable to access the DIP Facility or use Cash Collateral on an interim basis.

**D.      The Provisions Modifying the Automatic Stay, Providing for a Remedies Notice Period, and Providing for a Default Notice Hearing Are Appropriate.**

22.      Local Rules 4001-2(a)(i)(S) and (T) require explicit disclosure of provisions that modify the automatic stay upon a termination of the DIP Facility without a remedies notice period of at least five (5) days and provisions that seek to limit what parties in interest may raise at an emergency hearing scheduled during the remedies notice period. *See* Local Rules 4001-2(a)(i)(S) and (T). Here, the Interim Order provides for a five (5)-business day Remedies Notice Period for all DIP Termination Events. *See* Interim Order ¶ 36. During the Remedies Notice Period, the Debtors shall be entitled to seek an emergency hearing to consider (a) whether an Event of Default or an ABL Cash Collateral Termination Event has occurred and (b) any appropriate relief (including, without limitation, the Debtors' non-consensual use of Cash Collateral).

23.      During the Remedies Notice Period, notwithstanding anything to the contrary in paragraph 36 of the Interim Order, (i) the DIP Secured Parties may not exercise any rights or remedies to satisfy the DIP Obligations, including any rights and remedies against the DIP Collateral, (ii) the Prepetition Secured Parties may not exercise any rights or remedies to satisfy the Prepetition Secured Obligations and the Adequate Protection Obligations, including any rights or remedies against the Prepetition Collateral, and (iii) the Debtors will continue to have the right to use Cash Collateral (x) solely to pay expenses necessary to avoid immediate and irreparable harm to the Debtors' estates, in accordance with the Approved 13-Week Cash Flow, (y) to satisfy Allowed Professional Fees benefitting from the Carve Out without regard to whether or not in compliance with the Approved 13-Week Cash Flow and (z) as otherwise agreed to by the Required

DIP Lenders and the Prepetition ABL Agent.  At the end of the Notice Period, unless the Court has entered an order to the contrary or otherwise fashioned an appropriate remedy, the Debtors' right to use Cash Collateral will immediately cease, unless otherwise provided in the Interim Order, and Prepetition Secured Parties, the DIP Agents and DIP Lenders will have the rights set forth in paragraph 22 of the Interim Order, without the necessity of seeking relief from the automatic stay.

24.     During the Remedies Notice Period, the Debtors and/or any other party in interest will be entitled to seek an emergency hearing from the Court and the sole issue that may be contested by the Debtors at such hearing shall be whether an Event of Default (under the Interim Order and/or the DIP Credit Agreement) or an ABL Cash Collateral Termination Event has occurred and/or is continuing.  Interim Order ¶ 36.

25.     In light of the foregoing, the Debtors submit that the Significant Provisions are appropriate under the facts and circumstances of these chapter 11 cases.  Accordingly, the Significant Provisions in the Interim Order should be approved.

### The Debtors' Prepetition Capital Structure

26.     As of the Petition Date, the Debtors had approximately $485.6 million in total third-party funded debt obligations:

| Maturity | Facility | Interest Rates | Approximate Funded Debt Outstanding as of the Petition Date |
|---|---|---|---|
| May, 2026 | U.S. Revolving Loans – Base Rate | P + 250 | $52,800,000 |
| | U.S. Revolving Loans – SOFR | S + 360[8] | |
| | French Revolving Loans – Eur Base Rate | EURIBOR + 450 | $25,100,000 |
| | French Revolving Loans – Eur (Tranche) | EURIBOR + 350 | |
| | German Revolving Loans – Eur Base Rate | EURIBOR + 450 | |
| | German Revolving Loans – Eur (Tranche) | EURIBOR + 350 | |
| N/A | Letters of Credit | N/A | $20,300,000 |
| May, 2026 | 2023 Extended Term Loans | S + 687[9] | $294,600,000 |
| October, 2024 | Amendment No. 14 Loans | S + 1,000 | $40,000,000 |
| | Amendment No. 15 Loans | | $16,800,000 |
| | Amendment No. 16 Loans | | $16,600,000 |
| N/A | Finance Leases and Other Debt | N/A | $19,400,000 |
| **TOTAL** | | | **$485,600,000** |

## I.    ABL Facility.

27.    Accuride Corporation is the U.S. borrower (in this capacity, the "Prepetition ABL U.S. Borrower") under that certain Amended and Restated ABL Credit Agreement, dated as of June 1, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "Prepetition ABL Credit Agreement," together with the other "Loan Documents," as defined therein, the "Prepetition ABL Documents;" the revolving credit facilities under the Prepetition ABL Credit Agreement, the "Prepetition ABL Facility," and

---

[8]    Includes 10 bps spread adjustment.

[9]    Term Loan interest composed of 100 bps cash pay and 587 bps PIK.

the Debtors' prepetition obligations under the Prepetition ABL Documents, the "Prepetition ABL Obligations"),[10] by and among the Prepetition ABL U.S. Borrower, Holdings, the foreign borrowers from time to time party thereto[11] (the "Prepetition ABL Foreign Borrowers" and together with the ABL U.S. Borrower, the "Prepetition ABL Borrowers"), the lenders from time to time party thereto (the "Prepetition ABL Lenders"), Bank of America, N.A., as administrative agent and collateral (the "Prepetition ABL Agent" and, together with the Prepetition ABL Lenders, the "Prepetition ABL Secured Parties") and the other parties thereto.  The Prepetition ABL U.S. Borrower, Holdings, and each of the Prepetition ABL U.S. Borrower's Debtor-subsidiaries (the foregoing, the "Prepetition ABL U.S. Guarantors") are also party to that certain Amended and Restated Guaranty, dated as of June 1, 2018 (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, the "Prepetition ABL U.S. Guaranty") with the Prepetition ABL Agent, pursuant to which the Prepetition ABL U.S. Guarantors guarantee the Prepetition ABL U.S. Obligations.

28.    The Prepetition ABL Facility comprises commitments from the applicable Prepetition ABL Lenders to provide revolving loans in local currency (the "Prepetition ABL Loans") to each Prepetition ABL Borrower—Prepetition ABL Loans in U.S. dollars to the Prepetition ABL U.S. Borrower and Prepetition ABL Loans in Euros to each of the Prepetition

---

[10]    The Prepetition ABL Credit Agreement has been amended by that certain Amendment No. 1, dated as of April 18, 2019, Amendment No. 2, dated as of September 8, 2020, Amendment No. 3, dated as of December 23, 2021, Amendment No. 4, dated as of December 31, 2021, Amendment No. 5, dated as of June 7, 2022, Amendment No. 6, dated as of March 31, 2023, Amendment No. 7, dated as of May 31, 2023, Amendment No. 8, dated as of June 30, 2023, Amendment No. 9, dated as of July 7, 2023.

[11]    Non-debtor Accuride Wheels Troyes SAS (f/k/a mefro Wheels France SAS) is party to the Prepetition ABL Credit Agreement as the "ABL French Borrower."  Non-debtor Accuride Wheels Solingen GmbH (f/k/a KRONPRINZ GmbH) is party to the Prepetition ABL Credit Agreement as the "ABL Solingen Borrower." Accuride Wheels Ebersbach GmbH (f/k/a Südrad GmbH Radtechnik) is party to the Prepetition ABL Credit Agreement as the "ABL Ebersbach Borrower."  Wheels EbersbachRonneburg GmbH (f/k/a mefro Räderwerk Ronneburg GmbH) is party to the Prepetition ABL Credit Agreement as the "ABL Ronneburg Borrower."  The foregoing entities are collectively the "Prepetition ABL Foreign Borrowers."

ABL Foreign Borrowers.  The unpaid principal amounts of the Prepetition ABL Loans bear interest at variable rates based on the currency in which such Prepetition ABL Loans were made, as set forth in the summary table above.  The Prepetition ABL Facility matures on the earlier of (a) May 18, 2026, and (b) ninety-one (91) days prior to the maturity date of the 2023 Extended Term Loans (as defined below).  The Prepetition ABL Secured Parties have liens (the "Prepetition ABL Liens") on substantially all the assets and property of the borrowers and guarantors with respect to the Prepetition ABL Facility, other than certain "Excluded Property" under the Prepetition ABL Credit Agreement.  The Prepetition ABL Liens are first-priority liens on the ABL Priority Collateral (as defined in the Prepetition ABL Credit Agreement, the "Prepetition ABL Priority Collateral") and second-priority liens on the Term Priority Collateral (as defined in the Prepetition ABL Credit Agreement, the "Term Priority Collateral").

29.    Accuride Corporation, in its capacity as Prepetition ABL U.S. Borrower, is party to certain agreements, including that certain Agreement for Acceptance of Drafts or Bills of Exchange, dated as of August 11, 2017 (together with any supporting or ancillary document thereto, the "Vendor Financing Agreement;" the Vendor Financing Agreement, together with any and all other "Cash Management Agreements" (as defined in the Prepetition ABL Credit Agreement), the "Cash Management Agreements"), by and among the Prepetition ABL U.S. Borrower, the Debtors signatory thereto, and Bank of America, N.A., in its capacity as a Cash Management Bank (in such capacity, the "Vendor Financing Bank"), pursuant to which the Vendor Financing Bank or its affiliates provide to the Prepetition ABL U.S. Borrower and certain of its Debtor-subsidiaries vendor financing and similar services (collectively, the "Cash Management Services").

30.    Pursuant to the terms of the Prepetition ABL Credit Agreement the Debtors' obligations with respect to the Cash Management Services (the "Cash Management Obligations") are Prepetition ABL Obligations and are secured by the Prepetition ABL Liens to the same extent and with the same priorities set forth above.

## II.    Prepetition Term Loan Facility.

31.    Accuride Corporation is the borrower (in this capacity, the "Prepetition Term Borrower") under that certain Term Loan Credit Agreement, dated as of November 18, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "Prepetition Term Credit Agreement" and the term loan credit facilities under the Prepetition Term Loan Credit Agreement, the "Prepetition Term Facility," and the loans made thereunder, the "Prepetition Term Loans," and the Prepetition Term Loans, together with the Debtors' other prepetition obligations under the Prepetition Term Loan Credit Agreement, the "Prepetition Term Obligations"),[12] by and among Holdings, the lenders from time to time party thereto (the "Prepetition Term Loan Lenders"), Alter Domus (US), LLC (as successor in interest to Royal Bank of Canada), as administrative agent and collateral agent (the "Prepetition Term Loan Agent" and, together with the Prepetition Term Loan Lenders, the "Prepetition Term Loan Secured Parties") and the other parties thereto (the parties described in this paragraph, collectively, the "Prepetition Term Loan Parties").  The Prepetition Term Borrower, Holdings, and each of the Prepetition Term Borrower's Debtor-subsidiaries (the foregoing, the "Prepetition Term Guarantors") are also party to that certain Guaranty, dated as of November 18, 2016 (as amended,

---

[12]    The Prepetition Term Loan Credit Agreement has been amended from time to time, most recently by that certain Amendment No. 16., dated as of September 19, 2024 (the "Sixteenth Term Loan Amendment").  The Prepetition Term Loan Credit Agreement, together with the other "Loan Documents," as defined therein, are the "Prepetition Term Documents."  The Prepetition Term Loan Credit Agreement, together with the Prepetition ABL Credit Agreement, are the "Prepetition Credit Agreements."  The Prepetition Term Loan Credit Documents, together with the Prepetition ABL Credit Documents, are the "Prepetition Debt Documents."

restated, amended and restated, supplemented and/or otherwise modified from time to time, the "Prepetition Term Guaranty") with the Prepetition Term Agent, pursuant to which the Prepetition Term Guarantors guarantee the Prepetition Term Obligations.

 32. On May 10, 2023, certain of the Prepetition Term Loan Parties entered into that certain Amendment No. 11 to Term Loan Credit Agreement, pursuant to which certain of the Prepetition Term Loan Lenders agreed to extend the maturities applicable to certain of the Prepetition Term Loans (the "Extended 2023 Term Loans") to May 18, 2026.[13]  On July 5, 2024, the Prepetition Term Loan Parties entered into that certain Amendment No. 14 to Term Loan Credit Agreement (the "Fourteenth Term Loan Amendment"), pursuant to which certain of the Prepetition Term Lenders committed to provide approximately $35 million in additional Prepetition Term Loans (the "Amendment No. 14 Term Loans").  On August 21, 2024, certain of the Prepetition Term Loan Parties entered into the Amendment No. 15 to Term Loan Credit Agreement (the "Fifteenth Term Loan Amendment"), pursuant to which certain of the Prepetition Term Lenders committed to provide approximately $15 million in additional Prepetition Term Loans (the "Amendment No. 15 Term Loans").  On September 19, 2024, the certain of the Prepetition Term Loan Parties entered into the Sixteenth Term Loan Amendment (together with the Fourteenth Term Loan Amendment and Fifteenth Term Loan Amendment, the "Bridge Loan Amendments") pursuant to which certain of the Prepetition Term Lenders committed to provide approximately $15 million in additional Prepetition Term Loans (the "Amendment No. 16 Term Loans" and, together with the Amendment No. 14 Term Loans and the Amendment No. 15 Term Loans, the "Prepetition Bridge Loans").  Pursuant to the Intercreditor Annex attached to the

---

[13] As of the Petition Date, all Prepetition Term Loans other than the Prepetition Bridge Loans were Extended 2023 Term Loans.

Prepetition Term Credit Agreement, the Prepetition Bridge Loans are senior in priority of payment to all other Prepetition Term Obligations.

33.     The Prepetition Term Secured Parties have liens (the "<u>Prepetition Term Liens</u>") on substantially all the assets and property of the borrowers and guarantors with respect to the Prepetition Term Facility, other than certain "Excluded Property" under the Prepetition Term Credit Agreement.  The Prepetition Term Liens are first-priority liens on the Term Loan Priority Collateral and second-priority liens on the ABL Priority Collateral.

<div align="center"><b><u>The DIP Facility</u></b></div>

**I.      The Debtors' Need for Accessing the DIP Facility and Use of Cash Collateral.**

34.     As further described in the Moore Declaration, the Debtors require access to additional liquidity to ensure that they can continue operating their businesses during these chapter 11 cases and preserve the value of their estates for the benefit of all parties in interest.  As part of their chapter 11 preparations, the Debtors and their advisors reviewed and analyzed the Debtors' anticipated go-forward liquidity needs and the amount of postpetition financing required to support the Debtors' ongoing business operations and fund chapter 11 process costs.  Moore Decl. ¶ 11. This analysis is reflected in the Approved 13-Week Cash Flow attached to the Interim Order as <u>Exhibit 2</u>.  The Approved 13-Week Cash Flow contains projections of the Debtors' anticipated cash receipts and disbursements during the thirteen-week period following the Petition Date.  *Id.* The analysis takes into account a number of factors, including (but not limited to) the effect of the chapter 11 filings on the Debtors' business operations, operational expenses and other payments anticipated to be made to the extent the Court approves certain first-day motions, the fees and interest expense associated with the DIP Facility, restructuring costs (including professional fees and adequate protection payments), required operational payments, and the potential acceleration of liquidity demands through working capital contraction.  *Id.*

35.     Based on this analysis, the Debtors require incremental liquidity to prudently fund postpetition operations and chapter 11 process costs and demonstrate to trade partners, customers, employees, and other constituents that the Debtors will continue to operate in the ordinary course and have sufficient liquidity to do so.  *Id.* ¶ 12.  Based on the Debtors' forecasts, the Debtors would be unable to generate sufficient levels of operating cash flow in the ordinary course of business to cover the projected restructuring costs of these chapter 11 cases without access to the postpetition financing provided by the DIP Facility.  *Id.*

36.     The Debtors enter these chapter 11 cases with the support of many of their key economic stakeholders, including the DIP Lenders and the Prepetition ABL Lenders.  *Id.* ¶ 13. The Restructuring Term Sheet outlines a process by which, through these chapter 11 cases, the Debtors seek to expeditiously propose and confirm a chapter 11 plan that will deleverage their balance sheet through an equitization of Prepetition Term Loans and provide access to exit financing, both of which are critical pillars of the Debtors' reorganization and eventual emergence from chapter11.  *Id.*  Without access to Cash Collateral and the proceeds of the DIP Facility, the Debtors will be unable to avoid a near-term, value-destructive interruption to their businesses, to the detriment of the Debtors' estates and their stakeholders.  *Id.*

37.     The additional liquidity provided by the DIP Facility and access to Cash Collateral are necessary for the Debtors to conduct their operations in the ordinary course, avoid significant business disruption, and minimize distractions as the Debtors' management and advisors continue to advance their restructuring efforts.  *Id.* ¶ 14.  Moreover, access to a portion of this liquidity at the outset of these chapter 11 cases will convey a positive message to all stakeholders that the Debtors are adequately funded with the ability to satisfy operational obligations in the ordinary course.  *Id.*

**II.      Alternative Sources of Financing Are Not Available on Better Terms.**

38.      As further described in the Svoyskiy Declaration, the Debtors' proposed investment banker, Perella Weinberg Partners LP ("PWP"), conducted a marketing process to gauge the interest of third parties in providing DIP financing.  PWP contacted eight additional potential financing providers, all established lenders in the restructuring space, with a reputed ability to provide postpetition financing under complex circumstances.  *See* Svoyskiy Decl. ¶ 14.  The Debtors pursued multiple potential parties with both the capital and experience of lending into Companies similarly situated to the Debtors.  *Id.*  The Debtors struggled to capture a robust level of third-party interest, due to several factors, including the lack of unencumbered assets, the size of the proposed DIP Facility, and the Debtors' operations and financial profile, among others.  *Id.*  Moreover, none of the third-party financing sources were interested in providing a junior or unsecured postpetition facility and the inherent difficulty of priming existing liens, consensually or nonconsensually, likely discouraged participation from third-party financing sources.  Ultimately, one party signed a confidentiality agreement received access to a data room.  *Id.*  This marketing process, however, did not yield any proposals for postpetition financing from any third-party financing source.  *Id.*

39.      The DIP Facility is market-tested and the product of good-faith, arms'-length negotiations.  *Id.* ¶¶ 14, 24.  The DIP Facility provides critical liquidity to the Debtors on reasonable terms, and represents the best, and likely only, available financing option for the Debtors under the facts and circumstances of these chapter 11 cases.  *Id.* ¶ 25.

**Basis for Relief**

**III.    The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Documents.**

    **A.    Entry into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment.**

40.    The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facility, and continue using Cash Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below.  Courts grant a debtor considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest.").

41.    Specifically, to determine whether a debtor has met the business judgment standard, a court need only "examine whether a reasonable businessperson would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 799 (Bankr. D. Del. 2007) (declining to "entertain an

objection to [a] transaction . . . that . . . involves a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy Code]").

42.     Further, courts must consider the terms of postpetition financing "in context" and based on the "relative circumstances of the parties" in determining whether they are fair and reasonable. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing that it may be "necessary, and indeed prudent, for a postpetition debtor to enter into a 'hard' bargain with a creditor . . . to acquire needed funds to complete a reorganization").

43.     The Debtors' determination to move forward with the DIP Facility is a sound exercise of their business judgment following an arms'-length process and careful evaluation of available alternatives.  The Debtors require an immediate capital infusion in the form the DIP Facility and access to Cash Collateral to:  (a) operate their business postpetition; (b) finance working capital and payroll; (c) maintain favorable credit terms and relations with vendors, suppliers, customers, sureties, and other contract counterparties; (d) fund these chapter 11 cases; and (e) preserve the Debtors' assets during the pendency of these cases.

44.     The DIP Facility and the proposed terms for postpetition Cash Collateral use are tailored to the Debtors' capital structure and go-forward funding needs and appropriately balance intercreditor interests, as reflected in, among other things, the proposed adequate protection terms set forth in the Interim Order.  Additionally, the DIP Facility's economic terms are customary, "market" terms for similar debtor-in-possession financings and there are no alternative sources of postpetition financing with equally favorable terms available to the Debtors.  Svoyskiy Decl. ¶ 25.

**B.      The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.**

45.      The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth in the DIP Documents pursuant to sections 364(c) and 364(d) of the Bankruptcy Code.  More specifically, the Debtors' obligations under the DIP Credit Agreement will be secured by first-priority liens on encumbered property that constitutes Term Priority Collateral and second-priority liens on property that constitutes ABL Priority Collateral, in each case subject to the Carve Out and certain permitted prior liens, as set forth in the Interim Order and the DIP Documents.  The Debtors' obligations under the DIP Credit Agreement will also be secured by first-priority liens on all assets and property of the Debtors that was unencumbered as of the Petition Date.

46.      The above-described liens on encumbered and unencumbered assets are common features in postpetition financing facilities and are necessary to obtain the DIP Facility.  Postpetition financing facilities approved in this circuit and elsewhere routinely are secured by a debtor's unencumbered assets and the proceeds thereof.  *See, e.g.*, *In re Wheel Pros, LLC*, No. 24-11939 (JTD) (Bankr. D. Del. Sept. 9, 2024) (approving DIP liens on collateral including assets that were unencumbered as of the petition date); *In re Vyaire Med., Inc.*, No. 24-11217 (BLS) (Bankr. D. Del. June 12, 2024) (same); *In re Express, Inc.*, No. 24-10831 (KBO) (Bankr. D. Del. Apr. 24, 2024) (same); *In re Sientra, Inc.*, No. 24-10245 (JTD) (Bankr. D. Del. Feb. 14, 2024) (same); *In re SiO2 Med. Prods., Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. Mar. 30, 2023) (same).[14]

47.      The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that a debtor is "unable to obtain

---

[14]      Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c); *see also In re Crouse Grp., Inc*., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).   Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

a.      the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code—*i.e.*, by allowing a lender only an administrative claim;

b.      the credit transaction is necessary to preserve the assets of the estate; and

c.      the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*Crouse Grp., Inc*., 71 B.R.at 549; *see also L.A. Dodgers LLC*, 457 B.R. at 312–13 (Bankr. D. Del. 2011); *Ames Dep't Stores*, 115 B.R. at 37–40 (Bankr. S.D.N.Y. 1990); *In re St. Mary Hosp*., 86 B.R. 393, 401 (Bankr. E.D. Pa. 1988).

48.      As described above, the Debtors are unable to obtain unsecured credit.  Absent the DIP Facility, which will provide sufficient liquidity to administer these chapter 11 cases, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders. Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facility as set forth in the DIP Documents are fair, reasonable, and represent the best terms available to the Debtors to obtain DIP financing.  For all these reasons, the Debtors have met the standard for obtaining postpetition financing under section 364(c) of the Bankruptcy Code.

49.      Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which

such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). Accordingly, the Debtors may incur "priming" liens under the DIP Facility if either (a) the requisite number under the applicable of Prepetition Secured Parties have consented to being "primed" and (b) the Prepetition Secured Parties' interests in collateral are adequately protected.

50.     Here, the DIP Lenders, who represent a significant majority of the Prepetition Term Lenders, affirmatively consented to, and actively participated in providing, the proposed DIP Facility. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected."). Likewise, the Prepetition ABL Lenders have consented to the Debtors' use of Cash Collateral during the pendency of these chapter 11 cases, subject to the Approved 13-Week Cash Flow, and to the priming of the Prepetition ABL U.S. Liens by the Carve Out. Moreover, as more fully discussed herein and set forth in the Interim Order, the Debtors propose to provide an adequate protection package to protect the interests of the Prepetition Secured Parties, including the Prepetition ABL U.S. Secured Parties, whose security interests in and liens on the Prepetition Collateral are being primed. Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

  **C.     No Comparable Alternative to the DIP Facility Is Reasonably Available.**

51.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections section 364(c) of the Bankruptcy Code affords to potential lenders. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [a debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see Snowshoe Co.*, 789 F.2d at 1088

(demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987) ("[W]e would not require this or any debtor to contact a seemingly infinite number of possible lenders."); *Ames Dep't Stores*, 115 B.R. at 37–39 (finding that the debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b) of the Bankruptcy Code).

52.     As described above, the Debtors conducted a fulsome DIP marketing process which did not yield any proposals to provide postpetition financing on an unsecured or junior priority basis. The market-tested DIP Facility is the only viable postpetition financing option available to the Debtors. Accordingly, the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

**D.    The Debtors Should Be Authorized to Use Cash Collateral.**

53.     Section 363 of the Bankruptcy Code governs the Debtors' use of property of their estates, including Cash Collateral. Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may use cash collateral as long as "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Here, the DIP Lenders and the Prepetition Secured Parties consent or are deemed to consent to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim Order. As described in the Moore Declaration, access to Cash Collateral on an interim basis is essential to the continued operation of the Debtors' business and smooth entry into these chapter 11 cases. *See* Moore Decl. ¶ 14. Accordingly, use of the Cash Collateral is in the best interests of the Debtors' estates and all of their stakeholders, including the Prepetition Secured Parties.

E.     **Adequate Protection Provided to the Prepetition Secured Parties Is Appropriate.**

54.     Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral.  *See* 11 U.S.C. § 363(e).  Section 364(d)(1) of the Bankruptcy Code also provides adequate protection for the secured creditors whose interest in properties are primed in connection with postpetition financing.  *See* 11 U.S.C. § 364(d)(1)(B). Section 362(d)(1) of the Bankruptcy Code provides that the automatic stay may be lifted for cause, including the lack of adequate protection for a party's interests in property due to the imposition of the automatic stay.  *See* 11 U.S.C. § 362(d)(1).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *See, e.g.*, *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (explaining that the "determination of whether there is adequate protection is made on a case by case basis"); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) (same); *In re N.J. Affordable Homes Corp.*, 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) (holding that "the circumstances of the case will dictate the necessary relief to be given"); *In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) (holding that "what interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis"); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

55.     As set forth in the Interim Order, the Debtors propose to provide the Prepetition Secured Parties with certain forms of adequate protection to protect against the postpetition

diminution in value, if any, of their interests in the Prepetition Collateral, including the Cash

Collateral, resulting from the Debtors' use, sale, or lease of the Prepetition Collateral, priming of

their security interests and liens by the liens securing the DIP Facility and the Carve Out, and the

imposition of the automatic stay (collectively, the "Diminution in Value"):

  a. replacement liens on DIP Collateral in favor of the Prepetition Secured Parties subject and subordinate to the Carve Out, Permitted Liens (if any), with relative priority as set forth in the Interim Order;

  b. super-priority administrative expense claims to the extent provided by section 507(b) of the Bankruptcy Code in favor of the Prepetition Secured Parties in the amount of their respective Diminution in Value (i) subject and subordinate to the Carve Out with relative priority consistent with the relative priority of the replacement liens as set forth in the Interim Order;

  c. payment of all reasonable and documented professional fees and expenses for certain advisors to the Prepetition Term Lenders, the Prepetition Term Agent, the Prepetition ABL Lenders, and the Prepetition ABL Agent;

  d. cash payment during the Chapter 11 Cases of all accrued interest on the Prepetition ABL Obligations under the Prepetition ABL Credit Agreement as such interest becomes due and payable at the applicable contractual non-default rate thereunder and in the amounts specified in the Prepetition ABL Credit Agreement; and

  e. upon the entry of the Final Order, the waiver of (i) the Debtors' and the Estates' ability to surcharge against the DIP Collateral and Prepetition Collateral (as defined herein) pursuant to Bankruptcy Code section 506(c) with respect to the Prepetition Secured Parties, effective as of the Petition Date, (ii) the applicability of the "equities of the case" exception under Bankruptcy Code section 552(b) with respect to the proceeds, products, offspring or profits of the Prepetition Collateral, and (iii) the doctrine of "marshaling" and any other similar equitable doctrine with respect to any of the Prepetition Collateral (the protections in (a)–(e) collectively, the "Adequate Protection Obligations").

56.     The proposed Adequate Protection Obligations are appropriate and are sufficient to

protect the Prepetition Secured Parties from any potential Diminution in Value to the Cash

Collateral.  The Debtors' provision of the Adequate Protection Obligations is fair and appropriate

under the circumstances of these chapter 11 cases to ensure the Debtors are able to continue using

the Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their estates.

**F.     The Roll-Up Is Appropriate.**

57.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.  It is well settled in the Third Circuit that such transactions should be approved when they are supported by a sound business purpose.  *See In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions." (citing cases)).  The business judgment rule affords appropriate deference to a debtor's decision-making regarding the operation of its business.  *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

58.     Repayment of prepetition debt via roll-up is a common feature in debtor-in-possession financing arrangements.  Courts in this district and others have approved similar DIP financing features.  *See, e.g., In re Wheel Pros, LLC,* No. 24-11939 (JTD) (Bankr. D. Del. Sept. 10, 2024) (authorizing DIP facilities of approximately $285 million, including $110 million of new money DIP term loans and a roll-up of approximately $175 million of a prepetition ABL facility)*; In re Vyaire Medical, Inc.,* No. 24 11217 (BLS) (Bankr. D. Del. June 10, 2024) (authorizing a $180 million DIP facility, including $45 million of new money DIP term loans and a $135 million roll-up of prepetition first lien term loans)*; In re Express, Inc.,* No. 24-10831 (KBO) (Bankr. D. Del. June 6, 2024) (authorizing DIP facilities of approximately $225 million, including $25 million of new money DIP term loans and a roll-up of approximately $63 million of prepetition term loans and approximately $136 million of a prepetition ABL facility)*; In re Sientra, Inc.,* No.

24-10245 (JTD) (Bankr. D. Del. Mar. 11, 2024) (authorizing a $90 million DIP facility, including $22.5 million of new money DIP term loans and a $67.5 million roll-up of the prepetition debt obligations); *In re PGX Holdings,* Inc., No. 23-10718 (CTG) (Bankr. D. Del. Aug. 4, 2023) (authorizing an approximately $62.7 million DIP facility, including a $19.95 million new money new money DIP loan and a $42.75 million creeping roll-up of the prepetition term loan).

59.     Here, the Debtors entered into the Bridge Loan Amendments and the Prepetition Term Lenders funded the Prepetition Bridge Loans beginning in the summer of 2024 and continuing through the weeks before the commencement of these chapter 11 cases.  The Prepetition Bridge Loans provided the Debtors with emergency short-term liquidity to bridge to an orderly chapter 11 filing.  Svoyskiy Decl. ¶ 23.  The DIP Roll-Up Loans will roll-up the recent Prepetition Bridge Loans only; they will not roll-up "old money."  The Prepetition Bridge Loans acted as a "pre-DIP" form of financing and the Roll-Up of the Prepetition Bridge Loans was therefore required by the Prepetition Term Lenders as an integral component of the DIP Facility.  *Id.*  Absent agreement to the Roll-Up, the Debtors would be unable to fund these chapter 11 cases and finalize a restructuring support agreement, paving the way to an expeditious restructuring with the consent of the majority of the Debtors' secured creditors.

60.     Critically, the Roll-Up will not prejudice other parties in interest.  The Roll-Up does not prime the Prepetition ABL Lenders as to the ABL Priority Collateral, and the Prepetition ABL Lenders consented to the Roll-Up.  Moreover, as of the Petition Date, the Prepetition Bridge Loans were already senior in priority of payment to the Prepetition Term Loans and are secured by the same Prepetition Collateral, including the Term Priority Collateral.  Accordingly, although technically "priming," the Roll-Up is consistent with the prepetition priority scheme among the Prepetition Term Lenders and Prepetition ABL Lenders.

**IV.    The Debtors Should Be Authorized to Pay the Interest and Fees Required by the DIP Agents, the DIP Lenders, the Prepetition ABL Agent, and the Prepetition ABL Lenders under the DIP Documents.**

61.    Under the DIP Documents, the Debtors have agreed, subject to Court approval, to pay certain interest and fees to the DIP Agents, the DIP Lenders, the Prepetition ABL Agent, and the Prepetition ABL Lenders.  These interest and fees are summarized below:[15]

a.    *Interest Rate*.  The obligations in respect of the DIP Loans shall bear interest as follows:

   i.    each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Rate; and

   ii.    each Term SOFR Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to Term SOFR for such Interest Period plus the Applicable Rate.

b.    *Upfront Fee*.  As consideration for the Lenders funding the New Money First Draw, the New Money Second Draw and the New Money Third Draw, on the Closing Date, the New Money Second Draw Funding Date or the New Money Third Draw Funding Date, as applicable, the Borrower agrees to pay to the Administrative Agent, for the ratable account of each of the Lenders, a non-refundable Upfront Fee equal to 5.00% of the aggregate principal amount of the New Money Loans funded by such Lenders pursuant to the New Money First Draw, the New Money Second Draw and the New Money Third Draw, as applicable, which fee shall be earned, due and payable in kind in the form of additional New Money Loans on the New Money First Draw Funding Date, the New Money Second Draw Funding Date and the New Money Third Draw Funding Date.  The amounts so paid-in-kind in accordance with the immediately preceding sentence shall be treated as principal for all purposes of this Agreement and bear interest in accordance with the terms hereof from (and including) the applicable date on which such Upfront Fee was paid in kind.

c.    *Exit Fee*.  The Borrower agrees to pay in cash to the Administrative Agent, for the ratable account of each of the Lenders, on the Maturity Date or on any other date that the Term Loans are repaid (whether through a mandatory

---

15    The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this section but not otherwise defined have the meanings ascribed to them in the DIP Documents, as applicable.

prepayment, voluntarily prepayment, acceleration or otherwise) a non-refundable fee equal to 2.00% of the aggregate principal amount of the Term Loans repaid on such applicable date, which fee shall be earned, due and payable on such date.

d.  *Backstop Fee*.  The DIP Loans will be fully backstopped by certain of the DIP Lenders (in such capacity, the "DIP Backstop Parties").  As consideration for the DIP Backstop Parties' agreement to backstop the DIP Facility, the DIP Borrower shall pay the fees set forth in the Backstop Fee Letter, by and among the Borrower and Jefferies Capital Services, LLC, as a fronting lender (a copy of which shall be provided to the Agents), in the amounts and at the times set forth therein.

e.  *Sale Premium*.  If at any time, one or more Sale Transactions which would (individually or in the aggregate) result in the sale of all or substantially all of the assets or the equity of Topco and its Subsidiaries are consummated, the Lenders with respect to the Term Commitments and New Money Loans shall receive the Sale Premium in an aggregate amount equal to 10.00% of the sum of (x) the aggregate amount of all the Term Commitments (prior to giving effect to the New Money First Draw) provided on the Closing Date by all Lenders in the aggregate plus (y) the aggregate principal amount of all of the Roll-Up Loans deemed funded on the Closing Date by all Lenders in the aggregate, which Sale Premium shall be earned, due and payable in cash on the Sale Consummation Date from the proceeds of such Sale Transactions, and allocated on a pro rata basis among such Lenders holding Term Commitments and New Money Loans, in accordance with the amount of Term Commitments and principal amount of Term Loans (including both New Money Loans and Roll-Up Loans) held by such Lender and certain of such Lender's Affiliates (which Affiliates shall designated, and the pro rata calculation confirmed, to the Administrative Agent in writing by the Lender Advisors (which may be by email), upon which the Administrative Agent may rely without further investigation or inquiry) prior to the date such Sale Premium is paid) on the Sale Consummation Date.

f.  *ABL Fee Letters*.  The DIP Borrower shall pay the fees set forth in the ABL Fee Letters, by and among the DIP Borrower and the Prepetition ABL Agent, in the amounts and at the times set forth therein.

62.  As set forth in the Svoyskiy Declaration, the interest and fees to be paid under the DIP Facility and the Interim Order are consistent with the market and appropriate, particularly in light of the circumstances of these Chapter 11 Cases and the marketing process undertaken, and represent the only viable option presently available to the Debtors.  *See* Svoyskiy Decl. ¶¶ 19, 21. The fees and rates to be paid under the proposed DIP Facility and the Interim ORder (a) were the

subject of arms'-length negotiation between the Debtors, the DIP Agent, the DIP Lenders, the Prepetition ABL Agent, and the Prepetition ABL Lenders, and (b) are an integral component of the overall terms of the proposed DIP Facility and the Interim Order. *Id.* ¶¶ 22, 24. The Debtors considered the fees described above when determining in their sound business judgment that the DIP Facility is reasonable and constitutes the best terms on which the Debtors can obtain the postpetition financing necessary to continue their operations, prosecute their cases, and benefit the Debtors' estates. Moreover, the Debtors negotiated reasonable, on-market fees despite the limited market interest in providing the Debtors with a sufficiently sized and appropriately-structured postpetition financing package. *Id.* ¶ 14. Accordingly, the Court should authorize the Debtors to pay the interest and fees provided under the DIP Documents in connection with the DIP Facility.

## V.   The DIP Agent and the DIP Lenders Should Be Afforded Good-Faith Protection under Section 364(e) of the Bankruptcy Code.

63.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

64.     As explained herein and in the Svoyskiy Declaration, the DIP Facility is the result of (a) the Debtors' reasonable and informed determination that no alternative sources of postpetition financing are readily available to the Debtors (whether unsecured or secured) on terms better than the DIP Facility and (b) good-faith, arm's-length negotiations between the Debtors and

the DIP Secured Parties.  *See* Svoyskiy Decl. ¶¶ 19–24.  The terms and conditions of the

DIP Facility are necessary and appropriate under the circumstances, and the proceeds of the

DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.

Further, upon realizing there was a lack of interest from third-party lenders to provide postpetition

financing through a DIP marketing process, the Debtors and their advisors determined that the

DIP Facility represents the best and the only available financing option.  *Id.* ¶ 25.  Accordingly,

the Court should find that the obligations arising under the DIP Facility and other financial

accommodations made to the Debtors have been extended by the DIP Agent and the DIP Lenders

in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and therefore the

DIP Secured Parties are entitled to all of the protections afforded thereby.

## VI.    Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.

65.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to

use cash collateral and to obtain credit pursuant to sections 363 and 364 of the Bankruptcy Code

may not be commenced earlier than fourteen (14) days after the service of such motion.  Upon

request, however, the Court may conduct a preliminary, expedited hearing on the motion and

authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid

immediate and irreparable harm to a debtor's estate.  *See* Bankruptcy Rule 4001(b)(2), 4001(c)(2).

Section 363(c)(3) of the Bankruptcy Code authorizes the court to conduct a preliminary hearing

and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will

prevail at the final hearing under [section 363(e) of the Bankruptcy Code]." 11 U.S.C. § 363(c)(3).

66.    For the reasons discussed above and in the Moore Declaration, the Debtors have an

immediate need for the liquidity provided by the DIP Facility and the use of Cash Collateral.

*See* Turner Decl. ¶ 12–14.  The proposed DIP Facility is critical to the Debtors' ability to fund

their operations while providing sufficient liquidity at the outset of these chapter 11 cases. *Id.* ¶ 14. In addition, the Debtors believe that substantially all of their available cash constitutes the Prepetition Secured Parties' Cash Collateral. Access to the proceeds of the DIP Facility and Cash Collateral are essential to the Debtors' orderly operation of their business, maintaining business relationships with their trade partners, paying wages and benefits, and satisfying other essential working capital needs, all of which are required to preserve and maintain the Debtors' going concern value for the benefit of all parties in interest. Without such access, the Debtors would be unable to maintain their business during these chapter 11 cases and would suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest, including the Prepetition Secured Parties. *Id.* ¶ 13.

67. Accordingly, pursuant to section 363(c)(3) of the Bankruptcy Code and Bankruptcy Rules 4001(b) and 4001(c), the Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final Hearing, to receive initial funding under the DIP Facility and to use Cash Collateral. This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

**VII.  The Automatic Stay Should Be Modified on a Limited Basis.**

68. The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to the extent necessary to permit the DIP Agents and the Prepetition Secured Parties to file financing statements, trademark filings, copyright filings, notices of lien or similar instruments in any jurisdiction, or take possession of or control over cash or securities, or take any other action in order to validate and perfect the liens and security interests granted to them in the Interim Order.

69.     Stay modifications of this kind are ordinary and standard features of debtor in possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases.  *See, e.g.*, *In re Wheel Pros, LLC*, No. 24-11939 (JTD) (Bankr. D. Del. Sept. 10, 2024) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Vyaire Medical, Inc.* No. 24-11217 (BLS) (Bankr. D. Del. Jun. 10, 2024) (same); *In re Express, Inc.*, No. 24-10831 (KBO) (Bankr. D. Del. April 24, 2024) (same); *In re Sientra, Inc.*, No. 24-10245 (JTD) (Bankr. D. Del. Feb. 14, 2024) (same); *In re PGX Holdings, Inc.*, No. 23-10718 (CTG) (Bankr. D. Del. Jun. 6, 2023) (same).

## Request for Final Hearing

70.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## The Requirements of Bankruptcy Rule 6003 Are Satisfied

71.     Bankruptcy Rule 6003 empowers a court to grant certain relief within the first twenty-one days after the petition date only "to the extent that relief is necessary to avoid immediate and irreparable harm."  For the reasons discussed above, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations, and the failure to receive the requested relief during the first twenty-one days of these chapter 11 cases would severely disrupt the Debtors' operations at this important juncture.  The requested relief is necessary for the Debtors to operate their businesses in the ordinary course, preserve the ongoing value of their operations, and maximize the value of their estates for the benefit of all stakeholders. The Debtors have demonstrated that the requested relief is "necessary to avoid immediate and irreparable harm," as contemplated by Bankruptcy Rule 6003, and the Court should grant the requested relief.

**Notice**

72.     The Debtors will provide notice of this motion to the following parties of their respective counsel:  (a) the United States Trustee for the District of Delaware; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the Ad Hoc Group of Term Loan Lenders; (d) counsel to the Prepetition ABL Agent; (e) the office of the attorney general for each of the states in which the Debtors operate; (f) the United States Attorney's Office for the District of Delaware; (g) the Internal Revenue Service; (h) the DIP Agent; and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002 (the "Notice Parties").  As this motion is seeking "first day" relief, the Debtors will serve copies of this motion and any order entered with respect to this motion as required by Local Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors request entry of the DIP Orders, substantially in the form attached hereto, (a) granting the relief requested herein and (b) granting such other relief as the Court deems appropriate under the circumstances.

Dated: October 10, 2024
Wilmington, Delaware

/s/ Joseph Barry

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Joseph Barry (Del. Bar No. 4221)
Kenneth J. Enos (Del. Bar No. 4544)
Jared W. Kochenash (Del. Bar. No. 6557)
Andrew A. Mark (Del. Bar No. 6861)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:      (302) 571-6600
Facsimile:      (302) 571-1253
Email:           jbarry@ycst.com
                 kenos@ycst.com
                 jkochenash@ycst.com
                 amark@ycst.com

*Proposed Co-Counsel for the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Ryan Blaine Bennett, P.C. (*pro hac vice* pending)
Alexander D. McCammon (*pro hac vice* pending)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:           ryan.bennett@kirkland.com
                 alex.mccammon@kirkland.com

-and-

Derek I. Hunter (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:           derek.hunter@kirkland.com

*Proposed Co-Counsel for the Debtors*
*and Debtors in Possession*

**<u>Exhibit A</u>**

**Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ACCURIDE CORPORATION, *et al.*,[1] | ) | Case No. 24-12289 (JKS) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |
| | ) | **Re:  Docket No. _** |

**INTERIM ORDER**
**(I) AUTHORIZING DEBTORS**
**TO (A) OBTAIN POSTPETITION SENIOR**
**SECURED FINANCING AND (B) USE CASH COLLATERAL,**
**(II) GRANTING ADEQUATE PROTECTION, (III) GRANTING LIENS**
**AND SUPERPRIORITY CLAIMS, (IV) MODIFYING THE AUTOMATIC STAY,**
**(V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

Upon the motion (the "**Motion**") of Accuride Corporation and the other above-captioned debtors and debtors in possession, as debtors and debtors-in-possession (collectively, the "**Debtors**") in the above-captioned cases (the "**Chapter 11 Cases**"), pursuant to sections 105, 361, 362, 363, 364, 365, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), seeking, among other things, entry of interim and final orders:

    A.        authorizing (x) the DIP Borrower to obtain senior secured postpetition financing on a superpriority basis in the aggregate principal amount of up to $103 million (the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Accuride Corporation (9077); Accuride Group Holdings, Inc. (4531); Accuride Intermediate Co., Inc. (9045); Accuride Distributing, LLC (3124); Accuride EMI, LLC (0389); Accuride Erie L.P. (4862); Accuride Henderson Limited Liability Company (8596); AKW General Partner, L.L.C. (4861); AOT, LLC (3088); Armor Parent Corp. (6684); Bostrom Holdings, Inc. (9282); Bostrom Seating, Inc. (7179); Gunite Corporation (9803); KIC LLC (6356); Transportation Technologies Industries, Inc. (2791); and Truck Components, Inc. (5407).  The location of the Debtors' service address is:  38777 Six Mile Road, Suite 410, Livonia, MI 48152.

"**DIP Facility**"), consisting of (1) up to $30 million of new money term loans (the "**DIP New Money Loans**") and (2) roll-up loans in an aggregate principal amount of approximately $73 million representing a roll-up and conversion in full, on a cashless, dollar-for-dollar basis, of the Prepetition Bridge Loans (as defined below), and all accrued and unpaid interest, fees, and expenses with respect thereto (the "**DIP Roll-Up Loans**" and, together with the DIP New Money Loans, the "**DIP Loans**") upon entry of this interim order (this "**Interim Order**"), in each case, pursuant to the terms and conditions of that certain *Senior Secured Superpriority Debtor-in-Possession Credit Agreement* (as the same may be amended, restated, amended and restated, supplemented, waived and/or otherwise modified from time to time, the "**DIP Credit Agreement**" and, together with any exhibits and schedules attached thereto and the other Loan Documents (as defined in the DIP Credit Agreement), the "**DIP Documents**"), by and among Accuride Corporation, as the borrower (in such capacity, the "**DIP Borrower**"), Armor Parent Corp., as holdings ("**Holdings**"), Accuride Intermediate Co., Inc., ("**MidCo**"), Accuride Group Holdings, Inc. ("**TopCo**"), Alter Domus (US) LLC, as administrative agent and collateral agent (in such capacities, the "**DIP Agent**"), and the lenders party thereto from time to time (in such capacities, the "**DIP Lenders**" and, together with the DIP Agent, the "**DIP Secured Parties**"), substantially in the form attached hereto as **Exhibit 1** and (y) each of the Debtors other than the DIP Borrower (collectively in such capacities, the "**DIP Guarantors**"), to guaranty the DIP Borrower's (and each other DIP Guarantors') obligations under the DIP Facility and under, or secured by, the DIP Documents (such obligations, together with all "Obligations" as defined in the DIP Credit Agreement, the "**DIP Obligations**");

B.      authorizing the Debtors to execute and enter into the DIP Documents and to perform such other acts as may be necessary or appropriate in connection with the same;

C.      authorizing the DIP Borrower to borrow up to $15 million of DIP New Money Loans (the "**Interim New Money Loans**") upon entry of this Interim Order to avoid immediate and irreparable harm to the Debtors' estates;

D.      authorizing the roll-up and conversion of approximately $73 million in aggregate principal amount and accrued and unpaid interest, fees, and expenses with respect thereto of Prepetition Bridge Loans into DIP Roll-Up Loans upon the Closing Date (as defined in the DIP Credit Agreement);

E.      granting the DIP Obligations the status of allowed superpriority administrative expense claims in each of the Chapter 11 Cases, which, for the avoidance of doubt, shall be subject to the Carve Out (as defined below) in all respects;

F.      granting to the DIP Agent, for the benefit of the DIP Secured Parties, to secure the DIP Obligations, valid, enforceable, binding, non-avoidable, and fully perfected first priority priming liens on and security interests in all of the DIP Collateral (as defined below), including, without limitation, all property constituting "cash collateral" as defined in section 363(a) of the Bankruptcy Code (the "**Cash**

2

**Collateral**"), which liens shall have the priorities set forth herein and shall be subject to the Carve Out; provided that in no event shall DIP Collateral include DIP Excluded Property (as defined herein) or funds held in the Funded Reserve Account (other than the Debtors' reversionary interest, if any, therein, after all Allowed Professional Fees benefitting from the Carve Out have been indefeasibly paid in full, in cash);

G.    authorizing and directing the Debtors to pay the principal, interest, premiums, fees, expenses, and other amounts payable under the DIP Documents as such become due and payable;

H.    authorizing the Debtors to use the Prepetition Collateral (as defined below) of the Prepetition Secured Parties (as defined below), including Cash Collateral, and provide adequate protection, as and to the extent set forth herein, to the Prepetition Secured Parties against any diminution in value of their respective interests in the Prepetition Collateral from and after the Petition Date, including, as applicable, with respect to the Cash Collateral (any such diminution, "**Diminution in Value**");

I.    authorizing the Debtors to execute, deliver and perform under the ABL Fee Letters with the Prepetition ABL Secured Parties (as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, the "**ABL Fee Letters**");

J.    authorizing the Debtors to renew letters of credit and obtain cash management services from the Prepetition ABL Secured Parties, granting the Postpetition ABL Obligations the status of allowed superpriority administrative claims in the Chapter 11 Cases, granting the Prepetition ABL Agent the liens set forth herein to secure the Postpetition ABL Obligations and authorizing and directing the Debtors to pay obligations under the Postpetition ABL Obligations as such amounts become due and payable in accordance with the terms thereof;

K.    lifting and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents;

L.    subject to entry of the Final Order (as defined below), waiving the Debtors' right to surcharge the Prepetition Collateral and the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code and any right of the Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code with respect to the proceeds, products, offspring, or profits of any of the Prepetition Collateral or any of the DIP Collateral, as applicable;

M.    subject to entry of the Final Order, waiving the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral;

RLF1 31627761v.1
#99165958v13
#99165958v16

N.   scheduling a date for the hearing (the "**Final Hearing**") to consider the Motion on a final basis and the entry of a final order (the "**Final Order**") authorizing and approving the transactions described in the foregoing clauses and the Motion; and

O.   waiving any applicable stay with respect to the effectiveness and enforceability of this Interim Order (including a waiver pursuant to Bankruptcy Rule 6004(h)).

This Court having reviewed the Motion, the exhibits attached thereto, the *Declaration of Charles M. Moore, Chief Restructuring Officer of Accuride Corporation, in Support of Chapter 11 Petitions and First Day Motions* (the "**First Day Declaration**"), the *Declaration of Alexander Svoyskiy in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* (the "**Svoyskiy Declaration**"), the *Declaration of Charles M. Moore in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* (the "**Moore Declaration**" and, together with the Svoyskiy Declaration, the "**DIP Declarations**"), and the evidence submitted at the interim hearing on the Motion held on October 11, 2024 (the "**Interim Hearing**"); and notice of the Motion and the Interim Hearing having been provided in accordance with the Bankruptcy Code, Bankruptcy Rules and Local Rules; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein and that such relief is in the best interests of the Debtors and their estates and creditors and all parties in interest and is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing; and any objections to the Motion having been withdrawn or overruled on the merits; and upon all of

4

the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[2]**

A.      **Petition Date**.   On October 10, 2024 (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.

B.      **Debtors in Possession**.   The Debtors are authorized to continue operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   No trustee, examiner, or statutory committee has been appointed in these Chapter 11 Cases.

C.      **Jurisdiction and Venue**.   This Court has jurisdiction over the Chapter 11 Cases, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.   Venue for the Chapter 11 Cases and proceeding on the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D.      **Committee Formation**.   As of the date hereof, the United States Trustee for the District of Delaware (the "**U.S. Trustee**") has not appointed an official committee of unsecured creditors in the Chapter 11 Cases (a "**Committee**") pursuant to section 1102 of the Bankruptcy Code.

---

[2]   The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.   To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.   To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

E.    **Notice**.  Notice of the Motion and the Interim Hearing has been provided in accordance with the Bankruptcy Code, Bankruptcy Rules, and the Local Rules, and no other or further notice of the Motion with respect to the relief requested at the Interim Hearing or the entry of this Interim Order shall be required.  The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, for purposes of Bankruptcy Rule 4001.

F.    **Debtors' Stipulations**.  Without prejudice to the rights of any other party in interest specifically set forth in, and subject to the limitations thereon contained in, paragraph [45] below, the Debtors admit, acknowledge, agree, and stipulate to the following, which stipulations shall be binding on the Debtors, their estates, and all parties in interest (collectively, the "**Debtors' Stipulations**"):

i.    *Prepetition ABL Facility*.  Pursuant to that certain Amended and Restated ABL Credit Agreement, dated as of June 1, 2018 (as amended, restated, amended and restated, supplemented, waived and/or otherwise modified from time to time, the "**Prepetition ABL Credit Agreement**" and, together with the other Loan Documents, Secured Hedge Agreements and Secured Cash Management Agreements (each as defined in the Prepetition ABL Credit Agreement) and any other agreements and documents executed or delivered in connection therewith, each as amended, restated, amended and restated, supplemented, waived and/or otherwise modified from time to time, the "**Prepetition ABL Documents**"), among, *inter alios*, (I) Accuride Corporation, as the U.S. borrower (in such capacity, the "**Prepetition ABL U.S. Borrower**"), (II) Accuride Wheels Troyes SAS, a simplified joint stock company (*société par actions simplifiée*) existing under the laws of France, Accuride Wheels Solingen GmbH, a limited liability company (*Gesellschaft mit beschränkter Haftung*) existing under the laws of Germany,

Accuride Wheels Ebersbach GmbH, a limited liability company (*Gesellschaft mit beschränkter Haftung*) existing under the laws of Germany, and Accuride Wheels Ronneburg GmbH, a limited liability company (*Gesellschaft mit beschränkter Haftung*) existing under the laws of Germany (collectively, the "**Prepetition ABL Foreign Borrowers**" and, together with the Prepetition ABL U.S. Borrower, the "**Prepetition ABL Borrowers**"), (III) Holdings, (IV) Bank of America, N.A., as administrative agent and collateral agent (in such capacities, the "**Prepetition ABL Agent**"), and (V) the lending institutions party thereto from time to time, including the L/C Issuers (as defined in the Prepetition ABL Credit Agreement) (the "**Prepetition ABL Lenders**" and, together with the Prepetition ABL Agent and all other holders of Prepetition ABL Obligations (as defined herein), the "**Prepetition ABL Secured Parties**"), the Prepetition ABL Lenders provided revolving loans, swingline loans, letters of credit and other financial accommodations to, or for the benefit of, the Prepetition ABL Borrowers (collectively, the "**Prepetition ABL Facility**"). Pursuant to (i) that certain Amended and Restated Guaranty, dated as of June 1, 2018 (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, the "**Prepetition ABL U.S. Guaranty**"), Holdings and certain U.S. subsidiaries of Holdings (in such capacities, the "**Prepetition ABL U.S. Guarantors**" and, together with the Prepetition ABL U.S. Borrower, the "**Prepetition ABL U.S. Obligors**") guaranteed the Obligations (as defined in the Prepetition ABL Credit Agreement) and (ii) that certain Guaranty, dated as of June 1, 2018 (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, the "**Prepetition ABL German Guaranty**"), certain German subsidiaries of Holdings (in such capacities, the "**Prepetition ABL German Guarantors**" and, together with the Prepetition ABL Foreign Borrowers, the "**Prepetition ABL Foreign Obligors**"; the Prepetition ABL Foreign

RLF1 31627761v.1
#99165958v13
#99165958v16

Obligors, together with the Prepetition ABL U.S. Obligors, the "**Prepetition ABL Obligors**") guaranteed the Foreign Obligations (as defined in the Prepetition ABL Credit Agreement).

ii.    *Prepetition ABL Obligations.*  As of the Petition Date, the Prepetition ABL Obligors were lawfully indebted to the Prepetition ABL Secured Parties, without defense, counterclaim, or offset of any kind, in an amount of not less than (i) $[52,849,691.80] in aggregate principal amount of revolving loans made to the Prepetition ABL U.S. Borrower, $[20,265,099.60] in undrawn U.S. Letters of Credit (as defined in the Prepetition ABL Credit Agreement) and all Secured Cash Management Obligations (as defined in the Prepetition ABL Credit Agreement), *plus* accrued and unpaid interest, fees, expenses, and disbursements (including, without limitation, any accrued and unpaid attorneys' fees, accountants' fees, appraisers' fees, and financial advisors' fees and related expenses and disbursements), cash management obligations, indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition ABL U.S. Obligors' obligations pursuant to the Prepetition ABL Documents, including all "U.S. Obligations" (as defined in the Prepetition ABL Credit Agreement), in each case, whether arising before, on or after the Petition Date (collectively, the "**Prepetition ABL U.S. Obligations**"), and (ii) €[22,885,824.34] in aggregate principal amount of revolving loans made to the Prepetition ABL Foreign Borrowers and $[●] in undrawn Foreign Letters of Credit (as defined in the Prepetition ABL Credit Agreement), *plus* accrued and unpaid interest, fees, expenses, and disbursements (including, without limitation, any accrued and unpaid attorneys' fees, accountants' fees, appraisers' fees, and financial advisors' fees and related expenses and disbursements), indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or

8

chargeable in respect of any of the Prepetition ABL Foreign Obligors' obligations pursuant to the Prepetition ABL Documents, including all "Foreign Obligations" (as defined in the Prepetition ABL Credit Agreement), in each case, whether arising before, on or after the Petition Date (collectively, the "**Prepetition ABL Foreign Obligations**" and, together with the Prepetition ABL U.S. Obligations, the "**Prepetition ABL Obligations**"), all of which Prepetition ABL Obligations shall constitute allowed secured claims under sections 502 and 506 of the Bankruptcy Code against each of the Debtors' estates except for the estates of Accuride Group Holdings, Inc. and Accuride Intermediate Co., Inc.

       iii.    *Prepetition ABL Liens and Prepetition ABL Collateral*.  Pursuant to the Prepetition ABL Documents, as of the Petition Date, (i) the Prepetition ABL U.S. Obligations are secured by valid, binding, perfected, and enforceable security interests in and continuing liens on all "U.S. Collateral" (as such term is defined in the Prepetition ABL Credit Agreement), whether now owned or existing or hereafter acquired or arising (the "**Prepetition ABL U.S. Collateral**"; the liens on and security interests in the Prepetition ABL U.S. Collateral, the "**Prepetition ABL U.S. Liens**"), for the benefit of the Prepetition ABL Secured Parties, and the Prepetition ABL Obligations were fully secured as of the Petition Date by the Prepetition ABL U.S. Liens; and (ii) the Prepetition ABL Foreign Obligations are secured by valid, binding, perfected, and enforceable security interests in and continuing liens on all "Foreign Collateral" and "U.S. Collateral" (as such terms are defined in the Prepetition ABL Credit Agreement), whether now owned or existing or hereafter acquired or arising (the "**Prepetition ABL Foreign Collateral**" and, together with the Prepetition ABL U.S. Collateral, the "**Prepetition ABL Collateral**"; the liens on and security interests in the Prepetition ABL Foreign Collateral, the "**Prepetition ABL Foreign Liens**" and, together with the Prepetition ABL U.S. Liens, the "**Prepetition ABL Liens**"), for the benefit of

the Prepetition ABL Secured Parties, and the Prepetition ABL Foreign Obligations were fully secured as of the Petition Date by the Prepetition ABL Foreign Liens.

   iv. *Validity, Perfection, and Priority of Prepetition ABL Liens and Prepetition ABL Obligations.*  As of the Petition Date, (I) the Prepetition ABL Liens on the Prepetition ABL Collateral are valid, binding, enforceable, non-avoidable, and properly and fully perfected, and were granted to, or for the benefit of, the Prepetition ABL Secured Parties for fair consideration and reasonably equivalent value, contemporaneously with, or covenanted to be provided as inducement for, the making of loans and/or the commitments and other financial accommodations or consideration secured or obtained thereby; (II) the Prepetition ABL Liens are senior in priority over any and all other liens on the Prepetition ABL Collateral, subject only to the Prepetition Term Liens on the Term Priority Collateral (as defined in the Prepetition Intercreditor Agreement (as defined below), and, together with any other assets (including assets that are encumbered as of the Petition Date) of the same nature, scope and type as Term Priority Collateral (as defined in the Prepetition Intercreditor Agreement) the "**Term Priority Collateral**") and certain liens permitted by the Prepetition ABL Documents, in each case, to the extent that such existing liens were valid, non-avoidable, senior in priority to the Prepetition ABL Liens (and permitted by the Prepetition ABL Documents to be senior in priority to the Prepetition ABL Liens) and properly perfected as of the Petition Date (or were in existence immediately prior to the Petition Date and are properly perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code) (such permitted liens, the "**ABL Permitted Liens**"); (III) the Prepetition ABL Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition ABL Obligors, enforceable in accordance with the terms of the applicable Prepetition ABL Documents; (IV) no offsets, recoupments, challenges, objections, defenses, or counterclaims of any kind or

RLF1 31627761v.1
#99165958v13
#99165958v16

nature to any of the Prepetition ABL Liens or Prepetition ABL Obligations exist, and no portion of the Prepetition ABL Liens, Prepetition ABL Obligations or any payment made at any time to any of the Prepetition ABL Secured Parties or applied or paid on account of the obligations owing under the Prepetition ABL Documents is subject to any challenge or defense, including, without limitation, avoidance, disallowance, reduction, setoff, disgorgement, recharacterization, or subordination (equitable or otherwise), or any other claim or cause of action of any kind or nature whatsoever, pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (V) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including, without limitation, avoidance claims under chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition ABL Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, or employees, arising out of, based upon, or related to the Prepetition ABL Facility; and (VI) the Debtors have waived, discharged, and released any right to challenge any of the Prepetition ABL Obligations, the priority of the Debtors' obligations thereunder, or the validity, extent, or priority of the Prepetition ABL Liens.

v.    *Prepetition Term Facility*.    Pursuant to that certain Term Loan Credit Agreement, dated as of November 18, 2016 (as amended, restated, amended and restated, supplemented, waived and/or otherwise modified from time to time, the "**Prepetition Term Credit Agreement**" and, collectively with the other Loan Documents (as defined in the Prepetition Term Credit Agreement) and any other agreements and documents executed or delivered in connection therewith, each as amended, restated, amended and restated, supplemented, waived and/or otherwise modified from time to time, the "**Prepetition Term Documents**" and, together with the Prepetition ABL Documents, the "**Prepetition Debt Documents**"), among (I) Accuride

Corporation, a Delaware corporation (in such capacity, the "**Prepetition Term Borrower**"), (II) Holdings, and (III) Alter Domus (US) LLC, as administrative agent and collateral agent (in such capacities, the "**Prepetition Term Agent**" and, together with the Prepetition ABL Agent, the "**Prepetition Agents**") and (V) the lending institutions from time to time party thereto (the "**Prepetition Term Lenders**" and, together with the Prepetition Term Agent, the "**Prepetition Term Secured Parties**;" the Prepetition Term Lenders, together with the Prepetition ABL Lenders, the "**Prepetition Lenders**;" the Prepetition Term Secured Parties, together with the Prepetition ABL Secured Parties, the "**Prepetition Secured Parties**"), the Prepetition Term Lenders provided term loans to the Prepetition Term Borrower (the "**Prepetition Term Facility**" and, together with the Prepetition ABL Facility, the "**Prepetition Secured Facilities**") in the form of (x) 2023 Extended Term Loans (as defined in the Prepetition Term Credit Agreement) and (y) Amendment No. 14 Incremental Term Loans (as defined in the Prepetition Term Credit Agreement, the "**Prepetition Bridge Loans**" and, together with the 2023 Extended Term Loans, the "**Prepetition Term Loans**").    Pursuant to that certain Guaranty Agreement, dated as of November 18, 2016 (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, the "**Prepetition Term Guaranty**"), Holdings and certain U.S. subsidiaries of Holdings (in such capacities, the "**Prepetition Term Guarantors**" and, together with the Prepetition Term Borrower, the "**Prepetition Term Obligors**") guaranteed the Obligations (as defined in the Prepetition Term Credit Agreement).

    vi. *Prepetition Term Obligations*.  As of the Petition Date, the Prepetition Term Obligors were lawfully indebted to the Prepetition Term Secured Parties, without defense, counterclaim, or offset of any kind, in respect of the Prepetition Term Loans, in an aggregate outstanding principal amount, as of the Petition Date, exclusive of accrued but unpaid interest,

costs, fees, and expenses, not less than $[362,810,618.73] (including of $[290,758,564.53] of aggregate principal amount of 2023 Extended Term Loans and $[72,052,054.20] of aggregate principal amount of Prepetition Bridge Loans) (together with accrued and unpaid interest, fees, expenses, and disbursements (including, without limitation, any accrued and unpaid attorneys' fees, accountants' fees, appraisers' fees, and financial advisors' fees and related expenses and disbursements), indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition Term Obligors' obligations pursuant to the Prepetition Term Documents, including all "Obligations" as defined in the Prepetition Term Credit Agreement, in each case, as of the Petition Date, and all interest, fees, costs, and other charges allowable under Section 506(b) of the Bankruptcy Code (the "**Prepetition Term Obligations**," together with the Prepetition ABL Obligations, the "**Prepetition Obligations**"), which Prepetition Term Obligations shall constitute allowed claims under section 502 of the Bankruptcy Code against each of the Debtors' estates except for the estates of Accuride Group Holdings, Inc. and Accuride Intermediate Co., Inc.

vii.    *Prepetition Term Liens and Prepetition Term Collateral.*  Pursuant to the Prepetition Term Documents, as of the Petition Date, the Prepetition Term Obligations are secured by valid, binding, perfected, and enforceable security interests in and continuing liens on all "Collateral" (as such term is defined in the Prepetition Term Credit Agreement), whether now owned or existing hereafter acquired or arising (the "**Prepetition Term Collateral**"; the liens on and security interests in the Prepetition Term Collateral, the "**Prepetition Term Liens**" and, together with the Prepetition ABL Liens, the "**Prepetition Liens**", and the Prepetition Term

Collateral, together with the Prepetition ABL Collateral, the "**Prepetition Collateral**"), for the benefit of the Prepetition Term Secured Parties.

   viii. *Validity, Perfection, and Priority of Prepetition Term Liens and Prepetition Term Obligations.*  As of the Petition Date, (I) the Prepetition Term Liens on the Prepetition Term Collateral are valid, binding, enforceable, non-avoidable, and properly  and fully perfected, and were granted to, or for the benefit of, the Prepetition Term Secured Parties for fair consideration and reasonably equivalent value, contemporaneously with, or covenanted to be provided as inducement for, the making of loans and/or the commitments and other financial accommodations or considerations secured or obtained thereby; (II) the Prepetition Term Liens are senior in priority over any and all other liens on the Prepetition Term Collateral, subject only to the Prepetition ABL Liens on the ABL Priority Collateral (as defined in the Prepetition Intercreditor Agreement (as defined below) and, together with any other assets (including assets that are unencumbered as of the Petition Date) of the same nature, scope and type as ABL Priority Collateral (as defined in the Prepetition Intercreditor Agreement), the "**ABL Priority Collateral**") and certain liens permitted by the Prepetition Term Documents (in each case, to the extent that such existing liens were valid, non-avoidable, senior in priority to the Prepetition Term Liens (and permitted by the Prepetition Term Documents to be senior in priority to the Prepetition Term Liens) and properly perfected as of the Petition Date (or were in existence immediately prior to the Petition Date and are properly perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code) (such permitted liens, the "**Term Permitted Liens**", and together with the ABL Permitted Liens, the "**Permitted Liens**"); (III) the Prepetition Term Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition Term Obligors, enforceable in accordance with the terms of the applicable Prepetition Term Documents; (IV) no offsets, recoupments, challenges,

RLF1 31627761v.1
#99165958v13
#99165958v16

objections, defenses, or counterclaims of any kind or nature to any of the Prepetition Term Liens or Prepetition Term Obligations exist, and no portion of the Prepetition Term Liens, Prepetition Term Obligations, or any payment made at any time to any of the Prepetition Term Secured Parties or applied or paid on account of the obligations owing under the Prepetition Term Documents is subject to any challenge or defense, including, without limitation, avoidance, disallowance, reduction, setoff, disgorgement, recharacterization, or subordination (equitable or otherwise), or any other claim or cause of action of any kind or nature whatsoever, pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (V) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including, without limitation, avoidance claims under chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement against any of the Prepetition Term Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, or employees, arising out of, based upon, or related to the Prepetition Term Facility; and (VI) the Debtors have waived, discharged, and released any right to challenge any of the Prepetition Term Obligations, the priority of the Debtors' obligations thereunder, or the validity, extent, or priority of the Prepetition Term Liens.

ix.     *Cash Collateral.* All of the Debtors' cash, including, without limitation, the cash in their deposit accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitutes Cash Collateral within the meaning of section 363(a) of the Bankruptcy Code and is Prepetition Collateral of the Prepetition Secured Parties, subject in all respects to the Prepetition Intercreditor Agreement; provided that the DIP Account shall solely constitute DIP Collateral subject solely to the DIP Liens in accordance with the terms hereof.

RLF1 31627761v.1
#99165958v13
#99165958v16

x.      *Not Control Persons or Insiders.*  By virtue of any of the actions taken with respect to, in connection with, related to or arising from the Prepetition Debt Documents, the Prepetition Secured Parties do not control the Debtors or their properties or operation or have authority to determine the manner in which the Debtors' operations are conducted, and are not control persons or insiders of the Debtors.

G.      **Cash Collateral**.  The Debtors are hereby authorized, subject to the terms and conditions of this Interim Order, to use Cash Collateral strictly in accordance with the Approved 13-Week Cash Flow (as defined below) (subject to any Permitted Variances (as defined below)); provided, however, (a) the Prepetition Secured Parties are granted the adequate protection as hereinafter set forth and (b) except on the terms and conditions of this Interim Order, the Debtors shall be enjoined and prohibited from at any time using the Cash Collateral absent further order of the Court.  The Debtors' authority to use Cash Collateral shall terminate upon the earlier of expiration of the Approved 13-Week Cash Flow and the occurrence of the Cash Collateral Termination Date.

H.      **Intercreditor Agreements**.  Pursuant to section 510 of the Bankruptcy Code, that certain (x) Amended and Restated ABL Intercreditor Agreement, dated as of June 1, 2018 (as amended, restated, amended and restated, supplemented, waived and/or otherwise modified from time to time, the "**Prepetition Intercreditor Agreement**"), by and between the Prepetition ABL Agent and the Prepetition Term Agent and (y) each other applicable intercreditor or subordination provisions contained in any of the other Prepetition Debt Documents (including the Intercreditor Annex (as defined in the Prepetition Term Credit Agreement)), (i) shall remain in full force and effect, (ii) shall continue to govern the relative priorities, rights, and remedies of the Prepetition Secured Parties (including the relative priorities, rights, and remedies of such parties with respect

RLF1 31627761v.1
#99165958v13
#99165958v16

to the replacement liens, administrative expense claims, and superpriority administrative expense claims granted or the amounts payable by the Debtors under this Interim Order or otherwise), and (iii) shall not be deemed to be amended, altered, or modified by the terms of this Interim Order or the DIP Documents, unless expressly set forth herein or therein.

I.    **Permitted Prior Liens; Continuation of Prepetition Liens**.  Nothing herein shall constitute a finding or ruling by this Court that any lien (i) other than the Prepetition ABL Liens, the Prepetition Term Liens and the liens granted hereunder, is valid, enforceable, perfected, or non-avoidable or (ii) other than as set forth in the Prepetition Intercreditor Agreement or in this Interim Order, is senior to any of the Prepetition ABL Liens and/or the Prepetition Term Liens. Moreover, and subject in all respects to the Prepetition Intercreditor Agreement, nothing shall prejudice the rights of any party in interest, including, but not limited to, the Debtors, the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, or a Committee (if appointed), to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any asserted lien that is not the subject of the stipulations granted pursuant to paragraph [F] hereof.

J.    **Findings Regarding Postpetition Financing and Use of Cash Collateral**.

i.    *Request for Postpetition Financing and Use of Cash Collateral*.  The Debtors seek authority (a) for the Debtors to enter into the DIP Facility, incur the DIP Obligations, renew Letters of Credit, obtain Cash Management Services and incur the Postpetition ABL Obligations on the terms described herein and in the DIP Documents and (b) for the Debtors to use Cash Collateral on the terms described herein, in each case, to, among other things, administer their Chapter 11 Cases and fund their operations.

ii.    *Priming of the Prepetition Liens*.  The priming of the Prepetition Term Liens and Prepetition ABL Liens (except with respect to ABL Priority Collateral) under section 364(d)

of the Bankruptcy Code, as contemplated by the DIP Documents and as provided herein, will enable the Debtors to obtain the DIP Facility and Cash Management Services and the Debtors to continue to operate their business during the pendency of the Chapter 11 Cases, for the benefit of their estates and creditors. The Prepetition Secured Parties are entitled to receive adequate protection, as set forth in this Interim Order pursuant to sections 361, 363, and 364 of the Bankruptcy Code, against any Diminution in Value of their respective interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date. For the avoidance of doubt, the DIP Liens shall not prime, and shall instead be subject and subordinate in all respects to, the Prepetition ABL Liens on all ABL Priority Collateral.

iii. *Need for Postpetition Financing and Use of Cash Collateral.* The Debtors have demonstrated an immediate need to use Cash Collateral on an interim basis and to obtain credit in the form of the Interim New Money Loans under the DIP Facility, renewed Letters of Credit and Cash Management Services in order to, among other things, continue their ordinary course operations, administer these Chapter 11 Cases, and preserve the going-concern value of their estates.

iv. *No Credit Available on More Favorable Terms.* The DIP Facility and the Postpetition ABL Obligations are the best sources of debtor-in-possession financing reasonably available to the Debtors at this time. Given their current financial condition, financing arrangements, and capital structure, the Debtors have been and continue to be unable to obtain financing from sources other than the DIP Lenders and Prepetition ABL Secured Parties on terms more favorable than the DIP Facility and the Postpetition ABL Obligations. The Debtors are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors have also been unable to obtain: (a) adequate

18

unsecured credit having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code; (b) adequate credit secured solely by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) adequate credit secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien.  Financing on a postpetition basis on better terms is not available without granting the DIP Agent, for the benefit of itself and the DIP Lenders and the Prepetition ABL Agent, solely for the benefit of the Cash Management Banks and L/C Issuers (as applicable), (1) perfected security interests in and liens on (each as provided herein) the DIP Collateral (as defined below), with the priorities set forth herein; (2) superpriority claims; and (3) the other protections set forth in this Interim Order.

      v.    *Use of Cash Collateral and Proceeds of the DIP Facility*.  As a condition to entry into the DIP Credit Agreement, the extension of credit under the DIP Facility, the provision of Cash Management Services, the renewal of Letters of Credit and the authorization to use the Prepetition Collateral, including Cash Collateral, the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties require, and the Debtors have agreed, that proceeds of the DIP Facility and Cash Management Services and the Cash Collateral shall be used solely in a manner permitted by the terms and conditions of this Interim Order and the DIP Documents and in accordance with the Approved 13-Week Cash Flow (including with respect to any Permitted Variances), solely for the purposes set forth in the DIP Credit Agreement and this Interim Order, including (a) ongoing working capital, capital expenditures, other general corporate purposes of the Debtors and any other purpose not prohibited by the DIP Credit Agreement; (b) permitted payment of costs of administration of the Chapter 11 Cases; (c) payment of such prepetition expenses as consented to by the DIP Agent, acting at the direction of the Required Lenders (as defined in the DIP Credit

Agreement, the "**Required DIP Lenders**") and the Prepetition ABL Agent; (d) payment of interest, premiums, fees, expenses, and other amounts (including, without limitation, the fees and expenses of the DIP Agent and the Prepetition ABL Agent and the legal and other professionals' fees and expenses of the DIP Agent, the DIP Lenders and the Prepetition ABL Agent) owed under the DIP Documents and the Prepetition ABL Documents, including those incurred in connection with the preparation, negotiation, documentation, and Court approval of the DIP Facility and this Interim Order; (e) payment of the adequate protection amounts to the Prepetition Secured Parties, as set forth in paragraph [15] hereof; and (f) payment of obligations benefitting from the Carve Out (as defined below), and making disbursements therefrom, including by funding the Carve Out Reserve Account (as defined below); provided that, for the avoidance of doubt, and notwithstanding anything herein or in the DIP Documents (including the DIP Credit Agreement) to the contrary, in no instance shall the Debtors' use of Collateral (including Cash Collateral) to pay obligations benefiting from the Carve Out, including Professional Fees, be limited or deemed limited by any Approved 13-Week Cash Flow.  The Debtors believe that the Approved 13-Week Cash Flow (including any Permitted Variances) is reasonable under the facts and circumstances. The DIP Lenders and the Prepetition ABL Secured Parties are relying, in part, upon the Debtors' agreement to comply with the Approved 13-Week Cash Flow (including any Permitted Variances), this Interim Order, and the other DIP Documents in determining to enter into the postpetition financing arrangements and consent to the use of Cash Collateral provided for in this Interim Order.

vi.      *Application of Proceeds of DIP Collateral*.  As a condition to entry into the DIP Credit Agreement, the extension of credit under the DIP Facility, the renewal of Letters of Credit, the provision of Cash Management Services, and authorization to use Cash Collateral, the

Debtors, the DIP Agent, the DIP Lenders, and the applicable Prepetition Secured Parties have agreed that as of and commencing on the date of the Interim Hearing, the Debtors shall apply the proceeds of the DIP Collateral solely as permitted by the DIP Documents and this Interim Order.

vii.    *Roll-Up*.  The Prepetition Term Secured Parties that are DIP Lenders (or affiliates thereof) would not have consented to extend the DIP Facility or other financial accommodations to the Debtors without the inclusion of the DIP Roll-Up Loans in the DIP Obligations under the DIP Facility.  Thus, the Roll-Up (as defined below) is consideration for, and solely on account of, the agreement of the DIP Lenders that are Prepetition Term Secured Parties (or affiliates thereof) to extend the DIP New Money Loans.

viii.    *ABL Fee Letters*. Entry into and performance under the ABL Fee Letters reflects the Debtors' exercise of prudent business judgment consistent with their fiduciary duties. The ABL Fee Letters are the product of extensive good faith, arm's-length negotiations among the Debtors and the Prepetition ABL Secured Parties, and the terms are fair and reasonable and in the best interests of the Debtors, their estates, and their creditors. The Debtors would not have been able to obtain consent to the use of Cash Collateral without entering into and performing under the ABL Fee Letters.

K.    **Adequate Protection**.  (i) The Prepetition Term Agent, for the benefit of the Prepetition Term Secured Parties, and (ii) the Prepetition ABL Agent, for the benefit of the Prepetition ABL Secured Parties, are entitled to receive adequate protection against any Diminution in Value, if any, of their respective interests from and after the Petition Date in the Prepetition Collateral, including, without limitation, the Cash Collateral pursuant to sections 361, 363, 503, and 507(b) of the Bankruptcy Code.  Based on the Motion and on the record presented to the Court, the terms of the proposed adequate protection and for the use of the Prepetition

Collateral (including Cash Collateral) set forth herein are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of the Prepetition Collateral (including Cash Collateral); *provided* that nothing in the DIP Documents or herein shall (x) be construed as a consent by any of the Prepetition ABL Secured Parties to or authorization by the Court of the use of Cash Collateral other than on the terms set forth in this Interim Order and in the context of the DIP Facility authorized by this Interim Order to the extent such consent has been or is deemed to have been given or (y) prejudice, limit or otherwise impair the rights of any of the Prepetition ABL Secured Parties or Prepetition Term Secured Parties to seek new, different or additional adequate protection or assert any rights of the Prepetition ABL Secured Parties or Prepetition Term Secured Parties, and the rights of any other party in interest, including the Debtors or any other Prepetition Secured Party (as applicable), to object to such relief are hereby preserved.

L.    **Sections 506(c) and 552(b)**.  In light of, among other things, in each case, as more fully set forth herein: (i) the DIP Agent's and the DIP Lenders' agreement that their liens and superpriority claims shall be subject to the Carve Out (as defined below); (ii) the Prepetition Secured Parties' agreement that (x) their respective adequate protection liens and claims shall be subject to the Carve Out (as defined below) (except as provided herein) and (y) the Prepetition ABL Liens and ABL Adequate Protection Liens on the Term Priority Collateral, the Prepetition Term Liens and the Term Adequate Protection Liens shall be subordinate to the DIP Liens (as defined below); (iii) the authority to use Cash Collateral as provided herein; and (iv) the funding made available pursuant to the DIP Facility and the Postpetition ABL Obligations, (a) subject to entry of the Final Order, the Prepetition Secured Parties are entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section

552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties and (b) subject to entry of the Final Order, the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties are each entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code as provided herein.  The foregoing is a condition and a material inducement to the Prepetition Secured Parties' consent to the use of Cash Collateral.

  M.  **Good Faith of the DIP Agent and DIP Lenders and the Prepetition Secured Parties**.

   i.  Based upon the DIP Declarations, the First Day Declaration, and the record at the Interim Hearing, (i) the terms and conditions of the DIP Facility, the Postpetition ABL Obligations and the terms on which the Debtors may continue to use Prepetition Collateral (including Cash Collateral) are fair and reasonable, are appropriate for secured financing to debtors in possession, are the best available to the Debtors under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration; (ii) the terms and conditions of the DIP Facility and the use of the Cash Collateral have been negotiated in good faith and at arm's length among the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties, with the assistance and counsel of their respective advisors; (iii) the use of Cash Collateral pursuant to this Interim Order, has been agreed to in "good faith" within the meaning of sections 363(m) and 364(e) of the Bankruptcy Code; (iv) any credit to be extended, loans to be made, and other financial accommodations to be extended to the Debtors by the DIP Secured Parties and the Prepetition Secured Parties, including, without limitation, pursuant to this Interim Order, have been allowed, advanced, extended, issued, or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code by the DIP Secured Parties and the Prepetition Secured

RLF1 31627761v.1
#99165958v13
#99165958v16

Parties in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code; and (v) the DIP Facility, the DIP Liens, the DIP Superpriority Claims (as defined below), the Postpetition ABL Superpriority Claims, the Adequate Protection Liens, and the 507(b) Claims shall be entitled to the full protection of sections 363(m) and 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

ii.    Absent an order of this Court and the provision of adequate protection, consent of the Prepetition ABL Secured Parties and Prepetition Term Secured Parties is required for the Debtors' use of Cash Collateral and other Prepetition ABL Collateral and Prepetition Term Collateral.  The Prepetition ABL Secured Parties and Prepetition Term Secured Parties have consented, or have not objected, to the Debtors' use of Cash Collateral and other Prepetition ABL Collateral and Prepetition Term Collateral and to the Debtors' entry into the DIP Documents solely in accordance with and subject to the terms and conditions in this Interim Order and the DIP Documents.

N.    **Immediate Entry**.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

RLF1 31627761v.1
#99165958v13
#99165958v16

Based upon the foregoing findings and conclusions, the Motion, the First Day Declaration, the DIP Declarations, and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      **<u>DIP Facility and Use of Cash Collateral Approved on Interim Basis</u>**.  The Motion is granted to the extent provided herein on an interim basis.  All objections to this Interim Order, to the extent not withdrawn, waived, settled, or resolved, are hereby denied and overruled.

2.      **<u>Authorization of the DIP Facility</u>**.  The DIP Facility is hereby approved.  The Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Documents and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Documents and to deliver all instruments, certificates, agreements, and documents that may be required, desirable or necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens.  The Debtors are hereby authorized and directed to pay, in accordance with this Interim Order, the principal, interest, premiums, fees, payments, expenses, and other amounts described in the DIP Documents as such amounts (including, without limitation, agency, legal and other professional fees and expenses of the DIP Agent and the DIP Lenders) become due and payable in accordance with the terms and conditions of the DIP Documents, without need to obtain further Court approval, whether or not such fees arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, and to take any other related actions that may be necessary, desirable or appropriate, all to the extent provided in this Interim Order or the DIP Documents. Upon execution and delivery, the DIP Documents shall represent valid and binding obligations of the Debtors, enforceable against each of the Debtors and their estates in accordance with their

RLF1 31627761v.1
#99165958v13
#99165958v16

terms. Upon entry of this Interim Order, the Backstop Premium set forth in the Backstop Fee Letter (as defined in the DIP Credit Agreement) (the "**Backstop Premium**") shall be fully earned, non-refundable, and non-avoidable and shall be payable in accordance with and at the times specified in the DIP Documents.

3.     **Authorization to Borrow**. To prevent immediate and irreparable harm to the Debtors' estates, from the entry of this Interim Order through and including the earliest to occur of (i) entry of the Final Order or (ii) the DIP Termination Date (as defined below), and subject to the terms and conditions set forth in the DIP Documents and this Interim Order, the Debtors are hereby authorized to (i) enter into the DIP Facility, (ii) borrow the DIP New Money Loans and (iii) roll-up and convert $73 million of aggregate principal amount of Prepetition Bridge Loans (together with all accrued and unpaid interest, fees, and expenses with respect thereto) into an equivalent principal amount of DIP Roll-Up Loans, subject to the provisions of paragraphs [33 and 34] hereof (the "**Roll-Up**"). The Debtors are authorized to take such acts as shall be necessary or desirable to effect the Roll-Up and conversion of the Prepetition Bridge Loans by the DIP Lenders (or affiliates thereof).

4.     **DIP Account**. The Debtors shall maintain a deposit account at [●] in the name of Debtor [Accuride Corporation], but subject to a deposit account control agreement solely in favor of the DIP Agent, with the account number ending in [******7923], which account (x) shall constitute DIP Collateral (solely securing the DIP Obligations and the DIP Superpriority Claims) and (y) shall be subject solely to the DIP Liens and the DIP Superpriority Claims (each as defined below) (the "**DIP Account**"). The DIP Loans shall be funded into the DIP Account and the Debtors shall be permitted to make withdrawals from the DIP Account, subject to the terms and conditions of the DIP Credit Agreement (including Sections 6.11 and 7.13 thereof).

Notwithstanding anything to the contrary herein, amounts drawn under the DIP Facility pursuant to the DIP Loans (including all amounts in the DIP Account) shall constitute (i) DIP Collateral and be subject solely to the DIP Liens and the DIP Superpriority Claims and (ii) shall not constitute ABL Priority Collateral or be subject to any liens (including any ABL Adequate Protection Liens) securing any obligations owed to, or claims of the Prepetition ABL Secured Parties (but ABL Priority Collateral shall include the Debtors' reversionary interest in such funds after the payment in full of the DIP Obligations).  For the avoidance of doubt, no amounts other than amounts drawn under the DIP Facility pursuant to the DIP Loans shall be deposited into the DIP Account.

5.     **Amendment of the DIP Documents**.  The DIP Documents may from time to time be amended, restated, amended and restated, modified, waived, or supplemented by the parties thereto in accordance with the terms thereof, and each of the Debtors is expressly authorized and empowered to enter into and implement such amendments, restatements, amendment and restatements, modifications, waivers, or supplements from time to time in accordance with the terms of the DIP Documents, without further order of this Court if the amendment, restatement, amendment and restatement, modification, waiver or supplement is not material or is necessary to conform the terms of the DIP Documents.  Any such amendment, restatement, amendment and restatement, modification, waiver, or supplement to the DIP Documents shall be provided to counsel of the Prepetition ABL Agent, the Committee (if appointed) and the U.S. Trustee.  Any material amendment, restatement, amendment and restatement, modification, waiver, or supplement to the DIP Documents shall require approval of this Court. The foregoing shall be without prejudice to the Debtors' right to immediately seek approval from the Court of a material amendment, modification, waiver, or supplement on an expedited basis. For the avoidance of doubt, the extension of a DIP Milestone (as defined in the DIP Credit Agreement) and

amendments, restatements, amendments and restatements, modifications, waivers, or supplements to the Approved 13-Week Cash Flow shall not constitute a material amendment, restatement, amendment and restatement, modification, waiver, or supplement to the DIP Documents.

6. **DIP Obligations**. The DIP Documents and this Interim Order shall constitute and evidence the validity and binding effect of the DIP Obligations, which shall be enforceable in accordance with their terms against the Debtors, their estates and any successors thereto, including, without limitation, any trustee appointed in the Chapter 11 Cases or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "**Successor Cases**"). Upon entry of this Interim Order, the DIP Obligations will include all loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time hereafter be owing by any of the Debtors party to the DIP Documents to the DIP Agent or any of the DIP Lenders, in each case, under and in accordance with the terms and conditions of the DIP Documents or this Interim Order or secured by the DIP Liens, including, without limitation, all principal, accrued and unpaid interest, costs, fees, expenses, and other amounts owing under and in accordance with the DIP Documents; provided that, for the avoidance of doubt the DIP Liens and the DIP Obligations shall be subject to the Carve Out in all respects. The Debtors shall be jointly and severally liable for the DIP Obligations as and to the extent provided in the DIP Documents, which shall be subject to the Carve Out in all respects. The DIP Obligations shall be due and payable without notice or demand on the DIP Termination Date (as defined below), and the Debtors' authority to use Cash Collateral under this Interim Order shall automatically cease, in each case, without notice or demand on the Cash Collateral Termination Date (as defined below), in each case except as provided in paragraph [31] hereof and subject to the requirements

28

of the Carve Out (as defined below); provided that the Debtors' rights to seek the use of Cash Collateral upon entry of a further order of the Court after the occurrence of the Cash Collateral Termination Date are fully reserved, and nothing herein shall waive, limit, or modify or be deemed to waive, limit or modify the Debtors' rights to seek the use of Cash Collateral upon entry of a further order of the Court after the occurrence of the Cash Collateral Termination Date.  No obligation, payment, transfer, or grant of collateral security hereunder or under the DIP Documents (including any DIP Obligation or DIP Liens and including in connection with any adequate protection provided to the Prepetition Secured Parties hereunder) shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under chapter 5 of the Bankruptcy Code, section 724(a) of the Bankruptcy Code, or any other provision with respect to avoidance actions under the Bankruptcy Code or applicable state law equivalents), shall constitute original issue discount, or shall be subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

7.      **DIP Liens**.  Subject and subordinate to the Carve Out in all respects, as set forth in this Interim Order and effective immediately upon entry of this Interim Order, pursuant to, as applicable, sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted, in order to secure the DIP Obligations, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on (collectively, the "**DIP Liens**") all real and personal property, whether now existing or hereafter arising and wherever located, tangible or intangible, of each of the Debtors (the "**DIP Collateral**"), including, without limitation

29

(a) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including credit card receivables), chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including, without limitation, all of the issued and outstanding capital stock of each Debtor (other than TopCo), other equity or ownership interests, including equity interests in subsidiaries and non-wholly-owned subsidiaries), hedge agreements, furniture, fixtures, equipment (including documents of title), goods, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), rights to the payment of money (including, without limitation, tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action, and all substitutions, indemnification rights, all present and future intercompany debt, leases other than nonresidential real property leases, fee interests in real property owned by the Debtors, books and records related to the foregoing, and accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds; (b) all owned real property interests and all proceeds of leased real property; (c) actions brought under section 549 of the Bankruptcy Code to recover any post-petition transfer of DIP Collateral; (d) subject to entry of the Final Order, the proceeds of any avoidance actions brought pursuant to chapter 5 of the Bankruptcy Code or section 724(a) of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code or applicable state law equivalents (the "**Avoidance Action Proceeds**"), but not the actions themselves; (e) the proceeds of any exercise of the Debtors' rights under section 506(c) and 550 of the Bankruptcy Code; (f) the DIP Account and the amounts therein; and (g) all other DIP Collateral that was not otherwise subject to valid, perfected, enforceable, and unavoidable liens on the Petition Date; provided that the DIP Collateral shall not

RLF1 31627761v.1
#99165958v13
#99165958v16

include (and the DIP Liens shall not extend to) (x) funds held in the Borrowing Base Account (as defined below); provided the DIP Collateral shall include the Debtors' reversionary interest in such funds, (y) any "Excluded Property" (as defined in the DIP Credit Agreement) or (z) any Carve Out Reserve (as defined herein) and all funds held therein; provided the DIP Collateral shall include the Debtors' reversionary interest, if any, in funds held in the Carve Out Reserves, after all Professional Fees benefitting from the Carve Out have been indefeasibly paid in full, in cash (clauses (x), (y) and (z), collectively, the "**DIP Excluded Property**").

8.     **DIP Lien Priority**.  The DIP Liens shall have the following priority with respect to assets of the Debtors' estates, and subject in all respects to the Carve Out and with respect to the Term Priority Collateral (other than the DIP Account and the amounts therein) *pari passu* with the Cash Management Liens:

(a)     except as provided in clause (b) below, pursuant to Section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be first priority liens on all of the assets (now or hereafter acquired and all proceeds thereof) of the Debtors that, as of the Petition Date, are not otherwise subject to valid, properly perfected, and unavoidable liens in existence immediately prior to the Petition Date or liens that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code; provided that in no instance shall the DIP Liens encumber the DIP Excluded Property;

(b)     pursuant to Section 364(c)(3) of the Bankruptcy Code, the DIP Liens shall be junior priority liens upon all DIP Collateral constituting ABL Priority Collateral (now owned or hereafter acquired and all proceeds thereof), subject and junior only to, in order of priority: (1) the Carve Out; (2) the ABL Permitted Liens; and (3) any liens securing the ABL Obligations, including the ABL Adequate Protection Liens (as defined herein) and the Prepetition ABL Liens; provided that,

for the avoidance of doubt, the DIP Liens shall be senior in priority to the Prepetition Term Liens and any liens granted as adequate protection in favor of the Prepetition Term Secured Parties with respect to ABL Priority Collateral (now owned or hereafter acquired);

(c)    pursuant to Section 364(d) of the Bankruptcy Code, the DIP Liens shall be priming first-priority liens on all DIP Collateral (now or hereafter acquired and all proceeds thereof) that is "Collateral" as defined in the Prepetition Term Credit Agreement and "U.S. Collateral" as defined in the Prepetition ABL Credit Agreement, to the extent such Collateral is not ABL Priority Collateral; provided that such DIP Liens shall be junior in order of priority to:  (i) the Carve Out, and (ii) the Permitted Liens.  For the avoidance of doubt, the Prepetition ABL Liens and the Prepetition Term Liens on the DIP Collateral that is not ABL Priority Collateral (now owned or hereafter acquired), including for the avoidance of doubt, the DIP Account and the amounts therein, shall be junior to the DIP Liens and the Carve Out in all respects.

(d)    Other than as set forth herein (including with respect to the Carve Out) or in the DIP Documents, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Cases, upon the conversion of any of the Chapter 11 Cases to any Successor Case, and/or upon the dismissal of any of the Chapter 11 Cases or Successor Cases.  The DIP Liens shall not be subject to any of sections 510, 549 or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

9.    **DIP Superpriority Claims**.  Subject and subordinate to the Carve Out in all respects, upon entry of this Interim Order, the DIP Agent, on behalf of itself and the DIP Lenders,

RLF1 31627761v.1
#99165958v13
#99165958v16

is hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims in each of the Chapter 11 Cases and any Successor Cases (collectively, the "**DIP Superpriority Claims**") for all DIP Obligations (a) except as provided in this paragraph, with priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of their Chapter 11 Cases or any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113, or 1114 of the Bankruptcy Code or any other provision of the Bankruptcy Code, (b) which shall be *pari passu* with the Postpetition ABL Superpriority Claims, and (c) which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative to the extent permitted by law.  The DIP Superpriority Claims shall be payable from, and have recourse to, all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding, until the ABL Obligations have been indefeasibly paid in full in cash or otherwise fully cash collateralized in accordance with the Prepetition ABL Documents, the ABL Priority Collateral).

      10.    <u>**No Obligation to Extend Credit**</u>.  Except as required to fund the Carve Out (as defined below) as set forth in this Interim Order, the DIP Lenders shall have no obligation to make any loan or advance under the DIP Documents unless (and subject to the occurrence of the Closing Date (as defined in the DIP Credit Agreement)) all of the conditions precedent to the making of such extension of credit under the DIP Documents and this Interim Order have been satisfied in full or waived by the Required DIP Lenders in accordance with the terms of the DIP Credit Agreement.

RLF1 31627761v.1
#99165958v13
#99165958v16

11.     **Use of Proceeds of the DIP Facility**.  From and after the Petition Date, the Debtors shall use proceeds of borrowings under the DIP Facility and the Cash Management Services in accordance with the Approved 13-Week Cash Flow (including any Permitted Variances) and the terms and conditions in this Interim Order and the DIP Documents; provided that, for the avoidance of doubt, the Debtors' use of borrowings under the DIP Facility and the DIP Collateral (including Cash Collateral and amounts in the DIP Account) to pay obligations benefiting from the Carve Out shall not be limited or deemed limited by the Approved 13-Week Cash Flow (including any Permitted Variances).

12.     **Authorization to Use Cash Collateral**.  The Debtors are hereby authorized to use Cash Collateral solely in accordance with this Interim Order, the DIP Documents, and the Approved 13-Week Cash Flow (including any Permitted Variances), until the earlier of expiration of the Approved 13-Week Cash Flow and the occurrence of the Cash Collateral Termination Date (as defined below); provided, however that, during the Remedies Notice Period (as defined below), the Debtors are authorized to use Cash Collateral (x) solely to pay expenses necessary to avoid immediate and irreparable harm to the Debtors' estates, in accordance with the Approved 13-Week Cash Flow, (y) to satisfy Allowed Professional Fees benefitting from the Carve Out without regard to whether or not in compliance with the Approved 13-Week Cash Flow (provided that ABL Priority Collateral shall not be used to fund the Post-Carve Out Trigger Notice Reserve or any Post-Carve Out Amounts) and (z) as otherwise agreed to by the Required DIP Lenders and the Prepetition ABL Agent.  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors' estates outside the ordinary course of business (which shall be subject to further orders of this Court), or any Debtor's use of any Cash Collateral or other proceeds resulting

RLF1 31627761v.1
#99165958v13
#99165958v16

therefrom, except as expressly permitted in this Interim Order (including with respect to the Carve Out (as defined below)) and in accordance with the limitations under the DIP Documents.

13.     **Entry Into the ABL Fee Letters**. The Debtors are authorized to enter into the ABL Fee Letters, and the prior execution thereof is hereby ratified, approved, and authorized.  The Debtors are further authorized to comply with the terms of the ABL Fee Letters and to take any and all actions necessary to implement the terms thereof and pay the fees, expenses, and indemnity obligations set forth in the ABL Fee Letters, including, without limitation, any fees and expenses incurred prior to the date of this Interim Order, in each case, pursuant to the terms and conditions set forth in the ABL Fee Letters without further notice, hearing, or order of this Court.  The Debtors and the Prepetition ABL Secured Parties are authorized to enter into any amendment, modification, supplement, or waiver to any provision of the ABL Fee Letters in accordance with the terms thereof without further notice, hearing, or order of this Court.  Any such material amendment, modification, supplement, or waiver shall be provided to counsel of the Prepetition Term Lenders. The Debtors' obligations in respect of the fees, expenses, and indemnity obligations pursuant to the ABL Fee Letters shall constitute ABL Obligations.

14.     **Authorization to Incur Postpetition ABL Obligations**.  From the entry of this Interim Order, the Debtors are authorized to continue to renew outstanding Letters of Credit (as defined in the Prepetition ABL Credit Agreement, "**Letters of Credit**") and obtain Cash Management Services (as defined in the Prepetition ABL Credit Agreement, "**Cash Management Services**") from the Prepetition ABL Secured Parties, and to satisfy obligations thereunder as they come due in accordance with the terms thereof, as the same may be amended, waived or otherwise modified by agreement between the Debtors and the applicable Prepetition ABL Secured Parties, without need for further Court approval thereof so long as any such amendment, waiver or

RLF1 31627761v.1
#99165958v13
#99165958v16

modification is delivered to counsel to the DIP Lenders.  Upon entry of this Interim Order, all obligations of the Debtors, including all Obligations (as defined in the Prepetition ABL Credit Agreement) under or relating to any Letters of Credit (such Obligations solely to the extent relating to Letters of Credit, the "**L/C Obligations**") or Cash Management Services (such Obligations solely to the extent related to Cash Management Services, the "**Cash Management Obligations**" and, together with the L/C Obligations, the "**Postpetition ABL Obligations**"; the Postpetition ABL Obligations, together with the Prepetition ABL Obligations, the "**ABL Obligations**") provided by Prepetition ABL Secured Parties shall be enforceable in accordance with their terms against the Debtors, their estates and any successors thereto in each of the Chapter 11 Cases and any Successor Cases and have the claim and lien priorities set forth below.  The Postpetition ABL Obligations shall be due and payable without notice or demand on the Termination Date (as defined below).

(a)     The L/C Obligations shall constitute allowed superpriority administrative expense claims (the "**L/C Superpriority Claims**") pursuant to section 364(c)(1) of the Bankruptcy Code in each of the Chapter 11 Cases and any Successor Cases, which shall (i) except as provided in this paragraph, have priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of their Chapter 11 Cases or any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113, or 1114 of the Bankruptcy Code or any other provision of the Bankruptcy Code, (ii) be subject and subordinate to the Pre-Carve Out Amounts and *pari passu* with the DIP Superpriority Claims and the Cash Management Superpriority Claims in all respects, and (iii) at all times be senior to the rights of the Debtors and

their estates, and any successor trustee or other estate representative to the extent permitted by law. The L/C Obligations shall continue to be secured by the Prepetition ABL Liens in all respects.

(b)     The Cash Management Obligations shall constitute allowed superpriority administrative expense claims (the "**Cash Management Superpriority Claims**" and, together with the L/C Superpriority Claims, the "**Postpetition ABL Superpriority Claims**") pursuant to section 364(c)(1) of the Bankruptcy Code in each of the Chapter 11 Cases and any Successor Cases, which shall (i) except as provided in this paragraph, have priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of their Chapter 11 Cases or any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113, or 1114 of the Bankruptcy Code or any other provision of the Bankruptcy Code, (ii) be subject and subordinate to the Pre-Carve Out Amounts and *pari passu* with the DIP Superpriority Claims and the L/C Superpriority Claims in all respects, and (iii) at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative to the extent permitted by law.  The Cash Management Obligations shall (x) continue to be secured by the Prepetition ABL Liens and (y) be secured by continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on all DIP Collateral (other than the DIP Account) (the "**Cash Management Liens**")[3] granted hereby to the Prepetition ABL Agent for the benefit of the Cash

---

[3]   Notwithstanding anything to the contrary herein, (x) the Cash Management Liens shall not attach to (i) the DIP Account or the amounts therein or (ii) any "building" or "mobile home" (each as defined in applicable Federal Reserve Board regulations) on land comprising real property that is located in a special flood hazard as determined by the Federal Emergency Management Agency or such successor agency, and (y) the property described in clause (x) above shall constitute "DIP Excluded Property" for all purposes with respect to the Cash Management Liens.

Management Banks (as defined in the Prepetition ABL Credit Agreement), pursuant to, as applicable, sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, which Cash Management Liens shall be subject and subordinate to the Pre-Carve Out Amounts and with respect to the Term Priority Collateral (other than the DIP Account and the amounts therein) *pari passu* with the DIP Liens in all respects.  For the avoidance of doubt, the Cash Management Liens shall not be subject or subordinate to or made *pari passu* with (1) any lien or security interest that is avoided for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code, (2) except as set forth in this paragraph, any lien or security interest, now or hereafter existing, whether authorized under sections 363 or 364 of the Bankruptcy Code or otherwise, or (3) intercompany or affiliate liens, security interests or claims.

(c)     For the avoidance of doubt, nothing in this Interim Order shall (x) permit the issuance of new letters of credit under the ABL Facility or (y) obligate the Prepetition ABL Secured Parties to amend, renew or extend any Letters of Credit or Cash Management Services (or prohibit the issuance of any non-renewal notices with respect thereto).

15.     **Adequate Protection for the Prepetition Secured Parties**.  The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(c)(2), 363(e), 503, and 507 of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral as of the Petition Date, including the Cash Collateral, against any Diminution in Value, if any, of their respective interests in the Prepetition Collateral from and after the Petition Date (the "**Adequate Protection Claim**").  As adequate protection, the Prepetition Secured Parties are hereby granted the following (the "**Adequate Protection Obligations**"):

(a)     <u>ABL Adequate Protection Liens</u>.  Subject to the Pre-Carve Out Amounts in all respects, as security for the payment of the Prepetition ABL Secured Parties' Adequate Protection

38

Claims, the Prepetition ABL Agent (for itself and for the benefit of the other Prepetition ABL Secured Parties) is hereby granted (effective and automatically perfected upon the date of this Interim Order and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements, or other agreements) a valid, perfected replacement security interest in and lien on all of the DIP Collateral (other than the DIP Account and amounts from time to time therein) (including, subject to entry of the Final Order, Avoidance Action Proceeds) and the Borrowing Base Account (and amounts from time to time therein) (the "**ABL Adequate Protection Liens**"),[4] subject and subordinate only to (i) the Pre-Carve Out Amounts; (ii) the ABL Permitted Liens and (iii) with respect to the Term Priority Collateral, in order of priority (1) the DIP Liens and the Cash Management Liens, (2) the Term Adequate Protection Liens (as defined below); and (3) the Prepetition Term Liens.  For the avoidance of doubt, the ABL Adequate Protection Liens shall not be subject or subordinate to or made *pari passu* with (x) any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or (y) except as set forth in this paragraph, any lien or security interest, now or hereafter existing, whether authorized under sections 363 or 364 of the Bankruptcy Code or otherwise or (z) any intercompany or affiliate liens, security interests or claims.

(b)  <u>ABL Section 507(b) Claims</u>.  Subject to the Pre-Carve Out Amounts in all respects, the Prepetition ABL Agent (for itself and for the benefit of the other Prepetition ABL Secured Parties) is hereby granted an allowed superpriority claim against each of the Debtors as provided

---

[4]  Notwithstanding anything to the contrary herein, (x) the ABL Adequate Protection Liens shall not attach to (i) the DIP Account or the amounts therein or (ii) any "building" or "mobile home" (each as defined in applicable Federal Reserve Board regulations) on land comprising real property that is located in a special flood hazard as determined by the Federal Emergency Management Agency or such successor agency and (y) the property described in clause (x) above shall constitute "DIP Excluded Property" for all purposes with respect to the ABL Adequate Protection Liens.

RLF1 31627761v.1
#99165958v13
#99165958v16

in sections 503 and 507(b) of the Bankruptcy Code (the "**ABL 507(b) Claims**") in the amount of the Prepetition ABL Secured Parties' Adequate Protection Claims, if any, with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, or 1114 of the Bankruptcy Code, subject and subordinate only to (1) the Pre-Carve Out Amounts, (2) the DIP Superpriority Claims granted in respect of the DIP Obligations and (3) the Postpetition ABL Superpriority Claims.  Except to the extent expressly set forth in this Interim Order, the Prepetition ABL Secured Parties shall not receive or retain any payments, property, or other amounts in respect of the ABL 507(b) Claims unless and until (x) the Pre-Carve Out Amounts are funded in the Pre-Carve Out Trigger Notice Reserve, (y) solely with respect to Term Priority Collateral, all DIP Obligations shall have been indefeasibly paid in full in cash and (z) all Postpetition ABL Obligations shall have been indefeasibly paid in full in cash.

(c)    <u>ABL Postpetition Payments</u>.  From and after entry of this Interim Order, the Prepetition ABL Agent, on behalf of itself and the other Prepetition ABL Secured Parties, shall receive (i) payment of the fees set forth in the ABL Fee Letters, upon entry of this Interim Order, (ii) current cash payment during the Chapter 11 Cases of all interest and fees in respect of the Prepetition ABL Obligations, as such amounts become due and payable and as set forth in this paragraph and (iii) all other fees and expenses of the Prepetition ABL Agent under the Prepetition ABL Documents, as such amounts become due and payable (provided that any legal or financial advisor fees and expenses shall be subject to the review procedures set forth in section 15(f) hereof).  [Interest shall be paid on each Interest Payment Date (as defined in the Prepetition ABL Credit Agreement) at the applicable contractual non-default Term SOFR-based (or EURIBOR-

40

based or SONIA-based, to the extent applicable) rate under the Prepetition ABL Credit Agreement plus 1.00%, and the Prepetition ABL Secured Party hereby waives their rights to (i) charge interest at the default rate on the Prepetition ABL Obligations and (ii) convert the benchmark rate applicable to the Prepetition ABL Obligations and (ii) convert the benchmark rate applicable to the Prepetition ABL Obligations to the Base Rate (as defined in the Prepetition ABL Credit Agreement) as a result of a default or an event of default under the Prepetition ABL Credit Agreement.]  If it is determined by a final order, which order is not subject to any appeal, stay, reversal, or vacatur, that the aggregate value of postpetition interest paid to Prepetition ABL Secured Parties pursuant to this paragraph (other than on account of any Postpetition ABL Obligations) exceeds the amount permitted by section 506(b) of the Bankruptcy Code, then in each case a party in interest (other than the Debtors or the Prepetition Secured Parties), subject to [paragraph 44 herein], shall have the right to assert that such interest payments of adequate protection shall be applied toward repayment of the secured portion of the applicable Prepetition ABL Obligations as is owing to such Prepetition ABL Secured Party as of the Petition Date.

(d)      _Term Adequate Protection Liens_.  Subject in all respects to the Carve Out, as security for the payment of the Prepetition Term Secured Parties' Adequate Protection Claims, if any, the Prepetition Term Agent (for itself and for the benefit of the other Prepetition Term Secured Parties) is hereby granted (effective and automatically perfected upon the date of this Interim Order and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements, or other agreements) a valid, perfected replacement security interest in and lien on all of the DIP Collateral of each of the Debtors (including, subject to entry of the Final Order, Avoidance Action Proceeds) (the "**Term Adequate Protection Liens**" together with the ABL Adequate Protection Liens, the "**Adequate Protection Liens**"), subject and

subordinate only to (i) (1) the Carve Out (as defined below), (2) the Term Permitted Liens, (3) the DIP Liens (and any liens permitted by the DIP Documents to be senior to the DIP Liens) and (ii) with respect to the Term Priority Collateral, the Cash Management Liens; and (iii) with respect to the ABL Priority Collateral, (1) the ABL Adequate Protection Liens and (2) the Prepetition ABL Liens.  For the avoidance of doubt, the Term Adequate Protection Liens shall not be subject or subordinate to or made *pari passu* with (x) any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or (y) except as set forth in this paragraph, any lien or security interest, now or hereafter existing, whether authorized under sections 363 or 364 of the Bankruptcy Code or otherwise or (z) any intercompany or affiliate liens, security interests or claims.

(e)    Term Section 507(b) Claims.    Subject to the Carve Out in all respects, the Prepetition Term Agent (for itself and for the benefit of the other Prepetition Term Lenders) is hereby granted an allowed superpriority claim against each of the Debtors as provided in sections 503 and 507(b) of the Bankruptcy Code (the "**Term 507(b) Claims**" and, together with the ABL 507(b) Claims, the "**507(b) Claims**") in the amount of the Prepetition Term Secured Parties' Adequate Protection Claims, if any, with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, or 1114 of the Bankruptcy Code, subject and subordinate only to (1) the Carve Out (as defined below), (2) the DIP Superpriority Claims granted in respect of the DIP Obligations and (3) the Postpetition ABL Superpriority Claims.  Except to the extent expressly set forth in this Interim Order, the Prepetition Term Secured Parties shall not receive or retain any payments, property, or other amounts in

42

respect of the Term 507(b) Claims unless and until (x) the Carve Out (as defined below) is funded, (y) all DIP Obligations and Postpetition ABL Obligations shall have been indefeasibly paid in full in cash and (z) with respect to ABL Priority Collateral, all ABL Obligations shall have been indefeasibly paid in full in cash.  Only the Prepetition Term Agent, acting at the direction of the Required Lenders (as defined in the Prepetition Term Credit Agreement), may assert the Term 507(b) Claims against the Debtors.

(f)      <u>Fees and Expenses</u>.  The Debtors are authorized and directed to pay, as adequate protection, all accrued and unpaid fees and reasonable and documented disbursements (including agency fees but not success fees, transaction fees, or similar fees) incurred, whether accrued before, on, or after the Petition Date, by the DIP Agent and Prepetition Agents and (i) one primary counsel, (ii) one local counsel in each applicable jurisdiction, (iii) one financial advisor, and (iv) any other counsel or advisor to be agreed between the Debtors and the DIP Lenders, as applicable (the "**Approved Fee Party Advisors**"), for each of (v) the DIP Lenders, (w) the Prepetition Term Lenders (which shall be the same Approved Fee Party Advisors as the DIP Lenders'), (x) the Prepetition ABL Lenders, (y) the DIP Agent and the Prepetition Term Agent, and (z) the Prepetition ABL Agent (collectively, the "**Approved Fee Parties**").  The Approved Fee Party Advisors shall not be required to file applications seeking compensation for services or reimbursement of expenses with the Court or comply with the U.S. Trustee fee guidelines; however, any time that such professionals seek payment of fees and expenses from the Debtors, each professional shall provide summary copies of its fee and expense statements or invoices (which shall not be required to contain time entries but shall include a general description of the nature of the matters for which services were performed, a list of professionals who worked on the matter, their hourly rate (if such professionals bill at an hourly rate) and the number of hours each

43

#99165958v13
#99165958v16

professional billed and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work-product doctrine) to the U.S. Trustee and counsel to the Committee (if appointed), contemporaneously with the delivery of such fee and expense statements to the Debtors.  After delivery of a fee and expense statement or invoice, the Debtors, the U.S. Trustee, and the Committee (if appointed) shall have ten (10) calendar days to raise an objection thereto.  Any objections raised by the Debtors, the U.S. Trustee, or a Committee (if appointed) with respect to the Debtors' payment of the amounts in such invoices must be in writing and state with particularity the grounds therefor and must be submitted to the applicable professional.  If an objection is timely raised, such objection shall be subject to resolution by the Court.  Pending such resolution, the undisputed portion of any such fee and expense statement or invoice shall be paid promptly by the Debtors.  Notwithstanding the foregoing, the Debtors are authorized and directed to pay upon entry of this Interim Order all reasonable and documented fees, costs, and out-of-pocket expenses (including agency fees but not any "success", "transaction", or similar fees) of the DIP Agent and the Prepetition Agents and the legal and financial advisors to the Approved Fee Parties incurred on or prior to such date without the need for any professional engaged by such parties to first deliver a copy of its invoice as provided for herein.  Any and all fees, costs, and expenses paid prior to the Petition Date by any of the Debtors to the Approved Fee Parties are hereby approved in full.  For the avoidance of doubt, the fees set forth in any engagement letter executed by any of the Debtors prior to the Petition Date with any of the legal or financial advisors to the Approved Fee Parties shall be deemed reasonable for all purposes under this Interim Order,

RLF1 31627761v.1
#99165958v13
#99165958v16

including, without limitation, under this paragraph [15(f)]. Any and all fees, costs and expenses of the legal or financial advisors to the Approved Fee Parties paid by the Debtors prior to the Petition Date, or after the Petition Date in accordance with this paragraph, shall not be subject to recharacterization, avoidance, subordination, disgorgement or any similar form of recovery by the Debtors, their estates or any other person or entity.

16.     **Adequate Protection Reservation**.  Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties hereunder is insufficient to compensate for any Diminution in Value, if any, of their respective interests in the Prepetition Collateral from and after the Petition Date during the Chapter 11 Cases or any Successor Cases, or the Debtors' or any party in interest's rights to challenge such an assertion.  The receipt by the Prepetition Secured Parties of the adequate protection provided herein shall not be deemed an admission:  (a) that the interests of the Prepetition Secured Parties are adequately protected, or (b) that any of the Prepetition Secured Parties are entitled to other or different adequate protection.  Further, this Interim Order shall not prejudice or limit the rights of the Prepetition Secured Parties to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection, subject in all respects to the terms and limitations of the Prepetition Intercreditor Agreement.

17.     **[Reserved.]**

18.     **Budget Maintenance**.

(a)     The Debtors shall use the proceeds of all borrowings under the DIP Facility and Cash Collateral solely in accordance with the Approved 13-Week Cash Flow (including any Permitted Variances); <u>provided</u> that, for the avoidance of doubt, the Debtors' authorization to use proceeds of the DIP Facility, DIP Collateral, and Cash Collateral to satisfy obligations benefitting

45

from the Carve Out (subject to the limitations herein) shall in no way be subject to the Approved 13-Week Cash Flow (including any Permitted Variances).  The 13-Week Cash Flow annexed hereto as Exhibit 2 and each subsequent, modified, extended and/or updated 13-Week Cash Flow approved by the Required DIP Lenders in accordance with the DIP Credit Agreement and the Prepetition ABL Agent shall constitute the "**Approved 13-Week Cash Flow**."  By 5:00 p.m., New York City time, [on the first Friday of each month] (commencing on [●], 2024), the Debtors shall deliver to the DIP Agent, the DIP Lenders, the Prepetition ABL Agent, and the Prepetition ABL Lenders, a new projected thirteen (13) week cash flow forecast prepared by the Debtors in good faith (in each case covering the immediately following thirteen (13) week period) (each such projected 13-week cash flow forecast, a "**13-Week Cash Flow**"), in accordance with the terms of the DIP Credit Agreement and this Interim Order.  Until the Required DIP Lenders and the Prepetition ABL Agent approve a subsequently delivered 13-Week Cash Flow in accordance with the terms of the DIP Credit Agreement and this Interim Order, the then-current Approved 13-Week Cash Flow shall remain the Approved 13-Week Cash Flow.

(b)    Every other Thursday (provided that, if Thursday is not a Business Day, such date shall extend to the immediately succeeding Business Day) commencing on [●], 2024 (and testing for the two-week period ending [●], 2024), the Debtors shall test (and shall deliver the results of such test to the DIP Agent, the DIP Lenders, the Prepetition ABL Agent and the Prepetition ABL Lenders) the Permitted Variances (as defined below) for the immediately preceding cumulative two-week period ending on the Friday immediately prior to such Thursday (provided that, if Thursday is not a Business Day, such date shall extend to the immediately succeeding Business Day) (the "**Initial Variance Testing Period**" and, each two-week period thereafter, a "**Variance Testing Period**") against the Approved 13-Week Cash Flow.  "**Permitted Variances**" shall have

the meaning set forth in the DIP Credit Agreement as of the date of this Interim Order, as modified or waived in accordance with the terms of the DIP Credit Agreement, subject to (i) the prior written consent of the Prepetition ABL Agent for any modification or waiver permitting (x) Total Disbursements of more than 120% of the Total Disbursements in the Approved 13-Week Cash Flow for the Initial Variance Testing Period and each Variance Testing Period thereafter; (y) Total Receipts of less than 80% of the Total Receipts in the Approved 13-Week Cash Flow for the Initial Variance Testing Period and each Variance Testing Period thereafter (on an aggregate basis) or (z) total cash flow of less than the total cash flow shown in the Approved 13-Week Cash Flow for the Initial Variance Testing Period and each Variance Testing Period thereafter, in each case in this clause (z), by an amount in excess of 20% of the Total Receipts shown in the Approved 13-Week Cash Flow for such Variance Testing Period (on an aggregate basis) and (ii) with respect to any other modification or waiver, rights and compensation for the Prepetition ABL Secured Parties reasonably equivalent to those provided to the DIP Secured Parties for the DIP Secured Parties' consent or approval to such modification or waiver.  Capitalized terms use in the foregoing sentence but not otherwise defined in this Interim Order shall have the meaning ascribed to such terms in the DIP Credit Agreement as of the date of this Interim Order.

19.    **Budget and Reporting Compliance**. The Debtors shall provide the Prepetition ABL Agent (in addition to all other reporting to be provided to the Prepetition ABL Agent in accordance with this Interim Order) with all financial reporting and other periodic reporting and information that is required to be provided to any of the DIP Secured Parties under the DIP Credit Agreement and any other reporting or information that impacts the rights of the Prepetition ABL Secured Parties or the ABL Priority Collateral or that is reasonably requested by the Prepetition ABL Agent.  The failure to comply with Section 7.13 of the DIP Credit Agreement or the Debtors'

RLF1 31627761v.1
#99165958v13
#99165958v16

failure to provide the reports and other information required in this Interim Order or the DIP Credit Agreement to the parties entitled to receive such reports and information under the DIP Credit Agreement and the Prepetition ABL Agent within the time periods (including any grace periods) set forth in this Interim Order or the DIP Credit Agreement, as applicable, shall constitute an Event of Default under the DIP Credit Agreement and an ABL Cash Collateral Termination Event.

20.     **Borrowing Base; Borrowing Base Reporting**.[5]  The Debtors shall deliver to the Prepetition ABL Agent, with copies to the DIP Agent and the DIP Lenders, each [Wednesday] (or if such day is not a Business Day, the immediately succeeding Business Day) (commencing on [ ], 2024), a Borrowing Base Certificate (as defined in the Prepetition ABL Credit Agreement, a "**Borrowing Base Certificate**"), setting forth the Aggregate Borrowing Base, each Borrowing Base, the Aggregate Excess Availability, the U.S. Excess Availability, the Aggregate Line Cap, the U.S. Line Cap, the French Line Cap, the German Line Cap and, if applicable, the U.S. Borrowing Base Excess Amount Allocation, each calculated in accordance with the Prepetition ABL Credit Agreement (together with all back-up reports and information delivered with the Borrowing Base Certificates prior to the Petition Date); provided that, solely for purposes of any such calculation, each "Revolving Credit Commitment" shall be deemed to equal the amount thereof as of immediately prior to the Petition Date;[6] provided further that (x) from and after the date hereof until the date that is 100 days after the Petition Date, the Prepetition ABL Secured Parties shall not be permitted to take any new discretionary Reserves against the U.S. Borrowing Base other than (i) a Reserve based on any appraisals or field exams in process or scheduled as of the Petition Date, (ii) any Reserve based on circumstances, conditions or events (or changes to

---

[5]    Capitalized terms used in paragraphs 20 and 21 but not otherwise defined herein have the meanings ascribed to such terms in the Prepetition ABL Credit Agreement.
[6]    For the avoidance of doubt, for all Revolving Credit Commitments were terminated upon the filing of the Chapter 11 Cases.

#99165958v13
#99165958v16

circumstances, conditions or events) arising after the Petition Date or otherwise not known to the Prepetition ABL Secured Parties on or prior to the Petition Date or (iii) as otherwise permitted herein; provided that, in each case, any such permitted Reserves shall be established in accordance with the Prepetition ABL Agent's Permitted Discretion; (y) the Prepetition ABL Secured Parties shall be permitted to take a reserve against the U.S. Borrowing Base in an amount equal to (i) all Pre-Carve Out Amounts (as calculated including the amounts set forth in clause (iii) of the definition of the Carve Out based on the most recent reporting in accordance with this Interim Order and including the maximum amounts set forth in clauses (i) and (ii) of the definition of the Carve Out), minus (ii) any amounts held in the Funded Reserve Account, which Reserve may be adjusted by the Prepetition ABL Agent to account for any inaccuracies in such reporting delivered in accordance with the terms of this Interim Order, and (z) no subsequent appraisals or valuations (other than those in process or scheduled as of the Petition Date) shall be made with respect to the U.S. Borrowing Base or any determination of Net Recovery Percentage before the date that is 120 days after the Petition Date; provided that the Prepetition ABL Agent may obtain appraisals and field examinations at any time after the Petition Date for informational purposes and the Debtors shall use commercially reasonable efforts to cooperate with the Prepetition ABL Agent in obtaining such appraisals and field examinations (and, other than those in process or scheduled, such subsequent appraisals shall not affect the valuation of the applicable assets in the calculation of the Borrowing Base until the date that is 120 days after the Petition Date), and the Debtors shall pay the Prepetition ABL Agent's reasonable and documented expenses associated with obtaining such appraisals and field examinations (including for the avoidance of doubt any appraiser or other fees and expenses related to any appraisals, valuations or field examinations).  The Debtors shall deliver the first Borrowing Base Certificate as provided herein not later than [●].

21.     **Borrowing Base Reserve Account**.  To the extent that, in each case, as set forth on the most recent Borrowing Base Certificate, (A) the U.S. Excess Availability is less than the greater of (x) 7.5% of the U.S. Line Cap and (y) $7,500,000 (or, after the date that is 100 days after the Petition Date, the greater of (x) 10.0% of the U.S. Line Cap and (y) $10,000,000) (such difference, if any, the "**U.S. Minimum Availability Shortfall**") and/or (B) the Aggregate Excess Availability *minus* the U.S. Excess Availability set forth on the most recent Borrowing Base Certificate is less than the greater of (x) 5% of the sum of (1) the French Line Cap plus (2) the German Line Cap and (y) $5,000,000 (such difference, if any, the "**Foreign Minimum Availability Shortfall**"), (C) the French Line Cap is less than the aggregate French Revolving Credit Exposure (such difference, if any, the "**French Borrowing Base Shortfall**") or (D) the German Line Cap is less than the aggregate German Revolving Credit Exposure (such difference, if any, the "**German Borrowing Base Shortfall**"), the Debtors shall, within two (2) business days of delivery of such Borrowing Base Certificate, cause an amount of cash equal to the U.S. Minimum Availability Shortfall, the Foreign Minimum Availability Shortfall, the French Borrowing Base Shortfall and/or the German Borrowing Base Shortfall, as applicable, to, at their option either (a) be deposited in a segregated account maintained with the Prepetition ABL Agent (the "**Borrowing Base Account**") as additional adequate protection for the Prepetition ABL Lenders, which Borrowing Base Account and all funds held in the Borrowing Base Account, if any, shall be subject to a first priority, automatically perfected security interest and lien in favor of the Prepetition ABL Agent, for the benefit of the Prepetition ABL Secured Parties, and shall constitute Prepetition ABL Collateral (and ABL Priority Collateral) but not Prepetition Term Collateral or DIP Collateral (but DIP Collateral shall include the Debtors' reversionary interest in such funds after the payment in full of the ABL Obligations); <u>provided</u> that (x) funds held in the

Borrowing Base Account shall be added to the applicable Borrowing Base and (y) the Debtors may withdraw funds held in the Borrowing Base Account to the extent that the balance thereof (immediately after giving effect to such withdrawal) is equal to or greater than the U.S. Minimum Availability Shortfall, Foreign Minimum Availability Shortfall, French Borrowing Base Shortfall and/or German Borrowing Base Shortfall, as applicable, each as calculated by reference to the most recently delivered Borrowing Base Certificate as provided herein; or (b) be paid to the ABL Agent, for distribution to the ABL Secured Parties, to be applied to prepay and permanently reduce the outstanding ABL Obligations; *provided* that any net cash proceeds received by any Debtor from any disposition of ABL Priority Collateral to a third party (other than dispositions of ABL Priority Collateral (1) in the ordinary course of business, consistent with past practice or (2) as a result of casualty events to the extent reinvested within 3 months of the receipt thereof) shall not be deposited in the Borrowing Base Account and shall instead be applied in accordance with this clause (b) no later than two business days following receipt.  For the avoidance of doubt, neither the (i) Cash Management Obligations nor (ii) any amounts paid (or required to be paid) pursuant to the ABL Fee Letter (however structured and in whatever form) shall increase the U.S. Revolving Exposure, the French Revolving Credit Exposure or the German Revolving Credit Exposure for the purposes of determining whether there is a U.S. Minimum Availability Shortfall, Foreign Minimum Availability Shortfall, the French Borrowing Base Shortfall and/or the German Borrowing Base Shortfall.  Upon the occurrence of an ABL Cash Collateral Termination Event, subject to the Remedies Notice Period, the Prepetition ABL Agent shall be entitled to apply amounts maintained in the Borrowing Base Account to repay the ABL Obligations in accordance with the Prepetition ABL Documents without further notice or order of the court.

RLF1 31627761v.1
#99165958v13
#99165958v16

22.    **Modification of Automatic Stay**.  The automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to (a) permit the Debtors to grant the DIP Liens, Adequate Protection Liens, DIP Superpriority Claims, Postpetition ABL Superpriority Claims and 507(b) Claims; (b) permit the Debtors to perform such acts as the DIP Agent, the Prepetition ABL Agent, and the Prepetition Term Agent each may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Agent, DIP Lenders, and Prepetition Secured Parties under the DIP Documents, the DIP Facility, the Letters of Credit, the Cash Management Services and this Interim Order, as applicable; and (d) authorize the Debtors to pay, and the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties to retain and apply, payments made in accordance with the terms of this Interim Order.

23.    **Perfection of DIP Liens, Cash Management Liens and Adequate Protection Liens**.  This Interim Order shall be sufficient and conclusive evidence of the creation, validity, automatic perfection, and priority of all liens granted herein, including the DIP Liens, the Cash Management Liens and the Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens, the Cash Management Liens or the Adequate Protection Liens or to entitle the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties to the priorities granted herein.  Notwithstanding the foregoing, each of the DIP Agent, the Prepetition ABL Agent, and the Prepetition Term Agent is authorized

RLF1 31627761v.1
#99165958v13
#99165958v16

to file or record, as it in its sole discretion deems necessary or advisable, such financing statements, security agreements, mortgages, notices of liens, and other similar documents to perfect its respective liens in accordance with applicable non-bankruptcy law, and all such financing statements, mortgages, notices, and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens, the Cash Management Liens or the Adequate Protection Liens.  The Debtors are authorized and directed to execute and deliver, promptly upon demand to the DIP Agent, the Prepetition ABL Agent, and the Prepetition Term Agent all such financing statements, mortgages, notices, and other documents as the DIP Agent, the Prepetition ABL Agent, or the Prepetition Term Agent, as applicable, may reasonably request. Each of the DIP Agent, the Prepetition ABL Agent, and the Prepetition Term Agent, in its discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instrument, and all applicable officials are hereby authorized to accept a photocopy of this Interim Order for filing or recordation for such purpose. To the extent the Prepetition ABL Agent or the Prepetition Term Agent is the secured party under any security agreement, mortgage, landlord waiver, credit card processor notices or agreements, bailee letters, custom broker agreements, financing statement, account control agreements, or any other Prepetition Debt Documents or is listed as loss payee or additional insured under any of the Debtors' insurance policies, the DIP Agent shall also be deemed without any further action to be the secured party or the loss payee or additional insured, as applicable, under such documents (in each case, subject to the lien priority set forth herein).  The Prepetition ABL Agent and the Prepetition Term Agent, as applicable, shall serve as sub-collateral agents for the DIP Agent solely

53

for purposes of perfecting the DIP Liens on all DIP Collateral that is of a type such that, without giving effect to the Bankruptcy Code and this Interim Order, perfection of a lien thereon may be accomplished only by possession or control by a secured party (but will have no duty, responsibility or obligation to the DIP Secured Parties, including, without limitation, any duty, responsibility or obligation as to the maintenance of such control, the effect of such arrangement or the establishment of such perfection).

24.     No party shall be entitled to assert that a default has occurred by virtue of the granting of liens hereunder, and any provision of any lease or other license, contract or other agreement that requires (a) the consent or approval of one or more landlords or other parties or (b) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold or contractual interest, or the proceeds thereof, or other postpetition collateral related thereto, shall have no force and effect with respect to the grant of postpetition liens in such leasehold or contractual interest or the proceeds of any assignment and/or sale thereof by the Debtors, in accordance with the terms of this Interim Order or the other DIP Documents.

25.     **Protections of Rights of DIP Agent, DIP Lenders and Prepetition Secured Parties**.  Unless the Required DIP Lenders and the Prepetition ABL Agent shall have provided their prior written consent, or all DIP Obligations (excluding contingent indemnification obligations for which no claim has been asserted) and ABL Obligations have been indefeasibly paid in full in cash and the lending commitments under the DIP Facility have terminated, the entry of any order in these Chapter 11 Cases shall be an Event of Default for purposes of the DIP Credit Agreement and an ABL Cash Collateral Termination Event if such order authorizes any of the following (unless such order provides for the simultaneous satisfaction of such obligations): (i) the

54

obtaining of credit or the incurrence of indebtedness that is secured by a security, mortgage, or collateral interest or other lien on all or a portion of the DIP Collateral or that is entitled to administrative priority with a value in excess of $[500,000] in the aggregate that are superior to or *pari passu* with the DIP Liens, the DIP Superpriority Claims, the Postpetition ABL Superpriority Claims, the Prepetition Liens, the Adequate Protection Liens, or the 507(b) Claims except as expressly set forth in this Interim Order or the DIP Documents; (ii) the use of Cash Collateral for any purpose other than as permitted pursuant to the Approved 13-Week Cash Flow (including any Permitted Variances), the DIP Documents, and this Interim Order; provided that Debtors' rights to seek to use Cash Collateral on a non-consensual basis after the Cash Collateral Termination Date are fully reserved; or (iii) any modification of any of the DIP Agent's, any DIP Lender's, or any Prepetition Secured Party's rights under this Interim Order, the DIP Documents, or the Prepetition Debt Documents with respect to any DIP Obligations, ABL Obligations or Prepetition Term Obligations except as specifically provided herein.

26.     The Debtors (and/or their legal and financial advisors in the case of clauses (ii) and (iii) below) will (i) use commercially reasonable efforts to maintain books, records, and accounts to the extent and as required by the DIP Documents and the Prepetition Debt Documents (and subject to the applicable grace periods set forth therein); (ii) reasonably cooperate with, consult with, and provide to the Required DIP Lenders and the Prepetition ABL Agent all such information and documents that any or all of the Debtors are obligated to provide under the DIP Documents or the provisions of this Interim Order;  and (iii) permit the Required DIP Lenders and the Prepetition ABL Agent and their respective advisors and appraisers to consult with the Debtors' management and advisors on matters concerning the Debtors' businesses, financial condition, operations, and

RLF1 31627761v.1
#99165958v13
#99165958v16

assets in each case during regular business hours and commercially reasonable advance notice and otherwise use commercially reasonable efforts to cooperate with such advisors and appraisers.

27.    **Credit Bidding**.  In connection with any sale process authorized by the Court, whether effectuated through sections 363, 725, or 1123 of the Bankruptcy Code, the DIP Agent (or its designee) (at the direction of the Required DIP Lenders), the Prepetition ABL Agent (or its designee) (at the direction of the Required ABL Lenders) and, subject to paragraph [45] hereof, the Prepetition Term Agent (or its designee) (at the direction of the requisite Prepetition Term Secured Parties), may credit bid up to the full amount of the outstanding DIP Obligations, the ABL Obligations and the relevant Prepetition Term Obligations, respectively, in each case, including any accrued and unpaid interest, expenses, fees, and other obligations for their respective priority collateral (each such bid, a "**Credit Bid**") pursuant to section 363(k) of the Bankruptcy Code, subject in each case to the Prepetition Intercreditor Agreement; <u>provided</u> that neither the DIP Obligations nor the Prepetition Term Obligations may be credit bid in any disposition of any ABL Priority Collateral unless all ABL Obligations have been indefeasibly paid in full in cash.

28.    **Proceeds of Subsequent Financing**.  If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Cases or any Successor Cases shall obtain credit or incur debt pursuant to sections 364(b), 364(c), 364(d) of the Bankruptcy Code in violation of the DIP Documents or this Interim Order at any time prior to the indefeasible repayment in full in cash of all DIP Obligations and the ABL Obligations, as applicable, and the Termination Date, including subsequent to the confirmation of any plan with respect to any or all of the Debtors (if applicable), then all the cash proceeds derived from such credit or debt shall immediately be (i) to the extent such credit or debt is secured by Term Priority Collateral, turned over to the DIP Agent to be applied in accordance with this Interim Order and

the DIP Documents and the Prepetition Intercreditor Agreement and (ii) to the extent such credit

or debt is secured by ABL Priority Collateral, turned over to the Prepetition ABL Agent to be

applied in accordance with this Interim Order and the Prepetition ABL Documents and the

Prepetition Intercreditor Agreement.

29.     **Maintenance of DIP Collateral**.  Until the indefeasible payment in full in cash of

all DIP Obligations, all Prepetition Term Obligations, and all ABL Obligations and the termination

of the DIP Lenders' obligation to extend credit under the DIP Facility, the Debtors shall (a) insure

the DIP Collateral as required under the DIP Facility or the Prepetition Debt Documents, as

applicable; and (b) maintain the cash management system in effect as of the Petition Date, as

modified by and in accordance with any order entered by the Court and in a manner acceptable to

the Prepetition ABL Agent and the Required DIP Lenders.

30.     **Termination Dates**.  (a) On the DIP Termination Date (as defined below), subject

to the Carve Out (as defined below), the use of proceeds of the DIP Facility shall immediately

terminate (and no amounts may be withdrawn from the DIP Accounts), all DIP Obligations shall

be immediately due and payable, all commitments to extend credit under the DIP Facility will

terminate, other than as required in paragraph [43] with respect to the Carve Out (as defined

below); and (b) on the Cash Collateral Termination Date (as defined below) all authority to use

Cash Collateral shall cease, all Postpetition ABL Obligations shall be immediately due and payable

and all obligations (if any) of the Prepetition ABL Secured Parties to provide Cash Management

Services or renew Letters of Credit shall terminate, provided, however, that during the Remedies

Notice Period, the Debtors may use Cash Collateral (including proceeds of the DIP Facility) in

accordance with paragraph [12].

RLF1 31627761v.1
#99165958v13
#99165958v16

31.   **Release**.  Effective as of the date of entry of this Interim Order, each Debtor and, subject to paragraph [42] hereof with respect to the Prepetition Obligations, the Prepetition Liens and the Prepetition Lenders and their Representatives (as defined below), each of the Debtors' estates, on their own behalf and on behalf of their past, present, and future predecessors, successors, heirs, subsidiaries and assigns hereby unconditionally, irrevocably, and fully forever release, remise, acquit, relinquish, irrevocably waive, and discharge (the "**Release**") each of the DIP Secured Parties, the Prepetition ABL Secured Parties, the Prepetition Term Agent, and the Prepetition Term Lenders, and each of their respective affiliates, former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, assigns, and predecessors in interest, each in their capacity as such (collectively, the "**Representatives**"), of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, statute, or regulation or by contract, of every nature and description that exist on the date hereof or hereafter arising for or by reason of any act, omission, cause or thing whatsoever at any time on or prior to the date of this Interim Order, with respect to or relating to the DIP Obligations, the DIP Liens (as defined below), the DIP Documents, the ABL Obligations, the Prepetition ABL Liens, the ABL Adequate Protection Liens, the Prepetition ABL Documents, the Prepetition Term Obligations, the Prepetition Term Liens, or the Prepetition Term Documents, as applicable, including, without limitation, (i) any so-called "lender

liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code or applicable non-bankruptcy law, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection, or avoidability of the liens or claims of the DIP Secured Parties, the Prepetition ABL Secured Parties or the Prepetition Secured Parties.

32.     **Events of Default**.  The occurrence and continuation of any of the following events, unless waived by the Required DIP Lenders in writing and in accordance with the terms of the DIP Credit Agreement, shall constitute an event of default (collectively, the "**Events of Default**") under this Interim Order: (a) the failure of the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim Order, subject to a three-business day cure period following the Debtors' receipt of notice of such failure from the DIP Agent (if such failure is capable of being cured); (b) the occurrence of an "Event of Default" as defined in the DIP Credit Agreement; or (c) delivery of an ABL Cash Collateral Termination Declaration (as defined herein).

33.     **DIP Milestones**.  The occurrence of an Event of Default under Section 8.01(b) of the DIP Credit Agreement, unless waived by the Required DIP Lenders in writing or extended with the consent of the Required DIP Lenders, in each case in accordance with the terms of the DIP Credit Agreement, shall, constitute an Event of Default under each of the DIP Credit Agreement and this Interim Order.

34.     **Termination Date; Remedies**.  (a) Subject to any applicable notice and cure period under the DIP Documents and/or this Interim Order, while any Event of Default under the DIP Credit Agreement and/or this Interim Order has occurred and is continuing, following the Debtors' receipt of notice, notwithstanding the provisions of section 362 of the Bankruptcy Code, without

any application, motion or notice to, hearing before, or order of the Court, but subject to the terms of this Interim Order, (i) the DIP Agent, acting at the direction of the Required DIP Lenders, may declare, in accordance with Section 8.02 of the DIP Credit Agreement (w) the Term Commitments (as defined in the DIP Credit Agreement) of each DIP Lender to be terminated, (x) the unpaid principal amount of all outstanding DIP Loans, all interest accrued and unpaid thereon, and all other DIP Obligations owing or payable under the DIP Documents to be immediately due and payable, (y) subject to the Carve Out, termination of the DIP Facility and the DIP Documents as to any future obligation of the DIP Agent and the DIP Lenders, without affecting any of the DIP Liens or the DIP Obligations, or the post-petition administrative superpriority claim status of the DIP Obligations, and (z) that the application of the Carve Out (as defined below) has occurred through the delivery of the Carve Out Trigger Notice (as defined below) to the Debtors and the Prepetition ABL Agent (any such declaration shall be referred to as a "**DIP Termination Declaration**" and the date on which a DIP Termination Declaration is delivered shall be referred to as the "**DIP Termination Date**") and (ii) the DIP Agent, acting at the direction of the Required DIP Lenders, may declare a termination, reduction or restriction of the Debtors' ability to use any Cash Collateral derived solely from the proceeds of DIP Collateral (including access to the DIP Account) or that constitutes Cash Collateral as of the Petition Date (any such declaration shall be referred to as a "**DIP Cash Collateral Termination Declaration**" and the date on which either a DIP Cash Collateral Termination Declaration or an ABL Cash Collateral Termination Declaration is delivered shall be referred to as the "**Cash Collateral Termination Date**"; the Cash Collateral Termination Declaration and the DIP Termination Declaration are each a "**Termination Declaration**"; the Cash Collateral Termination Date and the DIP Termination Date are each a "**Termination Date**"); and (b) upon the occurrence and during the continuation of an ABL Cash

60

Collateral Termination Event, the Prepetition ABL Agent (acting at the direction of the Required Lenders (as defined in the Prepetition ABL Credit Agreement, the "**Required ABL Lenders**")) may declare (x) a termination, reduction, or restriction of the Debtors' ability to use Cash Collateral, (y) all amounts owing or payable in respect of the Postpetition ABL Obligations to be immediately due and payable and termination of any future obligation of the Prepetition ABL Secured Parties to provide Cash Management Services or renew Letters of Credit, in each case, without affecting the liens or post-petition administrative superpriority claim status of the Postpetition ABL Obligations, and (z) that the application of the Carve Out (as defined below) has occurred through the delivery of the Carve Out Trigger Notice (as defined below) to the Debtors and the DIP Agent (any such declaration shall be referred to as an "**ABL Cash Collateral Termination Declaration**").

35.     A DIP Termination Declaration or ABL Cash Collateral Termination Declaration shall be given by electronic mail (or other electronic means) to counsel to the Debtors, counsel to a Committee (if appointed), counsel to the DIP Lenders, and counsel to the DIP Agent (solely with respect to an ABL Cash Collateral Termination Declaration), counsel to the Prepetition ABL Agent (other than with respect to an ABL Cash Collateral Termination Declaration), counsel to the Prepetition Term Agent, counsel to the Prepetition Term Lenders, and the U.S. Trustee.

36.     The automatic stay is hereby modified so that five (5) business days after the date a DIP Termination Declaration or ABL Cash Collateral Termination Declaration is delivered (such five (5) business day period, the "**Remedies Notice Period**"), (a) the DIP Agent, acting at the direction of the Required DIP Lenders, shall be entitled to exercise its applicable rights and remedies in accordance with the DIP Documents and this Interim Order, subject in all respects to the Carve Out (as defined below); <u>provided</u> that the DIP Agent shall not be permitted to exercise

RLF1 31627761v.1
#99165958v13
#99165958v16

rights and remedies with respect to ABL Priority Collateral without the consent of the Prepetition

ABL Agent and (b) the Prepetition ABL Agent, acting at the direction of the Required ABL

Lenders, shall be entitled to exercise its applicable rights and remedies with respect to the

Postpetition ABL Obligations, in accordance with this Interim Order, subject in all respects to the

Pre-Carve Out Amounts; provided that the Prepetition ABL Agent shall not be permitted to

exercise rights and remedies with respect to Term Priority Collateral without the consent of the

Prepetition Term Agent and the DIP Agent.  During the Remedies Notice Period, the Debtors

and/or any other party in interest shall be entitled to seek an emergency hearing from the Court

and the sole issue that may be contested by the Debtors at such hearing shall be whether an Event

of Default (hereunder and/or under the DIP Credit Agreement) or an ABL Cash Collateral

Termination Event has occurred and/or is continuing.

37.     Unless the Court rules that an Event of Default or ABL Cash Collateral Termination

Event has not occurred during the Remedies Notice Period, at the end of the Remedies Notice

Period (a) the automatic stay shall automatically be terminated, without further notice or order, as

to the DIP Agent and the DIP Lenders, subject to the Carve Out, and as to the Prepetition ABL

Agent and Cash Management Banks (as defined in the Prepetition ABL Credit Agreement), subject

to the Pre-Carve Out Amounts and (b) the Debtors' authorization to use Cash Collateral will

terminate.  Upon expiration of the Remedies Notice Period, the DIP Agent, the Prepetition ABL

Agent, and any liquidator or other professional retained by either of the foregoing will have the

right to access and utilize, at no cost or expense, any trade names, trademarks, copyrights, or other

intellectual property of the Debtors to the extent necessary or appropriate in order to sell, lease, or

otherwise dispose of any of the DIP Collateral, including pursuant to any Court-approved sale

process.  Notwithstanding the foregoing, the DIP Secured Parties shall have no right to exercise

rights and remedies with respect to the ABL Priority Collateral without the consent of the Prepetition ABL Agent.  Any ABL Priority Collateral or proceeds thereof received by any DIP Secured Party or Prepetition Secured Party, whether in connection with the exercise of any right or remedy (including setoff) relating to the ABL Priority Collateral or otherwise received by a DIP Secured Party or Prepetition Secured Party, shall be segregated and held in trust for the benefit of and forthwith paid over to the Prepetition ABL Agent, for the benefit of the Prepetition ABL Secured Parties, in the same form as received, with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct.  The Prepetition ABL Agent is hereby authorized to make any such endorsements as agent for any such DIP Secured Parties or Prepetition Secured Parties, as applicable.  This authorization is coupled with an interest and is irrevocable.  From and after an ABL Cash Collateral Termination Event, any payments, property, or other amounts in respect of the DIP Obligations shall be paid ratably to the applicable Prepetition ABL Secured Parties on account of the Cash Management Obligations until such Cash Management Obligations have been indefeasibly paid in full in cash.

38.     **ABL Cash Collateral Termination Event**.  The occurrence and continuation of any of the events set forth on Exhibit 3, unless waived by the Prepetition ABL Agent in writing, shall constitute an "**ABL Cash Collateral Termination Event**" under this Interim Order.

39.     **Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order**.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, amended, or vacated by a subsequent order of this Court or any other court of competent jurisdiction, the DIP Agent, the DIP Lenders, and Prepetition Secured Parties are entitled to the protections provided in

63

section 364(e) of the Bankruptcy Code.  Any such modification, amendment, or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder, or lien, claim, or priority authorized or created hereby.

40.     **Indemnification**.   To the extent provided by the DIP Credit Agreement, the Prepetition Term Credit Agreement, or the Prepetition ABL Credit Agreement, as applicable, the Debtors shall, jointly and severally, indemnify and hold harmless the DIP Agent, the Prepetition ABL Agent, each of the DIP Lenders and other Prepetition Secured Parties, and each of their respective affiliates, officers, directors, fiduciaries, employees, agents, advisors, attorneys and representatives and all other Indemnitees (as defined in the DIP Credit Agreement) from and against all losses, claims, liabilities, damages, and expenses (including out-of-pocket fees and disbursements of counsel) in connection with any investigation, litigation or proceeding, or the preparation of any defense with respect thereto, arising out of or relating to the DIP Facility, the use of Cash Collateral or the transactions contemplated in this Interim Order, the DIP Credit Agreement or the other DIP Documents.

41.     **Proofs of Claim**.   The DIP Agent, the DIP Lenders, and the Prepetition Secured Parties will not be required to file proofs of claim or requests for administrative expense in any of the Chapter 11 Cases or Successor Cases for any claim allowed herein.  Notwithstanding the foregoing or any order entered by the Court in relation to the establishment of a bar date in any of the Chapter 11 Cases or Successor Cases to the contrary, each of the Prepetition ABL Agent and the Prepetition Term Agent, is hereby authorized and entitled, in its sole discretion, to file a single consolidated master proof of claim on behalf of the Prepetition ABL Secured Parties and the Prepetition Term Secured Parties, respectively, in the lead Chapter 11 Case, *In re Accuride Corporation*, Case No. 24-12289 (JKS) (Jointly Administered), on account of any and all of ABL

64

Obligations and all Prepetition Term Obligations, respectively, and such master proof of claim shall be treated as if such entity had filed a separate proof of claim and request for administrative expense in each Chapter 11 Case or any Successor Cases (as applicable).  Any master proof of claim filed by Prepetition ABL Agent or the Prepetition Term Agent shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the Prepetition ABL Secured Parties and the Prepetition Term Secured Parties, respectively.  The master proofs of claim are intended solely for the purpose of administrative convenience and shall not affect the right of each Prepetition Secured Party (or its successors in interest) to vote separately on any plan proposed in these Chapter 11 Cases or to assert that the amount of its claim is different from that set forth on the applicable master proof of claim.  The master proofs of claim shall not be required to (i) attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable Prepetition Secured Parties, which instruments, agreements or other documents will be provided upon written request to counsel to the applicable Prepetition Secured Party, or (ii) to identify any Prepetition Secured Party by its name or identify whether any Prepetition Secured Party acquired its claim from another party or the identity of any such party or to be amended to reflect a change in the holders of the claims set forth therein or a reallocation among such holders of the claims asserted therein resulting from the transfer of all or any portion of such claims.

42.     **Carve Out**.

(a)     Carve Out.  As used in this Interim Order, the "**Carve Out**" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $100,000 incurred by

a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (other than any restructuring, sale, success or other transaction-based fees) (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "**Debtor Professionals**") and a Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**") at any time before or on the first business day following delivery by the DIP Agent or the Prepetition ABL Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $2,500,000 incurred after the first business day following delivery by the DIP Agent or the Prepetition ABL Agent of the Carve Out Trigger Notice (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice Cap**").  For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent (acting at the direction of the Required DIP Lenders) or the Prepetition ABL Agent (acting at the direction of the Required ABL Lenders) to the Debtors, their lead restructuring counsel, counsel to the DIP Agent (if delivered by the Prepetition ABL Agent), counsel to the Prepetition ABL Agent (if delivered by the DIP Agent), the U.S. Trustee, and counsel to any Committee, which notice may be delivered following the occurrence and during the continuation of (i) with respect to a notice delivered by the DIP Agent, an Event of Default and acceleration of the DIP Obligations under the DIP Facility or (ii) with respect to a notice delivered by the Prepetition ABL Agent, an ABL Cash Collateral

66

Termination Event, as applicable, in each case, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)     Delivery of Weekly Fee Statements.

(i)     Not later than 7:00 p.m. New York time on the third business day of each week starting with the first full calendar week following the Petition Date, each Professional Person shall deliver to the Debtors a statement setting forth a good-faith estimate of the amount of fees and expenses (collectively, "**Estimated Fees and Expenses**") incurred during the preceding week by such Professional Person (through Saturday of such week, the "**Calculation Date**"), along with a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (each such statement, a "**Weekly Statement**"); provided that, within one business day of the occurrence of the Termination Declaration Date (as defined below), each Professional Person shall deliver one additional statement (the "**Final Statement**") setting forth a good-faith estimate of the amount of fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has been delivered and concluding on the Termination Declaration Date (and the Debtors shall cause such Weekly Statement and Final Statement to be delivered on the same day received to the DIP Agent and the Prepetition ABL Agent).  If any Professional Person fails to deliver a Weekly Statement within three (3) calendar days after such Weekly Statement is due, such Professional Person's entitlement (if any) to any funds in the Pre-Carve Out Trigger Notice Reserve (as defined below) with respect to the aggregate unpaid amount of Allowed Professional Fees for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement covering such period shall be limited to the aggregate unpaid amount of Allowed

#99165958v13
#99165958v16

Professional Fees included in the Approved 13-Week Cash Flow for such period for such Professional Person.

(c)    <u>Carve Out Reserves</u>.

(i)    Commencing with the week ended [October 11], 2024, and on or before the Thursday of each week thereafter, the Debtors shall utilize all cash on hand as of such date and any available cash thereafter held by any Debtor) to fund a reserve in an amount equal to the sum of (a) the greater of (i) the aggregate unpaid amount of all Estimated Fees and Expenses reflected in the Weekly Statement delivered on the immediately prior Wednesday to the Debtors and the DIP Agent, and (ii) the aggregate amount of unpaid Allowed Professional Fees contemplated to be incurred in the Approved 13-Week Cash Flow during such week, *plus* (b) the Post-Carve Out Trigger Notice Cap, *plus* (c) an amount equal to the amount of Allowed Professional Fees set forth in the Approved 13-Week Cash Flow for the week occurring after the most recent Calculation Date.  The Debtors shall deposit and hold such amounts in a segregated account maintained by the Debtors in trust (the "**Funded Reserve Account**") to pay such Allowed Professional Fees prior to any and all other claims, and all payments of Allowed Professional Fees incurred prior to the Termination Declaration Date shall be paid first from such Funded Reserve Account.

(ii)    On the day on which a Carve Out Trigger Notice is given by the DIP Agent or the Prepetition ABL Agent, as applicable, to the Debtors with a copy to counsel to the Committee, the DIP Agent, and the Prepetition ABL Agent, as applicable (the "**Termination Declaration Date**"), the Carve Out Trigger Notice shall constitute a demand to the Debtors to, and the Debtors shall, utilize all cash on hand as of such date, including cash in the DIP Account and the Funded Reserve Account and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the unpaid Allowed Professional Fees as of the Termination Declaration

68

Date.  The Debtors shall deposit and hold such amounts in a segregated account, which, for the avoidance of doubt, may be the Funded Reserve Account, maintained by the Debtors in trust to pay the unpaid Allowed Professional Fees as of the Termination Declaration Date (the "**Pre-Carve Out Trigger Notice Reserve**") prior to any other claims.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also constitute a demand to the Debtors to utilize all cash (other than any cash constituting ABL Priority Collateral) on hand as of such date, including cash in the DIP Account and the Funded Reserve Account, and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap.  The Debtors shall deposit and hold such amounts in a segregated account maintained by the Debtors in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "**Post-Carve Out Trigger Notice Reserve**" and, together with the Pre-Carve Out Trigger Notice Reserve, the "**Carve Out Reserves**") prior to any and all other claims.

(d)    <u>Application of Carve Out Reserves</u>.

(i)    All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "**Pre-Carve Out Amounts**"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until the Pre-Carve Out Amounts are indefeasibly paid in full.  If the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, all remaining funds shall be distributed to the DIP Secured Parties and the Prepetition Secured Parties, in accordance with their lien priorities as set forth in this Interim Order.

(ii)    All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above

69

(the "**Post-Carve Out Amounts**"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, all remaining funds shall be distributed to the DIP Secured Parties and the Prepetition Secured Parties, in accordance with their lien priorities as set forth in this Interim Order.

(iii)     Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in paragraph 42(c), then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively (subject to the limits contained in the Post-Carve Out Trigger Notice Cap), shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in paragraph 42(c), prior to making any payments to the DIP Secured Parties or the Prepetition Secured Parties; provided that no ABL Priority Collateral shall be used to fund the Post-Carve Out Trigger Notice Reserve or pay Post-Carve Out Amounts.

(iv)     Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, following delivery of a Carve Out Trigger Notice, the DIP Agent, the Prepetition Term Agent, and the Prepetition Term Lenders shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, and the Prepetition ABL Secured Parties shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Post-Carve Out Trigger Notice Reserve has been fully funded, but in each case, the DIP Secured Parties and the Prepetition Secured Parties shall have a security interest in any residual interest in the Carve Out Reserves, with any excess distributed to the DIP Secured

RLF1 31627761v.1
#99165958v13
#99165958v16

Parties and the Prepetition Secured Parties, in accordance with their lien priorities as set forth in this Interim Order.

(v)    Further, notwithstanding anything to the contrary in this Interim Order, (A) disbursements by the Debtors from the Carve Out Reserves shall not constitute DIP Loans or increase or reduce the DIP Obligations, (B) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out with respect to any shortfall (as described below), and (C) subject to the limitations with respect to the DIP Agent, DIP Lenders, the Prepetition Agents, and Prepetition Lenders set forth in this paragraph [43], in no way shall the Initial Approved 13-Week Cash Flow, any subsequent Approved 13-Week Cash Flow, Carve Out, Post-Carve Out Trigger Notice Cap or Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order or the DIP Documents, the Carve Out shall be senior to all claims and all liens securing such claims including, but not limited to, the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Prepetition Obligations, the Prepetition Liens, and any and all other forms of adequate protection, liens, or claims related the DIP Obligations and the Prepetition Obligations; provided that the Post-Carve Out Amounts shall not be senior to any claims or liens held by the Prepetition ABL Secured Parties on ABL Priority Collateral.

(e)    Payment of Allowed Professional Fees Prior to the Termination Declaration Date. Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(f)      <u>No Direct Obligation To Pay Allowed Professional Fees</u>.  None of the DIP Agent, the DIP Lenders, the Prepetition Agents, or the other Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Cases.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, the Prepetition Agents, or the other Prepetition Secured Parties in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(g)      <u>Payment of Allowed Professional Fees on or After the Termination Declaration Date</u>.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.

43.      **<u>Limitations on Use of DIP Proceeds, Cash Collateral, and Carve Out</u>**.  No proceeds of the Carve Out, the DIP Facility, the Postpetition ABL Obligations, the DIP Collateral, or the Prepetition Collateral, in each case, including Cash Collateral, may be used in connection with (a) preventing, hindering, or delaying any of the DIP Agent's, the DIP Lenders' or the Prepetition Secured Parties' realization upon any of the DIP Collateral or Prepetition Collateral or enforcement of any of their respective rights thereto in accordance with this Interim Order and the DIP Documents or the Prepetition Debt Documents, as applicable; (b) for any purpose that is prohibited under this Interim Order, the Final Order (when entered), the DIP Documents, or the Bankruptcy Code; (c) to prosecute or finance in any way any adversary action, suit, arbitration, proceeding, application, motion, or other litigation or Challenge of any type adverse to the interests of any or all of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties, any of their

respective Representatives, or their respective rights and remedies under the DIP Documents, the Interim Order, the Final Order (when entered), or the Prepetition Debt Documents, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, section 724(a) of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code or applicable state law equivalents; (d) for the payment of fees, expenses, interest, or principal under the Prepetition Term Documents (other than payments on account of Adequate Protection Obligations required by this Interim Order), (e) to make any distribution under a plan of reorganization confirmed in the Chapter 11 Cases that does not provide for the indefeasible payment of the DIP Loans and ABL Obligations in full and in cash, except as otherwise agreed; (f) except as permitted by the Approved 13-Week Cash Flow (including any Permitted Variances), to make any payment in settlement of any claim, action, or proceeding in excess of $500,000 in the aggregate without the prior written consent of the DIP Agent, acting at the direction of the Required DIP Lenders, and the Prepetition ABL Agent; (g) incurring Indebtedness (as defined in the DIP Credit Agreement), except to the extent permitted under the DIP Credit Agreement or this Interim Order; (h) seeking to amend or modify any of the rights granted to the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties under this Interim Order, the DIP Documents, or the Prepetition Debt Documents; (i) seeking to subordinate, recharacterize, disallow, or avoid the DIP Obligations, the Prepetition Term Obligations or the ABL Obligations; or (j) to pay allowed fees and expenses, in an amount in excess of $50,000 in the aggregate incurred by Committee Professionals (if a Committee is appointed), in investigating (but not prosecuting or challenging) the validity, enforceability, perfection, priority, or extent of the Prepetition Liens before the Challenge Deadline (as defined below).

RLF1 31627761v.1
#99165958v13
#99165958v16

44.     **Effect of Stipulations on Third Parties**.

(a)     *Generally*.  The Debtors' Stipulations and the Release set forth in this Interim Order shall be binding on the Debtors and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors) upon entry of this Interim Order.  The Stipulations shall also be binding on all creditors and all other parties in interest and all of their respective successors and assigns, including, without limitation, a Committee (if appointed), unless, and solely to the extent that, (i) a party in interest with standing and requisite authority has timely commenced an appropriate proceeding or contested matter required under the Bankruptcy Code and Bankruptcy Rules, including, without limitation, as required pursuant to Part VII of the Bankruptcy Rules (in each case subject to the limitations set forth in this paragraph 44) (A) objecting to or challenging the amount, validity, enforceability or priority of the Prepetition Obligations or the amount, validity, enforceability, perfection, priority or extent of the Prepetition Liens or (B) otherwise asserting or prosecuting any action for preferences, fraudulent conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses against the Prepetition Secured Parties or any their respective Representatives in connection with matters related to the Prepetition Debt Documents, the Prepetition Obligations, the Prepetition Liens or the Prepetition Collateral (each such proceeding or contested matter, a "**Challenge**") by no later than seventy-five (75) calendar days following the entry of the Interim Order (the "**Challenge Period**"), as such deadline may be extended in writing from time to time in the sole discretion of the Prepetition ABL Agent (with respect to the Prepetition ABL Secured Parties, Prepetition ABL Liens and Prepetition ABL Obligations) or the Prepetition Term Agent (acting at the direction of the requisite Prepetition Term Secured Parties) (with respect to the Prepetition Term Liens and Prepetition Term Obligations) (the "**Challenge Deadline**"); <u>provided</u>

<u>that</u> if the Chapter 11 Cases are converted to chapter 7 or a chapter 7 or chapter 11 trustee is appointed or elected prior to the expiration of the Challenge Period, any such trustee shall have the longer of (1) the remaining Challenge Period and (2) twenty-one (21) calendar days after their appointment, to commence a Challenge in accordance with this paragraph 44; and (ii) this Court enters judgment in favor of the plaintiff or movant in any such timely and properly commenced Challenge and any such judgment has become a final judgment that is not subject to any further review or appeal, and then only to the extent of any such final judgment. Notwithstanding the foregoing, the Challenge Deadline set forth herein shall be tolled if a party-in-interest (including the Committee, if any) files a motion seeking standing to bring a Challenge (a "**Standing Motion**"), which attaches one or more draft complaints that detail the alleged Challenge(s) that the applicable party in interest seeks to file, until such time as the Court decides the Standing Motion and solely with respect to (i) the party-in-interest that files the Standing Motion and (ii) the contents of the complaint(s) attached to the Standing Motion, in each case, solely to the extent such party in interest is granted standing and authority by the Court to bring the Challenge set forth in such complaint. Notwithstanding the foregoing, nothing in this Interim Order vests or confers on any person or entity, including any official committee or statutory or non-statutory committee appointed or formed in the Chapter 11 Cases, or any other party in interest, standing or authority to pursue any cause of action held or assertable by the Debtors or their estates, and all rights to object to any request for such standing are expressly reserved.

(b)    *Binding Effect*.  To the extent no Challenge is timely and properly commenced by the Challenge Deadline, or to the extent such Challenge does not result in a final and non-appealable judgment or order that is inconsistent with any of the Debtors' Stipulations, then, without further notice, motion, or application to, order of, or hearing before, this Court and without

RLF1 31627761v.1
#99165958v13
#99165958v16

the need or requirement to file any proof of claim, the Debtors' Stipulations shall, pursuant to this Interim Order, become irrevocably binding on any person, entity, or party in interest in the Chapter 11 Cases, as well as their successors and assigns, and in any Successor Case for all purposes and shall not be subject to further challenge or objection.  Notwithstanding anything to the contrary herein, if any Challenge is properly and timely commenced by a party in interest, the Debtors' Stipulations shall nonetheless remain binding on all other parties in interest.  To the extent any Challenge is timely and properly commenced, the Prepetition Secured Parties shall be entitled to, as adequate protection, payment of the related costs and expenses, including, but not limited to, reasonable attorneys' fees, incurred in defending themselves against any Challenge.

45.   **No Third-Party Rights**.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

46.   **Section 506(c) Claims**.  Subject to entry of the Final Order, and except to the extent of the Carve Out (to the extent set forth in paragraph 42 hereof), no costs or expenses of administration that have been or may be incurred in the Chapter 11 Cases at any time shall be charged against the DIP Agent, the DIP Lenders, the Prepetition ABL Agent, the Prepetition ABL Secured Parties; Prepetition Term Agent, the Prepetition Term Lenders, the DIP Collateral, or the Prepetition Collateral pursuant to section 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Agent (acting at the direction of the Required DIP Lenders), the Prepetition Term Agent (acting at the direction of the requisite Prepetition Term Lenders), or the Prepetition ABL Agent, as applicable, and no such consent shall be implied from any action, inaction, or acquiescence by any party.

47.     **No Marshaling/Applications of Proceeds**.  Subject to entry of the Final Order, in no event shall any of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral.

48.     **Section 552(b)**.  Subject to entry of the Final Order, the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception thereunder shall not apply to any of them.

49.     **Limits on Lender Liability**.  Nothing in this Interim Order, any of the DIP Documents, the Prepetition Debt Documents, or any other documents related thereto, shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties of any liability for any claims arising from any activities by the Debtors in the operation of their businesses or in connection with the administration of these Chapter 11 Cases or any Successor Cases.  The DIP Agent, the DIP Lenders, and the Prepetition Secured Parties shall not, solely by reason of having made loans under the DIP Facility, extending other financial accommodations to the Debtors or authorizing the use of Cash Collateral, be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 *et seq.*, as amended, or any similar federal or state statute).  Nothing in this Interim Order or the DIP Documents, shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, or any of the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors.

RLF1 31627761v.1
#99165958v13
#99165958v16

50.   **Insurance Proceeds and Policies**.   To the extent that the Prepetition Secured Parties are listed as loss payees or additional insured under the Debtors' insurance policies, the DIP Agent, for the benefit of itself and the DIP Lenders, is also deemed to be the additional insured and loss payee under such insurance policies and shall act in that capacity and distribute any proceeds recovered or received in respect of any such insurance policies in the order of priorities set forth herein.

51.   **Joint and Several Liability**.   Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder and all DIP Obligations and adequate protection obligations in accordance with the terms hereof and of the DIP Documents.

52.   **Rights Preserved**.   Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, subject to the DIP Documents, the Prepetition Debt Documents and the Prepetition Intercreditor Agreement: (a) the DIP Agent's, DIP Lenders', and Prepetition Secured Parties' rights to seek any other or supplemental relief; (b) any of the rights of any of the DIP Agent, DIP Lenders, and/or the Prepetition Secured Parties under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay imposed by section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Chapter 11 Cases or Successor Cases, conversion of any of the Chapter 11 Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the DIP Agent,

the DIP Lenders, or the Prepetition Secured Parties.  For all adequate protection and stay relief purposes throughout the Chapter 11 Cases, the Prepetition Secured Parties shall be deemed to have requested relief from the automatic stay and adequate protection as of the Petition Date.  For the avoidance of doubt, such request will survive termination of this Interim Order.

53.    **No Waiver by Failure to Seek Relief**.  The failure of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Documents, the Prepetition Debt Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties.

54.    **Binding Effect of Interim Order**.  Immediately upon entry on the docket of this Court, the terms and provisions of this Interim Order shall become binding upon the Debtors, the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, all other creditors of any of the Debtors, any Committee, and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Chapter 11 Cases, any Successor Cases, or upon dismissal of any Case or Successor Case.

55.    **No Modification of Interim Order**.  A motion or pleading filed by any of the Debtors to modify, stay, vacate, amend, or reverse this Interim Order shall be an Event of Default and an ABL Cash Collateral Termination Event unless and until: (a) the DIP Obligations, the ABL Obligations and the Prepetition Term Obligations have been indefeasibly paid in full in cash (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms), and all commitments to extend credit under the DIP Facility have been terminated; or (b) the DIP Agent (acting at the direction of the Required DIP Lenders),

the Prepetition ABL Agent, and the Prepetition Term Agent (acting at the direction of the requisite Prepetition Term Secured Parties), consent to such motion or pleading.

56.   **Payments Free and Clear.**  Any and all payments or proceeds remitted to the DIP Secured Parties or the Prepetition Secured Parties pursuant to the provisions of this Interim Order, the Final Order (if and when entered) or the DIP Documents shall be received free and clear of any claim, charge, assessment or other liability, whether asserted or assessed by, through or on behalf of the Debtors.

57.   **Continuing Effect of Prepetition Intercreditor Agreement**.  The Debtors, the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties each shall be bound by, and in all respects of the DIP Facility shall be governed by, and be subject to all the terms, provisions, and restrictions of the Prepetition Intercreditor Agreement, which shall govern the relative priorities, rights and remedies of the DIP Secured Parties and the Prepetition Secured Parties.  For the avoidance of doubt, the DIP Obligations shall constitute "Term Loan Debt Obligations" under the Prepetition Intercreditor Agreement.

58.   **Interim Order Controls**.  In the event of any inconsistency between the terms and conditions of the DIP Documents and this Interim Order, the provisions of this Interim Order shall control.

59.   **Discharge**.  The DIP Obligations, the Postpetition ABL Obligations and, except as otherwise provided in paragraph [15(e)] hereof, the obligations of the Debtors with respect to the adequate protection provided herein shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless (x) such obligations have been indefeasibly paid in full in cash on or before the effective date of such plan of reorganization, (y) each of the DIP

80

Agent, the DIP Lenders, and the Prepetition Secured Parties, as applicable, has otherwise agreed in writing or as otherwise provided herein or (z) each of the DIP Agent, the DIP Lenders, the Prepetition Agents, and the other Prepetition Secured Parties have accepted their treatment in a plan of reorganization or liquidation as provided herein.  It shall be an Event of Default if the Debtors shall propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets, or order confirming such plan or approving such sale, that is not conditioned upon the indefeasible payment in full in cash of the DIP Obligations and the ABL Obligations, and the payment of the Debtors' obligations with respect to the adequate protection provided for herein, in full in cash within a commercially reasonable period of time (and in no event later than the effective date of such plan of reorganization or sale), unless otherwise agreed (a "**Prohibited Plan or Sale**"), in each case, without the written consent of each of the DIP Agent (acting at the direction of the Required DIP Lenders), DIP Lenders, the Prepetition Term Agent (acting at the direction of the requisite Prepetition Term Secured Parties), and the Prepetition ABL Agent, as applicable.  For the avoidance of doubt, the Debtors' proposal or support of a Prohibited Plan or Sale, or the entry of an order with respect thereto, shall constitute an Event of Default hereunder and under the DIP Documents.

60.    **Survival**.  The provisions of this Interim Order, including with respect to the priority of the Carve Out, and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in any of the Chapter 11 Cases; (b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the Chapter 11 Cases or any Successor Cases.  The terms and provisions of this Interim Order shall continue in the Chapter 11 Cases, in any Successor Cases,

81

or following dismissal of the Chapter 11 Cases or any Successor Cases notwithstanding the entry of any orders described in clauses (a)–(d) above, and all claims, liens, security interests, and other protections granted to the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties pursuant to this Interim Order and/or the DIP Documents shall maintain their validity and priority as provided by this Interim Order until: (i) in respect of the DIP Facility, all the DIP Obligations have been indefeasibly paid in full in cash; and (ii) in respect of the Prepetition ABL Facility, all of the ABL Obligations have been indefeasibly paid in full in cash; (iii) in respect of the Prepetition Term Facility, all of the Prepetition Term Obligations have been indefeasibly paid in full in cash. The terms and provisions concerning the indemnification of the DIP Agent, the Prepetition ABL Agent, the DIP Lenders, the Prepetition Term Lenders, and the Prepetition ABL Lenders shall continue in the Chapter 11 Cases, in any Successor Cases, following dismissal of the Chapter 11 Cases or any Successor Cases, following termination of the DIP Documents, and/or the indefeasible repayment of the DIP Obligations.

61.    **Payments Held in Trust**.  Except as expressly permitted in this Interim Order or the DIP Credit Agreement, and subject to the Carve Out in all respects, in the event that any person or entity receives any payment on account of a security interest in DIP Collateral, receives any DIP Collateral or any proceeds of DIP Collateral, or receives any other payment with respect thereto from any other source prior to all DIP Obligations in accordance with the DIP Credit Agreement, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Agent and the DIP Lenders and shall immediately turn over such proceeds to the DIP Agent, or as otherwise instructed by this Court, for application in accordance with the DIP Credit Agreement and this Interim Order; provided that, to the extent any such payment or proceeds of DIP Collateral constitute ABL Priority

RLF1 31627761v.1
#99165958v13
#99165958v16

Collateral, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds in trust for the benefit of the Prepetition ABL Secured Parties and shall immediately turn over such payment or proceeds to the Prepetition ABL Agent, or as otherwise instructed by this Court, for application in accordance with the Prepetition Debt Documents and this Interim Order.

62.     **Headings**.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

63.     **Final Hearing**.  The Final Hearing is scheduled for [●], 2024 at [●] (Prevailing Eastern Time) before this Court.

64.     **Objections**.  Any party in interest objecting to the relief sought at the Final Hearing shall file and serve written objections, which objections shall be served upon: (a) the Debtors, c/o Accuride Corporation, 38777 Six Mile Road, Suite 410, Livonia, MI 48152 (Attn:  Matt Freeman, Senior Vice President, General Counsel); (b) proposed co-counsel to the Debtors, (i) Kirkland & Ellis LLP, 333 West Wolf Point Plaza, Chicago, Illinois, 60654, Attn: Ryan Blaine Bennett P.C., (ryan.bennett@kirkland.com), Alexander D. McCammon (alex.mccammon@kirkland.com), and (Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Derek I. Hunter (derek.hunter@kirkland.com) and (ii) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 N King St, Wilmington, Delaware 19801 (Attn: Joseph Barry (jbarry@ycst.com); Kenneth J. Enos (kenos@ycst.com); (c) counsel for the DIP Secured Parties and the Prepetition Term Secured Parties, (i) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn:   Matt Barr, Esq.  (matt.barr@weil.com), David N. Griffiths, Esq. (david.griffiths@weil.com), and F. Gavin Andrews, Esq. (f.gavin.andrews@weil.com)), (ii) Ropes & Gray LLP, 1211 Avenue of the Americas, New York, NY 10036 (Attn: Mark Somerstein

(mark.somerstein@ropesgray.com)) and Patricia Chen (patricia.chen@ropesgray.com) and (iii) Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Zachary I. Shapiro, Esq. (shapiro@rlf.com)); (d) counsel for the Prepetition ABL Agent, (i) Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017 (Attn: Eli J. Vonnegut (eli.vonnegut@davispolk.com); Stephanie Massman (stephanie.massman@davispolk.com)) and (ii) Morris, Nichols, Arscht & Tunnell LLP, 1201 North Market Street, 16th Floor, P.O. Box 1347, Wilmington, Delaware 19899 (Attn: Robert J. Dehney (rdehney@morrisnichols.com)); (e) the United States Attorney's Office for the District of Delaware; and (f) if any statutory committee has been appointed in the Chapter 11 Cases, counsel to such committee, by no later than [●], 2024 at 4:00 p.m. (Prevailing Eastern Time).

65.     **Retention of Jurisdiction**.  The Court has and will retain jurisdiction to enforce the terms of, any and all matters arising from or related to the DIP Facility, and/or this Interim Order.

RLF1 31627761v.1
#99165958v13
#99165958v16

## Exhibit 1

**DIP Credit Agreement**

**<u>SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT
AGREEMENT</u>**

Dated as of [●], 2024

among

ACCURIDE CORPORATION
as the Borrower,

ARMOR PARENT CORP.
as Holdings,

ACCURIDE INTERMEDIATE CO., INC.
as Midco,

ACCURIDE GROUP HOLDINGS, INC.
as Topco,

ALTER DOMUS (US) LLC,
as Administrative Agent and Collateral Agent,

and

THE LENDERS PARTY HERETO

## TABLE OF CONTENTS

ARTICLE I DEFINITIONS AND ACCOUNTING TERMS ..........................................2

Section 1.01    Defined Terms ................................................................2
Section 1.02    Other Interpretive Provisions..............................................40
Section 1.03    Accounting Terms...........................................................41
Section 1.04    Rounding..................................................................41
Section 1.05    References to Agreements, Laws, Etc .......................................41
Section 1.06    Times of Day..............................................................41
Section 1.07    Timing of Payment or Performance..........................................41
Section 1.08    Currency Equivalents Generally............................................41
Section 1.09    [Reserved] ...............................................................42
Section 1.10    Divisions ................................................................42
Section 1.11    Interest Rates; Benchmark Notification....................................42

ARTICLE II THE COMMITMENTS AND CREDIT EXTENSIONS ......................................43

Section 2.01    The Loans.................................................................43
Section 2.02    Borrowings, Conversions and Continuations of Loans .......................44
Section 2.03    [Reserved] ...............................................................46
Section 2.04    [Reserved] ...............................................................46
Section 2.05    Prepayments...............................................................46
Section 2.06    Termination or Reduction of Commitments ..................................48
Section 2.07    Repayment of Loans .......................................................49
Section 2.08    Interest .................................................................49
Section 2.09    Fees .....................................................................49
Section 2.10    Computation of Interest and Fees .........................................51
Section 2.11    Evidence of Indebtedness .................................................51
Section 2.12    Payments Generally .......................................................51
Section 2.13    Sharing of Payments ......................................................53
Section 2.14    [Reserved] ...............................................................54
Section 2.15    [Reserved] ...............................................................54
Section 2.16    Defaulting Lenders........................................................54
Section 2.17    [Reserved] ...............................................................54
Section 2.18    Super Priority Nature of Obligations and Administrative Agent's Liens; Payment of Obligations................................................................54
Section 2.19    Extension of Maturity Date................................................54

ARTICLE III TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY .................55

Section 3.01    Taxes ....................................................................55
Section 3.02    Inability to Determine Rates .............................................59
Section 3.03    Increased Cost and Reduced Return; Capital Adequacy ......................59
Section 3.04    Funding Losses ...........................................................60
Section 3.05    Matters Applicable to All Requests for Compensation ......................60
Section 3.06    [Reserved] ...............................................................62
Section 3.07    Illegality ...............................................................62

## TABLE OF CONTENTS (CONT'D)

Section 3.08    Survival .................................................................................62
Section 3.09    Benchmark Replacement Setting. ..........................................62

ARTICLE IV CONDITIONS PRECEDENT TO CREDIT EXTENSIONS ...............................64

Section 4.01    Conditions to Closing Date ....................................................64
Section 4.02    Conditions Precedent to each Credit Extension ...................67

ARTICLE V REPRESENTATIONS AND WARRANTIES.........................................................68

Section 5.01    Existence, Qualification and Power; Compliance with Laws............................68
Section 5.02    Authorization; No Contravention.............................................68
Section 5.03    Governmental Authorization; Other Consents.....................69
Section 5.04    Binding Effect .........................................................................69
Section 5.05    Financial Statements; No Material Adverse Effect..............69
Section 5.06    Litigation .................................................................................70
Section 5.07    Ownership of Property; Liens .................................................70
Section 5.08    Environmental Matters............................................................70
Section 5.09    Taxes .......................................................................................71
Section 5.10    Compliance with ERISA.........................................................71
Section 5.11    Subsidiaries; Equity Interests.................................................71
Section 5.12    Margin Regulations; Investment Company Act.....................71
Section 5.13    Disclosure ...............................................................................72
Section 5.14    Intellectual Property; Licenses, Etc .......................................72
Section 5.15    [Reserved] ...............................................................................72
Section 5.16    Security Interest ......................................................................72
Section 5.17    Use of Proceeds.......................................................................73
Section 5.18    Economic Sanctions and Anti-Corruption Laws ..................73
Section 5.19    Bankruptcy Matters.................................................................74

ARTICLE VI AFFIRMATIVE COVENANTS .........................................................................75

Section 6.01    Financial Statements ...............................................................75
Section 6.02    Certificates; Other Information...............................................76
Section 6.03    Notices .....................................................................................79
Section 6.04    Maintenance of Existence .......................................................80
Section 6.05    Maintenance of Properties ......................................................80
Section 6.06    Maintenance of Insurance .......................................................80
Section 6.07    Compliance with Laws ............................................................80
Section 6.08    Books and Records ..................................................................80
Section 6.09    Inspection Rights ....................................................................81
Section 6.10    Additional Subsidiaries; Further Assurances........................81
Section 6.11    Use of Proceeds.......................................................................81
Section 6.12    [Reserved] ...............................................................................81
Section 6.13    [Reserved] ...............................................................................81
Section 6.14    Payment of Taxes ....................................................................82

## TABLE OF CONTENTS (CONT'D)

Section 6.15    Nature of Business ....................................................................82
Section 6.16    Lender Calls ..............................................................................82
Section 6.17    Board Observer ..........................................................................82
Section 6.18    Special Committee ......................................................................83
Section 6.19    Canadian Intercompany Loan Agreement ..................................83
Section 6.20    Chief Restructuring Officer ......................................................83
Section 6.21    Milestones ..................................................................................84
Section 6.22    Cash Management ......................................................................84
Section 6.23    Debtor-in-Possession Obligations ............................................84
Section 6.24    Bankruptcy Documents ..............................................................84
Section 6.25    Additional Bankruptcy Matters ................................................85
Section 6.26    Ratings ......................................................................................85
Section 6.27    Post-Closing ..............................................................................85
Section 6.28    Special Committee Investigation ..............................................85

ARTICLE VII NEGATIVE COVENANTS ..............................................................85

Section 7.01    Liens ..........................................................................................86
Section 7.02    Investments ................................................................................88
Section 7.03    Indebtedness ..............................................................................91
Section 7.04    Fundamental Changes ................................................................93
Section 7.05    Dispositions ..............................................................................93
Section 7.06    Restricted Payments ..................................................................94
Section 7.07    Transactions with Affiliates ......................................................95
Section 7.08    Prepayments, Etc., of Indebtedness ..........................................96
Section 7.09    Holdings Covenants ..................................................................96
Section 7.10    Negative Pledge and Subsidiary Distributions ........................97
Section 7.11    Financial Covenant ....................................................................98
Section 7.12    Canadian Intercompany Loan Agreement; CCAA Cash Flow ....98
Section 7.13    Permitted Variances ..................................................................99
Section 7.14    Vendor Payments ......................................................................99
Section 7.15    Vendor Payments ......................................................................99
Section 7.16    Insolvency Proceeding Claims ..................................................99
Section 7.17    Bankruptcy Actions ..................................................................99

ARTICLE VIII EVENTS OF DEFAULT AND REMEDIES ..................................100

Section 8.01    Events of Default ....................................................................100
Section 8.02    Remedies Upon Event of Default ............................................106
Section 8.03    [Reserved] ................................................................................106
Section 8.04    Application of Funds ................................................................106

ARTICLE IX ADMINISTRATIVE AGENT AND OTHER AGENTS ....................107

Section 9.01    Appointment and Authorization of Agents ..............................107
Section 9.02    Delegation of Duties ................................................................108
Section 9.03    Liability of Agents ..................................................................108

**TABLE OF CONTENTS (CONT'D)**

| | | |
|---|---|---|
| Section 9.04 | Reliance by Agents | 109 |
| Section 9.05 | Notice of Default | 110 |
| Section 9.06 | Credit Decision; Disclosure of Information by Agents | 110 |
| Section 9.07 | Indemnification of Agents | 111 |
| Section 9.08 | Agents in their Individual Capacities | 111 |
| Section 9.09 | Successor Agents | 111 |
| Section 9.10 | Administrative Agent May File Proofs of Claim | 112 |
| Section 9.11 | Collateral and Guaranty Matters | 114 |
| Section 9.12 | [Reserved] | 115 |
| Section 9.13 | Appointment of Supplemental Administrative Agents | 115 |
| Section 9.14 | Withholding Tax | 116 |
| Section 9.15 | Certain ERISA Matters. | 116 |
| Section 9.16 | Additional Agent Provisions. | 117 |

ARTICLE X MISCELLANEOUS ...... 121

| | | |
|---|---|---|
| Section 10.01 | Amendments, Etc | 121 |
| Section 10.02 | Notices and Other Communications; Facsimile Copies | 122 |
| Section 10.03 | No Waiver; Cumulative Remedies | 124 |
| Section 10.04 | Attorney Costs and Expenses | 125 |
| Section 10.05 | Indemnification by the Borrower | 125 |
| Section 10.06 | Payments Set Aside | 127 |
| Section 10.07 | Successors and Assigns | 127 |
| Section 10.08 | Confidentiality | 131 |
| Section 10.09 | Setoff | 132 |
| Section 10.10 | Counterparts | 132 |
| Section 10.11 | Integration | 133 |
| Section 10.12 | Survival of Representations and Warranties | 133 |
| Section 10.13 | Severability | 133 |
| Section 10.14 | GOVERNING LAW, JURISDICTION, SERVICE OF PROCESS | 133 |
| Section 10.15 | WAIVER OF RIGHT TO TRIAL BY JURY | 134 |
| Section 10.16 | Binding Effect | 134 |
| Section 10.17 | Judgment Currency | 135 |
| Section 10.18 | Lender Action | 135 |
| Section 10.19 | USA PATRIOT Act | 135 |
| Section 10.20 | Prepetition Intercreditor Agreement and DIP Order | 135 |
| Section 10.21 | Obligations Absolute | 136 |
| Section 10.22 | No Advisory or Fiduciary Responsibility | 136 |
| Section 10.23 | Acknowledgement and Consent to Bail-In of Affected Financial Institutions | 137 |
| Section 10.24 | Electronic Execution of Assignments and Certain Other Documents | 137 |

SCHEDULES
| | | |
|---|---|---|
| 1.01A | — | Certain Events |
| 1.01B | — | [Reserved] |
| 1.01C | — | Excluded Subsidiaries |

iv

**TABLE OF CONTENTS (CONT'D)**

| | | |
|---|---|---|
| 1.01D | — | Guarantors |
| 2.01 | — | Commitments and Roll-Up Loans |
| 5.06 | — | Litigation |
| 5.11 | — | Subsidiaries and Other Equity Investments |
| 5.19 | — | Initial 13-Week Cash Flow |
| 7.01(b) | — | Existing Liens |
| 7.02 | — | Existing Investments |
| 7.03(c) | — | Existing Indebtedness |
| 7.07 | — | Transactions with Affiliates |
| 10.02 | — | Administrative Agent's Office, Certain Addresses for Notices |

<u>EXHIBITS</u>

Form of

| | | |
|---|---|---|
| A | — | Committed Loan Notice |
| B | — | [Reserved] |
| C-1 | — | Term Note |
| C-2 | — | [Reserved] |
| D | — | Compliance Certificate |
| E | — | Assignment and Assumption |
| F | — | Guaranty |
| G-1 | — | [Reserved] |
| G-2 | — | [Reserved] |
| G-3 | — | Security Agreement |
| G-4 | — | [Reserved] |
| H | — | [Reserved] |
| I | — | [Reserved] |
| J | — | [Reserved] |
| K | — | [Reserved] |
| L | — | United States Tax Compliance Certificates |

## SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "Agreement") is entered into as of [●], 2024, among ACCURIDE CORPORATION, a Delaware corporation (the "Borrower"), ARMOR PARENT CORP., a Delaware corporation ("Holdings"), ACCURIDE INTERMEDIATE CO., INC., a Delaware corporation ("Midco"), ACCURIDE GROUP HOLDINGS, INC., a Delaware corporation ("Topco"), ALTER DOMUS (US) LLC ("AD"), as Administrative Agent and Collateral Agent and each lender from time to time party hereto (collectively, the "Lenders" and individually, a "Lender").

## PRELIMINARY STATEMENTS

1.    On [●], 2024 (the "Petition Date"), Topco, Midco, Holdings, the Borrower and certain Domestic Subsidiaries of the Borrower (collectively, the "Debtors" and, each individually, a "Debtor") commenced cases (the "Chapter 11 Cases") under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and the Debtors have retained possession of their assets and are authorized under the Bankruptcy Code to continue the operations of their businesses as debtors-in-possession;

2.    Prior to the Petition Date, the Lenders (together with the other Prepetition Lenders (as defined below)) provided financing to the Borrower pursuant to that certain Term Loan Credit Agreement, dated as of November 18, 2016, among Holdings, the Borrower, as borrower, Alter Domus (US) LLC, as administrative agent and collateral agent (in such capacities the "Prepetition Term Loan Agent"), and the lenders party thereto from time to time (the "Prepetition Term Loan Lenders") (as so amended, and as further amended, restated, supplemented or otherwise modified from time to time through the Petition Date, the "Prepetition Term Loan Credit Agreement");

3.    On the Petition Date, the Prepetition Term Loan Lenders under the Prepetition Term Loan Credit Agreement were owed approximately $[●] in outstanding principal balance of Loans (as defined in the Prepetition Term Loan Credit Agreement) (the "Prepetition Term Loans") plus interest, fees, costs and expenses and all other Prepetition Term Loan Obligations under the Prepetition Term Loan Credit Agreement;

4.    The Borrower has requested, and, upon the terms set forth in this Agreement, the Lenders have agreed to make available to the Borrower, a senior secured superpriority debtor-in-possession term loan credit facility of up to $[103,435,278.05] (the "Facility"), consisting of two tranches: (i) a new money term loan in an initial aggregate principal amount not to exceed $30,000,000 (the "New Money Loans") and (ii) a term loan facility in an initial aggregate principal amount equal to $[73,435,278.05] (the "Roll-Up Loans"), which Roll-Up Loans resulted from the roll-up and exchange of all of the principal and accrued interest, fees and other amounts on, or with respect to, the Prepetition Amendment No. 14 Incremental Term Loans (as defined below), in each case subject to the conditions set forth herein and in the DIP Order;

1

5.      The proceeds of the Facility shall be used in accordance with <u>Section 6.11</u> hereof; and

6.      The Borrower, each Guarantor and their respective Subsidiaries will receive substantial direct and indirect benefits by reason of the making of loans and other financial accommodations to the Borrower as provided in this Agreement.

The Lenders have indicated their willingness to lend on the terms and subject to the conditions set forth herein.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

ARTICLE I

<u>DEFINITIONS AND ACCOUNTING TERMS</u>

Section 1.01    <u>Defined Terms</u>.  Capitalized terms defined in the DIP Order and used herein shall have the meanings given to them in the DIP Order unless otherwise defined herein.  As used in this Agreement, the following terms shall have the meanings set forth below:

"<u>Acceptable Plan</u>" means a plan of reorganization that is satisfactory to the Required Lenders (and with respect to any provisions that affect the rights or duties of the Agents, to the Agents in their reasonable discretion) (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms thereof and in a manner satisfactory to the Required Lenders and the Agents (with respect to their own rights and duties)).

"<u>AD</u>" has the meaning specified in the introductory paragraph hereof.

"<u>Adequate Protection Claims</u>" shall have the meaning assigned to such term in the DIP Order.

"<u>Adequate Protection Liens</u>" shall have the meaning assigned to such term in the DIP Order.

"<u>Adequate Protection Obligations</u>" shall have the meaning assigned to such term in the DIP Order.

"<u>Administrative Agent</u>" means, subject to <u>Section 9.13</u>, AD (and any of its Affiliates selected by AD to act as administrative agent for any of the facilities provided hereunder), in its capacity as administrative agent under the Loan Documents, or any successor administrative agent appointed in accordance with <u>Section 9.09</u>.

"<u>Administrative Agent's Office</u>" means, with respect to any currency, the Administrative Agent's address and, as appropriate, account as set forth on <u>Schedule 10.02</u> with respect to such currency, or such other address or account as the Administrative Agent may from time to time notify the Borrower and the Lenders.

2

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.  "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.  Notwithstanding the foregoing, no Lender listed on Schedule 2.01 (nor any of their respective Affiliates a majority of the voting Equity Interests of which are owned directly or indirectly by a parent company of any such Lender) shall be deemed to be an Affiliate of the Borrower or any Subsidiary.

"Agent Fee Letter" means the Fee Letter, dated [●], 2024, by and among the Borrower and Alter Domus (US) LLC, as amended, restated, supplemented or otherwise modified from time to time.

"Agent-Related Persons" means the Agents, together with their respective Affiliates, and the officers, directors, managers, members, employees, agents (including sub-agents and co-agents), attorney-in-fact, partners, trustees, advisors, and representatives of such Persons and of such Persons' Affiliates.

"Agents" means, collectively, the Administrative Agent, the Collateral Agent, and the Supplemental Administrative Agents (if any).

"Aggregate Commitments" means the Term Commitments of all the Lenders.

"Agreement" has the meaning specified in the introductory paragraph hereof.

"Agreement Currency" has the meaning specified in Section 10.17.

"Anti-Corruption Laws" has the meaning specified in Section 5.18(a).

"Applicable Lending Office" means for any Lender, such Lender's office, branch or affiliate designated Term SOFR Loans or Base Rate Loans, as applicable, as notified to the Administrative Agent, any of which offices may be changed by such Lender.

"Applicable Percentage" means, at any time (a) with respect to any Lender with a Term Commitment of any Class, the percentage equal to a fraction the numerator of which is the amount of such Lender's Term Commitment of such Class at such time and the denominator of which is the aggregate amount of all Term Commitments of such Class of all Lenders and (b) with respect to the Loans of any Class, a percentage equal to a fraction the numerator of which is such Lender's Outstanding Amount of the Loans of such Class and the denominator of which is the aggregate Outstanding Amount of all Loans of such Class.

3

"Applicable Rate" means (x) with respect to New Money Loans (a) that are Term SOFR Loans, 10.00% and (b) that are Base Rate Loans, 9.00% and (y) with respect to Roll-Up Loans (a) that are Term SOFR Loans, 10.00% and (b) that are Base Rate Loans, 9.00%.

"Appropriate Lender" means, at any time with respect to Loans of any Class, the Lenders of such Class.

"Approved 13-Week Cash Flow" has the meaning specified in Section 6.02(f).

"Approved Foreign Bank" has the meaning specified in the definition of "Cash Equivalents."

"Approved Fund" means, with respect to any Lender, any Fund that is administered, advised or managed by (a) such Lender, (b) an Affiliate of such Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages such Lender.

"Asset Percentage" has the meaning specified in Section 2.05(b)(ii).

"Assignees" has the meaning specified in Section 10.07(b).

"Assignment and Assumption" means an Assignment and Assumption substantially in the form of Exhibit E or any other form (including electronic documentation generated by an electronic platform) approved by the Administrative Agent.

"Attorney Costs" means and includes all reasonable fees, expenses and disbursements of any law firm or other external legal counsel.

"Attributable Indebtedness" means, on any date, in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"Audited Financial Statements" means (i) the audited consolidated balance sheets of the Borrower as of the last day of each of the three most recent fiscal years ended at least ninety (90) days prior to the Closing Date and (ii) the related audited consolidated statements of operations, cash flows and changes in equity of the Borrower for each of the three most recent fiscal years ended at least ninety (90) days prior to the Closing Date.

"Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 3.09(d).

"Backstop Fee Letter" has the meaning specified in Section 2.09(b)(iii).

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bankruptcy Code" means Title 11 of the United State Code, as amended, or any similar federal or state law for the relief of debtors.

"Bankruptcy Court" has the meaning specified in the in the preliminary statements to this Agreement.

"Bankruptcy Event" means, with respect to any Person, such Person or its parent entity becomes (other than via an Undisclosed Administration) the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business appointed for it, or, in the good faith determination of the Administrative Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment, provided that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority or instrumentality thereof, provided, further, that such ownership interest does not result in or provide such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person or its parent entity.

"Base Rate" means with respect to the Term Loans, a rate per annum equal to the greatest of (i) the Prime Rate in effect on such day, (ii) the Federal Funds Rate in effect on such day plus ½ of 1.00% and (iii) Term SOFR for a one-month tenor in effect for such day plus 1.00%; provided that to the extent such highest rate as calculated above shall, at any time, be less than 3.00% per annum, such rate shall be deemed to be 3.00% per annum for all purposes herein. Any change in the Base Rate due to a change in the Prime Rate, the Federal Funds Rate or Term SOFR shall be effective on the opening of business on the day specified in the public announcement of such change in the Prime Rate, the Federal Funds Rate or Term SOFR, respectively.

"Base Rate Loan" means a Loan that bears interest at a rate based on the Base Rate.

"Benchmark" means, initially, Term SOFR; provided that if a Benchmark Transition Event has occurred with respect to Term SOFR or the then-current Benchmark, then

"Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to clause (a) of <u>Section 3.09</u>.

"<u>Benchmark Replacement</u>" means, with respect to any Benchmark Transition Event, for any Available Tenor, the first alternative set forth in the order below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date:

(a)        Daily Simple SOFR; or

(b)        the sum of: (i) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower giving due consideration to (A) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (B) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated credit facilities and (ii) the related Benchmark Replacement Adjustment.

If the Benchmark Replacement as determined pursuant to clause (a) or (b) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"<u>Benchmark Replacement Adjustment</u>" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body and/or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for U.S. dollar-denominated syndicated credit facilities at such time.

"<u>Benchmark Replacement Date</u>" means a date and time determined by the Administrative Agent, which date shall be no later than, with respect to any Benchmark, the earliest to occur of the following events with respect to the then-current Benchmark:

(1)        in the case of clause (1) or (2) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(2)        in the case of clause (3) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; <u>provided</u>, that such non-representativeness will be determined by reference to the most

recent statement or publication referenced in such clause (3) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (1) or (2) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" means, with respect to any Benchmark, the occurrence of one or more of the following events with respect to such then-current Benchmark:

(1)     a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(2)     a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Board of Governors of the Federal Reserve System, the Federal Reserve Bank of New York, the Term SOFR Administrator, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), in each case, which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(3)     a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are no longer, or as of a specified future date will no longer be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Unavailability Period" means, with respect to any Benchmark, the period (if any) (x) beginning at the time that a Benchmark Replacement Date has occurred if, at

such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with <u>Section 3.09</u> and (y) ending at the time that a Benchmark Replacement has replaced such then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with <u>Section 3.09</u>.

"<u>Beneficial Ownership Certification</u>" means a certification regarding beneficial ownership or control as required by the Beneficial Ownership Regulation.

"<u>Beneficial Ownership Regulation</u>" means 31 C.F.R. § 1010.230.

"<u>Benefit Plan</u>" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"<u>Borrower</u>" has the meaning specified in the introductory paragraph to this Agreement.

"<u>Borrower Materials</u>" has the meaning specified in <u>Section 6.02</u>.

"<u>Borrowing</u>" means Loans of the same Class and Type, made, converted or continued on the same date and, in the case of Term SOFR Loans, as to which a single Interest Period is in effect.

"<u>Borrowing Minimum</u>" means $1,000,000.

"<u>Borrowing Multiple</u>" means $100,000.

"<u>Business Day</u>" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed.

"<u>Canadian Collateral</u>" has the meaning assigned to the term "Property" in the CCAA Initial Order.

"<u>Canadian Demand Note</u>" means that certain Grid Promissory Note, dated as of [●], 2024, by and between the Borrower and the Canadian Subsidiary, evidencing amounts owed by the Canadian Subsidiary to the Borrower, which Canadian Demand Note (i) shall be secured by a super-priority lien on the assets of the Canadian Subsidiary, (ii) shall be pledged to the Collateral Agent, in favor of the Secured Parties, as Collateral to secure the Obligations hereunder and (iii) shall be in form and substance reasonably acceptable to the Required Lenders and the Borrower.

"<u>Canadian Intercompany Loan Agreement</u>" means that certain intercompany agreement dated as of [●], 2024, by and between the Borrower and the Canadian Subsidiary, in respect of, certain intercompany loans (as evidenced by the Canadian Demand Note) and other intercompany arrangements, which agreement shall be in form and substance reasonably acceptable to the Required Lenders.

"<u>Canadian Intercompany Supply Agreement</u>" means that certain intercompany supply agreement dated as of [●], 2024, by and between the Borrower and the Canadian Subsidiary, in respect of, among other things, the supply of certain products by the Canadian Subsidiary to the Borrower and other intercompany arrangements, which agreement shall be in form and substance reasonably acceptable to the Required Lenders.

"<u>Canadian Subsidiary</u>" means Accuride Canada Inc.

"<u>Capitalized Lease Obligation</u>" means, at the time any determination thereof is to be made, the amount of the liability in respect of a Capitalized Lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) prepared in accordance with GAAP.

"<u>Capitalized Leases</u>" means all leases that are required to be, in accordance with GAAP, recorded as capitalized leases; <u>provided</u> that, for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the amount thereof accounted for as a liability in accordance with GAAP; <u>provided</u>, <u>further</u>, that all obligations of the Borrower and its Subsidiaries that are or would be characterized as an operating lease as determined in accordance with GAAP as in effect on the Closing Date (whether or not such operating lease was in effect on such date) shall continue to be accounted for as an operating lease (and not as a Capitalized Lease) for purposes of this Agreement regardless of any change in GAAP following the Closing Date that would otherwise require such obligation to be recharacterized as a Capitalized Lease.

"<u>Carve-Out</u>" shall have the meaning set forth for the defined term "Carve Out" in the DIP Order.

"<u>Cash Equivalents</u>" means any of the following types of Investments, to the extent owned by the Borrower or any Subsidiary:

(1)     Dollars;

(2)     securities issued or directly and fully and unconditionally guaranteed or insured by the United States government or any agency or instrumentality of the foregoing the securities of which are unconditionally guaranteed as a full faith and credit obligation of such government with maturities of 24 months or less from the date of acquisition;

(3)     certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition, with any domestic or foreign commercial bank having capital and surplus of not less than $500,000,000 in the case of U.S. banks and $100,000,000 (or the Dollar equivalent as of the date of determination)  in the case of non-U.S. banks;

(4)     repurchase obligations for underlying securities of the types described in clauses (2), (3) and (7) of this definition entered into with any financial institution meeting the qualifications specified in <u>clause (3)</u> above;

(5)     commercial paper rated at least "P-1" by Moody's or at least "A-1" by S&P, and in each case maturing within 24 months after the date of creation thereof and

9

Indebtedness or preferred stock issued by Persons with a rating of "A" or higher from S&P or "A-2" or higher from Moody's, with maturities of 24 months or less from the date of acquisition;

(6)     marketable short-term money market and similar securities having a rating of at least "P-2" or "A-2" from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower) and in each case maturing within 24 months after the date of creation or acquisition thereof;

(7)     readily marketable direct obligations issued by any state, commonwealth or territory of the United States or any political subdivision or taxing authority thereof having an Investment Grade Rating from Moody's or S&P with maturities of 24 months or less from the date of acquisition;

(8)     readily marketable direct obligations issued by any foreign government or any political subdivision or public instrumentality thereof, in each case having an Investment Grade Rating from Moody's or S&P with maturities of 24 months or less from the date of acquisition;

(9)     Investments with average maturities of 12 months or less from the date of acquisition in money market funds rated within the top three ratings category by S&P or Moody's;

(10)     with respect to any Foreign Subsidiary or the Borrower: (i) obligations of the national government of the country in which such Foreign Subsidiary or the Borrower maintains its chief executive office and principal place of business provided such country is a member of the Organization for Economic Cooperation and Development, in each case maturing within one year after the date of investment therein, (ii) certificates of deposit of, bankers acceptances of, or time deposits with, any commercial bank which is organized and existing under the laws of the country in which such Foreign Subsidiary or the Borrower maintains its chief executive office and principal place of business provided such country is a member of the Organization for Economic Cooperation and Development, and whose short-term commercial paper rating from S&P is at least "A-1" or the equivalent thereof or from Moody's is at least "P-1" or the equivalent thereof (any such bank being an "Approved Foreign Bank"), and in each case with maturities of not more than 270 days from the date of acquisition and (iii) the equivalent of demand deposit accounts which are maintained with an Approved Foreign Bank;

(11)     Cash Equivalents of the types described in clauses (1) through (10) above denominated in Dollars or, solely to the extent held in the ordinary course of business and not for speculative purposes, any currency in which the Borrower and/or its Subsidiaries regularly conducts business; and

(12)     investment funds investing at least 90% of their assets in Cash Equivalents of the types described in clauses (1) through (11) above.

"<u>Cash Management Bank</u>" means financial institution providing treasury, depository, credit or debit card, purchasing card, and/or cash management services or automated clearing house transactions to the Borrower or any Subsidiary or conducting any automated clearing house transfers of funds.

"<u>Cash Management Obligations</u>" means obligations owed by the Borrower or any Subsidiary to any Cash Management Bank in respect of any overdraft and related liabilities arising from treasury, depository, credit or debit card, purchasing card, or cash management services or any automated clearing house transfers of funds.

"<u>Cash Management Order</u>" means any interim or final order authorizing and approving the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Perform Intercompany Transactions, and (II) Granting Related Relief filed at Docket No. [●], which shall be in form and substance reasonably acceptable to the Required Lenders.

"<u>Casualty Event</u>" means any event that gives rise to the receipt by the Borrower or any Subsidiary of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"<u>CCAA</u>" means the Companies' Creditors Arrangement Act (Canada), as amended.

"<u>CCAA A&R Initial Order</u>" means the CCAA Initial Order as amended and restated by the CCAA Court at the hearing of the CCAA Comeback Motion to, among other things, provide for the full priming (other than with respect to the CCAA Administrative Charge and the CCAA D&O Charge) of the CCAA DIP Charge on all of the Collateral of the Canadian Subsidiary on the terms contemplated thereby, which shall be in form and substance acceptable to the Required Lenders (as the same may be amended, supplemented or modified from time to time after entry thereof in accordance with the terms thereof and in a manner satisfactory to the Required Lenders).

"<u>CCAA Administration Charge</u>" means the Administration Charge (as defined in the CCAA Initial Order) in an amount agreed between the Borrower, the Canadian Subsidiary and the Required Lenders, in consultation with the CCAA Monitor.

"<u>CCAA Case</u>" means the restructuring proceedings under the CCAA commenced by the Canadian Subsidiary in the CCAA Court.

"<u>CCAA Cash Flow</u>" means the Canadian Subsidiary's cash flow forecast for the 13-week period commencing on the CCAA Filing Date and ending the week of January 3, 2025 filed by the Canadian Subsidiary with the CCAA Court, as such cash flow forecast may be updated, amended or modified from time to time by the Canadian Subsidiary in consultation with the CCAA Monitor and as approved by the Required Lenders.

"CCAA Charges" means, collectively, the CCAA DIP Charge, the CCAA Administration Charge and the CCAA D&O Charge, and "CCAA Charge" means any of them individually, as applicable.

"CCAA Comeback Motion" shall mean the motion seeking the CCAA A&R Initial Order following the entry of the CCAA Initial Order, which motion shall be served by the Canadian Subsidiary on the service list established in the CCAA Case, all secured creditors of the Canadian Subsidiary and any other Person as may be reasonably requested by the Lender Advisors.

"CCAA Court" means the Ontario Superior Court of Justice (Commercial List).

"CCAA D&O Charge" means the Directors' Charge (as defined in the CCAA Initial Order) in an amount agreed between the Borrower, the Canadian Subsidiary and the Required Lenders, in consultation with the CCAA Monitor.

"CCAA DIP Charge" means a super-priority priming charge (subject only to the CCAA Administration Charge and the CCAA D&O Charge) granted by the CCAA Court on all of the Canadian Collateral.

"CCAA Initial Order" means an order of the CCAA Court, in form and substance satisfactory to the Required Lenders (as the same may be amended, supplemented or modified from time to time after entry thereof in accordance with the terms thereof and in a manner satisfactory to the Required Lenders).

"CCAA Orders" means, collectively, the CCAA Initial Order and the CCAA A&R Initial Order, and "CCAA Order" means each of them individually, as applicable.

"CCAA Monitor" means the monitor appointed by the CCAA Court in the CCAA Case.

"CFC" means any Foreign Subsidiary that is a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"Change of Control" means the earlier to occur of:

12

(a)    the Permitted Holders ceasing to beneficially own, in the aggregate, directly or indirectly, at least 50.1% of the issued and outstanding Equity Interests of each of (1) Topco entitled to vote in the election of the board of directors (or equivalent governing body) of Topco, (2) Midco entitled to vote in the election of the board of directors (or equivalent governing body) of Midco, (3) Holdings entitled to vote in the election of the board of directors (or equivalent governing body) of Holdings and (4) the Borrower entitled to vote in the election of the board of directors (or equivalent governing body) of the Borrower;

(b)    (1) the Midco ceasing to be a direct Wholly-Owned Subsidiary of Topco, (2) Holdings ceasing to be a direct Wholly-Owned Subsidiary of Midco or (3) the Borrower ceasing to be a direct Wholly-Owned Subsidiary of Holdings; or

(c)    the occurrence of a "Change of Control" (as defined in any Prepetition Credit Agreement).

"Chapter 11 Cases" has the meaning specified in the in the preliminary statements to this Agreement.

"Class" (a) when used with respect to Lenders, refers to whether such Lenders hold a particular Class of Term Commitments or Loans and (b) when used with respect to Loans or a Borrowing, refers to whether such Loans, or the Loans comprising such Borrowing, are New Money Loans or Roll-Up Loans. The New Money Loans and the Roll-Up Loans shall be treated as separate Classes.

"Closing Date" means the date all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 10.01.

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Collateral" has the meaning assigned to the term "DIP Collateral" in the DIP Order.

"Collateral Agent" means AD, in its capacity as collateral agent under any of the Loan Documents, or any successor collateral agent appointed in accordance with Section 9.09.

"Collateral and Guarantee Requirement" means, at any time, the requirement that (in each case subject to the DIP Order and Section 6.10):

(a)    the Obligations shall have been secured by a perfected security interest in the Collateral with the priority required by the DIP Order (subject in all respects to the Carve-Out) through the provisions of the DIP Order and the Security Agreement, to the extent such security interest may be perfected by virtue of the DIP Order or by filings of Uniform Commercial Code financing statements or any other method of perfection referred to in this definition;

(b)      on the Closing Date, the Collateral Agent shall have received from each of the Borrower and each other Loan Party, a counterpart of the Guaranty and the Security Agreement, in each case duly executed and delivered on behalf of such person; and

(c)      in the case of any person that becomes a Loan Party after the Closing Date, the Collateral Agent shall have received supplements to the Guaranty and the Security Agreement and any other documents reasonably requested by the Administrative Agent or the Required Lenders, in the form specified therefor or otherwise reasonably acceptable to the Administrative Agent and the Required Lenders, in each case, duly executed and delivered on behalf of such Loan Party, that will provide a perfected security interest in the Collateral with the priority required by the DIP Order (subject in all respects to the Carve-Out).

"Collateral Documents" means, collectively, the DIP Order, the Security Agreement, each of the mortgages, collateral assignments, Security Agreement Supplements, security agreements, pledge agreements, deposit account control agreements, securities account control agreements or other similar agreements that have been delivered to the Collateral Agent and the Lenders pursuant to this Agreement or the DIP Order, the Guaranty and each of the other agreements, instruments or documents that creates or purports to create a Lien or Guarantee in favor of the Collateral Agent for the benefit of the Secured Parties.

"Committed Loan Notice" means a notice of (a) a Term Borrowing, (b) a conversion of Loans from one Type to the other or (c) a continuation of Term SOFR Loans pursuant to Section 2.02(a), which, if in writing, shall be substantially in the form of Exhibit A.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Compensation Period" has the meaning specified in Section 2.12(c)(ii).

"Compliance Certificate" means a certificate substantially in the form of Exhibit D.

"Conforming Changes" means, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 3.09 and other technical, administrative or operational matters) that the Administrative Agent, in consultation with the Borrower, decides may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Administrative

14

Agent, in consultation with the Borrower, decides is necessary in connection with the administration of this Agreement and the other Loan Documents).

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" has the meaning specified in the definition of "Affiliate."

"Credit Extension" means a Borrowing.

"Daily Simple SOFR" means, for any day, a rate per annum equal to SOFR for the day, with the conventions for this rate (which will include a lookback) being established by the Administrative Agent in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans; provided, that if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent may establish another convention in its discretion.

"Debtor Relief Laws" means the Bankruptcy Code of the United States, the CCAA and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means an interest rate equal to (a) with respect to any overdue principal for any Loan, the applicable interest rate for such Loan plus 2.00% per annum (provided that with respect to Term SOFR Loans, the determination of the applicable interest rate is subject to Section 2.02(c) to the extent that Term SOFR Loans may not be converted to, or continued as Term SOFR Loans pursuant thereto) and (b) with respect to any other overdue amount, including overdue interest, the interest rate applicable to Base Rate Loans plus 2.00% per annum, in each case, to the fullest extent permitted by applicable Laws.

"Defaulting Lender" means any Lender that (a) has failed, within two (2) Business Days of the date required to be funded or paid, to (i) fund any portion of its Loans required to be funded by it, or (ii) pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder, unless, in the case of clause (i) above, such Lender notifies the Administrative Agent in writing that such failure is the result of such Lender's good faith determination that a condition precedent to funding (specifically identified and including the particular default, if any) has not been satisfied, (b) has notified the Borrower or the Administrative Agent or any other Lender in writing that it does not intend or expect to comply with any of its funding obligations under this Agreement (unless such writing indicates that such position is based on such Lender's good faith determination that a condition precedent (specifically identified and including the particular default, if any) to funding a Loan cannot be satisfied), (c) has failed, within three (3) Business Days after request by the Administrative Agent or any other Lender, acting in

15

good faith, to provide a certification in writing from an authorized officer of such Lender that it will comply with its obligations to fund prospective Loans, provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon such Administrative Agent's or Lender's receipt of such certification in form and substance satisfactory to it and the Administrative Agent, or (d) after the date of this Agreement, has become the subject of a Bankruptcy Event.

"DIP Funds Account" means that certain deposit account named "DIP Proceeds Account" at Bank of America, N.A. in the name of the Borrower, with account number ******7923, ABA number *****9593 which account shall constitute Collateral.

"DIP Order" means the Interim Order, and upon its entry, the Final Order.

"Discharge of DIP Obligations" means the occurrence of (a) all Commitments shall have been terminated and (b) the principal of and interest on each Loan and all other expenses, Obligations or other amounts payable under any Loan Document shall have been paid in full in cash (other than in respect of contingent indemnification and expense reimbursement claims not then due).

"Disclosure Statement" means the related disclosure statement (and all exhibits thereto) with respect to the Acceptable Plan, which shall be reasonably satisfactory to the Required Lenders in all material respects.

"Disposition" or "Dispose" means the sale, transfer, license (including sublicense), lease or other disposition (including any sale-leaseback transaction and any sale of Equity Interests) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Disqualified Equity Interests" means any Equity Interest which, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise, (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) provides for the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is ninety-one (91) days after the Latest Maturity Date at the time such Equity Interests are issued.

"Dollar" and "$" mean lawful money of the United States.

"Domestic Foreign Holding Company" means any Domestic Subsidiary with no material assets (either directly or through one or more disregarded entities) other than Equity Interests and/or Indebtedness of one or more Foreign Subsidiaries that are CFCs or one or more Domestic Foreign Holding Companies.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of the United States, any state thereof or the District of Columbia.

16

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent;

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Eligible Assignee" means any Assignee permitted by and consented to in accordance with Section 10.07(b).

"Environment" means ambient air, indoor or outdoor air, surface water, groundwater, drinking water, soil, surface and subsurface strata, and natural resources such as wetlands, flora and fauna.

"Environmental Laws" means any and all applicable Laws relating to pollution, the environment or natural resources, or to the generation, handling, management, transport, storage, disposal, use, treatment, Release or threatened Release of any hazardous or toxic substances or, to the extent relating to exposure to hazardous or toxic substances, human health or safety.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities) directly or indirectly relating to, resulting from or based upon (a) any Environmental Law, (b) the generation, use, handling, management, transportation, storage, disposal or treatment of any Hazardous Materials, (c) exposure of any Person to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement to the extent liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that is under common control with any Loan Party and is treated as a single employer within the meaning of Section 414 of the Code or Section 4001 of ERISA. For the avoidance of doubt, when any provision of this Agreement relates to a past event or period of time, the term "ERISA Affiliate" includes any person who was, as to the time of such past event or period of time, an

"ERISA Affiliate" within the meaning of the preceding sentence to the extent that such Loan Party continues to have liability with respect to such past event or period of time.

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Loan Party or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a failure to satisfy the minimum funding standard under Section 412 of the Code or Section 302 of ERISA with respect to a Pension Plan such that a Lien could arise (or does arise) in favor of the Plan or PBGC, whether or not waived, or a failure to make any required contribution to a Multiemployer Plan; (d) a complete or partial withdrawal by any Loan Party or any ERISA Affiliate from a Multiemployer Plan, notification of any Loan Party or ERISA Affiliate concerning the imposition of Withdrawal Liability or notification that a Multiemployer Plan is insolvent or in reorganization within the meaning of Title IV of ERISA or in endangered or critical status within the meaning of Section 305 of ERISA or Section 432 of the Code; (e) the filing of a notice of intent to terminate a Pension Plan or Multiemployer Plan, the treatment of a Pension Plan or Multiemployer Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (f) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (g) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Loan Party or any ERISA Affiliate; or (h) a determination that any Pension Plan is, or is expected to be, in "at-risk" status (within the meaning of Section 303(i)(4)(A) of ERISA or Section 430(i)(4)(A) of the Code).

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning specified in Section 8.01.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excluded Domestic Subsidiary" means any Domestic Subsidiary that is (a) a direct or indirect Subsidiary of an Excluded Foreign Subsidiary or Domestic Foreign Holding Company or (b) a Domestic Foreign Holding Company.

"Excluded Equity" means Equity Interests

(i)     [reserved];

(ii)    [reserved];

(iii)   [reserved];

(iv)    [reserved];

(v)     of any captive insurance companies and not-for-profit Subsidiaries;

(vi)    of any non-Wholly-Owned Restricted Subsidiary that constitutes a joint venture, but only to the extent that the granting of a Lien thereon would require the consent of a Person (other than Topco, Midco, Holdings, the Borrower or a Subsidiary thereof) or would be prohibited by the terms of the applicable joint venture agreement or the Organization Documents of such joint venture as in effect on the date hereof, and only to the extent such consent right or prohibition would not be overridden by the applicable provisions of the UCC; and

(vii)   of any Subsidiary organized in a jurisdiction outside the United States the pledge of which is prohibited by applicable Laws or which would reasonably be expected to result in a violation or breach of, or conflict with, fiduciary duties of such Subsidiary's officers, directors or managers.

"Excluded Foreign Subsidiary" means any subsidiary that is (i) a CFC, (ii) a foreign corporation that is treated as a disregarded entity (as defined in the Code) which owns the stock in a CFC or (iii) a Foreign Subsidiary owned by a Foreign Subsidiary described in the foregoing clauses (i) or (ii).

"Excluded Property" means

(i) [reserved];

(ii) [reserved];

(iii) assets for which a pledge thereof or a security interest therein is prohibited by applicable Laws after giving effect to the applicable anti-assignment clauses of the Uniform Commercial Code and applicable Laws;

(iv) [reserved];

(v) [reserved];

(vi) any lease, license or other agreements (if such contracts existed on the Closing Date), or any property subject to a purchase money security interest, Capitalized Lease Obligation or similar arrangements (if such purchase money security interest, Capitalized Lease Obligation or arrangement existed on the Closing Date), in each case to the extent permitted under the Loan Documents, to the extent that a pledge thereof or a security interest therein would violate or invalidate such lease, license or agreement, purchase money, Capitalized Lease or similar arrangement, or create a right of termination in favor of any other party thereto (other than any Loan Party or Affiliate of any of them) after giving effect to the applicable anti-assignment clauses of the Uniform Commercial Code and applicable Laws, other than the proceeds and receivables thereof the assignment of which is expressly deemed effective under applicable Laws notwithstanding such prohibition;

(vii) [reserved];

19

(viii) [reserved];

(ix) [reserved];

(x) any intent-to-use trademark application in the United States prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, to the extent, if any, that, and solely during the period, if any, in which, the grant, attachment, or enforcement of a security interest therein would impair the validity or enforceability, or result in the voiding of such intent-to-use trademark application or any registration issuing therefrom under applicable Law;

(xi) Excluded Equity; and

(xii) the Borrowing Base Account (as defined in the DIP Order).

"Excluded Subsidiary" means

(a) each Subsidiary listed on Schedule 1.01C hereto;

(b) any Subsidiary that is prohibited by applicable Law or by any Contractual Obligation existing on the Closing Date (or, if later, the date such Subsidiary first becomes a Subsidiary) from guaranteeing the Obligations (and in the case of such Contractual Obligation, not entered into in contemplation of the acquisition of such Subsidiary) or which would require governmental (including regulatory) consent, approval, license or authorization to provide a Guarantee unless such consent, approval, license or authorization has been received;

(c) [reserved];

(d) [reserved];

(e) [reserved];

(f) [reserved];

(g) captive insurance companies;

(h) not-for-profit Subsidiaries;

(i) [reserved];

(j) any non-Wholly-Owned Subsidiary;

(k) any Excluded Foreign Subsidiary; and

(l) any Excluded Domestic Subsidiary or Foreign Subsidiary, in each case, existing on the Petition Date and constituting an "Excluded Subsidiary" under the Prepetition Term Loan Agreement;

provided that, notwithstanding the foregoing, no Subsidiary that is a Debtor in the Chapter 11 Cases shall be an Excluded Subsidiary.

"Excluded Taxes" means, with respect to any Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party under any Loan Document, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, imposed by any jurisdiction as a result of a present or former connection of such Agent, Lender or other recipient, as the case may be, with such jurisdiction (including as a result of being resident or being deemed to be resident, being organized, maintaining an Applicable Lending Office or carrying on business or being deemed to carry on business in such jurisdiction) (other than any connection arising from any Agent, Lender or other recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Documents or any transactions contemplated thereby), (b) any U.S. federal withholding Taxes imposed on amounts payable to any Lender with respect to an interest in a Loan pursuant to a law in effect at the time such Lender becomes a party to this Agreement (or designates a new Applicable Lending Office), except to the extent such Lender's assignor was entitled immediately prior to the assignment, or such Lender was entitled immediately before it designated a new Applicable Lending Office, to receive additional amounts from any Loan Party with respect to such Taxes pursuant to Section 3.01, (c) any withholding Tax resulting from a failure of a Lender to comply with Section 3.01(f) or a failure of the Administrative Agent to comply with Section 3.01(g), (d) any U.S. federal withholding Tax imposed pursuant to FATCA and (e) any U.S. federal backup withholding imposed pursuant to Section 3406 of the Code.

"Exit Fee" shall have the meaning assigned to such term in Section 2.09(b).

"Extended Maturity Date" shall have the meaning assigned to such term in Section 2.19.

"Extension Effective Date" shall have the meaning assigned to such term in Section 2.19(a).

"Facility" has the meaning specified in the preliminary statements to this Agreement.

"FATCA" means current Sections 1471 through 1474 of the Code (and any amended or successor version that is substantively comparable) or any current or future Treasury Regulations with respect thereto or other official administrative interpretations thereof, any agreements entered into pursuant to current Section 1471(b)(1) of the Code (or any amended or successor version described above) and any intergovernmental agreements entered into to implement or further the collection of Taxes imposed pursuant to the foregoing (together with any law or official guidance implementing such agreements).

"FCPA" means the United States Foreign Corrupt Practices Act of 1977, as amended.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System on such day, as published by the Federal Reserve Bank of New York on the Business Day

next succeeding such day; <u>provided</u> that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1.00%) quoted to the Administrative Agent by three (3) federal funds brokers on such day on such transactions as determined by the Administrative Agent.

"<u>Final Order</u>" means an order of the Bankruptcy Court authorizing and approving on a final basis, among other things, the Loan Documents to which any Debtor is a party and the Transactions contemplated by this Agreement in the form of the Interim Order (with only such modifications thereto as are necessary to convert the Interim Order to a final order and such other modifications as are reasonably satisfactory to the Required Lenders) (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Required Lenders (and in each case, with respect to any provisions that affect the rights or duties of the Agents, the Agents)) as to which no stay has been entered.

"<u>Floor</u>" means the benchmark rate floor, if any, provided in this Agreement initially (as of the execution of this Agreement, the modification, amendment or renewal of this Agreement or otherwise) with respect to Term SOFR. For the avoidance of doubt, the initial Floor for Term SOFR shall be (x) 2.00% for all Term Loans.

"<u>Foreign Plan</u>" means any employee benefit plan, program, policy, arrangement or agreement sponsored, maintained or contributed to or by, or entered into with, any Loan Party or any Subsidiary with respect to employees outside the United States that is a defined benefit as described under GAAP.

"<u>Foreign Subsidiary</u>" means any direct or indirect Subsidiary of the Borrower which is not a Domestic Subsidiary.

"<u>FRB</u>" means the Board of Governors of the Federal Reserve System of the United States.

"<u>Fund</u>" means any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"<u>GAAP</u>" means generally accepted accounting principles in the United States, as in effect from time to time; <u>provided</u> that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

"<u>Governmental Authority</u>" means any nation or government, any state, provincial, country, territorial or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"<u>Granting Lender</u>" has the meaning specified in <u>Section 10.07(h)</u>.

"<u>Guarantee Obligations</u>" means, as to any Person, without duplication, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation payable or performable by another Person (the "<u>primary obligor</u>") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other monetary obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance of such Indebtedness or other monetary obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other monetary obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other monetary obligation of any other Person, whether or not such Indebtedness or other monetary obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); <u>provided</u> that the term "Guarantee Obligations" shall not include endorsements for collection or deposit, in either case in the ordinary course of business, or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee Obligation shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.

"<u>Guarantees</u>" has the meaning specified in the definition of "Collateral and Guarantee Requirement."

"<u>Guarantors</u>" means the Loan Parties (other than the Borrower of its own primary obligations), <u>provided</u> that no Excluded Subsidiary shall constitute a Guarantor.

"<u>Guaranty</u>" means, collectively, (a) the Guaranty substantially in the form of <u>Exhibit F</u> and (b) each other guaranty and guaranty supplement delivered pursuant to <u>Section 6.10</u>.

"<u>Hazardous Materials</u>" means all hazardous, toxic, explosive or radioactive substances, materials or wastes, and all other chemicals, pollutants, contaminants, substances, materials or wastes of any nature regulated pursuant to any Environmental Law because of their

23

hazardous, toxic, dangerous or deleterious characteristics or properties, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas and toxic mold.

"Holdings" has the meaning specified in the introductory paragraph to this Agreement.

"IFRS" means International Financial Reporting Standards as adopted in the European Union.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)     all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)     the maximum amount (after giving effect to any prior drawings or reductions which may have been reimbursed) of all letters of credit (including standby and commercial), banker's acceptances, bank guaranties, surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person;

(c)     net obligations of such Person under any Swap Contract;

(d)     all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business and consistent with past practice);

(e)     indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)     all Attributable Indebtedness;

(g)     all obligations of such Person in respect of Disqualified Equity Interests; and

(h)     all Guarantee Obligations of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation, company, or limited liability company) in which such Person is a general partner or a joint venturer, except to the extent such Person's liability for such Indebtedness is otherwise limited. The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date. The amount of Indebtedness of any

Person for purposes of <u>clause (e)</u> shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"<u>Indemnified Liabilities</u>" has the meaning specified in <u>Section 10.05</u>.

"<u>Indemnified Taxes</u>" means (a) all Taxes, other than Excluded Taxes, imposed on or in respect of any payment made by or on account of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"<u>Indemnitees</u>" has the meaning specified in <u>Section 10.05</u>.

"<u>Information</u>" has the meaning specified in <u>Section 10.08</u>.

"<u>Initial 13-Week Cash Flow</u>" has the meaning specified in <u>Section 4.01(c)</u>.

"<u>Interest Payment Date</u>" means the last Business Day of each calendar month and the Maturity Date of the Facility under which such Loan was made.

"<u>Interest Period</u>" means as to each Term SOFR Loan, a period of one month with respect to such Term SOFR Loan; provided that, with respect to each Borrowing:

      (a)      the initial Interest Period shall commence on the date of such Borrowing and end on the next immediate Interest Payment Date;

      (b)      thereafter, each successive Interest Period shall commence on the Interest Payment Date on which the preceding Interest Period expires and end on the next immediate Interest Payment Date; and

      (c)      no Interest Period shall extend beyond the Maturity Date of the Facility under which such Loan was made.

"<u>Interim Order</u>" means an order of the Bankruptcy Court authorizing and approving on an interim basis, among other things, the Loan Documents to which any Debtors is a party and the Transactions contemplated by this Agreement, which interim order is in form and substance satisfactory to the Required Lenders (as the same may be amended, supplemented, or modified from time to time after entry thereof in a manner reasonably satisfactory to the Required Lenders) (and in each case, with respect to any provisions that affect the rights or duties of the Agents, to the Agents).

"<u>Investment</u>" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee Obligation with respect to any obligation of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person.  For

purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"Investment Grade Rating" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, or an equivalent rating by Fitch, Inc.

"Investors" means the Sponsor and the Management Stockholders.

"IP Rights" has the meaning specified in Section 5.14.

"Judgment Currency" has the meaning specified in Section 10.17.

"JV Entity" means any joint venture of the Borrower or any Subsidiary that is not a Subsidiary.

"Latest Maturity Date" means, at any date of determination, the latest Maturity Date applicable to any Loan or Term Commitment hereunder at such time.

"Laws" means, collectively, all international, foreign, federal, state, provincial and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"Lender" has the meaning specified in the introductory paragraph to this Agreement.

"Lender Advisors" means Weil, Gotshal & Manges LLP, legal counsel to Lenders, Goodmans LLP, Canadian legal counsel to the Lenders, and Lazard Inc., financial advisor to the Lenders.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, assignment (by way of security or otherwise), deemed trust, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Capitalized Lease having substantially the same economic effect as any of the foregoing).

"Liquidity" means

(a) the aggregate amount of cash and Cash Equivalents (in each case, free and clear of all Liens other than any nonconsensual Lien that is permitted under the Loan Documents, Liens of the Collateral Agent, Liens granted pursuant to the DIP Order, Liens in favor of the Prepetition ABL Administrative Agent under the Loan Documents (as defined in the Prepetition ABL Credit Agreement) and Liens in favor of the Prepetition Term Loan Agent under the Loan Documents (as

defined in the Prepetition Term Loan Credit Agreement)) of the Borrower and the Subsidiaries; plus

(b) solely for the calculation set forth in Section 7.11(c)(ii), the amount that may be borrowed by the French Borrower (as defined in the Prepetition ABL Credit Agreement) and the German Borrowers (as defined in the Prepetition ABL Credit Agreement) under the Prepetition ABL Credit Agreement, in each case, on the date of calculation.

"Loan Documents" means, collectively, (i) this Agreement, (ii) the Term Notes, (iii) the Guaranty, (iv) the Collateral Documents, (v) the DIP Order and (vi) the Agent Fee Letter, in each case as amended, restated, supplemented, or otherwise modified from time to time.

"Loan Parties" means, collectively, (i) the Borrower, (ii) Holdings, (iii) Midco, (iv) Topco and (v) each Subsidiary Guarantor.

"Loans" means the Term Loans and Roll-Up Loans.

"Management Stockholders" means the members of management of Borrower or any of its Subsidiaries who are investors in Topco, Midco, Holdings or any direct or indirect parent thereof.

"Master Agreement" has the meaning specified in the definition of "Swap Contract."

"Material Adverse Effect" means a material adverse effect on the (i) business, condition (financial or otherwise), operations, performance, properties, contingent liabilities, material agreements or prospects of the Borrower and its Subsidiaries, taken as a whole (excluding (i) the filing of the Chapter 11 Cases, and the effects thereof and any action required to be taken under the Loan Documents or under the DIP Order, (ii) [reserved] and (iii) any matters disclosed on Schedule 1.01A hereto), (ii) the validity or enforceability of any of the Loan Documents or the rights and remedies of the Agents and the Lenders thereunder, or (iii) any material portion of the Collateral or the Collateral Agent's liens on any material portion of the Collateral.

"Maturity Date" means the earliest of:

(i)     the date that is 100 days after the Closing Date, as such date may be extended pursuant to Section 2.19,

(ii)     the date on which all Loans are accelerated and all unfunded Term Commitments (if any) have been terminated in accordance with this Agreement, by operation of law or otherwise,

(iii)     the date the Bankruptcy Court orders a conversion of the Chapter 11 Cases to a chapter 7 liquidation or the dismissal of the chapter 11 case of any Debtor,

(iv)     the closing of any sale of assets pursuant to Section 363 of the Bankruptcy Code, which when taken together with all other sales of assets since

the Closing Date, constitutes a sale of all or substantially all of the assets of the Loan Parties and

(v)     the Plan Consummation Date;

provided that, in each case, if any such day is not a Business Day, the Maturity Date shall be the Business Day immediately preceding such day.

"Midco" has the meaning specified in the introductory paragraph to this Agreement.

"Moody's" means Moody's Ratings and any successor thereto.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which any Loan Party or any ERISA Affiliate makes or is obligated to make contributions, or during the immediately preceding six (6) years, has made or been obligated to make contributions.

"Net Cash Proceeds" means:

(a)     with respect to the Disposition of any asset by the Borrower or any Subsidiary or any Casualty Event, the excess, if any, of

(i) the sum of cash and Cash Equivalents received in connection with such Disposition or Casualty Event (including any cash or Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received and, with respect to any Casualty Event, any insurance proceeds or condemnation awards in respect of such Casualty Event actually received by or paid to or for the account of the Borrower or any Subsidiary) over

(ii) the sum of (A) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness that is secured by the asset subject to such Disposition or Casualty Event and that is required to be repaid (and is timely repaid) in connection with such Disposition or Casualty Event (other than Indebtedness under the Loan Documents and Indebtedness that is secured by Liens ranking junior to or pari passu with the Liens securing Indebtedness under the Loan Documents), (B) the out-of-pocket fees and expenses (including attorneys' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant and other customary fees) actually incurred by the Borrower or such Subsidiary in connection with such Disposition or Casualty Event, (C) taxes paid or reasonably estimated to be actually payable in connection therewith (including, for the avoidance of doubt, any income, withholding and other taxes payable as a result of the distribution of such proceeds to the Borrower), and (D) any reserve for adjustment in respect of (x) the sale price of such asset or assets established in accordance with GAAP and (y) any liabilities associated with such asset or assets and retained by the Borrower or any Subsidiary

after such sale or other disposition thereof, including pension and other post-employment benefit liabilities and liabilities related to environmental matters or with respect to any indemnification obligations associated with such transaction,

provided, that that "Net Cash Proceeds" shall include (x) any cash or Cash Equivalents received upon the Disposition of any non-cash consideration by the Borrower or any Subsidiary in any such Disposition and (y) upon the reversal (without the satisfaction of any applicable liabilities in cash in a corresponding amount) of any reserve described in clause (D) above or if such liabilities have not been satisfied in cash and such reserve is not reversed within 365 days after such Disposition or Casualty Event, the amount of such reserve; and

(b)    with respect to the incurrence or issuance of any Indebtedness by the Borrower or any Subsidiary, the excess, if any, of (x) the sum of the cash received in connection with such incurrence or issuance over (y) the investment banking fees, underwriting discounts, commissions, costs and other out-of-pocket expenses and other customary expenses incurred by the Borrower or such Subsidiary in connection with such incurrence or issuance.

"New Money First Draw" has the meaning specified in Section 2.01(a)(i).

"New Money First Draw Commitment" means, as to each Lender, the amount set forth under the heading "New Money First Draw Commitment" on Schedule 2.01, as such amount may be adjusted from time to time in accordance with this Agreement.  The aggregate amount of the New Money First Draw Commitments on the Closing Date is $15,000,000.

"New Money Loans" has the meaning specified in the preliminary statements to this Agreement.

"New Money Second Draw" has the meaning specified in Section 2.01(a)(ii).

"New Money Second Draw Commitment" means, as to each Lender, the amount set forth under the heading "New Money Second Draw Commitment" on Schedule 2.01, as such amount may be adjusted from time to time in accordance with this Agreement.  The aggregate amount of the New Money Second Draw Commitments on the Closing Date is $5,000,000.

"New Money Second Draw Funding Date" has the meaning specified in Section 2.01(a)(ii).

"New Money Third Draw" has the meaning specified in Section 2.01(a)(iii).

"New Money Third Draw Commitment" means, as to each Lender, the amount set forth under the heading "New Money Third Draw Commitment" on Schedule 2.01, as such amount may be adjusted from time to time in accordance with this Agreement.  The aggregate amount of the New Money Third Draw Commitments on the Closing Date is $10,000,000.

"New Money Third Draw Funding Date" has the meaning specified in Section 2.01(a)(iii).

"<u>Non-Loan Party</u>" means any Subsidiary of the Borrower that is not a Loan Party.

"<u>Obligations</u>" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party or other Subsidiary arising under any Loan Document or otherwise with respect to any Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising. Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents (and of any of their Subsidiaries to the extent they have obligations under the Loan Documents) include (a) the obligation (including guarantee obligations) to pay principal, interest, reimbursement obligations, charges, expenses, fees, Attorney Costs, indemnities and other amounts, in each case, payable by any Loan Party or any other Subsidiary under any Loan Document and (b) the obligation of any Loan Party or any other Subsidiary to reimburse any amount in respect of any of the foregoing that any Lender, in its sole discretion, may elect to pay or advance on behalf of such Loan Party or such Subsidiary.

"<u>Observer</u>" means Herbert Parker, or such other Person designated by the Required Lenders with the consent of the Borrower (such consent not to be unreasonably delayed or withheld).

"<u>OFAC</u>" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"<u>Organization Documents</u>" means (a) with respect to any corporation or company, the certificate or articles of incorporation, the memorandum and articles of association, any certificates of change of name and/or the bylaws; (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, declaration, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"<u>Other Taxes</u>" means all present or future stamp, court or documentary Taxes and any other property, intangible, mortgage recording or similar Taxes which arise from any payment made under any Loan Document or from the execution, delivery, performance, enforcement or registration of, or otherwise with respect to, any Loan Document, excluding, in each case, any such Tax resulting from an Assignment and Assumption or transfer or assignment to or designation of a new Applicable Lending Office or other office for receiving payments under any Loan Document (an "<u>Assignment Tax</u>") but only if such Assignment Tax is imposed as a result of a present or former connection of the assignor or assignee with the jurisdiction imposing such Assignment Tax (other than any connections arising from any Agent, Lender or other recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Documents or any transactions contemplated thereby).

"Outstanding Amount" means the outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments thereof.

"Overnight Rate" means, for any day, the greater of (a) the Federal Funds Rate and (b) an overnight rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

"Participant" has the meaning specified in Section 10.07(e).

"Participant Register" has the meaning specified in Section 10.07(e).

"PBGC" means the Pension Benefit Guaranty Corporation and any successor entity performing similar functions.

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA) other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by any Loan Party or any ERISA Affiliate or to which any Loan Party or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding six (6) years.

"Permitted Equity Issuance" means any sale or issuance of any Qualified Equity Interests.

"Permitted German Sale Leaseback" means that certain sale leaseback transaction in Germany disclosed to the Required Lenders on or prior to the Closing Date.

"Permitted Holders" means any of (a) the Sponsor and (b) any other Investor.

"Permitted Liens" means any Liens permitted by Section 7.01.

"Permitted Tax Distribution" means if and for so long as the Borrower is a member of a group filing a consolidated or combined tax return with any parent entity, any dividends or other distributions to fund any income Taxes for which such parent entity is liable up to an amount not to exceed with respect to such Taxes the amount of any such Taxes that the Borrower and its Subsidiaries would have been required to pay on a separate company basis or on a consolidated basis if the Borrower and its Subsidiaries had paid Tax on a consolidated, combined, group, affiliated or unitary basis on behalf of an affiliated group consisting only of the Borrower and its Subsidiaries.

"Permitted Variances" has the meaning set forth in Section 7.13.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning specified in the preliminary statements to this Agreement.

31

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) other than a Foreign Plan, established, maintained or contributed to by any Loan Party or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate.

"Plan Consummation Date" shall mean the date of the substantial consummation (as defined in Section 1101 of the Bankruptcy Code) of a chapter 11 plan of reorganization, which, for purposes of this Agreement, shall be no later than the effective date of a chapter 11 plan of reorganization that is confirmed pursuant to an order of the Bankruptcy Court.

"Platform" has the meaning specified in Section 6.02.

"Prepetition" means the time period ending immediately prior to the filing of the Chapter 11 Cases.

"Prepetition ABL Administrative Agent" means Bank of America, N.A. in its capacities as administrative agent and collateral agent under the Prepetition ABL Credit Agreement or any successor agent under the Prepetition ABL Loan Documents (as defined in the Prepetition ABL Credit Agreement).

"Prepetition ABL Credit Agreement" means the Amended and Restated ABL Credit Agreement, dated as of June 1, 2018, among Holdings, the Borrower, the Prepetition ABL Administrative Agent and the several banks and other financial institutions from time to time parties thereto, as such agreement may be amended, supplemented, waived or otherwise modified from time to time through the Petition Date.

"Prepetition ABL Forbearance" that Forbearance Agreement, dated as of [●], 2024, by and among the Borrower, the French Borrower (as defined in the Prepetition ABL Credit Agreement), the German Borrowers (as defined in the Prepetition ABL Credit Agreement), the Prepetition ABL Lenders party thereto, the Foreign Guarantors (as defined in the Prepetition ABL Credit Agreement) and the Prepetition ABL Administrative Agent, pursuant to which, among other things, the Prepetition ABL Administrative Agent and the Prepetition ABL Lenders agree to forbear from exercising remedies as a result of any Event of Default or Default existing under the Prepetition ABL Credit Agreement on the Petition Date (including as a result of the filing of the Chapter 11 Cases) and agrees to continue to extend credit to the French Borrower and the German Borrowers on the terms set forth in the Prepetition ABL Credit Agreement, which Prepetition ABL Forbearance is in form and substance reasonably satisfactory to the Required Lenders.

"Prepetition ABL Lenders" means the lending institutions party to the Prepetition ABL Credit Agreement from time to time.

"Prepetition ABL Loans" means the "Loans" as defined in the Prepetition ABL Credit Agreement.

"Prepetition ABL Obligations" means the "Obligations" as defined in the Prepetition ABL Credit Agreement.

"<u>Prepetition Agents</u>" means the Prepetition ABL Administrative Agent and the Prepetition Term Loan Agent.

"<u>Prepetition Amendment No. 14 Incremental Loans</u>" means the "Amendment No. 14 Incremental Loans" as defined in the Prepetition Term Loan Credit Agreement.

"<u>Prepetition Credit Agreements</u>" means the Prepetition ABL Credit Agreement and the Prepetition Term Loan Credit Agreement.

"<u>Prepetition Indebtedness</u>" means all Indebtedness of the Loan Parties outstanding on the Petition Date immediately prior to the filing of the Chapter 11 Cases, other than Indebtedness under the Prepetition Credit Agreements.

"<u>Prepetition Intercreditor Agreement</u>" means the Amended and Restated ABL Intercreditor Agreement, dated as of June 1, 2018, by and among the Prepetition Term Loan Agent and the Prepetition ABL Administrative Agent, and the representatives for purposes thereof for holders of one or more other classes of Indebtedness, the Borrower and the other parties thereto, as amended by the terms of the DIP Order.

"<u>Prepetition Lenders</u>" means the Prepetition ABL Lenders and the Prepetition Term Loan Lenders.

"<u>Prepetition Loan Documents</u>" means the "Loan Documents" as defined in the Prepetition ABL Credit Agreement and the Prepetition Term Loan Credit Agreement.

"<u>Prepetition Loans</u>" means the Prepetition ABL Loans and the Prepetition Term Loans.

"<u>Prepetition Obligations</u>" means the Prepetition ABL Obligations and the Prepetition Term Loan Obligations

"<u>Prepetition Secured Parties</u>" means the "Secured Parties" as defined in the Prepetition ABL Credit Agreement or Prepetition Term Loan Credit Agreement, as applicable.

"<u>Prepetition Term Loan Agent</u>" has the meaning specified in the preliminary statements to this Agreement.

"<u>Prepetition Term Loan Credit Agreement</u>" has the meaning specified in the preliminary statements to this Agreement.

"<u>Prepetition Term Loan Lenders</u>" has the meaning specified in the preliminary statements to this Agreement.

"<u>Prepetition Term Loan Obligations</u>" means the "Obligations" as defined in the Prepetition Term Loan Credit Agreement.

"<u>Prepetition Term Loans</u>" has the meaning specified in the preliminary statements to this Agreement.

"<u>Prime Rate</u>" means the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by Administrative Agent) or any similar release by the Federal Reserve Board (as determined by Administrative Agent). Each change in the Prime Rate shall be effective from and including the date such change is publicly announced or quoted as being effective.

"<u>PTE</u>" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"<u>Public Lender</u>" has the meaning specified in <u>Section 6.02</u>.

"<u>Qualified Equity Interests</u>" means any Equity Interests of Topco, Midco or Holdings (or of the Borrower or any direct or indirect parent of Topco), in each case, that are not Disqualified Equity Interests.

"<u>Register</u>" has the meaning specified in <u>Section 10.07(d)</u>.

"<u>Release</u>" means any release, spill, emission, discharge, deposit, disposal, leaking, pumping, pouring, dumping, emptying, injection, migration or leaching on, into or through the Environment or into, from or through any building, structure or facility.

"<u>Relevant Governmental Body</u>" means the Federal Reserve Board or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board or the Federal Reserve Bank of New York, or any successor thereto.

"<u>Reportable Event</u>" means, with respect to any Pension Plan, any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the thirty (30) day notice period has been waived.

"<u>Request for Credit Extension</u>" means with respect to a Borrowing, conversion or continuation of Term Loans, a Committed Loan Notice.

"<u>Required Lenders</u>" means, as of any date of determination, Lenders holding more than 50% of the sum of the (a) Total Outstandings and (b) aggregate unused Term Commitments; <u>provided</u> that the unused Term Commitment and the portion of the Total Outstandings held or deemed held by any Defaulting Lender shall be excluded for all purposes of making a determination of Required Lenders.

"<u>Resolution Authority</u>" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"<u>Responsible Officer</u>" means the chief executive officer, president, vice president, chief financial officer, treasurer, assistant treasurer, or other similar officer or director of a Loan Party and, as to any document delivered on the Closing Date, any secretary or assistant secretary of a Loan Party.  Any document delivered hereunder that is signed by a Responsible Officer of a

Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Casualty Event" has the meaning specified in Section 2.05(b)(vi).

"Restricted Disposition" has the meaning specified in Section 2.05(b)(vi).

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest in the Borrower or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to the holders of Equity Interests of the Borrower.

"Roll-Up Lender" means any Lender with an outstanding Roll-Up Loan.

"Roll-Up Loans" has the meaning specified in the in the preliminary statements to this Agreement.  The amount of each Lender's Roll-Up Loans to be deemed made in accordance with Section 2.01(b) is set forth on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"Russian Federation Rule" has the meaning specified in Section 8.01.

"S&P" means S&P Global Ratings, and any successor to its rating agency business.

"Sale Consummation Date" has the meaning specified in Section 2.09(b)(iv).

"Sale Premium" has the meaning specified in Section 2.09(b)(iv).

"Sale Transactions" means one or more sales, pursuant to which all or any portion of the assets or equity of Topco, Midco, Holdings, the Borrower and their Subsidiaries is sold to a third party.

"Sanctions Laws and Regulations" means any economic sanctions administered or enforced by the U.S. government (including, without limitation, the U.S. Department of State and OFAC), the government of Canada, His Majesty's Treasury of the United Kingdom, or the European Union, and any requirements imposed by, or based upon the obligations or authorities set forth in the USA PATRIOT Act.

"SEC" means the Securities and Exchange Commission or any Governmental Authority succeeding to any of its principal functions.

"Secured Parties" means, collectively, the Administrative Agent, the Collateral Agent, the Lenders, the Supplemental Administrative Agent and each co-agent or sub-agent appointed by the Administrative Agent from time to time pursuant to Section 9.02.

"Securities Act" means the Securities Act of 1933, as amended.

"<u>Security Agreement</u>" means, collectively, the Security Agreement executed by the Loan Parties party thereto on the Closing Date substantially in the form of <u>Exhibit G-3</u> as supplemented by any Security Agreement Supplement executed and delivered pursuant to <u>Section 6.10</u>.

"<u>Security Agreement Supplement</u>" means a supplement to any Security Agreement as contemplated by such Security Agreement.

"<u>SOFR</u>" means a rate per annum equal to the secured overnight financing rate as administered by the SOFR Administrator.

"<u>SOFR Administrator</u>" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"<u>SPC</u>" has the meaning specified in <u>Section 10.07(h)</u>.

"<u>Special Committee</u>" has the meaning specified in <u>Section 6.18</u>.

"<u>Sponsor</u>" means each of Crestview Partners III, L.P. and its Affiliates and funds or partnerships managed by it or any of its Affiliates, but not including, however, any of their portfolio companies.

"<u>Subsidiary</u>" of a Person means a corporation, company, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly or indirectly, through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of Topco.

"<u>Subsidiary Guarantor</u>" means, collectively, the Subsidiaries of Topco that are Guarantors.

"<u>Supplemental Administrative Agent</u>" has the meaning specified in <u>Section 9.13(a)</u> and "Supplemental Administrative Agents" shall have the corresponding meaning.

"<u>Swap Contract</u>" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc.,

any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark to market value(s) for such Swap Contracts, as determined by a recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender) in accordance with the terms thereof and in accordance with customary methods for calculating mark-to-market values under similar arrangements by a recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"Taxes" means all present or future taxes, duties, levies, imposts, deductions, assessments, fees, withholdings or similar charges imposed by any Governmental Authorities, and all liabilities (including additions to tax, penalties and interest) with respect thereto.

"Term Borrowing" means a Borrowing in respect of a Class of Term Loans.

"Term Commitment" means as to each Term Lender on the Closing Date, its obligation to make a New Money Loan to the Borrower pursuant to Section 2.01(a), including its New Money First Draw Commitment, its New Money Second Draw Commitment and its New Money Third Draw Commitment.

"Term Lender" means, at any time, any Lender that has a Term Commitment or a Term Loan.

"Term Loans" means the New Money Loans and the Roll-Up Loans.

"Term Note" means a promissory note of the Borrower payable to any Term Lender or its registered assigns, in substantially the form of Exhibit C-1 hereto with appropriate insertions, evidencing the aggregate Indebtedness of the Borrower to such Term Lender resulting from any Class of Term Loans made by such Term Lender.

"Term SOFR" means, for any Interest Period, the greater of (i) the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (the "Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator and (ii) the Floor; provided, however, that if as of 5:00 p.m. (New York City time) on any Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government

Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Term SOFR Determination Day.

"<u>Term SOFR Administrator</u>" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"<u>Term SOFR Determination Day</u>" has the meaning assigned to it under the definition of Term SOFR.

"<u>Term SOFR Loan</u>" means a Loan that bears interest at a rate based on Term SOFR, other than pursuant to clause (b)(iii) of the definition of "Base Rate".

"<u>Term SOFR Reference Rate</u>" means the forward-looking term rate based on SOFR.

"<u>Test Period</u>" means, at any date of determination, the most recently completed four consecutive fiscal quarters of the Borrower ending on or prior to such date for which financial statements have been or are required to be delivered pursuant to <u>Section 6.01(a)</u> or <u>6.01(b)</u>.

"<u>Threshold Amount</u>" means $1,000,000.

"<u>Topco</u>" has the meaning specified in the introductory paragraph to this Agreement.

"<u>Total Disbursements</u>" means all disbursements of the Borrower and its Subsidiaries, but excluding payment for fees or expenses for professional services.

"<u>Total Outstandings</u>" means the aggregate Outstanding Amount of all Loans.

"<u>Total Receipts</u>" means all receipts shown in the "Receipts" line of the Approved 13-Week Cash Flow, but excludes all one-time settlements.

"<u>Transaction</u>" means, collectively, (a) the funding or roll-up, as applicable, of the Term Loans hereunder, (b) the execution and delivery of the Loan Documents, (c) the consummation of any other transactions in connection with the foregoing and (d) the payment of Transaction Expenses.

"<u>Transaction Expenses</u>" means any fees or expenses incurred or paid by Topco, Midco, Holdings, the Borrower, or any Subsidiary in connection with the Transaction, this Agreement and the other Loan Documents and the transactions contemplated hereby and thereby in connection therewith.

"<u>Treasury Regulations</u>" means the U.S. federal income tax regulations promulgated under the Code.

"<u>Type</u>" means, with respect to a Loan, its character as a Base Rate Loan or a Term SOFR Loan.

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Unadjusted Benchmark Replacement" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"Unaudited Financial Statements" means (i) the unaudited consolidated balance sheets of the Borrower as of the last day of each of the three most recent fiscal quarters ended at least forty-five (45) days prior to the Closing Date and (ii) the related unaudited consolidated statements of operations, cash flows and changes in equity of the Borrower for any of the first three fiscal quarters that have ended after the most recent fiscal year covered by the Audited Financial Statements and at least forty-five (45) days before the Closing Date.

"Undisclosed Administration" means in relation to a Lender or its parent company the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official by a supervisory authority or regulator under or based on the law in the country where such Lender or such parent company is subject to home jurisdiction supervision if applicable law requires that such appointment is not to be publicly disclosed.

"Uniform Commercial Code" or "UCC" means the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"United States" and "U.S." mean the United States of America.

"United States Tax Compliance Certificate" has the meaning specified in Section 3.01.

"USA PATRIOT Act" means The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)), as amended or modified from time to time.

"U.S. Government Securities Business Day" means any day except for (i) a Saturday, (ii) a Sunday or (iii) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"Variance Report" has the meaning set forth in Section 6.02(g).

"Variance Testing Period" has the meaning set forth in Section 7.13.

"Wholly-Owned" means, with respect to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which (other than (x) director's qualifying shares and (y) shares issued to foreign nationals to the extent required by applicable Law) are owned by such Person and/or by one or more wholly-owned Subsidiaries of such Person.

"Withdrawal Liability" means the liability of a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

Section 1.02   Other Interpretive Provisions.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)   The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)   (i) The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(ii)   Article, Section, Exhibit and Schedule references are to the Loan Document in which such reference appears.

(iii)   The term "including" is by way of example and not limitation.

(iv)   The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(c)   In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including."

(d)      Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

Section 1.03    Accounting Terms.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, applied in a manner consistent with that used in preparing the Audited Financial Statements, except as otherwise specifically prescribed herein.

Section 1.04    Rounding.  Any financial ratios required to be satisfied in order for a specific action to be permitted under this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

Section 1.05    References to Agreements, Laws, Etc.  Unless otherwise expressly provided herein, (a) references to Organization Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, extensions, supplements and other modifications are permitted by any Loan Document; and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

Section 1.06    Times of Day.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

Section 1.07    Timing of Payment or Performance.  When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definitions of Interest Period, Maturity Date, and Extended Maturity Date) or performance shall extend to the immediately succeeding Business Day.

Section 1.08    Currency Equivalents Generally.

(a)      Notwithstanding the foregoing, for purposes of determining compliance with Sections 7.01, 7.02 and 7.03 with respect to any amount of Indebtedness or Investment in a currency other than Dollars, no Default shall be deemed to have occurred solely as a result of changes in rates of exchange occurring after the time such Lien, Indebtedness or Investment is incurred.

(b)      For purposes of determining compliance under Sections 7.02, 7.05 and 7.06, any amount in a currency other than Dollars will be converted to Dollars in a manner consistent with that used in calculating net income in the Borrower's annual financial statements delivered pursuant to Section 6.01(a); provided, however, that the foregoing shall not be deemed to apply to the determination of any amount of Indebtedness.

(c)     For purposes of determining compliance with any restriction on the incurrence of Indebtedness, the Dollar equivalent of the principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; provided that if such Indebtedness is incurred to extend, replace, refund, refinance, renew or defease other Indebtedness denominated in a foreign currency, and such extension, replacement, refunding, refinancing, renewal or defeasance would cause the applicable restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such extension, replacement, refunding, refinancing, renewal or defeasance, such restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being extended, replaced, refunded, refinanced, renewed or defeased.

Section 1.09     [Reserved].

Section 1.10     Divisions. For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

Section 1.11     Interest Rates; Benchmark Notification. The interest rate on a Loan denominated in Dollars may be derived from an interest rate benchmark that may be discontinued or is, or may in the future become, the subject of regulatory reform.  Upon the occurrence of a Benchmark Transition Event, Section 3.09 provides a mechanism for determining an alternative rate of interest.  The Administrative Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, (a) the continuation of, the administration of, submission of, calculation of, performance of or any other matter related to any interest rate used in this Agreement (including, without limitation, the Base Rate, SOFR, the Term SOFR Reference Rate or Term SOFR) or (b) any component definition thereof or rates referred to in the definition thereof, or with respect to any alternative or successor rate thereto, or replacement rate thereof (including any Benchmark Replacement), including without limitation, whether the composition or characteristics of any such alternative, successor or replacement reference rate will be similar to, or produce the same value or economic equivalence of, or have the same value or economic equivalence of as the existing interest rate (or any component thereof) being replaced or have the same volume or liquidity as did any existing interest rate (or any component thereof) prior to its discontinuance or unavailability, except in the case of clause (a) and (b), to the extent of liabilities resulting from the gross negligence or willful misconduct of the Administrative Agent as determined by a final, non-appealable judgment of a court of competent jurisdiction.  The Administrative Agent and its affiliates and/or other related entities may engage in transactions that affect the calculation of any interest rate (or component thereof) used in this Agreement or any alternative, successor or alternative rate (including any Benchmark Replacement) and/or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower.  The Administrative Agent may select information sources or services in its reasonable discretion to ascertain any interest rate used in this Agreement, any component thereof, or rates referred to in

42

the definition thereof, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service, except in each case, to the extent of liabilities resulting primarily from the gross negligence or willful misconduct of the Administrative Agent as determined by a final, non-appealable judgment of a court of competent jurisdiction.

<div align="center">ARTICLE II</div>

<div align="center">THE COMMITMENTS AND CREDIT EXTENSIONS</div>

Section 2.01    The Loans.  Subject to the terms and conditions set forth herein:

(a)    The Term Borrowings.  Each Term Lender severally agrees to make to the Borrower:

(i)    a single loan denominated in Dollars in a principal amount equal to its New Money First Draw Commitment (the "New Money First Draw") on the Closing Date;

(ii)    a single loan denominated in Dollars in a principal amount equal to its New Money Second Draw Commitment (the "New Money Second Draw") no earlier than October 21, 2024 (or such earlier date to which the Required Lenders shall have agreed in their sole discretion by written communication to the Administrative Agent and the Borrower, which earlier date may be communicated via e-mail from the Lender Advisors) (the "New Money Second Draw Funding Date") subject to the satisfaction or waiver of the conditions set forth in Section 4.02 on such date; and

(iii)    a single loan denominated in Dollars in a principal amount equal to its New Money Third Draw Commitment (the "New Money Third Draw") no earlier than October 28, 2024 (or such earlier date to which the Required Lenders shall have agreed in their sole discretion by written communication to the Administrative Agent and the Borrower, which earlier date may be communicated via e-mail from the Lender Advisors) (the "New Money Third Draw Funding Date") subject to the satisfaction or waiver of the conditions set forth in Section 4.02 on such date;

(iv)    New Money Loans may be Base Rate Loans or Term SOFR Loans, as further provided herein.

(b)    The Roll-Up Loans.  On the Closing Date, concurrently with the making of the New Money Loans pursuant to Section 2.01(a)(i) above, all of the principal and accrued interest, fees and other amounts on, or with respect to, the Prepetition Amendment No. 14 Incremental Term Loans outstanding on the Closing Date shall be deemed converted into and exchanged for Roll-Up Loans, and an equivalent amount of Roll-Up Loans shall be deemed funded

on the Closing Date by the Roll-Up Lenders set forth on <u>Schedule 2.01</u>, without constituting a novation, and shall satisfy and discharge an equivalent amount of the principal and accrued interest, fees and other amounts on, or with respect to, the Prepetition Amendment No. 14 Incremental Term Loans held by such Roll-Up Lender (or one or more of its Affiliates) outstanding on the Closing Date.  Roll-Up Loans may be Base Rate Loans or Term SOFR Loans.  Each Roll-Up Lender that is an Affiliate of existing holder(s) of Prepetition Amendment No. 14 Incremental Term Loans hereby confirms to the Agents that such holder(s) has allocated and designated such Roll-Up Lender to hold the Roll-Up Loans (in respect of the conversion and exchange of such holder(s)'s Prepetition Amendment No. 14 Incremental Term Loans) as set forth on <u>Schedule 2.01</u>.

(c)    Amounts repaid or prepaid in respect of the Term Loans may not be reborrowed.

(d)    Following the completion of the syndication and initial assignments of the New Money First Draw, the New Money Second Draw and the New Money Third Draw by Jefferies Capital Services, LLC, as fronting Lender, each Lender holding New Money Loans shall be deemed to hold a pro rata portion of each of the New Money First Draw, the New Money Second Draw and the New Money Third Draw.  Such pro rata share shall be determined in accordance with the aggregate principal amount of New Money Loans held by such Lender, as compared to the aggregate principal amount of all New Money Loans held by all Lenders.

Section 2.02    <u>Borrowings, Conversions and Continuations of Loans</u>.

(a)    Each Term Borrowing, each conversion of Loans from one Type to the other, and each continuation of Term SOFR Loans shall be made upon the Borrower's irrevocable written notice, to the Administrative Agent.  Each such notice must be received by the Administrative Agent substantially in the form attached hereto as <u>Exhibit A</u>, (i) in the case of a Term SOFR Loan, not later than 1:00 p.m., New York City time, three (3) Business Days before the date of the proposed Borrowing or (ii) in the case of a Base Rate Loan, not later than 1:00 p.m., New York City time, on the Business Day immediately preceding the proposed Borrowing.  Each Borrowing of, conversion to or continuation of Term SOFR Loans shall be in a principal amount of the Borrowing Minimum or a whole multiple of the Borrowing Multiple in excess thereof.  Each Borrowing of or conversion to Base Rate Loans shall be in a principal amount of the Borrowing Minimum or a whole multiple of the Borrowing Multiple in excess thereof.  Each Committed Loan Notice shall specify (i) whether the Borrower is requesting a Term Borrowing, a conversion of Loans from one Type to the other, or a continuation of Term SOFR Loans, (ii) the requested date of the Borrowing, conversion or continuation, as the case may be (which shall be a Business Day), (iii) the Class, currency and principal amount of Loans to be borrowed, converted or continued and (iv) the Type of Loans to be borrowed or to which existing Loans are to be converted.  If the Borrower fails to specify a Type of Loan in a Committed Loan Notice or fail to give a timely notice requesting a conversion or continuation, then the applicable Loans shall be made or continued as, or converted to Base Rate Loans.  Any such automatic conversion or continuation shall be effective as of the last day of the Interest Period then in effect with respect to the applicable Term SOFR Loans.  For the avoidance of doubt, the Borrower and Lenders acknowledge and agree that any conversion or continuation of an existing Loan shall be deemed to be a continuation of that Loan with a converted interest rate methodology and not a new Loan.

(b)     Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each Appropriate Lender of the amount of its Applicable Percentage of the applicable Class of Loans, and if no timely notice of a conversion or continuation is provided by the Borrower, the Administrative Agent shall notify each Appropriate Lender of the details of any automatic conversion or continuation described in Section 2.02(a).  In the case of each Borrowing, each Appropriate Lender shall make (or cause its Applicable Lending Office to make) the amount of its Loan available to the Administrative Agent by wire transfer in immediately available funds at the Administrative Agent's Office not later than 1:00 p.m., New York City time on the Business Day specified in the applicable Committed Loan Notice.  Upon satisfaction of the applicable conditions set forth in Section 4.01 or Section 4.02, the Administrative Agent shall make all funds so received available to the Borrower as designated in the Committed Loan Notice in like funds as received by the Administrative Agent by wire transfer of such funds to the DIP Funds Account.

(c)     Except as otherwise provided herein, a Term SOFR Loan may be continued or converted only on the last day of an Interest Period for such Term SOFR Loan unless the Borrower pays the amount due, if any, under Section 3.04 in connection therewith.  During the existence of an Event of Default, the Administrative Agent or the Required Lenders may require that (i) no Loans may be converted to or continued as Term SOFR Loans, (ii) no outstanding Loans may be continued for an Interest Period of more than one month's duration and (iii) unless repaid, each Term SOFR Loan shall be converted to a Base Rate Loan at the end of the Interest Period applicable thereto.

(d)     The Administrative Agent shall promptly notify the Borrower and the Lenders of the interest rate applicable to any Interest Period for Term SOFR Loans upon determination of such interest rate.  The determination of the Term SOFR by the Administrative Agent shall be conclusive in the absence of manifest error.

(e)     Anything in clauses (a) to (d) above to the contrary notwithstanding, after giving effect to all Term Borrowings, all conversions of Term Loans from one Type to the other, and all continuations of Term Loans as the same Type, there shall not be more than five (5) Interest Periods in effect at any time for all Borrowings of Term SOFR Loans.

(f)     Unless the Administrative Agent shall have received notice from a Lender prior to the date of any Borrowing, or, in the case of any Borrowing of Base Rate Loans, prior to 1:00 p.m., New York City time, on the date of such Borrowing, that such Lender will not make available to the Administrative Agent such Lender's Applicable Percentage of such Borrowing, the Administrative Agent may assume that such Lender has made such Applicable Percentage available to the Administrative Agent on the date of such Borrowing in accordance with clause (b) above, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount.  If the Administrative Agent shall have so made funds available, then, to the extent that such Lender shall not have made such portion available to the Administrative Agent, each of such Lender and the Borrower severally agrees to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrower until the date such amount is repaid to the Administrative Agent at (a) in the case of the Borrower, the interest rate applicable at the time to the Loans comprising such Borrowing and (b) in the case of such Lender, the Overnight Rate plus any administrative, processing or similar fees customarily

charged by the Administrative Agent in accordance with the foregoing.  A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this Section 2.02(f) shall be conclusive in the absence of demonstrable error.  If the Borrower and such Lender shall both pay all or any portion of the principal amount in respect of such Borrowing or interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrower the amount of such Borrowing or interest paid by the Borrower for such period.  If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing.  Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

Section 2.03    [Reserved].

Section 2.04    [Reserved].

Section 2.05    Prepayments.

(a)    Optional Prepayments.    The Borrower may, upon notice to the Administrative Agent by the Borrower, at any time or from time to time voluntarily prepay any Borrowing of any Class in whole or in part without premium or penalty (except as set forth in Section 2.09(b)(ii)); provided that (1) such notice must be received by the Administrative Agent not later than 1:00 p.m., New York City time (A) three (3) Business Days prior to any date of prepayment of Term SOFR Loans and (B) one (1) Business Day prior to any date of prepayment of Base Rate Loans and (2) any prepayment of Term SOFR Loans shall be in a principal amount of the Borrowing Minimum or a whole multiple of the Borrowing Multiple in excess thereof, in each case, the entire principal amount thereof then outstanding.  Each such notice shall specify the date and amount of such prepayment and the Class(es) and Type(s) of Loans to be prepaid.  The Administrative Agent will promptly notify each Appropriate Lender of its receipt of each such notice, and of the amount of such Lender's Applicable Percentage of such prepayment.  If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.  Any prepayment of a Term SOFR Loan shall be accompanied by all accrued interest thereon, together with any additional amounts required pursuant to Section 3.04.  Each prepayment of the Loans pursuant to this Section 2.05(a) shall be applied ratably to each outstanding Class of Term Loans and shall be paid to the Appropriate Lenders in accordance with their respective Applicable Percentages.

(b)    Mandatory Prepayments.

(i)    [Reserved].

(ii)    (A) If following the Closing Date (x) the Borrower or any Subsidiary Disposes of any property or assets to any Person that is not a Loan Party (other than any Disposition of any property or assets (1) in the ordinary course of business, consistent with past practice or (2) with the consent of the Required Lenders (which consent shall not be unreasonably withheld or delayed, and may be

46

communicated via e-mail from the Lender Advisors), the Permitted German Sale Leaseback), or (y) any Casualty Event occurs, which in the aggregate results in the realization or receipt by the Borrower or such Subsidiary of Net Cash Proceeds, the Borrower shall make a prepayment, in accordance with Section 2.05(b)(ii)(C), of an aggregate principal amount of Term Loans equal to 100% (such percentage, the "Asset Percentage") of all such Net Cash Proceeds realized or received (other than any portion of such Net Cash Proceeds constituting proceeds from the Disposition of ABL Priority Collateral (as defined in the DIP Order), which shall be applied, and only to the extent applied, in accordance with the Prepetition Intercreditor Agreement to the payment or cash collateralization of the ABL Obligations (as defined in the DIP Order) until the ABL Obligations (as defined in the DIP Order) are either paid in full in cash or fully cash collateralized in the Borrowing Base Account (as defined in the DIP Order)); provided that no such prepayment shall be required pursuant to this Section 2.05(b)(ii)(A) (I) with respect to such portion of such Net Cash Proceeds in respect of Casualty Events that the Borrower shall have, on or prior to such date, given written notice to the Administrative Agent of its intent to reinvest in accordance with Section 2.05(b)(ii)(B) (which notice may only be provided if no Event of Default has occurred and is then continuing).

(B)    With respect to any Net Cash Proceeds realized or received with respect to any Casualty Event, at the option of the Borrower, the Borrower may reinvest an amount equal to all or any portion of such Net Cash Proceeds to replace assets subject to such Casualty Event) within three (3) months following receipt of such Net Cash Proceeds; provided that (i) so long as an Event of Default shall have occurred and be continuing, the Borrower shall not be permitted to make any such reinvestments and (ii) if any Net Cash Proceeds are not so reinvested by the deadline specified above, or if any such Net Cash Proceeds are no longer intended to be or cannot be so reinvested at any time after delivery of a notice of reinvestment election, 100% of such Net Cash Proceeds shall be applied, in accordance with Section 2.05(b)(ii)(C), to the prepayment of the Term Loans as set forth in this Section 2.05.

(C)    On each occasion that the Borrower must make a prepayment of the Term Loans pursuant to this Section 2.05(b)(ii), the Borrower shall, within five (5) Business Days after the date of realization or receipt of such Net Cash Proceeds, make a prepayment, in accordance with Section 2.05(b)(v) below, of the principal amount of Term Loans in an amount equal to the Asset Percentage of such Net Cash Proceeds realized or received.

(iii)    If, following the Closing Date, the Borrower or any Subsidiary incurs or issues any (A) [reserved], (B) [reserved] or (C) Indebtedness not expressly permitted to be incurred or issued pursuant to Section 7.03, the Borrower shall cause to be prepaid an aggregate principal amount of Term Loans equal to 100% of all Net Cash Proceeds received therefrom on or prior to the date which is five (5) Business Days after the receipt of such Net Cash Proceeds.

47

(iv)    Each prepayment of Term Loans pursuant to this Section 2.05(b) shall be applied, subject to the DIP Order, to the outstanding Term Loans of each Class, ratably, following the applicable prepayment event.

(v)    The Borrower shall notify the Administrative Agent in writing of any mandatory prepayment of Term Loans required to be made pursuant to clauses (ii) and (iii) of this Section 2.05(b) prior to 1:00 p.m. at least five (5) Business Days on the date of such prepayment.  Each such notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the amount of such prepayment.  The Administrative Agent will promptly notify each Appropriate Lender of the contents of the Borrower's prepayment notice and of such Appropriate Lender's Applicable Percentage of the prepayment with respect to the Term Loans.

(vi)    Notwithstanding any other provision of this Section 2.05(b), to the extent that any or all of the Net Cash Proceeds of any Disposition by a Subsidiary that is a Foreign Subsidiary otherwise giving rise to a prepayment pursuant to Section 2.05(b)(ii) (a "Restricted Disposition") or the Net Cash Proceeds of any Casualty Event of a Subsidiary that is a Foreign Subsidiary (a "Restricted Casualty Event") would be prohibited or delayed by applicable local law from being distributed or otherwise transferred to the Borrower, the Borrower shall not be required to make a prepayment at the time provided in Section 2.05(b)(ii), for so long, but only so long, as the applicable local law will not permit such distribution or transfer (the Borrower hereby agreeing to cause the applicable Subsidiary to promptly take all commercially reasonable actions available under the applicable local law to permit such repatriation), and once distribution or transfer of any of such affected Net Cash Proceeds is permitted under the applicable local law, the amount of such Net Cash Proceeds permitted to be distributed or transferred (net of additional taxes payable or reserved against as a result thereof) will be promptly (and in any event not later than two (2) Business Days after such distribution or transfer is permitted) taken into account in measuring the Borrower's obligation to repay the Term Loans pursuant to this Section 2.05(b) to the extent provided herein.

(c)    Interest, Funding Losses, Etc.  All prepayments under this Section 2.05 shall be accompanied by all accrued interest thereon, together with, in the case of any such prepayment of a Term SOFR Loan on a date other than the last day of an Interest Period therefor, any amounts owing in respect of such Term SOFR Loan pursuant to Section 3.04.

Section 2.06    Termination or Reduction of Commitments.  As of (i) the making of the New Money First Draw pursuant to Section 2.01(a)(i) on the Closing Date, the New Money First Draw Commitment of each Lender shall be automatically and permanently reduced to $0, (ii) the earlier of (x) November 1, 2024 (or such later date to which the Required Lenders shall have agreed in their sole discretion by written communication to the Administrative Agent and the Borrower, which later date may be communicated via e-mail from the Lender Advisors) and (y) the making of the New Money Second Draw pursuant to Section 2.01(a)(ii) on the New Money Second Draw Funding Date, the New Money Second Draw Commitment of each Lender shall be automatically and permanently reduced to $0 and (iii) the earlier of (x) November 8, 2024 (or such later date to

which the Required Lenders shall have agreed in their sole discretion by written communication to the Administrative Agent and the Borrower, which later date may be communicated via e-mail from the Lender Advisors) and (y) the making of the New Money Third Draw pursuant to Section 2.01(a)(iii) on the New Money Third Draw Funding Date, the New Money Third Draw Commitment of each Lender shall be automatically and permanently reduced to $0.

Section 2.07    <u>Repayment of Loans</u>.  The Borrower shall repay to the Administrative Agent for the ratable account of the Term Lenders in Dollars on the Maturity Date the aggregate principal amount of all Term Loans outstanding on such date.

Section 2.08    <u>Interest</u>.

(a)    Subject to the provisions of <u>Section 2.08(b)</u>, (i) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Rate; and (ii) each Term SOFR Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to Term SOFR for such Interest Period plus the Applicable Rate.

(b)    The Borrower shall pay interest on past due amounts under this Agreement at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.  Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand to the fullest extent permitted by and subject to applicable Laws, including in relation to any required additional agreements.

(c)    Interest on each Term Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein, and shall be paid "in kind" by capitalizing and adding such amount to the principal amount of the Term Loans then outstanding on such Interest Payment Date or such other date of payment. The amounts so capitalized and added to the principal in accordance with the immediately preceding sentence shall be treated as principal for all purposes of this Agreement and bear interest in accordance with the terms hereof from (and including) the applicable Interest Payment Date or such other date of payment, in each case on which such interest was paid "in kind".  Notwithstanding anything to the contrary herein, all accrued and unpaid interest required to be paid at maturity (whether by acceleration or otherwise) of the Term Loans shall be paid in cash in Dollars.

(d)    In connection with the use or administration of SOFR or Term SOFR, the Administrative Agent, in consultation with the Borrower and the Required Lenders, will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.  The Administrative Agent will promptly notify the Borrower and the Lenders of the effectiveness of any Conforming Changes in connection with the use or administration of SOFR or Term SOFR, as applicable.

Section 2.09    <u>Fees</u>.

(a)    The Borrower shall pay to the Agents such fees as shall have been separately agreed upon in the Agent Fee Letter in the amounts and at the times so specified.  Such fees shall

49

be fully earned when paid and shall not be refundable for any reason whatsoever (except as expressly agreed between the Borrower and the applicable Agent).

(b)

(i)        As consideration for the Lenders funding the New Money First Draw, the New Money Second Draw and the New Money Third Draw, on the Closing Date, the New Money Second Draw Funding Date or the New Money Third Draw Funding Date, as applicable, the Borrower agrees to pay to the Administrative Agent, for the ratable account of each of the Lenders, a non-refundable fee (the "Upfront Fee") equal to 5.00% of the aggregate principal amount of the New Money Loans funded by such Lenders pursuant to the New Money First Draw, the New Money Second Draw and the New Money Third Draw, as applicable, which fee shall be earned, due and payable in kind in the form of additional New Money Loans on the New Money First Draw Funding Date, the New Money Second Draw Funding Date and the New Money Third Draw Funding Date, as applicable.  The amounts so paid-in-kind in accordance with the immediately preceding sentence shall be treated as principal for all purposes of this Agreement and bear interest in accordance with the terms hereof from (and including) the applicable date on which such Upfront Fee was paid in kind.

(ii)       The Borrower agrees to pay in cash to the Administrative Agent, for the ratable account of each of the Lenders, on the Maturity Date or on any other date that the Term Loans are repaid (whether through a mandatory prepayment, voluntarily prepayment, acceleration or otherwise) a non-refundable fee equal to 2.00% of the aggregate principal amount of the Term Loans repaid on such applicable date, which fee shall be earned, due and payable on such date (the "Exit Fee").

(iii)      The Borrower shall pay the fees set forth in that certain Senior Secured Superpriority DIP Credit Agreement Fee Letter, dated as of [●], 2024 (the "Backstop Fee Letter"), by and among the Borrower and Jefferies Capital Services, LLC, as a fronting lender (a copy of which shall be provided to the Agents), in the amounts and at the times set forth therein.

(iv)      If at any time, one or more Sale Transactions which would (individually or in the aggregate) result in the sale of all or substantially all of the assets or the equity of Topco and its Subsidiaries are consummated, the Lenders with respect to the Term Commitments and New Money Loans shall receive a fee (the "Sale Premium") in an aggregate amount equal to 10.00% of the sum of (x) the aggregate amount of all the Term Commitments (prior to giving effect to the New Money First Draw) provided on the Closing Date by all Lenders in the aggregate plus (y) the aggregate principal amount of all of the Roll-Up Loans deemed funded on the Closing Date by all Lenders in the aggregate, which Sale Premium shall be earned, due and payable in cash on the date of consummation of such Sale Transaction (or in the case of multiple Sale Transactions, the last such Sale Transaction) (the "Sale Consummation Date") from the proceeds of such Sale

50

Transactions, and allocated on a pro rata basis among such Lenders holding Term Commitments and New Money Loans, in accordance with the amount of Term Commitments and principal amount of Term Loans (including both New Money Loans and Roll-Up Loans) held by such Lender and certain of such Lender's Affiliates (which Affiliates shall designated, and the pro rata calculation confirmed, to the Administrative Agent in writing (which may be by email from the Lender Advisors), upon which the Administrative Agent may rely without further investigation or inquiry) prior to the date such Sale Premium is paid) on the Sale Consummation Date.

Section 2.10    <u>Computation of Interest and Fees</u>.  All computations of interest for Base Rate Loans when the Base Rate is determined by the Prime Rate shall be made on the basis of a year of three hundred sixty-five (365) days or three hundred sixty-six (366) days, as the case may be, and actual days elapsed.  All other computations of fees and interest shall be made on the basis of a three hundred sixty (360) day year and actual days elapsed.  Interest shall accrue on each Loan for the day on which such Loan is made, and shall not accrue on such Loan, or any portion thereof, for the day on which such Loan or such portion is paid; <u>provided</u> that any such Loan that is repaid on the same day on which it is made shall, subject to <u>Section 2.12(a)</u>, bear interest for one (1) day. Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

Section 2.11    <u>Evidence of Indebtedness</u>.

(a)    The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by one or more entries in the Register. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the Register, the Register shall be conclusive in the absence of demonstrable error.  Upon the request of any Lender, the Borrower shall execute and deliver to such Lender a Term Note payable to such Lender or its registered assigns, which shall evidence such Lender's Loans in addition to such accounts or records.  Each Lender may attach schedules to its Term Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.

Section 2.12    <u>Payments Generally</u>.

(a)    All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the applicable Administrative Agent's Office and in immediately available funds not later than 2.00 p.m., New York City time, on the date specified herein.  The Administrative Agent will promptly distribute to each Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Applicable Lending Office. All payments received by the Administrative Agent after 2:00 p.m., New York City time, shall (in the sole discretion of the Administrative Agent) be deemed received on the next succeeding

Business Day and any applicable interest or fee shall continue to accrue. Unless expressly set forth herein, all payments under each Loan Document shall be made in Dollars.

(b)     If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be; provided that, if such extension would cause payment of interest on or principal of Term SOFR Loans to be made in the next succeeding calendar month, such payment shall be made on the immediately preceding Business Day.

(c)     Unless the Borrower or any Lender has notified the Administrative Agent, prior to the date any payment is required to be made by it to the Administrative Agent hereunder, that the Borrower or such Lender, as the case may be, will not make such payment, the Administrative Agent may assume that the Borrower or such Lender, as the case may be, has timely made such payment and may (but shall not be so required to), in reliance thereon, make available a corresponding amount to the Person entitled thereto. If and to the extent that such payment was not in fact made to the Administrative Agent in immediately available funds, then:

(i)     if the Borrower failed to make such payment, then the applicable Lender agrees to pay to the Administrative Agent forthwith on demand the portion of such assumed payment that was made available to such Lender in immediately available funds, together with interest thereon in respect of each day from and including the date such amount was made available by the Administrative Agent to such Lender to the date such amount is repaid to the Administrative Agent in immediately available funds at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, it being understood that nothing herein shall be deemed to relieve any Lender from its obligation to fulfill its Term Commitment or to prejudice any rights which the Administrative Agent or the Borrower may have against any Lender as a result of any default by such Lender hereunder; and

(ii)    if any Lender failed to make such payment, such Lender shall forthwith on demand pay to the Administrative Agent the amount thereof in immediately available funds, together with interest thereon for the period from the date such amount was made available by the Administrative Agent to the Borrower to the date such amount is recovered by the Administrative Agent (the "Compensation Period") at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation. When such Lender makes payment to the Administrative Agent (together with all accrued interest thereon), then such payment amount (excluding the amount of any interest which may have accrued and been paid in respect of such late payment) shall constitute such Lender's Loan included in the applicable Borrowing. If such Lender does not pay such amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent may make a demand therefor upon the Borrower, and the Borrower shall pay such amount to the Administrative Agent, together with interest thereon for the Compensation Period at the interest rate applicable to such Loan. Nothing herein

shall be deemed to relieve any Lender from its obligation to fulfill its Term Commitment or to prejudice any rights which the Administrative Agent or the Borrower may have against any Lender as a result of any default by such Lender hereunder.

A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this Section 2.12(c) shall be conclusive, absent demonstrable error.

(d)     If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrower by the Administrative Agent because the conditions to the applicable Credit Extension set forth in Article IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(e)     The obligations of the Lenders hereunder to make Loans are several and not joint.  The failure of any Lender to make any Loan or to fund any such participation on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan or purchase its participation.

(f)     Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(g)     Whenever any payment received by the Administrative Agent under this Agreement or any of the other Loan Documents is insufficient to pay in full all amounts due and payable to the Administrative Agent and the Lenders under or in respect of this Agreement and the other Loan Documents on any date, such payment shall be distributed by the Administrative Agent and applied by the Administrative Agent and the Lenders in the order of priority set forth in Section 8.04 (unless otherwise specified in the DIP Order).  If the Administrative Agent receives funds for application to the Obligations of the Loan Parties under or in respect of the Loan Documents under circumstances for which the Loan Documents or the DIP Order do not specify the manner in which such funds are to be applied, the Administrative Agent may, but shall not be obligated to, elect to distribute such funds to each of the Lenders in accordance with such Lender's Applicable Percentage of the Outstanding Amount of all Loans outstanding at such time.

Section 2.13   Sharing of Payments.  If, other than as expressly provided elsewhere herein or the DIP Order, any Lender shall obtain on account of the Term Loans made by it any payment (whether voluntary, involuntary, through the exercise of any right of setoff, or otherwise) in excess of its ratable share (or other share contemplated hereunder) thereof, such Lender shall immediately (a) notify the Administrative Agent of such fact, and (b) purchase from the other Lenders of the applicable Class such participations in the Loans made by them, as shall be necessary to cause such purchasing Lender to share the excess payment in respect of such Loans or such participations, as the case may be, pro rata with each of them; provided that (x) if all or any portion of such excess payment is thereafter recovered from the purchasing Lender under any of the circumstances described in Section 10.06 (including pursuant to any settlement entered into by the

purchasing Lender in its discretion), such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (i) the amount of such paying Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered, without further interest thereon and (y) the provisions of this Section 2.13 shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant. The Borrower agrees that any Lender so purchasing a participation from another Lender may, to the fullest extent permitted by applicable Law, exercise all its rights of payment (including the right of setoff, but subject to Section 10.09) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation. Each Lender that purchases a participation pursuant to this Section 2.13 shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.

Section 2.14    [Reserved].

Section 2.15    [Reserved].

Section 2.16    Defaulting Lenders.  Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the Term Commitment and Outstanding Amount of Term Loans of such Defaulting Lender shall not be included in determining whether all Lenders or the Required Lenders have taken or may take any action hereunder (including any consent to any amendment, waiver or other modification pursuant to Section 10.01); provided that any waiver, amendment or modification of a type described in clause (a), (b) or (c) of the first proviso in Section 10.01 that would apply to the Term Commitments or Obligations owing to such Defaulting Lender shall require the consent of such Defaulting Lender with respect to the effectiveness of such waiver, amendment or modification with respect to the Term Commitments or Obligations owing to such Defaulting Lender.

Section 2.17    [Reserved].

Section 2.18    Super Priority Nature of Obligations and Administrative Agent's Liens; Payment of Obligations.  The priority of the Collateral Agent's Liens on the Collateral, claims and other interests shall be as set forth in the DIP Order (and, for the avoidance of doubt, are subject to the Carve-Out).  Subject to the terms of the DIP Order, upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents, the Agents and the Lenders shall be entitled to immediate payment of such Obligations without application to or order of the Bankruptcy Court.

Section 2.19    Extension of Maturity Date.  The Borrower may, with the consent of the Required Lenders and by notice to the Administrative Agent not later than the date that is five (5) Business Days prior to the then-existing date set forth in clause (i) of the definition of Maturity

54

Date, elect to extend such date to the date that is 30 days after such then-existing date (the "Extended Maturity Date") (provided that if such day is not a Business Day, the Extended Maturity Date shall be the Business Day immediately preceding such day).

(a)     Upon such election (the "Extension Effective Date"), subject to the satisfaction (or waiver by the Required Lenders) of each of the following conditions, the date set forth in clause (i) of the definition of Maturity Date shall be extended to the Extended Maturity Date:

(i)     The Borrower shall pay to the Administrative Agent, for the account of each Lender, a consent fee equal to 2.50% of the aggregate principal amount of the Loans held by such Lender on the Extension Effective Date, with such fee payable in kind in additional amounts of Loans of the same Class; and

(ii)     On and as of the Extension Effective Date, no Default or Event of Default shall have occurred and be continuing.

(b)     Notwithstanding anything to the contrary in this Section 2.19, the Borrower may extend the date set forth in clause (i) of the definition of Maturity Date no more than once pursuant to this Section 2.19.

## ARTICLE III

## TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

Section 3.01    Taxes.

(a)     Except as provided in this Section 3.01, any and all payments by the Borrower or any Guarantor to or for the account of any Agent or any Lender under any Loan Document shall be made free and clear of and without deduction for any Taxes unless required by applicable Law.  If any applicable withholding agent shall be required by any Laws to deduct any Taxes from or in respect of any sum payable under any Loan Document to any Agent or any Lender, (i) if such Taxes are Indemnified Taxes, the sum payable by the Borrower or applicable Guarantor shall be increased as necessary so that after all required deductions have been made (including deductions applicable to additional sums payable under this Section 3.01), each of such Agent and such Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) such applicable withholding agent shall make such deductions, (iii) such applicable withholding agent shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable Laws, and (iv) within thirty (30) days after the date of such payment by such applicable withholding agent (or, if receipts or evidence are not available within thirty (30) days, as soon as possible thereafter), such applicable withholding agent shall furnish to the Borrower and such Agent or Lender (as the case may be) the original or a facsimile copy of a receipt evidencing payment thereof to the extent such a receipt is issued therefor, or other written proof of payment thereof that is reasonably satisfactory to the Administrative Agent.

(b)     In addition, without duplication of any amounts payable pursuant to Section 3.01(a), the Borrower agrees to pay all Other Taxes in accordance with applicable Law.

(c)     Without duplication of any amounts payable pursuant to Section 3.01(a) or Section 3.01(b), the Borrower agrees to indemnify each Agent and each Lender for (i) the full amount of Indemnified Taxes (including any Indemnified Taxes imposed or asserted by any jurisdiction in respect of amounts payable under this Section 3.01) payable by such Agent and such Lender and (ii) any reasonable expenses arising therefrom or with respect thereto, in each case whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.   Such Agent or Lender, as the case may be, will, at the Borrower's request, (A) provide the Borrower with a written statement thereof setting forth in reasonable detail the basis and calculation of such amounts or (B) have the amount of such Indemnified Taxes verified by an independent accountant selected by such Agent or Lender. Payment under this Section 3.01(c) shall be made within ten (10) days after the date such Lender or such Agent makes a demand therefor.

(d)     If any Lender or Agent determines, in its good faith, that it has received a refund in respect of any Taxes as to which indemnification or additional amounts have been paid to it by the Borrower or any Guarantor pursuant to this Section 3.01, it shall promptly remit an amount equal to such refund as soon as practicable (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower or any Guarantor under this Section 3.01 with respect to the Taxes giving rise to such refund plus any interest included in such refund by the relevant taxing authority attributable thereto) to the Borrower, net of all reasonable out-of-pocket expenses (including any Taxes) of the Lender or Agent, as the case may be and without interest (other than any interest paid by the relevant taxing authority with respect to such refund); provided that the Borrower, upon the request of the Lender or Agent, as the case may be, agrees promptly to return an amount equal to such refund (plus any applicable interest, additions to tax or penalties) to such party in the event such party is required to repay such refund to the relevant taxing authority.  Such Lender or Agent, as the case may be, shall, at the Borrower's request, provide the Borrower with a copy of any notice of assessment or other evidence of the requirement to repay such refund received from the relevant taxing authority (provided that such Lender or Agent may delete any information therein that such Lender or Agent deems confidential).  Notwithstanding anything to the contrary in this paragraph, in no event will any Lender or Agent be required to pay any amount to the relevant Loan Party pursuant to this paragraph the payment of which would place such Lender or Agent in a less favorable net after-Tax position than such Lender or Agent would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  Nothing herein contained shall interfere with the right of a Lender or Agent to arrange its Tax affairs in whatever manner it thinks fit nor oblige any Lender or Agent to claim any Tax refund or to make available its Tax returns or disclose any information relating to its Tax affairs or any computations in respect thereof or require any Lender or Agent to do anything that would prejudice its ability to benefit from any other refunds, credits, reliefs, remissions or repayments to which it may be entitled.

(e)     Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 3.01(a) or (c) with respect to such Lender it will, if requested by the Borrower, use commercially reasonable efforts (subject to legal and regulatory restrictions), at Borrower's expense, to designate another Applicable Lending Office for any Loan affected by such event; provided that such efforts are made on terms that, in the judgment of such Lender, cause such Lender and its Applicable Lending Office(s) to suffer no material economic, legal or regulatory

disadvantage, and provided further that nothing in this Section 3.01(e) shall affect or postpone any of the Obligations of the Borrower or the rights of such Lender pursuant to Section 3.01(a) or (c).

(f)     Each Lender shall, at such times as are reasonably requested by the Borrower or the Administrative Agent, provide the Borrower and the Administrative Agent with any documentation prescribed by law, or reasonably requested by the Borrower or the Administrative Agent, certifying as to any entitlement of such Lender to an exemption from, or reduction in, any withholding Tax with respect to any payments to be made to such Lender under any Loan Document.  Each such Lender shall, whenever a lapse in time or change in circumstances renders such documentation (including any documentation specifically referenced below) expired, obsolete or inaccurate in any material respect, deliver promptly to the Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the applicable withholding agent) or promptly notify the Borrower and the Administrative Agent in writing of its inability to do so.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 3.01(f)(i), (ii), and (iii)) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

Without limiting the generality of the foregoing:

(i)     Each Lender that is a "United States person" (as defined in Section 7701(a)(30) of the Code) shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement two properly completed and duly signed original copies of Internal Revenue Service Form W-9 (or any successor form) certifying that such Lender is exempt from U.S. federal backup withholding;

(ii)     Each Lender that is not a "United States person" (as defined in Section 7701(a)(30) of the Code) shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter when required by law or upon the reasonable request of the Borrower or the Administrative Agent) whichever of the following is applicable:

(A)     two duly completed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable (or any successor forms) claiming eligibility for benefits of an income tax treaty to which the United States is a party,

(B)     two duly completed copies of Internal Revenue Service Form W-8ECI (or any successor forms),

(C)     in the case of a Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) or the Code, (x) a certificate, in substantially the form of Exhibit L (any such certificate a

"United States Tax Compliance Certificate"), or any other form approved by the Administrative Agent, to the effect that such Lender is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code or (C) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and (y) two duly completed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable (or any successor forms),

(D)    to the extent a Lender is not the beneficial owner (for example, where the Lender is a partnership, or is a Lender that has granted a participation), Internal Revenue Service Form W-8IMY (or any successor forms) of the Lender, accompanied by a Form W-8ECI, W-8BEN or W-8BEN-E, as applicable (or any successor forms), United States Tax Compliance Certificate, Form W-9, Form W-8IMY (or other successor forms) or any other required information from each beneficial owner, as applicable (provided that, if the Lender is a partnership (and not a participating Lender) and one or more direct or indirect partners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate may be provided by such Lender on behalf of such direct or indirect partner(s)), or

(E)    two duly completed copies of any other form prescribed by applicable U.S. federal income tax laws (including the Treasury Regulations) as a basis for claiming a complete exemption from, or a reduction in, U.S. federal withholding tax on any payments to such Lender under the Loan Documents, together with such supplementary documentation as may be prescribed by applicable Law.

(iii)    If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Sections 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their FATCA obligations, to determine whether such Lender has or has not complied with such Lender's FATCA obligations and to determine the amount, if any, to deduct and withhold from such payment.

Notwithstanding any other provision of this clause (f), a Lender shall not be required to deliver any form that such Lender is not legally eligible to deliver.

(g)    The Administrative Agent shall provide the Borrower with two duly completed original copies of, if it is a United States person (as defined in Section 7701(a)(30) of the Code), Internal Revenue Service Form W-9 certifying that it is exempt from U.S. federal backup withholding, and, if it is not a United States person, (1) Internal Revenue Service Form W-8ECI with respect to payments to be received by it as a beneficial owner and (2) Internal Revenue Service Form W-8IMY (together with required accompanying documentation) with respect to payments to be received by it on behalf of the Lenders, and shall update such forms periodically upon the reasonable request of the Borrower. The Administrative Agent shall also, at the time or times prescribed by law and at such time or times reasonably requested by the Borrower, provide the Borrower such documentation as prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower as may be necessary for the Borrower to comply with its FATCA obligations, to determine whether the Administrative Agent has or has not complied with its FATCA obligations, and to determine the amount, if any, to deduct and withhold from a payment to the Administrative Agent. Notwithstanding any other provision of this clause (g), the Administrative Agent shall not be required to deliver any form that such Administrative Agent is not legally eligible to deliver.

Section 3.02    Inability to Determine Rates.  If the Administrative Agent or the Required Lenders determine that for any reason adequate and reasonable means do not exist for determining the Term SOFR for any requested Interest Period with respect to a proposed Term SOFR Loan denominated in any currency, or the Required Lenders (excluding for all purposes of this Section 3.02 only, the portion of the Total Outstandings and unused Term Commitments that are not available for Loans in such currency) determine that the Term SOFR for any currency requested Interest Period with respect to such proposed Term SOFR Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, or that deposits in the currency of such Term SOFR Loan are not being offered to banks in the applicable interbank market for the applicable amount and the Interest Period of such Term SOFR Loan, the Administrative Agent will promptly so notify the Borrower and each Lender.  Thereafter, the obligation of the Lenders to make or maintain Term SOFR Loans in such currency shall be suspended until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Term SOFR Loans or, failing that, in the case of Loans denominated in Dollars, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount specified therein.

Section 3.03    Increased Cost and Reduced Return; Capital Adequacy.

(a)    If any Lender determines that as a result of any Change in Law, or such Lender's compliance therewith, there shall be any increase in the cost to such Lender of agreeing to make or making, funding or maintaining any Loan, or a reduction in the amount received or receivable by such Lender in connection with any of the foregoing (excluding for purposes of this Section 3.03(a) any such increased costs or reduction in amount resulting from (i) Indemnified Taxes or Other Taxes indemnifiable under Section 3.01 and (ii) Excluded Taxes), then from time to time within fifteen (15) days after demand by such Lender setting forth in reasonable detail such increased costs (with a copy of such demand to the Administrative Agent given in accordance with Section 3.05), the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such increased cost or reduction.

(b)    If any Lender determines that as a result of any Change in Law regarding capital adequacy or any change therein or in the interpretation thereof, in each case after the date hereof, or compliance by such Lender (or its Applicable Lending Office) therewith, has the effect of reducing the rate of return on the capital of such Lender or any corporation controlling such Lender as a consequence of such Lender's obligations hereunder (taking into consideration its policies with respect to capital adequacy and such Lender's desired return on capital), then from time to time upon demand of such Lender setting forth in reasonable detail the charge and the calculation of such reduced rate of return (with a copy of such demand to the Administrative Agent given in accordance with Section 3.05), the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such reduction within fifteen (15) days after receipt of such demand.

(c)    [Reserved].

(d)    Subject to Section 3.05(b), failure or delay on the part of any Lender to demand compensation pursuant to this Section 3.03 shall not constitute a waiver of such Lender's right to demand such compensation.

(e)    If any Lender requests compensation under this Section 3.03 then such Lender will, if requested by the Borrower, use commercially reasonable efforts to designate another Applicable Lending Office for any Loan affected by such event; provided that such efforts are made on terms that, in the reasonable judgment of such Lender, cause such Lender and its Applicable Lending Office(s) to suffer no material economic, legal or regulatory disadvantage; and provided, further, that nothing in this Section 3.03(e) shall affect or postpone any of the Obligations of the Borrower or the rights of such Lender pursuant to Section 3.03(a), (b) or (d).

Section 3.04    Funding Losses.    Upon demand of any Lender (with a copy to the Administrative Agent) from time to time, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)    any continuation, conversion, payment or prepayment of any Term SOFR Loan on a day other than the last day of the Interest Period for such Loan; or

(b)    any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan (other than a Base Rate Loan) on the date or in the amount notified by the Borrower;

including any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained.

Section 3.05    Matters Applicable to All Requests for Compensation.

(a)    Any Agent or any Lender claiming compensation under this Article III shall deliver a certificate to the Borrower setting forth the additional amount or amounts to be paid to it hereunder which shall be conclusive in the absence of demonstrable error.  In determining such amount, such Agent or such Lender may use any reasonable averaging and attribution methods.

(b)     With respect to any Lender's claim for compensation under Section 3.01, Section 3.02, Section 3.03 or Section 3.04, the Borrower shall not be required to compensate such Lender for any amount incurred more than one hundred and eighty (180) days prior to the date that such Lender notifies the Borrower of the event that gives rise to such claim; provided that, if the circumstance giving rise to such claim is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof.  If any Lender requests compensation by the Borrower under Section 3.03, the Borrower may, by notice to such Lender (with a copy to the Administrative Agent), suspend the obligation of such Lender to make or continue Term SOFR Loans from one Interest Period to another, or to convert Base Rate Loans into Term SOFR Loans, as applicable, until the event or condition giving rise to such request ceases to be in effect (in which case the provisions of Section 3.05(c) shall be applicable); provided that such suspension shall not affect the right of such Lender to receive the compensation so requested.

(c)     If the obligation of any Lender to make or continue any Term SOFR Loan from one Interest Period to another, or to convert Base Rate Loans into Term SOFR Loans, as applicable, shall be suspended pursuant to Section 3.05(b) hereof, such Lender's Term SOFR Loans denominated in Dollars shall be automatically converted into Base Rate Loans on the last day(s) of the then current Interest Period(s) for such Term SOFR Loans (or, in the case of an immediate conversion required by Section 3.02, on such earlier date as required by Law) and, unless and until such Lender gives notice as provided below that the circumstances specified in Section 3.01, Section 3.02, Section 3.03 or Section 3.04 hereof that gave rise to such conversion no longer exist:

(i)     to the extent that such Lender's Term SOFR Loans denominated in Dollars have been so converted, all payments and prepayments of principal that would otherwise be applied to such Lender's Term SOFR Loans shall be applied instead to its Base Rate Loans; and

(ii)     all Loans denominated in Dollars that would otherwise be made or continued from one Interest Period to another by such Lender as Term SOFR Loans shall be made or continued instead as Base Rate Loans, and all Base Rate Loans of such Lender that would otherwise be converted into Term SOFR Loans, as applicable, shall remain as Base Rate Loans.

(d)     If any Lender gives notice to the Borrower (with a copy to the Administrative Agent) that the circumstances specified in Section 3.01, Section 3.02, Section 3.03 or Section 3.04 hereof that gave rise to the conversion of such Lender's Term SOFR Loans denominated in Dollars pursuant to this Section 3.05 no longer exist (which such Lender agrees to do promptly upon such circumstances ceasing to exist) at a time when Term SOFR Loans made by other Lenders are outstanding, such Lender's Base Rate Loans shall be automatically converted to Term SOFR Loans, as applicable, on the first day(s) of the next succeeding Interest Period(s) for such outstanding Term SOFR Loans, to the extent necessary so that, after giving effect thereto, all Loans held by the Lenders holding Term SOFR Loans, as applicable, and by such Lender are held pro rata (as to principal amounts, interest rate basis, and Interest Periods) in accordance with their respective Term Commitments.

Section 3.06    [Reserved].

Section 3.07    Illegality.  If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its Applicable Lending Office to perform any of its obligations hereunder or make, maintain or fund or charge interest with respect to any Credit Extension or to determine or charge interest rates based upon Term SOFR, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, (i) any obligation of such Lender to issue, make, maintain, fund or charge interest with respect to any such Credit Extension or continue Term SOFR Loans or to convert Base Rate Loans to Term SOFR Loans, as applicable, shall be suspended, and (ii) if such notice asserts the illegality of such Lender making or maintaining Base Rate Loans the interest rate on which is determined by reference to the Term SOFR component, as applicable, of the Base Rate, the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Term SOFR component, as applicable, of the Base Rate, in each case until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, (x) the Borrower shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all Term SOFR Loans of such Lender to Base Rate Loans (the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Term SOFR component, as applicable, of the Base Rate), either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Term SOFR Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such Term SOFR Loans and (y) if such notice asserts the illegality of such Lender determining or charging interest rates based upon the Term SOFR, as applicable, the Administrative Agent shall during the period of such suspension compute the Base Rate applicable to such Lender without reference to the Term SOFR component as applicable, thereof until the Administrative Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon the Term SOFR, as applicable.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

Section 3.08    Survival.  Each party's obligations under this Article III shall survive termination of the Aggregate Commitments and repayment of all other Obligations hereunder and any assignment of rights by or replacement of a Lender.

Section 3.09    Benchmark Replacement Setting.

(a)    Benchmark Replacement.  Notwithstanding anything to the contrary herein or in any other Loan Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior to any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (a) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document and (y) if a Benchmark Replacement is determined in accordance with clause (b) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark

Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders. If the Benchmark Replacement is Daily Simple SOFR, all interest payments will be payable on a monthly basis.

(b)      Benchmark Replacement Conforming Changes.  In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Conforming Changes, in consultation with the Borrower and the Required Lenders, from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(c)      Notices; Standards for Decisions and Determinations. The Administrative Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Benchmark Replacement Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement.  The Administrative Agent will promptly notify the Borrower of (x) the removal or reinstatement of any tenor of a Benchmark pursuant to Section 3.09(d) and (y) the commencement of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 3.09, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 3.09.

(d)      Unavailability of Tenor of Benchmark. Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the administrator of such Benchmark or the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous

definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e)     Benchmark Unavailability Period. Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any request for a Term SOFR Loan of, conversion to or continuation of Term SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans. During any Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of Base Rate.

ARTICLE IV

CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

Section 4.01    Conditions to Closing Date.   The obligation of each Lender to make its initial Credit Extension hereunder (or to be deemed to have made Roll-Up Loans) is subject to satisfaction of the following conditions precedent (or waiver thereof in accordance with Section 10.01):

(a)     The Administrative Agent's receipt of the following, each of which shall be originals or facsimiles (followed promptly by originals, if requested) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party, each in form and substance reasonably satisfactory to the Agents, the Required Lenders, and their respective legal counsel:

(i)     executed counterparts of this Agreement, the Guaranty and the Security Agreement from each of the parties listed on the signature pages hereto and thereto;

(ii)     a Term Note executed by the Borrower in favor of each Lender that has requested a Term Note at least five (5) Business Days in advance of the Closing Date;

(iii)     such certificates, copies of Organization Documents of the Loan Parties, resolutions or other action and incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Administrative Agent or the Required Lenders may reasonably require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party on the Closing Date;

(iv)     a certificate signed by a Responsible Officer of the Borrower certifying that the conditions set forth in clauses (g), (h), (i), (j) and (k) below are satisfied;

64

(v)    a Committed Loan Notice relating to the Credit Extension to be made on the Closing Date;

(vi)    if available in the relevant jurisdiction, good standing certificates and bring down telegrams or facsimiles, for each Loan Party; and

(vii)    the executed Canadian Intercompany Supply Agreement, Canadian Intercompany Loan Agreement and Canadian Demand Note (together with executed and undated powers or endorsements therefor).

(b)    All fees and expenses required to be paid hereunder or pursuant to the Agent Fee Letter, the Backstop Fee Letter or the fee letter between the Borrower and Jefferies Capital Services, LLC, as fronting lender, of (i) the Agents (including fees and expenses of Ropes & Gray LLP, as counsel to the Agents), (ii) the Lenders (including fees and expenses of Weil, Gotshal & Manges LLP, as counsel to the Lenders, Goodmans LLP, as Canadian counsel to the Lenders, and Lazard, as financial advisors to the Lenders) and (iii) Jefferies Capital Services, LLC, as fronting lender (including fees and expenses of Mandel, Katz & Brosnan LLP, as counsel to Jefferies Capital Services, LLC, as fronting lender), in each case, with respect to expenses, to the extent invoiced at least one (1) Business Day prior to the Closing Date shall have been paid in full in cash or will be paid on the Closing Date.

(c)    The Administrative Agent and the Lenders shall have received (i) the 13-Week Cash Flow, as agreed with the Required Lenders (the "Initial 13-Week Cash Flow") and (ii) the CCAA Cash Flow (in form and substance acceptable to the Required Lenders).

(d)    The Administrative Agent and the Lenders shall have received at least three (3) Business Days prior to the Closing Date all documentation and other information about the Borrower and the Guarantors as has been reasonably requested in writing at least five (5) Business Days prior to the Closing Date by the Administrative Agent that they reasonably determine is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT Act and, to the extent the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, a duly executed Beneficial Ownership Certification, in each case, to the extent requested at least five (5) Business Days prior to the anticipated Closing Date.

(e)    (i) The Bankruptcy Court shall have entered the Interim Order, no later than three (3) days after the Petition Date, which order shall be in form and substance satisfactory to the Required Lenders (which satisfaction may be communicated via an email from the Lender Advisors) (and with respect to any provisions that affect the rights or duties of the Agents, to the Agents), be in full force and effect, and shall not have been reversed, modified, amended, stayed or vacated absent prior written consent of the Required Lenders (which consent may be communicated via an email from each of the Lender Advisors, as applicable) (and with respect to any provisions that affect the rights or duties of the Agents, to the Agents); (ii) the Lenders shall have received drafts of the "first day" pleadings for the Chapter 11 Cases, in each case, in form and substance reasonably satisfactory to the Required Lenders (which satisfaction may be communicated via an email from the Lender Advisors), not later than a reasonable time in advance of the Petition Date for the Lenders' counsel to review and analyze the same; (iii) all motions,

65

orders (including the "first day" orders) and other documents to be filed with or submitted to the Bankruptcy Court on the Petition Date shall be in form and substance reasonably satisfactory to the Required Lenders (which satisfaction may be communicated via an email from the Lender Advisors); and (iv) all "first day" orders shall have been approved and entered by the Bankruptcy Court except as otherwise reasonably agreed by the Required Lenders (which agreement may be communicated via an email from each of the Lender Advisors).

(f)     The Prepetition Agents and the Prepetition Lenders shall have each consented to the use of collateral or received adequate protection (if applicable) in respect of the liens securing their respective obligations pursuant to the Interim Order.

(g)     The representations and warranties of the Borrower and each other Loan Party contained in Article V or any other Loan Document shall be true and correct in all material respects on and as of the Closing Date; provided that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; provided, further, that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

(h)     As of the Closing Date, no Event of Default or Default shall have occurred and be continuing.

(i)     After due inquiry, each Loan Party is unaware of any fraudulent activities in connection with its business.

(j)     There shall exist no unstayed action, suit, investigation, litigation or proceeding pending or (to the knowledge of the Loan Parties) threatened in any court or before any arbitrator or governmental instrumentality (other than the Chapter 11 Cases) that would reasonably be expected to have a Material Adverse Effect.

(k)     All third party consents and approvals (including from any Governmental Authority and/or the Bankruptcy Court) necessary in connection with the Facility and the transactions contemplated hereby shall have been obtained.

(l)     The Prepetition ABL Forbearance shall be effective and binding in accordance with its terms.

(m)     The DIP Funds Account shall have been opened and the details thereof have been notified to the Administrative Agent and the Lenders.

For purposes of determining whether the Closing Date has occurred, each Lender that has executed this Agreement shall be deemed to have consented to, approved or accepted, or to be satisfied with, each document or other matter required hereunder to be consented to or approved by or acceptable or satisfactory to the Administrative Agent or such Lender, as the case may be, unless such Lender has notified the Administrative Agent of any disagreement prior to the Closing Date.

Section 4.02    Conditions Precedent to each Credit Extension.   The obligation of each Lender to make any Credit Extension after the Closing Date (including to extend the New Money Second Draw and/or the New Money Third Draw) is subject to the satisfaction of the following conditions precedent (or waiver thereof in accordance with Section 10.01):

(a)    With respect to the New Money Third Draw, (x) the Bankruptcy Court shall have entered the Final Order, it shall be in full force and effect and it shall not have been vacated, stayed, reversed, modified or amended, in whole or in any part, without the Required Lenders' written consent (which consent may be communicated via an email from the Lender Advisors) (and with respect to any provisions that affect the rights or duties of the Agents, the Agents' consent) and (y) all other "second day" orders shall have been entered in form and substance acceptable to the Required Lenders.

(b)    The Administrative Agent (for distribution to the Lenders) shall have received a Committed Loan Notice relating to the applicable Credit Extension.

(c)    All fees and expenses required to be paid hereunder or pursuant to the Agent Fee Letter, the Backstop Fee Letter or the fee letter between the Borrower and Jefferies Capital Services, LLC, as fronting lender, of (i) the Agents (including fees and expenses of Ropes & Gray LLP, as counsel to the Agents), (ii) the Lenders (including fees and expenses of Weil, Gotshal & Manges LLP, as counsel to the Lenders, Goodmans LLP, as Canadian counsel to the Lenders, and Lazard, as financial advisors to the Lenders) and (iii) Jefferies Capital Services, LLC, as fronting lender (including fees and expenses of Mandel, Katz & Brosnan LLP, as counsel to Jefferies Capital Services, LLC, as fronting lender), in each case, with respect to expenses, to the extent invoiced at least one (1) Business Day prior to the date of such Credit Extension shall have been paid in full in cash or will be paid on the date of such Credit Extension.

(d)    The Loan Parties shall be in compliance with (x) the Approved 13-Week Cash Flow in all respects and the proceeds of the Loans shall be used as set forth in the 13-Week Cash Flow (in each case, subject to the Permitted Variances) and (y) the DIP Milestones.

(e)    The representations and warranties of the Borrower and each other Loan Party contained in Article V or any other Loan Document shall be true and correct in all material respects on and as of the date of the applicable Credit Extension; provided that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; provided, further, that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

(f)    As of the date of the applicable Credit Extension, no Event of Default or Default shall have occurred and be continuing on such date.

(g)    No motion, pleading or application seeking relief affecting the provision of the financing contemplated hereunder in a manner that is adverse to the Agents and the Lenders, in their capacities as such, shall have been filed in the Bankruptcy Court by any Loan Party without

the prior written consent of the Required Lenders (and with respect to any provisions that affect the rights or duties of the Agents, the prior written consent of the Agents).

(h)    After due inquiry, each Loan Party is unaware of any fraudulent activities in connection with its business.

(i)    There shall exist no unstayed action, suit, investigation, litigation or proceeding pending (or to the knowledge of the Loan Parties) threatened in any court or before any arbitrator or governmental instrumentality (other than the Chapter 11 Cases or the CCAA Case) that would reasonably be expected to have a Material Adverse Effect.

(j)    All third party consents and approvals (including from any Governmental Authority and/or the Bankruptcy Court) necessary in connection with the Facility and the transactions contemplated hereby shall have been obtained.

(k)    The Prepetition ABL Forbearance shall be effective and binding in accordance with its terms.

ARTICLE V

REPRESENTATIONS AND WARRANTIES

Each of Topco, Midco, Holdings and the Borrower represents and warrants to the Agents and the Lenders on the Closing Date and on the date of each subsequent Credit Extension that:

Section 5.01    Existence, Qualification and Power; Compliance with Laws.  Each Loan Party and each other Subsidiary (a) is a Person duly incorporated, organized or formed, and validly existing and, where applicable, in good standing under the Laws of the jurisdiction of its incorporation or organization, (b) has all requisite power and authority to (i) subject to any restriction arising on account of Topco's, Midco's, Holdings', the Borrower's or any Subsidiary's status as a "debtor" under the Bankruptcy Code, own or lease its assets and carry on its business and (ii) subject to the entry of the DIP Order and the terms thereof, execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) subject to any restriction arising on account of Topco's, Midco's, Holdings', the Borrower's or any Subsidiary's status as a "debtor" under the Bankruptcy Code, is duly qualified and, where applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, (d) is in compliance with all Laws (including the USA PATRIOT Act and anti-money laundering laws), orders, writs, injunctions and orders and (e) subject to the entry of the DIP Order and the terms thereof, has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted; except in each case referred to in clause (a), (b)(i), (c), (d) or (e), to the extent that failure to do so could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.02    Authorization; No Contravention.  Subject to the entry of the DIP Order and the terms thereof, the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party, and the consummation of the Transaction, (a) have been duly authorized by all necessary corporate or other organizational action and (b) do not and

will not (i) contravene the terms of any of such Person's Organization Documents, (ii) conflict with or result in any breach or contravention of, or require any payment to be made under (A) any Contractual Obligation exceeding the Threshold Amount to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (B) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject, (iii) result in the creation of any Lien (other than under the Loan Documents and Liens subject to the DIP Order) or (iv) violate any material Law; except (in the case of clauses (b)(ii) and (b)(iv)), to the extent that such conflict, breach, contravention, payment or violation could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.03    Governmental Authorization; Other Consents.    No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (a) the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, or for the consummation of the Transaction, (b) the grant by any Loan Party of the Liens granted by it pursuant to the Loan Documents, (c) the perfection or maintenance of the Liens created under the Loan Documents (including the priority thereof) or (d) the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Loan Documents, except for (i) the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect, (ii) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect and (iii) the entry of the DIP Order.

Section 5.04    Binding Effect.    Subject to the DIP Order and the terms thereof, this Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is party thereto.  Subject to the DIP Order and the terms thereof, this Agreement and each other Loan Document constitutes a legal, valid and binding obligation of each Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity.

Section 5.05    Financial Statements; No Material Adverse Effect.

(a)    The Audited Financial Statements and Unaudited Financial Statements fairly present in all material respects the consolidated financial condition of the Borrower, as of the dates thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the periods covered thereby, except as otherwise disclosed to the Administrative Agent prior to the Closing Date.

(b)    Since December 31, 2023, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

Each Lender and the Administrative Agent hereby acknowledges and agrees that Topco and its Subsidiaries may be required to restate historical financial statements as the result

of the implementation of changes in GAAP, or the respective interpretation thereof, and that such restatements will not result in a Default or Event of Default under the Loan Documents.

Section 5.06   Litigation.  Except as set forth on Schedule 5.06 and the Chapter 11 Cases, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower, threatened in writing or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against Topco, Midco, Holdings, the Borrower or any Subsidiary or against any of their properties or revenues that either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 5.07   Ownership of Property; Liens.  Each Loan Party and each of its Subsidiaries has good and valid title to, or valid leasehold interests in, or easements or other limited property interests in, all property necessary in the ordinary conduct of its business, free and clear of all Liens except for minor defects in title that do not materially interfere with its ability to conduct its business or to utilize such assets for their intended purposes, Permitted Liens and any Liens and privileges arising mandatorily by Law and, in each case, except where the failure to have such title or other interest could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.08   Environmental Matters.  Except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:

(a)      there are no pending or, to the knowledge of the Borrower, threatened claims, actions, suits, notices of violation, notices of potential responsibility, disputes or proceedings related to any Loan Party or any of their Subsidiaries alleging potential Environmental Liability or violation of, or otherwise relating to, any Environmental Law;

(b)      (i) there is no asbestos or asbestos-containing material on any property currently owned, leased or operated by any Loan Party or any of their Subsidiaries; and (ii) there has been no Release of Hazardous Materials at, on, under or from any location in a manner which would reasonably be expected to give rise to an Environmental Liability;

(c)      neither any Loan Party nor any of their Subsidiaries is undertaking, or has completed, either individually or together with other persons, any investigation or response action relating to any actual or threatened Release of Hazardous Materials at any location, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law;

(d)      all Hazardous Materials transported from any property currently or, to the knowledge of the Borrower or its Subsidiaries, formerly owned, leased or operated by any Loan Party or any of their Subsidiaries for off-site disposal have been disposed of in compliance with all Environmental Laws;

(e)      none of the Loan Parties nor any of their Subsidiaries has contractually assumed or is subject to any Environmental Liability; and

(f)      the Loan Parties and each of their Subsidiaries and their respective businesses, operations and properties are and have been in compliance with all Environmental

Laws and all permits, approvals and authorizations required by Environmental Laws, which compliance includes obtaining and maintaining such permits, approvals and authorizations.

Section 5.09    Taxes.  The Borrower and each Subsidiary have timely filed all federal, state, and other Tax returns and reports required to be filed, and have timely paid all federal, state, non-U.S. and other Taxes levied or imposed upon them or their properties, income or assets otherwise due and payable, except (i) those permitted to not be so filed or paid pursuant to an order of the Bankruptcy Court or pursuant to the Bankruptcy Code or for which payment is not otherwise authorized by the Bankruptcy Court, (ii) those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP and (iii) for failures to file or pay as could not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect. There are no Tax audits, deficiencies, assessments or other claims with respect to the Borrower or any Subsidiary that could, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

Section 5.10    Compliance with ERISA.

(a)    Except as could not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance with the applicable provisions of ERISA, the Code and other federal, state or local Laws and applicable foreign Laws, respectively.

(b)    (i) No ERISA Event or similar event with respect to a Foreign Plan is reasonably expected to occur; (ii) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 *et seq.* or 4243 of ERISA with respect to a Multiemployer Plan; and (iii) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA, except, with respect to each of the foregoing clauses of this Section 5.10, as could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

Section 5.11    Subsidiaries; Equity Interests.  As of the Closing Date, neither the Borrower nor any other Loan Party has any Subsidiaries other than those specifically disclosed in Schedule 5.11, and all of the outstanding Equity Interests in the Borrower and its Subsidiaries have been validly issued, are fully paid and, in the case of Equity Interests representing corporate interests, nonassessable and, on the Closing Date, all Equity Interests owned directly or indirectly by Topco or any other Loan Party are owned free and clear of all Liens except (i)  those created under the Collateral Documents and the DIP Order, (ii) those Liens permitted under Section 7.01(b) and (iii) any nonconsensual Lien that is permitted under Section 7.01.  As of the Closing Date, Schedule 5.11 (a) sets forth the name and jurisdiction of organization or incorporation of each Subsidiary, (b) sets forth the ownership interest of Topco, Midco, Holdings, the Borrower and any of their Subsidiaries in each of their Subsidiaries, including the percentage of such ownership and (c) identifies each Person the Equity Interests of which are pledged on the Closing Date.

Section 5.12    Margin Regulations; Investment Company Act.

(a)     No Loan Party is engaged nor will it engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock, and no proceeds of any Borrowings will be used for any purpose that violates Regulation U or Regulation X of the FRB.

(b)     None of Topco, Midco, Holdings, the Borrower, any Person Controlling Topco, Midco, Holdings, the Borrower or any Subsidiary is an "investment company" required to be registered as such under the Investment Company Act of 1940, as amended.

Section 5.13   Disclosure.   No report, financial statement, certificate or other written information furnished by or on behalf of any Loan Party to any Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or any other Loan Document (as modified or supplemented by other information so furnished) when taken as a whole contains when furnished any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (giving effect to all supplements and updates thereto); provided that, with respect to projected financial information, Topco, Midco, Holdings and the Borrower represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time of preparation; it being understood that (i) such projections are as to future events and are not to be viewed as facts and are subject to significant uncertainties and contingencies, many of which are beyond the control of the Loan Parties, (ii) no assurance can be given that any particular projections will be realized and that actual results during the period or periods covered by any such projections may differ significantly from the projected results and (iii) such differences may be material.

Section 5.14   Intellectual Property; Licenses, Etc.   Each of the Loan Parties and the other Subsidiaries own, license or possess the right to use, all of the trademarks, service marks, trade names, domain names, copyrights, patents, patent rights, technology, software, know-how database rights, design rights and other intellectual property rights (collectively, "IP Rights") that are used in or reasonably necessary for the operation of their respective businesses as currently conducted, and, to the knowledge of the Borrower, without violation of the rights of any Person, except to the extent such failures or violations, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.   No claim or litigation regarding any such IP Rights is pending or, to the knowledge of the Borrower, threatened against any Loan Party or Subsidiary, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 5.15   [Reserved].

Section 5.16   Security Interest.

(a)     Subject to the entry thereof, the DIP Order is effective to create in favor of the Collateral Agent for the benefit of the Secured Parties legal, valid and enforceable Liens on and security interests in, the Collateral described therein and to the extent intended to be created thereby, which security interest and Lien shall be valid and automatically perfected as of the Closing Date by entry of the DIP Order with respect to each Loan Party and which shall constitute

a continuing security interest and Lien on the Collateral having priority over all other security interests and Liens on the Collateral and securing all the Obligations, other than as set forth in the DIP Order.  The Collateral Agent and Lenders shall not be required to file or record any financing statements, mortgages, notices of Lien or similar instruments, in any jurisdiction or filing office or to take any other action in order to validate, perfect or establish the priority of the security interest and Lien granted pursuant to the DIP Order.

(b)     Pursuant to Section 364(c)(1) of the Bankruptcy Code, after entry of the Interim Order and subject to the Carve-Out, the Obligations of the Loan Parties shall at all times constitute allowed senior administrative expenses against each of the Loan Parties in the Chapter 11 Cases (without the need to file any proof of claim or request for payment of administrative expense), with priority over any and all other administrative expenses, adequate protection claims, diminution claims and all other claims against the Loan Parties, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other administrative expense claims arising under Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy or attachment, which allowed claims shall for purposes of Section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under Section 503(b) of the Bankruptcy Code, and which shall be payable from and have recourse to all pre- and post-petition property of the Loan Parties and their estates and all proceeds thereof other than as set forth in the DIP Order.

Section 5.17   Use of Proceeds.  The Loan Parties shall use the proceeds of the Loans to (i) pay fees, interest and other amounts payable under this Agreement, (ii) provide working capital for, and for other general corporate purposes of, the Borrower and its Subsidiaries, including for funding the Carve-Out, in each case of clauses (i) and (ii), in accordance with, and subject to, the DIP Order and the Approved 13-Week Cash Flow (subject to any Permitted Variance), and (iii) in the case of the Roll-Up Loans in exchange for (and to satisfy and discharge) the Prepetition Amendment No. 14 Incremental Loans and all accrued and unpaid interest, fees and other amounts thereon.

Section 5.18   Economic Sanctions and Anti-Corruption Laws.

(a)     Each of Topco, Midco, Holdings, the Borrower and their Subsidiaries is in compliance, in all material respects, with the FCPA and all other applicable laws relating to corruption or bribery (collectively, "Anti-Corruption Laws") and with all applicable Sanctions Laws and Regulations.  No Borrowing or use of proceeds will directly, or to the knowledge of the Borrower, indirectly, violate or result in the violation of any Sanctions Laws and Regulations applicable to any party hereto.

(b)     None of (I) Topco, Midco, Holdings, the Borrower or any other Loan Party or (II) any Subsidiary that is not a Loan Party or, (III) to the knowledge of the Borrower, any director, manager, officer, agent or employee of Topco, Midco, Holdings, the Borrower or any of their Subsidiaries, in each case, is a Person that is (or under the Control of, or owned 50 percent or more by, one or more Persons) (A) on the list of "Specially Designated Nationals and Blocked Persons" maintained by OFAC or any similar list maintained or enforced pursuant to any Sanctions

73

Laws and Regulations, (B) located, organized or resident in a country or territory that is itself the target of any applicable Sanctions Laws and Regulations, or (C) otherwise the target of the limitations or prohibitions under any applicable Sanctions Laws and Regulations.

(c)     No part of the proceeds of any Loan will be used for any improper payments, directly or, to the knowledge of the Borrower, indirectly to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, or any other party (if applicable) in order to obtain, retain or direct business or obtain any improper advantage or in any other manner in violation of any Anti-Corruption Laws.

(d)     The Borrower will not, directly or to its knowledge indirectly, use the proceeds of the Loans, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person, (i) to fund any activities or business of or with any Person, that, at the time of such funding, is the target of Sanctions Laws and Regulations, or in any country or territory, that, at the time of such funding, is, or whose government is, the target of comprehensive Sanctions Laws and Regulations (currently, the Donetsk People's Republic, the Luhansk People's Republic, the Crimea region of Ukraine, Cuba, Iran, North Korea and Syria) or (ii) in any other manner that would result in a violation of Sanctions Laws and Regulations by any Person (including any Person participating in the Loans, whether as lender, underwriter, advisor, investor or otherwise).

Section 5.19    Bankruptcy Matters.

(a)     The Chapter 11 Cases were commenced on the Petition Date in accordance in all material respects with applicable law and proper notice thereof was given.  Proper notice was also provided for (x) the motion seeking approval of the Loan Documents pursuant to the DIP Order and (y) the hearing for the approval of the DIP Order.

(b)     After entry of the Interim Order (and the Final Order when applicable) and pursuant to and to the extent provided in the Interim Order and the Final Order, as applicable, the Obligations will be secured by a valid and automatically perfected first priority Lien on all of the Collateral, (i) encumbered by no Liens other than Liens permitted by Section 6.02 and (ii) prior and superior to any other Person or Lien pursuant to Section 364(d)(1) of the Bankruptcy Code, in each case, other than the Carve-Out, the Permitted Liens (as defined in the DIP Orders) and subject to the priorities set forth in the Interim Order or the Final Order, as applicable (with respect to specified property of the estate, with respect to which the Obligation shall have a junior lien pursuant to Section 364(c)(3) of the Bankruptcy Code).

(c)     The Interim Order (with respect to the period prior to the entry of the Final Order) or the Final Order (with respect to the period on and after the entry of the Final Order), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), modified or amended without the Agents' and Required Lenders' consent (which consent of the Required Lenders may be communicated via an email from the Lender Advisors).

(d)      A true and complete copy of each of the Initial 13-Week Cash Flow and the CCAA Cash Flow is attached as Schedule 5.19 hereto.

<div align="center">ARTICLE VI</div>

<div align="center">AFFIRMATIVE COVENANTS</div>

From and after the Closing Date, for the benefit of the Secured Parties until the Discharge of DIP Obligations has occurred, Topco, Midco, Holdings and the Borrower shall, and shall (except in the case of the covenants set forth in Section 6.01, Section 6.02 and Section 6.03) cause each Subsidiary to:

Section 6.01   Financial Statements.   Deliver to the Administrative Agent for prompt further distribution to each Lender:

(a)      as soon as available, but in any event within ninety (90) days after the end of each fiscal year of the Borrower (or such later date in the sole discretion of the Required Lenders (which may be communicated via e-mail from the Required Lenders (or their counsel) to the Borrower (or its counsel))), a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, stockholders' equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, audited and accompanied by a report and opinion of an independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards, together with a customary management discussion and analysis with respect to the financial information disclosed therein;

(b)      as soon as available, but in any event, within forty-five (45) days after the end of each of the first three (3) fiscal quarters of each fiscal year of the Borrower, a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal quarter, and the related (i) consolidated statements of income or operations for such fiscal quarter and for the portion of the fiscal year then ended and (ii) consolidated statements of cash flows for the portion of the fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail and certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations, stockholders' equity and cash flows of the Borrower and its Subsidiaries in accordance with GAAP, subject only to normal year-end adjustments and the absence of footnotes, together with a customary management discussion and analysis with respect to the financial information disclosed therein; and

(c)      as soon as available, but in any event, within 30 days after the end of each calendar month commencing with the calendar month ending October 31, 2024, a management prepared consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such calendar month, and the related (i) consolidated statements of income or operations for such calendar month and for the portion of the fiscal year then ended and (ii) consolidated statements of cash flows for the portion of the fiscal year then ended, all in reasonable detail and fairly

<div align="center">75</div>

presenting in all material respects the financial condition, results of operations, stockholders' equity and cash flows of the Borrower and its Subsidiaries in accordance with GAAP, subject only to normal year-end and quarterly adjustments and the absence of footnotes.

Section 6.02    <u>Certificates; Other Information</u>.  Deliver to the Administrative Agent and the Lenders:

(a)    at the time of the delivery of the financial statements referred to in <u>Section 6.01(a)</u> and <u>(b)</u>, a duly completed Compliance Certificate signed by a Responsible Officer of the Borrower;

(b)    promptly after the same are publicly available, copies of all annual, regular, periodic and special reports and registration statements which Topco, Midco, Holdings or the Borrower files with the SEC or with any Governmental Authority that may be substituted therefor (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered), exhibits to any registration statement and, if applicable, any registration statement on Form S-8) and in any case not otherwise required to be delivered to the Administrative Agent pursuant hereto;

(c)    promptly after the furnishing thereof, copies of any material requests or material notices received by any Loan Party or any of its Subsidiaries (other than in the ordinary course of business) that could reasonably be expected to result in a Material Adverse Effect;

(d)    together with the delivery of the financial statements pursuant to <u>Section 6.01(a)</u> or <u>6.01(b)</u> and each Compliance Certificate pursuant to <u>Section 6.02(a)</u>, (i) a report setting forth the information required by <u>Section 3.03</u> of the Security Agreement or confirming that there has been no change in such information since the Closing Date or the date of the last Compliance Certificate, (ii) a description of each event, condition or circumstance during the last fiscal quarter covered by such Compliance Certificate requiring a prepayment under <u>Section 2.05(b)</u>, (iii) a list of Subsidiaries as of the date of delivery of such Compliance Certificate or a confirmation that there is no change in such information since the later of the Closing Date or the date of the last such list and (iv) such other information required by the Compliance Certificate;

(e)    such additional information regarding the business, legal, financial or corporate affairs of any Loan Party or any Subsidiary, or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender through the Administrative Agent may from time to time reasonably request;

(f)

(i)    by 5:00 p.m., New York City time, on the first Friday of each month (commencing on November 1, 2024), a projected thirteen (13) week cash flow forecast prepared by the Borrower in good faith (in each case covering the immediately following thirteen (13) week period) for such period, together with extended commentary of management of the Borrower in form and scope of that delivered to the Required Lenders on August 2, 2024, but in any event including forecasts for the fees payable to each professional or advisor retained by the Loan Parties or the Canadian Subsidiary (including, for certainty, the CCAA Monitor)

(the cash flow forecast and extended commentary delivered pursuant to this <u>clause (f)</u> being, "<u>13-Week Cash Flow</u>").

(ii)    For the purposes of this Agreement, the "<u>Approved 13-Week Cash Flow</u>" shall refer, initially, to the Initial 13-Week Cash Flow and upon delivery of an updated 13-Week Cash Flow pursuant to this clause (h), such updated 13-Week Cash Flow shall become the "Approved 13-Week Cash Flow" on the date on which the Required Lenders approve such 13-Week Cash Flow (which approval may be by email from the Lender Advisors); <u>provided</u> (A) that no Approved 13-Week Cash Flow shall include payments on account of the "Hydro" litigation previously notified to the Lenders (which consent may be communicated via email from the Lender Advisors)); and (B)    until such approval, the existing Approved 13-Week Cash Flow shall remain the Approved 13-Week Cash Flow for all purposes.

(g)    by 5:00 p.m., New York City time, every Thursday and covering the period ending on the Friday ending before such Thursday (commencing on October 17, 2024 (and testing for the two-week period ending October 11, 2024)), (x) an aggregate variance report (a "<u>Variance Report</u>"), which shall be substantially consistent in form, scope and detail as the Approved 13-Week Cash Flow, and which will contain columns with the prior weeks' actuals and budget figures in a form that matches the Approved 13-Week Cash Flow (with individual variance figures for each line item in the Approved 13-Week Cash Flow), (y) the actual totals by week since the week ending October 4, 2024 for fees that have been paid to, and invoiced by, each professional or advisor retained by the Loan Parties or the Canadian Subsidiary (including, for certainty, the CCAA Monitor) and professional or advisor fee projections for each such professional or advisor and (z) written commentary from management of the Borrower explaining all key variances on a line item by line item basis;

(h)    by 5:00 p.m., New York City time, on the third Friday of each month (commencing on October 18, 2024), a report detailing the Accuride Monthly Review reporting package, which includes (x) prior month actual results and proposed flash results for the current month and fiscal quarter, (y) prior month accounts payable aging summary by vendor for the entire global business of Topco and its Subsidiaries and (z) prior month accounts receivable aging summary by customer for the entire global business of Topco and its Subsidiaries;

(i)    by 5:00 p.m., New York City time, every Thursday (commencing on October 17, 2024), a Liquidity summary by jurisdiction of Topco and its Subsidiaries;

(j)    by 5:00 p.m., New York City time, every other Thursday (commencing on October 24, 2024) an accounts payable aging summary by vendor for the North America business of Topco and its Subsidiaries;

(k)    by 5:00 p.m., New York City time, every other Thursday (commencing on October 24, 2024) an accounts payable and accounts receivable balance summary for the U.S. business of Topco and its Subsidiaries;

(l)    by 5:00 p.m., New York City time, every Thursday (commencing on October 17, 2024) a reasonably detailed update on the marketing process with respect to each Sale

Transaction that the Borrower is pursuing (or that the Required Lenders have requested that the Borrower pursue), including a tracker detailing the status of conversations and negotiations with all active participants with respect to each such Sale Transaction;

(m)    by 5:00 p.m., New York City time, every other Thursday (commencing on October 24, 2024) an accounts receivable aging summary by customer for the North America business of Topco and its Subsidiaries;

(n)    as soon as practicable upon receipt thereof (but in any event prior to the second Business Day after receipt thereof), each indication of interest or other indication of value (written or otherwise) provided by third parties in conjunction with the marketing process for any Sale Transaction;

(o)    by 5:00 p.m., New York City time, on the first Friday of each calendar month (commencing on November 1, 2024), an accounts receivable aging schedule for the top 25 customers of Topco and its Subsidiaries and an accounts payable aging schedule for the top 25 vendors of Topco and its Subsidiaries;

(p)    (i) all monthly reports, projections, or other written information with respect to each of the Loan Parties' business or financial condition or prospects (as well as all pleadings, motions, applications, aide-mémoires and judicial information) filed by or on behalf of the Debtors with the Bankruptcy Court or provided by or to the U.S. Trustee (or any monitor or interim receiver, if any, appointed in any Chapter 11 Case) or the Committee, at the time such document is filed with the Bankruptcy Court or provided by or to the U.S. Trustee (or any monitor or interim receiver, if any, appointed in any Chapter 11 Case) or the Committee, as applicable; provided, however, that such reports, projections, or other written information required to be delivered pursuant to this clause (i) shall be deemed delivered for purposes of this Agreement when such reports, projections or other written information is filed with the Bankruptcy Court and (ii) all periodic reports or other written information with respect to the Canadian Subsidiary's business or financial condition or prospects (as well as all pleadings, motions, applications, aide-mémoires and judicial information) filed by or on behalf of the Canadian Subsidiary (or the CCAA Monitor) with the CCAA Court; and

(q)    (i) each report, notice, statement or certificate received from or required to be delivered to any of the lenders or agents under the Prepetition ABL Credit Agreement and any related loan documents, including, without limitation, each Borrowing Base Certificate (as defined in the Prepetition ABL Credit Agreement) and (ii) notice of any imposition of any new reserves and any changes in the eligibility criteria set forth in the Foreign Borrowing Base (as defined in the Prepetition ABL Credit Agreement) or any components thereof.

Documents required to be delivered pursuant to Sections 6.01(a), 6.01(b), 6.01(c), 6.02(a), 6.02(c), 6.02(f), 6.02(h), 6.02(i), 6.02(j) and 6.02(k) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website on the Internet at the website address listed on Schedule 10.02; or (ii) on which such documents are posted on the Borrower's behalf on IntraLinks/IntraAgency or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether

sponsored by the Administrative Agent); <u>provided</u> that:  (i) upon written request by the Administrative Agent, the Borrower shall deliver paper copies of such documents to the Administrative Agent for further distribution to each Lender until a written request to cease delivering paper copies is given by the Administrative Agent and (ii) the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent and the Lenders of the posting of any such documents and provide to the Administrative Agent and the Lenders by electronic mail electronic versions (<u>i.e.</u>, soft copies) of such documents.  Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

The Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "<u>Borrower Materials</u>") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "<u>Platform</u>") and (b) certain of the Lenders (each, a "<u>Public Lender</u>") may have personnel who do not wish to receive material non-public information with respect to the Borrower or its Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities.  The Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (v) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (w) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Borrower or its Affiliates or any of their respective securities for purposes of United States Federal and state securities laws (<u>provided</u>, <u>however</u>, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in <u>Section 10.08</u>); (x) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; (y) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information"; and (z) the information set forth in <u>Section 6.01(a)</u>, <u>Section 6.01(b)</u> and <u>Section 6.02(a)</u> shall, in each case, be deemed to be public.  Notwithstanding the foregoing, the following Borrower Materials may be posted on that portion of the Platform designated for Public Lenders: (1) the Loan Documents, and (2) notification of changes in the terms of the Term Loans.

Section 6.03   <u>Notices</u>.  Promptly after a Responsible Officer obtains actual knowledge thereof, notify the Administrative Agent and each Lender:

(a)   of the occurrence of any Default, which notice shall specify the nature thereof, the period of existence thereof and what action the Borrower proposes to take with respect thereto;

(b)   any litigation or governmental proceeding (including, without limitation, related to any Environmental Laws or Hazardous Materials) pending against Topco, Midco, Holdings, the Borrower or any of the Subsidiaries that could reasonably be expected to be determined adversely and, if so determined, to result in a Material Adverse Effect; and

(c)    of the occurrence of any ERISA Event or similar event with respect to a Foreign Plan or Environmental Liability that could reasonably be expected to have a Material Adverse Effect.

Section 6.04    <u>Maintenance of Existence</u>.  (a) Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization or incorporation and (b) take all reasonable action to maintain all rights, privileges (including its good standing), permits, licenses and franchises necessary or desirable in the normal conduct of its business, except in the case of <u>clause (b)</u>, (i) to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect or (ii) pursuant to a transaction permitted by <u>Section 7.05</u>.

Section 6.05    <u>Maintenance of Properties</u>.  Except if the failure to do so could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (a) maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order, repair and condition, ordinary wear and tear excepted and casualty or condemnation excepted, and (b) make all necessary renewals, replacements, modifications, improvements, upgrades, extensions and additions thereof or thereto in accordance with prudent industry practice.

Section 6.06    <u>Maintenance of Insurance</u>.  Maintain with financially sound and reputable insurance companies, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Topco and its Subsidiaries) as are customarily carried under similar circumstances by such other Persons.  If any portion of any Mortgaged Property is at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or hereafter in effect or successor act thereto), then, to the extent required by applicable Laws, the Borrower shall, or shall cause each Loan Party to, maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws.

Section 6.07    <u>Compliance with Laws</u>.  Subject to the DIP Order, comply in all respects with the requirements of all Laws and all orders, writs, injunctions, decrees and judgments (including any order of the Bankruptcy Court) applicable to it or to its business or property (including without limitation Environmental Laws, ERISA, the Code and applicable Sanctions Laws and Regulations and Anti-Corruption Laws), except if the failure to comply therewith could not, individually or in the aggregate reasonably be expected to have a Material Adverse Effect.

Section 6.08    <u>Books and Records</u>.  Maintain proper books of record and account, in which entries that are full, true and correct in all material respects and are in conformity with GAAP consistently applied shall be made of all material financial transactions and matters involving the assets and business of Topco, Midco, Holdings, the Borrower or such Subsidiary, as the case may be.

Section 6.09   <u>Inspection Rights</u>.  Permit representatives and independent contractors of the Administrative Agent and each Lender to visit and inspect any of its properties and to discuss its affairs, finances and accounts with its directors, managers, officers, and independent public accountants, all at the reasonable expense of the Borrower and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower.  The Administrative Agent and the Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants. Notwithstanding anything to the contrary in this <u>Section 6.09</u>, none of the Borrower or any Subsidiary will be required to disclose or permit the inspection or discussion of, any document, information or other matter (i) that constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by Law or any binding agreement or (iii) that is subject to attorney client or similar privilege or constitutes attorney work product.

Section 6.10   <u>Additional Subsidiaries; Further Assurances</u>.  If any additional direct or indirect Subsidiary of the Borrower is formed or acquired after the Closing Date (in each case, other than an Excluded Subsidiary) and if such Subsidiary becomes a Debtor under the Chapter 11 Cases, within ten (10) Business Days after the date such Subsidiary becomes a Debtor under the Chapter 11 Cases (or such later date to which the Required Lenders shall have agreed in their reasonable discretion, which later date may be communicated via e-mail from the Lender Advisors), notify the Collateral Agent thereof and cause the Collateral and Guarantee Requirement to be satisfied with respect to such Subsidiary.  Topco, Midco, Holdings and the Borrower shall and shall cause the Guarantors to take any and all actions reasonably requested by the Administrative Agent or Required Lenders that they deem necessary or advisable to obtain or maintain a valid and perfected Lien (with the priority therefor set forth in the DIP Order) with respect to the Collateral, all at the expense of the Loan Parties. Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, no Subsidiary of any Debtor that is not a Debtor shall be required to become a Guarantor or Loan Party under the Loan Documents.

Section 6.11   <u>Use of Proceeds</u>.  All proceeds of the Loans shall be used by the Loan Parties at any time for any of the permitted purposes described under <u>Section 5.17</u>, or for any other purpose permitted under the DIP Order or as set forth in the Approved 13-Week Cash Flow (subject to Permitted Variances); <u>provided</u> that the Loan Parties shall use reasonable best efforts (i) to utilize cash received from operations prior to utilizing proceeds of the Loans to fund their businesses and the Chapter 11 Cases and for the other permitted purposes set forth under <u>Section 5.17</u> (provided that the Loan Parties may use proceeds of the Loans to fund the CCAA Case without first utilizing cash received from operations for such purpose) and (ii) keep the proceeds of the Loans in the DIP Funds Account, and not withdraw such proceeds from the DIP Funds Account, until and unless the Loan Parties promptly apply such withdrawn amounts for a permitted purpose set forth under <u>Section 5.17</u>, in each case, in accordance with the Approved 13-Week Cash Flow (subject to Permitted Variances).

Section 6.12   [Reserved].

Section 6.13   [Reserved].

Section 6.14   Payment of Taxes.  Subject to the Bankruptcy Code, the terms of the DIP Order and any required approval by the Bankruptcy Court (it being understood that no Debtor shall be obligated to make any payments hereunder that are permitted to not be made pursuant to an order of the Bankruptcy Court or pursuant to the Bankruptcy Code or for which payment is not otherwise authorized by the Bankruptcy Court) , the Borrower will pay and discharge, and will cause each of the Subsidiaries to pay and discharge, all Taxes imposed upon it or upon its income or profits, or upon any properties belonging to it, in each case on a timely basis, and all lawful claims which, if unpaid, may reasonably be expected to become a lien or charge upon any properties of the Borrower or any of the Subsidiaries not otherwise permitted under this Agreement; provided that neither the Borrower nor any of the Subsidiaries shall be required to pay any such Tax or claim which (x) is being contested in good faith and by proper proceedings if it has maintained adequate reserves with respect thereto in accordance with GAAP or (y) would not reasonably be expected, individually or in the aggregate, to constitute a Material Adverse Effect.

Section 6.15   Nature of Business.  Topco, Midco, Holdings, the Borrower and their Subsidiaries will engage only in material lines of business substantially similar to those lines of business conducted by Topco, Midco, Holdings, the Borrower and their Subsidiaries on the Closing Date or any business reasonably related, complementary or ancillary thereto.

Section 6.16   Lender Calls. The Borrower will hold a conference call every Friday (commencing on October 18, 2024) (at a time mutually agreed upon by the Borrower and the Required Lenders) with all Lenders who choose to attend such conference call and management of the Borrower (including the Chief Restructuring Officer), Alvarez & Marsal and Perella Weinberg Partners and other advisors to the Borrower reasonably requested to join by the Required Lenders at which conference call shall be discussed those items covered in the management discussion and analysis with respect to the financial statements delivered pursuant to Sections 6.01(a) and 6.01(b), the financial statements delivered pursuant to Section 6.01(c), the 13-Week Cash Flow and/or the reports delivered pursuant to Sections 6.02(g) and (h) and, if applicable, 6.02(i) and any asset sale, preparation for strategic processes and/or any issues related to the financial affairs, finances, business, assets, operations or condition (financial or otherwise) of the Loan Parties and their Subsidiaries, including such matters as may be requested by the Required Lenders, subject, in each case, to any Confidential Restrictions.

Section 6.17   Board Observer.  The Borrower shall give the Lenders notice (in the same manner as notice is given to directors) of, and permit the Observer to attend (or, in the case of meeting held telephonically, join), subject to the limitations and conditions set forth in this Section 6.17, all meetings of its board of directors or similar governing body, but not any committee or sub-committee thereof, ("Board of Directors") and shall provide, subject to the limitations and exclusions set forth in this Section 6.17 (i) to the Lenders and the Observer the same information and materials concerning the Borrower and its Subsidiaries, provided to the Board of Directors (the "Board Materials") at the time they are given or distributed to such members and (ii) to the Observer reasonable access to management of the Borrower and its Subsidiaries to ask questions about, and otherwise to discuss, the business of the Borrower and its Subsidiaries that would be afforded to a member of the Board of Directors. Reasonable and documented or invoiced out-of-pocket fees and expenses incurred by the Observer in attending any board meeting shall be reimbursed by the Borrower.  The Borrower shall also compensate the Observer for serving as such in an amount and at such times as is agreed by the Observer and the Borrower, and reasonably

satisfactory to the Lenders, which amount shall be paid at times and in such amounts that are in line with market standards for individuals performing similar duties as the Observer: provided, the Lenders hereby acknowledge the compensation agreed to by the Observer and the Borrower on the Closing Date is satisfactory to the Lenders. Other than as set forth in Section 6.18, the Board of Directors shall be the sole governing body of the Borrower and its Subsidiaries with the authority to make managerial, strategic or supervisory decisions with respect to the Borrower and its Subsidiaries (taken as a whole), and the Board of Directors shall not delegate any material portion of such decision-making authority to any committee, subcommittee, entity or other body; provided, however, that the Borrower and its Subsidiaries shall be permitted to delegate such decision-making authority to committees, subcommittees, entities and other bodies to the extent that such delegation (i) is required as a matter of non-U.S. law, (ii) constitutes customary delegation to duly authorized management and/or officers consistent with the Borrower's past practice and/or (iii) constitutes the customary delegation to existing committees, subcommittees, entities or other bodies of the Board of Directors, consistent with the Borrower's past practice, in each case of clauses (i) through (iii), so long as any resulting decisions are promptly reported to the Board of Directors. The Board of Directors shall hold regularly scheduled meetings no less frequently than on a quarterly basis (and may hold meetings more frequently, if the Board of Directors decides in its sole discretion that it is necessary and/or desirable). The Observer may be excluded from any meeting (or portion thereof) or denied access to any Board Materials (or portion thereof), and the Borrower and its Subsidiaries shall not be required to disclose to the Observer information, only if and to the extent (a) access to such information or attendance at such meeting or portion thereof would adversely affect any attorney-client privilege or accountant-client privilege, (b) access to such information or attendance at such meeting or portion thereof could reasonably be expected to result in disclosure of trade secrets or a conflict of interest, or (c) relating to an actual or potential transaction with a Lender or any Affiliate thereof or other matter in which any Lender or any Affiliate thereof may be involved (including as to discussions or materials regarding this Agreement and the other Loan Documents or any other material debt financing arrangements, to the extent a Lender (or any Affiliate thereof) is involved, a party or prospective party thereto) (the items set forth in the foregoing clauses (a) through (c) being referred to as the "Confidential Restrictions").

Section 6.18    Special Committee.  The Board of Directors shall have created a special committee comprised of two directors, one of which shall be Ted Stenger and the other of which shall be Steven Panagos (the "Special Committee"), which Special Committee shall have the duties and the rights set forth in a charter in form and substance reasonably acceptable to the Required Lenders. Holdings and/or the Board of Directors shall make such amendments to the charter of the Special Committee that are mutually agreed to by the Required Lenders.

Section 6.19    Canadian Intercompany Loan Agreement.  The Borrower shall comply in all material respects with and shall cause or take all actions or other steps necessary to cause, the Canadian Subsidiary to comply in all material respects, with the Canadian Intercompany Supply Agreement, the Canadian Intercompany Loan Agreement and the Canadian Demand Note.

Section 6.20    Chief Restructuring Officer. The Borrower shall take, or cause to be taken, all actions or other steps necessary to maintain Charles Moore as the Borrower's Chief Restructuring Officer.  The Chief Restructuring Officer shall be responsible for preparation of the

13-Week Cash Flow and shall have all other duties commonly applicable to a chief restructuring officer.

Section 6.21   Milestones.  Each Loan Party shall, and shall cause each of its Subsidiaries to, satisfy and comply with the requirements of each of the milestones set forth below (each, a "DIP Milestone") by the deadlines stated below (as such deadlines may be extended with the consent of the Required Lenders in writing (including via e-mail of the Lender Advisors)):

(a)      by the date that is no later than 3 days after the Petition Date, the Debtors shall have obtained entry of the Interim Order;

(b)      by the date that is no later than 25 days after the Petition Date, the Debtors shall have filed the (x) the Disclosure Statement and (y) an Acceptable Plan;

(c)      by the date that is no later than 28 days after the Petition Date, the Debtors shall have obtained entry of the Final Order,

(d)      by the date that is no later than 55 days after the Petition Date, the Debtors shall have obtained entry of an order of the Bankruptcy Court approving (x) the Disclosure Statement and (y) related procedures for soliciting votes on the Disclosure Statement, in each case in form and substance reasonably satisfactory to the Required Lenders;

(e)      by the date that is no later than 95 days after the Petition Date, the Debtors shall have obtained entry of an order confirming an Acceptable Plan in form and substance satisfactory to the Required Lenders) (and with respect to any provisions that affect the rights or duties of the Agents, to the Agents); and

(f)      by the date that is no later than 100 days after the Petition Date, the Acceptable Plan confirmed pursuant to clause (d) above shall have been consummated in all material respects in accordance with the terms thereof (with only such amendments thereto as are consented to in writing by the Required Lenders) (and with respect to any amendments that affect the rights or duties of the Agents, by the Agents).

Section 6.22   Cash Management.  Maintain the cash management of the Loan Parties in accordance in all material respects with the Cash Management Order.

Section 6.23   Debtor-in-Possession Obligations.  Comply in all material respects in a timely manner with their obligations and responsibilities as debtors-in-possession under the Bankruptcy Code, the Bankruptcy Rules, the DIP Order, and any other order of the Bankruptcy Court.  Give, on a timely basis as specified in the applicable DIP Order, all notices required to be given to all parties specified in such DIP Order.

Section 6.24   Bankruptcy Documents.  At least two business days in advance of such filing or as promptly as reasonably practicable prior to such filing, provide drafts to the Lender Advisors of all material pleadings, motions, applications, aide-mémoires, judicial information, financial information, notices, reports, orders and other documents intended to be filed by or on behalf of (i) any Loan Party with the Bankruptcy Court in the Chapter 11 Cases or (ii) the Canadian Subsidiary with the CCAA Court in the CCAA Case.

Section 6.25   <u>Additional Bankruptcy Matters</u>.   Promptly provide the Administrative Agent, the Lenders and the Lender Advisors with updates of any material developments in connection with (i) the Loan Parties' reorganization efforts under the Chapter 11 Cases, whether in connection with the sale of all or substantially all of the Borrower's and its Subsidiaries' consolidated assets, the marketing of any Loan Parties' assets, the formulation of bidding procedures, an auction plan, and documents related thereto, or otherwise and (ii) the CCAA Case.

Section 6.26   <u>Ratings</u>.   The Borrower will use commercially reasonable efforts to obtain from Moody's and S&P ratings for the New Money Loans (it being understood that the Borrower shall not be required to obtain a specific rating) on or prior to the date that is 30 days after the Petition Date.

Section 6.27   <u>Post-Closing</u>.   The Loan Parties shall take the following actions within the time periods specified below:

(a)      within 5 Business Days of the Closing Date (or such longer period as the Required Lenders may consent to in their sole discretion (which consent may be communicated via email from the Lender Advisors)) execute and deliver a perfection certificate, substantially in the form of the perfection certificates delivered by the Loan Parties prior to the Petition Date pursuant to the Prepetition Term Loan Credit Agreement; and

(b)      within 20 days of the Closing Date (or such longer period as the Required Lenders may consent to in their sole discretion (which consent may be communicated via email from the Lender Advisors)) enter into a "springing" deposit control agreement (or other equivalent agreement) with the depositary bank of the DIP Funds Account, granting control over the DIP Funds Account to the Collateral Agent, and otherwise in form and substance reasonably satisfactory to the Agents and the Required Lenders; and

(c)      within 20 days of the Closing Date (or such longer period as the Required Lenders may consent to in their sole discretion (which consent may be communicated via email from the Lender Advisors)), to the extent not previously delivered, deliver original certificated evidencing Equity Interests required to be pledged pursuant to the Collateral Documents and required to be delivered thereunder, together with undated stock transfer powers therefor executed in blank, to the Collateral Agent, for the benefit of the secured parties.

Section 6.28 <u>Special Committee Investigation</u>.   [●].

ARTICLE VII

<u>NEGATIVE COVENANTS</u>

From and after the Closing Date, for the benefit of the Lenders until the Discharge of DIP Obligations has occurred, Topco, Midco, Holdings and the Borrower shall not, nor shall it permit any of its Subsidiaries to, directly or indirectly:

Section 7.01    Liens.   Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)        Liens securing the Obligations pursuant to any Loan Document or the DIP Order;

(b)        Liens existing on the date hereof and set forth on Schedule 7.01(b) (other than Liens securing the Prepetition ABL Obligations);

(c)        Liens for Taxes, assessments or governmental charges (i) which are not overdue for a period of more than thirty (30) days, (ii) which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person to the extent required in accordance with GAAP, or (iii) to the extent such Taxes, assessments, or governmental charges are excused or prohibited by the Bankruptcy Code or not otherwise authorized by the Bankruptcy Court with respect to periods prior to the Closing Date;

(d)        statutory or common law Liens of landlords, carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors or other like Liens arising in the ordinary course of business and consistent with past practice (i) which secure amounts not overdue for a period of more than thirty (30) days or if more than thirty (30) days overdue, are unfiled (or if filed have been discharged or stayed) and no other action has been taken to enforce such Lien or (ii) which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person to the extent required in accordance with GAAP;

(e)        (i) pledges, deposits or Liens arising as a matter of law in the ordinary course of business and consistent with past practice in connection with workers' compensation, payroll taxes, unemployment insurance and other social security legislation and (ii) pledges and deposits in the ordinary course of business securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to the Borrower or any Subsidiary;

(f)        Liens to secure the performance of bids, trade contracts, governmental contracts and leases (other than Indebtedness for borrowed money), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations) incurred in the ordinary course of business and consistent with past practice;

(g)        easements, rights-of-way, restrictions, covenants, conditions, encroachments, protrusions and other similar encumbrances and minor title defects affecting real property which, in the aggregate, do not in any case materially interfere with the ordinary conduct of the business of the Borrower or any Subsidiary;

(h)        Liens securing judgments for the payment of money not constituting an Event of Default;

(i)    Adequate Protection Liens granted pursuant to the DIP Order;

(j)    leases, licenses (including sublicenses), or subleases and Liens on the property covered thereby, in each case, granted to others in the ordinary course of business and consistent with past practice which do not (i) interfere in any material respect with the business of the Borrower or any Subsidiary, taken as a whole, or (ii) secure any Indebtedness;

(k)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business and consistent with past practice;

(l)    Liens (i) of a collection bank (including those arising under Section 4-210 of the Uniform Commercial Code) on the items in the course of collection and (ii) in favor of a banking or other financial institution arising as a matter of law encumbering deposits or other funds maintained with a financial institution (including the right of set off) and which are within the general parameters customary in the banking industry;

(m)    Liens consisting of an agreement to Dispose of any property in a Disposition permitted under Section 7.05, in each case, solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(n)    Liens securing the Prepetition ABL Obligations including Liens on the Borrowing Base Account (as defined in the DIP Order);

(o)    with the consent of the Required Lenders (which consent shall not be unreasonably withheld or delayed, and may be communicated via e-mail from the Lender Advisors), Liens in respect of the Permitted German Sale Leaseback;

(p)    any interest or title of a lessor or sublessor under leases or subleases entered into by the Borrower or any of its Subsidiaries in the ordinary course of business and consistent with past practice;

(q)    Liens, if any, arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by the Borrower or any of its Subsidiaries in the ordinary course of business and consistent with past practice;

(r)    Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks or other financial institutions not given in connection with the incurrence of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business and consistent with past practice of the Borrower or its Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any Subsidiary in the ordinary course of business and consistent with past practice;

(s)    Liens, if any, arising from precautionary Uniform Commercial Code financing statement filings;

(t)     Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(u)     any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of the Borrower or any Subsidiary;

(v)     Liens on specific items of inventory or other goods and the proceeds thereof securing such Person's obligations in respect of documentary letters of credit issued for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods;

(w)     the modification, replacement, renewal or extension of any Lien permitted by clause (b) of this Section 7.01; provided that (i) the Lien does not extend to any additional property other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien or financed by Indebtedness permitted under Section 7.03, and (B) proceeds and products thereof; and (ii) the renewal, extension or refinancing of the obligations secured or benefited by such Liens is permitted by Section 7.03;

(x)     ground leases in respect of real property on which facilities owned or leased by the Borrower or any of its Subsidiaries are located;

(y)     [reserved];

(z)     [reserved];

(aa)    [reserved];

(bb)    Liens securing Indebtedness permitted pursuant to Section 7.03(m);

(cc)    other Liens securing Indebtedness or other obligations in an aggregate principal amount at any time outstanding not to exceed $1,000,000;

(dd)    [reserved];

(ee)    [reserved];

(ff)    with respect to the Canadian Subsidiary, the CCAA Charges; and

(gg)    with respect to any Foreign Subsidiary, other Liens and privileges arising mandatorily by Law.

Section 7.02   Investments.  Make any Investments, except:

(a)     Investments by the Borrower or a Subsidiary in assets that were Cash Equivalents when such Investment was made;

(b)     loans or advances to officers, directors, managers, partners and employees of Topco, Midco, Holdings, the Borrower or its Subsidiaries for reasonable and customary

business-related travel, entertainment, relocation and analogous ordinary business purposes consistent with past practice;

(c)    asset purchases (including purchases of inventory, supplies and materials) and the licensing or contribution of intellectual property pursuant to joint marketing, collaboration or other similar arrangements with other Persons, in each case in the ordinary course of business and consistent with past practice;

(d)    Investments

(i)    by any Loan Party in any other Loan Party (other than Topco),

(ii)    by any Non-Loan Party in any Loan Party (other than Topco),

(iii)    by any Non-Loan Party in any other Non-Loan Party,

(iv)    (x) by any Loan Party in any Non-Loan Party made prior to, and outstanding on, the Closing Date and set forth on Schedule 7.02 hereto and (y) any modification, replacement, renewal, reinvestment or extension of any Investment permitted pursuant to clause (iv)(x) above; provided that the aggregate amount of Investments permitted pursuant to this clause (iv)(y) is not increased from the amount of the Investment on the Closing Date except as otherwise permitted by this Section 7.02 and

(v)    by any Loan Party in any other Non-Loan Party on or after the Closing Date; provided that the aggregate amount of such Investments in Non-Loan Parties pursuant to clause (v) made on or after the Closing Date shall not exceed an aggregate amount, as valued at cost at the time of each such Investment is made and including all related commitments for future Investments, $1,000,000; provided, that no Investments in Non-Loan Parties may be made pursuant to clause (v) of this Section 7.02(d) if an Event of Default is continuing or would result therefrom;

(e)    Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the ordinary course of business and consistent with past practice;

(f)    Investments consisting of Liens, Indebtedness, fundamental changes, Dispositions and Restricted Payments permitted under Section 7.01, Section 7.03 (other than Section 7.03(e)), Section 7.05 and Section 7.06 (other than Section 7.06(d)), respectively;

(g)    [reserved];

(h)    Investments in Swap Contracts permitted under Section 7.03(g);

89

(i)     to the extent constituting Indebtedness, with the consent of the Required Lenders (which consent shall not be unreasonably withheld or delayed, and may be communicated via e-mail from the Lender Advisors), the Permitted German Sale Leaseback;

(j)     Investments made in compliance with the DIP Order, any other order of the Bankruptcy Court or the Approved 13-Week Cash Flow (including any Permitted Variance);

(k)     following issuance of the CCAA Initial Order, Investments consisting of advances made by the Borrower to the Canadian Subsidiary pursuant to the Canadian Intercompany Loan Agreement (and evidenced by the Canadian Demand Note), in an aggregate principal amount (exclusive of interest) not to exceed at any time the amounts set out in the CCAA Cash Flow in respect of the relevant period (or such greater amount as may be approved by the Required Lenders);

(l)     Investments in the ordinary course of business and consistent with past practice consisting of endorsements for collection or deposit and customary trade arrangements with customers consistent with past practices;

(m)     Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers arising in the ordinary course of business and consistent with past practice or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(n)     [reserved];

(o)     advances of payroll payments to employees in the ordinary course of business and consistent with past practice;

(p)     [reserved];

(q)     [reserved];

(r)     Guarantee Obligations of the Borrower or any Subsidiary in respect of leases (other than Capitalized Leases) or of other obligations that do not constitute Indebtedness, in each case entered into in the ordinary course of business and consistent with past practice;

(s)     [reserved];

(t)     other Investments, other than in Subsidiaries that are not Loan Parties, in an aggregate amount, as valued at cost at the time each such Investment is made and including all related commitments for future Investments, not exceeding $1,000,000; provided, that, on and after the Closing Date, no Investments may be made in reliance on this Section 7.02(t) if an Event of Default is continuing or would result therefrom;

(u)     [reserved];

(v)     [reserved];

(w)     [reserved];

(x)     [reserved];

(y)     [reserved];

(z)     [reserved]; and

(aa)    Investments existing on the Closing Date and, in each case, set forth on Schedule 7.02 and any modification, replacement, renewal, reinvestment or extension thereof; provided that the amount of any Investment permitted pursuant to this Section 7.02(aa) is not increased from the amount of such Investment on the Closing Date except pursuant to the terms of such Investment as of the Closing Date or as otherwise permitted by this Section 7.02.

Section 7.03   Indebtedness.   Create, incur, assume or suffer to exist any Indebtedness, except:

(a)     Indebtedness of the Borrower and any of its Subsidiaries under the Loan Documents;

(b)     Indebtedness in respect of the Prepetition ABL Credit Agreement, which shall not exceed

(i)     with respect to the Prepetition ABL U.S. Obligations (as defined in the DIP Order) shall not exceed $121,333,333.33 (plus accrued and unpaid interest, fees, expenses and disbursements with respect thereto), plus

(ii)     with respect to amounts incurred by the French Borrower (as defined in the Prepetition ABL Credit Agreement on the date hereof), shall not exceed an aggregate principal amount outstanding of loans and letters of credit of $12,000,000, plus

(iii)     with respect to amounts incurred by the German Borrowers (as defined in the Prepetition ABL Credit Agreement on the date hereof), shall not exceed an aggregate principal amount outstanding of loans and letters of credit of $35,000,000;

(c)     Indebtedness existing on the Closing Date listed on Schedule 7.03(c) (other than Indebtedness with respect to the Prepetition ABL Obligations);

(d)     Guarantee Obligations of the Borrower and its Subsidiaries in respect of Indebtedness of the Borrower or any Subsidiary otherwise permitted hereunder (except that Non-Loan Parties may not, by virtue of this Section 7.03(d), guarantee Indebtedness that such Non-Loan Parties could not otherwise incur under this Section 7.03); provided that, if the Indebtedness being guaranteed is subordinated to the Obligations, such Guarantee Obligation shall be subordinated to the Guarantee of the Obligations on terms at least as favorable to the Lenders as those contained in the subordination of such Indebtedness;

(e)     Indebtedness of the Borrower or any Subsidiary owing to the Borrower or any other Subsidiary to the extent constituting an Investment permitted by Section 7.02; provided that all such Indebtedness of any Loan Party owed to any Person that is not a Loan Party shall be subject to the subordination terms set forth in Section 3.01 of the Guaranty;

(f)     Adequate Protection Claims and 507(b) claims, in each case, arising pursuant to the DIP Order;

(g)     Indebtedness in respect of Swap Contracts (i) [reserved], (ii) entered into in order to effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of the Borrower or any Subsidiary and (iii) entered into to hedge commodities, currencies or raw materials prices, in each case, in the ordinary course of business, consistent with past practice and not for speculative purposes;

(h)     Indebtedness in respect of the Prepetition Term Loan Credit Agreement;

(i)     Indebtedness representing deferred compensation to employees of the Borrower (or any direct or indirect parent of the Borrower) and its Subsidiaries incurred in the ordinary course of business and consistent with past practice;

(j)     [reserved];

(k)     [reserved];

(l)     [reserved];

(m)     Cash Management Obligations and other Indebtedness in respect of netting services, automatic clearinghouse arrangements, overdraft protections and similar arrangements in each case incurred in the ordinary course and consistent with past practice;

(n)     Indebtedness consisting of (a) the financing of insurance premiums or (b) take or pay obligations contained in supply arrangements, in each case, in the ordinary course of business and consistent with past practice;

(o)     Indebtedness incurred by the Borrower or any of its Subsidiaries in respect of letters of credit, bank guarantees, bankers' acceptances, warehouse receipts or similar instruments issued or created in the ordinary course of business and consistent with past practice, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims;

(p)     obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any of its Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business and consistent with past practice;

(q)     [reserved];

(r)     [reserved];

(s)     [reserved];

(t)     [reserved]; and

(u)     additional Indebtedness in an aggregate principal amount not to exceed $1,000,000.

The accrual of interest, the accretion of accreted value and the payment of interest in the form of additional Indebtedness shall not be deemed to be an incurrence of Indebtedness for purposes of this <u>Section 7.03</u>.

Section 7.04    <u>Fundamental Changes</u>.  Unless with the consent of the Required Lenders (which may be communicated via-email from the Lender Advisors), merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person; <u>provided</u> that the wind down of the business of the Canadian Subsidiary pursuant to the CCAA Case shall be permitted without any additional consent.

Section 7.05    <u>Dispositions</u>.  Make any Disposition, except:

(a)     Dispositions of obsolete, worn out or surplus property, whether now owned or hereafter acquired, in the ordinary course of business and consistent with past practice;

(b)     Dispositions of inventory in the ordinary course of business and consistent with past practice;

(c)     with the consent of the Required Lenders (which consent shall not be unreasonably withheld or delayed, and may be communicated via e-mail from the Lender Advisors), the Permitted German Sale Leaseback;

(d)     Dispositions of property to the Borrower or a Subsidiary; <u>provided</u> that if the transferor of such property is a Loan Party (i) the transferee thereof must be a Loan Party or (ii) to the extent such transaction constitutes an Investment, such transaction is permitted under <u>Section 7.02</u>;

(e)     Dispositions permitted by <u>Section 7.02</u> (other than <u>Section 7.02(f)</u>) and <u>Section 7.06</u> and Liens permitted by <u>Section 7.01</u>;

(f)     Dispositions in the ordinary course of business and consistent with past practice of Cash Equivalents;

(g)     leases, subleases or licenses (including sublicenses), in each case in the ordinary course of business and consistent with past practice and which do not materially interfere with the business of the Borrower and its Subsidiaries, taken as a whole;

(h)     transfers of property subject to Casualty Events;

(i)     Dispositions made in compliance with the DIP Order, any other order of the Bankruptcy Court  or the Approved 13-Week Cash Flow (including any Permitted Variance);

(j)     Dispositions of accounts receivable in the ordinary course of business and consistent with past practice in connection with the collection or compromise thereof;

(k)     the unwinding of any Swap Contract pursuant to its terms;

(l)     [reserved];

(m)     Dispositions not otherwise permitted pursuant to this Section 7.05 for an aggregate consideration not to exceed $1,000,000; provided that (i) such Disposition shall be for fair market value as reasonably determined by the Borrower in good faith, (ii) the Borrower or any of its Subsidiaries shall receive not less than 75.0% of such consideration in the form of cash or Cash Equivalents and (iii) the Borrower or the applicable Subsidiary complies with the applicable provisions of Section 2.05; and

(n)     the Borrower and its Subsidiaries may surrender or waive contractual rights and settle or waive contractual or litigation claims in the ordinary course of business and consistent with past practice.

Section 7.06    Restricted Payments.  Declare or make, directly or indirectly, any Restricted Payment, except:

(a)     each Subsidiary may make Restricted Payments to the Borrower and to other Subsidiaries;

(b)     [reserved];

(c)     [reserved];

(d)     to the extent constituting Restricted Payments, the Borrower and its Subsidiaries may enter into and consummate transactions expressly permitted by any provision of Section 7.02;

(e)     [reserved];

(f)     [reserved]; and

(g)     the Borrower and its Subsidiaries, Holdings and Midco may make Restricted Payments to Topco, Midco and Holdings:

(i)     the proceeds of which will be used to make Permitted Tax Distributions;

(ii)     [reserved];

(iii)    the proceeds of which shall be used to pay franchise and excise taxes, and other fees and expenses, required to maintain its, Topco's, Midco's, or Holdings' existence (including any costs or expenses associated with being a public company listed on a national securities exchange);

(iv)    [reserved];

(v)    [reserved]; and

(vi)    the proceeds of which shall be used to pay customary salary, bonus and other benefits payable to officers and employees of Topco, Midco and Holdings to the extent such salaries, bonuses and other benefits are attributable to the ownership or operation of the Borrower and its Subsidiaries.

Section 7.07    Transactions with Affiliates.  Enter into any transaction of any kind with any Affiliate of the Borrower with a fair market value in excess of $1,000,000, whether or not in the ordinary course of business, other than:

(a)    transactions between or among the Borrower or any Subsidiary or any entity that becomes a Subsidiary as a result of such transaction, in each case, in the ordinary course of business and consistent with past practice;

(b)    transactions on terms not less favorable to the Borrower or such Subsidiary as would be obtainable by the Borrower or such Subsidiary at the time in a comparable arm's-length transaction with a Person other than an Affiliate;

(c)    [reserved];

(d)    [reserved];

(e)    [reserved];

(f)    [reserved];

(g)    loans and other transactions by and among the Borrower and/or one or more Subsidiaries to the extent permitted under this Article VII;

(h)    employment and severance arrangements between the Borrower or any of its Subsidiaries and their respective officers and employees in the ordinary course of business and consistent with past practice and transactions pursuant to stock option plans and employee benefit plans and arrangements;

(i)    to the extent permitted by Sections 7.06(g)(i) and (iii), payments by the Borrower and its Subsidiaries, Topco, Midco and Holdings pursuant to any tax sharing agreements among the Borrower, Topco, Midco, Holdings and their Subsidiaries on customary terms to the extent attributable to the ownership or operation of the Borrower and its Subsidiaries;

(j)    transactions in compliance with the DIP Order, any other order of the Bankruptcy Court  or the Approved 13-Week Cash Flow (including any Permitted Variance);

(k)    the payment of customary fees and reasonable out of pocket costs to, and indemnities provided on behalf of, directors, managers, officers, employees and consultants of Topco, Midco, Holdings, the Borrower and its Subsidiaries in the ordinary course of business and consistent with past practice;

(l)    transactions pursuant to agreements in existence on the Closing Date and set forth on Schedule 7.07 or any amendment thereto to the extent such an amendment is not adverse to the Lenders in any material respect; and

(m)    dividends and other distributions permitted under Section 7.06.

Section 7.08    Prepayments, Etc., of Indebtedness.

(a)    Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any Indebtedness (other than the Loans), including, for the avoidance of doubt, the Indebtedness described in Section 7.03(h) and other Prepetition Indebtedness, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination in respect of any such Indebtedness, except for payments made in compliance with the DIP Order, any other order of the Bankruptcy Court, or the Approved 13-Week Cash Flow (including any Permitted Variance), including any amounts to be deposited in the Borrowing Base Account (as defined in the DIP Order) pursuant to the terms of the DIP Order.

(b)    Amend, modify or change (x) in any manner materially adverse to the interests of the Lenders any term or condition of any Indebtedness without the consent of the Required Lenders (not to be unreasonably withheld or delayed) or (y) in any manner the Prepetition ABL Forbearance without the consent of the Required Lenders.

Section 7.09    Holdings Covenants.

(a)    Topco, Midco and Holdings shall not own or acquire any assets (other than Equity Interests of Midco, Holdings or the Borrower, respectively, and cash and Cash Equivalents) or engage in any business or activity other than, subject to the DIP Order:

(i)    the ownership of all the outstanding Equity Interests of (x) in the case of Topco, Midco, (y) in the case of Midco, Holdings and(z) in the case of Holdings, the Borrower and, in each case, activities incidental thereto;

(ii)    the maintenance of its corporate existence and activities incidental thereto, including general and corporate overhead;

(iii)    activities required to comply with applicable Laws;

(iv)    maintenance and administration of stock option and stock ownership plans and activities incidental thereto;

(v)    the receipt of Restricted Payments to the extent permitted by Section 7.06 and the making of Restricted Payments and other transactions between Topco, Midco, Holdings and the Borrower permitted under Article VII;

(vi)    to the extent not otherwise covered by the other clauses of this Section 7.09, any of the activities of Topco, Midco or Holdings referred to in Section 7.06;

(vii)    the obtainment of, and the payment of any fees and expenses for, management, consulting, investment banking and advisory services to the extent otherwise permitted by this Agreement;

(viii)    [reserved];

(ix)    providing indemnification to officers and directors and as otherwise permitted under Article VII; and

(x)    activities incidental to legal, tax and accounting matters in connection with any of the foregoing activities.

(b)    None of Topco, Midco or Holdings shall create, incur, assume or permit to exist any Indebtedness or other liabilities except (i) Indebtedness created under the Loan Documents and (ii) the Prepetition Indebtedness, as in effect on the Closing Date.

(c)    None of Topco, Midco or Holdings shall create, incur, assume or permit to exist any Lien (other than Liens permitted by Section 7.01(a), (b) (to the extent securing the Prepetition Term Loan Obligations, as in effect on the Closing Date), (i) and (n) (to the extent securing the Prepetition ABL Obligations as in effect on the Closing Date).

Section 7.10    Negative Pledge and Subsidiary Distributions.  Enter into any agreement, instrument, deed or lease which prohibits or limits (i) the ability of any Loan Party to create, incur, assume or suffer to exist any Lien upon any of their respective properties or revenues, whether now owned or hereafter acquired, for the benefit of the Secured Parties with respect to the Obligations or under the Loan Documents or otherwise pursuant to the DIP Order or (ii) the ability of any Subsidiary to pay dividends or other distributions with respect to any of its Equity Interests; provided that the foregoing shall not apply to:

(a)    restrictions and conditions imposed by (A) law, (B) any Loan Document or (C) the DIP Order;

(b)    restrictions and conditions existing on the Closing Date;

(c)    customary restrictions and conditions arising in connection with any Disposition permitted by Section 7.05;

(d)     customary provisions in leases, licenses (including sublicenses) and other contracts entered in the ordinary course of business and consistent with past practice restricting the assignment thereof;

(e)     customary restrictions in leases, subleases, licenses (including sublicenses) or asset sale agreements and other similar contracts otherwise permitted hereby entered in the ordinary course of business and consistent with past practice so long as such restrictions may relate to the assets subject thereto;

(f)     customary provisions restricting assignment of any agreement entered into in the ordinary course of business and consistent with past practice;

(g)     [reserved];

(h)     [reserved];

(i)     [reserved];

(j)     [reserved];

(k)     [reserved]; and

(l)     customary net worth provisions contained in real property leases entered into by Subsidiaries of the Borrower in the ordinary course of business and consistent with past practice, so long as the Borrower has determined in good faith that such net worth provisions could not reasonably be expected to impair the ability of the Borrower and its Subsidiaries to meet their ongoing obligations.

Section 7.11   <u>Financial Covenant</u>.

(a)     [Reserved].

(b)     [Reserved].

(c)     <u>Minimum Liquidity</u>.  Permit, at any time (i) Liquidity of the Borrower and its Subsidiaries formed or organized in the United States (or any state or territory thereof or the District of Columbia) or Canada (or any province or territory thereof) on a consolidated basis, to be less than $5,000,000, and (ii) Liquidity of the Borrower and its Subsidiaries (other than any Subsidiary formed or organized in the Russian Federation), on a consolidated basis, to be less than $15,000,000.

Section 7.12   <u>Canadian Intercompany Loan Agreement; CCAA Cash Flow</u>. Permit any (i) termination of, or amendment, supplement, modification, consent, waiver or other change to, the Canadian Intercompany Supply Agreement, the Canadian Intercompany Loan Agreement or the Canadian Demand Note without the prior written consent of the Required Lenders or (ii) amendment to the CCAA Cash Flow without the prior written consent of the CCAA Monitor and the Required Lenders.

Section 7.13    Permitted Variances. Every other Thursday (provided if Thursday is not a Business Day, such date shall extend to the immediately succeeding Business Day) commencing on October 24, 2024 (and testing for the two-week period ending October 24, 2024), the Permitted Variances shall be tested for the immediately preceding cumulative two-week period ending on the Friday immediately prior to such Thursday (provided if Thursday is not a Business Day, such date shall extend to the immediately succeeding Business Day)  (the "Initial Variance Testing Period" and, each two-week period thereafter, a "Variance Testing Period") against the Approved 13-Week Cash Flow, and the Borrower shall not permit:

(a)    Total Disbursements to be more than 110% of the Total Disbursements in the Approved 13-Week Cash Flow for the Initial Variance Testing Period and each Variance Testing Period thereafter;

(b)    the professional fees paid to any professional or advisor retained by the Loan Parties to be more than 110% of the professional or advisor fees budgeted to be paid to such professional or advisor in the Approved 13-Week Cash Flow for the Variance Testing Period and each Variance Testing Period thereafter;

(c)    Total Receipts to be less than 90% of the Total Receipts in the Approved 13-Week Cash Flow for the Initial Variance Testing Period and each Variance Testing Period thereafter (on an aggregate basis) and

(d)    total cash flow to be less than the total cash flow shown in the Approved 13-Week Cash Flow for the Initial Variance Testing Period and each Variance Testing Period thereafter, in each case, by an amount in excess of 15% of the Total Receipts shown in the Approved 13-Week Cash Flow for such Variance Testing Period (on an aggregate basis) (clauses (a) through (d), the "Permitted Variances").

Section 7.15    Vendor Payments. Make any payments or transfers to vendors in respect of claims that arose prior to the Petition Date without the consent of the Required Lenders (for the avoidance of doubt, inclusion in an Approved 13-Week Cash Flow counts as such consent) other than up to $20,010,000, in the aggregate, for (i) critical vendors and foreign vendor payments in the ordinary course of business and in accordance with the Approved 13-Week Cash Flow (subject to Permitted Variances) and (ii) 503(b)(9) payments, which may be made substantially concurrently with the Debtors' emergence from the Chapter 11 Cases.

Section 7.16    Insolvency Proceeding Claims.  Incur, create, assume, suffer to exist or permit, or permit any Subsidiary to incur, create, assume, suffer to exist or permit, any other super priority administrative claim which is pari passu with or senior to the claim of the Administrative Agent or the Lenders against the Debtors, except as set forth in the DIP Order.

Section 7.17    Bankruptcy Actions.  Seek, consent to, or permit to exist, or permit any Subsidiary to seek, consent to or permit to exist, without the prior written consent of the Required Lenders (which approval may be communicated via an email from each of the Lender Advisors) (which consent shall constitute authorization under this Agreement), any order granting authority to take any action that is prohibited by the terms of this Agreement, the DIP Order or the other

Loan Documents or refrain from taking any action that is required to be taken by the terms of the DIP Order or any of the other Loan Documents.

ARTICLE VIII

EVENTS OF DEFAULT AND REMEDIES

Section 8.01   Events of Default.  Subject to the last paragraph of this Section 8.01, any of the following events referred to in any of clauses (a) through (hh) inclusive of this Section 8.01 shall constitute an "Event of Default":

(a)   Non-Payment.  Any Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan or (ii) within three (3) Business Days after the same becomes due, any interest on any Loan or any other amount payable hereunder or with respect to any other Loan Document; or

(b)   Specific Covenants.  Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of Section 6.02(f), 6.02(g), 6.03(a), 6.04, 6.11, 6.16, 6.18, 6.20, 6.21, 6.22, 6.23, 6.24, 6.25, 6.27 or Article VII; or

(c)   Other Defaults.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in Section 8.01(a) or (b) above) contained in any Loan Document, including the DIP Order, on its part to be performed or observed and such failure continues for five (5) days after receipt by the Borrower of written notice thereof by the Administrative Agent or the Required Lenders; or

(d)   Representations and Warranties.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Loan Party (for the avoidance of doubt, subject to the Russian Federation Rule) herein, in any other Loan Document, or in any document required to be delivered in connection herewith or therewith (including any Variance Report) shall be incorrect or misleading in any material respect when made or deemed made and such incorrect or misleading representation, warranty, certification or statement of fact, if capable of being cured, remains so incorrect or misleading for five (5) days after receipt by the Borrower of written notice thereof by the Administrative Agent or the Required Lenders; or

(e)   Cross-Default.  Any Loan Party or any Subsidiary (i) fails to make any payment beyond the applicable grace period with respect thereto, if any (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness (other than Indebtedness hereunder) having an aggregate principal amount exceeding the Threshold Amount or under the Prepetition Credit Agreements, or (ii) fails to observe or perform any other agreement or condition relating to any such Indebtedness, or any other event occurs (other than (A) with respect to Indebtedness consisting of Swap Contracts, termination events or equivalent events pursuant to the terms of such Swap Contracts and (B) any event requiring prepayment pursuant to customary asset sale provisions), the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, all such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed

100

(automatically or otherwise), or an offer to repurchase, prepay, defease or redeem all such Indebtedness to be made, prior to its stated maturity; <u>provided</u> that this <u>clause (e)(ii)</u> shall not apply to Prepetition Indebtedness to the extent the holders thereof are stayed from exercising remedies in connection therewith as a result of the Chapter 11 Cases; or

       (f)    <u>Insolvency Proceedings, Etc</u>.  Other than the Chapter 11 Cases, (i) any Subsidiary (other than a Debtor or the Canadian Subsidiary pursuant to the CCAA Case) institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, interim receiver, receiver and manager, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer for it or for all or any material part of its property; or any receiver, interim receiver, receiver and manager, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer is appointed without the application or consent of such Person; or (ii) any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person; or (iii) an order for relief is entered in any such proceeding and any such event being described in this <u>clause (i)</u> or <u>(iii)</u> shall continue for (60) days without having being dismissed, vacated, bonded or discharged; <u>provided</u> that this <u>clause (f)</u> shall not apply to the extent that, with respect to the case of any Subsidiary, such case becomes jointly administered with the Chapter 11 Cases with the consent of the Required Lenders; or

       (g)    <u>Inability to Pay Debts; Attachment</u>.  (i) Any Subsidiary (other than a Debtor or the Canadian Subsidiary pursuant to the CCAA Case) becomes unable or admits in writing its inability or fails generally to pay its debts as they become due, or (ii) any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part any Subsidiary (other than a Debtor), taken as a whole, and is not released, vacated or fully bonded within sixty (60) days after its issue or levy; or

       (h)    <u>Judgments</u>.  There is entered against any Loan Party or any Subsidiary a final post-petition judgment or order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by independent third-party insurance) and such post-petition judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of sixty (60) consecutive days; or

       (i)    <u>Invalidity of Loan Documents</u>.  Any material provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder (including as a result of a transaction permitted under <u>Section 7.05</u>) or as a result of acts or omissions by the Administrative Agent or any Lender or the satisfaction in full of all the Obligations, ceases to be in full force and effect or the DIP Order ceases to create a valid and perfected lien with the priority set forth therein; or any Loan Party contests in writing the validity or enforceability of any material provision of any Loan Document; or any Loan Party denies in writing that it has any or further liability or obligation under any Loan Document (other than as a result of repayment in full of the Obligations and termination of the Aggregate Commitments), or purports in writing to revoke or rescind any Loan Document; or

       (j)    <u>Change of Control</u>.  There occurs any Change of Control; or

(k)     ERISA.  (i) An ERISA Event or similar event with respect to a Foreign Plan occurs which has resulted or could reasonably be expected to result in liability of a Loan Party in an aggregate amount which could reasonably be expected to result in a Material Adverse Effect, or (ii) a Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its Withdrawal Liability in an aggregate amount which could reasonably be expected to result in a Material Adverse Effect; or

(l)     The Prepetition ABL Forbearance shall (i) no longer be in full force and effect or (ii) have been amended, waived, changed or otherwise modified (other than with the consent of the Required Lenders; or

(m)     Any material provision of the Canadian Intercompany Loan Agreement or the Canadian Demand Note ceases to be in full force and effect or the Canadian Demand Note fails to be secured by a valid and perfected superpriority lien on the assets of the Canadian Subsidiary secured by the CCAA DIP Charge; or the Canadian Subsidiary or any Loan Party contests in writing the validity or enforceability of any material provision of the Canadian Intercompany Loan Agreement or the Canadian Demand Note; the Canadian Subsidiary denies in writing that it has any or further liability or obligation under the Canadian Intercompany Loan Agreement or the Canadian Demand Note (other than as a result of repayment in full in cash of the obligations thereunder), or purports in writing to revoke or rescind the Canadian Intercompany Loan Agreement or the Canadian Demand Note; or the Loan Parties transfer the Canadian Intercompany Loan Agreement or the Canadian Demand Note or their interests therein or the receivable represented by the Canadian Demand Note ceases to constitute Collateral (other than as a result of repayment in full in cash of the obligations thereunder); or

(n)     The failure by the Debtors to timely object to any request for payment of an administrative claim filed in the Chapter 11 Cases over the Threshold Amount, or the settlement by the Debtors of any claim in any amount over the Threshold Amount other than pursuant to customary "first day" and "second day" orders, without the prior written consent of the Required Lenders (which approval may be communicated via an email from each of the Lender Advisors) (which consent shall constitute authorization under this Agreement); or

(o)     The entry of an order by the Bankruptcy Court appointing, the filing of an application by any Debtor or any Debtor consenting to or supporting an application by any other Person, for an order seeking the appointment of, in either case without the prior written consent of the Required Lenders, an interim or permanent trustee in any Chapter 11 Case or the appointment of a receiver or an examiner under Section 1104 of the Bankruptcy Code in any Chapter 11 Case with expanded powers (beyond those set forth in Sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) to operate or manage the financial affairs, the business, or reorganization of the Debtors; or

(p)     Other than circumstances whereby the Obligations are paid in full, the consummation of a sale of all or substantially all of the Debtors' assets pursuant to a sale under Section 363 of the Bankruptcy Code, a confirmed plan of reorganization in the Chapter 11 Cases or otherwise or any Loan Party shall file a motion or other pleading or shall consent to or support a motion or other pleading filed by any other Person seeking any of the foregoing, in each case, without the prior written consent of the Required Lenders; or

(q)    Subject to the DIP Order and the Carve-Out, and except as expressly permitted hereunder, the entry of an order in any of the Chapter 11 Cases granting any claim against any Debtor (as defined in the DIP Order) entitled to superpriority administrative expense status in any of the Chapter 11 Cases pursuant to section 364(c)(2) of the Bankruptcy Code that is *pari passu* with or senior to the claims of the Secured Parties or any 507(b) claim, without the prior written consent of the Required Lenders (which consent shall not be unreasonably withheld, conditioned or delayed) (which, for the avoidance of doubt, can be communicated via e-mail from the Lender Advisors); or

(r)    The Debtors filing or supporting any motion, pleading, applications or adversary proceeding challenging the validity, enforceability, perfection, or priority of the liens securing the Prepetition Obligations or asserting or supporting any other cause of action against and/or with respect to any of the liens securing the Prepetition Obligations or any of the Prepetition Secured Parties; or

(s)    The conversion of any Chapter 11 Case of a Debtor from one under chapter 11 to one under chapter 7 of the Bankruptcy Code or any Debtor shall file a motion or other pleading or shall consent to or support a motion or other pleading filed by any other Person seeking the conversion of any Chapter 11 Case of a Debtor under Section 1112 of the Bankruptcy Code or otherwise; or

(t)    The payment of or granting adequate protection (except for Adequate Protection Obligations) that rank senior to or *pari passu* with the Adequate Protection Obligations with respect to any Prepetition Indebtedness (other than as set forth in the DIP Order or any Approved 13-Week Cash Flow); or

(u)    (i) The entry by the Bankruptcy Court of any order terminating the Debtors' exclusive periods to file a plan of reorganization or liquidation and solicit acceptances thereon under Section 1121 of the Bankruptcy Code or (ii) the expiration of any Loan Party's exclusive right to file a plan of reorganization or plan of liquidation; or

(v)    The dismissal of any Chapter 11 Case which does not contain a provision for Discharge of DIP Obligations, or if any Debtor shall file a motion or other pleading seeking the dismissal of any Chapter 11 Case which does not contain a provision for the Discharge of DIP Obligations; or

(w)    The entry of an order in any of the Chapter 11 Cases granting relief from or otherwise modifying any stay of proceeding (including the automatic stay) to allow a third party to execute upon or enforce a Lien against any assets of the Debtors (as defined in the DIP Order) that have an aggregate value in excess of $500,000; or

(x)    The bringing of a motion or taking of any action in any Chapter 11 Case, or the entry by the Bankruptcy Court of any order in any Chapter 11 Case: (i) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement or the DIP Order, as the case may be, except (x) as may be permitted by the Required Lenders in writing or (y) to the extent that such new financing shall pay in full in cash the Obligations substantially concurrently with the incurrence thereof or (ii) except as provided in

the DIP Order, to use cash collateral of the Agents or Lenders under Section 363(c) of the Bankruptcy Code without the prior written consent of the Required Lenders; or

(y)     The filing of a motion or the taking of any action in any Chapter 11 Case by any Debtor seeking the entry by the Bankruptcy Court of any order in any Chapter 11 Case, or the entry by the Bankruptcy Court of an order in any Chapter 11 Case, granting any Lien that is *pari passu* or senior to the Liens on the Collateral securing the Obligations, other than Liens expressly permitted under this Agreement or the DIP Order; or

(z)     The filing of a motion or the taking of any action in any Chapter 11 Case by any Debtor seeking an order, or the entry by the Bankruptcy Court of an order in any Chapter 11 Case, amending, supplementing, staying, vacating or otherwise modifying any Loan Document, the DIP Order or the Cash Management Order, in each case, in a manner that is adverse to the Agents and the Lenders, in their capacities as such, without the prior written consent of the Agents (with respect to their own rights and duties) and the Required Lenders; or

(aa)    The filing of a motion or the taking of any action in any Chapter 11 Case by any Debtor seeking the entry by the Bankruptcy Court of an order in any Chapter 11 Case, or the entry by the Bankruptcy Court of an order in any Chapter 11 Case, avoiding or requiring repayment by any Lender of any portion of the payments made by any Debtor on account of the Obligations owing under this Agreement or the other Loan Documents; or

(bb)    The filing of a motion by any Debtor requesting, or the entry of any order by the Bankruptcy Court granting, any superpriority claim which is senior or *pari passu* with the Agents' and Lenders' claims or with the claims of the Prepetition Agents and the Prepetition Lenders under the Prepetition Loan Documents; or

(cc)    The filing of a motion or the taking of any action in any Chapter 11 Case by any Debtor seeking the entry of an order by the Bankruptcy Court, or the entry by the Bankruptcy Court of an order in any Chapter 11 Case, precluding any Agent or any Prepetition Agent to have the right to or be permitted to "credit bid"; or

(dd)    Any attempt by any Loan Party to reduce, set off or subordinate the Obligations or the Liens securing such Obligations to any other Indebtedness; or

(ee)    The filing by any Loan Party of any chapter 11 plan of reorganization or disclosure statement attendant thereto, or any amendment to such plan or disclosure, that is not an Acceptable Plan without the prior written consent of the Agents (with respect to their own rights and duties) and the Required Lenders; or

(ff)    (i) The filing by any of the Debtors of any motion, objection, application or adversary proceeding challenging the validity, enforceability, perfection or priority of, or seeking avoidance, subordination or characterization of, any portion of the Prepetition Obligations or the Obligations, and/or the liens securing the Prepetition Obligations or the Obligations or asserting any other claim or cause of action against and/or with respect to the Prepetition Obligations, the Obligations, the liens securing the Prepetition Obligations, the lien securing the Obligations, the Prepetition Agents, the Prepetition Lenders, the Agents, or the Lenders (or if any Debtor files a pleading supporting any such motion, application or adversary proceeding commenced by any

third party) or (ii) the entry of an order by the Bankruptcy Court providing relief adverse to the interests of any consenting Lender, the Prepetition Agents or the Agents with respect to any of the foregoing claims, causes of action or proceedings, but excluding preliminary or final relief granting standing to any other party to prosecute such claims, causes of action or proceeding; or

(gg)    An order in the Chapter 11 Cases shall be entered (i) charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the Administrative Agent and the other Secured Parties or (ii) limiting the extension under Section 552(b) of the Bankruptcy Code of the Liens of any Prepetition Agent on the Collateral to any proceeds, products, offspring, or profits of the Collateral acquired by any Loan Party after the Petition Date (or granting any other relief under section 552(b) of the Bankruptcy Code) or the commencement of other actions that is adverse to the Administrative Agent, the other Secured Parties or their respective rights and remedies under the Loan Documents in any of the Chapter 11 Cases or inconsistent with any of the Loan Documents; or

(hh)    Except as otherwise agreed by the Required Lenders in writing in advance:

(i)    the CCAA A&R Initial Order is not issued within 10 days following the issuance of the CCAA Initial Order;

(ii)    any order is issued in the CCAA Case that dismisses the CCAA Case or lifts the stay of proceedings therein to permit the enforcement of any security against the Canadian Subsidiary or the Canadian Collateral;

(iii)    the appointment of a receiver, interim receiver or similar official, an assignment in bankruptcy;

(iv)    a bankruptcy order or receiving order is issued against or in respect of the Canadian Subsidiary;

(v)    any other Lien is granted by the CCAA Court in respect of the Canadian Collateral that is in priority to or *pari passu* with the CCAA DIP Charge (other than the CCAA Administration Charge and the CCAA D&O Charge);

(vi)    any order is issued in the CCAA Case modifying the Canadian Intercompany Loan Agreement or the Canadian Demand Note;

(vii)    any CCAA Order is stayed, reversed, vacated or otherwise modified; or

(viii)    the stay of proceedings provided for in the CCAA Initial Order or the A&R Initial Order expires without further extension; or

(ii)    Any Material Adverse Effect shall have occurred.

Notwithstanding anything to the contrary contained in this Agreement, no Default or Event of Default under this Agreement (other than a Default or Event of Default arising as a result of noncompliance with Section 7.13) shall occur solely as a result of any actions taken or

omitted to be taken or inaccuracy of representations or warranties made by any Subsidiary formed or organized in the Russian Federation to the extent such action or inaction (or the circumstances resulting in such inaccuracy of representations or warranties) was not directed or caused (and could not reasonably be directed or caused) by any Loan Party or any other Subsidiary not formed or organized in the Russian Federation (this paragraph, the "Russian Federation Rule").

Section 8.02    Remedies Upon Event of Default.

(a)    If any Event of Default occurs and is continuing, subject to the terms of the conditions of the DIP Order, the Administrative Agent may and, at the request of the Required Lenders, shall take any or all of the following actions upon written notice thereof by the Administrative Agent (which such notice shall be made to the Debtors, the Committee and the U.S. Trustee and shall be referred to herein as a "Termination Declaration" and the date on which any Termination Declaration is made (excluding the notice period) being herein referred to as the "Termination Declaration Date"):

(i)    declare the commitment of each Lender to make Loans to be terminated, whereupon such commitments shall be terminated;

(ii)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower;

(iii)    declare a restriction or termination of the Loan Parties' ability to use cash collateral; and

(iv)    exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law;

In addition, five (5) Business Days following the Termination Declaration Date (such five (5) Business Day period, the "Remedies Notice Period"), absent the Debtors curing all such existing Events of Default during such Remedies Notice Period, the Agents, subject to other applicable conditions set forth in the DIP Order, may foreclose on all or any portion of the Collateral, collect accounts receivable and, subject to the Carve-Out, apply the proceeds thereof to the Obligations in accordance with Section 8.04, occupy the Loan Parties' premises to sell or otherwise dispose of the Collateral or otherwise exercise remedies against the Collateral permitted by applicable non-bankruptcy law and the DIP Order.  During the Remedies Notice Period, the Debtors and any statutory committee shall be entitled to seek an emergency hearing before the Bankruptcy Court for the sole purpose of determining whether an Event of Default has occurred.

Section 8.03    [Reserved].

Section 8.04    Application of Funds.  If the circumstances described in Section 2.12(g) have occurred, or after the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable), including in any bankruptcy or

insolvency proceeding, any amounts received on account of the Obligations shall be applied by the Administrative Agent, subject to the DIP Order and the Carve-Out, in the following order:

> First, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including Attorney Costs payable under Section 10.04 and amounts payable under Article III and Section 10.05) payable to each Agent in its capacity as such;

> Second, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including Attorney Costs payable under Section 10.04 and amounts payable under Article III), ratably among them in proportion to the amounts described in this clause Second payable to them;

> Third, to payment of that portion of the Obligations constituting accrued and unpaid interest (including, but not limited to, post-petition interest), ratably among the Lenders in proportion to the respective amounts described in this clause Third payable to them;

> Fourth, to payment of that portion of the Obligations constituting unpaid principal of the Loans, ratably among the Secured Parties in proportion to the respective amounts described in this clause Fourth;

> Fifth, to the payment of all other Obligations of the Loan Parties that are due and payable to the Administrative Agent and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and the other Secured Parties on such date; and

> Last, the balance, if any, after all of the Obligations have been paid in full, to the Borrower or as otherwise required by Law.

ARTICLE IX

ADMINISTRATIVE AGENT AND OTHER AGENTS

Section 9.01    Appointment and Authorization of Agents.

(a)    Each Lender hereby irrevocably appoints, designates and authorizes the Administrative Agent to take such action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to it by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably incidental thereto.  Notwithstanding any provision to the contrary contained elsewhere herein or in any other Loan Document, the Administrative Agent shall have no duties or responsibilities, except those expressly set forth herein, nor shall the Administrative Agent have or be deemed to have any fiduciary relationship with any Lender or participant, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Administrative Agent. Without limiting the generality of the foregoing sentence, the use of the term "agent" herein and in the other Loan Documents with reference to any Agent is not intended to connote any fiduciary

or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

(b)    [Reserved].

(c)    The Administrative Agent shall also act as the "Collateral Agent" under the Loan Documents and each of the Lenders hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of (and to hold any security interest, charge or other Lien created by the Collateral Documents for and on behalf of or on trust for) such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Administrative Agent, as the "Collateral Agent" (and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 9.02 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent), shall be entitled to the benefits of all provisions of this Article IX and Article X and all other rights, privileges, protections, immunities, and indemnities granted to an Agent hereunder and under the other Loan Documents as if set forth in full herein with respect thereto and references to the "Administrative Agent" in provisions granting rights, privileges, protections, immunities, and indemnities to the Administrative Agent hereunder and under the other Loan Documents shall also be deemed to include the Collateral Agent.  Without limiting the generality of the foregoing, the Lenders hereby expressly authorize the Administrative Agent to execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of the Loan Documents and the Collateral Documents and acknowledge and agree that any such action by any Agent shall bind the Lenders.

Section 9.02    Delegation of Duties.  The Administrative Agent may execute any of its duties under this Agreement or any other Loan Document (including for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents or of exercising any rights and remedies thereunder) by or through Affiliates, agents, employees or attorneys-in-fact, such sub-agents as shall be deemed necessary by the Administrative Agent, and shall be entitled to advice of counsel, both internal and external, and other consultants or experts concerning all matters pertaining to such duties.  The Administrative Agent shall not be responsible for the negligence or misconduct of any agent or sub-agent or attorney-in-fact that it selects in the absence of gross negligence or willful misconduct as determined by a final, non-appealable judgment of a court of competent jurisdiction.

Section 9.03    Liability of Agents.  No Agent-Related Person shall (a) be liable to any Lender for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby, including their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent (except for its own gross negligence or willful misconduct, as determined by the final and non-appealable judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein) or (b) be responsible in any manner to any Lender or participant for any recital, statement, representation or warranty made by

any Loan Party or any officer thereof, contained herein or in any other Loan Document, or in any certificate, report, statement or other document referred to or provided for in, or received by the Administrative Agent under or in connection with, this Agreement or any other Loan Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document, perfection or priority of any Lien or security interest created or purported to be created under the Collateral Documents, or the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent, or for any failure of any Loan Party or any other party to any Loan Document to perform its obligations hereunder or thereunder. No Agent-Related Person shall be under any obligation to any Lender or participant to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party or any Affiliate thereof. No Agent shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that such Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that such Agent shall not be required to take any action that, in its judgment or the judgment of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable Law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law. No Agent nor any of its Agent-Related Persons shall be liable for any action taken or not taken by it (a) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents) or (b) in the absence of its own gross negligence or willful misconduct, as determined by the final and non-appealable judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein (which shall not include any action taken or omitted to be taken in accordance with clause (a), for which no Agent-Related Person shall have any liability).

Section 9.04    Reliance by Agents.

(a)    Each Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, communication, signature, resolution, representation, notice, request, consent, certificate, instrument, affidavit, letter, telegram, facsimile, telex or telephone message, electronic mail message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to any Loan Party), independent accountants and other experts selected by such Agent and shall not incur any liability for relying thereon. Each Agent shall be fully justified in failing or refusing to take any action under any Loan Document unless it shall first receive such advice or concurrence of the Required Lenders (or such greater number of Lenders as may be expressly required hereby in any instance) as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Required Lenders (or such greater number of Lenders as may be expressly required hereby in any

instance) and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders.

(b)       For purposes of determining compliance with the conditions specified in Section 4.01 or Section 4.02, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date or proposed Credit Extension, as applicable, specifying its objection thereto.

Section 9.05   Notice of Default.  The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default, except with respect to defaults in the payment of principal, interest and fees required to be paid to the Administrative Agent for the account of the Lenders, unless the Administrative Agent shall have received written notice from a Lender or the Borrower referring to this Agreement, describing such Default and stating that such notice is a "notice of default."  The Administrative Agent will notify the Lenders of its receipt of any such notice.  Subject to the other provisions of this Article IX, the Administrative Agent shall take such action with respect to such Event of Default as may be directed by the Required Lenders in accordance with Article VIII; provided that unless and until the Administrative Agent has received any such direction, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Event of Default as it shall deem advisable or in the best interest of the Lenders.

Section 9.06   Credit Decision; Disclosure of Information by Agents.  Each Lender acknowledges that no Agent-Related Person has made any representation or warranty to it, and that no act by any Agent hereafter taken, including any consent to and acceptance of any assignment or review of the affairs of any Loan Party or any Affiliate thereof, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender as to any matter, including whether Agent-Related Persons have disclosed material information in their possession.  Each Lender represents to each Agent that it has, independently and without reliance upon any Agent-Related Person and based on such documents and information as it has deemed appropriate, made its own appraisal of an investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of the Loan Parties and their respective Subsidiaries, and all applicable bank or other regulatory Laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrower and the other Loan Parties hereunder.  Each Lender also represents that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrower and the other Loan Parties.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by any Agent herein, such Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Loan Parties or any of their respective Affiliates which may come into the possession of any Agent-Related Person.

Section 9.07    Indemnification of Agents.  Whether or not the transactions contemplated hereby are consummated, the Lenders shall indemnify upon demand each Agent-Related Person (to the extent not reimbursed by or on behalf of any Loan Party and without limiting the obligation of any Loan Party to do so), pro rata, and hold harmless each Agent-Related Person from and against any and all Indemnified Liabilities incurred by it in its capacity as an Agent-Related Person; provided that no Lender shall be liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities resulting from such Agent-Related Person's own gross negligence or willful misconduct, as determined by the final and non-appealable judgment of a court of competent jurisdiction; provided that no action taken in accordance with the directions of the Required Lenders (or such other number or percentage of the Lenders as shall be required by the Loan Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 9.07.  In the case of any investigation, litigation or proceeding giving rise to any Indemnified Liabilities, this Section 9.07 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person.  Without limitation of the foregoing, each Lender shall reimburse the Administrative Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including Attorney Costs) incurred by the Administrative Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that the Administrative Agent is not reimbursed for such expenses by or on behalf of the Borrower, provided that such reimbursement by the Lenders shall not affect the Borrower's continuing reimbursement obligations with respect thereto, if any.  The undertaking in this Section 9.07 shall survive termination of the Aggregate Commitments, the payment of all other Obligations and the resignation of the Administrative Agent.

Section 9.08    Agents in their Individual Capacities.  AD and its Affiliates may make loans to, accept deposits from, acquire Equity Interests in and generally engage in any kind of banking, trust, financial advisory, underwriting or other business with each of the Loan Parties and their respective Affiliates as though AD were not the Administrative Agent hereunder and without notice to or consent of the Lenders.  The Lenders acknowledge that, pursuant to such activities, AD or its Affiliates may receive information regarding any Loan Party or any Affiliate of a Loan Party (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that the Administrative Agent shall be under no obligation to provide such information to them.  With respect to its Loans, AD shall have the same rights and powers under this Agreement as any other Lender and may exercise such rights and powers as though it were not the Administrative Agent, and the terms "Lender" and "Lenders" include AD in its individual capacity.

Section 9.09    Successor Agents.    The Administrative Agent may resign as the Administrative Agent and Collateral Agent upon thirty (30) days' notice to the Lenders and the Borrower.  If the Administrative Agent resigns under this Agreement, the Required Lenders shall appoint a successor agent for the Lenders.  If no successor agent is appointed prior to the effective date of the resignation of the Administrative Agent, the Administrative Agent may appoint, with the consent of the Required Lenders, a successor agent.  Upon the acceptance of its appointment as successor agent hereunder, the Person acting as such successor agent shall succeed to all the rights, powers and duties of the retiring Administrative Agent and Collateral Agent and the term

"Administrative Agent" shall mean such successor administrative agent and/or supplemental administrative agent, as the case may be (and the term "Collateral Agent" shall mean such successor collateral agent and/or supplemental agent, as described in Section 9.01(c)), and the retiring Administrative Agent's appointment, powers and duties as the Administrative Agent and Collateral Agent shall be terminated.  After the retiring Administrative Agent's resignation hereunder as the Administrative Agent and Collateral Agent, the provisions of this Article IX and Section 10.04 and Section 10.05 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Administrative Agent and Collateral Agent under this Agreement.  If no successor agent has accepted appointment as the Administrative Agent and Collateral Agent by the date which is thirty (30) days following the retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of the Administrative Agent and Collateral Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above (except that in the case of any collateral security held by the Collateral Agent on behalf of the Lenders under any of the Loan Documents, the retiring Collateral Agent shall continue to hold such collateral security until such time as a successor Collateral Agent is appointed).  Upon the acceptance of any appointment as the Administrative Agent and Collateral Agent hereunder by a successor and upon the execution and filing or recording of such financing statements, or amendments thereto, and such other instruments, documents or notices (or amendment to any existing instruments, documents or notices), as may be necessary or desirable, or as the Required Lenders may reasonably request, in order to (a) continue the perfection of the Liens granted or purported to be granted by the Collateral Documents or (b) otherwise ensure that the Collateral and Guarantee Requirement is satisfied, the Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, discretion, privileges, and duties of the retiring Administrative Agent and Collateral Agent (other than as provided in Section 3.08 and other than any rights to indemnity payments or other amounts owed to the retiring Administrative Agent as of the effective date of its resignation), and the retiring Administrative Agent and Collateral Agent shall, to the extent not previously discharged, be discharged from its duties and obligations under the Loan Documents.

Section 9.10    Administrative Agent May File Proofs of Claim.  In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Section 2.09 and Section 10.04) allowed in such judicial proceeding; and

(b)      to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and

(c)      any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agents and their respective agents and counsel, and any other amounts due to the Administrative Agent under Section 2.09 and Section 10.04.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code of the United States, including under Sections 363, 1123 or 1129 of the Bankruptcy Code of the United States, or any similar Laws in any other jurisdictions to which a Loan Party is subject or (b) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable Law. In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Equity Interests or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase). In connection with any such bid (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles to make a bid, (ii) to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or Equity Interests thereof) shall be governed, directly or indirectly, by the vote of the Required Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in clauses (a) through (f) of Section 10.01 of this Agreement, (iii) the Administrative Agent shall be authorized to assign the relevant Obligations to any such acquisition vehicle pro rata by the Lenders, as a result of which each of the Lenders shall be deemed to have received a pro rata portion of any Equity Interests and/or debt instruments issued by such an acquisition vehicle on account of the assignment of the Obligations to be credit bid, all without the need for any Secured Party or acquisition vehicle to take any further action, and (iv) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any

113

reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Lenders pro rata and the Equity Interests and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.

Section 9.11   <u>Collateral and Guaranty Matters</u>.   The Lenders irrevocably agree that, subject to the DIP Order:

(a)    that any Lien on any property granted to or held by the Administrative Agent or the Collateral Agent under any Loan Document shall be automatically released (i) upon the Discharge of DIP Obligations, (ii) at the time the property subject to such Lien is transferred as part of or in connection with any transaction permitted hereunder or under any other Loan Document to any Person other than any other Loan Party (<u>provided</u> that in the event of a transfer of assets from a Loan Party to another Loan Party organized in a different jurisdiction, the Collateral Agent shall release such Lien if such transferee Loan Party takes all actions reasonably necessary to grant a Lien in such transferred assets to the Collateral Agent (to the extent required by the Collateral and Guarantee Requirement)), (iii) subject to <u>Section 10.01</u>, if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders, (iv) if the property subject to such Lien is owned by a Guarantor, upon release of such Guarantor from its obligations under its Guaranty pursuant to <u>clause (c)</u> below or (v) subject to the DIP Order, as required by the Collateral Agent to effect any Disposition of Collateral in connection with an exercise of remedies of the Collateral Agent hereunder and under the DIP Order;

(b)    [reserved]; and

(c)    if any Subsidiary Guarantor becomes an Excluded Subsidiary as a result of a transaction permitted hereunder (as certified in writing delivered to the Administrative Agent by a Responsible Officer of the Borrower), (x) such Subsidiary shall be released from its obligations under the Guaranty and (y) any Liens granted by such Subsidiary or Liens on the Equity Interests of such Subsidiary (to the extent such Equity Interests have become Excluded Property or are being transferred to a Person that is not a Loan Party) shall be released; <u>provided</u>, if any Subsidiary Guarantor becomes an Excluded Subsidiary of the type described in <u>clause (j)</u> of the definition thereof, such Subsidiary shall not be released from its obligations under the Guaranty unless either (x) as a result of such transaction, the Borrower no longer owns any Equity Interests of such Subsidiary Guarantor or (y)(1) such transaction is entered into for a bona fide business purpose (and not to evade the Loan Guaranty or the Collateral and Guarantee Requirement) and (2) such Subsidiary Guarantor becomes a bona fide joint venture with a Person who is not an Affiliate of the Borrower.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property or to release any Guarantor from its obligations under the Guaranty pursuant to this <u>Section 9.11</u>.  In each case as specified in this <u>Section 9.11</u>, upon the certification by the Borrower that such release is permitted by this Agreement, the Administrative Agent will promptly (and each Lender irrevocably authorizes the Administrative Agent to), at the

Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release or subordination of such item of Collateral from the assignment and security interest granted under the DIP Order, or to evidence the release of such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this <u>Section 9.11</u>.

The Collateral Agent shall have no obligation whatsoever to the Lenders or to any other Person to assure that the Collateral exists or is owned by any Loan Party or is cared for, protected or insured or that the Liens granted to the Collateral Agent herein or pursuant hereto have been properly or sufficiently or lawfully created, perfected, maintained, protected or enforced or are entitled to any particular priority, or to exercise or to continue exercising at all or in any manner or under any duty of care, disclosure or fidelity any of the rights, authorities and powers granted or available to the Collateral Agent in this <u>Section 9.11</u> or in any of the Collateral Documents, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Collateral Agent may act in any manner it may deem appropriate, in its sole discretion, given the Collateral Agent's own interest in the Collateral and that the Collateral Agent shall have no duty or liability whatsoever to the Lenders, except for its gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

Section 9.12   [Reserved].

Section 9.13   <u>Appointment of Supplemental Administrative Agents</u>.

(a)   It is the purpose of this Agreement and the other Loan Documents that there shall be no violation of any Law of any jurisdiction denying or restricting the right of banking corporations or associations to transact business as agent or trustee in such jurisdiction.  It is recognized that in case of litigation under this Agreement or any of the other Loan Documents, and in particular in case of the enforcement of any of the Loan Documents, or in case the Administrative Agent deems that by reason of any present or future Law of any jurisdiction it may not exercise any of the rights, powers or remedies granted herein or in any of the other Loan Documents or take any other action which may be desirable or necessary in connection therewith, the Administrative Agent is hereby authorized to appoint an additional individual or institution selected by the Administrative Agent in its sole discretion as a separate trustee, co-trustee, administrative agent, collateral agent, administrative sub-agent or administrative co-agent (any such additional individual or institution being referred to herein individually as a "<u>Supplemental Administrative Agent</u>" and, collectively, as "<u>Supplemental Administrative Agents</u>").

(b)   In the event that the Administrative Agent appoints a Supplemental Administrative Agent with respect to any Collateral, (i) each and every right, power, privilege or duty expressed or intended by this Agreement or any of the other Loan Documents to be exercised by or vested in or conveyed to the Administrative Agent with respect to such Collateral shall be exercisable by and vest in such Supplemental Administrative Agent to the extent, and only to the extent, necessary to enable such Supplemental Administrative Agent to exercise such rights, powers and privileges with respect to such Collateral and to perform such duties with respect to such Collateral, and every covenant and obligation contained in the Loan Documents and necessary to the exercise or performance thereof by such Supplemental Administrative Agent shall

115

run to and be enforceable by either the Administrative Agent or such Supplemental Administrative Agent, and (ii) the provisions of this Article IX and of Section 10.04 and Section 10.05 that refer to the Administrative Agent shall inure to the benefit of such Supplemental Administrative Agent and all references therein to the Administrative Agent shall be deemed to be references to the Administrative Agent and/or such Supplemental Administrative Agent, as the context may require.

(c)     Should any instrument in writing from any Loan Party be required by any Supplemental Administrative Agent so appointed by the Administrative Agent for more fully and certainly vesting in and confirming to him or it such rights, powers, privileges and duties, the Borrower shall, or shall cause such Loan Party to, execute, acknowledge and deliver any and all such instruments promptly upon request by the Administrative Agent.  In case any Supplemental Administrative Agent, or a successor thereto, shall die, become incapable of acting, resign or be removed, all the rights, powers, privileges and duties of such Supplemental Administrative Agent, to the extent permitted by Law, shall vest in and be exercised by the Administrative Agent until the appointment of a new Supplemental Administrative Agent.

Section 9.14   Withholding Tax.   To the extent required by any applicable Law, the Administrative Agent may deduct or withhold from any payment to any Lender under any Loan Document an amount equivalent to any applicable withholding Tax.  If the Internal Revenue Service or any other Governmental Authority asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender for any reason (including because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of, withholding Tax ineffective), such Lender shall indemnify and hold harmless the Administrative Agent fully for all amounts paid, directly or indirectly, by the Administrative Agent as Tax or otherwise, and shall make payable in respect thereof within ten (10) days after demand therefore including any penalties, additions to Tax or interest and together with all expenses (including legal expenses, allocated internal costs and out-of-pocket expenses) incurred, whether or not such Tax was correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this Section 9.14.  The agreements in this Section 9.14 shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of this Agreement and the repayment, satisfaction or discharge of all other obligations.  For the avoidance of doubt, this Section 9.14 shall not limit or expand the obligations of the Borrower or any Guarantor under Section 3.01 or any other provision of this Agreement.

Section 9.15   Certain ERISA Matters.

(a)     Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

116

(i)       such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Term Commitments or this Agreement,

(ii)       (ii) the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Term Commitments and this Agreement,

(iii)       (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Term Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Term Commitments and this Agreement satisfies the requirements of sub-sections (b) through (k) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Term Commitments and this Agreement, or

(iv)       such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)       In addition, unless either (1) sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that the Administrative Agent is not a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Term Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related hereto or thereto).

Section 9.16    Additional Agent Provisions.

(a)     The provisions of this <u>Article IX</u> are solely for the benefit of the Agents and the Lenders, and the Borrower and the other Loan Parties shall not have rights as a third-party beneficiary of any such provision.

(b)     Notwithstanding anything in this Agreement or any other Loan Document, no Agent shall be (i) required to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties, obligations, or responsibilities or in the exercise of any of its rights or powers under this Agreement or under any other Loan Document, (ii) responsible or liable for any failure or delay in the performance of its obligations under this Agreement or any other Loan Document arising out of or caused, directly or indirectly, by circumstances beyond its control, including without limitation, any act or provision of any present or future law or regulation or Governmental Authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; pandemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility, or (iii) be required to take title to any Collateral without its prior written consent.

(c)     For the avoidance of doubt, and without limiting the other protections set forth in this <u>Article IX</u>, with respect to any approval, determination, designation, or judgment to be made by any Agent herein or in the other Loan Documents, such Agent shall be entitled to request that the Required Lenders (or such other number or percentage of the Lenders as such Agent shall believe in good faith to be necessary hereunder, under this Agreement or the other Loan Documents) make or confirm such approval, determination, designation, or judgment.  The permissive rights of any Agent to take any actions permitted by this Agreement or any other Loan Document shall not be construed as an obligation or duty to do so.

(d)     Notwithstanding anything to the contrary contained in <u>Sections 10.04</u> or <u>10.05</u> or in any other Loan Document, the Loan Parties hereby agree that (i) the Agents shall be entitled to engage one primary outside counsel and one firm of local counsel in each appropriate jurisdiction in connection with this Agreement and the other Loan Documents, including in connection with the negotiation, preparation, execution, delivery, administration, or enforcement of the Loan Documents and any amendments, modifications or waivers of the provisions thereof, and all of the reasonable, documented, and invoiced fees, charges and disbursements of such counsel to the Agents shall be payable by the Borrower pursuant to <u>Section 10.04</u>, (ii) the Agents and their Indemnitees (taken as a whole) shall be entitled to engage one primary outside counsel and one firm of local counsel in each appropriate jurisdiction in connection with any of the Indemnified Liabilities for which an Indemnitee is entitled to indemnification under <u>Section 10.05</u>, and all of the reasonable, documented, and invoiced fees, charges and disbursements of such counsel to the Agents and their Indemnitees (taken as a whole) shall be payable and indemnifiable by the Borrower pursuant to <u>Section 10.05</u>.

(e)     At the request of any Agent, and to the extent that the Borrower has requested that such Agent take any action with respect thereto, the Borrower shall deliver an officer's certificate executed by a Responsible Officer of the Borrower to such Agent (upon which such Agent may conclusively rely without further investigation or inquiry), certifying that any

amendment or other documentation effectuating or memorializing any of the foregoing is authorized under this Agreement.

(f)     With respect to any release or subordination requested by the Borrower pursuant to Section 9.11, (i) the Agent may conclusively rely without further investigation or inquiry on any certification provided by the Borrower that such release or subordination is permitted by this Agreement, and (ii) no Agent shall be required to execute any document or take any action necessary to evidence such requested release or subordination on terms that, in its opinion or the opinion of its counsel, could expose such Agent to liability or create any obligation or entail any consequence other than on terms without recourse to or representation or warranty of any kind by such Agent.  Any release requested by the Borrower pursuant to Section 9.11 shall be without recourse to or representation or warranty by any Agent of any kind.

(g)     Erroneous Payments.

(i)     Each Lender hereby agrees that (A) if the Administrative Agent notifies such Lender that the Administrative Agent has determined in its reasonable discretion that any funds received by such Lender from the Administrative Agent or any of its Affiliates were erroneously or mistakenly transmitted to, or otherwise erroneously or mistakenly received by, such Lender (whether or not known to such Lender) (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, an "Erroneous Payment") and demands in writing the return of such Erroneous Payment (or a portion thereof), such Lender shall promptly, but in no event later than two (2) Business Days thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Lender to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect and (B) to the extent permitted by applicable law, such Lender shall not assert any right or claim to the Erroneous Payment, and hereby waives any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payments received, including, without limitation, waiver of any defense based on "discharge for value" or any similar theory or doctrine. A notice of the Administrative Agent to any Lender or under this clause (i) shall be conclusive, absent manifest error.

(ii)     Without limiting immediately preceding clause (i), each Lender hereby further agrees that if it receives a payment from the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment sent by the Administrative Agent, (y) that was not preceded or accompanied by notice of payment, or (z) that such Lender otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), then in each case, if an error has been made, and to the extent

permitted by applicable Law, such Lender shall not assert any right or claim to the Erroneous Payment, and hereby waives, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payments received, including without limitation waiver of any defense based on "discharge for value" or any similar theory or doctrine. Each Lender agrees that, in each such case, it shall, upon demand in writing from the Administrative Agent, promptly, but in all events no later than two (2) Business Days thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made in same day funds (in the currency so received), together with interest thereon (except to the extent waived in writing by the Administrative Agent) in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Lender to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect.

(iii)    The Borrower and each other Loan Party hereby agrees that (x) in the event an Erroneous Payment (or portion thereof) is not recovered from any Lender (and without limiting the Administrative Agent's rights and remedies under this Section 9.16(g)), the Administrative Agent shall be subrogated to all the rights of such Lender with respect to such amount and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Loan Party; provided, that for the avoidance of doubt, the immediately preceding clauses (x) and (y) shall not apply to the extent any such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from the Borrower or any other Loan Party, directly or indirectly, for the purpose of making a payment to pay, prepay, repay, discharge or otherwise satisfy any Obligation.

(iv)    In addition to any rights and remedies of the Administrative Agent provided by law, the Administrative Agent shall have the right, upon prior notice to any Lender, with respect to any Erroneous Payment for which a demand has been made in accordance with this Section 9.16(g) and which has not been returned to the Administrative Agent, to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final but excluding trust accounts), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by the Administrative Agent or any Affiliate, branch or agency thereof to or for the credit or the account of such Lender.

(h)    The agreements under this Article IX shall survive the resignation of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of this Agreement and the Commitments and the payment, satisfaction, or discharge of the Loans and all other Obligations payable hereunder and under any other Loan Document.

ARTICLE X

MISCELLANEOUS

Section 10.01 <u>Amendments, Etc</u>.  Except as otherwise set forth in this Agreement, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders and the Borrower or the applicable Loan Party, as the case may be, and acknowledged by the Administrative Agent (<u>provided</u> that to the extent that such waiver, amendment or modification does not affect the rights, duties, privileges or obligations of any Agent under this Agreement, the Administrative Agent shall acknowledge such waiver, amendment or other modification to the extent approved by the Required Lenders; <u>provided</u>, <u>further</u>, that, to the extent such waiver, amendment or modification was delivered to the Administrative Agent and does not affect the rights, duties, privileges or obligations of the Administrative Agent under this Agreement, the Administrative Agent's failure to so acknowledge shall not impact the effectiveness of such waiver, amendment or modification) and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; <u>provided</u> that no such amendment, waiver or consent shall:

(a)    extend or increase the Term Commitment of any Lender without the written consent of each Lender directly and adversely affected thereby;

(b)    postpone any date scheduled for, or reduce the amount of, any payment of principal or interest under <u>Section 2.07</u> or <u>Section 2.08</u>, fees or other amounts without the written consent of each Lender directly and adversely affected thereby, it being understood that the waiver of (or amendment to the terms of) any mandatory prepayment of the Loans shall not constitute a postponement of any date scheduled for the payment of principal or interest;

(c)    reduce the principal of, or the rate of interest specified herein on, any Loan, or (subject to <u>clause (iii)</u> of the second proviso to this <u>Section 10.01</u>) any fees, premiums or other amounts payable hereunder or under any other Loan Document without the written consent of each Lender directly and adversely affected thereby; <u>provided</u> that only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest at the Default Rate;

(d)    (i) change any provision of this <u>Section 10.01</u> or the definition of "<u>Required Lenders</u>" without the written consent of each Lender directly and adversely affected thereby or (ii) change any provision of <u>Section 8.04</u> in a manner that would alter the pro rata sharing or priority of payments thereunder without the written consent of each Lender directly and adversely affected thereby;

(e)    release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender; <u>provided</u> that any transaction permitted under <u>Section 7.05</u> shall not be subject to this <u>clause (e)</u> to the extent such transaction does not result in the release of all or substantially all of the Collateral; or

121

(f)    release all or substantially all of the value of the Guarantees in any transaction or series of related transactions, without the written consent of each Lender; provided that any transaction permitted under Section 7.05 shall not be subject to this clause (f) to the extent such transaction does not result in the release of all or substantially all of the Guarantees;

and provided, further, that

(i) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of, or any fees or other amounts payable to, any Agent under this Agreement or any other Loan Document;

(ii) Section 10.07(h) may not be amended, waived or otherwise modified without the consent of each Granting Lender all or any part of whose Loans are being funded by an SPC at the time of such amendment, waiver or other modification;

(iii) any amendment or waiver that by its terms affects the rights or duties of Lenders holding Loans or Term Commitments of a particular Class (but not the Lenders holding Loans or Term Commitments of any other Class) will require only the requisite percentage in interest of the affected Class of Lenders that would be required to consent thereto if such Class of Lenders were the only Class of Lenders, and

(iv) any amendment, waiver, modification, consent, extension or other modification of the terms of this Agreement by the Required Lenders may be communicated via e-mail from the Required Lenders (or their counsel and/or their advisors) to the Borrower and the Agents (or their respective counsel and/or advisors).

The Administrative Agent and the Borrower may, without the consent of any Lender, enter into amendments or modifications to this Agreement or any of the other Loan Documents or to enter into additional Loan Documents as the Administrative Agent, in consultation with the Borrower, deems appropriate in order to implement any Benchmark Replacement or any Benchmark Replacement Conforming Change or otherwise effectuate the terms of Section 3.09 in accordance with the terms thereof.

Section 10.02    Notices and Other Communications; Facsimile Copies.

(a)    General.  Unless otherwise expressly provided herein, all notices and other communications provided for hereunder or under any other Loan Document shall be in writing (including by facsimile transmission).  All such written notices shall be mailed, faxed or delivered to the applicable address, facsimile number or electronic mail address, as follows:

(i)    if to the Borrower or the Administrative Agent, to the address, facsimile number or electronic mail address specified for such Person on Schedule 10.02 or to such other address, facsimile number or electronic mail address as shall be designated by such party in a notice to the other parties; and

(ii)    if to any other Lender, to the address, facsimile number or electronic mail address specified in its Administrative Questionnaire or to such other address,

facsimile number or electronic mail address as shall be designated by such party in a written notice to the Borrower and the Administrative Agent.

All such notices and other communications shall be deemed to be given or made upon the earlier to occur of (i) actual receipt by the relevant party hereto and (ii) (A) if delivered by hand or by courier, when signed for by or on behalf of the relevant party hereto; (B) if delivered by mail, four (4) Business Days after deposit in the mails, postage prepaid; (C) if delivered by facsimile, when sent and receipt has been confirmed by telephone; and (D) if delivered by electronic mail (which form of delivery is subject to the provisions of Section 10.02(b)), when delivered; provided that notices and other communications to the Administrative Agent pursuant to Article II shall not be effective until actually received by such Person during the person's normal business hours.  In no event shall a voice mail message be effective as a notice, communication or confirmation hereunder.

(b)     Electronic Communications.  Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent or the Borrower may, in their discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)     The Platform.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."  THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall the Administrative Agent or any of its Agent-Related Persons (collectively, the "Agent Parties") have any liability to the Loan Parties, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind

(whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; provided, however, that in no event shall any Agent Party have any liability to any Loan Party, any Lender or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)     Change of Address, Etc.   Each of Topco, Midco, Holdings, the Borrower and the Administrative Agent may change its address or telecopier for notices and other communications hereunder by notice to the other parties hereto.  Each other Lender may change its address or facsimile for notices and other communications hereunder by notice to the Borrower and the Administrative Agent.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.  Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower or their securities for purposes of United States Federal or state securities laws.

(e)     Reliance by Agents and Lenders.   The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrower shall indemnify each Agent-Related Person and each Lender from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower in the absence of gross negligence or willful misconduct.

(f)     Notice to other Loan Parties.   The Borrower agrees that notices to be given to any other Loan Party under this Agreement or any other Loan Document may be given to the Borrower in accordance with the provisions of this Section 10.02 with the same effect as if given to such other Loan Party in accordance with the terms hereunder or thereunder.

(g)     Nothing in this Agreement or in any other Loan Document shall be construed to limit or affect the obligation of the Loan Parties or any other Person to serve upon the Administrative Agent, the Collateral Agent and the Lenders in the manner prescribed by the Bankruptcy Code any pleading or notice required to be given to the Administrative Agent, the Collateral Agent and the Lenders pursuant to the Bankruptcy Code.

Section 10.03  No Waiver; Cumulative Remedies.   No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right,

124

remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein <u>provided</u>, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law or under the Bankruptcy Code.

Section 10.04 <u>Attorney Costs and Expenses</u>. Subject to the DIP Order, the Borrower agrees (a) to pay or reimburse the Agents and the Lenders for all reasonable and documented or invoiced out-of-pocket costs and expenses associated with the syndication of the Term Loans and the preparation, execution and delivery, administration, amendment, modification, waiver and/or enforcement of this Agreement and the other Loan Documents, and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated); provided that with respect to legal expenses, such reimbursement shall be limited to all Attorney Costs, of Ropes & Gray LLP, as counsel to the Agents, and Weil, Gotshal & Manges LLP, as counsel to the Lenders, Goodmans LLP, as Canadian counsel to the Lenders, and other local and foreign counsel in each relevant jurisdiction, and (b) to pay or reimburse the Agents and each Lender for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement of any rights or remedies under this Agreement or the other Loan Documents. The agreements in this <u>Section 10.04</u> shall survive the termination of the Aggregate Commitments and repayment of all other Obligations. All amounts due under this <u>Section 10.04</u> shall be paid within ten (10) Business Days of receipt by the Borrower of an invoice relating thereto setting forth such expenses in reasonable detail. If any Loan Party fails to pay when due any costs, expenses or other amounts payable by it hereunder or under any Loan Document, such amount may be paid on behalf of such Loan Party by the Administrative Agent in its sole discretion.

Section 10.05 <u>Indemnification by the Borrower</u>. Subject to the DIP Order, Topco, Midco, Holdings and the Borrower shall indemnify and hold harmless each Agent-Related Person, each Lender and their respective Affiliates and their and their Affiliates' respective directors, officers, employees, counsel, agents, advisors, and other representatives (collectively, the "<u>Indemnitees</u>") from and against any and all losses, liabilities, damages, claims, and reasonable and documented or invoiced out-of-pocket fees and expenses; provided that with respect to legal expenses, limited to shall be limited to all Attorney Costs, of Ropes & Gray LLP, as counsel to the Agents, and Weil, Gotshal & Manges LLP, as counsel to the Lenders, Goodmans LLP, as Canadian counsel to the Lenders, and other local and foreign counsel in each relevant jurisdiction of any such Indemnitee arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such Indemnitee is a party thereto and whether or not such proceedings are brought by the Borrower, its equity holders, its Affiliates, creditors or any other third person) that relates to the Transaction, including the financing contemplated hereby, of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (a) the execution, delivery, enforcement, performance or administration of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (b) any Term Commitment or Loan or the use or proposed use of the proceeds therefrom, or (c) any actual or alleged presence or Release or threat of Release of Hazardous Materials on, at, under or from any property currently or formerly owned, leased or

125

operated by the Borrower, any Subsidiary or any other Loan Party or its Subsidiaries, and any Environmental Liability related in any way to the Borrower, any Subsidiary or any other Loan Party or its Subsidiaries, or (d) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) (all the foregoing, collectively, the "Indemnified Liabilities"), in all cases, whether or not caused by or arising, in whole or in part, out of the negligence of the Indemnitee; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements resulted from, (A) with respect to Indemnitees other than the Agent-Related Persons and their Indemnitees, (x) the gross negligence, bad faith or willful misconduct of such Indemnitee or of any of its controlled Affiliates or controlling Persons or any of the officers, directors, employees, agents, advisors or members of any of the foregoing, in each case who are involved in or aware of the Transaction (as determined by a court of competent jurisdiction in a final and non-appealable decision), (y) a material breach of the Loan Documents by such Indemnitee or one of its Affiliates (as determined by a court of competent jurisdiction in a final and non-appealable decision) or (z) disputes solely between and among such Indemnitees to the extent such disputes do not arise from any act or omission of the Borrower or any of its Affiliates (other than with respect to a claim against an Indemnitee acting in its capacity as an Agent or similar role under the Loan Documents unless such claim arose from the gross negligence, bad faith or willful misconduct of such Indemnitee (as determined by a court of competent jurisdiction in a final and non-appealable decision)) and (B) with respect to the Agent-Related Persons and their Indemnitees, the gross negligence or willful misconduct of such Indemnitee (as determined by a court of competent jurisdiction in a final and non-appealable decision). No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through IntraLinks or other similar information transmission systems in connection with this Agreement, nor shall any Indemnitee or any Loan Party have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date); provided that the foregoing shall not limit any Loan Party's indemnification obligations hereunder. In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 10.05 applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Loan Party, its directors, managers, partners, stockholders or creditors or an Indemnitee or any other Person, whether or not any Indemnitee is otherwise a party thereto and whether or not any of the transactions contemplated hereunder or under any of the other Loan Documents is consummated. Subject to the DIP Order, all amounts due under this Section 10.05 shall be paid within ten (10) Business Days after demand therefor; provided, however, that if the Borrower has reimbursed any Indemnitee for any legal or other expenses in connection with any Indemnified Liabilities and there is a final non-appealable judgment of a court of competent jurisdiction that the Indemnitee was not entitled to indemnification or contribution with respect to such Indemnified Liabilities pursuant to the express terms of this Section 10.05, the Indemnitee shall promptly refund such expenses paid by the Borrower to the Indemnitee. The agreements in this Section 10.05 shall survive the resignation of any Agent, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.

For the avoidance of doubt, this <u>Section 10.05</u> shall not apply to Taxes other than Taxes that represent liabilities, obligations, losses, damages, etc., with respect to a non-Tax claim.

Section 10.06  <u>Payments Set Aside</u>.  To the extent that any payment by or on behalf of the Borrower is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by any Agent, <u>plus</u> interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate.

Section 10.07  <u>Successors and Assigns</u>.

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except as otherwise provided herein, neither Topco nor any of its Subsidiaries may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Agents and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee, (ii) by way of participation in accordance with the provisions of <u>Section 10.07(e)</u>, (iii) by way of pledge or assignment of a security interest subject to the restrictions of <u>Section 10.07(g)</u> or (iv) to an SPC in accordance with the provisions of <u>Section 10.07(h)</u> (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in <u>Section 10.07(e)</u> and, to the extent expressly contemplated hereby, the Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.  Any assignment that violates or does not comply with this <u>Section 10.07</u> shall be void *ab initio*.

(b)     (i) Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees ("<u>Assignees</u>") all or a portion of its rights and obligations under this Agreement (including all or a portion of its Term Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld or delayed) of:

(A)     [reserved]; and

(B)     the Administrative Agent; <u>provided</u> that no consent of the Administrative Agent shall be required for an assignment of all or any portion of a Loan to another Lender, an Affiliate of a Lender or an Approved Fund.

127

(ii)     Assignments shall be subject to the following additional conditions:

(A)     except in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Term Commitment or Loans of any Class, the amount of the Term Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000 unless the Administrative Agent otherwise consents;

(B)     the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption;

(C)     the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire and any documentation required by Section 3.01(f) together with all "know your customer" information requested by the Administrative Agent;

(D)     the Assignee shall not be a natural person;

(E)     the Assignee shall not be a Defaulting Lender; and

(F)     the Assignee shall not be the Borrower or any of its Subsidiaries or Affiliates.

This paragraph (b) shall not prohibit (i) any Lender from assigning all or a portion of its rights and obligations among separate Classes on a non-pro rata basis or (ii) the assignment by Jefferies Capital Services, LLC, in its capacity as fronting lender, of funded New Money Loans separately from any New Money Second Draw Commitment and/or New Money Third Draw Commitment.

(c)     Subject to acceptance and recording thereof by the Administrative Agent pursuant to Section 10.07(d) and receipt by the Administrative Agent from the parties to each assignment of a processing and recordation fee of $3,500 (provided that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment), from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.03, 3.04, 10.04 and 10.05 with respect to facts and circumstances occurring prior to the effective date of such assignment).  Upon request, and the surrender by the assigning Lender of its Term Note (if any), the Borrower (at its expense) shall execute and deliver a Term Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this clause (c) shall be

128

treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.07(e). For greater certainty, any assignment by a Lender pursuant to this Section 10.07 shall not in any way constitute or be deemed to constitute a novation, discharge, recession, extinguishment or substitution of the existing Indebtedness and any Indebtedness so assigned shall continue to be the same obligation and not a new obligations.

(d)     The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Term Commitments of, and principal amounts (and related interest amounts) and currencies of the Loans, owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, absent demonstrable error, and the Borrower, the Agents and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, any Agent and any Lender (with respect to its own interests only), at any reasonable time and from time to time upon reasonable prior notice. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph. This Section 10.07(d) shall be construed so that the Loans are at all times maintained in "registered form" within the meanings of Code Section 163(f), 871(h)(2) and 881(c)(2) and any related regulations (and successor provisions).

(e)     Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural person and other than to Topco, Midco, Holdings, the Borrower or any Subsidiary) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Term Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or the other Loan Documents; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in Section 10.01(a), (b), (c), (d), (e) or (f) that directly affects such Participant. Subject to Section 10.07(f), the Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.01, 3.03 and 3.04 (through the applicable Lender), subject to the requirements and limitations of such Sections (including Section 3.01(e) and (f) and Section 3.05), to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.07(b). To the extent permitted by applicable Law, each Participant also shall be entitled to the benefits of Section 10.09 as though it were a Lender; provided that such Participant complies with Section 2.13 as though it were a Lender. Any Lender that sells participations shall maintain a register on which it enters the name and the address of each Participant and the principal and interest amounts of each Participant's participation interest in the Term Commitments and/or Loans (or other rights or obligations) held by it (the "Participant Register"). The entries in the

129

Participant Register shall be conclusive, absent demonstrable error, and the Borrower and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation interest as the owner thereof for all purposes notwithstanding any notice to the contrary.  In maintaining the Participant Register, such Lender shall be acting as the non-fiduciary agent of the Borrower solely for purposes of applicable United States federal income tax law and undertakes no duty, responsibility or obligation to the Borrower (without limitation, in no event shall such Lender be a fiduciary of the Borrower for any purpose).  No Lender shall have any obligation to disclose all or any portion of a Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, or its other obligations under this Agreement) except to the extent that such disclosure is necessary to establish in connection with a Tax audit that such commitment, loan, or other obligation is in registered form under Section 5f.103(c) of the United States Treasury Regulations or, if different, under Sections 871(h) or 881(c) of the Code.

(f)    A Participant shall not be entitled to receive any greater payment under Section 3.01, 3.03 or 3.04 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent or except to the extent such entitlement to a greater payment results from a Change in Law after the Participant became a Participant.

(g)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Term Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other central bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(h)    Notwithstanding anything to the contrary contained herein, any Lender (a "Granting Lender") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "SPC") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; provided that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan and (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof.  Each party hereto hereby agrees that (i) an SPC shall be entitled to the benefit of Sections 3.01, 3.03 and 3.04, subject to the requirements and limitations of such Sections (including Section 3.01(e) and (f) and Section 3.05), to the same extent as if such SPC were a Lender, but neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement (including its obligations under Section 3.01, 3.03 or 3.04) except to the extent any entitlement to greater amounts results from a Change in Law after the grant to the SPC occurred, (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable and such liability shall remain with the Granting Lender, and (iii) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the lender of record hereunder.  The making of a Loan by an SPC hereunder shall utilize

the Term Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the Borrower and the Administrative Agent, assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee Obligation or credit or liquidity enhancement to such SPC.

(i)    Notwithstanding anything to the contrary contained herein, (1) any Lender may in accordance with applicable Law create a security interest in all or any portion of the Loans owing to it and the Term Note, if any, held by it and (2) any Lender that is a Fund may create a security interest in all or any portion of the Loans owing to it and the Term Note, if any, held by it to the trustee for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; provided that unless and until such trustee actually becomes a Lender in compliance with the other provisions of this Section 10.07, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

(j)    Notwithstanding anything herein to the foregoing, in no event shall any assignment or participations be permitted to Topco, Midco, Holdings, the Borrower or any of its Subsidiaries or Affiliates.

Section 10.08 Confidentiality. Each of the Agents and the Lenders agrees to maintain the confidentiality of the Information and to not use or disclose such information, except that Information may be disclosed (a) to its Affiliates and its and its Affiliates' directors, officers, employees, trustees, auditors, investment advisors and agents and other Agent-Related Persons, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential); (b) to the extent requested by any Governmental Authority, to any pledgee referred to in Section 10.07(g); (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process; (d) to any other party to this Agreement; (e) subject to an agreement containing provisions substantially the same as those of this Section 10.08 (or as may otherwise be reasonably acceptable to the Borrower), to any pledgee referred to in Section 10.07(i), counterparty to a Swap Contract, Eligible Assignee of or Participant in, or any prospective Eligible Assignee of or Participant in, any of its rights or obligations under this Agreement, or any prospective successor Agent; (f) with the written consent of the Borrower; (g) to the extent such Information becomes publicly available other than as a result of a breach of this Section 10.08; (h) to any Governmental Authority or examiner regulating any Lender or any Agent; (i) to any rating agency when required by it (it being understood that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Information relating to the Loan Parties received by it from such Lender); (j) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder; (k) to the extent that such Information is received by such Agent or Lender or any of its Affiliates from a third party that is not, to such Agent's Lender's knowledge, subject to any

contractual or fiduciary confidentiality obligations owing to the Borrower or any of its Affiliates; (l) to the extent that such Information is independently developed by such Agent or Lender or any of its Affiliates; or (m) to the Bankruptcy Court in connection with the approval of the Transactions contemplated hereby.  In addition, the Agents and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry, and service providers to the Agents and the Lenders in connection with the administration and management of this Agreement, the other Loan Documents, the Term Commitments, and the Credit Extensions.  For the purposes of this Section 10.08, "Information" means all information received from any Loan Party or its Affiliates or its Affiliates' directors, managers, officers, employees, trustees, investment advisors or agents, relating to Topco, Midco, Holdings, the Borrower or any of their Subsidiaries or their business, other than any such information that is publicly available to any Agent or any Lender prior to disclosure by any Loan Party other than as a result of a breach of this Section 10.08, including, without limitation, information delivered pursuant to Section 6.01, 6.02 or 6.03 hereof.

Section 10.09  Setoff.  In addition to any rights and remedies of the Lenders provided by Law, upon the occurrence and during the continuance of any Event of Default, subject to the DIP Order, each Lender and its Affiliates is authorized at any time and from time to time, without prior notice to the Borrower or any other Loan Party, any such notice being waived by the Borrower (on its own behalf and on behalf of each Loan Party and its Subsidiaries) to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final but excluding any payroll, trust, or tax withholding accounts) at any time held by, and other Indebtedness (in any currency) at any time owing by, such Lender and its Affiliates, as the case may be, to or for the credit or the account of the respective Loan Parties and their Subsidiaries against any and all Obligations owing to such Lender and its Affiliates hereunder or under any other Loan Document, now or hereafter existing, irrespective of whether or not such Agent or such Lender or Affiliate shall have made demand under this Agreement or any other Loan Document and although such Obligations may be contingent or unmatured or denominated in a currency different from that of the applicable deposit or Indebtedness.  Notwithstanding anything to the contrary contained herein, no Lender or its Affiliates shall have a right to set off and apply any deposits held or other Indebtedness owing by such Lender or its Affiliates, as the case may be, to or for the credit or the account of any Subsidiary of a Loan Party that is an Excluded Foreign Subsidiary or a Domestic Foreign Holding Company.  Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such set off and application made by such Lender, as the case may be; provided that the failure to give such notice shall not affect the validity of such setoff and application.  The rights of the Administrative Agent, each Lender under this Section 10.09 are in addition to other rights and remedies (including other rights of setoff) that the Administrative Agent and such Lender may have.

Section 10.10  Counterparts.  This Agreement and each other Loan Document may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Delivery by telecopier or other electronic transmission of an executed counterpart of a signature page to this Agreement and each other Loan Document shall be effective as delivery of an original executed counterpart of this Agreement and such other Loan Document.  The Agents may also require that any such documents and signatures delivered by telecopier or other electronic transmission be confirmed by a manually signed original

thereof; <u>provided</u> that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by telecopier or other electronic transmission.

Section 10.11 <u>Integration</u>. This Agreement, together with the other Loan Documents, the Agent Fee Letter and the fee letter between the Borrower and Jefferies Capital Services, LLC, as fronting lender, comprises the complete and integrated agreement of the parties on the subject matter hereof and thereof and supersedes all prior agreements, written or oral, on such subject matter.  In the event of any conflict between the provisions of this Agreement and those of any other Loan Document, the provisions of this Agreement shall control; <u>provided</u> that the inclusion of supplemental rights or remedies in favor of the Agents or the Lenders in any other Loan Document shall not be deemed a conflict with this Agreement.  Each Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof.

Section 10.12 <u>Survival of Representations and Warranties</u>.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by each Agent and each Lender, regardless of any investigation made by any Agent or any Lender or on their behalf and notwithstanding that any Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.   The provisions of <u>Sections 10.14</u> and <u>10.15</u> shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

Section 10.13 <u>Severability</u>.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 10.14 <u>GOVERNING LAW, JURISDICTION, SERVICE OF PROCESS</u>.

(a)     THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK (EXCEPT AS OTHERWISE EXPRESSLY PROVIDED THEREIN) AND TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

(b)     EXCEPT AS SET FORTH IN THE FOLLOWING PARAGRAPH, ANY LEGAL ACTION OR PROCEEDING BROUGHT BY ANY LOAN PARTY AND ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, SHALL BE BROUGHT IN THE BANKRUPTCY COURT, AND, IF THE BANKRUPTCY COURT DOES NOT HAVE, OR ABSTAINS FROM, JURISDICTION, THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK CITY OR OF THE UNITED STATES FOR

THE SOUTHERN DISTRICT OF SUCH STATE (PROVIDED THAT IF NONE OF SUCH COURTS CAN AND WILL EXERCISE SUCH JURISDICTION, SUCH EXCLUSIVITY SHALL NOT APPLY), AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, THE BORROWER, HOLDINGS, MIDCO, TOPCO AND EACH LOAN PARTY CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THOSE COURTS.   THE BORROWER, HOLDINGS, MIDCO AND TOPCO IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF ANY LOAN DOCUMENT OR OTHER DOCUMENT RELATED THERETO.

NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE ADMINISTRATIVE AGENT, THE COLLATERAL AGENT OR ANY LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION (I) FOR PURPOSES OF ENFORCING A JUDGMENT, (II) IN CONNECTION WITH EXERCISING REMEDIES AGAINST THE COLLATERAL IN A JURISDICTION IN WHICH SUCH COLLATERAL IS LOCATED, (III) IN CONNECTION WITH ANY PENDING BANKRUPTCY, INSOLVENCY OR SIMILAR PROCEEDING IN SUCH JURISDICTION OR (IV) TO THE EXTENT THE COURTS REFERRED TO IN THE PREVIOUS PARAGRAPH DO NOT HAVE JURISDICTION OVER SUCH LEGAL ACTION OR PROCEEDING OR THE PARTIES OR PROPERTY SUBJECT THERETO.

Section 10.15  WAIVER OF RIGHT TO TRIAL BY JURY.   EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 10.15 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

Section 10.16  Binding Effect.  Subject to the entry of the DIP Order and the terms thereof, this Agreement shall become effective when it shall have been executed by each of the Borrower, Holdings, Midco, Topco and the Administrative Agent shall have been notified by each Lender that each such Lender has executed it and thereafter shall be binding upon and inure to the benefit of Topco, Midco, Holdings, the Borrower, each Agent and each Lender and their respective successors and assigns, except that the Topco, Midco, Holdings, and Borrower shall not have the

right to assign its rights hereunder or any interest herein without the prior written consent of the Agents and the Lenders.

Section 10.17 <u>Judgment Currency</u>. If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Loan Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given. The obligation of the Borrower in respect of any such sum due from it to the Agents or the Lenders hereunder or under the other Loan Documents shall, notwithstanding any judgment in a currency (the "<u>Judgment Currency</u>") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "<u>Agreement Currency</u>"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency. If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent from the Borrower in the Agreement Currency, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or the Person to whom such obligation was owing against such loss. If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent in such currency, the Administrative Agent agrees to return the amount of any excess to the Borrower (or to any other Person who may be entitled thereto under applicable Law).

Section 10.18 <u>Lender Action</u>. Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party or any other obligor under any of the Loan Documents (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Loan Party, without the prior written consent of the Administrative Agent. The provisions of this <u>Section 10.18</u> are for the sole benefit of the Lenders and shall not afford any right to, or constitute a defense available to, any Loan Party.

Section 10.19 <u>USA PATRIOT Act</u>. Each Agent and each Lender hereby notifies the Borrower that, pursuant to the requirements of the USA PATRIOT Act and Beneficial Ownership Regulation, it is required to obtain, verify and record information that identifies the Borrower and the Guarantors, which information includes the name and address of the Borrower and the Guarantors and other information that will allow such Agent or Lender to identify the Borrower and the Guarantors in accordance with the USA PATRIOT Act and/or the Beneficial Ownership Regulation.

Section 10.20 <u>Prepetition Intercreditor Agreement and DIP Order</u>.

(a)     Notwithstanding anything to the contrary in this Agreement or in any other Loan Document: (a) the Liens granted to the Collateral Agent in favor of the Secured Parties pursuant to the Loan Documents and the exercise of any right related to any Collateral shall be subject, in each case, to the terms of the Prepetition Intercreditor Agreement, (b) in the event of any conflict between the express terms and provisions of this Agreement or any other Loan

Document, on the one hand, and of the Prepetition Intercreditor Agreement, on the other hand, the terms and provisions of the Prepetition Intercreditor Agreement, as the case may be, shall control, and (c) each Lender agrees to be bound by the terms of the Prepetition Intercreditor Agreement.

(b)     Each of the Loan Parties, the Administrative Agent, the Collateral Agent and the Lenders agrees that any reference contained herein to the DIP Order shall include all terms, conditions and provisions of such DIP Order and that the DIP Order is incorporated herein for all purposes.  To the extent there is any inconsistency between the terms of this Agreement (or any other Loan Document) and the terms of the DIP Order, the terms of the DIP Order shall govern.

Section 10.21  <u>Obligations Absolute</u>.  To the fullest extent permitted by applicable Law, all obligations of the Loan Parties hereunder shall be absolute and unconditional irrespective of:

(a)     [reserved];

(b)     any lack of validity or enforceability of any Loan Document or any other agreement or instrument relating thereto against any Loan Party;

(c)     any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from any Loan Document or any other agreement or instrument relating thereto;

(d)     any exchange, release or non-perfection of any other Collateral, or any release or amendment or waiver of or consent to any departure from any guarantee, for all or any of the Obligations;

(e)     any exercise or non-exercise, or any waiver of any right, remedy, power or privilege under or in respect hereof or any Loan Document; or

(f)     any other circumstances which might otherwise constitute a defense available to, or a discharge of, the Loan Parties.

Section 10.22  <u>No Advisory or Fiduciary Responsibility</u>.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each of the Borrower, Holdings, Midco and Topco acknowledge and agrees, and acknowledges its Affiliates' understanding, that:  (i) (A) [reserved], (B) each of the Borrower, Holdings, Midco and Topco have consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each of the Borrower, Holdings, Midco and Topco are capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) the Administrative Agent and each Lender each is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower, Holdings, Midco, Topco or any of their respective Affiliates, or any other Person and (B) neither the Administrative Agent nor any Lender has any obligation to the Borrower, Holdings, Midco, Topco or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent and each Lender and their respective Affiliates may be engaged in a broad range of transactions that

involve interests that differ from those of the Borrower, Holdings, Midco, Topco and their respective Affiliates, and neither the Administrative Agent nor any Lender has any obligation to disclose any of such interests to the Borrower, Holdings, Midco, Topco or any of their respective Affiliates.  To the fullest extent permitted by law, each of the Borrower, Holdings, Midco and Topco hereby waive and release any claims that it may have against the Administrative Agent and each Lender with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 10.23  Acknowledgement and Consent to Bail-In of Affected Financial Institutions.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)     the effects of any Bail-In Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)     the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

Section 10.24  Electronic Execution of Assignments and Certain Other Documents.  The words "execution," "execute", "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement and the transactions contemplated hereby (including without limitation Assignment and Assumptions, amendments or other Committed Loan Notices, waivers and consents) shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Administrative Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National

Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

ACCURIDE CORPORATION,
   as Borrower

By: _____
     Name:
     Title:

ARMOR PARENT CORP.,
   as Holdings

By: _____
     Name:
     Title:

ACCURIDE INTERMEDIATE CO., INC.,
   as Midco

By: _____
     Name:
     Title:

ACCURIDE GROUP HOLDINGS, INC.,
   as Topco

By: _____
     Name:
     Title:

[Signature Page to Senior Secured Superpriority Debtor-in-Possession Credit Agreement]

ALTER DOMUS (US) LLC,
as Administrative Agent and Collateral Agent


By: _____
     Name:
     Title:

[Signature Page to Senior Secured Superpriority Debtor-in-Possession Credit Agreement]

[●],
as [a Term Lender] [a Roll-Up Lender]


By: _____
　　　Name:
　　　Title:


[Signature Page to Senior Secured Superpriority Debtor-in-Possession Credit Agreement]

## **Exhibit 2**

**Initial Approved 13-Week Cash Flow**

**Accuride Corporation**

**Global Enterprise**

| ($ in millions) | Wk 1 10/4/24 | Wk 2 10/11/24 | Wk 3 10/18/24 | Wk 4 10/25/24 | Wk 5 11/1/24 | Wk 6 11/8/24 | Wk 7 11/15/24 | Wk 8 11/22/24 | Wk 9 11/29/24 | Wk 10 12/6/24 | Wk 11 12/13/24 | Wk 12 12/20/24 | Wk 13 12/27/24 | Total 13-Week |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Receipts** | $ 27.8 | $ 13.8 | $ 20.1 | $ 17.8 | $ 27.8 | $ 17.0 | $ 22.9 | $ 20.9 | $ 30.1 | $ 18.4 | $ 15.8 | $ 21.0 | $ 15.1 | $ 268.6 |
| **Operating disbursements:** | | | | | | | | | | | | | | |
| Supplier payments | (17.8) | (14.8) | (18.2) | (17.4) | (18.3) | (17.4) | (17.9) | (16.5) | (15.1) | (13.7) | (12.0) | (15.7) | (11.3) | (206.1) |
| Payroll-related costs | (3.2) | (6.2) | (0.7) | (4.8) | (6.4) | (3.6) | (3.3) | (4.6) | (6.3) | (4.4) | (2.8) | (3.7) | (6.1) | (56.2) |
| Rent | (1.5) | (0.1) | (0.4) | (0.1) | (3.0) | (0.0) | (0.2) | (0.2) | (0.0) | (2.4) | (0.1) | (0.5) | (0.9) | (9.3) |
| Insurance | (1.3) | – | – | – | (0.5) | | | | | (1.0) | | | | (2.8) |
| Taxes | (1.5) | (0.1) | (0.1) | (1.0) | (0.3) | (0.1) | (0.1) | (0.3) | (0.6) | (0.1) | (0.2) | (0.1) | (0.7) | (5.1) |
| **Total operating disbursements** | $ (25.4) | $ (21.2) | $ (19.4) | $ (23.3) | $ (28.5) | $ (21.1) | $ (21.5) | $ (21.6) | $ (22.1) | $ (21.6) | $ (15.0) | $ (20.0) | $ (18.9) | $ (279.5) |
| **Non-operating items:** | | | | | | | | | | | | | | |
| Debt service | (0.7) | – | – | (0.6) | (0.5) | – | – | – | (0.7) | – | – | – | (0.4) | (2.9) |
| RX costs | (5.4) | (2.5) | (1.9) | (1.7) | (1.9) | (1.6) | (1.6) | (1.6) | (1.8) | (1.8) | (1.8) | (1.4) | (0.8) | (25.7) |
| Other non-operating | (2.6) | (2.0) | – | – | – | – | – | – | – | (0.5) | (0.5) | (0.5) | 1.5 | (4.6) |
| **Total non-operating items** | $ (8.7) | $ (4.5) | $ (1.9) | $ (2.2) | $ (2.4) | $ (1.6) | $ (1.6) | $ (1.6) | $ (2.5) | $ (2.3) | $ (2.3) | $ (1.9) | $ 0.4 | $ (33.2) |
| **Net cash flow** | $ (6.3) | $ (11.8) | $ (1.2) | $ (7.7) | $ (3.2) | $ (5.8) | $ (0.1) | $ (2.3) | 5.5 | $ (5.5) | $ (1.5) | $ (0.9) | $ (3.5) | $ (44.1) |
| Bank cash balance, beg. | $ 26.3 | $ 25.0 | $ 23.2 | $ 22.0 | $ 24.4 | $ 21.2 | $ 20.4 | $ 25.3 | $ 23.0 | $ 28.5 | $ 23.0 | $ 21.5 | $ 20.7 | $ 26.3 |
| Net cash flow | (6.3) | (11.8) | (1.2) | (7.7) | (3.2) | (5.8) | (0.1) | (2.3) | 5.5 | (5.5) | (1.5) | (0.9) | (3.5) | (44.1) |
| Bridge loan draw | 5.0 | | | | | | | | | | | | | 5.0 |
| DIP loan proceeds | – | 10.0 | – | 10.0 | | 5.0 | 5.0 | – | – | – | – | – | – | 30.0 |
| **Bank cash balance, end.** | $ 25.0 | $ 23.2 | $ 22.0 | $ 24.4 | $ 21.2 | $ 20.4 | $ 25.3 | $ 23.0 | $ 28.5 | $ 23.0 | $ 21.5 | $ 20.7 | $ 17.2 | $ 17.2 |

## Exhibit 3

**ABL Cash Collateral Termination Events**

**Exhibit 3**

**ABL Cash Collateral Termination Events**

The occurrence of any of the following events shall constitute an ABL Cash Collateral Termination Event unless waived or consented to in writing by the Prepetition ABL Agent (email being sufficient):

(a)   the Debtors shall have failed to comply with any of the following milestones:

Bankruptcy Milestones

    (i)   the Final Order, in form and substance acceptable to the ABL Agent, shall have been entered on or within [28] days from the Petition Date;

    (ii)   an order approving a disclosure statement for a chapter 11 plan that provides for the payment, in full in cash, or such treatment as is otherwise consented to by the Prepetition ABL Agent, of all ABL Obligations (an "**ABL Acceptable Plan**") shall have been entered on or within [55] days from the Petition Date;

    (iii)   an order confirming an ABL Acceptable Plan shall have been entered on or within [95] days following the Petition Date;

    (iv)   the Debtors shall have consummated an ABL Acceptable Plan and emerged from these Chapter 11 Cases on or within [100] days following the Petition Date;

Refinancing Milestones

    (v)   the Debtors shall have commenced the solicitation of non-binding indications of interest for exit financing to repay the ABL Obligations in full in cash pursuant to an ABL Acceptable Plan ("**Exit Refinancing Transaction**") within [21] days following the Petition Date;

    (vi)   the Debtors shall have received one or more commitment letters for an Exit Financing Transaction within [85] days following the Petition Date;

    (vii)   the Debtors shall provide to the Prepetition ABL Agent, on a weekly basis, (A) an update on the refinancing status, including an updated list of all interested third parties that have entered into non-disclosure agreements with the Debtors in respect of an Exit Financing Transaction (including confirmation that such parties have received the investor presentation and each [Process Letter]) and have not withdrawn their indications of interest, and (B) following the applicable submission deadline set forth in any [Process Letter], copies of any final offers to consummate an Exit Financing Transaction submitted by third parties;

1

Wheel Ends Milestones

    (viii)    the Debtors shall deliver to the Prepetition ABL Agent a liquidation or winddown analysis for the [Wheel Ends] business by no later than [the Petition Date]; and

    (ix)    the Debtors shall deliver to the Prepetition ABL Agent a definitive plan for resolution of the [Wheel Ends] business, either pursuant to a sale, reorganization, liquidation or winddown, acceptable to the Prepetition ABL Agent, within [60] days following the Petition Date;

(b)    delivery of a Termination Declaration by the DIP Agent or Prepetition Term Agent;

(c)    the occurrence of an Event of Default under the DIP Credit Agreement or this Interim Order;

(d)    any material amendment, restatement, amendment and restatement, modification, waiver or supplement to the DIP Documents that is in any manner materially adverse to the Prepetition ABL Secured Parties or the ABL Obligations, it being agreed that any (i) shortening of the maturity of the DIP Loans, (ii) increase in the aggregate commitments under the DIP Documents, (iii) increase in the rate of interest or fees, or addition of new fees or other amounts, payable under the DIP Documents or (iv) increase in the cash payment obligations under the DIP Documents, in each case, shall be considered materially adverse to the Prepetition ABL Secured Parties;

(e)    any sale, lease, license or other disposition of any assets or properties of the Debtors or their subsidiaries without the consent of the Prepetition ABL Agent except sales of inventory in the ordinary course of business consistent with past practice;

(f)    the usage of ABL Priority Collateral or the proceeds thereof to fund any insolvency proceeding, other than these Chapter 11 Cases, and solely, if any amounts available at such time under the DIP Facility have been utilized, any proceeding under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended commenced by Accuride Canada Inc. in the Ontario Superior Court of Justice (Commercial List) on or around the Petition Date;

(g)    the taking of any action by any Prepetition ABL Obligor that results in a Guarantor (as defined in the Prepetition ABL Credit Agreement) becoming an Excluded Subsidiary (as defined in the Prepetition ABL Credit Agreement);

(h)    any Prepetition ABL Obligor shall have failed to:

    (i)    perform or observe any term, covenant, or agreement of the Prepetition ABL Credit Agreement; provided that (A) for all purposes hereof, the Prepetition ABL Credit Agreement shall be deemed to permit the DIP Facility on the terms set forth in the Interim Order (including the incurrence of indebtedness, and liens to secured the obligations, thereunder), (B) no indebtedness for borrowed money shall be permitted to be incurred, other

2

than the DIP Facility on the terms set forth in the Interim Order and (C) no direct or indirect non-ordinary course acquisition or investment shall be permitted to be made;

(ii)   (A) make any payment or satisfy any of their monetary obligations to or for the benefit of the ABL Secured Parties or their advisors as required under this Interim Order, including pursuant to paragraph [15(c)] or paragraph [18];

(iii)   deliver to the Prepetition ABL Agent any of the documents or other information required to be delivered pursuant to this Interim Order within [three (3)] business days of when due (or, with respect to the Borrowing Base Certificate, on the date such certificate is due under this Interim Order), or any such documents or other information shall contain a material misrepresentation;

(iv)   comply with the Approved 13-Week Cash Flow in any manner except with respect to Permitted Variances;

(v)   perform or observe any other term, covenant or agreement under this Interim Order, including with respect to their adequate protection obligations, in favor of or for the benefit of the Prepetition ABL Secured Parties, which failure remains uncured for five (5) business days from receipt by the Debtors of written notice from the Prepetition ABL Agent (email being sufficient); or

(vi)   compensate the Prepetition ABL Secured Parties on a reasonably equivalent basis as the DIP Secured Parties, to the extent the DIP Secured Parties have been compensated for consenting or approving to any modification or waiver to the Permitted Variances as set forth in the DIP Credit Agreement;

(i)   any Debtor shall have filed (or solicited, supported or failed to contest) any motion, application, proceeding or pleading with the Court (or any other court) seeking or consenting to, or an order shall have been entered granting:

(i)   entry or approval of a Final Order which is not in the form of the Interim Order (with only such modifications thereto as are necessary to convert the Interim Order to a final order and such other modifications as are satisfactory to the Prepetition ABL Agent);

(ii)   any (A) stay, revocation, vacatur, or reversal of this Interim Order; or (B) any amendment, supplement, or other modification of this Interim Order that is in any manner adverse to Prepetition ABL Secured Parties or that would adversely affect in any way ABL Priority Collateral;

(iii)   (A) the invalidation, subordination, or other Challenge to the ABL Obligations, the Prepetition ABL Liens, the ABL Adequate Protection Liens, the ABL 507(b) Claims, or any other claims or liens held by or for

3

the benefit of or indebtedness owed to the Prepetition ABL Secured Parties; (B) any relief under section 506(c) of the Bankruptcy Code, the "equities of the case" exception under section 552(b) of the Bankruptcy Code or the equitable doctrine of "marshaling" with respect to any Prepetition Collateral or DIP Collateral or otherwise against any of the Prepetition ABL Secured Parties; (C) any other action that is materially adverse to any of the Prepetition ABL Secured Parties or their rights and remedies under the Prepetition ABL Documents or (D) standing or authorization to any person or entity to commence, join in, assist or otherwise participate as an adverse party in any suit or proceeding against any of Prepetition ABL Secured Parties;

(iv)     (A) the appointment of a trustee, responsible officer, receiver, or examiner with expanded powers with respect to any of the Debtors; (B) the dismissal or transfer of any of the Debtors' chapter 11 cases; or (C) the conversion of any of the Debtors' cases to cases under chapter 7 of the Bankruptcy Code;

(v)      relief from any stay of proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed with foreclosure (or granting of a deed in lieu of foreclosure) or other remedy against any asset of a Debtor with a value in excess of $500,000;

(vi)     any termination and/or shortening, reduction of, or other modification to, the Debtors' exclusive periods to file and/or solicit a chapter 11 plan pursuant to the Bankruptcy Code (or the Debtors otherwise do not seek to extend such periods if and when applicable);

(vii)    (A) any adequate protection, authorization for the use of cash collateral, or approval of the terms of any post-petition financing, other than under the Interim Order or the Final Order or (B) the termination of the Debtors' use of Cash Collateral;

(viii)   any sale, lease, license or other disposition of any assets or properties of the Debtors or their subsidiaries, other than any sales of inventory in the ordinary course of business consistent with past practices, without the consent of the Prepetition ABL Agent; or

(ix)     any other relief which could reasonably be expected to result in an impairment of the rights or interests of the Prepetition ABL Secured Parties;

(j)     the Debtors shall have (i) withdrawn or abandoned a filed ABL Acceptable Plan, (ii) filed an amendment to, or a motion seeking to modify, amend or waive any provision of, a filed ABL Acceptable Plan, which would result in such plan no longer constituting an ABL Acceptable Plan; or (iii) filed or taken steps in furtherance of any plan that is not an ABL Acceptable Plan or other transaction that does not provide for the payment, in full and in cash, or such treatment as is otherwise consented to by the Prepetition ABL Agent, of all ABL Obligations; or

4

(k)     the payment of any prepetition claims that are contractually subordinated in right of payment to the ABL Obligations or that are secured by any of the Prepetition ABL Collateral on a junior basis to the ABL Obligations, except to the extent required under this Interim Order.