IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| ACCURIDE CORPORATION, *et al.*,[1] | ) Case No. 24-12289 (JKS) |
|  | ) |
| Debtors. | ) (Joint Administration Requested) |
|  | ) |

**DECLARATION OF ALEXANDER
SVOYSKIY IN SUPPORT OF THE DEBTORS'
MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN
POSTPETITION FINANCING AND (B) USE CASH COLLATERAL,
(II) GRANTING ADEQUATE PROTECTION, (III) GRANTING LIENS
AND SUPERPRIORITY CLAIMS, (IV) MODIFYING THE AUTOMATIC STAY,
(V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

I, Alexander Svoyskiy, declare under penalty of perjury that:

1.  I am a Managing Director of Perella Weinberg Partners LP ("PWP"), an investment banking firm with principal offices located at 767 Fifth Avenue, New York, New York, 10153. PWP is the proposed investment banker for the debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases.[2]

2.  I submit this declaration in support of the relief requested in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection, (III) Granting Liens*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Accuride Corporation (9077); Accuride Group Holdings, Inc. (4531); Accuride Intermediate Co., Inc. (9045); Accuride Distributing, LLC (3124); Accuride EMI, LLC (0389); Accuride Erie L.P. (4862); Accuride Henderson Limited Liability Company (8596); AKW General Partner, L.L.C. (4861); AOT, LLC (3088); Armor Parent Corp. (6684); Bostrom Holdings, Inc. (9282); Bostrom Seating, Inc. (7179); Gunite Corporation (9803); KIC LLC (6356); Transportation Technologies Industries, Inc. (2791); and Truck Components, Inc. (5407). The location of the Debtors' service address is: 38777 Six Mile Road, Suite 410, Livonia, MI 48152.

[2] The Debtors anticipate filing an application to retain PWP as their investment banker, effective as of the commencement of their chapter 11 cases, shortly hereafter.

*and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "Motion") filed contemporaneously herewith.[3]

3. Although PWP is expected to be compensated for its work as the Debtors' proposed investment banker in these chapter 11 cases, I am not being compensated separately for this declaration or testimony. Except as otherwise indicated herein, all the facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, the information provided to me by PWP professionals involved in advising the Debtors in these chapter 11 cases, or information provided to me by the Debtors and their other advisors. If called to testify, I could and would testify to the facts set forth herein on that basis. I am over the age of 18 years and am authorized to submit this declaration.

## Professional Background and Qualifications

4. PWP is a leading global independent advisory firm that provides strategic and financial advice to clients across a range of the most active industry sectors and international markets, with offices in New York, London, Houston, Calgary, Chicago, Denver, Los Angeles, Munich, Paris, and San Francisco. PWP's corporate advisory practice is focused on providing clients with advice related to mergers and acquisitions and financial restructurings. PWP's mergers and acquisitions practice advises both public and private companies. Its financial restructuring practice works with companies, investors, and other parties in interest in turn-around and distressed situations.

5. PWP and its professionals have extensive experience working with financially troubled companies across a variety of industries in complex financial restructurings, both out of

---

[3] Capitalized terms used but not defined herein shall have the meanings set forth in the Motion or the Interim Order attached thereto as Exhibit 1, as applicable.

2

court and in chapter 11 cases. Major in-court restructurings in which PWP has been involved include: *In re NanoString Techs., Inc.*, Case No. 24-10160 (Bankr. D. Del. 2024); *In re Mallinckrodt plc*, Case No. 23-11258 (Bankr. D. Del. 2023); *In re Clovis Oncology, Inc.*, Case No. 22-11292 (Bankr. D. Del. 2022); *In re Ector County Energy Center LLC*, Case No. 22-10320 (Bankr. D. Del. 2022); *In re FTX Trading Ltd.*, Case No. 22-11068 (Bankr. D. Del. 2022); *In re TPC Group Inc.*, Case No. 22-10493 (Bankr. D. Del. 2022); *In re HighPoint Res. Corp.*, No. 21-10565 (Bankr. D. Del. 2021); *In re Nine Point Energy Holdings, Inc.*, Case No. 21-10570 (Bankr. D. Del. 2021); *In re Global Eagle Entm't Inc.*, Case No. 20-11835 (Bankr. D. Del. 2020); *In re The Hertz Corp.*, Case No. 20-11218 (Bankr. D. Del. 2020); I*n re Hexion Holdings LLC*, Case No. 19-10684 (Bankr. D. Del. 2019); *In re ATD Corporation*, Case No. 18-12221 (Bankr. D. Del. 2018); *In re EV Energy Partners, LP*, Case No. 18-10814 (CSS) (Bankr. D. Del. 2018); *In re Remington Outdoor Company, Inc.*, Case No. 18-10684 (Bankr. D. Del 2018); *In re Bonanza Creek Energy, Inc.*, Case No. 17-10015 (Bankr. D. Del 2017); *In re Chaparral Energy, Inc.*, Case No. 16-11144 (Bankr. D. Del. 2016); *In re Pac. Sunwear of California*, Case No. 16-10882 (Bankr. D. Del. 2016); *In re Energy Future Holdings Corp.*, Case No. 14-10979 (Bankr. D. Del. 2014); *In re Acorda Therapeutics, Inc.*, Case No. 24-22284 (Bankr. S.D.N.Y. 2024); *In re Celsius Network LLC*, Case No. 22-10964 (Bankr. S.D.N.Y. 2022); *In re Endo Int'l plc*, Case No. 22-22549 (Bankr. S.D.N.Y. 2022); *In re Garrett Motion Inc.*, Case No. 20-12212 (MEW) (Bankr. S.D.N.Y. 2020); *In re Hermitage Offshore Service*s Ltd., Case No. 20-11850 (Bankr. S.D.N.Y. 2020); *In re Windstream Holdings, Inc.*, Case No. 19-22312 (RDD) (Bankr. S.D.N.Y. 2019); *In re Sears Holdings Corporation*, Case No. 18-23538 (Bankr. S.D.N.Y. 2018); *In re Ocean Rig UDW Inc.*, Case No. 17-10736 (Bankr. S.D.N.Y. 2017); I*n re Pacific Drilling S.A.*, Case No. 17-13193 (Bankr. S.D.N.Y. 2017); *In re Atlas Resource Partners, L.P.*, Case No. 16-12149 (Bankr. S.D.N.Y

2016); *In re Breitburn Energy Part*ners LP, Case No. 16-11390 (Bankr. S.D.N.Y. 2016); *In re California Resources Corporation*, Case No. 20-33568 (DRJ) (Bankr. S.D. Tex. 2020); *In re CARBO Ceramics Inc.*, Case No. 20-31973 (MI) (Bankr. S.D. Tex. 2020); *In re Alta Mesa Resources, Inc.*, Case No. 19-35133 (MI) (Bankr. S.D. Tex. 2019); *In re Approach Resources Inc.*, Case No. 19-36444 (MI) (Bankr. S.D. Tex. 2019); *In re Bristow Group, Inc.*, Case No. 19-32713 (DRJ) (Bankr. S.D. Tex. 2019); *In re Halcón Resources Corporation*, Case No. 19-34446 (DRJ) (Bankr. S.D. Tex. 2019); *In re Legacy Reserves Inc.*, Case No. 19-33395 (MI) (Bankr. S.D. Tex. 2019); *In re Fieldwood Energy LLC*, Case No. 18-30648 (Bankr. S.D. Tex. 2018); *In re Gastar Exploration Inc.*, Case No. 18-36057 (MI) (Bankr. S.D. Tex. 2018); *In re iHeartMedia, Inc.*, Case No. 18-31274 (MI) (Bankr. S.D. Tex. 2018); *In re Memorial Production Partners LP*, Case No. 17-30262 (MI) (Bankr. S.D. Tex. 2017); *In re Seadrill Limited*, Case No. 17-60079 (Bankr. S.D. Tex. 2017); *In re Stone Energy Corp.*, Case No. 16-36390 (Bankr. S.D. Tex. 2016); *In re Hartshorne Holdings, LLC*, Case No. 20-40133 (Bankr, W.D. Ky. 2020); *In re PG&E Corporation and Pacific Gas and Electric Company*, Case No. 19-30088 (DM) (Bankr. N.D. Cal. 2019); *In re EB Holdings II, Inc.*, Case No. 19-16364 (Bankr. D. Nev. 2019); *In re R.E. Gas Dev.*, LLC, Case No. 18-22032 (Bankr. W.D. Pa. 2018); *and In re The Commonwealth of Puerto Rico*, Case No. 17-3283 (LTS) (Bankr. D.P.R. 2017).  PWP's professionals have also provided services in connection with the out-of-court restructurings of numerous companies, including Algeco Group; Blackhawk Mining; Concordia International Corp.; Danaos Corporation; International Automotive Components Group; Del Monte; Highland Therapeutics; Jack Cooper; Key Energy Services; Land's End Inc.; Ligado Networks; Medical Depot Holdings; Pernix Therapeutics; Proserv; Sabre Corporation; Salt Creek Midstream; Savers; SM Energy Company; Sprint Industrial Holdings; Titan Energy; and WeWork Companies.

6. PWP has been engaged as investment banker to the Debtors since June 1, 2024 and has rendered investment banking advisory services to the Debtors in connection with the Debtors' evaluation of financing and strategic alternatives. Additionally, PWP has worked with the Debtors' management and other professionals retained by the Debtors, and has become familiar with the Debtors' capital structure, financial condition, liquidity needs, and business operations.

7. I received a Bachelor of Science degree in Finance from the Stern School of Business at New York University. I have more than twenty years of experience in investment banking, over fifteen of which have been spent providing restructuring advice to companies, creditors, sponsors, and other interested parties on restructuring transactions, both in chapter 11 proceedings and out-of-court. Since joining PWP in 2015, my restructuring and financial advisory engagements have included, among others, representations of debtors and creditors in the following chapter 11 cases: *In re NanoString Techs., Inc.*, Case No. 24-10160 (Bankr. D. Del. 2024); *In re Clovis Oncology, Inc.,* No. 22-11292 (Bankr. D. Del. 2022); *In re Ector County Energy Center, LLC*, No. 22-10320 (Bankr. D. Del. 2022); *In re ESML Holdings Inc.,* No. 16-11626 (Bankr. D. Del. 2016); *In re Garrett Motion Inc.*, Case No. 20-12212 (Bankr. S.D.N.Y. 2020); *In re Pacific Drilling S.A.,* No. 17-13193 (Bankr. S.D.N.Y. 2017); *In re Atlas Resource Partners, L.P.*, No. 16-12149 (Bankr. S.D.N.Y. 2016); *In re Approach Resources Inc.*, No. 19-36444 (Bankr. S.D. Tex. 2019); *In re Fieldwood Energy LLC*, No. 18-30648 (Bankr. S.D. Tex. 2018); I*n re Memorial Prod. Partners LP*, No. 17-30262 (Bankr. S.D. Tex. 2017); *In re The Commonwealth of Puerto Rico,* Case No. 17-3283 (Bankr. D.P.R. 2017); and *In re CorEnergy Infrastructure Trust, Inc.*, No. 24-40236 (Bankr. W.D. Mo. 2024).

### The Debtors' Pre-Petition Capital Structure

8. As detailed in the *Declaration of Charles M. Moore, Chief Restructuring Officer of Accuride Corporation, in Support of Chapter 11 Petitions and First Day Motions* (the "<u>First Day Declaration</u>"), Accuride has approximately $485.6 million in third-party funded debt obligations, as reflected in this summary chart included therein:

| Maturity | Facility | Interest Rates | Funded Debt Outstanding as of the Petition Date |
|---|---|---|---|
| May, 2026 | U.S. Revolving Loans – Base Rate | P + 250 | $52,800,000 |
| | U.S. Revolving Loans – SOFR | S + 360[4] | |
| | French Revolving Loans – Eur Base Rate | EURIBOR + 450 | $25,100,000 |
| | French Revolving Loans – Eur (Tranche) | EURIBOR + 350 | |
| | German Revolving Loans – Eur Base Rate | EURIBOR + 450 | |
| | German Revolving Loans – Eur (Tranche) | EURIBOR + 350 | |
| N/A | Letters of Credit | N/A | $20,300,000 |
| May, 2026 | 2023 Extended Term Loans | S + 687[5] | $294,600,000 |
| October, 2024 | Amendment No. 14 Loans | S + 1,000 | $40,000,000 |
| | Amendment No. 15 Loans | | $16,800,000 |
| | Amendment No. 16 Loans | | $16,600,000 |
| N/A | Finance Leases and Other Debt | N/A | $19,400,000 |
| | **TOTAL** | | **$485,600,000** |

9. The Prepetition ABL Facility is guaranteed by a substantial majority of Accuride Corporation's Debtor affiliates and secured by liens on substantially all of the Prepetition ABL

---

[4] Includes 10 bps spread adjustment.

[5] Term Loan interest composed of 100 bps cash pay and 587 bps PIK.

Obligors' assets (other than real property assets and interests therein) including first-priority liens on the ABL Priority Collateral and second-priority liens on the Term Priority Collateral (other than real property assets).

10.     The Prepetition Term Loan Facility is guaranteed by a substantial majority of Accuride Corporation's Debtor affiliates and secured by liens on substantially all of the Prepetition Term Obligors' assets, including first-priority liens on the Term Loan Priority Collateral and second-priority liens on the ABL Priority Collateral.

### The Debtors' Need for Postpetition Financing and Access to Cash Collateral

11.     In the months leading up to these chapter 11 cases, the Debtors, with the assistance of their advisors, explored various strategic and financial alternatives, including potential out-of-court financial and operational restructuring options.  Ultimately, however, as explained in the First Day Declaration, the Debtors determined that a restructuring through chapter 11 would best position Accuride for long-term success.  The Debtors determined that they would require incremental liquidity to prudently fund postpetition operations and chapter 11 costs, while also providing confidence to trade partners, customers, employees, and other constituents that the Debtors will continue to operate in the ordinary course and have sufficient liquidity to do so.

12.     The Debtors commence these chapter 11 cases with the commitments from the Ad Hoc Group to provide a $103 million senior secured superpriority term loan facility to fund these chapter 11 cases.  The debtors have also negotiated consensual access to Cash Collateral with the Ad Hoc Group and the Prepetition ABL Lenders.  The DIP Facility is necessary at the outset of these chapter 11 cases to stabilize the Debtors' operations, fund these chapter 11 cases, and avoid irreparable harm to the estates.

13.     The Debtors also have agreed with the Ad Hoc Group on the framework for a

consensual restructuring of the Debtors' balance sheet. Specifically, the Debtors anticipate implementing a deleveraging restructuring transaction via an equitization of their prepetition term loan obligations and raising incremental exit financing from the Ad Hoc Group to fund the go-forward business upon emergence. The DIP Credit Agreement contains a series of milestones establishing an expeditious timeline for consummation of these restructuring transactions. However, as noted herein and in the Moore Declaration, to provide the Debtors with sufficient liquidity for an organized chapter 11 filing, and to be able to effectuate the transactions set forth in the Restructuring Support Agreement, the Debtors need immediate access to liquidity.

### The Debtors' Efforts to Obtain DIP Financing

14. In pursuit of a comprehensive restructuring solution, the Debtors, the Prepetition Term Lenders, and the Prepetition ABL Lenders engaged, over several months, in arms'-length negotiations concerning the terms of such a restructuring, including postpetition financing and cash collateral arrangements. The DIP Facility and the consensual cash collateral arrangements described in the Motion are the product of these negotiations.

15. The Debtors also sought postpetition financing proposals from sources outside of their existing capital structure. Specifically, as the Debtors negotiated with the Prepetition Lenders, the Debtors, with the assistance of PWP, contacted eight additional potential financing providers, all established lenders in the restructuring space, with a reputed ability to provide postpetition financing in distressed situations. The Debtors pursued multiple potential parties with both the capital and experience of lending to companies similarly situated to the Debtors. The Debtors ultimately were unable to capture third-party interest, due to several factors, including the lack of unencumbered assets, the size of the proposed DIP Facility, and the Debtors' operational and financial profile, among others. Moreover, none of the third-party financing sources were

interested in providing a junior or unsecured postpetition facility and the inherent difficulty of priming existing liens, consensually or nonconsensually, likely discouraged participation from third-party financing sources. Ultimately, of the eight parties contacted, only one party signed a confidentiality agreement and received access to private Company information. That party passed shortly after reviewing the Company's materials. As a result, this DIP financing marketing process did not yield any proposals for postpetition financing.

## The Proposed DIP Facility

16. As noted in the Motion, the proposed DIP Facility is a senior secured superpriority term loan facility provided by a certain of the Debtors' Prepetition Term Lenders comprising: (a) DIP New Money Loans in an aggregate principal amount of $30 million and (b) DIP Roll-Up Loans in aggregate principal amount of approximately $73 million representing a roll-up and conversion on a cashless, dollar-for-dollar basis, of a corresponding amount of Prepetition Bridge Loans. The Debtors' Prepetition ABL Lenders and Prepetition Term Lenders also agreed, in connection with the DIP Facility, to the consensual use of Cash Collateral on the terms and conditions set forth in the Interim Order.

17. The proposed DIP Facility, if approved, will be used to fund the Debtors' working capital and other funding needs. The DIP New Money Loans will provide the Debtors with $30 million of new money, $20 million of which will be available upon entry of the Interim Order, which will be used to fund operating expenses, chapter 11 administrative costs, and other obligations in accordance with the Interim Order and other DIP Documents. The DIP Roll-Up Loans will roll-up and convert the Prepetition Bridge Loans in full into the DIP Facility upon entry of the Interim Order.

18. In connection with the DIP Facility and the Interim Order, the Debtors have agreed to grant liens on certain unencumbered property and pay interest and certain fees to the DIP

Secured Parties and the ABL Secured Parties, including a backstop fee, a commitment fee, an exit fee, and an extension fee.  Specifically, the Debtors have agreed to pay:

    a.    ***Interest Rates***.  The obligations in respect of the DIP Loans shall bear interest as follows:

        (i)    each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Rate; and

        (ii)    each Term SOFR Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to Term SOFR for such Interest Period plus the Applicable Rate.

    b.    ***Upfront Fee***.  As consideration for the Lenders funding the New Money First Draw, the New Money Second Draw and the New Money Third Draw, on the Closing Date, the New Money Second Draw Funding Date or the New Money Third Draw Funding Date, as applicable, the Borrower agrees to pay to the Administrative Agent, for the ratable account of each of the Lenders, a non-refundable Upfront Fee equal to 5.00% of the aggregate principal amount of the New Money Loans funded by such Lenders pursuant to the New Money First Draw, the New Money Second Draw and the New Money Third Draw, as applicable, which fee shall be earned, due and payable in kind in the form of additional New Money Loans on the New Money First Draw Funding Date, the New Money Second Draw Funding Date and the New Money Third Draw Funding Date.  The amounts so paid-in-kind in accordance with the immediately preceding sentence shall be treated as principal for all purposes of this Agreement and bear interest in accordance with the terms hereof from (and including) the applicable date on which such Upfront Fee was paid in kind.

    c.    ***Exit Fee***.  The Borrower agrees to pay in cash to the Administrative Agent, for the ratable account of each of the Lenders, on the Maturity Date or on any other date that the Term Loans are repaid (whether through a mandatory prepayment, voluntarily prepayment, acceleration or otherwise) a non-refundable fee equal to 2.00% of the aggregate principal amount of the Term Loans repaid on such applicable date, which fee shall be earned, due and payable on such date.

    d.    ***Backstop Fee***.  The DIP Loans will be fully backstopped by certain of the DIP Lenders (in such capacity, the "DIP Backstop Parties").  As consideration for the DIP Backstop Parties' agreement to backstop the DIP Facility, the DIP Borrower shall pay the fees set forth in the Backstop Fee Letter, by and among the Borrower and Jefferies Capital Services, LLC, as

      a fronting lender (a copy of which shall be provided to the Agents), in the amounts and at the times set forth therein.

    e. ***Sale Premium***. If at any time, one or more Sale Transactions which would (individually or in the aggregate) result in the sale of all or substantially all of the assets or the equity of Topco and its Subsidiaries are consummated, the Lenders with respect to the Term Commitments and New Money Loans shall receive the Sale Premium in an aggregate amount equal to 10.00% of the sum of (x) the aggregate amount of all the Term Commitments (prior to giving effect to the New Money First Draw) provided on the Closing Date by all Lenders in the aggregate plus (y) the aggregate principal amount of all of the Roll-Up Loans deemed funded on the Closing Date by all Lenders in the aggregate, which Sale Premium shall be earned, due and payable in cash on the Sale Consummation Date from the proceeds of such Sale Transactions, and allocated on a pro rata basis among such Lenders holding Term Commitments and New Money Loans, in accordance with the amount of Term Commitments and principal amount of Term Loans (including both New Money Loans and Roll-Up Loans) held by such Lender and certain of such Lender's Affiliates (which Affiliates shall designated, and the pro rata calculation confirmed, to the Administrative Agent in writing by the Lender Advisors (which may be by email), upon which the Administrative Agent may rely without further investigation or inquiry) prior to the date such Sale Premium is paid) on the Sale Consummation Date.

    a. ***ABL Fee Letters***. The DIP Borrower shall pay the fees set forth in the ABL Fee Letters, by and among the DIP Borrower and the Prepetition ABL Agent, in the amounts and at the times set forth therein.

19. The DIP Facility has a tenor of 100 days with one 30-day extension available in the Debtors' discretion, subject to the Extension Fee described above.

### The Proposed DIP Facilities are the Best Postpetition Financing Arrangement Presently Available to the Debtors

20. Based on my experience with debtor-in-possession financing transactions as well as my involvement in the efforts to secure postpetition financing for the Debtors, the proposed DIP Facility, taken as a whole, is the best presently available financing option under the facts and circumstances of these chapter 11 cases.

21. *First*, the proposed DIP Facility is expected to provide the Debtors with access to the amount of capital that the Debtors believe is necessary to effectively and efficiently administer these chapter 11 cases.

22. *Second*, the terms of the proposed DIP Facility are the result of the negotiations and the marketing process described above. As previously noted, the Debtors, with the assistance of their advisors, solicited and considered other sources of postpetition financing, but were unable to secure any alternative postpetition financing proposals.

23. *Third*, the principal economic terms proposed under the DIP Facility such as the contemplated pricing, fees, and interest rate are customary for debtor-in-possession financings of this type. In my view, based on the discussions I observed and participated in, such economic terms were negotiated at arm's length and are, are an integral component of the overall terms of the DIP Facility, and are, in the aggregate, appropriate and represent the best terms available to the Debtors under the current circumstances.

24. *Fourth*, as noted in the Motion, the Debtors are seeking to "roll up" $73 million of Prepetition Bridge Loans. The Debtors entered into the Prepetition Bridge Loans mere weeks before the commencement of these chapter 11 cases, which provided emergency short-term liquidity to bridge to an orderly chapter 11 filing. Based on the discussions I participated in, the roll-up of this amount of the Prepetition Bridge Loans was required by the Prepetition Term Loan Lenders, who deemed this an integral component of the DIP Facility. Similarly, based on the discussions I participated in, the milestones were also required by the Prepetition Term Loan Lenders, who similarly viewed these as an integral component of the overall terms of the DIP Facility.

**The Proposed DIP Facility was Negotiated at Arm's Length**

25. Negotiations around the proposed DIP Facilities and their terms, including the interest rates and fees, included exchange of several proposals between the Company and its prepetition lenders. Based on the discussions I participated in and observed during the course of these negotiations, and my experience negotiating other debtor-in-possession financings, these negotiations were conducted at arms' length. I also believe, based on my participation in such negotiations, that the DIP Facility's principal economic terms are a material component of the overall terms that were specifically required by the DIP Lenders and the DIP Agent in order to extend postpetition financing.

**Conclusion**

26. For the reasons stated above and based on my experience with debtor-in-possession financing transactions as well as my participation and involvement in the marketing and negotiation of the postpetition financing alternatives for the Debtors, I believe that the proposed DIP Facility offers the best and likely only available financing option for the Debtors under the facts and circumstances of these chapter 11 cases. Additionally, the principal economic terms proposed under the DIP Facility (such as the pricing, fees, and interest rate) are reasonable for debtor-in-possession financings of this type. In my view, based on the discussions I participated in and observed, they were negotiated at arms' length, and are, in the aggregate, appropriate and represent the best terms currently available to the Debtors. Accordingly, I believe that the DIP Facility is in the best interests of the Debtors and their creditors and should be approved.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

October 10, 2024

By: /s/ *Alexander Svoyskiy*
Alexander Svoyskiy
Managing Director
Perella Weinberg Partners, LP