**<u>Exhibit 1</u>**

**Disclosure Statement**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ACCURIDE CORPORATION, *et al.*,[1] | ) | Case No. 24-12289 (JKS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**DISCLOSURE STATEMENT RELATING TO THE AMENDED**
**JOINT PLAN OF REORGANIZATION OF ACCURIDE CORPORATION AND**
**ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Joseph Barry (Del. Bar No. 4221)
Kenneth J. Enos (Del. Bar No. 4544)
Jared W. Kochenash (Del. Bar. No. 6557)
Andrew A. Mark (Del. Bar No. 6861)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:     (302) 571-6600
Facsimile:     (302) 571-1253
Email:        jbarry@ycst.com
             kenos@ycst.com
             jkochenash@ycst.com
             amark@ycst.com

*Co-Counsel for the Debtors*
*and Debtors in Possession*

Dated: November 18, 2024

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Ryan Blaine Bennett, P.C. (admitted *pro hac vice*)
Alexander D. McCammon (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:        ryan.bennett@kirkland.com
             alex.mccammon@kirkland.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
             derek.hunter@kirkland.com

*Co-Counsel for the Debtors*
*and Debtors in Possession*

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Accuride Corporation (9077); Accuride Group Holdings, Inc. (4531); Accuride Intermediate Co., Inc. (9045); Accuride Distributing, LLC (3124); Accuride EMI, LLC (0389); Accuride Erie L.P. (4862); Accuride Henderson Limited Liability Company (8596); AKW General Partner, L.L.C. (4861); AOT, LLC (3088); Armor Parent Corp. (6684); Bostrom Holdings, Inc. (9282); Bostrom Seating, Inc. (7179); Gunite Corporation (9803); KIC LLC (6356); Transportation Technologies Industries, Inc. (2791); and Truck Components, Inc. (5407). The location of the Debtors' service address is: 38777 Six Mile Road, Suite 410, Livonia, MI 48152.

THIS IS NOT A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT.  AS OF THE DATE HEREOF, THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.   THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE AMENDED JOINT PLAN OF REORGANIZATION OF ACCURIDE CORPORATION AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.   BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IX HEREIN.[2]

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE.  THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.    FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN EVENTS AND ANTICIPATED EVENTS IN THE CHAPTER 11 CASES.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN IN ALL PURPOSES.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE

---

[2]     Capitalized terms used but not defined herein have the meanings ascribed to them in the *Amended Joint Plan of Reorganization of Accuride Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, supplemented or modified from time to time, the "Plan"), attached hereto as **Exhibit A**.

INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND OPERATIONS. ALTHOUGH THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND OPERATIONS AND THEIR FUTURE RESULTS.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS, AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS (I) HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE DEBTORS OR THE PLAN THAT IS DIFFERENT FROM, OR IN ADDITION TO, THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT OR THE PLAN, AS APPLICABLE AND (II) DO NOT TAKE RESPONSIBILITY FOR, OR CAN PROVIDE ANY ASSURANCE AS TO THE RELIABILITY OF, ANY OTHER INFORMATION THAT OTHERS MAY GIVE YOU.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO

ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING ARTICLE IX, ENTITLED "RISK FACTORS" BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.   ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE HEREIN.

**SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS AND FORWARD-LOOKING STATEMENTS**

The Plan and Disclosure Statement have neither been filed with, nor approved or disapproved by the SEC or any similar federal, state, local, or non-U.S. regulatory authority or government agency and neither the SEC nor any such similar regulatory authority or government agency has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or the Plan. The securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the SEC under the Securities Act of 1933, as amended (the "Securities Act"), or any securities regulatory authority of any state under any state securities law ("Blue-Sky Laws"). Any representation to the contrary is a criminal offense. The securities may not be offered or sold within the United States or to, or for the account or benefit of, United States persons (as defined in Regulation S under the Securities Act), except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable laws of other jurisdictions.

The Debtors will rely on Section 1145(a) of the Bankruptcy Code to exempt from registration under the Securities Act and Blue-Sky Laws the offer, issuance, and distribution, if applicable, of New Common Stock under the Plan (other than any New Common Stock distributed pursuant to the Management Incentive Plan), and to the extent such exemption is not applicable or available, then such New Common Stock will be offered, issued, and distributed under the Plan pursuant to other applicable exemptions from registration under the Securities Act and any other applicable securities laws. Neither the Solicitation nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.

Any New Common Stock distributed pursuant to the Management Incentive Plan will be offered, issued, and distributed in reliance upon Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other exemptions from registration will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.

Any New Common Stock issued in respect of the Management Incentive Plan, or otherwise not issued pursuant to the exemption from registration provided by Section 1145(a) of the Bankruptcy Code, will be offered, issued, and distributed in reliance upon the exemption from registration provided by Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other exemptions from registration, and similar state Blue-Sky Laws, will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom, and subject to applicable state and local securities laws, including state Blue-Sky Law. This Disclosure Statement contains "forward-looking statements" within the meaning of United States securities laws. Statements containing words such as "anticipate," "believe," "estimate," "expect," "intend," "plan," "project," "target," "model," "can," "could," "may," "should," "will," "would," or similar words or the negative thereof, constitute "forward-looking statements." However, not all forward-looking statements in this Disclosure Statement may contain one or more of these identifying terms. Forward-looking statements are based on the Debtors' current expectations, beliefs, assumptions and estimates. These statements are subject to significant risks, uncertainties and assumptions that are difficult to predict and could cause actual results to differ materially and adversely from those expressed or implied in the forward-looking statements. The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- **Business strategy;**

- **Technology;**

- **Financial condition, revenues, cash flows, and expenses;**

- **The adequacy of the Debtors' capital resources and liquidity;**

- **Levels of indebtedness, liquidity, and compliance with debt covenants;**

- **Financial strategy, budget, projections, and operating results;**

- **The amount, nature, and timing of capital expenditures;**

- **Availability and terms of capital;**

- **Successful results from the Debtors' operations;**

- **The integration and benefits of asset and property acquisitions or the effects of asset and property acquisitions or dispositions on the Debtors' cash position and levels of indebtedness;**

- **Costs of conducting the Debtors' other operations;**

- **General economic and business conditions;**

- **Effectiveness of the Debtors' risk management activities;**

- **Counterparty credit risk;**

- **The outcome of pending and future litigation;**

- **Uncertainty regarding the Debtors' future operating results;**

- **Plans, objectives, and expectations;**

- **Risks in connection with acquisitions;**

- **The potential adoption of new governmental regulations; and**

- **The Debtors' ability to satisfy future cash obligations.**

**Statements concerning these and other matters are not guarantees of the Reorganized Debtors' future performance. There are risks, uncertainties, and other important factors that could cause the Reorganized Debtors' actual performance or achievements to be different from those they may project, and neither the Debtors nor the Reorganized Debtors, as applicable, undertake any obligation to update the projections made herein. These risks, uncertainties and factors may include the following: (a) the Debtors' ability to confirm and consummate the Plan; (b) the potential that the Debtors may need to pursue an alternative transaction if the Plan is not confirmed; (c) the Debtors' ability to reduce their overall financial leverage; (d) the potential adverse impact of the Chapter 11 Cases on the Debtors' operations, management, and employees; (e) the risks associated with**

operating the Debtors' businesses during the Chapter 11 Cases; (f) customer and trade partner responses to the Chapter 11 Cases; (g) the Debtors' inability to discharge or settle claims during the Chapter 11 Cases; (h) the Debtors' plans, objectives, business strategy, and expectations with respect to future financial results and liquidity, including the ability to finance operations in the ordinary course of business; (i) the Debtors' levels of indebtedness and compliance with debt covenants; (j) additional post-restructuring financing requirements; (k) the amount, nature, and timing of the Debtors' capital expenditures and cash requirements, and the terms of capital available to the Debtors'; (l) the effect of competitive products, services, or procuring by competitors; (m) the outcome of pending and future litigation claims; (n) the proposed restructuring and costs associated therewith; (o) the effect of natural disasters, pandemics, and general economic and political conditions on the Debtors; (p) the Debtors' ability to implement cost-reduction initiatives in a timely manner; (q) adverse tax changes; (r) the terms and conditions of the New Takeback Facility, the New ABL Facility, and the New Common Stock, to be entered into, or issued, as the case may be, pursuant to the Plan; (s) the results of renegotiating certain key commercial agreements and any disruptions to relationships with landlords, suppliers, and trade partners, among others; (t) compliance with laws and regulations; and (u) each of the other risks identified in this Disclosure Statement.  Due to these uncertainties, you cannot be assured that any forward-looking statements will prove to be correct.  The Debtors are under no obligation to (and expressly disclaim any obligation to) update or alter any forward-looking statements whether as a result of new information, future events, or otherwise, unless instructed to do so by the Bankruptcy Court.

You are cautioned that all forward-looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements.  The projections and forward-looking information contained herein and attached hereto are only estimates, and the timing and amount of actual distributions to Holders of Allowed Claims and Allowed Interests, among other things, may be affected by many factors that cannot be predicted.  Any analyses, estimates, or recovery projections may or may not turn out to be accurate.

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION..............................................................................................................1

II.   PRELIMINARY STATEMENT ....................................................................................1

III.  QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT
      AND THE PLAN ..............................................................................................................3
      A.   What is chapter 11?..............................................................................................3
      B.   Why are the Debtors sending me this Disclosure Statement?.............................3
      C.   What does it mean that the Debtors are seeking conditional approval of this
           Disclosure Statement?.........................................................................................3
      D.   Am I entitled to vote on the Plan? ......................................................................3
      E.   What is the Recapitalization Transaction under the Plan?..................................4
      F.   What will I receive from the Debtors if the Plan is consummated?....................4
      G.   What will I receive from the Debtors if I hold an Allowed Administrative Claim,
           DIP Claim, or a Priority Tax Claim? ..................................................................6
      H.   Are any regulatory approvals required to consummate the Plan?.......................9
      I.   What happens to my recovery if the Plan is not confirmed or does not go
           effective?.............................................................................................................9
      J.   If the Plan provides that I get a distribution, do I get it upon Confirmation or
           when the Plan goes effective, and what is meant by "Confirmation," "Effective
           Date," and "Consummation?"...............................................................................9
      K.   What are the sources of Cash and other consideration required to fund the Plan?...........10
      L.   Are there risks to owning the New Common Stock upon the Debtors' emergence
           from chapter 11? ...............................................................................................10
      M.   Is there potential litigation related to the Plan?...............................................10
      N.   What is the Management Incentive Plan and how will it affect the distribution
           I receive under the Plan?...................................................................................10
      O.   Does the Plan preserve Causes of Action?........................................................10
      P.   Will there be releases, exculpation, and injunction granted to parties in interest as
           part of the Plan? ................................................................................................11
      Q.   When is the deadline to vote on the Plan? ........................................................16
      R.   How do I vote on the Plan?................................................................................16
      S.   Why is the Bankruptcy Court holding a Combined Hearing? ...........................16
      T.   What is the purpose of the Combined Hearing? ...............................................17
      U.   What is the effect of the Plan on the Debtors' ongoing businesses? ................17
      V.   Will any party have significant influence over the corporate governance and
           operations of the Reorganized Debtors?...........................................................17
      W.   Who do I contact if I have additional questions with respect to this Disclosure
           Statement or the Plan? ......................................................................................18
      X.   Do the Debtors recommend voting in favor of the Plan? .................................18
      Y.   Who Supports the Plan?.....................................................................................18

IV.   THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS
      OVERVIEW....................................................................................................................18
      A.   The Debtors' Corporate History .......................................................................18
      B.   The Debtors' Business Operations.....................................................................19
      C.   The Debtors' Prepetition Corporate and Capital Structure ..............................22

**V.    EVENTS LEADING TO THE CHAPTER 11 FILINGS**................................................**24**

    A.    Business Challenges. .............................................................................. 24
    B.    Restructuring Initiatives and the Path Forward.................................... 26

**VI.    MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES** ................................................................................**27**

    A.    First Day Relief and Other Case Matters.............................................. 27
    B.    Appointment of Unsecured Creditors' Committee ............................... 29
    C.    Approval of the DIP Facility.................................................................. 29
    D.    Bar Date Motion .................................................................................... 30
    E.    Schedules of Assets and Liabilities and Statements of Financial Affairs........................ 30
    F.    The Special Committee's Independent Investigation ........................... 30
    G.    The CCAA Proceedings and the Intercompany Note .......................... 31
    H.    Wheel Ends Transaction ........................................................................ 31
    I.    AWEA and Accuride Russia .................................................................. 32
    J.    Proposed Confirmation Schedule ......................................................... 32

**VII.    SUMMARY OF THE PLAN** .............................................................................**33**

    A.    General Settlement of Claims and Interests.......................................... 33
    B.    Restructuring Transactions. .................................................................. 33
    C.    The Reorganized Debtors. ..................................................................... 34
    D.    Sources of Consideration for Plan Distributions.................................. 34
    E.    Corporate Existence. .............................................................................. 38
    F.    Plan Implementation. ............................................................................ 38
    G.    New Organizational Documents. .......................................................... 38
    H.    Certain Securities Law Matters............................................................. 39
    I.    Management Incentive Plan. ................................................................. 39
    J.    Employment Obligations. ...................................................................... 39
    K.    Preservation of Causes of Action. ........................................................ 40
    L.    Cancellation of Existing Agreements and Interests. ............................ 41
    M.    Section 1146 Exemption. ....................................................................... 41
    N.    Corporate Action. .................................................................................. 42
    O.    Directors and Officers of the Reorganized Debtors............................. 42
    P.    Effectuating Documents; Further Transactions. .................................. 43
    Q.    Vesting of Assets in the Reorganized Debtors...................................... 43
    R.    Private Company. ................................................................................... 43
    S.    Director and Officer Liability Insurance............................................... 43

**VIII.    OTHER KEY ASPECTS OF THE PLAN**.......................................................**44**

    A.    Treatment of Executory Contracts and Unexpired Leases.................. 44
    B.    Conditions Precedent to Confirmation and Consummation of the Plan .......................... 47

**IX.    RISK FACTORS**...............................................................................................**50**

    A.    Bankruptcy Law Considerations........................................................... 50
    B.    Risks Related to Recoveries Under the Plan......................................... 55
    C.    Risks Related to the Debtors' and the Reorganized Debtors' Businesses ........................ 57
    D.    Risks Related to the Offer and Issuance of Securities Under the Plan .......................... 62

X.      SOLICITATION AND VOTING PROCEDURES ................................................... 63

        A.      Holders of Claims Entitled to Vote on the Plan .......................................... 64
        B.      Voting on the Plan ....................................................................................... 64
        C.      Ballots Not Counted .................................................................................... 64
        D.      Votes Required for Acceptance by a Class .................................................. 64
        E.      Certain Factors to Be Considered Prior to Voting ...................................... 64
        F.      Solicitation Procedures ................................................................................ 65

XI.     CONFIRMATION OF THE PLAN ................................................................. 66

        A.      The Combined Hearing ................................................................................ 66
        B.      Requirements for Confirmation of the Plan ................................................ 66
        C.      Best Interests of Creditors/Liquidation Analysis ....................................... 66
        D.      Feasibility .................................................................................................... 67
        E.      Valuation Analysis ...................................................................................... 67
        F.      Acceptance by Impaired Classes ................................................................. 68
        G.      Confirmation Without Acceptance by All Impaired Classes ....................... 68

XII.    CERTAIN SECURITIES LAW MATTERS ................................................... 69

        A.      New Common Stock ..................................................................................... 69
        B.      Exemption from Registration Requirements; Issuance of New Common Stock
                under the Plan ............................................................................................. 70
        C.      Resales of New Common Stock; Definition of "Underwriter" Under Section
                1145(b) of the Bankruptcy Code ................................................................. 71

XIII.   [CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF
        THE PLAN] ........................................................................................................ 74

        A.      Introduction ................................................................................................. 74
        B.      Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and
                the Reorganized Debtors ............................................................................. 76
        C.      Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders ... 78
        d.      Sale, Taxable Exchange, or other Taxable Disposition. .............................. 84
        D.      Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders ......... 85
        a.      Payments of Interest (Including Interest Attributable to Accured but Untaxed
                Interest) ....................................................................................................... 88
        E.      [Tax Treatment of Liquidating Trust] ......................................................... 90
        F.      Information Reporting and Back-Up Withholding ....................................... 92

XIV.    [CERTAIN CANADIAN FEDERAL INCOME TAX CONSEQUENCES OF THE
        PLAN] ................................................................................................................. 93

        A.      Introduction ................................................................................................. 93
        B.      Residents of Canada .................................................................................... 93
        C.      Non-Residents of Canada ............................................................................ 95
        D.      Consequences to the Canadian Debtors ...................................................... 95

XV.     RECOMMENDATION OF THE DEBTORS ................................................... 95

**EXHIBITS**[1]

EXHIBIT A      Plan of Reorganization

EXHIBIT B      Organizational Structure Chart

EXHIBIT C      Liquidation Analysis

EXHIBIT D      Financial Projections

EXHIBIT E      Valuation Analysis

---

[1]      Each Exhibit is incorporated herein by reference.

## I.     INTRODUCTION

Accuride Corporation and its affiliated debtors and debtors in possession (collectively, the "Debtors," and together with their non-Debtor affiliates, "Accuride" or the "Company"), submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against the Debtors in connection with the solicitation of votes for acceptance of the *Amended Joint Plan of Reorganization of Accuride Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan"). A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.

**THE DEBTORS, THE AD HOC GROUP, THE HOLDERS OF ABL CLAIMS, AND THE SPONSOR BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS.   AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.   THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.    PRELIMINARY STATEMENT

Accuride filed these chapter 11 cases to implement a comprehensive financial and operational restructuring.  Accuride is a global leader in steel and aluminum wheels and wheel-end components and assemblies, supplying innovative products to over 1,000 customers in the commercial vehicles, passenger cars, agriculture, construction and industrial equipment markets.  Headquartered in Livonia, Michigan, the Debtors are part of a global enterprise that employs approximately 3,600 individuals at facilities in the United States, Mexico, Germany, France, Turkey, and China.

In the last several years, Accuride's business performance has suffered despite steady growth, significantly expanded product and an increasing geographic footprint.  The effects of the COVID-19 pandemic, operational and business integration challenges, and supply chain distortions created significant headwinds weakening the Debtors' profitability.  At the same time, internal challenges with integrating certain of the Debtors' acquired business lines and supporting others reduced liquidity and demanded the Debtors' attention, preventing investment in continued growth.

The Debtors engaged in operational initiatives directed at eliminating drags on profitability and extending runway until demand for the Debtors' products increases and stabilizes.  These initiatives, while successful in part, proved insufficient to meaningfully improve the Debtors' financial position.  To increase runway, the Debtors began carefully managing their liquidity by working with their vendors to implement alternative payment schedules or, in some instances, "stretching" vendors significantly beyond agreed payment terms.  The Debtors also divested certain of their assets through a series of liquidity enhancing transactions.  Unfortunately, the Debtors' operations and the broader market did not recover sufficiently, and despite the Debtors' best efforts, liquidity tightened in the first half of 2024.  Accordingly, starting in July 2024, the Company began to explore additional strategic alternatives, including an investment in or sale of some or all of its business, and, thereafter, a further equity investment from its existing sponsor.

As part of these efforts, the Company, with the assistance of Kirkland & Ellis, LLP ("Kirkland") as legal counsel, Perella Weinberg Partners LP ("Perella Weinberg") as investment banker, and, Alvarez and Marsal North America LLC ("A&M" and together with Kirkland and Perella Weinberg, the "Advisors") engaged with an ad hoc group of lenders under the Debtors' Prepetition Term Loan Credit Agreement (the "AHG"), represented by Weil, Gotshal & Manges LLP as legal counsel and Lazard Frères & Co. LLC as investment banker, to chart a value maximizing path forward.  In parallel, in early August 2024, the Company, with the assistance of Perella Weinberg, launched a marketing process (the "Marketing

Process") to engage potential interested parties concerning a significant investment in or purchase of some or all of the Company's assets and/or equity (the "Sale Transaction"). To fund the Marketing Process, the AHG agreed to fund incremental bridge financing through three tranches of senior term loans (the "Bridge Loans") under the existing Term Loan Credit Agreement. In total, the AHG provided $73 million of Bridge Loans to the Debtors, allowing the Debtors, with the assistance of the Advisors, to run a robust Marketing Process and seek a value-maximizing transaction while discussions with the AHG regarding alternative transactions continued.

Ultimately, despite Perella Weinberg contacting more than 50 potential financial and strategic counterparties, the Marketing Process failed to yield an actionable bid for the purchase of substantially all of the Debtors' assets. Accordingly, the Debtors and the AHG pivoted and began negotiating the terms of an equitization through an expedient chapter 11 process with the support of the AHG. These discussions culminated in an agreement in principle on the terms of a comprehensive restructuring of the Debtors' balance sheet through, among other things, an equitization of the AHG's prepetition debt. The key terms of the proposed restructuring transactions are set forth in the Restructuring Term Sheet, attached as Exhibit A to the First Day Declaration, and such terms are memorialized in the Plan and this Disclosure Statement.

On October 9, 2024, the Debtors, with the support of the AHG, the Holders of ABL Claims, and the Sponsor, initiated a prearranged court-supervised process under chapter 11 of the United States Bankruptcy Code in the U.S. Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") with the goal of expeditiously implementing the restructuring transactions described in the Restructuring Term Sheet. The Debtors initiated these Chapter 11 Cases on sound footing with a commitment of $103 million in DIP Term Loans from the AHG. On October 11, 2024, at the "first day" hearing, the Bankruptcy Court approved the DIP Facility (as defined below) on an interim basis, providing the Debtors with access to $20 million in new money DIP Loans. The details of the DIP Facility are discussed in greater detail in Article VI.C.

The Debtors' non-Debtor affiliates include foreign entities comprising the Accuride Wheels Europe and Asia ("AWEA" and the non-Debtor affiliates comprising AWEA, the "AWEA Entities") business line. None of the AWEA Entities are Debtors, however Topco is the ultimate parent of each AWEA Entity. In connection with these Chapter 11 Cases, as described in the Plan, the Debtors are evaluating whether it is feasible to contribute the assets and/or equity of certain AWEA Entities to a liquidating trust or other vehicle for the purpose of liquidating such assets and/or equity and distributing the proceeds to the holders of the trust interests or other interests, as applicable, in accordance with the plan. As described herein, Accuride Canada (as defined below) is subject to the CCAA Proceedings (as defined below). The Debtors are also evaluating whether it is feasible to contribute the assets and/or equity of Accuride Canada to a liquidating trust or other vehicle for the purpose of liquidating such assets and/or equity and distributing the proceeds to the holders of the trust or other interests, as applicable, in accordance with the Plan.

Contemporaneously with the filing of this Disclosure Statement, the Debtors filed their Plan, which contemplates a deleveraging restructuring transaction via an equitization of the Debtors' prepetition term loan obligations. The Plan further contemplates a recapitalization of the Debtors' businesses upon exit, in the form of incremental exit financing from the AHG to position the go-forward business for sustained future growth. The equitization and other restructuring transactions set forth in the Plan will result in (i) Holders of Term Loan Claims receiving their *pro rata* share of [●] percent of the New Common Stock, subject to dilution by the Management Incentive Plan, (ii) the equitization of more than $368 million of the Debtors prepetition term loans, (iii) approximately $[●] in committed exit financing to support the Reorganized Debtors' operations, and (iv) enhanced flexibility for the Reorganized Debtors to invest in their business.

### III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

**A.    What is chapter 11?**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly-situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

**B.    Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

**C.    What does it mean that the Debtors are seeking conditional approval of this Disclosure Statement?**

Pursuant to the *Motion of the Debtors for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement, (II) Approving the (A) Solicitation and Voting Procedures, (B) the Forms of Ballots and Notices in Connection Therewith, and (C) Certain Dates with Respect Thereto, (III) Scheduling a Combined Hearing, and (IV) Granting Related Relief* (the "Conditional DS Motion"), the Debtors are seeking conditional approval of this Disclosure Statement pursuant to Rule 3017-2 of the Local Rules for the United States Bankruptcy Court, District of Delaware.  Upon entry of the Disclosure Statement Order approving the Conditional DS Motion, the Debtors will commence solicitation of votes on the Plan in accordance with the timeline set forth therein.  The debtors will subsequently seek final approval of the Disclosure Statement contemporaneously with confirmation of the Plan at the Combined Hearing.

**D.    Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date (*i.e.*, as of November 20, 2024).  Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | ABL Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 4 | Term Loan Claims | Impaired | Entitled to Vote |
| Class 5 | General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

**E.    What is the Recapitalization Transaction under the Plan?**

The proposed Plan contemplates the Debtors pursuing a balance sheet recapitalization, through which, more than $368 million of the Debtors prepetition funded debt obligations would be eliminated—Holders of Term Loan Claims would receive, in full and final satisfaction of their Term Loan Claims, [●] percent of the Reorganized Topco's New Common Stock, subject to dilution on account of the Management Incentive Plan.

**F.    What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims or Interests under the Plan.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[4]**

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Interest | Treatment of Claim/ Interest | Projected Allowed Amount of Claims | Estimated % Recovery Under the Plan |
| Class 1 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim and, at the option of the Debtors and the AHG, either:  (i) payment in full in Cash of its Allowed | $[0] | [100]% |

---

[4]    The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Interest | Treatment of Claim/ Interest | Projected Allowed Amount of Claims | Estimated % Recovery Under the Plan |
| | | Other Secured Claim; (ii) delivery of the collateral securing such Allowed Other Secured Claim; (iii) Reinstatement of its Allowed Other Secured Claim pursuant to section 1124 of the Bankruptcy Code; or (iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | | |
| Class 2 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment of its Allowed Claim, each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | $[0] | [100]% |
| Class 3 | ABL Claims | On the Effective Date, except to the extent that a Holder of an Allowed ABL Claim agrees to less favorable treatment, each Holder of an Allowed ABL Claim (or its designated Affiliate, managed fund or account, or other designee) shall receive, in full and final satisfaction, settlement, release, and discharge of such Allowed ABL Claim, Cash in an amount equal to such Allowed ABL Claim. | $[77.2 million] | [100]% |
| Class 4 | Term Loan Claims | On or prior to the Effective Date, as applicable, except to the extent that a Holder of an Allowed Term Loan Claim agrees to less favorable treatment, each Holder of an Allowed Term Loan Claim (or its designated Affiliate, managed fund or account, or other designee) shall receive, in full and final satisfaction, settlement, release, and discharge of such Term Loan Claim its pro rata share of (i) the Term Loan Equity Pool, subject to dilution by the New Common Stock issued on account of the Management Incentive Plan; (ii) the Liquidating Trust Beneficial Interests (if applicable), and (iii), as may be distributed earlier than the Effective Date in accordance with the Right Offering Documents, its pro rata share of the Rights with respect to the Rights Offering Term Loans. | $[290.8 million] | [22.2]–[39.1]% |
| Class 5 | General Unsecured Claims | On the Effective Date, all General Unsecured Claims will be cancelled, released, discharged, and extinguished and will be of no further force or effect, and Holders of General Unsecured Claims will not receive any distribution on account of such General Unsecured Claims. | $[373.2 million] | [0]% |

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Interest | Treatment of Claim/ Interest | Projected Allowed Amount of Claims | Estimated % Recovery Under the Plan |
| Class 6 | Section 510(b) Claims | On the Effective Date, all Section 510(b) Claims will be cancelled, released, discharged, and extinguished and will be of no further force or effect, and Holders of Section 510(b) Claims will not receive any distribution on account of such Section 510(b) Claims. | [N/A] | [0]% |
| Class 7 | Intercompany Claims | Each Allowed Intercompany Claim shall be, at the option of the applicable Debtor or Reorganized Debtor, with the consent of the AHG, either: (i) Reinstated; or (ii) set off, settled, discharged, contributed, canceled, released without any distribution on account of such Intercompany Claims, or otherwise addressed at the option of the Reorganized Debtors. | [N/A] | [0% or 100%] |
| Class 8 | Intercompany Interests | On the Effective Date, Intercompany Interests shall be, at the option of the applicable Debtor or Reorganized Debtor, with the consent of the AHG, either:  (i) Reinstated; or (ii) set off, settled, discharged, contributed, canceled, and released without any distribution on account of such Intercompany Interests, or otherwise addressed at the option of the Reorganized Debtors. | [N/A] | [0% or 100%] |
| Class 9 | Existing Equity Interests | On the Effective Date, all Existing Equity Interests shall be cancelled, released, extinguished, and discharged and will be of no further force or effect. Holders of Interests shall receive no recovery or distribution on account of their Existing Equity Interests. | [N/A] | [0%] |

**G.    What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP Claim, or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in <u>Article III</u> of the Plan.

**1.    Administrative Claims**

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of DIP Claims, Cash Management Superpriority Claims, L/C Superpriority Claims, Professional Fee Claims, and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed

Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Except as otherwise provided in <u>Article II.A</u> of the Plan, requests for payment of Administrative Claims must be Filed with the Bankruptcy Court and served on the Debtors by the applicable Administrative Claims Bar Date. **Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, their Estates, or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Debtors or the Reorganized Debtors, as applicable, or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.** Objections to such requests, if any, must be Filed with the Bankruptcy Court and served on the Debtors and the requesting party by the Administrative Claims Objection Deadline. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with the Bankruptcy Court with respect to an Administrative Claim previously Allowed.

## 2. DIP Claims

On the Effective Date, except to the extent that a Holder of an Allowed DIP Claim agrees to alternative treatment, and in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim, each Holder of an Allowed DIP Claim (or its designated Affiliate, managed fund or account, or other designee) shall receive (i)(A) its *pro rata* share of New Takeback Facility Loans under the New Takeback Facility and (B) its *pro rata* share of the DIP Equity Pool, or (ii) such other treatment as agreed in writing among the Debtors and the respective Holder of an Allowed DIP Claim, subject to the consent of the AHG.

With regard to clause (i)(A) above, the DIP Loans giving rise to Allowed DIP Claims shall be refinanced by means of a cashless settlement whereby such DIP Loans shall be converted on a dollar-for-dollar basis into New Takeback Facility Loans (up to the initial aggregate principal amount of the New Takeback Facility Loans) in accordance with the DIP Documents and the New Takeback Facility Documents, and all collateral that secures the Obligations (as defined in the DIP Credit Agreement) under the DIP Credit Agreement shall be reaffirmed, ratified, and shall automatically secure all obligations under the New Takeback Facility Documents, subject to the priorities of liens and payment set forth in the New Takeback Facility Documents.

## 3. Cash Management Superpriority Claims and L/C Superpriority Claims

### a. Cash Management Superpriority Claims

Except to the extent that a Holder of a Cash Management Superpriority Claim agrees to alternative treatment, on the Effective Date, each Holder of a Cash Management Superpriority Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, payment in full in Cash.

### b. L/C Superpriority Claims

Except to the extent that a Holder of an L/C Superpriority Claim agrees to alternative treatment, on the Effective Date, each Holder of an L/C Superpriority Claim shall receive, in full and final satisfaction,

settlement, release, and discharge of such Claim, (a) in respect of drawn Letters of Credit (as defined in the ABL Credit Agreement), payment in full in Cash and (b) in respect of undrawn Letters of Credit, in its sole discretion, either (i) cancellation and return of such undrawn Letters of Credit or (ii) with the consent of such Holder, cash collateral to secure such undrawn Letters of Credit in the amount required by the ABL Credit Agreement or other arrangements reasonably satisfactory to the issuing bank.

### 4.    Professional Fee Claims

#### a.    Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from funds held in the Professional Fee Escrow Account.  The Reorganized Debtors shall establish the Professional Fee Escrow Account in trust for the Professionals and fund such account with Cash equal to the Professional Fee Amount on the Effective Date.

#### b.    Professional Fee Escrow Account

No later than the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals.  Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors, as applicable. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed.  When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors, without any further action or order of the Bankruptcy Court.

#### c.    Professional Fee Amount

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date and shall deliver such estimates to the Debtors no later than three (3) Business Days before the Effective Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims.  If a Professional does not provide an estimate, the Debtors or the Reorganized Debtors, as applicable, may estimate the unpaid and unbilled fees and expenses of such Professional.

#### d.    Post-Confirmation Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327–331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or the Reorganized Debtors, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

5.        **Priority Tax Claims**

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive Cash equal to the full amount of its Claim or such other treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

6.        **Payment of Restructuring Expenses**

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms set forth herein, without any requirement to File a fee application with the Bankruptcy Court, without the need for itemized time detail, and without any requirement for Bankruptcy Court review or approval.  All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date, and such estimates shall be delivered to the Debtors at least three (3) Business Days before the anticipated Effective Date; *provided*, *however*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses.  On the Effective Date, invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.  In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay, when due and payable in the ordinary course, Restructuring Expenses arising directly out of the implementation of the Plan and Consummation thereof (whether incurred before, on, or after the Effective Date) without any requirement for review or approval by the Bankruptcy Court or for any party to File a fee application with the Bankruptcy Court.

H.        **Are any regulatory approvals required to consummate the Plan?**

At this time, the Debtors are evaluating which, if any, regulatory approvals are required to consummate the Plan.  To the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, however, it is a condition precedent to the Effective Date that they be obtained.

I.        **What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses.  It is possible that any alternative may provide Holders of Claims with less than they would have received pursuant to the Plan.

J.        **If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective.  Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan.  "Consummation" of the Plan refers to the occurrence of the Effective Date. *See* Article VIII.B of this Disclosure Statement, entitled "Conditions Precedent to Confirmation and Consummation of the Plan," for a discussion of conditions precedent to Confirmation and Consummation of the Plan.

**K.        What are the sources of Cash and other consideration required to fund the Plan?**

The Debtors shall fund distributions under the Plan, as applicable, with: (i) the issuance of New Takeback Facility Loans under the New Takeback Facility, (ii) the New Common Stock, and (iii) the Debtors' Cash on hand.

**L.        Are there risks to owning the New Common Stock upon the Debtors' emergence from chapter 11?**

Yes. *See* <u>Article IX</u> of this Disclosure Statement, entitled "Risk Factors," for a discussion of such risks.

**M.        Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan, which objections potentially could give rise to litigation.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. *See* <u>Article XI.G</u> of this Disclosure Statement, entitled "Confirmation Without Acceptance by All Impaired Classes."

**N.        What is the Management Incentive Plan and how will it affect the distribution I receive under the Plan?**

After the Effective Date, the New Board shall adopt and implement the Management Incentive Plan with the consent of the AHG, which will provide a portion of the New Common Stock (the amount of such New Common Stock to be determined by the New Board) as of the Effective Date, on a fully diluted basis in accordance with the terms of the Management Incentive Plan. The issuance of any awards under the Management Incentive Plan shall be at the discretion of the New Board.

**O.        Does the Plan preserve Causes of Action?**

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the rights of the Reorganized Debtors to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released or exculpated herein (including, without limitation, by the Debtors) pursuant to the releases and exculpations contained in the Plan, including in Article VIII thereof, which shall be deemed released and waived by the Debtors and the Reorganized Debtors, as applicable, as of the Effective Date.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors and the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as expressly provided in the Plan, including Article VIII of the Plan.** Unless any Causes of Action against

an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the corresponding Reorganized Debtor except as otherwise expressly provided in the Plan, including Article VIII of the Plan.  The Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to Article IV.K of the Plan include any Claim or Cause of Action against a Released Party or Exculpated Party.

**P.      Will there be releases, exculpation, and injunction granted to parties in interest as part of the Plan?[5]**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties.  The Debtors' release, third-party release, exculpation, and injunction provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and their key constituencies in obtaining support for the Plan.

[**IMPORTANTLY, THE FOLLOWING PARTIES ARE INCLUDED IN THE DEFINITION OF "RELEASING PARTIES" AND WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES:  (I) ALL HOLDERS OF CLAIMS THAT VOTE TO ACCEPT THE PLAN AND (II) ALL OTHER HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT (1) VALIDLY OPT IN TO THE RELEASES CONTAINED IN THE PLAN OR (2) FILE AN OBJECTION TO THE RELEASES CONTAINED IN THE PLAN BY THE PLAN OBJECTION DEADLINE.  THE RELEASES ARE AN INTEGRAL ELEMENT OF THE PLAN.**][6]

Based on the foregoing, the Debtors believe that the releases, exculpation, and injunction provisions in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit.  Moreover, the Debtors will present evidence at the Combined Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.  The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

---

[5]     The release provisions and related definitions in the Plan are subject to ongoing review and discussion with the AHG, and subject to review as part of the Special Committee's independent investigation and its determination that releases should be granted.

[6]     The release provisions and related definitions in the Plan are subject to ongoing review and discussion with the AHG, and subject to review as part of the Special Committee's independent investigation and its determination that releases should be granted.

1.      **Release of Liens**

Except as otherwise provided in the New Takeback Facility Documents, the Rights Offering Documents, the New ABL Facility Documents, the Plan, or the Confirmation Order, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim or any related claim that may be asserted against a non-Debtor Affiliate, in satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for (x) Other Secured Claims that the Debtors elect to Reinstate in accordance with Article III.B.1 of the Plan [and (y) the Liens securing any undrawn letters of credit that remain outstanding under the ABL Credit Agreement in accordance with <u>Article II.C.2</u> of the Plan], all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates or any non-Debtor Affiliate shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns.  Any Holder of such Secured Claim or claim against a non-Debtor Affiliate (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor or non-Debtor Affiliate (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder) and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, at the sole cost and expense of the Reorganized Debtors, such Holder (or the agent for such Holder) shall take any and all steps reasonably requested by the Debtors or the Reorganized Debtors, that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

2.      **[Releases by the Debtors**

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by and on behalf of the Debtors, their Estates, and, if applicable, the Reorganized Debtors, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all claims and Causes of Action whatsoever (including any Avoidance Actions and any derivative claims asserted or assertable on behalf of the Debtors, their Estates, or the Reorganized Debtors), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors, their Estates, the

Reorganized Debtors, if applicable, or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the management, ownership, or operation of the Debtors, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions, events, circumstances, acts, or omissions giving rise to, any Claim or Interest that is treated under the Plan, the business or contractual arrangements or interactions between the Debtors and any Released Party, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, any other in-court or out-of-court restructuring efforts of the Debtors, the negotiation, formulation, or preparation of the Restructuring Term Sheet, the Restructuring Transactions, the Prepetition Credit Documents, the New Organizational Documents, the DIP Documents, the DIP Orders, the Disclosure Statement, the Plan Supplement, the Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to the Plan, the New Takeback Facility Documents, the Rights Offering Documents, the New ABL Facility Documents, the New Organizational Documents, the Liquidating Trust Agreements, and all other Definitive Documents, and any other any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided*, *however*, that notwithstanding anything herein to the contrary, nothing in the Plan shall affect, limit, or release in any way any performance obligations of any party or Entity under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; *provided*, *further*, that, nothing in <u>Art. VIII.C</u> of the Plan shall be construed to release (i) the Released Parties from any criminal act or intentional fraud, willful misconduct, or gross negligence, in each case, as determined by a Final Order or (ii) any action included in the Schedule of Retained Causes of Action.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan and, further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interests of the Debtors and all Holders of Claims and Interests; (iv) fair, equitable, and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Debtors' Estates or, if applicable, the Reorganized Debtors, asserting any Claim or Cause of Action released pursuant to the Debtor Release.][7]

3.    [Releases by Holders of Claims and Interests

Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by the Releasing Parties, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including

---

[7]   The release provisions and related definitions in the Plan are subject to ongoing review and discussion with the AHG, and subject to review as part of the Special Committee's independent investigation and its determination that releases should be granted.

pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the management, ownership, or operation of the Debtors, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions, events, circumstances, acts, or omissions giving rise to, any Claim or Interest that is treated under the Plan, the business or contractual arrangements or interactions between the Debtors and any Released Party, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, any other in-court or out-of-court restructuring efforts of the Debtors, the negotiation, formulation, or preparation of the Restructuring Term Sheet, the Restructuring Transactions, the Prepetition Credit Documents, the New Organizational Documents, the DIP Documents, the DIP Orders, the Disclosure Statement, the Plan Supplement, the Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to the Plan, the New Takeback Facility Documents, the Rights Offering Documents, the New ABL Facility Documents, the New Organizational Documents, the Liquidating Trust Agreements, and all other Definitive Documents, and any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided*, *however*, that notwithstanding anything herein to the contrary, nothing in the Plan shall affect, limit, or release in any way any performance obligations of any party or Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.  For the avoidance of doubt, nothing in <u>Article VIII.D</u> of the Plan shall be construed to release the Released Parties from any criminal act, intentional fraud, willful misconduct, or gross negligence, in each case, as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:  (i) consensual; (ii) essential to the confirmation of the Plan; (iii) given in exchange for good and valuable consideration provided by the Released Parties; (iv) a good faith settlement and compromise of the Claims released by the Third-Party Release; (v) in the best interests of the Debtors and their Estates; (vi) fair, equitable, and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.][8]

4.     Exculpation

To the fullest extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party will be released and exculpated from, any Claim or Cause of Action occurring

---

[8] The release provisions and related definitions in the Plan are subject to ongoing review and discussion with the AHG, and subject to review as part of the Special Committee's independent investigation and its determination that releases should be granted.

between the Petition Date and the Effective Date in connection with or arising out of the administration of the Chapter 11 Cases, the negotiation and pursuit of the Restructuring Term Sheet, the Restructuring Transactions, the Prepetition Credit Documents, the New Organizational Documents, the DIP Documents, the DIP Orders, the Disclosure Statement, the Plan Supplement, the Plan and related agreements, instruments, and other documents, the New Takeback Facility Documents, the Rights Offering Documents, the New ABL Facility Documents, the Liquidating Trust Agreements, and all other Definitive Documents, the solicitation of votes for, or Confirmation of, the Plan, the funding of the Plan, the occurrence of the Effective Date, the administration of the Plan or the property to be distributed under the Plan, the issuance of Securities under or in connection with the Plan, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, if applicable, in connection with the Plan and the Restructuring Transactions, or the transactions in furtherance of any of the foregoing, other than Claims or Causes of Action in each case arising out of or related to any act or omission of an Exculpated Party that is a criminal act or constitutes actual fraud, willful misconduct, or gross negligence as determined by a Final Order, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of Securities pursuant to the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of Securities thereunder. The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability; provided, that notwithstanding anything herein to the contrary, nothing in the Plan shall affect, limit, or release in any way any performance obligations of any party or Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

5.      Injunction

Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date through and until the date upon which all remaining property of the Debtors' Estates vested in the Reorganized Debtors has been liquidated and distributed in accordance with the terms of the Plan, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (iii) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any

kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities released or settled pursuant to the Plan.

No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to Article VIII.C, Article VIII.D, or Article VIII.E the Plan, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party. At the hearing for the Bankruptcy Court to determine whether such Claim or Cause of Action represents a colorable Claim of any kind, the Bankruptcy Court may, or shall if any Debtor, Reorganized Debtor, Exculpated Party, Released Party, or other party in interest requests by motion (oral motion being sufficient), direct that such Person or Entity seeking to commence or pursue such Claim or Cause of Action file a proposed complaint with the Bankruptcy Court embodying such Claim or Cause of Action, such complaint satisfying the applicable Federal Rules of Civil Procedure, including, but not limited to, Rule 8 and Rule 9 (as applicable), which the Bankruptcy Court shall assess before making a determination.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Article VIII.F of the Plan.

For more detail, see <u>Article VIII</u> of the Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.

**Q.      When is the deadline to vote on the Plan?**

The Voting Deadline is December 16, 2024, at 4:00 p.m. (prevailing Eastern Time).

**R.      How do I vote on the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballot distributed to Holders of Claims that are entitled to vote on the Plan (the "<u>Ballot</u>"). For your vote to be counted, the Ballot containing your vote must be properly completed, executed, and delivered as directed so that it is **<u>actually received</u>** by the Debtors' claims, noticing, and solicitation agent, Omni Agent Solutions, Inc. (the "<u>Claims and Noticing Agent</u>") **on or before the Voting Deadline, *i.e.* December 16, 2024, at 4:00 p.m., prevailing Eastern Time**. *See* Article X of this Disclosure Statement, entitled "Solicitation and Voting Procedures," for additional information.

**S.      Why is the Bankruptcy Court holding a Combined Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan. The Combined Hearing will be scheduled by the Bankruptcy Court, and all parties in interest will be served notice of the time, date, and location of the Combined Hearing once scheduled. In addition, the Debtors are seeking approval of this Disclosure Statement on a final basis at the Combined Hearing. The Combined Hearing may be adjourned from time to time without further notice.

**T.        What is the purpose of the Combined Hearing?**

At the Combined Hearing, the Bankruptcy Court will determine (i) whether to approve the Disclosure Statement as containing "adequate information" under section 1125(a) of the Bankruptcy Code on a final basis and (ii) whether to confirm the Plan.  The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**U.        What is the effect of the Plan on the Debtors' ongoing businesses?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code.  As a result, the occurrence of the Effective Date means that the Debtors will ***not*** be liquidated or forced to go out of business.  Following Confirmation, the Plan will be consummated on the Effective Date, which is a date that is the first Business Day after the Confirmation Date on which (1) no stay of the Confirmation Order is in effect and (2) all conditions to Consummation have been satisfied or waived in accordance with Article IX of the Plan.  On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**V.        Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?**

As of the Effective Date, the term of the current members of the board of directors of Topco shall expire, and the members for the initial term of the New Board shall be appointed; *provided*, that the disinterested directors of Topco, comprising the Special Committee (as defined below), shall retain authority following the Effective Date with respect to matters relating to Professional Fee Claim requests by Professionals acting at their authority and direction in accordance with the terms of the Plan.  The disinterested directors of Topco shall not have any of their privileged and confidential documents, communications, or information transferred (or deemed transferred) to the Reorganized Debtors or any other Entity without their prior written consent.  The initial members of the New Board will be identified in the Plan Supplement to the extent known at the time of filing.  Each such member and officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtors.  The members of the New Board shall consist of the Debtors' chief executive officer, with the remaining four members to be selected by the AHG in their sole discretion and in consultation with the Debtors.

Assuming that the Effective Date occurs, Holders of Allowed Claims that receive distributions representing a substantial percentage of outstanding shares of the New Common Stock may be in a position to influence matters requiring approval by the holders of shares of New Common Stock, including, among other things, the election of directors and the approval of a change of control of the Reorganized Debtors.

**W.   Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Claims and Noticing Agent via one of the following methods:

*By regular mail, hand delivery or overnight mail at:*
Accuride Corporation *et al.*
c/o Omni Agent Solutions, Inc.
5955 De Soto Avenue, Suite 100
Woodland Hills, CA 91367

*By electronic mail at:*

accurideinquiries@omniagnt.com

Please reference "Accuride Corporation – Solicitation Inquiry" in the subject line.

*By telephone (toll free) at:*

866-956-2136 (U.S. Toll-Free/Domestic) or +1 747-263-0154  (International)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Claims and Noticing Agent at the address above or by downloading the documents from the Debtors' restructuring website at https://omniagentsolutions.com/Accuride (free of charge) or via PACER at https://www.pacer.gov (for a fee) upon filing.

**X.   Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe that the Plan provides for a greater distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe that the Plan is in the best interest of all Holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.  Consummation of the Plan and the restructuring transactions set forth therein will significantly delever the Debtors' balance sheet.  The schedule set forth in this Disclosure Statement will allow for a quick confirmation by no later than December 20, 2024.

**Y.   Who Supports the Plan?**

The Plan has broad support across the Debtors' capital structure including from:  (a) the AHG, the members of which hold approximately 98 percent of the claims arising on account of obligations under the Term Loan Credit Agreement, (b) the Holders of all outstanding ABL Claims, and (c) the Sponsor.

**IV.   THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW**

**A.   The Debtors' Corporate History**

Accuride traces its origins back almost 150 years to when Gunite was founded in 1854 as a manufacturer of bicycle, wagon, and buggy tires.  Many tire and wheel companies were, over time, incorporated into the Firestone Tire and Rubber Company conglomerate.  In 1986, Accuride was formed as a vehicle to acquire Firestone's wheel and wheel ends businesses.  Accuride's specialization in wheel

and wheel end components allowed it to produce high quality products at a significantly reduced margin, which fostered continued growth throughout the next decade.  In January 2005, Accuride merged with Transportation Technologies Industries, Inc., acquiring one of the largest North American producers of truck components for the heavy and medium-duty trucking industry and the Gunite brand.  The newly-combined Accuride became a dominant parts supplier to the medium to heavy trucking industry and, in April 2005, debuted as a public company through an initial public offering.

Accuride's steady growth and expansion was curtailed by the Great Recession.  While Accuride experienced a period of extremely high demand through 2007 due to many trucking fleets purchasing trucks prior to the implementation of revised EPA standards, the combination of a severe, global economic downturn and excess capacity among trucking fleets drastically reduced demand for Accuride's products.  In October 2009, Accuride sought chapter 11 protection to alleviate liquidity pressure and implement a broader restructuring of their debt portfolio via a prepackaged plan of reorganization.[9]  Accuride emerged from chapter 11 five months later as a privately-owned company and relisted on the New York Stock Exchange in December of 2010.

Reorganized Accuride's renewed focus on operational excellence drove significant growth.  In 2014, 2015, and 2016, Accuride won awards from the American Society for Manufacturing Excellence for its quality and supply chain system methodologies and high standards of performance.  During this time, Accuride divested many non-core businesses, including its specialty axle and seating business.  Based on this record of success and recovery, Accuride was acquired by Crestview AQ Holdings, L.P. ("AQ Holdings") and Crestview Partners III (Co-Investment B), L.P. ("Partners III") in November 2016.

Accuride augmented its product offerings and market reach through two major acquisitions.  In May 2017, Accuride acquired KIC LLC ("KIC"), which greatly expanded Accuride's wheel end offerings for medium and heavy-duty trucks and trailers.  Through KIC, which utilized a primarily foreign supplier base, Accuride was able to offer a significantly expanded selection of brake drums, rotors, hub and drum assemblies, steel wheels and aluminum wheels to both original equipment manufacturers and aftermarket distributors, as well as reaching more price-sensitive customers.  Then, in June 2018, Accuride acquired Mefro wheels GmbH ("Mefro"), a major wheels manufacturer with 5,000 employees and eight factories supplying wheels throughout Europe, Russia, and Asia for the passenger automotive, commercial, and agricultural vehicle sectors.  This acquisition effectively doubled Accuride's core wheels business and transformed Accuride into a worldwide industry leader.  Accuride promptly invested capital and implemented lean manufacturing and quality control processes to bring operations in both acquired companies up to the standard of Accuride's award-winning North American factories.

## B.     The Debtors' Business Operations

Today, Accuride is a leading supplier of wheels and wheel end solutions in the medium to heavy-duty commercial vehicle market.  Accuride distributes its products to original equipment manufacturers of trucks and trailers and to aftermarket distributors.  Because of its high-quality products and strong business relationships, Accuride captured significant market share amongst a wide variety of blue-chip automotive manufacturers, including some of the largest producers of commercial trucks and trailers.

---

[9]    These prior jointly administered chapter 11 cases were styled as *In re Accuride Corporation, et al.*, Case No. 09-13449 (BLS) (Bankr. D. Del. Oct. 8, 2009).

Accuride organizes its business into three divisions:  "Accuride Wheels North America" ("Wheels North America"),[10] "Accuride Wheel End Solutions" ("Wheel Ends"), and "Accuride Wheels Europe and Asia" ("AWEA").  The Debtors comprise the Wheel Ends business as well as the U.S. entities in the Wheels North America business.

### 1.    Wheels North America

As part of Accuride's Wheels North America division, the Debtors provide high-quality steel and aluminum wheels to more than a thousand commercial vehicle manufacturers and aftermarket distributors.  The Debtors produce wheels in three manufacturing facilities that are strategically located to facilitate efficient customer service and reduce customer freight charges:  Erie, Pennsylvania; Henderson, Kentucky; and Springfield, Ohio.  Accuride's facilities in London, Ontario and Monterrey, Mexico are operated by non-Debtors.  Each facility uses Accuride's award-winning lean manufacturing and distribution principles.  In total, Accuride's wheels manufacturing operations (Debtor and non-Debtor) can produce approximately 20 million wheels per year and employs approximately 3,600 people.

The Debtors are the largest producer of medium and heavy-duty steel wheels and demountable rims in North America.  The Debtors' designed disc wheels are standard products for all truck and trailer manufacturers and are sold broadly to aftermarket distributors.  The Debtors primarily produce two types of proprietary steel wheels – the Accu-Lite®, which consists of high-strength, low-alloy steel that weighs less than comparable models sold by its competitors, and the Steel-Armor™, which utilizes a powder coat, epoxy e-coat, and zinc phosphate pre-treatment to adapt wheels for all weather conditions.  The Debtors have a strong position in the steel wheels market, with 56% market share for original manufacturers of medium to heavy-duty trucks, 51% for trailers, and 33% of the aftermarket.  The Debtors have also developed key supply relationships with many of the largest commercial vehicle manufacturers, with several almost completely relying on Accuride for their steel wheel inventory.

The Debtors also have a strong position in the market for aluminum wheels, which are significantly lighter than steel wheels and are used by commercial, agricultural, and construction vehicle manufacturers.  The Debtors primarily produce two types of aluminum wheels – the Accu-Lite®, which uses the Debtors' proprietary Quantum 99 alloy to create a light, yet highly durable wheel, and the DupleX-One, which reduces fuel expense and increases total payload by replacing dual-wheel sets with a single wheel.  The Debtors' aluminum wheels are heavily relied upon by several blue-chip commercial vehicle manufacturers, and, all told, the Debtors supply 28% of the aluminum wheel market for original manufacturers of medium to heavy-duty trucks, 29% of the aluminum wheels market for trailer manufacturers, and 30% of the total aluminum wheel aftermarket.

### 2.    Wheel Ends

Certain of the Debtors produce wheel end solutions for truck and trailer manufacturers and aftermarket distributors.  These wheel end solutions consist of a set of products—including brake drums, disc wheel hubs, hub and drum assemblies, slack adjusters, and rotor and spoke wheels—designed to assist a vehicle's braking capacity and are complementary to the Debtors' core wheel offerings.  The Debtors sell these products under two brands: "Gunite," which focuses on premium offerings for truck and trailer manufacturers, and "KIC," which focuses on manufacturers of smaller commercial vehicles and aftermarket distributors.

---

[10]    Wheels North America also includes non-Debtors Accuride Canada Inc. ("Accuride Canada"), Accuride de Mexico, S.A. de CV, Accuride Monterrey S.De F.L. de C.V., and Accuride del Norte, S.A. de C.V.  None of the AWEA entities are Debtors.

The Debtors produce wheel end components through a set of domestic foundry and in-house machining capabilities that are complemented by offshore casting and machining partners. The Debtors manufacture wheel ends components at a manufacturing facility in Rockford, Illinois, which boasts significant automation capabilities and an in-house foundry with a 250-thousand-ton yearly melt capacity. As a result, the Rockford facility has the capacity to produce approximately 2.2 million brake drums and 845,000 slack adjusters annually. The Debtors also partner with select offshore partners to produce wheel end products using the Debtors' designs and technology. These offshore partners both deliver finished products to the Debtors for distribution and sell these products in their home region, with the Debtors paid a licensing fee. The Debtors distribute domestically-produced and imported wheel ends products from a distribution center in Joliet, Illinois.

A brake drum is a closed cylinder attached to a vehicle's wheel, against which the brake presses to slow or stop a moving truck or trailer. The Debtors produces more than 950 configurations of brake drum to fit almost any vehicle-type or application. The Debtors' brake drums are lighter than most competitors, with an average cumulative weight savings of 170 pounds, and high levels of reliability. This high standard of manufacturing quality has led to the Debtors' brake drum designs being approved by many of the largest transit authorities and government procurement departments for purchase.

A disc wheel hub serves as the mounting location for brake components and is located between the drive axle and the brake drums. The Debtors' array of disc wheel hubs, including Ductilite iron hubs, are lighter than comparable models offered by the Debtors' competitors while offering similar levels of reliability. The Debtors also sell combined disc wheel hubs and brake drum assemblies, primarily to truck and trailer manufacturers. These include the KIC-branded Rolliant bearing system, which uses a proprietary design to improve the durability of a truck's brake assembly.

Slack adjusters regulate the distance a brake pad travels to apply pressure to the wheel, which reduces overall wear on brake pads and the risk of brake failure. While the Debtors produce a variety of slack adjuster configurations, its proprietary Gunite slack adjusters utilize a unique clearance-sensing design to accurately read the brake pad to brake drum clearance and thereby reduce total brake wear. The Debtors sells slack adjusters to both original manufacturers and aftermarket distributors in roughly equal measure.

3.      **Accuride Wheels Europe and Asia**

Accuride's AWEA division provides high-quality steel wheels for medium and heavy-duty and off-road commercial vehicles and passenger vehicles, with many of the largest commercial vehicle manufacturers and aftermarket distributors in Europe being long-term Accuride customers.[11] Accuride produces wheels in five manufacturing facilities spread throughout Eurasia including: Troyes, France; Solingen and Ronnenberg in Germany; Bilecik, Turkey; and Jining Shi, China. Accuride is a leading producer of wheels in Europe, with a market share of approximately 45% among commercial vehicle manufacturers. Accuride's high-quality production methods have resulted in highly durable relationships with automotive manufacturers, with the average relationship lasting more than twelve years and certain relationships spanning more than thirty years. In total, Accuride's international wheels manufacturing operations can produce approximately 12 million wheels per year and employs approximately 2,000 employees.

The AWEA division also includes Accuride Russia, a wheel production business in Russia. Accuride Russia employs more than 540 employees at two factories in Togliatti and Zainsk. Accuride Russia is not a Debtor in these chapter 11 cases. To ensure compliance with economic sanctions imposed

---

[11]    The Accuride Wheels Europe and Asia division is not included in these chapter 11 proceedings.

against the Russian Federation and certain individuals, industries, and entities therein by the United States and the European Union, Accuride Russia is currently entirely self-funding and self-managing; in other words, no capital travels between Accuride Russia and the rest of Accuride.  From a management and infrastructure perspective, Accuride has taken steps to "ring-fence" the Russian business in order to maintain compliance with United States and European Union sanction requirements.

**C.    The Debtors' Prepetition Corporate and Capital Structure**

**1.    The Debtors' Corporate Structure**

Topco is the ultimate parent of each Debtor.  Topco conducts business through its thirty-four subsidiaries, thirty-three of which are wholly-owned (directly or indirectly) and fourteen of which are Debtors in these Chapter 11 Cases.  A simplified corporate structure chart is attached hereto as **Exhibit B**, which depicts the Debtors' corporate structure, as well as the Debtors' various prepetition debt obligations.

**2.    The Debtors' Prepetition Capital Structure**

As of the Petition Date, the Debtors had approximately $485.6 million in total third-party funded debt obligations, as reflected below:

| Maturity | Facility | Interest Rates | Funded Debt Outstanding as of the Petition Date |
|---|---|---|---|
| May, 2026 | U.S. Revolver – Base Rate | P + 250 | $52,800,000 |
| | U.S. Revolver – SOFR | S + 360[12] | |
| | French Revolver – Eur Base Rate | EURIBOR + 450 | $25,100,000 |
| | French Revolver – Eur (Tranche) | EURIBOR + 350 | |
| | German Revolver – Eur Base Rate | EURIBOR + 450 | |
| | German Revolver – Eur (Tranche) | EURIBOR + 350 | |
| N/A | Letters of Credit | N/A | $20,300,000 |
| May, 2026 | 2023 Extended Term Loans[13] | S + 687[14] | $294,600,000 |
| October, 2024 | Amendment No. 14 Bridge Loans | S + 1,000 | $40,000,000 |
| | Amendment No. 15 Bridge Loans | | $16,800,000 |
| | Amendment No. 16 Bridge Loans | | $16,600,000 |

---

[12]    Includes 10 bps spread adjustment.

[13]    Principal amount represents total repayment amount inclusive of fees; interest is PIK.

[14]    Term Loan interest composed of 100 bps cash pay and 587 bps PIK.

| Maturity | Facility | Interest Rates | Funded Debt Outstanding as of the Petition Date |
|---|---|---|---|
| N/A | Finance Leases and Other Debt | N/A | $19,400,000 |
| **TOTAL** | | | **$485,600,000** |

### a. ABL Facility

Accuride Corporation, as the U.S. borrower, Bank of America, N.A. ("BofA"), as administrative agent and collateral agent, and certain lenders are parties to that certain Amended and Restated ABL Credit Agreement, dated as of June 1, 2018 (as most recently amended as of July 7, 2023, the "Prepetition ABL Credit Agreement").

The Prepetition ABL Credit Agreement provides for a senior secured, multi-currency, asset-based revolving credit facility (the "Prepetition ABL Facility"), including a sub-limit for the issuance of letters of credit, comprising three tranches pursuant to which the lenders provide revolving loans in local currency to Accuride Corporation and the non-Debtor foreign borrowers party to the Prepetition ABL Credit Agreement. As of the Petition Date, approximately $98.2 million in aggregate principal amounts remained outstanding under the Prepetition ABL Facility, of which approximately $20.3 million was outstanding on account of issued, undrawn letters of credit. The Prepetition ABL Facility matures on the earlier of (a) May 18, 2026, and (b) ninety-one days prior to the maturity of the 2023 Extended Term Loans

Under the Prepetition Credit Agreement, Bank of America also provides certain cash management services to the Debtors, including (a) commercial credit cards, merchant card services, purchase or debit cards, including non-card e-payables services, (b) treasury management services (including controlled disbursement, overdraft automatic clearing house fund transfer services, return items and interstate depository network services), (c) vendor financing services or similar services and (d) any other demand deposit or operating account relationships or other cash management services (the "Cash Management Services"). The obligations the Debtors incur on account of the Cash Management Services constitute obligations under the ABL Credit Agreement and are secured by liens to the same extent as the loans issued under the Prepetition ABL Facility.

### b. Term Loan Facilities

Accuride Corporation, as the borrower, Alter Domus (US) LLC, as administrative and collateral agent, and certain lenders are parties to that certain Term Loan Credit Agreement, dated as of November 18, 2016 (as most recently amended as of October 7, 2024, the "Prepetition Term Loan Credit Agreement").

The Prepetition Term Loan Credit Agreement provides for a senior secured term loan facility (the "Prepetition Term Loan Facility") pursuant to which certain lenders make loans (the "Term Loans") to Accuride Corporation. As of the Petition Date, approximately $368 million in aggregate principal amounts were outstanding under the Prepetition Term Loan Facility comprising approximately $294.6 million of 2023 Extended Term Loans (as defined in the Prepetition Term Loan Agreement) and $73.4 million of Bridge Loans. The 2023 Extended Term Loans mature on May 18, 2026.

In the months leading up to the Petition Date, the AHG agreed to make the Bridge Loans to the Debtors to provide critical incremental liquidity to, among other things, fund the Marketing Process and bridge the Debtors to an orderly chapter 11 filing. On July 5, 2024, the Debtors and the AHG entered into that certain Amendment No. 14 to Term Loan Credit Agreement, pursuant to which the AHG committed to provide, and provided, approximately $35 million in Bridge Loans. On July 12, 2024, the Term Loan Agent filed a UCC-1 financing statement to perfect its liens on the assets of Debtor KIC, LLC. The Term

Loan Agent's liens on the assets of all other obligors under the Prepetition Term Loan Credit Agreement were previously perfected.  On August 21, 2024, the Debtors and the AHG entered into that certain Amendment No. 15 to Term Loan Credit Agreement, pursuant to which the AHG committed to provide, and provided, an additional approximately $15 million in additional Bridge Loans.  Finally, on September 19, 2024, the Debtors and the AHG entered into that certain Amendment No. 16 to Term Loan Credit Agreement, pursuant to which the AHG committed to provide, and provided, an additional approximately $15 million in Bridge Loans.  The Bridge Loans are senior in priority of payment to all other Term Loans.

## V.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

Over the last several years, the Debtors' business performance has suffered despite steady growth and a significantly expanded product and geographic footprint.  Supply chain distortions and a steep rise in the cost of several key inputs for the Debtors' products stressed the Debtors' cost structure.  At the same time, slower-than-anticipated integration of Mefro and longer-than-expected "new business" holds placed on Mefro by potential customers left the Debtors covering liquidity shortfalls in AWEA.  In addition, the Debtors' Wheel Ends business has underperformed, and non-Debtor Accuride Canada's plant in London, Ontario has failed to reach profitability on a standalone basis, despite the Debtors' and their affiliates' efforts.  These pressures depleted liquidity and demanded the Debtors' attention, preventing the Debtors from investing in continued growth.

### A.    Business Challenges.

During the COVID-19 pandemic, consumer demand for goods increased sharply due to increased leisure time produced by work from home polices and governmental stimulus support.  This resulted in an increased need to transport goods to consumers and a corresponding increase in the size of trucking fleets.  This had a positive impact on the Debtors' performance, as shipping companies purchased increasing number of medium to heavy-duty trucks and trailers to cope with demand.  However, the medium to heavy duty truck and trailer market served by the Debtors is highly cyclical, and, over the last two years, demand for freight transportation has plummeted.  Due to inflation and a corresponding increase in benchmark interest rates, consumer demand has dropped, with a corresponding major negative impact on manufacturing output and volumes of imported goods.  Less domestic production and fewer imported goods means less freight to transport; this is a situation, known popularly as the "freight recession," in which freight companies have outsized, costly truck fleets and a significantly diminished amount of freight demand to sustain them.  Trucking companies have responded to this sharp downturn in demand by relying on capital reserves that may otherwise have been deployed to upgrade their trucking fleets.

As a result, the "freight recession" has impacted truck manufacturers—the Debtors' primary customers—even more severely than the freight industry.  Many freight carriers have, from their perspective, too many trucks, and they are unlikely to buy more until demand rises commensurate with their fleet capacity and their existing trucks accumulate sufficient wear to merit replacement.  The net result is that demand for new commercial trucks, and therefore demand for the Debtors' products, has plummeted, despite the Debtors' continued high market share among vehicle manufacturers.

During and after the COVID-19 pandemic, the Debtors also experienced significant strains on their supply chain infrastructure and a corresponding increase in costs.  Specifically, interruptions in the production and supply of the Debtors' products, particularly for the Wheel Ends Debtors' foreign suppliers, worldwide supply chain disruptions and shortages in the availability of raw materials and labor, and a corresponding increase in related manufacturing and ocean-freight costs all continued after the most severe economic effects of the COVID-19 pandemic had abated in the United States, due to trailing impacts of closures by industrial suppliers, and continued suppressed ocean freight capacity.  For example, between 2020 and 2022 the cost of aluminum, a vital product ingredient, almost doubled, and ocean freight costs

nearly quintupled.  The price of steel, a key input for the Debtors' steel wheels, also experienced significant volatility, rising by nearly a third between 2022 and 2023.  These supply chain distortions continue to be costly to the Debtors.

The Debtors' management attempted to navigate these significant business headwinds through careful attention to liquidity and vendor relationships.  The Debtors "stretched" trade payables beyond agreed payment terms and moved procurement between suppliers of commoditized goods to different players to maintain their ability to manufacture and ship product.  Eventually, certain vendors began significantly tightening terms, demanding cash in advance, or otherwise pursuing payment of their outstanding amounts, including via litigation: on May 21, 2024, a major aluminum supplier filed a complaint and motion for summary judgment in the Circuit Court for Baltimore County asserting that Debtor Accuride Corporation owed more than $4 million for orders of aluminum.  On August 29, 2024, summary judgment was entered in the vendor's favor for the entire claimed amount.

The Debtors have also been forced to navigate significant operational and legal issues in their international (non-Debtor) production lines.  *First*, following the Debtors' acquisition of Mefro, numerous passenger and commercial vehicle manufacturers in Europe placed holds on new purchase orders from Mefro.  These holds were much broader and lasted longer than the Debtors anticipated and were only lifted after significant effort was expended by the Debtors' management team to negotiate with key customers. In addition, significant time and capital needed to be invested in AWEA by the Debtors before it could return to profitability.  *Second*, operational challenges have consistently arisen at non-Debtor Accuride Canada's London, Ontario facility, which produces wheels primarily for the medium-duty truck market. The London, Ontario facility has consistently failed to operate at a profit and has fallen behind in manufacturing technology compared to peer factories operated by the Debtors' competitors.  As a result, these non-Debtor operations in Canada have required regular capital support from the Debtors.  While non-Debtor Accuride Russia has experienced significant success, sanctions placed on the Russian Federation and businesses operating inside of it in response to the Russian Federation's invasion of Ukraine have prevented the Debtors from legally accessing excess cash at Accuride Russia.

On June 20, 2024, one of the Debtors' competitors, Webb Wheel Products, Inc. ("Webb"), filed petitions against the imports of certain brake drums from the People's Republic of China and the Republic of Türkiye alleging that brake drums from these countries were being sold in the United States at less than full value.  The net impact of these petitions on the Debtors' business remains to be seen.  Debtor KIC, LLC, purchases brake drums from certain Chinese manufacturing partners.  Antidumping and countervailing duties, if imposed, would significantly increase the cost of Wheel Ends' imported products. At the same time, Debtor Gunite, LLC may face increased demand for its domestic production capacity for wheel end products.  The uncertainty resulting from the outstanding petitions filed by Webb appear to have contributed to discouraging potential acquirers of Wheel Ends from transacting at a price that would be profitable for the Debtors (net of projected wind-down and exit costs).

The impact of these operational headwinds was compounded by the need for the Debtors to fund significant capital to certain non-Debtor affiliates to remain "in formula" under the Prepetition ABL Facility.  Despite the infusion of $65 million in Bridge Loans between July 5, 2024 and the Petition Date, approximately $17.6 million went to keeping the Prepetition ABL Facility in formula, and much of the remainder has been spent simply keeping operations running while the Debtors explored potential transaction alternatives.  As of the Petition Date, the Debtors are down to approximately $6 million in available cash.  As one condition to continuing to fund the Debtors' business operations and restructuring initiatives, the AHG required that the Debtors commence these chapter 11 cases so that further financing could be supplied in the form of the super-priority DIP Facility.

B.      **Restructuring Initiatives and the Path Forward.**

As the Debtors' liquidity tightened in early to mid-2024, they sought to implement a series of initiatives to bolster liquidity and chart a path forward in conjunction with their lenders.  These initiatives included the retention of advisors and a refresh of the Debtors' corporate governance to provide expert guidance as the Debtors navigated the difficult and operational and financial decisions the Debtors were required to make prior to the Petition Date.  The Debtors also decided to launch a sale and marketing process for their assets.  While these efforts have not yet borne fruit in the form of an actionable bid, they have served as a basis for the Debtors and their lender to coalesce around a path forward.

On June 1, 2024, the Debtors retained Perella Weinberg, as investment banker, and on June 20, 2024, the Debtors retained Kirkland, as legal counsel.  On June 26, 2024, the Debtors appointed Charles Moore, as CRO and retained A&M to provide certain additional personnel to support the CRO.  On August 8, 2024, the Debtors retained Young Conaway Stargatt & Taylor, LLP ("Young Conaway") as local counsel.  On September 20, 2024, after soliciting proposals from three qualified claims and noticing firms pursuant to the Court's *Protocol for the Employment of Claims and Noticing Agents Under 28 U.S.C. § 156(c)*, the Debtors retained Omni Agent Solutions, Inc. as claims and noticing agent and as a consulting and administrative services provider.

On June 19, 2024, the Debtors appointed Ted Stenger to Topco's board of directors (the "Topco Board") as an independent, disinterested director to assist the board in the Debtors' review of strategic alternatives, and on June 26, 2024, the Debtors formed a special committee of the board (the "Special Committee"), initially comprised solely of Mr. Stenger.  Subsequently, on July 9, 2024, the Debtors appointed Steve Panagos as a second independent, disinterested director to the board and the Special Committee.  The Special Committee operates under a broad delegation of authority on all matter related to consideration and negotiation of a restructuring, reorganization, or other transaction (any such transaction, a "Transaction") and making one or more recommendations to the Topco Board regarding the Debtors' entry into and consummation of a Transaction.  In addition, the Board delegated sole authority to the Special Committee with respect to any matter in which a conflict of interest is likely to exist between the Debtors and their related parties (the "Conflict Matters"), including the authority to:  (a) determine whether any matter constitutes a Conflict Matter and (b) take any action with respect to Conflict Matters, as determined in the sole judgment of the Special Committee.  The Special Committee has been conducting an independent investigation (the "Independent Investigation") into any potential claims or causes of action belonging to the estates and such investigation is ongoing.

The Debtors' prepetition engagement with the AHG and other stakeholders, including the Sponsor, centered around the terms of a capital infusion to support the business and extend runway to explore strategic alternatives.  As part of these discussions, the Debtors explored the possibility of implementing a consensual restructuring or sale transaction on an out-of-court basis, pivoting to an in-court chapter 11 process, or pursuing both paths simultaneously.  To that end, the Debtors, with the assistance of Perella Weinberg, launched the Marketing Process in early August 2024 to engage potential interested parties concerning a significant investment in or purchase of some or all of the Debtors' or non-Debtor affiliates' assets.  As part of the marketing process, Perella Weinberg contacted 51 parties regarding the Debtors, including 23 strategic and 28 financial partners.  Ultimately, 31 parties went under NDA and 7 parties provided indications of interest in acquiring parts of Debtors' business or assets.

During the prepetition period, the Debtors and the AHG discussed solutions to provide a runway to market Accuride's business units and assets and ultimately agreed on the parameters of a restructuring transaction.  To provide runway to prepare the Debtors' businesses for a chapter 11 process, the Debtors closed an amendment to the Prepetition Term Loan Agreement with the AHG on July 5, 2024, which provided for an initial $35 million of Bridge Loans, and the Debtors and the AHG negotiated and executed

two more amendments to the Prepetition Term Loan Agreement that provided the Debtors with an additional incremental $30 million in Bridge Loans.

Although the Debtors welcome any alternative transaction proposals, the existing bids have not generated sufficient value to present an attractive opportunity to transact.  The Debtors and the AHG have therefore pivoted to negotiation of a standalone restructuring transaction, which has culminated in an agreement on the terms of a consensual restructuring of the Debtors' indebtedness.  The Debtors intend to use these Chapter 11 Cases to expeditiously proceed to solicitation of votes on and confirmation of the Plan. The Debtors will also consider any additional third-party bids that emerge, whether for all or part of the Debtors, or their non-Debtor affiliates, assets or business units.  The terms of the Debtors' agreement with the AHG preserves flexibility for the Debtors to, in the exercise of their fiduciary duties, pursue higher or otherwise better proposals than the contemplated transaction.

Concurrently with the commencement of these Chapter 11 Proceedings, the Debtors' non-Debtor affiliate, Accuride Canada made an application to the Ontario Superior Court of Justice (Commercial List) seeking protection pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA" and the related proceedings, the "CCAA Proceedings").  Accuride Canada intends to use the breathing space afforded by the CCAA Proceedings to allow the pre-petition marketing process conducted by the Debtors to continue for a brief period to determine if there a potential for a going concern transaction for some or all of Accuride Canada's business, failing which Accuride Canada will conduct an orderly wind-down of its operations.  Accuride Canada's operations are not self-funding and will require an infusion of capital from the Debtors on a postpetition basis, as discussed more fully in the Cash Management Motion (defined below).

## VI.    MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

### A.    First Day Relief and Other Case Matters

On the Petition Date, the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations.  A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the First Day Declaration.  At a hearing on October 11, 2024, (the "First Day Hearing") the Bankruptcy Court granted all of the relief initially requested in the First Day Motions:[15]

- **Joint Administration Motion**: *Motion of Debtors for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 2]. On October 11, 2024, the Bankruptcy Court entered an order granting the Joint Administration Motion [Docket No. 75].

- **Creditor Matrix Motion**: *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (B) File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, (C) Serve Certain Parties in Interest by Email, and (D) Redact Certain Personally Identifiable Information of Individuals; (II) Approving the Form and Manner of Service of the Notice of Commencement; and (III) Granting Related Relief* [Docket No. 4].  On October 11, 2024, the Bankruptcy Court

---

[15]    The First Day Motions, and all orders for relief entered in the Chapter 11 Cases, can be viewed free of charge at https://omniagentsolutions.com/Accuride.

entered an order.  On October 11, 2024, the Bankruptcy Court entered an interim order granting the Creditor Matrix Motion, pending entry of a final order [Docket No. 97].

- **Automatic Stay Enforcement Motion**.  *Motion of Debtors Seeking Entry of an Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of the Bankruptcy Code, (II) Approving the Form and Manner of Notice, and (III) Granting Related Relief* [Docket No. 5].  On October 11, 2024, the Bankruptcy Court entered an order granting the Automatic Stay Enforcement Motion [Docket No. 95].

- **Omni 156(c) Retention Application**.  *Application of Debtors for Entry of an Order (I) Authorizing and Approving the Appointment of Omni Agent Solutions, Inc. as Claims and Noticing Agent and (II) Granting Related Relief* [Docket No. 6].  On October 11, 2024, the Bankruptcy Court entered an order approving the Omni 156(c) Retention Application [Docket No. 83].

- **Wages Motion**.  *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses, and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief* [Docket No. 9].  On October 11, 2024, the Bankruptcy Court entered an interim order granting the Wages Motion, pending entry of a final order [Docket No. 93].

- **Taxes Motion**.  *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees and (II) Granting Related Relief* [Docket No. 10].  On October 11, 2024, the Bankruptcy Court entered an interim order granting the Taxes Motion, pending entry of a final order [Docket No. 84].

- **Utilities Motion**.  *Motion of Debtors for Entry of Interim and Final Orders (I) Determining Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief* [Docket No. 11].  On October 11, 2024, the Bankruptcy Court entered an interim order granting the Utilities Motion, pending entry of a final order [Docket No. 91].

- **Insurance Motion**.  *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Insurance and Surety Coverage Entered into Prepetition and Pay Related Prepetition Obligations, and (B) Renew, Supplement, Modify, or Purchase Insurance and Surety Coverage, and (II) Granting Related Relief* [Docket No. 12].  On October 11, 2024, the Bankruptcy Court entered an interim order granting the Insurance Motion, pending entry of a final order [Docket No. 81].

- **Critical Vendors Motion**.  *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Critical Vendors, (B) Foreign Vendors, (C) Lien Claimants, and (D) 503(b)(9) Claimants, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief* [Docket No. 13].  On October 11, 2024, the Bankruptcy Court entered an interim order granting the Critical Vendors Motion, pending entry of a final order [Docket No. 89].

- **Customer Programs Motion**.  *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain and Administer Their Customers Programs and (B) Honor Certain Prepetition Business Practices Related Thereto, and (II) Granting*

*Related Relief* [Docket No. 14]. On October 11, 2024, the Bankruptcy Court entered an interim order granting the Customer Programs Motion, pending entry of a final order [Docket No. 92].

- **NOL Motion**. *Motion of Debtors for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and Preferred Stock and (II) Granting Related Relief* [Docket No. 15]. On October 11, 2024, the Bankruptcy Court entered an interim order granting the NOL Motion, pending entry of a final order [Docket No. 96].

- **Cash Management Motion**. *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate the Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Perform Intercompany Transactions, and (II) Granting Related Relief* [Docket No. 17]. On October 11, 2024, the Bankruptcy Court entered an interim order granting the Cash Management Motion, pending entry of a final order [Docket No. 82].

## B.    Appointment of Unsecured Creditors' Committee

On October 22, 2024, the U.S. Trustee filed the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 127] appointing the Committee. The seven-member Committee has retained Morrison & Foerster LLP as its legal counsel and AlixPartners as its financial advisor. The Committee includes the following entities:

- Matalco USA, LLC;

- Pension Benefit Guaranty Corporation (PBGC);

- Ellwood Aluminum, LLC;

- Hydro Aluminum Metals USA, LLC;

- Temium Mexico SA de CV;

- Zhumadian CIMC Huajun Casting Co., Ltd; and

- International Union – UAW.

Immediately after the Committee's appointment, the Debtors began sharing diligence with the Committee, which has been substantial. The Debtors have also proactively engaged the Committee regarding the key components of these Chapter 11 Cases, including the Sale Process, the Final DIP Order, and the substance of the Plan, which has been productive. As a result of such discussions, information transfer and dialogue between the Debtors and the Committee remains robust and ongoing.

## C.    Approval of the DIP Facility.

On October 11, 2024, the Bankruptcy Court entered an order [Docket No. 88] approving, on an interim basis, the relief requested in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Senior Secured Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "Interim DIP

Order"). The Interim DIP Order approved, on an interim basis, among other things, a superpriority senior secured term loan credit facility (the "DIP Facility") in the aggregate principal amount of approximately $103 million, comprising: (i) new money superpriority senior secured term loans in an aggregate principal amount of $30 million, of which $20 million become available upon entry of the Interim DIP Order and (ii) "roll-up" superpriority senior secured term loans in an aggregate principal amount of $73 (which includes accrued and unpaid interest as of the Petition Date on account of the Bridge Loans) which were converted from all then outstanding principal of, and accrued and unpaid interest as of the Petition Date on account of, Bridge Loans into an equivalent principal amount of roll-up loans under the DIP Facility.

The DIP Facility is essential to the Debtors' realization of a successful restructuring. In particular, the liquidity provided under the DIP Facility is necessary for the Debtors to fund postpetition operations and chapter 11 process costs, as well as to send a strong signal to the market and the Debtors' key constituencies that the Debtors can and will satisfy postpetition obligations in the ordinary course.

**D.    Bar Date Motion**

On October 18, 2024, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, and (IV) Approving Form and Manner of Notice Thereof* [Docket No. 118] (the "Bar Date Motion"). Through the Bar Date Motion, the Debtors seek to establish: (i) the date that is thirty days after entry of an order granting the Bar Date Motion as the general claims bar date and (ii) April 7, 2025 at 11:59 p.m. (prevailing Eastern Time) as the governmental bar date. The Bar Date Motion has been set for hearing before the Bankruptcy Court on November 20, 2024, and objections to the Bar Date Motion are due on October 29, 2024 at 4:00 p.m. (prevailing Eastern Time).

**E.    Schedules of Assets and Liabilities and Statements of Financial Affairs**

On November 11, 2024, each Debtor filed its schedules of assets and liabilities and statement of financial affairs (together, collectively, the "Schedules and Statements") [Docket No. 239–270]. The Schedules and Statements provide information regarding each Debtors' assets, liabilities, and other relevant financial information on a non-consolidated basis. Interested parties may review the Schedules and Statements free of charge by visiting https://omniagentsolutions.com/Accuride.

**F.    The Special Committee's Independent Investigation**

As described in Article VI.E herein, the Topco Board established the Special Committee and delegated sole authority to the Special Committee (i) to consider, negotiate, and make one or more recommendations to the Topco Board regarding a Transaction; (ii) on all matters related to Conflict Matter; and (iii) to conduct the Independent Investigation related thereto. Specifically, the Special Committee has the authority to, on behalf of the entire Topco Board, take any action with respect to the Conflict Matters, including, but not limited to: (a) any release or settlement of potential claims or causes of action of the Company or its subsidiaries, if any, against the Debtors' related parties; (b) any decision regarding all or part of a Transaction to the extent it constitutes a Conflict Matter; and (c) any other transaction implicating the Debtors involving Conflict Matters. The disinterested directors serving on the Special Committee retained Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel") to provide legal counsel in connection with the Independent Investigation. *See* Art. VI.E. The Independent Investigation is ongoing.

The Special Committee is continuing to investigate matters in accordance with its delegated authority and the disinterested directors' fiduciary obligations. Accordingly, the Independent Investigation remains ongoing as of the date hereof.

**G.**     **The CCAA Proceedings and the Intercompany Note**

Concurrently with the commencement of these Chapter 11 Proceedings, the Debtors' non-Debtor affiliate, Accuride Canada made an application to the Ontario Superior Court of Justice (Commercial List) seeking protection pursuant to the CCAA. Accuride Canada intends to use the breathing space afforded by the CCAA Proceedings to allow the prepetition marketing process conducted by the Debtors to continue for a brief period to determine if there a potential for a going concern transaction for some or all of Accuride Canada's business, failing which Accuride Canada will conduct an orderly wind down of its operations. Accuride Canada's operations are not self-funding and will require an infusion of capital from the Debtors on a postpetition basis, as discussed more fully in the Cash Management Motion (as defined below).

The Debtors provide funding to Accuride Canada pursuant to that certain Grid Promissory Note dated as of October 9, 2024, and executed by Accuride Canada (the "Intercompany Note"). The Debtors will use capital from the DIP Facility in accordance with the terms of DIP Credit Agreement and as described in that certain Intercompany Agreement between Accuride Corporation and Accuride Canada, dated October 9, 2024 (the "U.S.-Canada Intercompany Agreement"). The Debtors expect to fund up to approximately $4.8 million over the course of the CCAA Proceedings, and such funding may take the form of (i) direct wire transfer of funds to Accuride Canada, (ii) direct payments on behalf of Accuride Canada to third-party suppliers or vendors, (iii) direct payments of Accuride Canada's operations expenses, and/or (iv) payments of the Debtors' costs in the CCAA Proceeding allocated to Accuride Canada (any such transactions, collectively, the "CCAA Transactions"). In order to secure the full repayment, plus any interest thereon, of the funds transferred pursuant to the CCAA Transactions, Accuride Canada has granted the Debtors a "priority charge" in the CCAA Proceedings against Accuride Canada's assets, held by the Debtors for the sole benefit of the DIP Agent and the DIP Lenders.

Accuride Canada operates a 57,000 square foot manufacturing facility in London, Ontario, where it manufactures three products: blanks (used in the Debtors' disc manufacturing process), single steel wheels, and dual steel wheels. In the ordinary course of business, Accuride Canada sells products to the Debtors at cost plus a mark-up, in accordance with certain intercompany agreements among the Debtors and Accuride Canada. Intercompany sales to the Debtors represent approximately two-thirds of Accuride Canada's aggregate sales. In the absence of the flow of inventory from Accuride Canada to the Debtors, the Debtors would be required to purchase such inventory from third-party suppliers. Accordingly, maintaining Accuride Canada's operations via intercompany funding during the pendency of the CCAA Proceedings is critical to ensuring the Debtors' ordinary course operations continue during these chapter 11 cases.

**H.**     **Wheel Ends Transaction**

As part of the Marketing Process, the Debtors solicited interest from potential purchasers in a sale of all or substantially all of the assets or equity of Wheel Ends through a going concern sale transaction. Such purchasers have continued their work postpetition, although none have put forward an actionable offer for a sale transaction to date. Although the Debtors' preference is to sell or reorganize Wheel Ends, the AHG has indicated that it is unwilling to take control of Wheel Ends following a restructuring. Therefore, in anticipation of a potential wind-down and liquidation of Wheel Ends' assets, the Debtors intend to seek to modify or terminate the Gunite Corporation (Rockford, Illinois) Master Retired Bargained Employee Health Benefit Plan (the "Gunite OPEB Plan") sponsored by Debtor Gunite Corporation in accordance with the requirements of section 1114 of the Bankruptcy Code including, if necessary, appointment of a committee of retired employees.

## I.   AWEA and Accuride Russia

As part of the Marketing Process, the Debtors solicited interest from potential purchasers in a sale of all or substantially all of the assets or equity of Accuride Russia.  The Debtors, with the assistance of their advisors, have also been evaluating whether and how ultimate ownership of Accuride Russia can be transferred pursuant to the Plan in light of the economic sanctions imposed on the Russian Federation by the European Union and the United States and the restrictions imposed by the Russian Federation on transfers to entities based in the European Union and the United States and certain other countries.  Any structure that complies with these requirements will also have significant tax implications.

[While this analysis is ongoing, the Plan currently provides that the Debtors, with the consent of the AHG, may make the Transfer Election and form a liquidating trust or other vehicle and transfer the assets or equity of Accuride Russia to it for the purpose of liquidating those assets or equity and distributing the proceeds.  The Debtors' determination to make the Transfer Election is subject to a reasonable determination by the Debtors and the AHG that the transfer of assets or equity to a liquidating trust or other vehicle may be accomplished in accordance with applicable law and without triggering substantial tax liabilities that may not be satisfied.][16]

## J.   Proposed Confirmation Schedule

The Debtors agreed to certain milestones to ensure an orderly and timely implementation of the Restructuring Transactions.  The DIP Lenders required these milestones as part of the negotiations involving the DIP Facility.  The DIP Facility was carefully sized to provide sufficient liquidity to the Debtors to pursue these Chapter 11 Cases on the timeline to which the DIP Lenders agreed.  The Debtors' liquidity simply does not permit a longer timeline.  The Debtors intend to proceed swiftly to confirmation of the Plan and emergence from these Chapter 11 Cases to mitigate uncertainty among employees, customers, and vendors, minimize disruptions to the Company's business, and curtail professional fees and administrative costs.  To that end, the Debtors have proposed the following case timeline, subject to Court approval and availability:

| Event | Date |
|---|---|
| Voting Record Date | November 19, 2024 |
| Conditional Disclosure Statement Hearing | November 20, 2024, at 11:00 a.m., prevailing Eastern Time |
| Solicitation Deadline | One (1) business day following entry of the Order (or as soon as reasonably practicable thereafter) |
| Publication Deadline | Two (2) business days following entry of the Order (or as soon as reasonably practicable thereafter) |
| Combined Hearing Objection Deadline | December 16, 2024, at 4:00 p.m., prevailing Eastern Time |
| Voting Deadline | December 16, 2024, at 4:00 p.m., prevailing Eastern Time |

---

[16]   This Article VI.H is subject to ongoing tax review and material revision.

| Event | Date |
|---|---|
| Plan Supplement Filing Deadline | The date that is no later than seven (7) days prior to the Combined Hearing Objection Deadline |
| Deadline to File Voting Report | December 19, 2024 |
| Confirmation Brief and Plan Objection Reply Deadline | December 19, 2024 |
| Combined Hearing Date | December 20, 2024 at [●] [a.m.], prevailing Eastern Time |

## VII.    SUMMARY OF THE PLAN

The Plan contemplates the following key terms described below.  In addition, the Plan contains additional detail, including descriptions of the provisions governing distributions under the Plan, the procedures for resolving contingent, unliquidated, and disputed claims, and provisions related to modification, revocation, or withdrawal of the Plan, among others.

### A.    General Settlement of Claims and Interests.

To the greatest extent permissible under the Bankruptcy Code, and in consideration of the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.  To the greatest extent permissible under the Bankruptcy Code, the Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies, and entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests.  Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

### B.    Restructuring Transactions.

Before, on, and after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall consummate the Restructuring Transactions in accordance with the Restructuring Transactions Memorandum and may take all actions (which, for the avoidance of doubt, shall in each case be in form, substance, and structure reasonably acceptable to the AHG) as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan, including, as applicable: (i) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, the Plan Supplement, and the other Definitive Documents; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the Plan Supplement, and the other Definitive Documents; (iii) the execution, delivery, and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (iv) the execution and delivery of the New Takeback Facility Documents and entry into the New Takeback Facility; (v) the execution and delivery of the New ABL Facility Documents and entry into the New ABL Facility; (vi) the execution and delivery of the Rights Offering Documents; (vii) the offering, issuance, and distribution of

33

the New Common Stock as set forth in the Plan; (viii) the execution and delivery of the New Organizational Documents and any certificates or articles of incorporation, bylaws, or such other applicable formation documents (if any) of each Reorganized Debtor (including all actions to be taken, undertakings to be made, obligations to be incurred, and fees and expenses to be paid by the Debtors and/or the Reorganized Debtors, as applicable); (ix) such other transactions that, in the reasonable business judgment of the Debtors or the Reorganized Debtors, as applicable, and the AHG, are required to effectuate the Restructuring Transactions; and (x) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law. Notwithstanding anything to the contrary contained in the Plan, to the greatest extent possible, the Restructuring Transactions contemplated herein shall be implemented in the most tax efficient manner as agreed upon by the Debtors and the AHG.

The Confirmation Order shall and shall be deemed to, pursuant to sections 105, 363, 1123, and 1141 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

**C.     The Reorganized Debtors.**

On the Effective Date, the New Board shall be established, and each Reorganized Debtor shall adopt its New Organizational Documents. The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan.

**D.     Sources of Consideration for Plan Distributions.**

The Debtors shall fund or make distributions under the Plan, as applicable, with: (a) the issuance of New Takeback Facility Loans under the New Takeback Facility, (b) the New Common Stock, and (c) the Debtors' Cash on hand. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. The issuance, distribution, or authorization, as applicable, of certain Securities in connection with the Plan, including the New Common Stock, will be exempt from Securities Act registration, as described more fully in Article IV.H of the Plan.

**1.     Use of Cash.**

The Debtors or Reorganized Debtors, as applicable, shall use Cash on hand and proceeds of the DIP Facility, the New Takeback Facility, and the Rights Offering to fund distributions to certain Holders of Allowed Claims, consistent with the terms of the Plan; *provided* that, for the avoidance of doubt, the Sale Debtors shall not have access to, or otherwise be entitled to use, the proceeds of the DIP Facility, the New Takeback Facility, and the Rights Offering.

**2.     New Takeback Facility.**

On the Effective Date, the Reorganized Debtors (excluding the Sale Debtors) shall enter into the New Takeback Facility Credit Agreement. Confirmation of the Plan shall be deemed approval of the New Takeback Facility and the New Takeback Facility Documents, as applicable, and all transactions contemplated thereby; all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors (excluding the Sale Debtors) in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein; and authorization for the Reorganized Debtors (excluding the Sale Debtors) to enter into and execute the New Takeback Facility Documents and such other documents as may be required to effectuate the treatment afforded by the New

Takeback Facility. Each Holder (or its designated Affiliate, managed fund or account, or other designee) receiving a participation in the New Takeback Facility Loans shall execute any signature pages required with respect to the New Takeback Facility Documents.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the New Takeback Facility Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Takeback Facility Documents, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the New Takeback Facility Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers, voidable transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors (excluding the Sale Debtors) and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically on and as of the Effective Date by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

3.      **Rights Offering for Rights Offering Term Loans.**

The Debtors shall provide for the Rights to the Rights Offering Eligible Offerees with respect to the Rights Offering Term Loans on behalf of the Reorganized Debtors (excluding the Sale Debtors) as set forth in the Plan and the Rights Offering Documents. Pursuant to the Rights Offering Procedures, the Rights Offering shall be open to all Rights Offering Eligible Offerees, and Rights Offering Eligible Offerees shall be entitled to participate in the Rights Offering up to a maximum amount of each such Rights Offering Eligible Offeree's *pro rata* share of the Rights. Each Rights Offering Eligible Offeree may exercise either all or none of its Rights. Each Rights Offering Eligible Offeree who chooses not to participate in the Rights Offering shall nevertheless receive its *pro rata* share of the New Takeback Facility Loans consistent with the Plan and the New Takeback Facility Documents. The Rights with respect to the Rights Offering are not separately transferrable, exercisable, or detachable from the Term Loan Claims and may only be transferred together with the Term Loan Claims.

Each Rights Offering Participant shall be committed to participate for up to its full amount of Rights [that it elects to exercise] and to fund Rights Offering Term Loans in respect thereof in accordance with the Rights Offering Procedures. Each Rights Offering Participant will receive its Rights Offering Term Loan Allocation. Upon exercise of the Rights by the Rights Offering Participants pursuant to the terms of the Rights Offering Procedures, the Reorganized Debtors (excluding the Sale Debtors) shall be authorized to issue the Rights Offering Term Loans issuable pursuant to such exercise.

In accordance with the Rights Offering Backstop Agreement and their respective Rights Offering Backstop Commitments, the Rights Offering Backstop Parties have committed to fully backstop, severally and not jointly, the Rights Offering Amount and to fund the Rights Offering Backstop Term Loans. Each Rights Offering Backstop Party shall fund up to its commitment amount of Rights Offering Term Loans and/or Rights Offering Backstop Term Loans. The Rights Offering Backstop Agreement shall provide for, among other things, the Rights Offering Backstop Premium.

4.       **New Common Stock.**

Reorganized Topco shall be authorized to issue a certain number of shares of New Common Stock (including any New Common Stock issued with respect to the Rights Offering Backstop Premium) pursuant to its New Organizational Documents and any options or other equity awards, if any, reserved for the Management Incentive Plan.  Except as set forth in the Plan, the issuance of the New Common Stock, including any equity awards reserved under the Management Incentive Plan, to the extent applicable, shall be authorized without the need for any further corporate action or without any further action by the Debtors or Reorganized Debtors.  On the Effective Date, the New Common Stock shall be issued and distributed pursuant to, and in accordance with, the Plan.

All of the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, including the New Organizational Documents, which terms and conditions shall bind each Entity receiving such distribution or issuance.  Any Entity's acceptance of New Common Stock shall be deemed to constitute its agreement to the New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms, without the need for execution by any party thereto other than the applicable Reorganized Debtor(s).

As a condition to receiving the New Common Stock, all recipients of New Common Stock shall be required to execute and deliver signature pages to the New Organizational Documents, as applicable; *provided* that acceptance of such New Common Stock constitutes deemed acceptance and consent to the terms of the New Organizational Documents, without the need for execution by any party thereto.  For the avoidance of doubt, the Reorganized Debtors, including Reorganized Topco, may waive any requirement to receive executed signature pages to the New Organizational Documents.  The New Organizational Documents will be effective as of the Effective Date, and, as of such date, will be deemed to be valid, binding, and enforceable in accordance with its terms, and each holder of New Common Stock will be bound thereby in all respects.  The New Common Stock will not be required to be registered under the Securities Act, to be listed on any securities exchange as of the Effective Date or to have met any eligibility requirements of The Depository Trust Company or any other securities depository.  For the avoidance of doubt, as a result of the offering, issuance and distribution of the New Common Stock or any other securities that may be issued in accordance with the Plan, the Reorganized Debtors shall not be voluntarily subjected to any reporting requirements promulgated by the SEC.  Additional information relating to the applicability of the securities law is available in Article IV of the Plan.

5.       **The New ABL Facility.**

On the Effective Date, the Reorganized Debtors (excluding the Sale Debtors) shall enter into the New ABL Facility on the terms set forth in the New ABL Facility Documents.  To the extent not already approved, Confirmation shall be deemed approval of the New ABL Facility Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors (excluding the Sale Debtors) in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the Reorganized Debtors (excluding the Sale Debtors) to enter into and execute the New ABL Credit Agreement, and such other New ABL Facility Documents as may be required to effectuate the New ABL Facility.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the New ABL Facility Documents, to the extent applicable:  (a) shall be deemed to be granted; (b) shall be legal, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in,

the collateral granted thereunder in accordance with the terms of the New ABL Facility Documents; (c) shall be deemed automatically perfected on or prior to the Effective Date, subject only to such Liens and security interests as may be permitted under the respective New ABL Facility Documents; and (d) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.

To the extent not already approved, the Reorganized Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

**6.**      [**Liquidating Trusts.**][17]

Article IV.D.6 of the Plan shall apply only if and to the extent that the Debtors or the Reorganized Debtors, as applicable, with the consent of the AHG, make the Transfer Election and form the Liquidating Trusts and in such case only to the extent provided for in, and in accordance with, the Restructuring Transactions Memorandum. The decision to make the Transfer Election, form the Liquidating Trusts, and transfer the Liquidating Trust Assets thereto (as well as the administration of the Liquidating Trusts) is, in each case, subject to a reasonable determination by the Debtors, with the consent of the AHG, that the transfer of the Liquidating Trust Assets to the Liquidating Trusts and the administration of the Liquidating Trusts (including the disposition of an assets by the Liquidating Trusts) can be accomplished in accordance with all applicable law and without triggering material tax liabilities that may not be satisfied by the Debtors or the Reorganized Debtors or the applicable Liquidating Trust, as applicable.

If the Debtors, with the consent of the AHG and solely to the extent the conditions in the preceding paragraph are satisfied, make the Transfer Election and elect to form the Liquidating Trusts, on the Effective Date, the Liquidating Trusts will be formed for the benefit of the Liquidating Trust Beneficiaries, as determined by the Liquidating Trust Agreements, to administer and distribute the Liquidating Trust Assets. The Liquidating Trusts shall be established for the primary purpose of liquidating the Liquidating Trust Assets and distributing the proceeds thereof in accordance with the Plan, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the Liquidating Trust, and is otherwise intended to comply with the ruling guidelines set forth in Revenue Procedure 94-45, 1994-2 C.B. 684. Upon the transfer of the Liquidating Trust Assets to the Liquidating Trusts, the Reorganized Debtors will have no reversionary or further interest in or with respect to the Liquidating Trust Assets. To the extent Liquidating Trust Beneficial Interests are deemed to be "securities" as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws, the Debtors intend that the exemption provisions of section 1145 of the Bankruptcy Code will apply to such Liquidating Trust Beneficial Interests. Prior to any transfer of the Liquidating Trust Assets to the Liquidating Trusts, the Reorganized Debtors, subject to the sole consent of the AHG, may designate trustees for the Liquidating Trusts for the purposes of administering the Liquidating Trusts. The reasonable costs and expenses of the trustees shall be paid from the Liquidating Trusts. For the avoidance of doubt, nothing in Article IV.D.6 or elsewhere in the Plan shall be construed to require the formation of the Liquidating Trusts if not provided for in the Restructuring Transactions

---

[17]      Article IV.D.6 of the Plan is subject, in its entirety, to ongoing tax review and material revision.

Memorandum, and in all events the assets that are proposed to be transferred to any applicable Liquidating Trust shall be subject to the terms of the Restructuring Transactions Memorandum.

The tax treatment of the Liquidating Trusts is further described in Article XII.

**E.    Corporate Existence.**

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which such Debtor is incorporated or formed and pursuant to the certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).  On or after the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of one or more of the Reorganized Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  On or after the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**F.    Plan Implementation.**

On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; *provided*, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

**G.    New Organizational Documents.**

On or immediately prior to the Effective Date, except as otherwise provided in the Plan and subject to local Law requirements, the New Organizational Documents shall be adopted or amended as may be necessary to effectuate the transactions contemplated by the Plan.  To the extent required under the Plan or applicable non-bankruptcy law, each of the Reorganized Debtors (excluding the Sale Debtors) will file its New Organizational Documents with the applicable secretaries of state and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation to the extent such filing is required for each such document.  The New Organizational Documents will, among other things, (a) authorize the issuance of the New Common Stock and (b) prohibit the issuance of non-voting Equity Securities to the extent required under section 1123(a)(6) of the Bankruptcy Code.  For the avoidance of doubt, the New Organizational Documents shall be included as exhibits to the Plan Supplement.  After the Effective Date, each Reorganized Debtor may amend and restate its constituent and governing documents as permitted by the laws of its jurisdiction of formation and the terms of such documents, and the Reorganized Debtors may file such amended certificates or articles of incorporation, bylaws, or other applicable formation and constituent documents as permitted by the laws of the applicable states, provinces, or countries of incorporation and the New Organizational Documents.  For the avoidance of doubt, any Holder's

acceptance of the New Common Stock shall be deemed to constitute its agreement to be bound by the New Organizational Documents without the need for execution by any party other than the Reorganized Debtors.

From and after the Effective Date, all holders of New Common Stock shall be subject to the terms and conditions of the New Organizational Documents.  On the Effective Date, Reorganized Topco shall enter into and deliver the New Organizational Documents to each Holder of New Common Stock, which shall become effective and binding in accordance with their terms and conditions upon the parties thereto without further notice to or order of the Bankruptcy Court, act or action under applicable Law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  Holders of New Common Stock shall be deemed to have executed the New Organizational Documents and be parties thereto, even if such Holders have not delivered signature pages thereto.

**H.      Certain Securities Law Matters.**

Pursuant to section 1145 of the Bankruptcy Code, or, to the extent that section 1145 of the Bankruptcy Code is either not permitted or not applicable, section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, the offering, issuance, and distribution of the New Common Stock (including any New Common Stock issued with respect to the Rights Offering Backstop Premium) as contemplated herein shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. federal, state, or local laws requiring registration prior to the offering, issuance, distribution, or sale of securities.

The shares of New Common Stock to be issued under the Plan on account of Allowed Claims in accordance with, and pursuant to, section 1145 of the Bankruptcy Code will be freely transferable under the Securities Act by the recipients thereof, subject to:  (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; and (b) any restrictions on the transferability of such New Common Stock in the New Organizational Documents.

The shares of New Common Stock that may be issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D or Regulation S promulgated thereunder, and/or other available exemptions from registration of Securities will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act.

**I.      Management Incentive Plan.**

After the Effective Date, the New Board shall adopt and implement the Management Incentive Plan with the consent of the AHG, which will provide a portion of the New Common Stock (the amount of such New Common Stock to be determined by the New Board) as of the Effective Date, on a fully diluted basis in accordance with the terms of the Management Incentive Plan.  The issuance of any awards under the Management Incentive Plan shall be at the discretion of the New Board.

**J.      Employment Obligations.**

Other than the Gunite Corporation (Rockford, Illinois) Master Retired Bargained Employee Health Benefit Plan sponsored by Gunite Corporation, a Sale Debtor, or as otherwise provided herein, all employee wages, compensation, retiree benefits (as defined in 11 U.S.C. § 1114(a) of the Bankruptcy Code), and

benefit programs in place as of the Effective Date with the Debtors, including, for the avoidance of doubt, the Pension Plan and the CBAs, shall be deemed to have been assumed by the Reorganized Debtors (excluding the Sale Debtors) and shall remain in place as of the Effective Date, and the Reorganized Debtors (excluding the Sale Debtors) will continue to honor such agreements, arrangements, programs, and plans as of the Effective Date. For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, as of the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law. On the Effective Date, the Reorganized Debtors (excluding the Sale Debtors) shall (a) assume all employment agreements, indemnification agreements, or other agreements entered into with current employees; or (b) enter into new agreements with such employees on terms and conditions acceptable to such employee and the AHG.

**K.      Preservation of Causes of Action.**

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the rights of the Reorganized Debtors to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released or exculpated herein (including, without limitation, by the Debtors) pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and the Reorganized Debtors, as applicable, as of the Effective Date.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors and the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as expressly provided in the Plan, including Article VIII of the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the corresponding Reorganized Debtor except as otherwise expressly provided in the Plan, including Article VIII of the Plan. The Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to Article IV.K of the Plan include any Claim or Cause of Action against a Released Party or Exculpated Party.

**L.**     **Cancellation of Existing Agreements and Interests.**

On the Effective Date, except with respect to the New Takeback Facility and the New ABL Facility, or to the extent otherwise provided in the Plan, including in Article V.A of the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including the Prepetition Credit Documents and all other credit agreements and indentures, and all existing equity interests shall be cancelled, and the obligations of the Debtors and any non-Debtor Affiliate thereunder or in any way related thereto, including any Liens and/or claims in connection therewith as set forth in the Restructuring Transactions Memorandum, shall be deemed satisfied in full, cancelled, discharged, released, and of no force or effect, and the Agents shall be automatically and fully discharged and released from all duties and obligations thereunder; *provided*, *however*, that such cancelled instruments, securities, and other documentation shall continue in effect solely for the purposes of (a) allowing Holders of Claims to receive and accept distributions under the Plan on account of such Claims and (b) allowing and preserving the rights of the Agents to (1) receive and make distributions on account of such Claims; (2) assert or maintain any rights the Agents may have against any money or property distributable or allocable to Holders of such Claims; (3) receive compensation and reimbursement for any reasonable and documented fees and expenses incurred in connection with the implementation, consummation, and defense of the Plan and the Confirmation Order; (4) maintain, enforce, and exercise any right or obligation to compensation, indemnification, expense reimbursement, priority of payment, immunity, exculpation, or contribution, or any other claim or entitlement that the Agents may have under the Plan, the Prepetition Credit Documents, and the Confirmation Order; (5) appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court, including to enforce any obligation under the Plan or the Confirmation Order owed to the Agents or Holders of such Claims; and (6) perform any functions that are necessary to effectuate the foregoing.  Holders of or parties to such cancelled instruments, securities, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation, or the cancellation thereof, except the rights provided for or preserved pursuant to the Plan. Notwithstanding the foregoing or anything to the contrary herein, any rights of each Agent to indemnification and reimbursement or other rights, obligations, immunities, and exculpations under the Prepetition Credit Documents and the DIP Documents that would survive the satisfaction and discharge of all other obligations under the applicable Prepetition Credit Documents and DIP Documents shall survive the occurrence of the Effective Date, remain binding and enforceable in accordance with the terms of such documents, and shall not be subject to discharge, impairment, or release under the Plan or the Confirmation Order.

**M.**     **Section 1146 Exemption.**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor, as applicable, or to or from any other Person) of property under the Plan or pursuant to:  (i) the issuance, Reinstatement, distribution, transfer, or exchange of any debt, Equity Security, or other interest in the Debtors or the Reorganized Debtors, as applicable; (ii) the Restructuring Transactions; (iii) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (iv) the making, assignment, or recording of any lease or sublease; (v) the grant of collateral as security for the New Takeback Facility and the New ABL Facility; or (vi) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax, fee, or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials

or agents shall forego the collection of any such tax, fee, or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146 of the Bankruptcy Code, shall forego the collection of any such tax, fee, or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, fee, or governmental assessment.

N.      **Corporate Action.**

Upon the Effective Date, all actions contemplated under the Plan (including under the Restructuring Transactions Memorandum and the other documents contained in the Plan Supplement) shall be deemed authorized and approved in all respects by the Bankruptcy Court in all respects without any further corporate, governing body, or equityholder action, including, as and if applicable:  (i) selection of the directors, including the New Board, officers, or managers for the Reorganized Debtors; (ii) the offering, issuance and distribution of the New Common Stock; (iii) implementation of the Restructuring Transactions; (iv) entry into the New Takeback Facility Documents, the Rights Offering Documents, and the New ABL Facility Documents; (v) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (vi) adoption of the New Organizational Documents; (vii) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (viii) reservation of shares for the Management Incentive Plan; (ix) formation of the Reorganized Debtors; and (x) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect without any requirement of further action by the Holders of Existing Equity Interests or Holders of New Common Stock, or directors, officers, or managers of the Debtors or the Reorganized Debtors, as applicable.  On or prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan, or otherwise necessary or desirable to effect the transactions contemplated under the Plan, in the name of and on behalf of the Reorganized Debtors, including the New Common Stock, the New Organizational Documents, the New Takeback Facility, the New Takeback Facility Documents, the Rights Offering, the Rights Offering Documents, the New ABL Facility, the New ABL Facility Documents, any other Definitive Documents, and any and all other agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by Article IV.N of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

O.      **Directors and Officers of the Reorganized Debtors.**

As of the Effective Date, the term of the current members of the board of directors or other Governing Body of Topco shall expire.  On the Effective Date, or as soon as reasonably practicable thereafter, the members for the initial term of the New Board shall be appointed; *provided*, that the persons who are the disinterested directors of Topco, comprising the Special Committee, shall retain authority following the Effective Date with respect to matters relating to Professional Fee Claim requests by Professionals acting at their authority and direction in accordance with the terms of the Plan.  Such disinterested directors of Topco shall not have any of their privileged and confidential documents, communications, or information transferred (or deemed transferred) to the Reorganized Debtors or any other Entity without their prior written consent.

42

The initial members of the New Board, if applicable, will be identified in the Plan Supplement to the extent known at the time of filing. Each member of the New Board and each officer of the Reorganized Debtors (excluding the Sale Debtors) shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtors (excluding the Sale Debtors). As of the Effective Date, the members of the New Board shall comprise the Chief Executive Officer of Accuride and the remaining four (4) members selected by the AHG in its sole discretion and in consultation with the Debtors.

**P.      Effectuating Documents; Further Transactions.**

On and after the Effective Date, the Reorganized Debtors and their respective officers and boards of directors and managers are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

**Q.      Vesting of Assets in the Reorganized Debtors.**

Subject to Article IV.D.6 of the Plan with regard to the Liquidating Trust Assets, and except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, or entered into in connection with or pursuant to, the Plan, the Plan Supplement, the New Takeback Facility Documents, the Rights Offering Documents, or the New ABL Facility Documents, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, each Reorganized Debtor may operate its business and use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**R.      Private Company.**

The Reorganized Debtors shall not have any class of Equity Securities listed on a national securities exchange and shall not be voluntarily subjected to any reporting requirements promulgated by the SEC under the Securities Act or the Exchange Act upon the Effective Date.

**S.      Director and Officer Liability Insurance.**

After the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any of the D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct or events occurring prior to the Effective Date, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date. Notwithstanding anything herein to the contrary, the Debtors shall retain the ability to supplement such D&O Insurance Policies as the Debtors deem necessary, including by purchasing any additional tail coverage (including a tail policy).

## VIII.   OTHER KEY ASPECTS OF THE PLAN

### A.   Treatment of Executory Contracts and Unexpired Leases

#### 1.   Assumption of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided in the Plan, pursuant to sections 365 and 1123 of the Bankruptcy Code, each Executory Contract or Unexpired Lease not previously rejected, assumed, or assumed and assigned shall be deemed automatically rejected *unless* such Executory Contract or Unexpired Lease:  (i) is explicitly designated by the Plan or the Confirmation Order to be assumed or assumed and assigned, as applicable, in connection with the Confirmation of the Plan, (ii) is identified on the Schedule of Assumed Executory Contracts and Unexpired Leases; (iii) is subject to a pending motion to assume such Executory Contract or Unexpired Lease as of the Effective Date; (iv) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (v) is a D&O Liability Insurance Policy.  The assumption or rejection of any Executory Contract or Unexpired Lease shall be subject to the consent of the AHG.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of all assumptions, assumptions and assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided for in the Plan, the Plan Supplement, and the Confirmation Order, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor, as applicable, in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by Reorganized Debtors, as applicable.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed (or assumed and assigned) Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.  Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases at any time through and including forty-five (45) days after the Effective Date; *provided* that such alteration, amendment, modification, or supplement shall be subject to the consent rights set forth in the Plan.

2.        **Indemnification Obligations**

Consistent with applicable law, all indemnification provisions in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, D&O Liability Insurance Policies, or otherwise) for current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall (i) not be discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, or the Confirmation Order; (ii) be reinstated and remain intact, in full force and effect, and irrevocable; (iii) not be limited, reduced, or terminated after the Effective Date; and (iv) survive the effectiveness of the Plan on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Effective Date irrespective of whether such indemnification obligation is owed for an act or event occurring before, on, or after the Petition Date.  All such obligations shall be deemed and treated as Executory Contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Debtors and any Claim based on the Debtors' obligations with respect thereto shall be an Allowed Claim.

3.        **Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Claims and Noticing Agent at the address specified in any notice of entry of the Confirmation Order and served on the Reorganized Debtors no later than thirty (30) days after the effective date of such rejection.  The notice of the Plan Supplement shall be deemed appropriate notice of rejection when served on applicable parties.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease with respect to which a Proof of Claims is not Filed with the Claims and Noticing Agent within thirty (30) days after the effective date of such rejection will be automatically disallowed and forever barred from assertion and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, or their property without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged and shall be subject to the permanent injunction set forth in Article VIII.F of the Plan, notwithstanding anything in a Proof of Claim to the contrary.**

All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as a General Unsecured Claim as set forth in Article III.B of the Plan and may be objected to in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

4.        **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**

The Debtors or the Reorganized Debtors, as applicable, shall pay Cures, if any, on the Effective Date or as soon as reasonably practicable thereafter.  The proposed amount and timing of payment of each such Cure shall be set forth in the Plan Supplement unless otherwise agreed in writing (email being sufficient) between the Debtors or the Reorganized Debtors and the counterparty to the applicable Executory Contract or Unexpired Lease.  Unless otherwise agreed in writing by the parties to the applicable Executory Contract or Unexpired Lease, any Assumption Objection must be Filed, served, and actually received by counsel to the Debtors and the U.S. Trustee by the applicable Assumption Objection Deadline

or any other deadline that may be set by the Bankruptcy Court. Any Assumption Objection (x) timely Filed prior to the Combined Hearing will be heard by the Bankruptcy Court at the Combined Hearing unless otherwise agreed to by the Debtors and the objecting party, or (y) timely Filed after the Combined Hearing shall be heard as soon as reasonably practicable on a date requested by the Debtors or the Reorganized Debtors, as the case may be. Any Assumption Objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion and shall not be enforceable against any Reorganized Debtor without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors, as applicable, of such Cure; *provided* that nothing herein shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to File an Assumption Objection. The Debtors or the Reorganized Debtors, as applicable, may also settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or assumption and assignment of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption and/or assignment.

If there is any dispute regarding any Cure, the ability of the Reorganized Debtors, or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption (or assumption and assignment), then payment of such Cure shall occur as soon as reasonably practicable after entry of a Final Order (which may be the Confirmation Order) resolving such dispute, approving such assumption (and, if applicable, assumption and assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, and the counterparty to the Executory Contract or Unexpired Lease.

The Debtors or the Reorganized Debtors, as applicable, may assume or assume and assign an Executory Contract or Unexpired Lease prior to the resolution of any Filed Cure Objection; *provided* that the Debtors or the Reorganized Debtors, as applicable, reserve Cash in an amount sufficient to pay the full amount reasonably asserted in the applicable Cure Objection as the required Cure by the non-Debtor party to such Executory Contract or Unexpired Lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court or otherwise agreed to by such non-Debtor party and the applicable Reorganized Debtor).

Assumption (or assumption and assignment) of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure pursuant to Article V.D of the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed (or assumed and assigned) in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to Article V.D of the Plan, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

5.      **Insurance Policies**

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. On the Effective Date, (i) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims, including all D&O Liability Insurance Policies and (ii) such insurance policies and any agreements, documents, or instruments relating thereto, including all D&O Liability

Insurance Policies, shall revest in the Reorganized Debtors and all obligations of the Debtors under such insurance policies and any agreements, documents, or instruments relating thereto, including all D&O Liability Insurance Policies, shall continue as obligations of the Reorganized Debtors.

Nothing in the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening), (i) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such insurance policies or (ii) alters or modifies the duty, if any, that the insurers or third party administrators pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Reorganized Debtors) or draw on any collateral or security therefor.

6. **Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases**

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors and the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

7. **Reservation of Rights**

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Debtors or the Reorganized Debtors have any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease under the Plan.

8. **Nonoccurrence of Effective Date**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

9. **Contracts and Leases Entered Into After the Petition Date**

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtors or the Reorganized Debtors liable thereunder in the ordinary course of their business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

B. **Conditions Precedent to Confirmation and Consummation of the Plan**

1. **Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B the Plan:

1.      any Restructuring Transactions that are required to occur before the Effective Date under the Restructuring Transactions Memorandum shall have been implemented in accordance with the Restructuring Transactions Memorandum in all material respects;

2.      the Bankruptcy Court shall have entered the DIP Orders, the form and substance of which are acceptable to the AHG, the ABL Agent, and the DIP Agent by the applicable DIP Milestones and such DIP Orders shall have become Final Orders;

3.      all conditions precedent to the effectiveness of the DIP Credit Agreement shall have been satisfied or waived in accordance with the terms of the DIP Credit Agreement, and the DIP Credit Agreement shall remain in full force and effect and in form and substance acceptable to the AHG;

4.      the Bankruptcy Court shall have entered an order conditionally approving the Disclosure Statement by the applicable DIP Milestone and such order shall have become a Final Order and be in form and substance acceptable to the AHG and the DIP Agent;

5.      the Bankruptcy Court shall have entered the Confirmation Order and the Confirmation Order shall have become a Final Order and be in form and substance acceptable to the AHG;

6.      each document or agreement constituting the applicable Definitive Documents, the form and substance of which shall be acceptable to the AHG and subject to the consent rights set forth in the DIP Documents, shall have been executed and/or effectuated and remain in full force and effect, and any conditions precedent related thereto or contained therein shall have been satisfied or waived by the applicable party or parties thereto (with the consent of the AHG) prior to or contemporaneously with the occurrence of the Effective Date;

7.      the New Takeback Facility Documents, the form and substance of which shall be acceptable to the AHG and the New Takeback Facility Agent and subject to the consent rights set forth in the DIP Documents, shall have been executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the parties thereto (with the consent of the AHG), other than such conditions that relate to the effectiveness of the Plan and related transactions, including payment of fees and expenses;

8.      the Rights Offering Documents, the form and substance of which shall be acceptable to the AHG and subject to the consent rights set forth in the DIP Documents, shall have been executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the parties thereto (with the consent of the AHG), other than such conditions that relate to the effectiveness of the Plan and related transactions, including payment of fees and expenses;

9.      the New ABL Facility Documents, the form and substance of which shall be acceptable to the AHG and subject to the consent rights set forth in the DIP Documents, shall have been executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the parties thereto (with the consent of the AHG), other than such conditions that relate to the effectiveness of the Plan and related transactions, including payment of fees and expenses;

10.     the DIP Claims, the ABL Claims, the Cash Management Superiority Claims, and the L/C Superpriority Claims shall have been indefeasibly paid in full in Cash, solely with respect to the DIP Claims to the extent set forth herein, satisfied by the New Takeback Facility and the DIP Equity Pool, or, solely with respect to the L/C Superpriority Claims on account of undrawn letters of credit to the extent set forth herein, cancelled and returned or cash collateralized;

11.     the New Common Stock (other than any New Common Stock that may be issued in connection with the Management Incentive Plan) shall have been issued;

12.     all Restructuring Expenses, to the extent invoiced, shall have been paid in full in Cash;

13.     the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and the Restructuring Transactions;

14.     the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed in form and substance acceptable to the AHG;

15.     the Debtors' use of Cash Collateral pursuant to the DIP Orders shall not have been terminated and the DIP Orders shall not have been vacated, stayed, or modified without the prior written consent of the ABL Agent and the AHG;

16.     none of the Chapter 11 Cases shall have been converted to a case under chapter 7 of the Bankruptcy Code;

17.     no Bankruptcy Court order appointing a trustee or examiner with expanded powers shall have been entered and remain in effect under any chapter of the Bankruptcy Code with respect to the Debtors;

18.     18.     the Plan shall not have been materially amended, altered, or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration, or modification has been consented to by the AHG, the DIP Agent and Term Loan Agent (with respect to any provision relating to or affecting the DIP Agent and Term Loan Agent in its capacity as such) and the ABL Agent (with respect to any provision relating to or affecting the ABL Agent, the ABL Claims, the Cash Management Superpriority Claims, or the L/C Superpriority Claims, or the respective Holders thereof) and made in accordance with the terms of the Plan as confirmed by the Confirmation Order and the DIP Documents;

19.     all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in the Professional Fee Escrow Account pending approval by the Bankruptcy Court;

20.     the disposition of AWEA GmbH shall be effectuated in a manner acceptable to the AHG in its sole discretion; and

21.     all governmental, regulatory approvals, including foreign direct investment approvals, third-party approvals and consents necessary, if any, in connection with the Restructuring Transactions shall have been obtained, not subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions.

### 2.     Waiver of Conditions

The conditions to the Effective Date set forth in Article IX of the Plan, except for the conditions set forth in Article IX.A.10, 12, 15, and 18 of the Plan (each of which may not be waived without the consent of the affected parties), may be waived in whole or in part at any time by the Debtors only with the

prior written consent (email shall suffice) of the AHG, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

### 3. Effect of Failure of Conditions

If Consummation does not occur, the Plan shall be null and void in all respects, and nothing contained in the Plan or the Disclosure Statement shall: (i) constitute a waiver or release of any Claims by the Debtors or other Claims or Interests; (ii) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity in any respect.

## IX.   RISK FACTORS

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES. THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN. EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS AND THE REORGANIZED DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.**

### A.   Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

### 1. The Debtors Will Consider All Available Restructuring Alternatives if the Restructuring Transactions Are Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against and Interests in the Debtors

If the Restructuring Transactions are not implemented, the Debtors will consider all available restructuring alternatives, including filing an alternative chapter 11 plan, converting to a chapter 7 plan, commencing section 363 sales of the Debtors' assets, and any other transaction that would maximize the value of the Debtors' estates. The terms of any alternative restructuring proposal may be less favorable to Holders of Claims against and Interests in the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in the confirmation of the Plan, the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would have other adverse effects on the Debtors. For example, it would adversely affect:

- the Debtors' ability to raise additional capital;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators, investors, lenders, and credit ratings agencies;

- the Debtors' enterprise value; and

- the Debtors' business relationship with customers and trade partners.

**2.      Parties in Interest May Object to the Plan's Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

**3.      The Bankruptcy Court May Not Approve on a Final Basis the Debtors' Use of Cash Collateral or the DIP Facility**

As discussed in Article VI.C of this Disclosure Statement, the Bankruptcy Court entered the Interim DIP Order approved the DIP Facility on an interim basis, pending entry of a final order.  There can be no assurance that the Bankruptcy Court will approve the DIP Facility and/or use of the Debtors' cash collateral on the terms requested on a final basis, despite entry of the Interim DIP Order.  Moreover, if the Chapter 11 Cases take longer than expected to conclude, the Debtors may exhaust the proceeds of the DIP Facility and their available cash collateral.  There is no assurance that the Debtors will be able to obtain an extension of the right to obtain further postpetition financing and/or use of cash collateral, in which case, the liquidity necessary for the orderly functioning of the Debtors' business may be materially impaired.

**4.      The Conditions Precedent to the Effective Date of the Plan May Not Occur**

As more fully set forth in Article IX of the Plan, the Confirmation and Effective Date of the Plan are subject to a number of conditions precedent.  If such conditions precedent are not waived or not met, the Confirmation and Effective Date of the Plan will not take place.  In the event that the Effective Date does not occur, the Debtors may seek Confirmation of a new chapter 11 plan.  If the Debtors do not secure sufficient working capital to continue their operations of if the new chapter 11 plan is not confirmed, however, the Debtors may be forced to liquidate their assets.

**5.      The Debtors May Fail to Satisfy Vote Requirements**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  If sufficient votes are not received, the Debtors may need to seek to confirm an alternative chapter 11 plan or transaction.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

6.     **The Debtors May Not Be Able to Secure Confirmation of the Plan**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

7.     **The Debtors May Not Be Able to Secure Nonconsensual Confirmation Over Certain Impaired Non-Accepting Classes**

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

8.     **The Debtors May Not Be Able to Obtain Exit Facility Commitments.**

Based on the Financial Projections and ongoing discussions among the Debtors, the ABL Agent, and the lenders under the ABL Revolving Facility, the Debtors believe that they will need to refinance the ABL Revolving Facility or secure alternative exit financing or alternative sources of liquidity to support their efforts to effectuate this restructuring and exit from these Chapter 11 Cases. There is a risk that the Debtors may not be able to secure commitments for such exit financing and consummate the Plan. If the Debtors are unable to secure commitments to provide exit financing, the Plan may not be feasible.

9.      **Even if the Restructuring Transactions are Successful, the Debtors Will Face Continued Risk Upon Confirmation**

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for the Debtors' services, and increasing expenses.  See Article IX.C of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Reorganized Debtors' Businesses."  Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed.  As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their Petitions.  If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

10.     **The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code**

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling the business or segments of the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

11.     **One or More of the Chapter 11 Cases May Be Dismissed**

If the Bankruptcy Court finds that the Debtors have incurred substantial or continuing loss or diminution to the estate and lack of a reasonable likelihood of rehabilitation of the Debtors or the ability to effectuate substantial Consummation of a confirmed plan, or otherwise determines that cause exists, the Bankruptcy Court may dismiss one or more of the Chapter 11 Cases.  In such event, the Debtors would be unable to confirm the Plan with respect to the applicable Debtor or Debtors, which may ultimately result in significantly smaller distributions to creditors than those provided for in the Plan.

12.     **The Debtors May Object to the Amount or Classification of a Claim**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

13.     **Risk of Non-Occurrence of the Effective Date**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

14.     **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

15.     **Releases, Injunctions, and Exculpations Provisions May Not Be Approved**

[Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party claims that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved, certain Released Parties may withdraw their support for the Plan.  The releases provided in the Plan are also subject to the Independent Investigation of the Special Committee and may be modified prior to confirmation based on the outcome of the Independent Investigation.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties is necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts and have agreed to make further contributions, but only if they receive the full benefit of the Plan's release and exculpation provisions.  The Plan's release and exculpation provisions are an inextricable component of the Plan and the significant deleveraging and financial benefits that they embody.][18]

---

[18]     The release provisions and related definitions in the Plan are subject to ongoing review and discussion with the AHG, and subject to review as part of the Special Committee's independent investigation and its determination that releases should be granted.

**B.**     **Risks Related to Recoveries Under the Plan**

**1.**     **Certain Significant Holders of Shares of New Common Stock May Have Substantial Influence Over the Reorganized Debtors Following the Effective Date**

Assuming that the Effective Date occurs, holders of Claims who receive distributions representing a substantial percentage of the outstanding shares of the New Common Stock may be in a position to influence matters requiring approval by the holders of shares of New Common Stock, including, among other things, the election of directors and the approval of a change of control of the Reorganized Debtors. The holders may have interests that differ from those of the other holders of shares of New Common Stock and may vote in a manner adverse to the interests of other holders of shares of New Common Stock. This concentration of ownership may facilitate or may delay, prevent, or deter a change of control of the Reorganized Debtors and consequently impact the value of the shares of New Common Stock.  A holder of a significant number of shares of New Common Stock may, on its own account, pursue acquisition opportunities that may be complementary to the Reorganized Debtors' businesses, and as a result, such acquisition opportunities may be unavailable to the Reorganized Debtors.  Such actions by holders of a significant number of shares of New Common Stock may have a material adverse impact on the Reorganized Debtors' businesses, financial condition, and operating results.

**2.**     **Estimated Valuations of the Debtors and the New Common Stock, and Estimated Recoveries to Holders of Allowed Claims and Interests Are Not Intended to Represent Potential Market Values**

The Debtors' estimated recoveries to Holders of Allowed Claims and Allowed Interests are not intended to represent the market value of the Debtors' Securities.  The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtors), including:  (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; (d) the Debtors' ability to maintain adequate liquidity to fund operations; (e) the assumption that capital and equity markets remain consistent with current conditions; and (f) the Debtors' ability to maintain critical existing customer relationships, including customer relationships with key customers.

**3.**     **The Terms of the New Organizational Documents Are Subject to Change Based on Negotiation and the Approval of the Bankruptcy Court.**

The terms of the New Organizational Documents are subject to change based on negotiations between the Debtors and the AHG.  Holders of Claims that are not members of the AHG will not participate in these negotiations and the results of such negotiations may affect the rights of equity holders in Reorganized Topco following the Effective Date.

**4.**     **The Terms of the New Takeback Facility Documents Are Subject to Change Based On Negotiations and the Approval of the Bankruptcy Court.**

The terms of the New Takeback Facility Documents are subject to change based on negotiations between the Debtors and the AHG.  Holders of Claims that are members of the AHG will not participate in these negotiations and the results of such negotiations may affect the rights of stakeholders in the Reorganized Debtors following the Effective Date.  As a result, the final terms of the New Takeback Facility Documents may be less favorable to Holders of Claims and Interests than as described herein and in the Plan.

5.      **A Decline in the Reorganized Debtors' Credit Ratings Could Negatively Affect the Debtors' Ability to Refinance Their Debt.**

The Debtors' or the Reorganized Debtors' credit ratings, as applicable, could be lowered, suspended, or withdrawn entirely, at any time by the rating agencies if, in each rating agency's judgment, circumstances warrant such action, including as a result of exposure to the credit risk and the business and financial condition of the Debtors or the Reorganized Debtors, as applicable. Downgrades in the Reorganized Debtors' long-term debt ratings may make it more difficult to refinance their debt, including through the New ABL Facility, if any, and increase the cost of any debt that they may incur in the future.

6.      **The Reorganized Debtors May Not Be Able to Generate or Receive Sufficient Cash to Service Their Debt and May Be Forced to Take Other Actions to Satisfy their Obligations, Which May Not Be Successful**

The Reorganized Debtors' ability to make scheduled payments on their debt obligations depends on their financial condition and operating performance, which is subject to prevailing economic and competitive conditions and to certain financial, business, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may not be able to maintain a level of cash flow sufficient to permit them to pay the principal, premium, if any, and interest on their debt, including the Exit Facilities.

If cash flows and capital resources are insufficient to fund the Reorganized Debtors' debt obligations, they could face substantial liquidity problems and might be forced to reduce or delay investments and capital expenditures, or to dispose of assets or operations, seek additional capital or restructure or refinance debt, including the Exit Facilities. These alternative measures may not be successful, may not be completed on economically attractive terms, or may not be adequate to satisfy their debt obligations when due.

Further, if the Reorganized Debtors suffer or appear to suffer from a lack of available liquidity, the evaluation of their creditworthiness by counterparties and rating agencies and the willingness of third parties to do business with them could be adversely affected.

7.      **The New Common Stock is Subject to Dilution**

The ownership percentage represented by the New Common Stock distributed on the Effective Date under the Plan will be subject to dilution from the New Common Stock issued in connection with the conversion of any other options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence, including pursuant to the Management Incentive Plan.

8.      **Certain Tax Implications of the Plan May Increase the Tax Liability of the Reorganized Debtors**

Holders of Allowed Claims should carefully review Article XIII of this Disclosure Statement, entitled "Certain United States Federal Income Tax Consequences of the Plan," and Article XIV of this Disclosure Statement, entitled "Certain Canadian Federal Income Tax Consequences" to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors and Holders of certain Claims.

C.      **Risks Related to the Debtors' and the Reorganized Debtors' Businesses**

1.      **The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness**

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control.  The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest on their indebtedness, including, without limitation, potential borrowings under the New Takeback Facility and the New ABL Facility, and upon emergence.

2.      **The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases**

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy.  These risks include the following:  (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions Filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, trade partners, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition.  Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

3.      **Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses**

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization.  A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity.  So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations.  A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses.  In addition, the longer the proceedings related to the Chapter 11 Cases

continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases. Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

### 4.    Financial Results May Be Volatile and May Not Reflect Historical Trends

Unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Debtors' operations. These variations may be material and may adversely affect the value of the New Common Stock and the ability of the Debtors to make payments with respect to their indebtedness.

Further, during the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as restructuring activities and expenses, contract terminations and rejections, and claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date. In addition, if the Debtors emerge from the Chapter 11 Cases, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

Finally, the business plan was developed by the Debtors with the assistance of their advisors. There can be no assurances that the Debtors' business plan will not change, perhaps materially, as a result of decisions that the board of directors may make after fully evaluating the strategic direction of the Debtors and their business plan. Any deviations from the Debtors' existing business plan would necessarily cause a deviation.

### 5.    The Reorganized Debtors May Not Be Able to Implement the Business Plan.

Although the Debtors believe that Consummation of the Plan will put them in a strong position to implement their go-forward business plan, various factors beyond the Reorganized Debtors' control may hinder or prevent their successful implementation of the business plan. In particular, the Reorganized Debtors' successful implementation of the business plan depends significantly on maintaining and growing their customer base. Given the nature of the Debtors' customer arrangements, there can be no assurance that the Reorganized Debtors will maintain and grow their customer base. The erosion of the Reorganized Debtors' customer base may materially and adversely affect their operating results and hinder or prevent their successful implementation of the business plan.

### 6.    The Debtors' Business is Subject to Various Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business

The Debtors' operations are subject to various federal, state and local laws and regulations, including occupational health and safety laws and evolving environmental standards. The Debtors may be

required to make large expenditures to comply with such regulations. Failure to comply with these laws and regulations may result in the suspension or termination of operations and subject the Debtors to administrative, civil and criminal penalties, which could have a material adverse effect on the business, financial condition, results of operations and cash flows of the Reorganized Debtors.

7.    **The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases**

In the future, the Reorganized Debtors may become parties to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

8.    **The Loss of Key Personnel Could Adversely Affect the Debtors' Operations**

The Debtors' operations are dependent on a relatively small group of key management personnel. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. As a result, the Debtors may experience increased levels of employee attrition. Because competition for experienced personnel can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience, and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

9.    **The Debtors Face Significant Competition and May Lose Market Share to Their Competitors**

The market for the Debtors' products is competitive and characterized by rapid changes in technology, customer preferences, industry standards, and frequent introductions of new products and improvements of existing products. The Debtors compete with many established wheel and wheel end suppliers, as well as new entrants. As customer preferences evolve, and as new products, services, and technologies are introduced, if the Debtors are unable to anticipate or effectively react to these competitive challenges, the Debtors' competitive position could weaken, and they could experience a decline in revenue or growth rate that could materially and adversely affect their business and results of operations.

10.    **The Cyclical Nature of the Automotive Parts Sector May Lead to Volatility**

The Debtors' business is highly cyclical. With respect to seasonality, the spring and summer are generally the Debtors' busiest seasons with substantially less sales volume and revenue during the rest of the year. Additionally, the Debtors' business operations are volatile and highly susceptible to a downturn in market conditions.

11.    **Deteriorations in Business Relationships May Impact the Ability to Source Materials.**

The Debtors' success depends in part on their ability to source various parts, materials, and equipment necessary to sell the Debtors' products. These materials are sourced from a broad range of suppliers. As a result, the Debtors' business depends on maintaining productive business relationships with their national and dispersed network of third-party suppliers. The Debtors' operations could be disrupted

if such business relationships decline, for whatever reason, or if such suppliers go out of business or are unable to provide parts to the Debtors as they have on a historical basis. There is a risk that economic conditions could lead to financial, operational, production, labor, regulatory, or quality assurance difficulties that could result in a reduction or interruption in the Debtors' parts, material, and equipment supply.

12.    **The Debtors May Not Be Able to Accurately Report Their Financial Results**

The Debtors have established internal controls over financial reporting. However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud. Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements. If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required under the terms of the agreements governing the Debtors' indebtedness. Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition. Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

13.    **The Debtors May Fail to Retain or Attract Customers, Which Would Adversely Affect the Debtors' Business and Financial Results**

The Debtors' future revenue is dependent in large part upon the retention and growth of their existing customer base, in terms of customers continuing to purchase products. This is particularly important, given that a significant portion of the Debtors' revenue is derived from current market participant purchases. Existing customers may purchase fewer products and new customers may avoid entry into the marketplace, which could have a material adverse effect on the Debtors' business and results of operations. In such cases, there can be no assurance that the Debtors will be able to retain their current customers.

A variety of factors could affect the Debtors' ability to successfully retain and attract customers, including the level of demand for their products, the quality of the Debtors' customer service, the Debtors' ability to update their products and develop new products and services desired by customers, and the Debtors' ability to integrate and manage any acquired business. Further, the industry in which the Debtors operate is highly competitive and the Debtors may not be able to compete effectively. The Debtors' revenue comes from the sale of the Debtors' products. It is impossible to predict with perfect accuracy what market demand for such products will be.

14.    **The Debtors May Be Unable to Dispose of Accuride Russia in an Advantageous Manner.**

The Debtors, with the assistance of their advisors, are evaluating whether and how ultimate ownership of Accuride Russia's assets or equity can be transferred in light of certain economic sanctions imposed on the Russian Federation by the European Union and the United States and certain restrictions imposed by the Russian Federation on transfers to entities based in the European Union and the United States and certain other countries. The nature of these sanctions and restrictions creates material risk that a disposition of Accuride Russia may not be accomplished prior to Confirmation, and repatriation of any proceeds of such a disposition is also subject to similar risks. Moreover, the Debtors' ability to consummate a sale of Accuride Russia's assets or equity is uncertain given the degree of discretion certain Russian governmental commissions have regarding approval of such transactions.

Other risks related to unstable political or social conditions, shifting legal and regulatory requirements, and other instabilities caused by geopolitical conflicts could further adversely affect the Debtors' ability to advantageously dispose of Accuride Russia.

**15.    The Debtors Could Be Adversely Affected by Violations of the U.S. Foreign Corrupt Practices Act or Similar U.S. or Foreign Anti-Bribery and Anti-Corruption Laws and Regulations in the Jurisdictions in Which They Operate.**

The Debtors operate in many different jurisdictions, including jurisdictions that are considered high-risk countries, and the Debtors could be adversely affected by violations of the United States Foreign Corrupt Practices Act ("FCPA") and similar worldwide anti-corruption laws.  The FCPA and similar worldwide anti-corruption laws generally prohibit companies and their intermediaries from making improper payments for the purpose of obtaining or retaining business.  The Debtors' internal policies mandate compliance with these anti-corruption laws.  The Debtors' business operates in many parts of the world that have experienced corruption to some degree, and in certain circumstances, strict compliance with anti-corruption laws may conflict with local customs and practices.  Despite the Debtors' business training and compliance programs, the Debtors cannot assure you that its internal control policies and procedures always will protect the Debtors from reckless or criminal acts committed by Debtors' employees or agents.  The Debtors' continued expansion outside the United States, including in developing countries, could increase the risk of such violations in the future.  Violations of these laws, or allegations of such violations, could disrupt the Debtors' business and result in a material adverse effect on the Debtors' business and financial results.

**16.    The Debtors' Ability to Conduct Business in its International Markets May Be Affected by Political, Legal, and Tax and Regulatory Risks.**

The Debtors' global operations expose the Debtors to a number of additional risks, including:

- changes in a specific country's or region's political, social, or economic conditions, particularly in emerging markets;

- civil unrest, turmoil, or outbreak of disease or illness, such as the novel coronavirus, in any of the countries in which the Debtors sell their products or in which the Debtors or their suppliers operate;

- tariffs, other trade protection measures, as discussed in more detail below, and import or export licensing requirements;

- potential adverse changes in trade agreements between the United States and foreign countries;

- potentially negative consequences from changes in United States and international tax laws;

- difficulty in staffing and managing geographically widespread operations;

- differing labor regulations;

- requirements relating to withholding taxes on remittances and other payments by subsidiaries;

- different regulatory regimes controlling the protection of the Debtors' intellectual property;

- restrictions on its ability to own or operate subsidiaries, make investments or acquire new businesses in these jurisdictions;

- restrictions on its ability to repatriate dividends from the Debtors' foreign subsidiaries;

- difficulty in collecting international accounts receivable;

- difficulty in enforcement of contractual obligations not within United States legal jurisdiction;

- transportation delays or interruptions;

- changes in regulatory requirements; and

- the burden of complying with multiple and potentially conflicting laws, including, but not limited to, conflicting labor and employment laws and laws applicable to direct selling.

**D.      Risks Related to the Offer and Issuance of Securities Under the Plan**

**1.      The Debtors Do Not Intend to Register the Offer or Sale of New Common Stock and Certain Holders of New Common Stock May Be Restricted in Their Ability to Transfer or Sell Their Securities**

The New Common Stock will not be registered under the Securities Act or any Blue-Sky Laws. As summarized in Article XII of this Disclosure Statement, entitled "Certain Securities Laws Matters," certain of the New Common Stock may not be re-offered, resold, exchanged, assigned or otherwise transferred, except in transactions exempt from the registration requirements of the Securities Act and other applicable Laws.  The Debtors do not intend currently to register the New Common Stock under the Securities Act. As a result, certain of the New Common Stock may be transferred or resold only in transactions exempt from the securities registration requirements of federal and applicable state laws.

It is expected that all the shares of New Common Stock (other than any New Common Stock distributed pursuant to the Management Incentive Plan) may be issued in reliance on the exemption from registration under the federal and state securities laws under section 1145(a) of the Bankruptcy Code. Accordingly, the Debtors believe that such New Common Stock (i) will not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (ii) will be freely tradeable and transferable without registration under the Securities Act in the United States by the recipients thereof that are not, and have not been within 90 days of such transfer, an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, subject to the provisions of Section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in Section 1145(b) of the Bankruptcy Code, and compliance with applicable securities laws and any rules and regulations of the SEC or Blue-Sky Laws, if any, applicable at the time of any future transfer of such securities or instruments.

Any New Common Stock underlying the Management Incentive Plan (or otherwise not permitted to be issued under Section 1145 of the Bankruptcy Code) will be offered, issued, and distributed in reliance upon Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the

Securities Act and/or other exemptions from registration, will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom and pursuant to applicable Blue-Sky Laws. Holders of such restricted securities may not be entitled to have their restricted securities registered and are not permitted to resell them except in accordance with an available exemption from registration under the Securities Act. Generally, Rule 144 of the Securities Act would permit the resale of securities received by a Person after a specified holding period if current information regarding the issuer is publicly available and, under certain circumstances, volume limitations, manner of sale requirements and certain other conditions are met. These conditions vary depending on whether the issuer is a reporting issuer and whether the holder of the restricted securities is an "affiliate" of the issuer. A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities of an issuer that does not file reports with the SEC pursuant to Rule 144 after a one-year holding period. An affiliate may resell restricted securities of an issuer that does not file reports with the SEC under Rule 144 after such holding period, as well as other securities without a holding period, but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale and notice requirements of Rule 144. The Debtors do not intend to make publicly available the requisite information regarding the Debtors, and, as a result, even after the holding period, Rule 144 may not be available for resales of such New Common Stock by affiliates of the issuer. Restricted securities (as well as other securities held by affiliates) may be resold without holding periods under other exemptions from registration, including Rule 144A under the Securities Act and Regulation S under the Securities Act, but only in compliance with the conditions of such exemptions from registration.

The Debtors make no representation regarding the right of any Holder of New Common Stock to freely resell such securities. *See* Article XII of this Disclosure Statement, entitled "Certain Securities Law Matters."

### 2.      A Trading Market for the Shares of New Common Stock May Not Develop At All

The Debtors do not intend to relist the New Common Stock on a national securities exchange. There can be no assurance that a trading market for the New Common Stock will develop, nor can any assurance be given as to the liquidity or prices at which such securities might be traded. In the event an a trading market does not develop, the ability to transfer or sell New Common Stock may be substantially limited.

In addition, the Reorganized Debtors do not expect to be subject to the reporting requirements of the Securities Act, and Holders of the New Common Stock will not be entitled to any information except as expressly required by the New Organizational Documents. As a result, the information which the Debtors are required to provide in order to issue the New Common Stock may be less than the Debtors would be required to provide if the New Common Stock were registered. Among other things, the Debtors may not be required to provide: (a) separate financial information for any subsidiary; (b) selected historical consolidated financial data of the Debtors; (c) selected quarterly financial data of the Debtors; (d) certain information about the Debtors' disclosure controls and procedures and their internal controls over financial reporting; and (e) certain information regarding the Debtors' executive compensation policies and practices and historical compensation information for their executive officers. This lack of information could impair your ability to evaluate your ownership and impair the marketability of the New Common Stock.

## X.      SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.

A.      **Holders of Claims Entitled to Vote on the Plan**

Holders of Claims in Class 4 (the "Voting Class") are entitled to vote to accept or reject the Plan. The Holders of Claims in the Voting Class are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, Holders of Claims in the Voting Class have the right to vote to accept or reject the Plan.  The Debtors are *not* soliciting votes from Holders of Claims or Interests in Classes 1, 2, 3, 5, 6, 7, 8, or 9.

---

THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS
DISCLOSURE STATEMENT IS ONLY A SUMMARY.

PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER AND SOLICITATION PROCEDURES FOR A
MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

---

B.      **Voting on the Plan**

The Voting Deadline is **December 16, 2024, at 4:00 p.m. (prevailing Eastern Time**).  To be counted as votes to accept or reject the Plan, all Ballots must be properly executed, completed, and submitted via the online balloting portal (available at https://omniagentsolutions.com/Accuride-Ballots, the "E-Ballot Portal"), so that such Ballot is actually received by the Solicitation Agent on or before the Voting Deadline.  Ballots returned by acsimile, telecopy, electronic mail, or any electronic means other than the Solicitation Agent's online portal will not be valid and will not be counted.

C.      **Ballots Not Counted**

No ballot will be counted toward Confirmation if, among other things:  (i) any Ballot submitted via hard copy, electronic mail, or facsimile or any other method other than through the E-Ballot Portal; (ii) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of such Claim; (iii) any Ballot cast by any Entity that does not hold a Claim in the Voting Class; (iv) any Ballot cast for a Claim scheduled as unliquidated, contingent, or disputed for which no Proof of Claim was timely filed by the Voting Record Date (unless the applicable bar date has not yet passed, in which case such Claim shall be entitled to vote in the amount of $1.00); (v) any unsigned Ballot or Ballot lacking an original or e-signature; (vi) any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan; (vii) any Ballot submitted by any Entity not entitled to vote.

D.      **Votes Required for Acceptance by a Class**

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted.  Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted.  Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

E.      **Certain Factors to Be Considered Prior to Voting**

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan and include, among other things:

- unless otherwise specifically indicated, the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of the Plan by all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan, the occurrence or impact of such factors may not necessarily affect the validity of the vote of the Voting Class or necessarily require a re-solicitation of the votes of Holders of Claims in the Voting Class pursuant to section 1127 of the Bankruptcy Code.

For a further discussion of risk factors, please refer to "Risk Factors" described in Article IX of this Disclosure Statement.

## F.    Solicitation Procedures

### 1.    Claims and Noticing Agent

The Debtors have retained Omni Agent Solutions, Inc. to act as, among other things, the solicitation agent (in such capacity, the "Solicitation Agent") in connection with the solicitation of votes to accept or reject the Plan.

### 2.    Solicitation Package

The following materials constitute the solicitation package distributed to Holders of Claims in the Voting Class (collectively, the "Solicitation Package"):  (a) the Solicitation Procedures; (c) the applicable form of Ballot, together with detailed voting instructions and instructions on how to submit the Ballot via the E-Ballot Portal; (d) the Cover Letter, which describes the contents of the Solicitation Package and urges Holders of Claims in the Voting Class to vote to accept the Plan; (e) the Combined Hearing Notice; (f) this Disclosure Statement (and the exhibits hereto, including the Plan); (g) the Disclosure Statement Order (without exhibits, except for the Solicitation Procedures); and (h) any additional documents that the Court has ordered to be made available to Holders of Claims in the Voting Class.

### 3.    Distribution of the Solicitation Package and Plan Supplement

The Debtors are causing the Solicitation Agent to distribute the Solicitation Package to Holders of Claims in the Voting Class on November 21, 2024, which is 25 days before the Voting Deadline (*i.e.*, 4:00 p.m., prevailing Eastern Time, on December 16, 2024), and will complete the hard-copy mailing of all Solicitation Packages as soon as reasonably practicable thereafter.

The Solicitation Package (except the Ballot) may also be obtained from the Claims and Noticing Agent by:  (a) calling the Debtors' restructuring hotline at (866) 956-2140 (Toll Free) or +1 (818) 666-3635 (international), (b) emailing AccurideInquiries@OmniAgent.com, and/or (c) writing to the Claims and

Noticing Agent at Accuride Corporation Ballot Processing Center, c/o Omni Agent Solutions, Inc., 5955 De Soto Avenue, Stuie 100, Woodland Hills, CA 91367. You may also obtain copies of any pleadings Filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://omniagentsolutions.com/Accuride (free of charge), or for a fee via PACER at https://www.pacer.gov/.

The Debtors shall file the Plan Supplement, to the extent reasonably practicable, with the Bankruptcy Court no later than seven (7) days before the Combined Hearing. If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website.

## XI.    CONFIRMATION OF THE PLAN

### A.    The Combined Hearing

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization. The Combined Hearing may, however, be continued or adjourned from time to time without further notice to parties in interest other than an adjournment announced in open court or a notice of adjournment Filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules. Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Combined Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that a party in interest may object to Confirmation. An objection to final approval of the Disclosure Statement and/or confirmation of the Plan must be Filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that it is actually received on or before the deadline to file such objections as set forth therein.

### B.    Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Combined Hearing, the Bankruptcy Court will determine whether (1) the Court should approve this Disclosure Statement as containing "adequate information" on a final basis and (2) the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) this Disclosure Statement contains adequate information pursuant to section 1125(a) of the Bankruptcy Code; (2) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (3) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (4) the Plan has been proposed in good faith.

### C.    Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or interest in such impaired class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value that is not less than the amount that the nonaccepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit C** and incorporated herein by reference is a hypothetical liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of the Debtors' advisors and reliance upon the valuation methodologies utilized by the Debtors' advisors and subject to the assumptions stated therein.  As reflected in the Liquidation Analysis, the Debtors believe that a hypothetical liquidation of the Debtors' business under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims or Interests as compared to distributions contemplated under the Plan.  Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' business may be liquidated pursuant to the provisions of a chapter 11 liquidating plan.  In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7.  Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs.  Any distribution to Holders of Claims or Interests (to the extent Holders of Interests would receive distributions at all) under a chapter 11 liquidation plan would most likely be substantially delayed.  Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the significant going-concern value of their business, which is reflected in the New Common Stock to be distributed under the Plan.  Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

**D.      Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their advisors, have analyzed their ability to meet their respective obligations under the Plan.  As part of this analysis, the Debtors have prepared their projected consolidated balance sheet, income statement, and statement of cash flows (collectively, the "Financial Projections").  Creditors and other interested parties should review Article IX of this Disclosure Statement entitled "Risk Factors" for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections are attached hereto as **Exhibit D** and incorporated herein by reference.  Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

**E.      Valuation Analysis**

The Plan provides for the distribution of the New Equity Interests to certain Holders of Claims upon consummation of the restructuring transactions contemplated by the Plan.  Accordingly, an analysis of the estimated implied equity value of the Debtors was performed as of an assumed Effective Date (the "Valuation Analysis") at the Debtors' request and subject to the assumptions stated therein.  The Valuation Analysis is attached hereto as **Exhibit E.**  The Valuation Analysis, including the procedures followed, assumptions made, qualifications, and limitations on review undertaken, should be read in conjunction with Article IX of this Disclosure Statement entitled "Risk Factors."  The Debtors' make no

representations as to changes to such data and information that may have occurred since the date of the Valuation Analysis.

## F.     Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[19]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan.  Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan.  Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Article III.E of the Plan, if a Class contains Claims or Interests is eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

## G.     Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

---

[19]    A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

1.      **No Unfair Discrimination**

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

2.      **Fair and Equitable Test**

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## XII.    CERTAIN SECURITIES LAW MATTERS

### A.    New Common Stock

As discussed herein, the Plan provides for the offer, issuance, sale, and distribution of New Common Stock to the Holders of Term Loan Claims and DIP Claims. The Debtors believe that the class of New Common Stock will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and any applicable state securities laws.

It is expected that the issuance of the New Common Stock (other than any New Common Stock awards distributed pursuant to the Management Incentive Plan) after the Petition Date pursuant to the Restructuring Transactions under the Plan is, and subsequent transfers of such New Common Stock by the holders thereof that are not "underwriters" (which definition includes "Controlling Persons") will be, exempt from federal and state securities registration requirements under Section 1145(a) of the Bankruptcy Code, Securities Act and any applicable state securities laws as described in more detail below, except in certain limited circumstances.

Any New Common Stock awards distributed pursuant to the Management Incentive Plan (or otherwise not issued pursuant to the exemption from registration provided by Section 1145 of the Bankruptcy Code) will be offered, issued and distributed in reliance upon Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other exemptions from registration and will also be considered "restricted securities." Section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder provide that the offering, issuance, and distribution of securities by an issuer in transactions not involving any public offering are exempt from registration under the Securities Act. Regulation S under the Securities Act provides an exemption from registration under the

Securities Act for the offering, issuance, and distribution of securities in certain transactions to persons outside of the United States.

The following discussion of the issuance and transferability of the New Common Stock relates solely to matters arising under federal securities laws and state securities laws.  The rights of holders of New Common Stock, including the right to transfer such interests, will also be subject to any restrictions in the New Organizational Documents to the extent applicable.  Recipients of the New Common Stock are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state securities laws.

**B.     Exemption from Registration Requirements; Issuance of New Common Stock under the Plan**

All shares of New Common Stock (other than any New Common Stock underlying the Management Incentive Plan) are expected to be issued after the Petition Date without registration under the Securities Act, state securities laws or any similar federal, state, or local law in reliance on Section 1145(a) of the Bankruptcy Code.

Section 1145 of the Bankruptcy Code provides, among other things, that Section 5 of the Securities Act and any other applicable U.S. state or local law requirements for the registration of issuance of a security do not apply to the offering, issuance, distribution or sale of stock, options, warrants or other securities by a debtor if (1) the offer or sale occurs under a plan of reorganization of the debtor, (2) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor or an affiliate thereof participating in the plan of reorganization, and (3) the securities are (i) issued in exchange for a claim against, interest in, or claim for an administrative expense against a debtor or an affiliate thereof participating in the plan of reorganization, or (ii) issued principally in such exchange and partly for cash or property.  It is expected that all shares of New Common Stock (other than any New Common Stock underlying the Management Incentive Plan) issued after the Petition Date in exchange for the Claims described above satisfy the requirements of Section 1145(a) of the Bankruptcy Code.

However, any New Common Stock issued in respect of the Management Incentive Plan, or otherwise not issued pursuant to the exemption from registration provided by Section 1145 of the Bankruptcy Code, will be offered, issued, and distributed in reliance upon the exemption from registration provided by Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other exemptions from registration, and similar Blue-Sky Laws, will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom, and subject to applicable state and local securities laws, including state Blue-Sky Law.

Accordingly, no registration statement will be filed under the Securities Act or any state securities laws with respect to the initial offer, issuance, and distribution of New Common Stock.  Recipients of the New Common Stock are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state securities laws.  The New Common Stock will also be subject to any restrictions imposed on it by the New Organizational Documents. As discussed below, the exemptions provided for in Section 1145(a) do not apply to an entity that is deemed an "underwriter" as such term is defined in Section 1145(b) of the Bankruptcy Code.

C.    **Resales of New Common Stock; Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code**

1.    **Resales of New Common Stock Issued Pursuant to Section 1145**

New Common Stock (other than any New Common Stock underlying the Management Incentive Plan) to the extent offered, issued and distributed pursuant to Section 1145 of the Bankruptcy Code, (i) will not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (ii) will be transferable without registration under the Securities Act in the United States by the recipients thereof that are not, and have not been within 90 days of such transfer, an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, subject to the provisions of Section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in Section 1145(b) of the Bankruptcy Code, and compliance with applicable securities laws and any rules and regulations of the SEC or Blue-Sky Laws, if any, applicable at the time of any future transfer of such securities or instruments.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (1) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (2) offers to sell securities offered or sold under a plan for the holders of such securities; (3) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (a) with a view to distribution of such securities and (b) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (4) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under Section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all "affiliates," which are all Persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter" contained in Section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities.  "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities.  In addition, the legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor who owns 10% or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of the New Common Stock issued in exchange for Term Loan Claims pursuant to the Plan by entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by Section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of such New Common Stock who are deemed to be "underwriters" may be entitled to resell their New Common Stock pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act.  Generally, Rule 144 of the Securities Act would permit the public sale of control securities received by such Person if the requirements for sales of such control securities under Rule 144 have been met, including that current information regarding the issuer is publicly available and volume

limitations, manner of sale requirements and certain other conditions are met. Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the New Common Stock would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to such New Common Stock and, in turn, whether any Person may freely trade such New Common Stock. However, the Debtors do not intend to make publicly available the requisite information regarding the Debtors, and, as a result, Rule 144 may not be available for resales of such New Common Stock by Persons deemed to be underwriters or otherwise.

**IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE REORGANIZED DEBTORS, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN. ACCORDINGLY, THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF NEW COMMON STOCK CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.**

2.      **Resales of New Common Stock Issued Pursuant to Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or Regulation S under the Securities Act**

To the extent the exemption set forth Section 1145(a) of the Bankruptcy Code is unavailable, New Common Stock will be offered, issued, and distributed in reliance of Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder Regulation S under the Securities Act and/or other exemptions from registration. Any New Common Stock issued in respect of the Management Incentive Plan, or otherwise not issued pursuant to the exemption from registration provided by Section 1145 of the Bankruptcy Code, will be offered, issued, and distributed in reliance upon the exemption from registration provided by Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other exemptions from registration, and similar Blue-Sky Laws, will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom, and subject to applicable state and local securities laws, including state Blue-Sky Law.

Generally, Rule 144 of the Securities Act provides a limited safe harbor for the public resale of restricted securities if certain conditions are met. These conditions vary depending on whether the issuer is a reporting issuer and whether the holder of the restricted securities is an "affiliate" of the issuer. Rule 144 defines an affiliate as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer." A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities of an issuer that does not file reports with the SEC pursuant to Rule 144 after a one-year holding period. An affiliate may resell restricted securities of an issuer that does not file reports with the SEC under Rule 144 after such holding period, as well as other securities without a holding period, but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale and notice requirements of Rule 144. The Debtors do not intend to make publicly available the requisite information regarding the Debtors, and, as a result, even after the holding period, Rule 144 may not be available for resales of such New Common Stock by affiliates of the Debtors. Restricted securities (as well as other securities held by affiliates) may be resold without holding periods under other exemptions from registration, including Rule 144A under the Securities Act and Regulation S under the Securities Act, but only in compliance with the conditions of such exemptions from registration.

In addition, in connection with resales of any New Common Stock offered, issued and distributed pursuant to Regulation S under the Securities Act: (i) the offer or sale, if made prior to the expiration of the one-year distribution compliance period (six months for a reporting issuer), may not be made to a U.S. person or for the account or benefit of a U.S. person (other than a distributor); and (ii) the offer or sale, if made prior to the expiration of the applicable one-year or six-month distribution compliance period, is made pursuant to the following conditions: (a) the purchaser (other than a distributor) certifies that it is not a U.S. person and is not acquiring the securities for the account or benefit of any U.S. person or is a U.S. person who purchased securities in a transaction that did not require registration under the Securities Act; and (b) the purchaser agrees to resell such securities only in accordance with the provisions of Regulation S, pursuant to registration under the Securities Act, or pursuant to an available exemption from registration; and agrees not to engage in hedging transactions with regard to such securities unless in compliance with the Securities Act.

All New Common Stock issued in reliance upon section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder and/or Regulation S under the Securities Act, will bear a restrictive legend. Each certificate or book-entry interest representing, or issued in exchange for or upon the transfer, sale or assignment of, any New Interests issued in reliance upon section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder and/or Regulation S under the Securities Act, shall be stamped or otherwise imprinted with a legend in substantially the following form:

**"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION."**

The Debtors will reserve the right to require certification, legal opinions, or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the New Common Stock issued in reliance upon section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder and/or Regulation S under the Securities Act. The Debtors will also reserve the right to stop the transfer of any such New Common Stock if such transfer (x) is not registered in compliance with Rule 144 or in compliance with another applicable exemption from registration (including Section 1145 of the Bankruptcy Code) or (y) would otherwise make the Debtors subject to the periodic reporting requirements under the Exchange Act.

Notwithstanding anything to the contrary in this Disclosure Statement, no Entity shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan or this Disclosure Statement, including, for the avoidance of doubt, whether the New Common Stock are exempt from the registration requirements of Section 5 of the Securities Act.

In addition to the foregoing restrictions, the New Common Stock will also be subject to any applicable transfer restrictions contained in the New Organizational Documents.

**PERSONS WHO RECEIVE SECURITIES UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE FEDERAL OR STATE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS. THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE SECURITIES OR THE**

**BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, WE ENCOURAGE EACH RECIPIENT OF SECURITIES AND PARTY IN INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A SECURITY IS EXEMPT FROM THE REGISTRATION REQUIREMENTS UNDER THE FEDERAL OR STATE SECURITIES LAWS OR WHETHER A PARTICULAR RECIPIENT OF NEW COMMON STOCK MAY BE AN UNDERWRITER, WE MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE SECURITIES ISSUED UNDER THE PLAN.**

## XIII.  [CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN][20]

### A.    Introduction

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, the Reorganized Debtors, and to certain Holders (which, solely for purposes of this discussion, means the beneficial owners for U.S. federal income tax purposes) of Allowed Term Loan Claims. This summary does not address the U.S. federal income tax consequences to Holders of Claims (a) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan, (b) that are deemed to reject the Plan, or (c) that are otherwise not entitled to vote to accept or reject the Plan. This summary is based on the U.S. Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and authorities, published administrative rules, positions and pronouncements of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect, so as to result in U.S. federal income tax consequences different from those summarized herein. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained, and the Debtors do not intend to seek a ruling or determination from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to Holders of Allowed Term Loan Claims in light of their individual circumstances. This discussion does not address tax issues with respect to such Holders of Allowed Term Loan Claims subject to special treatment under the U.S. federal income tax laws (including, for example, banks, brokers dealers, mutual funds, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, small business investment companies, non-U.S. taxpayers, Persons who are related to the Debtors within the meaning of the IRC, Persons liable for alternative minimum tax, Holders of Allowed Term Loan Claims whose functional currency is not the U.S. dollar, Holders of Allowed Term Loan Claims who prepare "applicable financial statements" (as defined in section 451 of the IRC), Persons using a mark-to-market method of accounting, Holders of Allowed Term Loan Claims who are themselves

---

[20]    This section is subject to ongoing tax review and material revision.

in bankruptcy, regulated investment companies, and those holding, or who will hold, any property described herein as part of a hedge, straddle, conversion, or other integrated transaction).  Moreover, this summary does not address any aspect of U.S. non-income (including estate or gift), state, local, or non-U.S. taxation, considerations under any applicable tax treaty or, except as discussed below in "Net Investment Income Tax," any tax arising under section 1411 of the IRC (the "Medicare" tax on certain investment income). Furthermore, this summary assumes that a Holder of an Allowed Term Loan Claim holds only Allowed Term Loan Claims in a single class and holds such Allowed Term Loan Claims, as applicable, as "capital assets" (within the meaning of section 1221 of the IRC).  This summary also assumes that the various debt and other arrangements to which the Debtors and the Reorganized Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Allowed Term Loan Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC. This discussion also assumes that none of the Allowed Term Loan Claims is treated as a "short-term" debt instrument, "variable rate debt instrument," or a "contingent payment debt instrument" for U.S. federal income tax purposes, and that each of the Allowed Term Loan Claims are denominated in U.S. dollars. This summary does not discuss differences in tax consequences to Holders of Allowed Term Loan Claims that act or receive consideration in a capacity other than as a Holder of An Allowed Term Loan Claim, and the tax consequences for such Holders may differ materially from that described below.

For purposes of this discussion, a "U.S. Holder" is a Holder of an Allowed Term Loan Claim that for U.S. federal income tax purposes is: (1) an individual citizen or resident of the United States; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more "United States persons" (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a "United States person" (within the meaning of section 7701(a)(30) of the IRC).  For purposes of this discussion, a "Non-U.S. Holder" is any Holder of an Allowed Term Loan Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of an Allowed Term Loan Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the partnership (or other pass-through entity). Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Allowed Term Loan Claims are urged to consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF AN ALLOWED TERM LOAN CLAIM. ALL HOLDERS OF ALLOWED TERM LOAN CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO THEM OF THE PLAN, AS WELL AS THE CONSEQUENCES TO THEM OF THE PLAN ARISING UNDER ANY OTHER U.S. FEDERAL TAX LAWS OR THE LAWS OF ANY STATE, LOCAL, OR NON-U.S. TAXING JURISDICTION OR UNDER ANY APPLICABLE TREATY.**

B.    **Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Reorganized Debtors**

1.    **Characterization of the Restructuring Transactions**

The tax consequences of the implementation of the Plan to the Debtors and Reorganized Debtors will differ depending on whether the Restructuring Transactions are structured as a recapitalization of the Debtors (a "Recapitalization Transaction") or as a taxable sale of the assets and/or stock of any Debtor (a "Taxable Transaction") to the Reorganized Debtors. The Debtors have not yet determined whether the Restructuring Transactions will be consummated as a Recapitalization Transaction or Taxable Transaction, whether in whole or in part. Such decision will depend on, among other things, the amount of the expected reduction in the aggregate tax basis of such assets by excluded cancellation of indebtedness income ("COD Income"), whether a Taxable Transaction would give rise to taxable income and whether sufficient tax attributes are available to offset it, the comparative depreciation and amortization deductions that will be available to the Reorganized Debtors in either structure, expectations regarding the Reorganized Debtors' "earnings and profits" in either structure, and the amount and character of any losses with respect to the stock of the Debtors, in each case for U.S. federal, state, and local income tax purposes.

If the transactions undertaken pursuant to the Plan are structured as a Taxable Transaction, the Debtors would realize gain or loss upon the transfer in an amount equal to the difference between the aggregate fair market value of the assets transferred by the Debtors and the Debtors' aggregate tax basis in such assets. Gain, if any, would be reduced by the amount of such Debtors' available tax attributes, and any remaining gain would be recognized by the Debtors and result in a cash tax obligation. If a Reorganized Debtor purchases assets or stock of any Debtor pursuant to a Taxable Transaction, the Reorganized Debtor will take a fair market value basis in the transferred assets or stock, and the Reorganized Debtors would not succeed to any of the tax attributes of the selling Debtor or Debtors under section 381 of the IRC. However, if a Taxable Transaction involves a purchase of stock, the entity whose stock is transferred will retain its basis in its assets (subject to reduction due to COD Income, as described below) unless an election is made pursuant to section 338(h)(10) or 336(e) of the IRC with respect to the purchase to treat the purchase as the purchase of assets.

2.    **Cancellation of Debt and Reduction of Tax Attributes**

In general, absent an exception, a taxpayer will realize and recognize COD Income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied over (b) the sum of the issue price of the Rights Offering Term Loans and the fair market value of the New Common Stock and any other consideration (including Liquidating Trust Assets), in each case, given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the IRC, however, a taxpayer will not be required to include any amount of COD Income in gross income if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC. Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined. In general, tax attributes will be reduced in the following order: (a) net operating losses ("NOLs") and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the Reorganized Debtors remain subject immediately after the discharge); (f) passive activity loss and credit carryovers; and (g) foreign tax credits carryovers. Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC. Deferred deductions under section 163(j) of the IRC

76

("163(j) Deductions") are not subject to reduction under these rules.  Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

The aggregate tax basis of the Debtors in their assets is not required to be reduced below the amount of indebtedness (determined on an entity-by-entity basis) that the Debtors will be subject to immediately after the cancellation of indebtedness giving rise to COD Income (the "Asset Tax Basis Floor"). Generally, all of an entity's obligations that are treated as debt under general U.S. federal income tax principles (including intercompany debt treated as debt for U.S. federal income tax purposes) are taken into account in determining an entity's Asset Tax Basis Floor.

The exact amount of any COD Income that will be realized by the Debtors will not be determinable until the consummation of the Plan because the amount of COD Income will depend, in part, on the issue price of the Rights Offering Term Loans and the fair market value of the New Common Stock and any other consideration (including Liquidating Trust Assets, if applicable), which cannot be determined until after the Plan is consummated.

### 3.    Limitation on NOLs, 163(j) Deductions, and Other Tax Attributes

After giving effect to the reduction in tax attributes pursuant to excluded COD Income described above, to the extent the Reorganized Debtors succeed to the Debtors' tax attributes, the Reorganized Debtors' ability to use any remaining tax attributes post-emergence will be subject to certain limitations under sections 382 and 383 of the IRC.

Under sections 382 and 383 of the IRC, if the Debtors undergo an "ownership change," the amount of any remaining NOL carryforwards, tax credit carryforwards, 163(j) Deductions, and possibly certain other attributes (potentially including losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change and cost recovery deductions) of the Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation.  For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation.  In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

The rules of section 382 of the IRC are complicated, but as a general matter, the Debtors anticipate that the issuance of New Common Stock pursuant to the Plan will result in an "ownership change" of the Debtors for these purposes, and that the Reorganized Debtors' use of the Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the IRC applies.

### a.    General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments), and (ii) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the ownership change occurs, currently 3.31 percent for November 2024).   The annual limitation may be increased to the extent that the

Reorganized Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. If the corporation or consolidated group does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's Pre-Change Losses (absent any increases due to recognized built-in gains). As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

        **b.**        **Special Bankruptcy Exceptions**

Special rules may apply in the case of a corporation that experiences an "ownership change" as a result of a bankruptcy proceeding. An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their Allowed Term Loan Claims, at least 50 percent of the vote and value of the stock of the debtor corporation (or a controlling corporation if also in chapter 11) as reorganized pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). If the requirements of the 382(l)(5) Exception are satisfied, a debtor's Pre-Change Losses would not be limited on an annual basis, but, instead, NOL carryforwards would be reduced by the amount of any interest deductions claimed by the debtor during the three taxable years preceding the effective date of the plan of reorganization and during the part of the taxable year prior to and including the effective date of the plan of reorganization in respect of all debt converted into stock pursuant to the reorganization. If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor corporation does not qualify for it or the debtor corporation otherwise elects not to utilize the 382(l)(5) Exception), another exception will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of (i) the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or (ii) the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that, under it, a debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and a debtor corporation may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses. The resulting limitation would be determined under the regular rules for ownership changes.

The Debtors will likely elect out of the application of the 382(l)(5) Exception. Whether the Reorganized Debtors take advantage of the 382(l)(6) Exception, though, the Reorganized Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of section 382 of the IRC were to occur after the Effective Date.

**C.**        **Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders**

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan. U.S. Holders of Allowed Term Loan Claims are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

1.    **Consequences of the Restructuring Transactions to U.S. Holders of Allowed Term Loan Claims**

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of their Allowed Term Loan Claims, each U.S. Holder of an Allowed Term Loan Claim will receive its pro rata share of (i) the Term Loan Equity Pool, subject to dilution by the New Common Stock issued on account of the Management Incentive Plan, and (ii) the Liquidating Trust Beneficial Interests (if applicable), and (iii) the Rights with respect to the Rights Offering Term Loans.  In a Recapitalization Transaction the New Common Stock shall be issued by the entity described in clause (a) of the definition of Reorganized Topco, and in a Taxable Transaction the New Common Stock shall be issued by an entity described in clause (b) of the definition of Reorganized Topco.

As further discussed below, Holders who exercise their Rights are expected to be treated for U.S. federal income tax purposes as receiving the Rights Offering Term Loans directly in exchange for their Allowed Term Loan Claims.

The U.S. federal income tax consequences to a U.S. Holder of Allowed Term Loan Claims in a Recapitalization Transaction will depend, in part, on whether for U.S. federal income tax purposes the (a) Allowed Term Loan Claim surrendered by such U.S. Holder constitutes a "security" of a Debtor, and (b) the New Common Stock and/or Rights Offering Term Loans constitute a stock or a "security" issued by the same entity against which the Claim is asserted (or, an entity that is a "party to a reorganization" with such entity).

Neither the IRC nor the Treasury Regulations promulgated thereunder define the term "security." Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes.  These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security.  There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.  The Debtors expect that the Term Loan Claims will be treated as a "security" for U.S. federal income tax purposes. However, due to the inherently factual nature of the determination, U.S. Holders are urged to consult their tax advisors regarding the status of their Allowed Term Loan Claims as "securities" for U.S. federal income tax purposes.

In a Recapitalization Transaction, and for U.S. federal income tax purposes, the entity issuing the New Common Stock under the Plan will not be the same entity as the Debtor against which the Allowed Term Loan Claims are asserted (or an entity that is a "party to a reorganization" with such Debtor for U.S. federal income tax purposes).  Accordingly, the exchange of such Allowed Term Loan Claims should generally be treated as a taxable exchange pursuant to section 1001 of the IRC. In a Taxable Transaction, the exchange of Allowed Term Loan Claims under the Plan will similarly be treated as a taxable exchange pursuant to section 1001 of the IRC.  A U.S. Holder of an Allowed Term Loan Claim generally should recognize gain or loss equal to (a) the sum of (i) the fair market value of the New Common Stock received and (ii) the fair market value of any Liquidating Trust Assets deemed received by such Holder (and subsequently deemed contributed to the Liquidating Trusts as described in the Plan) less (b) the U.S. Holder's adjusted tax basis in its Allowed Term Loan Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status

of the U.S. Holder, the nature of the Allowed Term Loan Claim in such U.S. Holder's hands, whether such Claim constitutes a capital asset in the hands of the U.S. Holder, whether such Claim was purchased at a discount, and whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to such Claim.  If recognized gain or loss is capital gain or loss, it would generally constitute long-term capital gain or loss if the U.S. Holder has held such Claim for longer than one year.  Non-corporate taxpayers are generally subject to a reduced federal income tax rate on net long-term capital gains.  The deductibility of capital losses is subject to certain limitations.  A U.S. Holder should obtain a tax basis in the New Common Stock or any Liquidating Trust Assets deemed received equal to the fair market value of the New Common Stock or Liquidating Trust Assets (as applicable) as of the date such New Common Stock or Liquidating Trust Assets (as applicable) are distributed (or deemed distributed) to such U.S. Holder.  The holding period for any such New Common Stock or Liquidating Trust Assets (as applicable) should begin on the day following the receipt of such New Common Stock or deemed receipt of such Liquidating Trust Assets.

However, in a Recapitalization Transaction where either (a) the Term Loan Claims do not constitute "securities," or (b) the Rights Offering Term Loans do not constitute a "security," the exchange of such Allowed Term Loan Claims should generally be treated as a taxable exchange pursuant to section 1001 of the IRC. In a Taxable Transaction, the exchange of Allowed Term Loan Claims under the Plan will similarly be treated as a taxable exchange pursuant to section 1001 of the IRC.  Under section 1001 of the IRC, a U.S. Holder of an Allowed Term Loan Claim generally should recognize gain or loss equal to (a) the sum of (i) the fair market value of the New Common Stock received, (ii) the fair market value of any Liquidating Trust Assets deemed received by such Holder (and subsequently deemed contributed to the Liquidating Trusts as described in the Plan), and (iii) the issue price of the Rights Offering Term Loans received less (b) the U.S. Holder's adjusted tax basis in its Allowed Term Loan Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Allowed Term Loan Claim in such U.S. Holder's hands, whether such Claim constitutes a capital asset in the hands of the U.S. Holder, whether such Claim was purchased at a discount, and whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to such Claim.  If recognized gain or loss is capital gain or loss, it would generally constitute long-term capital gain or loss if the U.S. Holder has held such Claim for longer than one year. Non-corporate taxpayers are generally subject to a reduced federal income tax rate on net long-term capital gains.  The deductibility of capital losses is subject to certain limitations.  A U.S. Holder should obtain a tax basis in the New Common Stock, any Liquidating Trust Assets, and Rights Offering Term Loans received or deemed received equal to the fair market value of the New Common Stock or, Liquidating Trust Assets, or the issue price of the Rights Offering Term Loans (as applicable) as of the date such New Common Stock, Liquidating Trust Assets, or Rights Offering Term Loans (as applicable) are distributed (or deemed distributed) to such U.S. Holder.  The holding period for any such New Common Stock, Liquidating Trust Assets, or Rights Offering Term Loans (as applicable) should begin on the day following the receipt of such New Common Stock or Rights Offering Term Loans or deemed receipt of such Liquidating Trust Assets.

The treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest, original issue discount ("OID") or market discount, which differs from the treatment described above, is discussed below.

## 2.       Distributions Attributable to Accrued Interest (and OID)

To the extent that the fair market value of the consideration received by a U.S. Holder on an exchange of its Allowed Term Loan Claim under the Plan is attributable to accrued but unpaid interest (or OID) on such Allowed Term Loan Claim, the receipt of such amount generally should be taxable to the U.S. Holder as ordinary interest income (to the extent such amount was not previously included in the gross

income of such U.S. Holder).  Conversely, a U.S. Holder of an Allowed Term Loan Claim may be able to deduct a loss to the extent that any accrued interest on such debt instruments was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point. The tax basis of any New Common Stock treated as received by U.S. Holders of Allowed Term Loan Claims in satisfaction of accrued but unpaid interest (or OID) should equal the amount of such accrued but unpaid interest (or OID). The holding period for such New Common Stock should begin on the day following the receipt of such New Common Stock.

The extent to which the consideration received by a U.S. Holder of an exchanged Allowed Term Loan Claim will be attributable to accrued interest on the debt constituting of the exchanged Allowed Term Loan Claim is unclear.  Certain legislative history and case law indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest.  The Plan provides that amounts paid to U.S. Holders of Allowed Term Loan Claims will be allocated first to unpaid principal and then to unpaid interest.  The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. U.S. Holders of Allowed Term Loan Claims are urged to consult their own tax advisor regarding the allocation deductibility of accrued but unpaid interest for U.S. federal income tax purposes.

*U.S. Holders of Allowed Term Loan Claims are urged to consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.*

### 3.    Market Discount

Under the "market discount" provisions of sections 1276 through 1278 of the IRC, some or all of any gain realized by a U.S. Holder of an Allowed Term Loan Claim who exchanges such Allowed Term Loan Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on such exchanged Allowed Term Loan Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with OID, its adjusted issue price, by more than a *de minimis* amount (equal to 1/4 of 1 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the remaining number of complete years to maturity).

Any gain recognized by a U.S. Holder on the disposition of an Allowed Term Loan Claim (determined as described above) which was acquired with market discount should be treated as ordinary income to the extent of the amount of market discount that accrued thereon while such Allowed Term Loan Claim was treated as held by such U.S. Holder (unless such U.S. Holder elected to include such amount of market discount in income as it accrued).  To the extent that a Term Loan Claim that was acquired with market discount is exchanged in a tax-free transaction for other property, any market discount that accrued on the Term Loan Claim (i.e., up to the time of the exchange) but was not recognized by the U.S. Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of the property is treated as ordinary income to the extent of the accrued, but not recognized, market discount. U.S. Holders should consult their own tax advisors concerning the application of the market discount rules to their Term Loan Claim.

*U.S. Holders of Allowed Term Loan Claims are urged to consult their own tax advisors concerning the application of the market discount rules to their Allowed Term Loan Claim.*

4.      **Consequences to U.S. Holders of the Ownership and Disposition of New Common Stock**

    a.      **Dividends on New Common Stock**

Any distributions made on account of the New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Topco as determined under U.S. federal income tax principles. "Qualified dividend income" received by a non-corporate U.S. Holder is subject to preferential tax rates. To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares of the New Common Stock. Any such distributions in excess of the U.S. Holder's basis in its shares of the New Common Stock (determined on a share-by-share basis) generally will be treated as capital gain.

Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as certain holding period requirements are satisfied. The length of time that a U.S. Holder has held its stock is reduced for any period during which such U.S. Holder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends-received deduction may be disallowed.

    b.      **Sale, Redemption, or Repurchase of New Common Stock**

Unless a non-recognition provision applies, and subject to the market discount rules discussed above, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the New Common Stock. Such capital gain generally will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder has held the New Common Stock for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described below. Under the recapture rules of section $108(e)(7)$ of the Tax Code, a U.S. Holder may be required to treat gain recognized on the taxable disposition of the New Common Stock, as applicable as ordinary income if such U.S. Holder took a bad debt deduction with respect to its Allowed Term Loan Claims or recognized an ordinary loss on the exchange of its Allowed Term Loan Claims for New Common Stock.

5.      **U.S. Federal Income Tax Consequences to U.S. Holders of Ownership and Disposition of the Rights Offering Term Loans.**

    a.      **Payments of Qualified Stated Interest**

Payments or accruals of "qualified stated interest" (as defined below) on the Rights Offering Term Loans will be includible in the U.S. Holder's gross income as ordinary interest income and taxable at the time that such payments are accrued or are received in accordance with such U.S. Holder's regular method of accounting for U.S. federal income tax purposes. The term "qualified stated interest" generally means stated interest that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually during the entire term of the Rights Offering Term Loans, at a single fixed rate of interest, or, subject to certain conditions, based on one or more interest indices.

    b.      **Original Issue Discount**

Where, as here, U.S. Holders of Allowed Term Loan Claims receiving debt instruments are also receiving other property in exchange for their Allowed Term Loan Claims (i.e., New Common Stock and,

if applicable, Liquidating Trust Assets), the "investment unit" rules may apply to the determination of the "issue price" for any debt instrument received in exchange for their Allowed Term Loan Claims. In such case, the issue price of the Rights Offering Term Loan will depend, in part, on the issue price of the "investment unit" (i.e., the Rights Offering Term Loan, New Common Stock, and, if applicable, Liquidating Trust Assets), and the respective fair market values of the elements of consideration that compose the investment unit. The issue price of an investment unit is generally determined in the same manner as the issue price of a debt instrument. As a result, the issue price of the investment unit will depend on whether the investment unit is considered, for U.S. federal income tax purposes and applying rules similar to those applied to debt instruments, to be traded on an established market. In general, consideration can be treated as being traded on an established market for these purposes even if no trades actually occur and there are merely firm or indicative quotes available with respect to the items discussed below. Additionally, when determining fair market value under these rules, actual trades and firm quotes will generally be dispositive, while it may be possible to refute the application of mere "indicative" quotes if such indicative quotes "materially misrepresent[] the fair market value of the property" being valued.

If none of the components of the investment unit nor the surrendered Term Loan Claims are publicly traded on an established market, then the issue price of the Rights Offering Term Loan would generally be determined under section 1273(b)(4) or 1274 of the IRC, as applicable. If none of the components of the investment unit are publicly traded on an established market, but the Term Loan Claims are so traded, then the issue price of the investment unit will be determined by the fair market value of the Term Loan Claims.

If the investment unit received in exchange for Term Loan Claims was considered to be traded on an established market, the issue price of the investment unit would be the fair market value of the investment unit. However, under applicable Treasury Regulations, a debt instrument, including the Rights Offering Term Loans, will not be treated as publicly traded if the outstanding stated principal amount of the issue that includes the debt instrument is $100 million or less on the relevant determination date. The law is somewhat unclear on whether an investment unit is treated as publicly traded if some, but not all, elements of such investment unit are publicly traded. If the Rights Offering Term Loans are not publicly traded on an established market, the New Common Stock is traded on an established market, and the surrendered Term Loan Claims are publicly traded on an established market, the issue price of the investment unit may either be determined by reference to (a) the fair market value of the investment unit or (b) by reference to the fair market value of the surrendered Term Loan Claims.

If an issue price is determined for the investment unit received in exchange for surrendered Term Loan Claims under the above rules, then the issue price of an investment unit is allocated among the elements of consideration making up the investment unit based on their relative fair market values, with such allocation determining the issue price of the Rights Offering Term Loans.

An issuer's allocation of the issue price of an investment unit is binding on all U.S. Holders of the investment unit unless a U.S. Holder explicitly discloses a different allocation on a timely filed income tax return for the taxable year that includes the acquisition date of the investment unit.

A debt instrument, such as the Rights Offering Term Loans, is treated as issued with OID for U.S. federal income tax purposes if its issue price is less than its stated redemption price at maturity by more than a de minimis amount. A debt instrument's stated redemption price at maturity includes all principal and interest payable over the term of the debt instrument, other than "qualified stated interest." Stated interest payable at a fixed rate is "qualified stated interest" if it is unconditionally payable in cash at least annually. The terms of any Rights Offering Term Loans have not yet been determined; to the extent not all the interest on the Rights Offering Term Loans is unconditionally payable in cash at least annually, the Rights Offering Term Loans may be considered to be issued with OID. Moreover, the Rights Offering Term Loans could be treated as issued with OID to the extent the allocation rules described above result in

the Rights Offering Term Loans having an issue price that is less than their stated redemption price at maturity.

For purposes of determining whether there is OID, the de minimis amount is generally equal to ¼ of 1 percent of the principal amount of the Rights Offering Term Loans multiplied by the number of complete years to maturity from their original issue date, or if the Rights Offering Term Loans provide for payments other than payments of qualified stated interest before maturity, multiplied by the weighted average maturity (as determined under applicable Treasury Regulations).  If the Rights Offering Term Loans are issued with OID, a U.S. Holder generally (i) will be required to include the OID in gross income as ordinary interest income as it accrues on a constant yield to maturity basis over the term of the Rights Offering Term Loans, in advance of the receipt of the cash attributable to such OID and regardless of the holder's method of accounting for U.S. federal income tax purposes, but (ii) will not be required to recognize additional income upon the receipt of any Cash payment on the Rights Offering Term Loans that is attributable to previously accrued OID that has been included in its income.  If the amount of OID on the Rights Offering Term Loans is de minimis, rather than being characterized as interest, any payment attributable to the de minimis OID will be treated as gain from the sale of the Rights Offering Term Loans, and a Pro Rata amount of such de minimis OID must be included in income as principal payments are received on the Rights Offering Term Loans.

### c.    Acceleration of Income Recognition for Certain U.S. Holders.

Accrual method U.S. Holders that prepare an "applicable financial statement" (as defined in section 451 of the IRC) generally will be required to include certain items of income such as OID no later than the time such amounts are reflected on such a financial statement. This could result in an acceleration of income recognition for income items differing from the above description, although recently proposed regulations provide that OID and market discount on the Rights Offering Term Loans would not be subject to acceleration under these rules.

### d.    Sale, Taxable Exchange, or other Taxable Disposition.

Upon the disposition of the Rights Offering Term Loans by sale, exchange, retirement, redemption or other taxable disposition, a U.S. Holder will generally recognize gain or loss equal to the difference, if any, between (i) the amount realized on the disposition (other than amounts attributable to accrued but unpaid interest, which will be taxed as ordinary interest income to the extent not previously so taxed) and (ii) the U.S. Holder's adjusted tax basis in the Rights Offering Term Loans, as applicable. A U.S. Holder's adjusted tax basis in their interest in the Rights Offering Term Loans will depend on whether, as described above, the Rights Offering Term Loans are considered a "security" for tax purposes and whether the U.S. Holder receives the Rights Offering Term Loans as part of a transaction that is treated as a recapitalization for U.S. federal income tax purposes. A U.S. Holder's adjusted tax basis will generally be increased by any accrued OID previously included in such U.S. Holder's gross income. A U.S. Holder's gain or loss will generally constitute capital gain or loss and will be long-term capital gain or loss if the U.S. Holder has held such Rights Offering Term Loans for longer than one year. Non-corporate taxpayers are generally subject to a reduced federal income tax rate on net long-term capital gains. The deductibility of capital losses is subject to certain limitations.

### 6.    [Consequences to U.S. Holders of the Ownership of Liquidating Trust Interests][21]

The U.S. federal income tax obligations of U.S. Holders of Allowed Term Loan Claims receiving Liquidating Trust Beneficial Interests are not dependent on the Liquidating Trusts distributing any Cash or other proceeds.  U.S. Holders of such Allowed Term Loan Claims will be required to report on their U.S.

---

[21]    This Article XIII.C.6 is subject to ongoing tax review and material revision.

federal income tax returns their share of each Liquidating Trust's items of income, gain, loss, deduction, and credit in the year recognized by such Liquidating Trust. This requirement may result in such U.S. Holders being subject to tax on their allocable share of such Liquidating Trust's taxable income prior to receiving any cash distributions from such Liquidating Trust. In general, a distribution of Cash by a Liquidating Trust will not be separately taxable to a Liquidating Trust Beneficiary since the Liquidating Trust Beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the Cash was earned or received by the applicable Liquidating Trust).

### 7.  Limitations on Use of Capital Losses.

A U.S. Holder of a Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (1) $3,000 annually ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years. For corporate Holders, capital losses may only be used to offset capital gains. A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

### 8.  Net Investment Income Tax.

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, interest, dividends, and gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of debt of, and equity interests in, the Debtors and Reorganized Debtors.

### 9.  Ownership, Exercise, and Disposition of the Rights.

As noted above, U.S. Holders of Term Loan Claims will receive Rights. The characterization of the Rights and their subsequent exercise for U.S. federal income tax purposes—as simply the receipt of options as partial satisfaction of a Claim and subsequent exercise of that option to acquire the property that is subject to the Rights or, alternatively, as an integrated transaction pursuant to which the applicable option consideration is acquired directly in partial satisfaction of a U.S. Holder's Claim—is uncertain. Although the issue is not free from doubt, this discussion assumes that the exchange of a Claim for the Rights (along with the other consideration under the Plan) is treated as the receipt of Rights Offering Term Loans directly in exchange for a U.S. Holder's Claim.

### D.  Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders of Allowed Term Loan Claims. This discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, and non-U.S. tax consequences of the consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of the New Common Stock.

1.       **Gain Recognition by Non-U.S. Holders of Allowed Term Loan Claims**

Any gain realized by a Non-U.S. Holder of an Allowed Term Loan Claim on the exchange of its Allowed Term Loan Claims (other than any gain attributable to accrued but untaxed interest, which will be taxable in the manner described below in "Accrued but Untaxed Interest") generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an applicable income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder.  In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or suitable substitute or successor form or such other form as the IRS may prescribe).  In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a "branch profits tax" equal to 30 percent (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

2.       **Accrued but Untaxed Interest.**

Payments made to a Non-U.S. Holder pursuant to the Plan that are attributable to accrued but untaxed interest generally will not be subject to U.S. federal income or withholding tax, provided that (among other requirements) (i) such Non-U.S. Holder does not actually or constructively own 10 percent or more of the total combined voting power of all classes of the stock of Accuride, (ii) such Non-U.S. Holder is not a "controlled foreign corporation" that is a "related person" with respect to Accuride (each, within the meaning of the IRC), (iii) such Non-U.S. Holder is not a bank receiving interest described in Section 881(c)(3)(A) of the IRA, and (iv) the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a "United States person" (within the meaning of section 7701(a)(30) of the IRC) (the "Portfolio Interest Exception"), unless such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a "branch profits tax" with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).  A Non-U.S. Holder that does not qualify for the Portfolio Interest Exception to withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to accrued but untaxed interest.  For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

3.    **Consequences to Non-U.S. Holders of the Ownership and Disposition of New Common Stock**

a.    **Distributions**

Any distributions made (or deemed made) with respect to New Common Stock will generally constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Topco, as determined under U.S. federal income tax principles (and thereafter first as a return of capital which reduces basis and then, generally, capital gain subject to the rules discussed under "Gain on Disposition of New Common Stock").

Dividends paid to a Non-U.S. Holder of New Common Stock will generally be subject to withholding of U.S. federal income tax at a 30 percent rate or such lower rate as may be specified by an applicable income tax treaty.  However, dividends that are effectively connected with the conduct of a trade or business by the Non-U.S. Holder within the United States (and, if required by an applicable income tax treaty, are attributable to a U.S. permanent establishment of the non-U.S. Holder) are not subject to withholding, provided certain certification and disclosure requirements are satisfied.  Instead, such dividends are generally subject to U.S. federal income tax on a net income basis in the same manner as if the Non-U.S. Holder were a U.S. Holder.  Any such effectively connected dividends received by a foreign corporation may be subject to an additional "branch profits tax" at a 30 percent rate or such lower rate as may be specified by an applicable income tax treaty.

A Non-U.S. Holder of New Common Stock who wishes to claim the benefit of an applicable income tax treaty and avoid backup withholding, as discussed below, for dividends, will be required (a) to complete the applicable IRS Form W-8BEN or Form W-8BEN-E and certify under penalty of perjury that such Holder is not a "United States person" (within the meaning of section 7701(a)(30) of the IRC) and is eligible for treaty benefits or (b) if the New Common Stock are held through certain foreign intermediaries, to satisfy the relevant certification requirements of applicable U.S. Treasury Regulations.  Special certification and other requirements apply to certain Non-U.S. Holders that are pass-through entities rather than corporations or individuals.  A Non-U.S. Holder of New Common Stock eligible for a reduced rate of U.S. withholding tax pursuant to an income tax treaty may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.

b.    **Gain on Disposition of New Common Stock**

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of New Common Stock of Reorganized Topco unless:

(i)    such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition, and certain other conditions are met;

(ii)    such gain is effectively connected with the conduct of a U.S. trade or business (and, if an applicable income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

(iii)    the issuer of such New Common Stock is or has been during a specified testing period a "United States real property holding corporation" (or "USRPHC") within the meaning of section 897(c)(2) of the IRC.

If the first exception applies, the Non-U.S. Holder generally will be subject to a flat 30 percent (or a reduced rate or exemption from tax under an applicable income tax treaty) tax on the gain derived from the sale or other disposition, which may be offset by its U.S.-source capital losses, even though the

individual is not considered a resident of the United States, provided such non-U.S. Holder has timely filed U.S. federal income tax returns with respect to such losses.

If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a "branch profits tax" with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

If the third exception applies, a Non-U.S. Holder of New Common Stock generally will be subject to U.S. federal income tax on any gain recognized on the disposition of all or a portion of its New Common Stock under the Foreign Investment in Real Property Tax Act and the Treasury Regulations thereunder ("FIRPTA").  Taxable gain from a Non-U.S. Holder's disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and the Non-U.S. Holder's adjusted tax basis in such interest) would constitute effectively connected income.  A Non-U.S. Holder would also be subject to withholding tax equal to 15% of the amount realized on the disposition and generally required to file a U.S. federal income tax return.  The amount of any such withholding may be allowed as a credit against the Non-U.S. Holder's U.S. federal income tax liability and may entitle the Non-U.S. Holder to a refund if the Non-U.S. Holder properly and timely files a tax return with the IRS.

In general, a corporation would be a USRPHC with respect to a Non-U.S. Holder if the fair market value of the corporation's U.S. real property interests (as defined in the IRC and applicable Treasury Regulations) equals or exceeds 50% of the aggregate fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business (applying certain look-through rules to evaluate the assets of subsidiaries) at any time within the shorter of (a) the five-year period ending on the effective time of the applicable disposition or (b) the Non-U.S. Holder's holding period for its interests in the corporation.

In general, FIRPTA will not apply upon a Non-U.S. Holder's disposition of its New Common Stock if (x) the New Common Stock is treated as "regularly traded" on an established market and continue to be regularly traded on an established market and (y) the Non-U.S. Holder did not directly or indirectly own more than 5% of the value of the New Common Stock during a specified testing period. The Debtors do not anticipate that Accuride or Topco have been or are, or that Reorganized Topco will be, a USRPHC, although no guarantees can be made in that regard.

4.    **Consequences to Non-U.S Holders of Payments of Interest and the ownership and Disposition of Rights Offering Term Loans.**

a.    **Payments of Interest (Including Interest Attributable to Accrued but Untaxed Interest)**

Subject to the discussion of backup withholding and FATCA below, interest income (which, for purposes of this discussion of Non-U.S. Holders, includes OID and accrued but untaxed interest) of a Non-U.S. Holder that is not effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder may qualify for the so-called "portfolio interest exemption" and, therefore, will not be subject to U.S. federal income tax or withholding, provided that:

- the Non-U.S. Holder does not own, actually or constructively, a 10 percent or greater interest in the borrower, within the meaning of Section 871(h)(3) of the IRC and Treasury Regulations thereunder;

- the Non-U.S. Holder is not a controlled foreign corporation related to the borrower, actually or constructively through the ownership rules under Section 864(d)(4) of the IRC;

- the Non-U.S. Holder is not a bank that is receiving the interest on an extension of credit made pursuant to a loan agreement entered into in the ordinary course of its trade or business; and

- the beneficial owner gives the borrower or the borrower's paying agent an appropriate IRS Form W-8 (or suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed establishing its status as a Non-U.S. Holder.

If not all of these conditions are met, interest on the Rights Offering Term Loans paid to a Non-U.S. Holder or interest paid to a Non-U.S. Holder pursuant to the Plan that is not effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder will generally be subject to U.S. federal income tax and withholding at a 30 percent rate, unless an applicable income tax treaty reduces or eliminates such withholding and the Non-U.S. Holder claims the benefit of that applicable income tax treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed.

If interest on the Rights Offering Term Loans or interest paid to a Non-U.S. Holder pursuant to the Plan is effectively connected with a trade or business in the United States ("ECI") carried on by the Non-U.S. Holder, the Non-U.S. Holder will be required to pay U.S. federal income tax on that interest on a net income basis generally in the same manner as a U.S. Holder (and the 30 percent withholding tax described above will not apply, provided the appropriate statement is provided to the borrower or borrower's paying agent unless an applicable income tax treaty provides otherwise. To claim an exemption from withholding, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or suitable substitute or successor form or such other form as the IRS may prescribe). If a Non-U.S. Holder is eligible for the benefits of any applicable income tax treaty between the United States and its country of residence, any interest income that is ECI will be subject to U.S. federal income tax in the manner specified by the applicable income tax treaty if the Non-U.S. Holder claims the benefit of the applicable income tax treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed. In addition, a corporate Non-U.S. Holder may, under certain circumstances, be subject to an additional "branch profits tax" at a 30-percent rate, or, if applicable, a lower treaty rate, on its effectively connected earnings and profits attributable to such interest (subject to adjustments).

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest and, as applicable, must be updated periodically. Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS. Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

**b.**   **Sale, Taxable Exchange, or Other Disposition of the Rights Offering Term Loans.**

A Non-U.S. Holder will generally not be subject to U.S. federal income tax on any gain realized on a sale, exchange, retirement, redemption or other taxable disposition of the Rights Offering Term Loan (other than any amount representing accrued but unpaid interest on the loan) unless:

- the gain is ECI (and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment that such Non-U.S. Holder maintains in the United States); or

- in the case of a Non-U.S. Holder who is a nonresident alien individual, such Non-U.S. Holder is present in the United States for 183 or more days in the taxable year of disposition and certain other requirements are met.

If a Non-U.S. Holder falls under the first of these exceptions, unless an applicable income tax treaty provides otherwise, the Non-U.S. Holder will generally be taxed on the net gain derived from the disposition of the Rights Offering Term Loans under the graduated U.S. federal income tax rates that are applicable to U.S. Holders and, if the Non-U.S. Holder is a foreign corporation, it may also be subject to the branch profits tax described above in "Payments of Interest (Including Interest Attributable to Accrued, Untaxed Interest)." To claim an exemption from withholding, such non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or suitable substitute or successor form or such other form as the IRS may prescribe). If an individual Non-U.S. Holder falls under the second of these exceptions, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (unless a lower applicable treaty rate applies) on the amount by which the gain derived from the disposition exceeds such Non-U.S. Holder's capital losses allocable to sources within the United States for the taxable year of the disposition.

5.    **FATCA**

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S.-source payments of fixed or determinable, annual or periodical income (including dividends, if any, on New Common Stock), and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S.-source interest or dividends (which would include New Common Stock). FATCA withholding could apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules that were previously scheduled to take effect on January 1, 2019, would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future. Each Holder should consider the impact of FATCA withholding rules on such Holder.

E.    **[Tax Treatment of Liquidating Trust]**[22]

In the event the Debtors make the Transfer Election, the Plan provides that, among other things, under certain circumstances, assets may be transferred to Liquidating Trusts. Such assets may either be subject to:

1.    **Liquidating Trust Treatment**

Subject to any applicable law or definitive guidance from the IRS or a court of competent jurisdiction to the contrary, and other than with respect to any potential disputed claims of ownership or

---

[22]    Article IV.D.6 of the Plan is subject, in its entirety, to ongoing tax review and material revision.

uncertain distributions, the Debtors intend to treat the Liquidating Trusts as "liquidating trusts" under section 301.7701-4(d) of the Treasury Regulations and grantor trusts under section 671 of the Tax Code with the Liquidating Trust Beneficiaries treated as grantors and owners of each Liquidating Trust, and the trustee of each Liquidating Trust will take a position on such Liquidating Trust's tax return accordingly. For U.S. federal income tax purposes, all parties shall treat the transfer of the applicable Liquidating Trust Assets by the Debtors (or Reorganized Debtors, as applicable) to each Liquidating Trust, as set forth in the Liquidating Trust Agreements, as follows: (a) a first-step transfer of such Liquidating Trust Assets to the Holders of the Allowed Term Loan Claims, followed by (b) a second-step transfer by such Holders to such Liquidating Trust in exchange for Liquidating Trust A Beneficial Interests or Liquidating Trust B Beneficial Interests, as applicable. Accordingly, the Liquidating Trust Beneficiaries shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the applicable Liquidating Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

No request for a ruling from the IRS will be sought on the classification of the Liquidating Trusts. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trusts. If the IRS were to successfully challenge the classification of a Liquidating Trust as a grantor trust, the federal income tax consequences to such Liquidating Trust and the Liquidating Trust Beneficiaries could vary from those discussed in the Plan (including the potential for an entity-level tax). For example, the IRS could characterize such Liquidating Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

As soon as possible after the transfer of the Liquidating Trust Assets to the Liquidating Trusts, the trustee(s) of the Liquidating Trusts shall make a good faith valuation of the Liquidating Trust Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors, the trustee(s) of the Liquidating Trusts, and the Holders of Allowed Term Loan Claims receiving interests in the Liquidating Trusts shall take consistent positions with respect to the valuation of the Liquidating Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

Allocations of taxable income and loss of each Liquidating Trust among the Liquidating Trust Beneficiaries shall be determined, as closely as possible, by reference to the amount of distributions that would be received by each such Liquidating Trust Beneficiary if such Liquidating Trust had sold all of its assets at their tax book value and distributed the proceeds to Liquidating Trust Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from such Liquidating Trust. The tax book value of the Liquidating Trust Assets shall equal their fair market value on the date of the transfer of the Liquidating Trust Assets to the Liquidating Trusts, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

Each Liquidating Trust shall in no event be dissolved later than 5 years from the creation of such Liquidating Trust unless the Bankruptcy Court, upon motion within the 6-month period prior to the fifth anniversary (or within the 6-month period prior to the end of an extension period), determines that a fixed period extension (not to exceed 5 years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the trustee of such Liquidating Trust that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the applicable Liquidating Trust Assets.

Each Liquidating Trust will file annual information tax returns with the IRS as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations that will include information concerning certain

items relating to the holding or disposition (or deemed disposition) of the applicable Liquidating Trust Assets (e.g., income, gain, loss, deduction and credit).  Each Liquidating Trust Beneficiary holding a Liquidating Trust Beneficial Interest will receive a copy of the information returns and must report on its federal income tax return its share of all such items.  The information provided by each Liquidating Trust will pertain to Liquidating Trust Beneficiaries who receive their Liquidating Trust Beneficial Interests in such Liquidating Trust in connection with the Plan.

### 2.    Disputed Ownership Fund Treatment

With respect to any of the Liquidating Trust Assets that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "liquidating trust" treatment is otherwise unavailable or not elected to be applied with respect to a Liquidating Trust, such Liquidating Trust Assets may be subject to disputed ownership fund treatment under section 1.468B-9 of the Treasury Regulations, and if this is the case, the Debtors intend that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes.  Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account.  Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

## F.    Information Reporting and Back-Up Withholding

The Debtors, Reorganized Debtors, and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends (or other payments), whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan, and will comply with all applicable information reporting requirements.  The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident.  In general, information reporting requirements may apply to distributions or payments made to a Holder of an Allowed Term Loan Claim under the Plan.  Additionally, under the backup withholding rules, a Holder may be subject to backup withholding (currently at a rate of 24 percent) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)).  Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; *provided* that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.   Holders subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

## XIV.    [CERTAIN CANADIAN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN] [23]

### A.    Introduction

The following is a summary of the principal Canadian federal income tax consequences of the Plan to a Holder of General Unsecured Claims who, at all relevant times for purposes of the Income Tax Act (Canada) (the "Canadian Tax Act"), deals at arm's length with and is not affiliated with the Debtors or any other entity related to the Debtors, and holds its General Unsecured Claims as capital property. The General Unsecured Claims will generally be considered to be capital property to a Holder thereof unless either the Holder of General Unsecured Claims holds (or will hold) such securities in the course of carrying on a business, or the Holder of General Unsecured Claims has acquired (or will acquire) such securities in a transaction or transactions considered to be an adventure in the nature of trade.

This summary does not apply to (a) a Holder of General Unsecured Claim an interest in which is a "tax shelter investment" as defined in the Canadian Tax Act, (b) a Holder of General Unsecured Claim that is a "financial institution" for purposes of the "mark-to-market" rules as defined in the Canadian Tax Act, (c) a Holder of General Unsecured Claim that is a "specified financial institution" as defined in the Canadian Tax Act, (d) a Holder of General Unsecured Claims that has made the "functional currency" reporting election, or (e) a Canadian Holder (as defined below) in relation to which the Debtors are "foreign affiliates" as defined in the Canadian Tax Act. Such Holders of General Unsecured Claims should consult with their own tax advisors.

This summary is based on the current provisions of the Canadian Tax Act, the regulations thereunder (the "Canadian Regulations") and the understanding of the current published administrative policies and assessing practices of the Canada Revenue Agency (the "CRA") publicly available prior to the date of the filing of this Disclosure Statement. The summary also takes into account all specific proposals to amend the Canadian Tax Act and Canadian Regulations publicly announced by or on behalf of the Minister of Finance (Canada) prior to the date of the filing of this Disclosure Statement (the "Canadian Tax Proposals") and assumes that all such Canadian Tax Proposals will be enacted in the form proposed. No assurance can be given that the Canadian Tax Proposals will be enacted in the form proposed or at all. This summary does not take into account or anticipate any changes in law or administrative policies or assess practices of the CRA, whether by way of judicial, governmental or legislative action or decisions, nor does it address any provincial, territorial or foreign tax legislation or considerations.

This summary is of a general nature only, is not exhaustive of all Canadian federal income tax consequences, and is not intended to be, nor should it be construed as, legal or tax advice to any particular Holder of General Unsecured Claims. Holders of General Unsecured Claims are urged to consult their own tax advisors as to the tax consequences to them of the Plan in their particular circumstances.

For purpose of the Canadian Tax Act, all amounts, including cost, proceeds of disposition, interest or dividends received and accrued must be determined in Canadian currency at applicable exchange rates as determined in accordance with the Canadian Tax Act. The amount of interest and any capital gain or capital loss of a Holder of General Unsecured Claims may be affected by fluctuations in Canadian dollar exchange rates.

### B.    Residents of Canada

This portion of the summary applies to a Holder of General Unsecured Claim who, for the purposes of the Canadian Tax Act and any applicable income tax treaty or convention, and at all relevant times, is or

---

[23]    This section is subject to ongoing tax review and material revision.

is deemed to be resident of Canada (a "Canadian Holder").  Certain Canadian Holders whose General Unsecured Claims issued by Canadian Debtors that might not otherwise qualify as capital property may, in certain circumstances, treat the General Unsecured Claims issued by Canadian Debtors as capital property by making an irrevocable election pursuant to subsection 39(4) of the Canadian Tax Act, to the extent such General Unsecured Claims are "Canadian securities" as defined in the Canadian Tax Act.  Therefore, this election will not apply to the General Unsecured Claims that are not Canadian securities.  Canadian Holders are advised to consult their own tax advisors regarding such an election.

### 1.       Exchange of the General Unsecured Claim

A Canadian Holder will be considered to have disposed of its General Unsecured Claims upon the exchange of such General Unsecured Claims for cash.  Under the Plan, any cash received will be allocated first to the principal amount of the General Unsecured Claims, and the balance, if any, to the accrued interest with respect to the General Unsecured Claims.

A Canadian Holder that is a corporation, partnership, unit trust, or any trust of which a corporation or partnership is a beneficiary will generally be required to include in income the amount of interest accrued or deemed to accrue on the General Unsecured Claims up to the Effective Date or that became receivable or was received on or before the Effective Date, to the extent that such amounts have not otherwise been included in the Canadian Holder's income for the taxation year or a preceding taxation year.  Any other Canadian Holder, including an individual, will be required to include in income for a taxation year any interest on the General Unsecured Claims received or receivable by such Canadian Holder in the taxation year (depending upon the method regularly followed by the Canadian Holder in computing income) except to the extent that such amount was otherwise included in its income for the taxation year or a preceding taxation year.  In addition, if such Canadian Holder has not otherwise included interest in the General Unsecured Claims in computing the Canadian Holder's income at periodic intervals of not more than one year, such Canadian Holder will be required to include in computing income for a taxation year any interest that accrues to the Canadian Holder on the General Unsecured Claims up to the end of any "anniversary day" (as defined in the Canadian Tax Act) in that taxation year to the extent such interest was not otherwise included in computing the Canadian Holder's income for that taxation year or a preceding taxation year.  Generally, a Canadian Holder should be entitled to deduct in computing income for the year of disposition, amounts that were included in computing the Canadian Holder's income for the year of disposition or a preceding taxation year as interest in respect of the General Unsecured Claims, to the extent that such amounts were not received or receivable by the Canadian Holder and were not deducted by the Canadian Holder in computing income for the year of disposition or a preceding taxation year.

In general, a Canadian Holder will realize a capital gain (or capital loss) on the exchange of the General Unsecured Claims equal to the amount by which any cash received, net of any amount included in the Canadian Holder's income as interest, exceeds (or is exceeded by) the adjusted cost base to the Canadian Holder of such General Unsecured Claims, plus any reasonable costs of disposition.  The tax treatment of any capital gain (or capital loss) realized is described below under the heading "Taxation of Capital Gains and Capital Losses."

### 2.       Taxation of Capital Gains and Capital Losses

Generally, one-half of any capital gain (a "Taxable Capital Gain") realized by a Canadian Holder for a taxation year must be included in the Canadian Holder's income in the year.  A Canadian Holder is required to deduct one-half of any capital loss (an "allowable capital loss") realized in the taxation year from Taxable Capital Gains realized in that year, and allowable capital losses in excess of Taxable Capital Gains may be carried back and deducted in any of the three preceding taxation years or carried forward and deducted in any subsequent year, from net Taxable Capital Gains realized in such years to the extent and under the circumstances described in the Canadian Tax Act.

94

3.        **Additional Refundable Tax**

A Canadian Holder that is throughout the year a "Canadian-controlled private corporation" (as defined in the Canadian Tax Act) may be liable to pay an additional refundable tax of 6 and 2/3 percent on certain investment income, including amounts in respect of interest, certain dividends and Taxable Capital Gains.

**C.        Non-Residents of Canada**

This portion of the summary applies to a Holder of General Unsecured Claims that, for the purposes of the Canadian Tax Act and any applicable income tax treaty or convention and at all relevant times, is not and will not be deemed to be resident of Canada and does not use or hold the General Unsecured Claims in carrying on a business in Canada (a "Non-Canadian Holder").  In addition, this summary does not apply to an insurer who carries on an insurance business in Canada and elsewhere or an authorized foreign bank that carries on a Canadian banking business.

1.        **Exchange of the General Unsecured Claims**

Upon the exchange by a Non-Canadian Holder of the General Unsecured Claims for cash, no taxes will be payable under the Canadian Tax Act by such a Non-Canadian Holder.

**D.        Consequences to the Canadian Debtors**

The exchange of General Unsecured Claims will result in the settlement or extinguishment of the General Unsecured Claims.  The "forgiven amount", as defined in the Canadian Tax Act, arising from the settlement or extinguishment will reduce, in prescribed order, certain tax attributes of the relevant Canadian Debtors, including non-capital losses, net capital losses, cumulative eligible capital, undepreciated capital cost of depreciable property and the adjusted cost base of certain capital property (the "Canadian Tax Shield").  Generally, one half of the amount by which the forgiven amount exceeds the Canadian Tax Shield (such amount, the "Excess") will be required to be included in the relevant Canadian Debtor's income for the taxation year in which the Effective Date takes place, unless the Excess was otherwise assigned by such relevant Canadian Debtor to other Canadian Debtors that are "eligible transferees" as defined in the Canadian Tax Act for reduction of such other Canadian Debtors' Canadian Tax Shield.

**XV.      RECOMMENDATION OF THE DEBTORS**

In the opinion of the Debtors, the AHG, the Holders of ABL Claims, and the Sponsor, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.  Accordingly, the Debtors, the AHG, the Holders of ABL Claims, and the Sponsor recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  November 18, 2024

Accuride Corporation
on behalf of itself and all other Debtors

By:  _/s/ Charles Moore_

Charles Moore
Chief Restructuring Officer

**Exhibit A**

**Plan of Reorganization**

[*Filed Separately.*]

<u>**Exhibit B**</u>

**Organizational Structure Chart**





**Exhibit C**

**Liquidation Analysis**

## LIQUIDATION ANALYSIS

### Introduction

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires, as a condition to confirmation of a plan, that with respect to each impaired class of claims or interests each holder of a claim or interest of such class (i) has accepted the plan; or (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date. The Debtors, with the assistance of their advisors, have prepared the following hypothetical analysis (the "**Liquidation Analysis**") in connection with the Plan and Disclosure Statement.[1] In this Liquidation Analysis, the Debtors present: (a) an estimate of the cash proceeds (the "**Net Estimated Liquidation Proceeds**") that a chapter 7 trustee would generate if the Debtors' chapter 11 cases were converted to chapter 7 cases on the Effective Date and the assets of the Debtors' estates were liquidated; (b) an estimate of the distribution (the "**Estimated Liquidation Recovery**") that each non-accepting Holder of a Claim or Interest would receive from the Net Estimated Liquidation Proceeds under the priority scheme dictated in chapter 7; and (c) a comparison of each such Holder's Estimated Liquidation Recovery to the distribution that such holder would receive under the Plan (the "**Plan Recovery**") if the Plan were confirmed and consummated.

Based on the Liquidation Analysis, the Debtors believe the Plan satisfies the best interests test and that each Holder of an Impaired Claim or Interest will receive value under the Plan on the Effective Date that is not less than the value such Holder would receive if the Debtors liquidated their Estates in proceedings under chapter 7 of the Bankruptcy Code. The Debtors believe that the Liquidation Analysis and conclusions set forth herein are fair and represent the Debtors' best judgment regarding the results of a liquidation of the Debtors estates in proceedings under chapter 7 of the Bankruptcy Code. The Liquidation Analysis was prepared for the sole purpose of assisting the Bankruptcy Court and Holders of Impaired Claims or Interests in making this determination and should not be used for any other purpose. Accordingly, asset values and Claim amounts included herein may be different than amounts referred to in the Plan. The Liquidation Analysis is based upon certain assumptions discussed herein.

NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS. NOTHING IN THIS LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM BY THE DEBTORS. THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS IN THE DEBTORS' CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THIS LIQUIDATION ANALYSIS. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN RESULTS COULD VARY MATERIALLY. NOTHING CONTAINED IN THIS LIQUIDATION.

---

[1] Capitalized terms used but not otherwise defined herein have the meanings set forth in the *Disclosure Statement Relating to the Joint Plan of Reorganization of Accuride Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, modified, or supplemented from time to time and including all exhibits thereto, the "**Disclosure Statement**"), to which these Financial Projections are attached as Exhibit C, or in the *Joint Plan of Reorganization of Accuride Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "**Plan**").

> **CONCLUSION:** THE DEBTORS HAVE DETERMINED THAT CONFIRMATION OF THE PLAN WILL PROVIDE ALL HOLDERS OF IMPAIRED CLAIMS AND INTERESTS WITH A RECOVERY (IF ANY) THAT IS NOT LESS THAN WHAT THEY WOULD OTHERWISE RECEIVE PURSUANT TO A LIQUIDATION OF THE DEBTORS UNDER CHAPTER 7 OF THE BANKRUPTCY CODE. ACCORDINGLY, EACH DEBTOR SATISFIES THE BEST INTEREST TEST ON AN INDIVIDUAL BASIS, AND ALL THE DEBTORS, COLLECTIVELY, SATISFY THE BEST INTEREST TEST.

### Significant Assumptions

The Liquidation Analysis assumes that the Debtors' hypothetical chapter 7 liquidation would commence on or about December 31, 2024 (the "**Conversion Date**"), under the direction of a chapter 7 trustee and would continue for a period of approximately six (6) months, during which time all of the assets of the Debtors' estates would be sold or otherwise liquidated, and the Net Estimated Liquidation Proceeds (net of liquidation-related costs), together with cash on hand, would then be distributed to Holders of Claims and Interests in accordance with the priority scheme established under the Bankruptcy Code. The Debtors would expect the chapter 7 trustee to retain professionals to assist in the liquidation of their estates. All operations except for those required to execute the liquidation are assumed to cease to minimize costs associated with the chapter 7 wind down and liquidation. For the purposes of the Liquidation Analysis, the Debtors and their advisors have attempted to ascribe value to each of the assets as they would be liquidated by a chapter 7 trustee.

**<u>Summary Notes to the Liquidation Analysis</u>**

1. *Dependence on assumptions.*  The Liquidation Analysis is based on several estimates and assumptions that, although developed and considered reasonable by the Debtors and their advisors, are inherently subject to significant economic, business, regulatory, and competitive uncertainties and contingencies beyond the control of the Debtors.  Accordingly, there can be no assurance that the values reflected in this Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation and actual results could vary materially and adversely from those contained herein.

2. *Dependence on an unaudited balance sheet.*  The Liquidation Analysis is dependent on the Debtors' preliminary unaudited consolidated balance sheet as of September 30, 2024 (the "**<u>September 30 Balance Sheet</u>**"), adjusted to account for the forecasted changes in certain asset and liability classes as of the Conversion Date.

3. *Claims estimates*.  Claims are estimated as of the Conversion Date based on the September 30 Balance Sheet and remain subject to change pending completion of a Claims reconciliation process.

4. *Guaranty Claims.*  The ABL Claims and Term Loan Claims include Claims arising from guarantees from certain of the Debtors' affiliates for the benefit of Debtor Accuride Corporation ("**<u>Accuride</u>**") in its capacity as the "U.S. Borrower" under the ABL Credit Agreement and the "Borrower" under the Term Loan Credit Agreement (together with the ABL Credit Agreement, the "**<u>Prepetition Credit Agreements</u>**").  Accuride's obligations under the Prepetition Credit Agreements are guaranteed by all of the Debtors in these Chapter 11 Cases.  Claims with respect to such obligations are asserted first at Accuride and then, to the extent not paid in full, at each Debtor-guarantor.

**Accuride Corporation et. al.**
Liquidation Analysis
*($ in millions)*

| | | Book Value | | | Recovery | | | |
| | | 9/30/24 | Adj. | 12/31/24 | Low | | High | |
| | Note | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Cash and Cash Equivalents | (1) | $ 19.5 | $ (10.8) | $ 8.8 | $ 8.8 | 100.0% | $ 8.8 | 100.0% |
| Trade Accounts Receivable, Net | (2) | 61.5 | (9.4) | 52.0 | 44.2 | 85.0% | 49.4 | 95.0% |
| Other Receivables | (3) | 3.8 | (1.7) | 2.0 | — | | 0.4 | 20.0% |
| Inventories | (4) | 61.1 | 11.8 | 72.9 | 49.9 | 68.4% | 57.0 | 78.1% |
| Prepaid Expenses | (5) | 7.3 | 0.1 | 7.4 | — | — | — | — |
| Intercompany Receivables | (6) | 464.0 | — | 464.0 | — | — | — | — |
| Fixed Assets, Net | (7) | 46.2 | — | 46.2 | 13.2 | 28.6% | 16.2 | 34.9% |
| Deferred Tax Assets | (8) | 2.7 | 9.0 | 11.8 | — | — | — | — |
| Intangibles | (9) | 157.6 | — | 157.6 | — | — | — | — |
| Investment in Affiliates | (10) | 426.9 | — | 426.9 | — | — | — | — |
| Other Assets | (11) | 106.2 | (1.7) | 104.6 | — | — | — | — |
| **Total Asset Proceeds** | | **$ 1,356.8** | **$ (2.7)** | **$ 1,354.1** | **$ 116.1** | **8.6%** | **$ 131.7** | **9.7%** |
| Less: Post-Effective Date Winddown Costs | (12) | | | | (5.8) | n/a | (6.6) | n/a |
| Less: Chapter 7 Trustee Fees | (13) | | | | (3.6) | | (4.1) | n/a |
| **Net Estimated Liquidation Proceeds** | | | | | **$ 106.6** | **7.9%** | **$ 121.0** | **8.9%** |

**Claim Recoveries Waterfall:**

| | | Claim Amount | Low | | High | |
|---|---|---|---|---|---|---|
| Proceeds Available for Distribution | | | $ 106.6 | | $ 121.0 | |
| DIP Claims | (14) | $ 112.0 | 20.2 | 18.0% | 23.3 | 20.8% |
| Other Superpriority Claims | (15) | 25.6 | 24.5 | 95.9% | 25.2 | 98.7% |
| ABL Claims | (16) | 77.2 | 61.9 | 80.2% | 72.5 | 93.9% |
| Term Loan Claims | (17) | 303.6 | 0.0 | 0.0% | (0.0) | (0.0%) |
| Unsecured Claims | (18) | 373.2 | — | | — | |
| Existing Equity Interests | (19) | — | — | | — | |

*See accompanying notes to liquidation analysis.*

## Notes To Liquidation Analysis

### I.    NET ASSET PROCEEDS

1. <u>Cash and Cash Equivalents</u>.  Cash and cash equivalent consist of all the Debtors' cash and liquid investments.  The forecasted balance of cash and cash equivalents as of the Conversion Date is based on the actual book balance as of September 30, 2024, adjusted for changes in cash forecasted between September 30, 2024 and the Conversion Date.  All cash balances are assumed to be one hundred percent (100%) recoverable.

2. <u>Trade Accounts Receivable, Net</u>.  Accounts receivable primarily consist of trade receivables.  It is assumed that, in the event of a chapter 7 liquidation of the Debtors' estates, the trustee would retain certain existing staff from the Debtors to collect the outstanding accounts receivable.  Historically, the Debtor's accounts receivable have been concentrated among large customers and have demonstrated low loss rates.  The Debtors believe that, in the event of liquidation, the Debtors would be able to recover approximately 85–90% of the outstanding receivables.  Recovery percentages have been adjusted to account for potential warranty claims and commercial disputes.  No recovery is anticipated for receivables aged over 90 days.

3. <u>Other Receivables</u>.  Other receivables primarily consist of amounts owed for scrap and accrued and unbilled amounts.  The Debtors estimate that they would be able to recover approximately 0–20% of the outstanding amounts of other receivables.

4. <u>Inventories</u>.  The Debtors classify inventory into three primary categories:  finished goods, work in progress, and raw materials.  Finished goods inventory comprises products that are or were projected to be fully completed as of the Conversion Date and are or are projected to be ready for shipment to customers.  Work in progress inventory comprises products that are or are projected to be at various stages of completion, but not finished goods, as of the Conversion Date.  Raw materials inventory represents the value of input goods or materials the Debtors require for production, such as steel, aluminum, and other components.

   The estimated recovery rate for inventory is based on an independent third-party appraisal dated May 1, 2024.  The "low" recovery estimate assumes a non-conversion scenario where inventory is sold in its current condition, while the "high" estimate assumes a conversion scenario in which production would continue for up to two weeks during the initial stages of liquidation to complete partially finished products. The "high" estimate is net of conversion costs.  The recovery range for the Debtors' inventory is approximately 68–78%.

5. <u>Prepaid Expenses</u>.  Prepaid expenses primarily include rent, utilities, and professional services.  The Liquidation Analysis assumes no recovery for prepaid expenses, as the Debtors expect prepaid expenses to be offset against outstanding accounts payable.

6. <u>Intercompany Receivables</u>.  Prepetition and postpetition intercompany receivables relate to transactions among Debtors and non-Debtor subsidiaries, including those in Europe, Asia, and Mexico, which are expected to undergo formal insolvency proceedings in the event of a conversion of the Debtors' cases to chapter 7 cases (see Note 10). The intercompany balances arise from the allocation of back-office support costs, cash payments and/or cash transfers, all of which were and continue to be incurred in the ordinary course of business and pursuant to existing intercompany arrangements among the various Debtors and their non-Debtor affiliates. The Liquidation Analysis assumes the intercompany receivables are treated as general unsecured claims in the non-Debtor affiliate insolvency proceedings and are assumed to have 0% recoveries.

7. <u>Fixed Assets, Net</u>. Fixed assets primarily consist of, among other things, machinery, equipment, and real property. Recovery for machinery and equipment assets with net book values above $250,000 as of the Conversion Date were calculated on an item-by-item basis and range from 10–75%. Recovery for construction in process assets were estimated at 25% as recovery value is expected to be limited until construction is completed. The remaining pool of machinery and equipment primarily consists of older assets or assets whose applications are specific to the Debtors. Recovery on assets with net book values below $250,000 as of the Conversation Date was estimated based on the type and age of the equipment, and is estimated at 24–44%. Estimated recovery on all fixed assets ranges from 29–35%. The recovery on fixed assets is net of costs to effectuate the sale of such fixed assets and are estimated at approximately 5% of gross liquidation proceeds.

8. <u>Deferred Tax Assets</u>. For the purposes of the Liquidation Analysis, any deferred tax assets are illustratively assumed to either offset any potential income tax obligations of the Debtors or to be reduced by any cancellation of debt income that is excluded from taxable income such that the remaining balance of deferred tax assets is likely immaterial. In addition, it is assumed that any remaining deferred tax assets have limited transferability among the Debtors or to any third party. Accordingly, the Liquidation Analysis ascribes no incremental recoverable value to deferred tax assets.

9. <u>Intangible Assets</u>. Intangible assets primarily consist of intellectual property including trademarks and trade names, customer relationships, and technology. The Liquidation Analysis assumes no recovery on avoidance actions under the Bankruptcy Code or on certain other contingent intangible assets. Although recovery may be possible in connection with such items, the Debtors estimate that any such recoveries would not result in recoveries in the Liquidation Analysis exceeding those in the Plan.

10. <u>Investment in Non-Debtor Affiliates</u>. Investments in consolidated non-Debtor subsidiaries represents the net proceeds from the liquidation of foreign subsidiaries, including those in Europe, Asia, and Mexico, which are expected to undergo formal insolvency proceedings in the event of a conversion of the Debtors' cases to chapter 7 cases. Insolvency proceedings related to non-Debtor subsidiaries are anticipated based on assumptions that (1) customers and suppliers will divert orders and cancel trade terms in response to conversion of the Debtors' Chapter 11 Cases to chapter 7 cases, (2) foreign subsidiaries will lose access to cash previously available via ordinary course intercompany funding using proceeds of the DIP Facility to sustain operations, and (3) the Prepetition ABL Secured Parties will seek to foreclose on collateral as a result of the conversion of the Debtors' Chapter 11 Cases to chapter 7 cases. It is also assumed that local obligations, such as accounts payable, severance payments, and building leases, outstanding as of the Conversion Date, will be required to be settled before any remaining liquidation proceeds are repatriated to the Debtors' estates. Furthermore, any such repatriated proceeds are assumed to be subject to taxation at the same rate as cash dividends. As a result, the recovery (if any) to the Debtors' estates from the wind-down and liquidation of the Debtors' foreign non-Debtor subsidiaries is estimated to be *de minimis*.

11. <u>Other Assets</u>. Other assets include, among other things, right-of-use assets and debt issuance costs. The assumed recovery on other assets is 0%.

## II.    CHAPTER 7 WINDDOWN & LIQUIDATION COSTS

12. <u>Post-Effective Date Wind-Down Costs</u>. Post-effective date wind-down costs reflects the cost of reduced corporate staff and limited back office overhead required to execute the liquidation and is generally consistent with the existing operating costs of the Debtors' business over a six-month wind-down period. Post-effective date wind-down costs also include litigation costs and other legal costs in connection with the wind-down of the Debtors' estates, as well as the cost of potential extended

litigation period beyond the six-month wind-down period required to effectuate a chapter 7 liquidation, including the pursuit of potential claims and causes of action that are property of the Debtors' estates.

13. <u>Chapter 7 Trustee Fees</u>.  Pursuant to section 326 of the Bankruptcy Code, the Bankruptcy Court may allow reasonable compensation for the Trustee's services, not to exceed 25% on the first $5,000 or less, 10% on any amount in excess of $5,000 but not in excess of $50,000, 5% on any amount in excess of $50,000 but not in excess of $1.0 million, and reasonable compensation not to exceed 3% of such moneys in excess of $1,000,000 upon all moneys disbursed or turned over in the case by the Trustee to parties in interests. The Liquidation Analysis reflects estimated chapter 7 trustee fees that are calculated based on the foregoing methodology.  Such fees represent incremental costs that would not otherwise be incurred under the Plan.

### III.    CLAIMS

14. <u>DIP Claims.</u>  The Liquidation Analysis assumes that amounts outstanding under the DIP Facility total approximately $112 million at the Conversion Date.

15. <u>Other Superpriority Claims</u>.  Other Superpriority Claims include the L/C Superpriority Claims and the Cash Management Superpriority Claims.  Other Superpriority Claims are estimated at approximately $26 million at the Conversion Date.

16. <u>ABL Claims</u>.  The Liquidation Analysis assumes that amounts outstanding under the ABL Revolving Facility total approximately $77 million at the Conversion Date.

17. <u>Term Loan Claims</u>.  The Liquidation Analysis assumes that amounts outstanding under the Term Loan Facilities total approximately $304 million at the Conversion Date. The Debtors estimate that no proceeds will be available for distribution to Holders of Term Loan Claims.

18. <u>Unsecured Claims</u>.   Unsecured claims include, among other Claims, Administrative Claims and General Unsecured Claims, including rejection damages Claims arising from the rejection of Executory Contracts and Unexpired Leases upon conversion to chapter 7, severance and other employee-related costs, and Intercompany Claims.  Unsecured Claims are estimated at approximately $373 million.  The Debtors estimate that no proceeds will be available for distribution to Holders of Unsecured Claims.

19. <u>Existing Equity Interests</u>.  Includes Existing Equity Interests. The Debtors estimate that no proceeds will be available for distribution to Holders of Existing Equity Interests.

**Exhibit D**

**Financial Projections**

## FINANCIAL PROJECTIONS

**Introduction to Financial Projections**

As a condition to Confirmation, the Bankruptcy Code requires, among other things, the Bankruptcy Court to find that entry of a Confirmation Order is not likely to be followed by either a liquidation or the need to further reorganize the Debtors or any successor to the Debtors.  In accordance with this condition and in order to assist each Holder of a Claim in determining whether to vote to accept or reject the Plan, the Debtors' management team ("**Management**"), with the assistance of its advisors, developed financial projections (the "**Financial Projections**") to support the feasibility of the Plan. [1]

The Financial Projections were prepared in good faith by Management, with the assistance of its advisors, and are based on a number of assumptions made by Management, within the bounds of their knowledge of the Debtors' business and operations, with respect to the future performance of the Debtors' operations.  Forward-looking statements in these projections include the intent, belief, or current expectations of the Debtors and members of its Management with respect to the timing of, completion of, and scope of the current restructuring, the Plan, the Debtors' strategic business plan, bank financing, debt and equity market conditions, and the Debtors' future liquidity, as well as the assumptions upon which such statements are based.  Although Management has prepared the Financial Projections in good faith and believes the assumptions to be reasonable, it is important to note that the Debtors can provide no assurance that such assumptions will be realized.  Because future events and circumstances may well differ from those assumed and unanticipated events or circumstances may occur, the Debtors expect that the actual and projected results will differ and the actual results may be materially greater or less than those contained in the Financial Projections and from those contemplated by such forward-looking statements.   No representations can be made as to the accuracy of the Financial Projections or the Debtors' ability to achieve the projected results.  Therefore, the Financial Projections may not be relied upon as a guarantee or as any other form of assurance as to the actual results that will occur.  The inclusion of the Financial Projections herein should not be regarded as an indication that the Debtors considered or consider the Financial Projections to reliably predict future performance. Accordingly, in deciding whether to vote to accept or reject the Plan, creditors should review the Financial Projections in conjunction with a review of the risk factors set forth in the Disclosure Statement and the assumptions and risks described herein, including all relevant qualifications and footnotes.

**THE DEBTORS BELIEVE THAT THE CONFIRMATION DATE AND EFFECTIVE DATE OF THE PLAN ARE NOT LIKELY TO BE FOLLOWED BY THE LIQUIDATION OR FURTHER REORGANIZATION OF THE REORGANIZED DEBTORS.  ACCORDINGLY, THE DEBTORS BELIEVE THAT THE PLAN SATISFIES THE FEASIBILITY REQUIREMENT OF SECTION 1129(A)(11) OF THE BANKRUPTCY CODE.**

---

[1]   Capitalized terms used but not otherwise defined herein have the meanings set forth in the *Disclosure Statement Relating to the Joint Plan of Reorganization of Accuride Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, modified, or supplemented from time to time and including all exhibits thereto, the "**Disclosure Statement**"), to which these Financial Projections are attached as Exhibit C, or in the *Joint Plan of Reorganization of Accuride Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "**Plan**").

The Debtors' boards of directors or managers were not asked to and did not approve, evaluate or endorse the Financial Projections or the assumptions underlying the Financial Projections. Moreover, the Financial Projections were not prepared with a view toward compliance with published rules of the Securities and Exchange Commission or the American Institute of Certified Public Accountants regarding projections. The Debtors' independent auditor has not examined, compiled, or performed any procedures with respect to the prospective financial information contained in this exhibit and, accordingly, it does not express an opinion or any other form of assurance on such information or its achievability. The Debtors' independent auditor assumes no responsibility for and denies any association with the prospective financial information.

The Debtors do not intend to and disclaim any obligation to: (1) furnish updated Financial Projections to Holders of Claims or Interests prior to the Effective Date or to any other party after the Effective Date, except as required by the Plan; (2) include any such updated information in any documents that may be required to be filed with the Securities and Exchange Commission; or (3) otherwise make such updated information publicly available.

**Select Assumptions of the Financial Projections**

The Financial Projections are based on, but not limited to, factors such as industry performance, general business, economic, competitive, regulatory, market, and financial conditions, as well as the assumptions detailed below. Many of these factors and assumptions are beyond the control of the Debtors and do not take into account the uncertainty and disruptions of business that may accompany an in-court restructuring. Accordingly, the assumptions should be reviewed in conjunction with a review of the risk factors set forth in the Disclosure Statement.

- **Methodology:** In light of the form of distributions contemplated by the Plan (*i.e.*, cash or New Common Stock), the Financial Projections were developed on a consolidated basis rather than on a legal entity basis. The Financial Projections were developed by Management with the assistance of the Debtors' advisors and are presented solely for purposes of the formulation and negotiation of the Plan in order to present the anticipated impact of the Plan. No representation or warranty, express or implied, is provided in relation to the fairness, accuracy, correctness, completeness, or reliability of the information, opinions, or conclusions expressed herein.

- **Plan and Effective Date:** The Financial Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated by the Plan will be consummated by December 31, 2024 (the "**Assumed Effective Date**").

- **Projection Period:** The Debtors prepared the Financial Projections based on, among other things, the anticipated future financial condition and results of operations of the Reorganized Debtors and the terms of the Plan. The Debtors prepared consolidated Financial Projections of the Debtors for the years ending December 31, 2025 through December 31, 2028.

- **New Takeback Facility:** The New Takeback Facility means a new senior secured, first lien term loan facility, in an initial aggregate principal amount of $134 million comprising: (a) New Takeback Facility Loans in the aggregate principal amount of $114 million and (b) Rights Offering Term Loans in the amount of $20 million, plus any accrued and unpaid interest, fees, costs, charges, expenses, and any other accrued and unpaid amounts under the DIP Documents as of the Effective Date, to be incurred by the Debtors on the Effective Date in accordance with this Plan and the

Restructuring Transactions Memorandum, in each case as determined by the Debtors and in form and substance acceptable to the Debtors and the New Takeback Facility Agent.

- **New ABL Facility:**  Assumes the ABL Revolving Facility is refinanced as of the Assumed Effective Date with terms consistent with the ABL Revolving Facility.

- **Other Assumptions:** The Financial Projections also assume that: (1) there will be no material change in legislation or regulations, or the administration thereof, that will have an unexpected effect on the operations of the Debtors; (2) there will be no change in generally accepted accounting principles in the United States that will have a material effect on the reported financial results of the Debtors; (3) the potential application of fresh start accounting will not materially change the Debtors' accounting procedures; and (4) there will be no material contingent, unliquidated or indemnity claims applicable to the Debtors.

*THE INDEPENDENT AUDITOR FOR THE DEBTORS HAS NOT EXAMINED, COMPILED OR OTHERWISE PERFORMED ANY PROCEDURES ON THE FOLLOWING PROSPECTIVE FINANCIAL INFORMATION, AND CONSEQUENTLY, DOES NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE PROSPECTIVE FINANCIAL INFORMATION.*

# Reorganized Topco
## Unaudited Financial Summary
*($ in millions, U.S. dollars)*

| | Notes | 2025F | 2026F | 2027F | 2028F | Total |
|---|---|---|---|---|---|---|
| | | **For the 12-Months Ending December 31,** | | | | |
| **Net Sales:** | | | | | | |
| Wheels North America | | $ 463.5 | $ 553.7 | $ 503.6 | $ 545.6 | $ 2,066.4 |
| Wheels Europe & Asia | | 316.6 | 391.7 | 430.7 | 459.4 | 1,598.3 |
| **Total Net Sales** | [1] | **$ 780.0** | **$ 945.4** | **$ 934.3** | **$1,005.0** | **$ 3,664.7** |
| **Cost of Goods Sold:** | | | | | | |
| Material | [2] | (412.7) | (511.8) | (502.8) | (540.5) | (1,967.8) |
| Direct Labor | [3] | (47.2) | (52.4) | (54.2) | (57.9) | (211.7) |
| Overhead | [4] | (226.2) | (247.0) | (251.6) | (263.4) | (988.1) |
| **Total Cost of Goods Sold** | | **$ (686.1)** | **$ (811.2)** | **$ (808.6)** | **$ (861.8)** | **$(3,167.7)** |
| **Gross Profit** | | **$ 93.9** | **$ 134.2** | **$ 125.7** | **$ 143.3** | **$ 497.0** |
| *%* | | *12.0%* | *14.2%* | *13.5%* | *14.3%* | *13.6%* |
| Operating Expenses | [5] | (50.2) | (51.6) | (53.1) | (54.6) | (209.5) |
| **Operating Income** | | **$ 43.7** | **$ 82.6** | **$ 72.6** | **$ 88.7** | **$ 287.6** |
| *%* | | *5.6%* | *8.7%* | *7.8%* | *8.8%* | *7.8%* |
| Other Income (Loss) | [6] | (0.3) | (0.3) | (0.3) | (0.3) | (1.3) |
| **EBITDA** | [7] | **$ 43.4** | **$ 82.3** | **$ 72.3** | **$ 88.4** | **$ 286.3** |
| *%* | | *5.6%* | *8.7%* | *7.7%* | *8.8%* | *7.8%* |
| **Free Cash Flow Walk:** | | | | | | |
| EBITDA | | $ 43.4 | $ 82.3 | $ 72.3 | $ 88.4 | $ 286.3 |
| Capital Expenditures: | [8] | | | | | |
| Wheels North America | | (12.3) | (12.4) | (12.7) | (13.1) | (50.5) |
| Wheels Europe & Asia | | (13.6) | (16.7) | (12.6) | (12.9) | (55.8) |
| Cash Taxes | [9] | (5.1) | (5.4) | (6.2) | (7.2) | (23.9) |
| Changes in Working Capital | [10] | (17.7) | (9.3) | (5.5) | (8.5) | (41.0) |
| **Unlevered Free Cash Flow** | | **$ (5.3)** | **$ 38.5** | **$ 35.2** | **$ 46.6** | **$ 115.1** |
| Cash Interest | [11] | (12.4) | (21.0) | (20.0) | (19.6) | (73.0) |
| New Takeback Facility Principal Repayment | | – | – | – | – | – |
| ABL Draw (Paydown) | | 8.9 | (17.5) | (15.0) | – | (23.6) |
| **Levered Free Cash Flow** | | **$ (8.8)** | **$ (0.0)** | **$ 0.2** | **$ 27.0** | **$ 18.4** |
| **CASH BALANCE** (as of Dec. 31 of respective period) | [12] | **$ 15.0** | **$ 15.0** | **$ 15.2** | **$ 42.2** | **$ 42.2** |
| (+) ABL Availability | | 7.1 | 38.3 | 48.8 | 55.4 | 55.4 |
| **TOTAL LIQUIDITY** (as of Dec. 31 of respective period) | | **$ 22.1** | **$ 53.3** | **$ 64.1** | **$ 97.6** | **$ 97.6** |
| *Memo: New Takeback Facility PIK Interest* | | *$ 8.9* | *$ –* | *$ –* | *$ –* | *$ 8.9* |
| **Funded Debt:** | | | | | | |
| New Takeback Facility | [13] | $ 142.7 | $ 142.7 | $ 142.7 | $ 142.7 | $ 142.7 |
| New Exit ABL Facility | [14] | 57.8 | 40.3 | 25.3 | 25.3 | 25.3 |
| **Total Funded Debt** (excludes lease and other liabilities) | | **$ 200.5** | **$ 183.0** | **$ 168.0** | **$ 168.0** | **$ 168.0** |

## NOTES TO FINANCIAL PROJECTIONS

**Note 1 – Net Sales**

Revenue projections underlying the net sales projections are based on assumptions of volume and unit price. Volume expectations rely on third-party industry forecasts, current market trends, and customer demand data. Management anticipates maintaining market share until the industry's projected recovery in 2025, with prices assumed to remain stable at current levels.

**North America OEM Production Forecast (000's of units)**

| For the 12-Months Ending December 31: | 2025 | 2026 | 2027 | 2028 |
|---|---|---|---|---|
| NACL 8 | 267 | 336 | 264 | 290 |
| NACL 5-7 | 235 | 283 | 224 | 290 |
| **Total** | **502** | **619** | **489** | **580** |
| *Year-over-year change %* | | *23%* | *-21%* | *19%* |

**Note 2 – Material Costs**

Material costs as a percentage of revenue are projected to remain aligned with current run-rates, with material cost inflation passed to customers.

**Note 3 – Direct Labor**

Direct labor costs as a percentage of revenue are projected to remain consistent with current levels, with labor cost inflation beyond volume growth offset by efficiency improvements or cost reductions.

**Note 4 – Overhead**

Variable overhead costs as a percentage of revenue are forecasted to remain in line with current rates, with cost inflation offset by efficiency gains and cost-saving measures. Fixed overhead costs are projected to increase gradually over the forecast period.

**Note 5 – Operating Expenses**

Operating expenses include management bonuses, selling, general and administrative costs[2], research and development expenditures, and other associated costs.

**Note 6 – Other Income (Loss)**

This category primarily comprises foreign currency gains or losses (assumed to be zero for all forecast periods), board fees, and pension expenses.

**Note 7 – EBITDA**

EBITDA represents earnings before interest, taxes, depreciation and amortization as defined without adjustments permitted by banks or management.

---

[2]  Selling, general and administrative costs are net of approximately $3 million per year of fees charged to and paid by non-Debtor Accuride Wheels RUSSIA for back-office support and other services consistent with historical practice.

**Note 8 – Capital Expenditures**

Estimates are aligned with the capital spending plan established by Management and historical run-rates. Wheels North America capital expenditures are maintenance-related and consistent with historical trends.  Wheels Europe & Asia capital expenditures include maintenance costs and customer tooling for new program launches.

**Note 9 – Cash Taxes**

The projections assume no federal income tax liabilities during the forecast period. Any potential future federal tax liabilities are assumed to be offset with historical net operating losses.  The analysis includes estimates for state and foreign tax obligations consistent with historical rates. Actual tax liabilities may vary significantly from the projections.

**Note 10 – Changes in Working Capital**

Reflects variations in operational working capital components, including accounts receivable, accounts payable, inventory, accrued compensation and benefits, and other prepayments.

**Note 11 – Cash Interest**

Forecasted interest amounts based on the following assumptions:

| | |
|---|---|
| New Exit ABL Facility: | North America Tranche: SOFR plus 3.60% |
| | European Tranche: EUR plus 3.50% |
| New Takeback Facility: | 2025 Cash Interest: SOFR plus 1.50% |
| | 2025 Paid-in-Kind Interest: 6.50% |
| | 2026-28 Cash Interest: SOFR plus 8.00% |

**Note 12 – Cash Balance**

The opening cash balance includes $24 million in global cash as of the Assumed Emergence Date. This amount reflects $20 million of new money from the Rights Offering, net of assumed exit costs. Projected cash balances are as of December 31 for each respective forecast year.

**Note 13 – New Takeback Facility**

Includes approximately $114 million of New Takeback Facility loans and $20 million of new money to be funded through the Rights Offering.

**Note 14 – New Exit ABL Facility**

Assumes the ABL Revolving Facility is refinanced at the Assumed Effective Date with terms consistent with the ABL Revolving Facility.

**Exhibit E**

**Valuation Analysis**

# VALUATION ANALYSIS[1]

THE INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES AND/OR FUNDED DEBT TO BE ISSUED PURSUANT TO THE PLAN. THE INFORMATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION UNDER SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS OR ANY OF THEIR AFFILIATES.

Solely for the purpose of the Plan and the Disclosure Statement, Perella Weinberg Partners, LP ("PWP"), an investment banker to the Debtor, has estimated a potential range of total enterprise value (the "Enterprise Value") for the Reorganized Debtors, as of an assumed effective date for the purposes of PWP's valuation analysis of December 31, 2024 (the "Assumed Effective Date"), would be in a range between $273 million and $330 million. The midpoint of the enterprise value range is $301 million. The range of total equity value (the "Equity Value"), which takes into account the total Enterprise Value less the estimated net debt outstanding as of the Assumed Effective Date, was estimated by PWP to be between $74 million and $132 million, with an estimated midpoint of $103 million.[2]

PWP's analysis is based, at the Debtors' direction, on a number of assumptions including, among other assumptions, that (i) the Debtors will be reorganized in accordance with the Plan which will be effective on the Assumed Effective Date, (ii) the Reorganized Debtors will achieve the results set forth in the Debtors' management's Financial Projections (as defined in this Disclosure Statement and attached as Exhibit E to this Disclosure Statement) for 2025 through 2028 (the "Projection Period") provided to PWP by the Debtors, (iii) the Reorganized Debtors' capitalization and available cash will be as set forth in the Plan and this Disclosure Statement, and (iv) the Reorganized Debtors will be able to obtain all future financings, on the terms and at the times, necessary to achieve the results set forth in the Financial Projections. PWP makes no representation as to the achievability or reasonableness of such assumptions. In addition, PWP assumed that there will be no material change in economic, monetary, market, and other

---

[1]   All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan or the Disclosure Statement, as applicable.

[2]   This valuation analysis assumes that the Reorganized Debtors will have, as of the Assumed Effective Date, funded net debt obligations of approximately $198 million (comprised of $69 million outstanding under the Exit ABL Facility, $134 million outstanding under the Exit Term Loan Facility, $19 million outstanding under other debt items, and unrestricted cash of $24 million)

conditions as in effect on, and the information made available to PWP, as of the Assumed Effective Date.

The estimated enterprise value in this section represents a hypothetical enterprise value of the Reorganized Debtors as the continuing operators of the business and assets of the Debtors, after giving effect to the Plan, based on consideration of certain valuation methodologies as described below. The estimated enterprise value in this section does not purport to constitute an appraisal or necessarily reflect the actual market value that might be realized through a sale or liquidation of the Reorganized Debtors, their securities or their assets, which may be materially higher or lower than the estimated enterprise value range herein. The actual value of an operating business such as the Reorganized Debtors' business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in various factors affecting the financial condition and prospects of such a business. For purposes of this valuation analysis, PWP has assumed that no material changes that would affect value will occur between the date of this Disclosure Statement and the Assumed Effective Date.

In preparing the valuation analysis, PWP, among other things: (i) reviewed certain historical financial information of the Debtors for recent years and interim periods; (ii) reviewed certain financial and operating data of the Debtors, including the Financial Projections; (iii) discussed the Debtors' performance, future prospects, and industry observations with members of the Debtors' management; (iv) considered informal feedback received from market participants through the Debtors' sale process; (v) reviewed certain publicly available financial data for, and considered the market value of, public companies that PWP deemed generally relevant in analyzing the value of the Reorganized Debtors; (vi) reviewed publicly available financial data for certain transactions that PWP deemed relevant; and (vii) considered certain economic and industry information that PWP deemed generally relevant to the Reorganized Debtors. PWP assumed and relied on the accuracy and completeness of all financial information furnished to it by the Debtors' management and other parties as well as publicly available information.

The estimated enterprise value in this section does not constitute a recommendation to any Holder of a Claim or Interest as to how such Holder of a Claim or Interest should vote or otherwise act with respect to the Plan. PWP has not been asked to and does not express any view as to what the trading value of the Reorganized Debtors' securities would be when issued pursuant to the Plan or the prices at which they may trade in the future. The estimated enterprise value set forth herein does not constitute an opinion as to fairness from a financial point of view to any Holder of a Claim or Interest of the consideration to be received by such Holder of a Claim or Interest under the Plan or of the terms and provisions of the Plan.

<u>**Valuation Methodologies**</u>

In preparing its valuation, PWP performed a variety of financial analyses and considered a variety of factors. The following is a brief summary of the material financial analyses performed by PWP, which consisted of (a) a discounted cash flow analysis ("<u>DCF</u>"), (b) a selected publicly traded companies analysis, and (c) a selected transactions analysis. This summary does not

purport to be a complete description of the analyses performed and factors considered by PWP. The preparation of a valuation analysis is a complex analytical process involving various judgmental determinations as to the most appropriate and relevant methods of financial analysis and the application of those methods to particular facts and circumstances, and such analyses and judgments are not readily susceptible to summary description. As such, PWP's valuation analysis must be considered as a whole. Reliance on only one of the methodologies used, or portions of the analysis performed, could create a misleading or incomplete conclusion as to enterprise value.

A. **Discounted Cash Flow Analysis.** The DCF analysis is an enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business plus a present value of the estimated terminal value of that asset or business. PWPs' DCF analysis used the Financial Projections' estimated debt-free, after-tax free cash flows through December 31, 2028. These cash flows were then discounted at a range of estimated weighted average costs of capital ("Discount Rate") for the Reorganized Debtors. The Discount Rate reflects the estimated blended rate of return that would be expected by debt and equity investors to invest in the Reorganized Debtors' business based on a target capital structure. The enterprise value was determined by calculating the present value of the Reorganized Debtors' unlevered after-tax free cash flows based on the Financial Projections plus an estimate for the value of the Reorganized Debtors beyond the Projection Period known as the terminal value.

B. **Selected Publicly Traded Companies Analysis.** The selected publicly traded companies analysis is based on the enterprise values of selected publicly traded companies that have operating and financial characteristics comparable in certain respects to the Reorganized Debtors. For example, such characteristics may include similar size and scale of operations, end-market exposure, product mix, operating margins, growth rates, and geographical exposure. Under this methodology, certain financial multiples that measure financial performance and value are calculated for each selected company and then applied to the Reorganized Debtors' financials to imply an enterprise value for the Reorganized Debtors. PWP used, among other measures, enterprise value (defined as market value of equity, plus book value of debt and book value of preferred stock and minority interests, less cash, subject to adjustments for underfunded pension and retirement obligations and other items where appropriate) for each selected company as a multiple of such company's publicly available consensus projected EBITDA for fiscal year 2026. Although the selected companies were used for comparison purposes, no selected publicly traded company is either identical or directly comparable to the business of the Reorganized Debtors. Accordingly, PWP's comparison of selected publicly traded companies to the business of the Reorganized Debtors and analysis of the results of such comparisons was not purely mathematical, but instead involved considerations and judgments concerning differences in operating and financial characteristics and other

factors that could affect the relative values of the selected publicly traded companies and the Reorganized Debtors. The selection of appropriate companies for this analysis is a matter of judgment and subject to limitations due to sample size and the public availability of meaningful market-based information.

C. **Selected Transaction Analysis.** The selected transactions analysis is based on the implied enterprise values of companies and assets involved in publicly disclosed merger and acquisition transactions for which the targets had operating and financial characteristics comparable in certain respects to the Reorganized Debtors. Under this methodology, the enterprise value of each such target is determined by an analysis of the consideration paid and the net debt assumed in the merger or acquisition transaction. The enterprise value is then compared to a selected financial metric, in this case, EBITDA for the Reorganized Debtors, respectively, for the next twelve-month period ("NTM"), in order to determine an enterprise value multiple. In this analysis, the NTM EBITDA enterprise value multiples were utilized to determine a range of implied enterprise value for the Reorganized Debtors.

The summary herein does not purport to be a complete description of the analyses and factors undertaken to support PWP's conclusions. The preparation of a valuation is a complex process involving various quantitative and qualitative determinations as to the most appropriate analyses and factors to consider, and the application of those analyses and factors to the particular circumstances of the Debtors. As a result, the process involved in preparing a valuation is not readily summarized.

## Exhibit 2

**Solicitation and Voting Procedures**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ACCURIDE CORPORATION, *et al.*,[1] | ) | Case No. 24-12289 (JKS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**SOLICITATION AND VOTING PROCEDURES**

**PLEASE TAKE NOTICE THAT** on November 20, 2024, the United States Bankruptcy Court for the District of Delaware (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"): (a) authorizing the above-captioned debtors and debtors in possession (collectively, the "Debtors") to solicit votes on the *Amended Joint Plan of Reorganization of Accuride Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 301] (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) conditionally approving the *Disclosure Statement Relating to the Amended Joint Plan of Reorganization of Accuride Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 302] (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages; (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan; and (e) granting related relief.

**A.    The Voting Record Date.**

The Court has established **November 19, 2024**, as the record date for purposes of determining which Holders of Term Loan Claims in Class 4 are entitled to vote on the Plan (the "Voting Record Date").

---

1    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Accuride Corporation (9077); Accuride Group Holdings, Inc. (4531); Accuride Intermediate Co., Inc. (9045); Accuride Distributing, LLC (3124); Accuride EMI, LLC (0389); Accuride Erie, L.P. (4862); Accuride Henderson Limited Liability Company (8596); AKW General Partner, L.L.C. (4861); AOT, LLC (3088); Armor Parent Corp. (6684); Bostrom Holdings, Inc. (9282); Bostrom Seating, Inc. (7179); Gunite Corporation (9803); KIC LLC (6356); Transportation Technologies Industries, Inc. (2791); and Truck Components, Inc. (5407).  The location of the Debtors' service address is:  38777 Six Mile Road, Suite 410, Livonia, MI 48152.

2    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan.

**B.      The Voting Deadline.**

The Court has established **December 16, 2024, at 4:00 p.m., prevailing Eastern Time**, as the voting deadline (the "Voting Deadline") for the Plan.  The Debtors may extend the Voting Deadline without further order of the Court.  To be counted as votes to accept or reject the Plan, all ballots (collectively, the "Ballots") must be properly executed, completed, and delivered pursuant to the instructions provided on or with the Ballot.

**C.      Form, Content, and Manner of Notices.**

**1.      The Solicitation Package.**

The following materials shall constitute the solicitation package (the "Solicitation Package"):

  a.      The Disclosure Statement Order (without exhibits, except for these Solicitation and Voting Procedures);

  b.      the Combined Hearing Notice, in substantially the form attached as Exhibit 6 to the Disclosure Statement Order;

  c.      the Cover Letter in support of the Plan, substantially in the form attached as Exhibit 5 to the Disclosure Statement Order:  (1) describing the contents of the Solicitation Package and (2) including instructions to obtain access, free of charge, to the Plan, the Disclosure Statement and this Order (without exhibits, except the Solicitation and Voting Procedures);

  d.      a Ballot with applicable voting instructions, attached as Exhibit 3 to the Disclosure Statement Order, including instructions for how to submit the Ballot via the E-Ballot Portal (as defined below);

  e.      the Disclosure Statement (and exhibits thereto, including the Plan and all exhibits thereto); and

  f.      such other materials as the Court may direct.

**2.      Distribution of the Solicitation Package.**

The Solicitation Packages shall provide certain materials, including the Ballot, the Cover Letter, and the Combined Hearing Notice by first-class U.S. mail.  In addition, these Solicitation and Voting Procedures, the Disclosure Statement, the Plan, and the Order shall be made available on the Debtors' case website at https://omniagentsolutions.com/Accuride.  Paper copies are available upon request by contacting Omni Agent Solutions, Inc., the claims, noticing, and solicitation agent retained by the Debtors in these chapter 11 cases (the "Solicitation Agent") by: (a) writing via first class mail, to Accuride Corporation Ballot Processing, c/o Omni Agent Solutions, Inc., 5955 De Soto Avenue, Suite 100, Woodland Hills, CA 91367; (b) writing via electronic mail to accurideinquiries@omniagnt.com;  or (c) calling the Debtors' restructuring hotline at 866-956-2136 (U.S. Toll-Free/Domestic) or +1 747-263-0154  (International).

The Debtors shall serve or cause to be served the Disclosure Statement Order (in electronic format) and the Combined Hearing Notice on all parties required to be notified under Bankruptcy Rule 2002 and Local Rule 2002-1 (the "2002 List") as of the Voting Record Date.  In addition, the Debtors shall distribute (or cause to be distributed) Solicitation Packages by first-class mail with instructions on how to submit the Ballot via the E-Ballot Portal, to all Holders of Claims in the Voting Class who are entitled to vote by no later than **November 21, 2024** (the "Solicitation Mailing Deadline") or as soon as reasonably practicable thereafter, as described in **Section D** below.  To the extent that such distribution is not made by the Solicitation Mailing Deadline, the Debtors shall distribute the Solicitation Packages as soon as reasonably practicable thereafter.  The Debtors will not distribute Solicitation Packages or other solicitation materials to (i) Holders of Claims that have already been paid in full during these Chapter 11 Cases or that are authorized to be paid in full in the ordinary course of business pursuant to an order previously entered by this Court, (ii) any party to whom notice of the Motion was sent but was subsequently returned as undeliverable without a forwarding address by the Voting Record Date; or (iii) the Holders in Class 7 (Intercompany Claims) or Class 8 (Intercompany Interests).  The Debtors will distribute the Notice of Non-Voting Status to (i) Holders of Claims in a Class that is not Impaired under the Plan and, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, (ii) Holders of Claims or Interests in a Class that is Impaired under the Plan and, therefore, conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, or (iii) except as otherwise set forth herein or in the Disclosure Statement Order, Holders of Claims that are subject to a pending objection by the Debtors, and is therefore not entitled to vote on the Plan.

For purposes of serving the Solicitation Packages, the Debtors may rely on the address information for the Voting Class as compiled, updated, and maintained by the Solicitation Agent as of the Voting Record Date.  The Debtors and the Solicitation Agent are not required to conduct any additional research for updated addresses based on undeliverable Solicitation Packages (including Ballots) or Notices of Non-Voting Status.

To avoid duplication and reduce expenses, the Debtors will use commercially reasonable efforts to ensure that each Holder of a Claim entitled to vote on the Plan receives no more than one Solicitation Package (and, therefore, one Ballot per Class) and is only entitled to submit one Ballot on account of such Holder's Claim in the Voting Class.

3.    **Resolution of Disputed Claims for Voting Purposes; Resolution Event.**

a.    The Debtors shall have until ten (10) days prior to the Voting Deadline to object to Proofs of Claims for purposes of voting on the Plan (the "Voting Claims Objection Deadline").  Absent a further order of the Court, the Holder of a Claim in the Voting Class that is the subject of a pending objection on a "reduce and allow" basis shall be entitled to vote such Claim in the reduced amount contained in such objection.  If a Claim in the Voting Class is subject to an objection other than a "reduce and allow" objection that is filed with the Court on or prior to the Voting Claims Objection Deadline:  (i) the Debtors shall cause the applicable Holder to be served with a Notice of Non-Voting Status substantially in the form attached as Exhibit 3 to the Disclosure Statement Order (which notice shall be served together with such objection); and (ii) the applicable Holder shall not be entitled to vote to accept or reject the Plan on

4

account of such claim unless a Resolution Event (as defined herein) occurs as provided herein.

b.  To the extent the Debtors wish to object to a Proof of Claim that is timely filed following the Voting Claims Objection Deadline but prior to the Voting Deadline, the Debtors shall promptly file such objection and the applicable Claim shall be deemed temporarily allowed for voting purposes only, without further action by the Holder of such Claim and without further order of the Bankruptcy Court, unless the Bankruptcy Court orders otherwise. Any such objection that remains pending as of the Combined Hearing Date will be heard on an emergency basis at the Combined Hearing.

c.  A "<u>Resolution Event</u>" means the occurrence of one or more of the following events no later than two (2) business days prior to the Voting Deadline:

- an order of the Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing;

- an order of the Court is entered temporarily allowing such Claim for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing;

- a stipulation or other agreement is executed between the Holder and the Debtors resolving the objection and allowing such Claim in an agreed upon amount; or

- the pending objection is voluntarily withdrawn by the objecting party.

d.  To the extent an applicable Claim is in the Voting Class, no later than three (3) business days following the occurrence of a Resolution Event, or as soon as reasonably practicable thereafter, the Debtors shall cause the Solicitation Agent to distribute via email, hand delivery, or overnight courier service a Solicitation Package to the relevant Holder to the extent such Holder has not already received a Solicitation Package.

**4.      <u>Notices of Non-Voting Status for Unimpaired Classes and Classes Deemed to Reject the Plan</u>.**

Holders of Claims and Interests that are not classified pursuant to section 1123(a)(1) of the Bankruptcy Code, or who are not entitled to vote because such Claims or Interests are: (1) Unimpaired or otherwise presumed to accept the Plan under section 1126(f) of the Bankruptcy Code, (2) Impaired and therefore deemed to reject the Plan under section 1126(g) of the Bankruptcy Code, or (3) Disputed Claims, will receive only the *Notice of Non-Voting Status and Opt In to Releases to Holders of Unimpaired Claims Deemed to Accept the Plan, Holders or Potential Holders of Impaired Claims Presumed to Reject the Plan, and Holders or Potential Holders of Disputed Claims*, substantially in the form attached as <u>Exhibit 3</u> to the Disclosure Statement Order. Such notice will instruct these Holders as to how they may obtain copies of the documents contained in the Solicitation Package (excluding the Ballot). Such notice will also

include a form by which all Holders or potential Holders of Claims or Interests may elect to opt in to the third-party release provision included in the Plan.  The Holders of Claims may affirmatively opt in by completing and returning the form (the paper version or electronically) or file an objection with the Court on or before **December 16, 2024, at 4:00 p.m., prevailing Eastern Time**.

     **5.**    **Notices Regarding Executory Contracts and Unexpired Leases Assumed, Assumed and Assigned, or Rejected, in Each Case, Under the Plan**.

Counterparties to Executory Contracts or Unexpired Leases that receive a *Notice of (A) Executory Contracts and Unexpired Leases to Be Assumed or Assumed and Assigned by the Debtors Pursuant to the Plan, (B) Cure Amounts, if any, and (C) Related Procedures in Connection Therewith* (the "Assumption Notice") and the *Notice Regarding Executory Contracts and Unexpired Leases to Be Rejected Pursuant to the Plan* (the "Rejection Notice"), substantially in the forms attached as Exhibit 8 and Exhibit 9 to the Disclosure Statement Order, respectively, may file an objection to the Debtors' proposed assumption, assumption and assignment, rejection, and/or cure amount, each under the Plan, as applicable (an "Assumption Objection").  Any Assumption Objection must be Filed, served, and actually received by the Debtors by no later than fourteen (14) days after the Debtors file the Plan Supplement containing the Schedule of Assumed Executory Contracts and Unexpired Leases; *provided* that, if the Debtors modify the Schedule of Assumed Executory Contracts and Unexpired Leases, any party affected by such modifications shall have fourteen (14) days to object to the proposed modified treatment from the date of their recept of notice of such modification.

    **D.**    **Voting and Tabulation Procedures.**

    **1.**    **Holders of Claims Entitled to Vote**.

Only the following Holders of Claims in the Voting Class shall be entitled to vote:

    a.    Holders of Claims who on or before the Voting Record Date, have filed a Proof of Claim that (i) has not been expunged, disallowed, disqualified, withdrawn, or superseded prior to the Voting Record Date and (ii) is not the subject of a pending objection, other than a "reduce and allow" objection, filed with the Court prior to the Voting Deadline, pending a Resolution Event as provided herein; *provided* that a Holder of a Claim that is the subject of a pending objection on a "reduce and allow" basis shall receive a Solicitation Package and be entitled to vote such Claim in the reduced amount contained in such objection;

    b.    Holders of Claims that are listed in the Schedules; and

    c.    The assignee of any Claim that was transferred on or before the Voting Record Date by any Entity described in subparagraph (a) above, provided that such transfer or assignment has been fully effectuated pursuant to the procedures set forth in Bankruptcy Rule 3001(e) and such transfer is reflected on the Claims Register on the Voting Record Date.

    **2.**    **Establishing Claims Amounts for Voting Purposes**

For voting purposes, claim amounts for Claims in the Voting Class will be established based on (a) the amount of the applicable Term Loans held by such Holders of Term Loan Claims, as of the Voting Record Date, as evidenced by a list of lenders (the "<u>Lender List</u>") to be provided, or to be provided, by the Term Loan Agent to the Debtors or the Solicitation Agent no later than three (3) business day following the Voting Record Date.

**3.      <u>Voting and Ballot Tabulation Procedures</u>.**

The following voting procedures and standard assumptions shall be used in tabulating Ballots, subject to the Debtors' right to waive any of the below specified requirements for completion and submission of Ballots so long as such requirement is not otherwise required by the Bankruptcy Code, Bankruptcy Rules, or Local Rules.

a.  Except as otherwise provided in the Solicitation and Voting Procedures, unless the Ballot being furnished is timely submitted on or prior to the Voting Deadline (as the same may be extended by the Debtors), the Debtors, in their sole discretion, shall be entitled to reject such Ballot as invalid and, therefore, not count it in connection with Confirmation of the Plan.

b.  The Debtors will file with the Court by no later than three (3) business days before the Combined Hearing (or as soon as reasonably practicable thereafter) a voting report (the "<u>Voting Report</u>").  The Voting Report shall, among other things, delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures, or lacking necessary information, received via facsimile, or damaged (in each case, an "<u>Irregular Ballot</u>"). The Voting Report shall indicate the Debtors' intentions with regard to each Irregular Ballot.

c.  The online balloting portal (available at https://omniagentsolutions.com/Accuride-Ballots, the "<u>E-Ballot Portal</u>") is the sole manner in which Ballots may be delivered to the Solicitation Agent. Delivery of a Ballot to the Solicitation Agent by facsimile, hard copy, hand delivery, or any electronic means other than expressly provided in these Solicitation and Voting Procedures will not be valid.

d.  An executed Ballot is required to be submitted by the Entity submitting such Ballot. Delivery of a Ballot to the Solicitation Agent by facsimile, telecopy, electronic mail, or any electronic means other than the E-Ballot Portal will not be valid.

e.  No Ballot should be sent to the Debtors, the Debtors' agents (other than the Solicitation Agent), or the Debtors' financial or legal advisors, and if so sent will not be counted.

f.  If multiple Ballots are received from the same Holder with respect to the same Claim prior to the Voting Deadline, the last properly executed Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior received Ballot.

g.  Holders must vote all of their Claims within a particular Class either to accept or reject the Plan and may not split any votes.  Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted.  Further, to the extent there are multiple Claims within the same Class, the applicable Debtor may, in its discretion, aggregate the Claims of any particular Holder within a Class for the purpose of counting votes.

h.  Holders of Claims that may be asserted against multiple Debtors must vote such Claims either to accept or reject the Plan at each such Debtor and may not vote any such Claim to accept at one Debtor and reject at another Debtor.  Accordingly, a Ballot that rejects the Plan for a Claim at one Debtor and accepts the Plan for the same Claim at another Debtor will not be counted.

i.  A person signing a Ballot in its capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity of a Holder of Claims must indicate such capacity when signing.

j.  The Debtors, subject to a contrary order of the Court, may waive any defects or irregularities as to any particular Irregular Ballot at any time, either before or after the close of voting, and any such waivers will be documented in the Voting Report or a supplemental voting report, as applicable.

k.  Neither the Debtors, nor any other Entity, will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification.

l.  Unless waived or as ordered by the Court, any defects or irregularities in connection with deliveries of Ballots must be cured by the Holder of Claims prior to the Voting Deadline or such Ballots will not be counted.

m.  In the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

n.  Subject to any order of the Court, the Debtors reserve the right to reject any and all Ballots not in proper form, the acceptance of which, in the opinion of the Debtors, would not be in accordance with the provisions of the Bankruptcy Code or the Bankruptcy Rules; *provided* that any such rejections will be documented in the Voting Report.

o.  If a Claim has been estimated or a Claim has otherwise been Allowed only for voting purposes by order of the Court, such Claim shall be temporarily Allowed in the amount so estimated or Allowed by the Court for voting purposes only, and not for purposes of allowance or distribution.

p.  If an objection to a Claim is filed, such Claim shall be treated in accordance with the procedures set forth herein.

q.  The following Ballots shall not be counted in determining the acceptance or rejection of the Plan:  (i) any Ballot submitted via hard copy, electronic mail, or facsimile or any other method other than through the E-Ballot Portal; (ii) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of such Claim; (iii) any Ballot cast by any Entity that does not hold a Claim in the Voting Class; (iv) any Ballot cast for a Claim scheduled as unliquidated, contingent, or disputed for which no Proof of Claim was timely filed by the Voting Record Date (unless the applicable bar date has not yet passed, in which case such Claim shall be entitled to vote in the amount of $1.00); (v) any unsigned Ballot or Ballot lacking an original or e-signature; (vi) any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan; (vii) any Ballot submitted by any Entity not entitled to vote pursuant to the procedures described herein.

r.  After the Voting Deadline, no Ballot may be withdrawn or modified without the prior written consent of the Debtors.

s.  The Debtors are authorized to enter into stipulations with the Holder of any Claim agreeing to the amount of a Claim for voting purposes.

t.  Where any portion of a single Claim has been transferred to a transferee, all Holders of any portion of such single Claim will be (i) treated as a single creditor for purposes of the numerosity requirements in section 1126(c) of the Bankruptcy Code (and for the other voting and solicitation procedures set forth herein), and (ii) required to vote every portion of such Claim collectively to accept or reject the Plan.  In the event that (i) a Ballot, (ii) a group of Ballots within the Voting Class received from a single creditor, or (iii) a group of Ballots received from the various Holders of multiple portions of a single Claim partially reject and partially accept the Plan, such Ballots shall not be counted.

u.  For purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate Claims held by a single creditor in a particular Class will be aggregated and treated as if such creditor held one Claim in such Class, and all votes related to such Claim will be treated as a single vote to accept or reject the Plan; *provided* that if separate affiliated entities hold Claims in a particular Class, these Claims will not be aggregated and will not be treated as if such creditor held one Claim in such Class, and the vote of each affiliated entity will be counted separately as a vote to accept or reject the Plan.

**E.    Amendments to the Plan and Solicitation and Voting Procedures.**

The Debtors reserve the right to make non-substantive or immaterial changes to the Disclosure Statement, Plan (including, for the avoidance of doubt, the Plan Supplement), Ballots, Combined Hearing Notice, and related documents without further order of the Court, including, without limitation, changes to correct typographical and grammatical errors, if any, and to make

conforming changes among the Disclosure Statement, the Plan, and any other materials in the Solicitation Package before their distribution; *provided* that all such modifications shall be made in accordance with the terms of the document being modified, the Plan, and the consent requirements contained in  the DIP Documents.

**Exhibit 3**

**Form of Notice of Non-Voting Status**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ACCURIDE CORPORATION, *et al.*,[1] | ) | Case No. 24-12289 (JKS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

### NOTICE OF NON-VOTING STATUS
### AND OPT IN TO RELEASES TO HOLDERS OR
### POTENTIAL HOLDERS OF UNIMPAIRED CLAIMS DEEMED
### TO ACCEPT THE PLAN, HOLDERS OR POTENTIAL HOLDERS
### OF IMPAIRED CLAIMS AND INTERESTS PRESUMED TO REJECT
### THE PLAN, AND HOLDERS OR POTENTIAL HOLDERS OF DISPUTED CLAIMS

**PLEASE TAKE NOTICE THAT** on November 20, 2024, the United States Bankruptcy Court for the District of Delaware (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"):   (a) authorizing the above-captioned debtors and debtors in possession (collectively, the "Debtors") to solicit votes on the *Amended Joint Plan of Reorganization of Accuride and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 301] (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) conditionally approving the *Disclosure Statement Relating to the Amended Joint Plan of Reorganization of Accuride Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 302] (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages; (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan; and (e) granting related relief.

**PLEASE TAKE FURTHER NOTICE THAT** you are a Holder or potential Holder of a Claim against or Interest in the Debtors that, due to the nature and treatment of such Claim or Interest under the Plan, is not entitled to vote on the Plan.  Specifically, under the terms of the Plan, (i) a Holder of a Claim in a Class that is not Impaired under the Plan and, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, (ii) a Holder of a Claim or Interest in a Class that is Impaired under the Plan and, therefore, conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Accuride Corporation (9077); Accuride Group Holdings, Inc. (4531); Accuride Intermediate Co., Inc. (9045); Accuride Distributing, LLC (3124); Accuride EMI, LLC (0389); Accuride Erie, L.P. (4862); Accuride Henderson Limited Liability Company (8596); AKW General Partner, L.L.C. (4861); AOT, LLC (3088); Armor Parent Corp. (6684); Bostrom Holdings, Inc. (9282); Bostrom Seating, Inc. (7179); Gunite Corporation (9803); KIC LLC (6356); Transportation Technologies Industries, Inc. (2791); and Truck Components, Inc. (5407).  The location of the Debtors' service address is:  38777 Six Mile Road, Suite 410, Livonia, MI 48152.

[2]    Capitalized terms not otherwise defined herein have the same meaning as set forth in the Plan.

Code, or (iii) except as otherwise set forth herein or in the Disclosure Statement Order, a Holder of a Claim that is subject to a pending objection by the Debtors, and is therefore not entitled to vote on the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** if you are a Holder of a Claim that is subject to a pending objection (other than solely on a "reduce and allow" basis) by the Debtors, you are not entitled to vote any disputed portion of your Claim on the Plan unless one or more of the following events have taken place before a date that is two (2) business days before the Voting Deadline (each, a "Resolution Event"):

    a.    an order of the Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing;

    b.    an order of the Court is entered temporarily allowing such Claim for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing;

    c.    a stipulation or other agreement is executed between the Holder and the Debtors resolving the objection and allowing such Claim in an agreed upon amount; or

    d.    the pending objection is voluntarily withdrawn by the objecting party.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider final approval of the Disclosure Statement and Confirmation of the Plan (the "Combined Hearing") will commence on **December 23, 2024, at 10:30 a.m.**, prevailing Eastern Time, before the Honorable J. Kate Stickles, in the United States Bankruptcy Court for the District of Delaware, located at 824 North Market St., 3rd Floor, Courtroom 6, Wilmington, DE 19801.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to final approval of the Disclosure Statement and/or confirmation of the Plan, as applicable, is **December 16, 2024, at 4:00 p.m., prevailing Eastern Time** (the "Combined Hearing Objection Deadline"). All objections to the relief sought at the Combined Hearing **must**: (a) be in writing; (b) conform to the Bankruptcy Code, Bankruptcy Rules, the Local Rules, and any orders of the Court; (c) state, with particularity, the basis and nature of any objection to final approval of the Disclosure Statement and/or confirmation of the Plan and, if practicable, a proposed modification to the Disclosure Statement and/or Plan that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) and served upon the counsel to the Debtors, the U.S. Trustee, counsel to the DIP Lenders, and counsel to the Committee so as to be ***actually received*** on or before the Combined Hearing Objection Deadline.

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Omni Agent Solutions, Inc., the claims and noticing agent retained by the Debtors in these chapter 11 cases, by: (a) writing via first class mail, to Accuride Corporation Ballot Processing, c/o Omni Agent Solutions, Inc., 5955 De Soto Avenue, Suite 100, Woodland Hills, CA 91367; (b) writing via electronic mail to accurideinquiries@omniagnt.com; or (c) calling the Debtors' restructuring hotline at 866-956-2136 (U.S. Toll-Free/Domestic) or +1 747-263-0154 (International). You may also obtain copies of any pleadings filed in these chapter 11 cases (a) for

a fee via PACER at: http://www.deb.uscourts.gov; or (b) at no charge from Omni Agent Solutions, Inc. by accessing the Debtors' restructuring website at https://omniagentsolutions.com/Accuride.

---

ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE VIII.D OF THE PLAN CONTAINS A THIRD-PARTY RELEASE**. YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER. DIRECTIONS REGARDING THE RELEASE OPT IN FORM ARE INCLUDED IN THIS NOTICE.

AS SET FORTH IN THE PLAN, ALL HOLDERS OF CLAIMS OR INTERESTS THAT ELECT TO OPT IN TO THE THIRD-PARTY RELEASE CONTAINED IN ARTICLE VIII OF THE PLAN USING THE ENCLOSED OPT IN FORM WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES. BY ELECTING TO OPT IN TO THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN, YOU WILL RECEIVE THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII.C OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.

---

Dated:  November 20, 2024
Wilmington, Delaware

/s/Draft
_____
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Joseph Barry (Del. Bar No. 4221)
Kenneth J. Enos (Del. Bar No. 4544)
Jared W. Kochenash (Del. Bar No. 6557)
Andrew A. Mark (Del. Bar No. 6861)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:      (302) 571-6600
Facsimile:      (302) 571-1253
Email:          jbarry@ycst.com
                kenos@ycst.com
                jkochenash@ycst.com
                amark@ycst.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Ryan Blaine Bennett, P.C. (admitted *pro hac vice*)
Alexander D. McCammon (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          ryan.bennett@kirkland.com
                alex.mccammon@kirkland.com

-and-

Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          derek.hunter@kirkland.com

*Co-Counsel for the Debtors*
*and Debtors in Possession*

*Co-Counsel for the Debtors*
*and Debtors in Possession*

**OPTIONAL:  RELEASE OPT IN FORM**

You are receiving this optional opt in form (the "Opt In Form") because you are or may be a Holder of a Claim or Interest that is not entitled to vote on the *Amended Joint Plan of Reorganization of Accuride Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 301] (as modified, amended, or supplemented from time to time, the "Plan").  Holders of Claims or Interests wishing to opt in to grant the Third-Party Release set forth in the Plan must affirmatively opt in by checking the box below and returning this Opt In Form by no later **December 16, 2024, at 4:00 p.m., prevailing Eastern Time** (the "Opt In Deadline").

**If you believe you are a Holder of a Claim or Interest with respect to the Debtors and choose to opt in to the Third-Party Release set forth in Article VIII.D of the Plan, please either** (i) promptly complete, sign, and date this Opt In Form and return it via first class mail, overnight courier, or hand delivery to Omni Agent Solutions, Inc. (the "Solicitation Agent") at the address set forth below or (ii)  submit your Opt In Form through the Solicitation Agent's online E-Ballot Portal in accordance with the directions provided below.  Parties that submit their Opt In Form using the E-Ballot Portal should NOT also submit a paper Opt In Form.

**THIS OPT IN FORM MUST BE ACTUALLY RECEIVED (WHETHER A PHYSICAL COPY IS RETURNED OR THE OPT IN FORM IS COMPLETED ONLINE) BY THE SOLICITATION AGENT BY THE OPT IN DEADLINE.  IF THE OPT IN FORM IS RECEIVED AFTER THE OPT IN DEADLINE, IT WILL NOT BE COUNTED.**

<u>Item 1.</u>              **Important information regarding releases under the Plan.**[1]

Article VIII.C of the Plan provides for a release by the Debtors (the "**Debtor Release**"):

          **[Notwithstanding anything contained in this Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by and on behalf of the Debtors, their Estates, and, if applicable, the Reorganized Debtors, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all claims and Causes of Action whatsoever (including any Avoidance Actions and any derivative claims asserted or assertable on behalf of the Debtors, their Estates, or the Reorganized Debtors), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors, their Estates, the Reorganized Debtors, if applicable, or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the management, ownership, or operation of the Debtors, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions, events, circumstances, acts, or omissions giving rise to, any Claim or Interest that is treated under this Plan, the business or contractual arrangements or interactions between the Debtors and any Released Party, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, any other in-court or out-of-**

---

[1]     The Plan provisions referenced herein are for summary purposes only and do not include all provisions of the Plan that may affect your rights.  If there is any inconsistency between the provisions set forth herein and the Plan, the Plan governs.  Please read the Plan carefully before completing this Opt In Form.  Defined terms used but not defined herein shall have the meaning ascribed to such term as in the Plan.  The release provisions and related definitions in this Plan are subject to ongoing review and discussion with the AHG, and subject to review as part of the Special Committee's independent investigation and its determination that releases should be granted.

court restructuring efforts of the Debtors, the negotiation, formulation, or preparation of the Restructuring Term Sheet, the Restructuring Transactions, the Prepetition Credit Documents, the New Organizational Documents, the DIP Documents, the DIP Orders, the Disclosure Statement, the Plan Supplement, this Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to this Plan, the New Takeback Facility Documents, the Rights Offering Documents, the New ABL Facility Documents, the New Organizational Documents, the Liquidating Trust Agreements, and all other Definitive Documents, and any other any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided, however*, that notwithstanding anything herein to the contrary, nothing in this Plan shall affect, limit, or release in any way any performance obligations of any party or Entity under this Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan; *provided, further*, that, nothing in this Art. VIII.C shall be construed to release (i) the Released Parties from any criminal act or intentional fraud, willful misconduct, or gross negligence, in each case, as determined by a Final Order or (ii) any action included in the Schedule of Retained Causes of Action.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in this Plan and, further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing this Plan; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interests of the Debtors and all Holders of Claims and Interests; (iv) fair, equitable, and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Debtors' Estates or, if applicable, the Reorganized Debtors, asserting any Claim or Cause of Action released pursuant to the Debtor Release.][2]

Article VIII.D of the Plan provides for a third-party release by Holders of Claims and Interests (the "**Third-Party Release**"):

[Except as otherwise expressly set forth in this Plan or the Confirmation Order, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by the Releasing Parties, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the management, ownership, or operation of the Debtors, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions, events, circumstances, acts, or omissions giving rise to, any Claim or Interest that is treated under this Plan, the business or contractual arrangements or interactions between the Debtors and any Released Party, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, any other in-court or out-of-court restructuring efforts of the Debtors, the negotiation, formulation, or preparation of the Restructuring Term Sheet, the Restructuring Transactions, the

---

[2]    The release provisions and related definitions in this Plan are subject to ongoing review and discussion with the AHG, and subject to review as part of the Special Committee's independent investigation and its determination that releases should be granted.

**Prepetition Credit Documents, the New Organizational Documents, the DIP Documents, the DIP Orders, the Disclosure Statement, the Plan Supplement, this Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to this Plan, the New Takeback Facility Documents, the Rights Offering Documents, the New ABL Facility Documents, the New Organizational Documents, the Liquidating Trust Agreements, and all other Definitive Documents, and any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided*, *however*, that notwithstanding anything herein to the contrary, nothing in this Plan shall affect, limit, or release in any way any performance obligations of any party or Entity under this Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan. For the avoidance of doubt, nothing in this Section 8(d) shall be construed to release the Released Parties from any criminal act, intentional fraud, willful misconduct, or gross negligence, in each case, as determined by a Final Order.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (i) consensual; (ii) essential to the confirmation of this Plan; (iii) given in exchange for good and valuable consideration provided by the Released Parties; (iv) a good faith settlement and compromise of the Claims released by the Third-Party Release; (v) in the best interests of the Debtors and their Estates; (vi) fair, equitable, and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.]**[3]

Definitions Related to the Debtor Release and the Third-Party Release:

UNDER THE PLAN, "***AVOIDANCE ACTIONS***" MEANS ANY AND ALL ACTUAL OR POTENTIAL CLAIMS AND CAUSES OF ACTION TO AVOID A TRANSFER OF PROPERTY OR AN OBLIGATION INCURRED BY THE DEBTORS ARISING UNDER CHAPTER 5 OF THE BANKRUPTCY CODE, INCLUDING SECTIONS 502(D), 542, 544, 545, 547, 548, 549, 550, 551, 552, AND 553(B) OF THE BANKRUPTCY CODE, AND APPLICABLE NON-BANKRUPTCY LAW.

UNDER THE PLAN, "***DEBTOR RELEASE***" MEANS THE RELEASE SET FORTH IN ARTICLE VIII.C OF THE PLAN.

[UNDER THE PLAN, "***RELEASED PARTIES***" MEANS EACH OF, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) EACH DEBTOR; (B) EACH REORGANIZED DEBTOR; (C) EACH HOLDER OF A TERM LOAN CLAIM; (D) EACH DIP LENDER AND HOLDER OF A DIP CLAIM; (E) EACH AGENT; (F) THE SPONSOR; (G) THE COMMITTEE AND EACH OF ITS MEMBERS, SOLELY IN THEIR RESPECTIVE CAPACITIES AS SUCH; (H) EACH RELEASING PARTY; (I) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSES (A) THROUGH THE FOLLOWING CLAUSE (J); (J) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (A) THROUGH THE PRECEDING CLAUSE (I); PROVIDED THAT IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASED PARTY IF IT: (X) ELECTS NOT TO OPT IN TO THE RELEASES DESCRIBED IN ARTICLE VIII.D OF THIS PLAN; OR (Y) TIMELY OBJECTS TO THE RELEASES CONTAINED IN ARTICLE VIII.D OF THIS PLAN AND SUCH OBJECTION IS NOT RESOLVED BEFORE CONFIRMATION.][4]

[UNDER THE PLAN, "***RELEASING PARTIES***" MEANS EACH OF, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) EACH HOLDER OF A TERM LOAN

---

[3]    The release provisions and related definitions in this Plan are subject to ongoing review and discussion with the AHG, and subject to review as part of the Special Committee's independent investigation and its determination that releases should be granted.

[4]    The release provisions and related definitions in this Plan are subject to ongoing review and discussion with the AHG, and subject to review as part of the Special Committee's independent investigation and its determination that releases should be granted.

CLAIM; (D) EACH DIP LENDER AND HOLDER OF A DIP CLAIM; (E) EACH AGENT; (F) THE SPONSOR; (G) THE COMMITTEE AND EACH OF ITS MEMBERS, SOLELY IN THEIR RESPECTIVE CAPACITIES AS SUCH; (H) ALL HOLDERS OF CLAIMS THAT VOTE TO ACCEPT THIS PLAN; (I) ALL HOLDERS OF CLAIMS THAT ARE DEEMED TO ACCEPT THIS PLAN AND THAT AFFIRMATIVELY OPT IN TO THE RELEASES PROVIDED FOR IN THIS PLAN; (J) ALL HOLDERS OF CLAIMS THAT ABSTAIN FROM VOTING ON THIS PLAN AND THAT AFFIRMATIVELY OPT IN TO THE RELEASES PROVIDED FOR IN THIS PLAN; (K) ALL HOLDERS OF CLAIMS OR INTERESTS THAT VOTE TO REJECT THIS PLAN OR ARE DEEMED TO REJECT THIS PLAN AND THAT AFFIRMATIVELY OPT IN TO THE RELEASES PROVIDED FOR IN THIS PLAN; (L) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSES (A) THROUGH (K); AND (M) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (A) THROUGH (L) FOR WHICH SUCH ENTITY IS LEGALLY ENTITLED TO BIND SUCH RELATED PARTY TO THE RELEASES CONTAINED IN THIS PLAN UNDER APPLICABLE LAW; PROVIDED THAT, FOR THE AVOIDANCE OF DOUBT, AN ENTITY IN CLAUSE (I) THROUGH CLAUSE (L) SHALL NOT BE A RELEASING PARTY IF IT: (X) ELECTS NOT TO OPT IN TO THE RELEASES CONTAINED IN ARTICLE VIII.D OF THIS PLAN; OR (Y) TIMELY OBJECTS TO THE RELEASES CONTAINED IN ARTICLE VIII.D OF THIS PLAN AND SUCH OBJECTION IS NOT RESOLVED BEFORE CONFIRMATION; PROVIDED, FURTHER, THAT EACH SUCH ENTITY THAT VALIDLY OBJECTS TO OR ELECTS NOT TO OPT IT TO THE RELEASES CONTAINED IN THIS PLAN, SUCH THAT IT IS NOT A RELEASING PARTY IN ITS CAPACITY AS A HOLDER OF A CLAIM OR INTEREST, SHALL NEVERTHELESS BE A RELEASING PARTY IN EACH OTHER CAPACITY APPLICABLE TO SUCH ENTITY.][5]

## IMPORTANT INFORMATION REGARDING THE RELEASES:

AS A HOLDER OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS, YOU ARE A "RELEASING PARTY" UNDER THE PLAN AND ARE DEEMED TO PROVIDE THE THIRD-PARTY RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN, AS SET FORTH ABOVE. YOU MAY CHECK THE BOX BELOW TO ELECT NOT TO GRANT THE RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN. YOU WILL NOT BE CONSIDERED A "RELEASING PARTY" UNDER THE PLAN UNLESS YOU CHECK THE BOX BELOW AND SUBMIT THE OPT IN BY THE OPT IN DEADLINE. THE ELECTION TO CONSENT TO GRANT THE THIRD-PARTY RELEASE IS AT YOUR OPTION. BY OPTING IN TO THE THIRD-PARTY RELEASE SET FORTH IN ARTICLE VIII.D OF THE PLAN, YOU WILL OBTAIN THE BENEFIT OF THE DEBTOR RELEASE SET FORTH IN ARTICLE VIII.C OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.

YOU WILL RECEIVE THE SAME TREATMENT ON ACCOUNT OF YOUR CLAIM(S) UNDER THE PLAN REGARDLESS OF WHETHER YOU ELECT TO NOT GRANT THE RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN.

**OPTIONAL RELEASE ELECTION**. **YOU MAY ELECT TO OPT IN TO THE RELEASE CONTAINED IN ARTICLE VIII.C OF THE PLAN BY CHECKING THE BOX BELOW:**

☐   **The Undersigned Holder of Claims or Interests elects to <u>OPT IN to the Third-Party Release</u>**

Article VIII.E of the Plan provides for an exculpation of certain parties (the "**<u>Exculpation</u>**"):

**To the fullest extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party will be released and exculpated from, any Claim or Cause of Action occurring between the Petition Date and the Effective Date in connection with or arising out of the administration of the Chapter 11 Cases, the negotiation and pursuit of the Restructuring Term Sheet, the Restructuring Transactions, the**

---

[5]   The release provisions and related definitions in this Plan are subject to ongoing review and discussion with the AHG, and subject to review as part of the Special Committee's independent investigation and its determination that releases should be granted.

Prepetition Credit Documents, the New Organizational Documents, the DIP Documents, the DIP Orders, the Disclosure Statement, the Plan Supplement, this Plan and related agreements, instruments, and other documents, the New Takeback Facility Documents, the Rights Offering Documents, the New ABL Facility Documents, the Liquidating Trust Agreements, and all other Definitive Documents, the solicitation of votes for, or Confirmation of, this Plan, the funding of this Plan, the occurrence of the Effective Date, the administration of this Plan or the property to be distributed under this Plan, the issuance of Securities under or in connection with this Plan, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, if applicable, in connection with this Plan and the Restructuring Transactions, or the transactions in furtherance of any of the foregoing, other than Claims or Causes of Action in each case arising out of or related to any act or omission of an Exculpated Party that is a criminal act or constitutes actual fraud, willful misconduct, or gross negligence as determined by a Final Order, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan.  The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of Securities pursuant to this Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan, including the issuance of Securities thereunder.  The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability; provided, that notwithstanding anything herein to the contrary, nothing in this Plan shall affect, limit, or release in any way any performance obligations of any party or Entity under this Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan.

        Article VIII.F of the Plan establishes an injunction (the "**Injunction**"):

        Except as otherwise expressly provided in this Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to this Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date through and until the date upon which all remaining property of the Debtors' Estates vested in the Reorganized Debtors has been liquidated and distributed in accordance with the terms of this Plan, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (iii) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities released or settled pursuant to this Plan.

        No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to Article VIII.C, Article VIII.D, or Article VIII.E hereof, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party.  At the hearing for the Bankruptcy Court to determine whether such Claim or Cause of Action represents a colorable Claim of any kind, the Bankruptcy Court may, or shall if any Debtor, Reorganized Debtor, Exculpated Party, Released

**Party, or other party in interest requests by motion (oral motion being sufficient), direct that such Person or Entity seeking to commence or pursue such Claim or Cause of Action file a proposed complaint with the Bankruptcy Court embodying such Claim or Cause of Action, such complaint satisfying the applicable Federal Rules of Civil Procedure, including, but not limited to, Rule 8 and Rule 9 (as applicable), which the Bankruptcy Court shall assess before making a determination.**

**Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of this Plan.  Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to this Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.F.**

**Item 2.**        **Certifications.**

By signing this Opt In Form, the undersigned certifies to the Bankruptcy Court and the Debtors that:

(a)        as of the Voting Record Date, either: (i) the Entity is the Holder of a Claim or Interest; or (ii) the Entity is an authorized signatory for the Entity that is a Holder of a Claim or Interest;

(b)        the Entity (or in the case of an authorized signatory, the Holder) has received a copy of the *Notice of Non-Voting Status to Holders or Potential Holders of Unimpaired Claims Deemed to Accept the Plan, Holders or Potential Holders of Impaired Claims and Interests Presumed to Reject the Plan, and Holders or Potential Holders of Disputed Claims* and that this Opt In Form is made pursuant to the terms and conditions set forth therein;

(c)        the Entity has submitted the same respective election concerning the releases with respect to all Claims or Interests in a single Class; and

(d)        no other Opt In Form has been submitted or, if any other Opt In Forms have been submitted with respect to such Claims or Interests, then any such earlier Opt In Forms are hereby revoked.

Name of Holder:_____
*(print or type)*

Signature:_____

Name of Signatory:_____
*(if other than Holder)*

Title: _____

Address:_____

_____

_____

Telephone Number:_____

Email:_____

Date Completed:_____

**IF YOU HAVE MADE THE OPTIONAL OPT IN ELECTION, PLEASE COMPLETE, SIGN, AND DATE THIS OPT IN FORM AND RETURN IT PROMPTLY BY ONLY ONE OF THE METHODS BELOW.**

**By regular mail, overnight mail, or hand delivery at:**

**Accuride Corporation Ballot Processing**
**c/o Omni Agent Solutions, Inc.**
**5955 De Soto Avenue**
**Suite 100**
**Woodland Hills, CA 91367**

**OR**

7

> **By electronic, online submission:**
>
> The Solicitation Agent will accept Opt In Forms if properly completed through the E-Ballot Portal. To submit your Opt In Form, please visit https://omniagentsolutions.com/Accuride-Ballots (the "E-Ballot Portal") and follow the instructions to submit your Opt in Form.

**The Solicitation Agent's E-Ballot Portal is the sole manner in which Opt In Forms will be accepted via electronic or online transmission.  Opt In Forms submitted by facsimile, email, or other means of electronic transmission will not be counted.**

Parties that submit their Opt In Form using the E-Ballot Portal should **NOT** also submit a paper Opt In Form.

> **THE OPT IN DEADLINE IS <u>DECEMBER 16, 2024</u>, AT 4:00 P.M., PREVAILING EASTERN TIME.**
>
> THE SOLICITATION AGENT MUST ACTUALLY RECEIVE YOUR OPT IN ELECTION ON OR BEFORE THE VOTING DEADLINE.  IF YOU HAVE ANY QUESTIONS REGARDING THIS OPT IN FORM, PLEASE CONTACT:   ACCURIDEINQUIRIES@OMNIAGNT.COM   AND   REFERENCE   "ACCURIDE"   FOR FURTHER ASSISTANCE.

## Exhibit 4

**Form of Ballot**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ACCURIDE CORPORATION, *et al.*,[1] | ) | Case No. 24-12289 (JKS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## BALLOT FOR VOTING TO
## ACCEPT OR REJECT THE JOINT PLAN OF REORGANIZATION OF
## ACCURIDE CORPORATION AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE
## BANKRUPTCY CODE

### BALLOT FOR HOLDERS OF TERM LOAN CLAIMS

---

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**

**IN ORDER FOR YOUR VOTE TO BE COUNTED, THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE SOLICITATION AGENT BY DECEMBER 16, 2024, AT 4:00 P.M., PREVAILING EASTERN TIME (THE "VOTING DEADLINE") IN ACCORDANCE WITH THE FOLLOWING:**

---

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes with respect to the *Amended Joint Plan of Reorganization of Accuride Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 301] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan") as set forth in the *Disclosure Statement Relating to the Amended Joint Plan of Reorganization of Accuride Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 302 (as may be amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement"). The United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") has conditionally approved the Disclosure Statement as containing adequate information pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code"), by entry of an order on November 20, 2024 [Docket No. [●]] (the "Disclosure Statement Order"). The Bankruptcy Court's approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

You are receiving this ballot (this "Ballot") because you are a Holder of a Term Loan Claim in Class 4 (the "Voting Class") as of **November 19, 2024** (the "Voting Record Date"). Accordingly, you are entitled to vote to accept or reject the Plan.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Accuride Corporation (9077); Accuride Group Holdings, Inc. (4531); Accuride Intermediate Co., Inc. (9045); Accuride Distributing, LLC (3124); Accuride EMI, LLC (0389); Accuride Erie, L.P. (4862); Accuride Henderson Limited Liability Company (8596); AKW General Partner, L.L.C. (4861); AOT, LLC (3088); Armor Parent Corp. (6684); Bostrom Holdings, Inc. (9282); Bostrom Seating, Inc. (7179); Gunite Corporation (9803); KIC LLC (6356); Transportation Technologies Industries, Inc. (2791); and Truck Components, Inc. (5407). The location of the Debtors' service address is: 38777 Six Mile Road, Suite 410, Livonia, MI 48152.

**YOUR VOTE ON THIS BALLOT WILL BE APPLIED TO EACH DEBTOR AGAINST WHICH YOU HAVE A CLAIM.**

Your rights are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials). If you need to obtain additional Solicitation Packages, you may obtain them by (a) writing via first class mail, to Accuride Corporation Ballot Processing, c/o Omni Agent Solutions, Inc., 5955 De Soto Avenue, Suite 100, Woodland Hills, CA 91367; (b) writing via electronic mail to accurideinquiries@omniagnt.com; or (c) calling the Debtors' restructuring hotline at 866-956-2136 (U.S. Toll-Free/Domestic) or +1 747-263-0154 (International). You may also obtain copies of any pleadings filed in these chapter 11 cases (a) for a fee via PACER at: http://www.deb.uscourts.gov; or (b) at no charge from Omni Agent Solutions, Inc. by accessing the Debtors' restructuring website at https://omniagentsolutions.com/Accuride.

<div align="center">

**U.S. Toll Free:** 866-956-2136
**International:** +1 747-263-0154

</div>

This Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Ballot in error, or if you believe you have received the wrong ballot, please contact the Solicitation Agent *immediately* at the address, telephone number, or email address set forth above.

**You should review the Disclosure Statement, the Plan, and the instructions contained herein before you vote.** You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim. Your Claim has been placed in Class 4 under the Plan.

**PLEASE SUBMIT YOUR BALLOT BY THE METHOD BELOW:**

**Electronically, Via Ballot Portal.** **Submit your Ballot via upload through the Solicitation Agent's online portal, by visiting https://omniagentsolutions.com/Accuride-Ballots (the "E-Ballot Portal") and following the instructions to submit your Ballot.**

**The Solicitation Agent's Ballot Portal is the sole manner in which Ballots will be accepted. Ballots submitted by facsimile, email, or other means of electronic transmission will not be counted.**

<u>**Item 1**</u>. **Amount of Claim.**

The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the Holder of a Term Loan Claim in the following *aggregate* unpaid amount:

<div align="center">

| $_____ |
| --- |

</div>

<u>**Item 2**</u>.          **Vote on Plan.**

The Holder of the Term Loan Claim against the Debtors, the aggregate amount of which is set forth in Item 1, votes to (please check <u>one</u>):

| <u>**ACCEPT**</u> (vote FOR) the Plan | <u>**REJECT**</u> (vote AGAINST) the Plan |
| --- | --- |

**<u>Your vote on the Plan will be applied to each applicable Debtor in the same manner and in the same amount as indicated in Item 1 and Item 2 above.</u>**

<u>Item 3</u>.         **Important information regarding releases under the Plan.**[2]

Article VIII.C of the Plan provides for a release by the Debtors (the "**<u>Debtor Release</u>**"):

[**Notwithstanding anything contained in this Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by and on behalf of the Debtors, their Estates, and, if applicable, the Reorganized Debtors, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all claims and Causes of Action whatsoever (including any Avoidance Actions and any derivative claims asserted or assertable on behalf of the Debtors, their Estates, or the Reorganized Debtors), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors, their Estates, the Reorganized Debtors, if applicable, or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the management, ownership, or operation of the Debtors, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions, events, circumstances, acts, or omissions giving rise to, any Claim or Interest that is treated under this Plan, the business or contractual arrangements or interactions between the Debtors and any Released Party, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, any other in-court or out-of-court restructuring efforts of the Debtors, the negotiation, formulation, or preparation of the Restructuring Term Sheet, the Restructuring Transactions, the Prepetition Credit Documents, the New Organizational Documents, the DIP Documents, the DIP Orders, the Disclosure Statement, the Plan Supplement, this Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to this Plan, the New Takeback Facility Documents, the Rights Offering Documents, the New ABL Facility Documents, the New Organizational Documents, the Liquidating Trust Agreements, and all other Definitive Documents, and any other any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; provided, however, that notwithstanding anything herein to the contrary, nothing in this Plan shall affect, limit, or release in any way any performance obligations of any party or Entity under this Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan; provided, further, that nothing in this Art. VIII.C shall be construed to release (i) the Released Parties from any criminal act or intentional fraud, willful misconduct, or gross negligence, in each case, as determined by a Final Order or (ii) any action included in the Schedule of Retained Causes of Action.**

       **Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in this Plan and, further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing this Plan; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interests of the Debtors and all Holders of Claims and Interests; (iv) fair, equitable, and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of the**

---

[2]    The Plan provisions referenced herein are for summary purposes only and do not include all provisions of the Plan that may affect your rights.  If there is any inconsistency between the provisions set forth herein and the Plan, the Plan governs.  Please read the Plan carefully before completing this Ballot.  The release provisions and related definitions in this Plan are subject to ongoing review and discussion with the AHG, and subject to review as part of the Special Committee's independent investigation and its determination that releases should be granted.

**Debtors, the Debtors' Estates or, if applicable, the Reorganized Debtors, asserting any Claim or Cause of Action released pursuant to the Debtor Release.]**[3]

Article VIII.D of the Plan provides for a third-party release by Holders of Claims and Interests (the "**Third-Party Release**"):

**[Except as otherwise expressly set forth in this Plan or the Confirmation Order, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by the Releasing Parties, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non bankruptcy law, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the management, ownership, or operation of the Debtors, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions, events, circumstances, acts, or omissions giving rise to, any Claim or Interest that is treated under this Plan, the business or contractual arrangements or interactions between the Debtors and any Released Party, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, any other in-court or out-of-court restructuring efforts of the Debtors, the negotiation, formulation, or preparation of the Restructuring Term Sheet, the Restructuring Transactions, the Prepetition Credit Documents, the New Organizational Documents, the DIP Documents, the DIP Orders, the Disclosure Statement, the Plan Supplement, this Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to this Plan, the New Takeback Facility Documents, the Rights Offering Documents, the New ABL Facility Documents, the New Organizational Documents, the Liquidating Trust Agreements, and all other Definitive Documents, and any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; provided, however, that notwithstanding anything herein to the contrary, nothing in this Plan shall affect, limit, or release in any way any performance obligations of any party or Entity under this Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan. For the avoidance of doubt, nothing in this Section 8(d) shall be construed to release the Released Parties from any criminal act, intentional fraud, willful misconduct, or gross negligence, in each case, as determined by a Final Order.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third Party Release is: (i) consensual; (ii) essential to the confirmation of this Plan; (iii) given in exchange for good and valuable consideration provided by the Released Parties; (iv) a good faith settlement and compromise of the Claims released by the Third-Party Release; (v) in the best interests of the Debtors and their Estates; (vi) fair, equitable, and reasonable; (vii) given**

---

[3]     The release provisions and related definitions in this Plan are subject to ongoing review and discussion with the AHG, and subject to review as part of the Special Committee's independent investigation and its determination that releases should be granted.

**and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.]**[4]

Definitions Related to the Debtor Release and the Third-Party Release:

UNDER THE PLAN, "***AVOIDANCE ACTIONS***" MEANS ANY AND ALL ACTUAL OR POTENTIAL CLAIMS AND CAUSES OF ACTION TO AVOID A TRANSFER OF PROPERTY OR AN OBLIGATION INCURRED BY THE DEBTORS ARISING UNDER CHAPTER 5 OF THE BANKRUPTCY CODE, INCLUDING SECTIONS 502(D), 542, 544, 545, 547, 548, 549, 550, 551, 552, AND 553(B) OF THE BANKRUPTCY CODE, AND APPLICABLE NON-BANKRUPTCY LAW.

UNDER THE PLAN, "***DEBTOR RELEASE***" MEANS THE RELEASE SET FORTH IN ARTICLE VIII.C OF THE PLAN.

UNDER THE PLAN, "***EXCULPATED PARTIES***" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH, (A) THE DEBTORS; (B) THE COMMITTEE AND EACH OF ITS MEMBERS, SOLELY IN THEIR RESPECTIVE CAPACITIES AS SUCH; AND (C) WITH RESPECT TO EACH OF THE FOREGOING ENTITIES IN CLAUSES (A) AND (B), THEIR RESPECTIVE CURRENT AND FORMER DIRECTORS, LIMITED LIABILITY COMPANY MANAGERS, OFFICERS, AND ATTORNEYS, FINANCIAL ADVISORS, OR OTHER PROFESSIONALS THAT WERE RETAINED DURING ANY PORTION OF THE CHAPTER 11 CASES.

UNDER THE PLAN, "***RELATED PARTIES***" MEANS, WITH RESPECT TO AN ENTITY, EACH OF, AND IN EACH CASE IN ITS CAPACITY AS SUCH, SUCH ENTITY'S CURRENT AND FORMER DIRECTORS, MANAGERS, OFFICERS, COMMITTEE MEMBERS, MEMBERS OF ANY GOVERNING BODY, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), AFFILIATED INVESTMENT FUNDS OR INVESTMENT VEHICLES, MANAGED ACCOUNTS OR FUNDS, PREDECESSORS, PARTICIPANTS, SUCCESSORS, ASSIGNS, SUBSIDIARIES, AFFILIATES, PARTNERS, LIMITED PARTNERS, GENERAL PARTNERS, PRINCIPALS, MEMBERS, MANAGEMENT COMPANIES, FUND ADVISORS OR MANAGERS, EMPLOYEES, AGENTS, TRUSTEES, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, ATTORNEYS (INCLUDING ANY OTHER ATTORNEYS OR PROFESSIONALS RETAINED BY ANY CURRENT OR FORMER DIRECTOR OR MANAGER IN HIS OR HER CAPACITY AS DIRECTOR OR MANAGER OF AN ENTITY), ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS AND ADVISORS AND ANY SUCH PERSON'S OR ENTITY'S RESPECTIVE HEIRS, EXECUTORS, ESTATES, AND NOMINEES.

[UNDER THE PLAN, "***RELEASED PARTIES***" MEANS EACH OF, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) EACH DEBTOR; (B) EACH REORGANIZED DEBTOR; (C) EACH HOLDER OF A TERM LOAN CLAIM; (D) EACH DIP LENDER AND HOLDER OF A DIP CLAIM; (E) EACH AGENT; (F) THE SPONSOR; (G) THE COMMITTEE AND EACH OF ITS MEMBERS, SOLELY IN THEIR RESPECTIVE CAPACITIES AS SUCH; (H) EACH RELEASING PARTY; (I) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSES (A) THROUGH THE FOLLOWING CLAUSE (J); (J) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (A) THROUGH THE PRECEDING CLAUSE (I); PROVIDED THAT IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASED PARTY IF IT: (X) ELECTS NOT TO OPT IN TO THE RELEASES DESCRIBED

---

[4]    The release provisions and related definitions in this Plan are subject to ongoing review and discussion with the AHG, and subject to review as part of the Special Committee's independent investigation and its determination that releases should be granted.

IN ARTICLE VIII.D OF THIS PLAN; OR (Y) TIMELY OBJECTS TO THE RELEASES CONTAINED IN ARTICLE VIII.D OF THIS PLAN AND SUCH OBJECTION IS NOT RESOLVED BEFORE CONFIRMATION.][5]

[UNDER THE PLAN, "***RELEASING PARTIES***" MEANS EACH OF, AND IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) EACH HOLDER OF A TERM LOAN CLAIM; (D) EACH DIP LENDER AND HOLDER OF A DIP CLAIM; (E) EACH AGENT; (F) THE SPONSOR; (G) THE COMMITTEE AND EACH OF ITS MEMBERS, SOLELY IN THEIR RESPECTIVE CAPACITIES AS SUCH; (H) ALL HOLDERS OF CLAIMS THAT VOTE TO ACCEPT THIS PLAN; (I) ALL HOLDERS OF CLAIMS THAT ARE DEEMED TO ACCEPT THIS PLAN AND THAT AFFIRMATIVELY OPT IN TO THE RELEASES PROVIDED FOR IN THIS PLAN; (J) ALL HOLDERS OF CLAIMS THAT ABSTAIN FROM VOTING ON THIS PLAN AND THAT AFFIRMATIVELY OPT IN TO THE RELEASES PROVIDED FOR IN THIS PLAN; (K) ALL HOLDERS OF CLAIMS OR INTERESTS THAT VOTE TO REJECT THIS PLAN OR ARE DEEMED TO REJECT THIS PLAN AND THAT AFFIRMATIVELY OPT IN TO THE RELEASES PROVIDED FOR IN THIS PLAN; (L) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSES (A) THROUGH (K); AND (M) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (A) THROUGH (L) FOR WHICH SUCH ENTITY IS LEGALLY ENTITLED TO BIND SUCH RELATED PARTY TO THE RELEASES CONTAINED IN THIS PLAN UNDER APPLICABLE LAW; PROVIDED THAT, FOR THE AVOIDANCE OF DOUBT, AN ENTITY IN CLAUSE (I) THROUGH CLAUSE (L) SHALL NOT BE A RELEASING PARTY IF IT: (X) ELECTS NOT TO OPT IN TO THE RELEASES CONTAINED IN ARTICLE VIII.D OF THIS PLAN; OR (Y) TIMELY OBJECTS TO THE RELEASES CONTAINED IN ARTICLE VIII.D OF THIS PLAN AND SUCH OBJECTION IS NOT RESOLVED BEFORE CONFIRMATION; PROVIDED, FURTHER, THAT EACH SUCH ENTITY THAT VALIDLY OBJECTS TO OR ELECTS NOT TO OPT IT TO THE RELEASES CONTAINED IN THIS PLAN, SUCH THAT IT IS NOT A RELEASING PARTY IN ITS CAPACITY AS A HOLDER OF A CLAIM OR INTEREST, SHALL NEVERTHELESS BE A RELEASING PARTY IN EACH OTHER CAPACITY APPLICABLE TO SUCH ENTITY.][6]

### IMPORTANT INFORMATION REGARDING THE RELEASES:

AS A HOLDER OF THE CLAIMS IN THE VOTING CLASS IDENTIFIED IN ITEM 1, YOU MAY BE A "RELEASING PARTY" UNDER THE PLAN AND PROVIDE THE THIRD-PARTY RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN, AS SET FORTH ABOVE.  IF YOU CHECK THE BOX BELOW TO GRANT THE RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN, YOU WILL BE CONSIDERED A "RELEASING PARTY" UNDER THE PLAN.  AN ENTITY SHALL NOT BE A "RELEASING PARTY" UNDER THE PLAN IF IT FILES AN OBJECTION TO THE RELEASES CONTAINED IN THE PLAN WITH THE BANKRUPTCY COURT PRIOR TO THE COMBINED HEARING OBJECTION DEADLINE THAT IS NOT WITHDRAWN OR OTHERWISE RESOLVED BEFORE THE CONFIRMATION ORDER IS ENTERED.  THE ELECTION TO CONSENT TO GRANT THE THIRD-PARTY RELEASE IS AT YOUR OPTION.  BY OPTING IN TO THE RELEASE SET FORTH IN ARTICLE VIII.D OF THE PLAN, YOU WILL RECEIVE THE BENEFIT OF OBTAINING THE RELEASE SET FORTH IN ARTICLE VIII.C OF THE PLAN IF YOU ARE A "RELEASED PARTY" IN CONNECTION THEREWITH.

YOU WILL RECEIVE THE SAME TREATMENT ON ACCOUNT OF YOUR CLAIM(S) UNDER THE PLAN REGARDLESS OF WHETHER YOU ELECT TO NOT GRANT THE RELEASE CONTAINED IN ARTICLE VIII.C OF THE PLAN.

---

[5]   The release provisions and related definitions in this Plan are subject to ongoing review and discussion with the AHG, and subject to review as part of the Special Committee's independent investigation and its determination that releases should be granted.

[6]   The release provisions and related definitions in this Plan are subject to ongoing review and discussion with the AHG, and subject to review as part of the Special Committee's independent investigation and its determination that releases should be granted.

<div style="border:1px solid black; padding:8px;">

**PLEASE TAKE NOTICE THAT IF YOU VOTE IN FAVOR OF THE PLAN, YOU WILL BE CONSIDERED A "RELEASING PARTY" UNDER THE PLAN AND DO NOT NEED TO OPT IN TO THE RELEASES CONTAINED THEREIN. ANY OPT IN TO THE RELEASES CONTAINED IN THE PLAN SUBMITTED ON YOUR BEHALF WILL NOT BE COUNTED.**

</div>

**The Holder of the Claim identified in Item 1 elects to:**

<div style="border:1px solid black; padding:8px; text-align:center;">

☐ **OPT IN to the Third Party Release**

</div>

Article VIII.E of the Plan provides for an exculpation of certain parties (the "**Exculpation**"):

       **To the fullest extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party will be released and exculpated from, any Claim or Cause of Action occurring between the Petition Date and the Effective Date in connection with or arising out of the administration of the Chapter 11 Cases, the negotiation and pursuit of the Restructuring Term Sheet, the Restructuring Transactions, the Prepetition Credit Documents, the New Organizational Documents, the DIP Documents, the DIP Orders, the Disclosure Statement, the Plan Supplement, this Plan and related agreements, instruments, and other documents, the New Takeback Facility Documents, the Rights Offering Documents, the New ABL Facility Documents, the Liquidating Trust Agreements, and all other Definitive Documents, the solicitation of votes for, or Confirmation of, this Plan, the funding of this Plan, the occurrence of the Effective Date, the administration of this Plan or the property to be distributed under this Plan, the issuance of Securities under or in connection with this Plan, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, if applicable, in connection with this Plan and the Restructuring Transactions, or the transactions in furtherance of any of the foregoing, other than Claims or Causes of Action in each case arising out of or related to any act or omission of an Exculpated Party that is a criminal act or constitutes actual fraud, willful misconduct, or gross negligence as determined by a Final Order, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan. The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of Securities pursuant to this Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan, including the issuance of Securities thereunder. The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability; provided, that notwithstanding anything herein to the contrary, nothing in this Plan shall affect, limit, or release in any way any performance obligations of any party or Entity under this Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan.**

       Article VIII.F of the Plan establishes an injunction (the "**Injunction**"):

       **Except as otherwise expressly provided in this Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to this Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date through and until the date upon which all remaining property of the Debtors' Estates vested in the Reorganized Debtors has been liquidated and distributed in accordance with the terms of this Plan, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (iii) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such**

Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities released or settled pursuant to this Plan.

No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to Article VIII.C, Article VIII.D, or Article VIII.E hereof, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party. At the hearing for the Bankruptcy Court to determine whether such Claim or Cause of Action represents a colorable Claim of any kind, the Bankruptcy Court may, or shall if any Debtor, Reorganized Debtor, Exculpated Party, Released Party, or other party in interest requests by motion (oral motion being sufficient), direct that such Person or Entity seeking to commence or pursue such Claim or Cause of Action file a proposed complaint with the Bankruptcy Court embodying such Claim or Cause of Action, such complaint satisfying the applicable Federal Rules of Civil Procedure, including, but not limited to, Rule 8 and Rule 9 (as applicable), which the Bankruptcy Court shall assess before making a determination.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of this Plan. Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to this Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.F.

**Item 4**.  **Certifications.**

By signing this Ballot, the undersigned certifies to the Bankruptcy Court and the Debtors that:

     (a)       as of the Voting Record Date, the Entity is the Holder (or authorized signatory for a Holder) of a Claim  or Interest;

     (b)       the Entity (or in the case of an authorized signatory, the Holder) has reviewed a copy of the Disclosure Statement, the Plan, and the remainder of the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

     (c)       the Entity has not relied on any statement made or other information received from any person with respect to the Plan other than the information contained in the Solicitation Package or other publicly available materials;

     (e)       no other Ballots with respect to the amount of the Claim identified in Item 1 has been cast or, if any other Ballots have been cast with respect to such Claim, then any such earlier Ballots are hereby revoked;

     (f)       the Entity understands and acknowledges that if multiple Ballots are submitted voting the Claim set forth in Item 1, only the last properly completed Ballot voting the Claim and received by the Solicitation Agent before the Voting Deadline shall be deemed to reflect the voter's intent and thus to supersede and revoke any prior Ballots received by the Solicitation Agent; and

     (g)       the Entity understands and acknowledges that all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the Holder hereunder, shall be binding upon the transferees, successors, assigns, heirs, executors, administrators, and legal representatives of the Holder and shall not be affected by, and shall survive, the death or incapacity of the Holder.

| | |
|---|---|
| Name of Holder: | _____ |
| | (Print or Type) |
| | |
| Signature: | _____ |
| Name of Signatory: | _____ |
| | (If other than the Holder) |
| Title: | _____ |
| Address: | _____ |
| | _____ |
| | _____ |
| Telephone Number: | _____ |
| Email: | _____ |
| Date Completed: | _____ |

**IF THE SOLICITATION AGENT DOES NOT *ACTUALLY RECEIVE* THIS BALLOT ON OR BEFORE DECEMBER 16, 2024, AT 4:00 P.M., PREVAILING EASTERN TIME, AND IF THE VOTING DEADLINE IS NOT EXTENDED, YOUR VOTE TRANSMITTED BY THIS BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.**

## <u>INSTRUCTIONS FOR COMPLETING THIS BALLOT</u>

1.    The Debtors are soliciting the votes of Holders of Term Loan Claims in Class 4 with respect to the Plan referred to in the Disclosure Statement. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2.    The Plan can be confirmed by the Bankruptcy Court and thereby made binding upon you if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims or at least two-thirds in amount of Interests in at least one class that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code. Please review the Disclosure Statement for more information.

3.    To ensure that your Ballot is counted, you *must* complete and submit this Ballot as instructed herein. **Ballots will not be accepted in hard copy, or by electronic mail or facsimile.**

4.    <u>Use of Ballot</u>. To ensure that your Ballot is counted, you must: (a) complete your Ballot in accordance with these instructions; (b) clearly indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 of the Ballot; and (c) clearly sign and submit your Ballot as instructed herein.

5.    <u>Use of Online E-Ballot Portal</u>. To ensure that your electronic Ballot is counted, please visit **https://omniagentsolutions.com/Accuride-Ballots** (the "<u>E-Ballot Portal</u>") and follow the instructions to submit your Ballot. The E-Ballot Portal is the sole manner in which Ballots will be accepted. **Hard copy Ballots will not be accepted, and electronic Ballots will not be accepted by facsimile or any other electronic means (other than the online portal)**. Each Unique BallotID is to be used solely for voting only those Claims described in Item 1 of your Ballot. Please complete and submit a Ballot for each Unique BallotID you receive, as applicable.

6.    Your Ballot *must* be returned to the Solicitation Agent so as to be *actually received* by the Solicitation Agent on or before the Voting Deadline. **The Voting Deadline is <u>December 16, 2024, at 4:00 p.m.</u>, prevailing Eastern Time.**

7.    If a Ballot is received after the Voting Deadline and if the Voting Deadline is not extended, it may be counted only in the sole and absolute discretion of the Debtors. Additionally, **the following Ballots will *not* be counted**:

    (a)    any Ballot that partially rejects and partially accepts the Plan;

    (b)    Ballots sent to the Debtors, the Debtors' agents (other than Solicitation Agent), the Debtors' financial or legal advisors or any other person (other than the Solicitation Agent);

    (c)    Ballots sent by hard copy, electronic mail, or facsimile;

    (d)    any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim;

    (e)    any Ballot cast by an Entity that does not hold a Term Loan Claim in Class 4;

    (f)    any Ballot submitted by a Holder not entitled to vote pursuant to the Plan;

    (g)    any unsigned Ballot (for the avoidance of doubt, Ballots validly submitted through the Ballot Portal will be deemed signed);

    (h)    any non-original Ballot (for the avoidance of doubt, Ballots validly submitted through the Ballot Portal will be deemed original); and/or

(i)     any Ballot not marked to accept or reject the Plan or any Ballot marked both to accept and reject the Plan.

8.     If multiple Ballots are received from the same Holder Claim with respect to the same Class prior to the Voting Deadline, the latest, timely received, and properly completed Ballot will supersede and revoke any earlier received Ballots.

9.     You must vote all of your Claims within your respective class either to accept or reject the Plan and may ***not*** split your vote.

10.     This Ballot does ***not*** constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

11.     **Please be sure to sign and date your Ballot.** If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Solicitation Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder.

<div align="center">

**PLEASE SUBMIT YOUR BALLOT PROMPTLY**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT, THESE VOTING INSTRUCTIONS, OR THE PROCEDURES FOR VOTING, PLEASE CALL THE RESTRUCTURING HOTLINE AT:**

**U.S. TOLL FREE: 866-956-2136 (US toll free)**
**INTERNATIONAL: +1 747-263-0154 (International)**

**OR BY EMAILING ACCURIDEINQUIRIES@OMNIAGNT.COM**

**IF THE SOLICITATION AGENT DOES NOT *ACTUALLY RECEIVE* THIS BALLOT ON OR BEFORE THE VOTING DEADLINE, WHICH IS DECEMBER 16, 2024, AT 4:00 P.M., PREVAILING EASTERN TIME, AND IF THE VOTING DEADLINE IS NOT EXTENDED, YOUR VOTE TRANSMITTED HEREBY MAY BE COUNTED ONLY IN THE DISCRETION OF THE DEBTORS.**

</div>

## **Exhibit 5**

**Form of Cover Letter**



**November 20, 2024**

<u>Via First Class Mail</u>

**RE**:   *In re Accuride Corporation*, *et al.* Chapter 11 Case No. 24-12289 (JKS), Summary of Chapter 11 Plan and Information Regarding Certain Key Dates.

You have received this letter and the enclosed materials because you are entitled to vote on the *Amended Joint Plan of Reorganization of Accuride Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 301] (as modified, amended, or supplemented from time to time, the "<u>Plan</u>").[1]

Accuride Corporation and its affiliated debtors and debtors in possession in the above captioned cases, (collectively, the "<u>Debtors</u>")[2] each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") on October 9, 2024.

On November 20, 2024, the Bankruptcy Court entered an order [Docket No. [●]] (the "<u>Disclosure Statement Order</u>"): (a) authorizing the Debtors to solicit acceptances for the Plan; (b) conditionally approving the *Disclosure Statement Relating to the Amended Joint Plan of Reorganization of Accuride Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 302] (the "<u>Disclosure Statement</u>") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages; (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan; and (e) granting related relief.

YOU ARE RECEIVING THIS LETTER BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN. THEREFORE, YOU SHOULD READ THIS LETTER CAREFULLY AND DISCUSS IT WITH YOUR ATTORNEY. IF YOU DO NOT HAVE AN ATTORNEY, YOU MAY WISH TO CONSULT ONE.

---

[1]   Capitalized terms used but not otherwise defined herein have the same meanings ascribed to them in the Plan.

[2]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Accuride Corporation (9077); Accuride Group Holdings, Inc. (4531); Accuride Intermediate Co., Inc. (9045); Accuride Distributing, LLC (3124); Accuride EMI, LLC (0389); Accuride Erie, L.P. (4862); Accuride Henderson Limited Liability Company (8596); AKW General Partner, L.L.C. (4861); AOT, LLC (3088); Armor Parent Corp. (6684); Bostrom Holdings, Inc. (9282); Bostrom Seating, Inc. (7179); Gunite Corporation (9803); KIC LLC (6356); Transportation Technologies Industries, Inc. (2791); and Truck Components Inc. (5407). The location of the Debtors' service address is: 38777 Six Mile Road, Suite 410, Livonia, MI 48152.

In addition to this cover letter, the enclosed materials comprise your Solicitation Package, and were approved by the Court for distribution to Holders of Claims in connection with the solicitation of votes to accept or reject the Plan. The Solicitation Package consists of the following:

(a)  a copy of the Solicitation and Voting Procedures;

(b)  a Ballot, together with detailed voting instructions;

(c)  the Disclosure Statement, as conditionally approved by the Bankruptcy Court (and exhibits thereto, including the Plan);

(d)  the Disclosure Statement Order (without exhibits);

(e)  the Combined Hearing Notice; and

(f)  any additional documents that the Court has ordered to be made available.

The Debtors have approved the filing of the Plan and the solicitation of votes to accept or reject the Plan.  The Debtors believe that the acceptance of the Plan is in the best interests of their estates Holders of Claims, and all other parties in interest.  Moreover, the Debtors believe that any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses, which, in turn, likely would result in smaller distributions (or no distributions) on account of Claims asserted in the Chapter 11 Cases.

> **THE DEBTORS STRONGLY URGE YOU TO PROPERLY AND TIMELY SUBMIT YOUR BALLOT CASTING A VOTE TO ACCEPT THE PLAN.  THE VOTING DEADLINE IS DECEMBER 16, 2024, at 4:00 P.M., PREVAILING EASTERN TIME.**

The materials in the Solicitation Package are intended to be self-explanatory.  If you should have any questions, however, please feel free to contact Omni Agent Solutions, Inc., the solicitation agent retained by the Debtors in the Chapter 11 Cases (the "Solicitation Agent"), by:  (a) accessing the Debtors' restructuring website at https://omniagentsolutions.com/Accuride; (b) writing to the Solicitation Agent at Accuride Corporation Ballot Processing, c/o Omni Agent Solutions, Inc., 5955 De Soto Avenue, Suite 100, Woodland Hills, CA 91367; (c) calling (866) 956-2136 (U.S. & Canada Toll-Free) or +1 (747) 263-0154 (International); or (d) e-mailing accurideinquiries@omniagnt.com and referencing "Accuride" in the subject line.  You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER on the Bankruptcy Court's website at: https://www.deb.uscourts.gov/.  Please be advised that the Solicitation Agent is authorized to answer questions about, and provide additional copies of, solicitation materials, but may not advise you as to whether you should vote to accept or reject the Plan or provide legal advice.

Sincerely,

_____

Charles Moore, Chief Restructuring Officer
Accuride Corporation

**Exhibit 6**

**Combined Hearing Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ACCURIDE CORPORATION, *et al.*,[1] | ) | Case No. 24-12289 (JKS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**NOTICE OF HEARING TO CONSIDER
CONFIRMATION OF THE JOINT CHAPTER 11 PLAN FILED BY THE DEBTORS**

**PLEASE TAKE NOTICE THAT** on November 20, 2024, the United States Bankruptcy Court for the District of Delaware (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"):  (a) authorizing the above-captioned debtors and debtors in possession (collectively, the "Debtors") to solicit votes on the *Amended Joint Plan of Reorganization of Accuride Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 301] (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) conditionally approving the *Disclosure Statement Relating to the Amended Joint Plan of Reorganization of Accuride Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 302] (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages; (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan; and (e) granting related relief.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider final approval of Disclosure Statement and Confirmation of the Plan (the "Combined Hearing") will commence on **December 23, 2024, at 10:30 a.m., prevailing Eastern Time** before the Honorable J. Kate Stickles, in the United States Bankruptcy Court for the District of Delaware, located at 824 North Market Street, 3rd Floor, Courtroom #6, Wilmington, DE 19801.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Accuride Corporation (9077); Accuride Group Holdings, Inc. (4531); Accuride Intermediate Co., Inc. (9045); Accuride Distributing, LLC (3124); Accuride EMI, LLC (0389); Accuride Erie, L.P. (4862); Accuride Henderson Limited Liability Company (8596); AKW General Partner, L.L.C. (4861); AOT, LLC (3088); Armor Parent Corp. (6684); Bostrom Holdings, Inc. (9282); Bostrom Seating, Inc. (7179); Gunite Corporation (9803); KIC LLC (6356); Transportation Technologies Industries, Inc. (2791); and Truck Components, Inc. (5407).  The location of the Debtors' service address is:  38777 Six Mile Road, Suite 410, Livonia, MI 48152.

[2]    Capitalized terms used but not otherwise defined herein have the same meaning ascribed to them in the Plan.

> **PLEASE BE ADVISED**:  THE COMBINED HEARING MAY BE CONTINUED FROM TIME TO TIME BY THE COURT OR THE DEBTORS **WITHOUT FURTHER NOTICE** OTHER THAN BY SUCH ADJOURNMENT BEING ANNOUNCED IN OPEN COURT OR BY A NOTICE OF ADJOURNMENT FILED WITH THE COURT AND SERVED ON ALL PARTIES ENTITLED TO NOTICE.
>
> ANY SUCH NOTICES OF ADJOURNMENT ARE AVAILABLE FREE OF CHARGE ON THE DEBTORS' CASE WEBSITE AT https://omniagentsolutions.com/Accuride

## CRITICAL INFORMATION REGARDING VOTING ON THE PLAN

**Voting Record Date**.  The voting record date is **November 19, 2024**, which is the date for determining which Holders of Claims in Class 4 are entitled to vote on the Plan.

**Voting Deadline**.  The deadline for voting on the Plan is **December 16, 2024, at 4:00 p.m., prevailing Eastern Time** (the "Voting Deadline").  If you received a Solicitation Package, including a Ballot and intend to vote on the Plan you **must**:  (a) follow the instructions carefully; (b) complete **all** of the required information on the Ballot; and (c) execute and return your completed Ballot according to and as set forth in detail in the voting instructions so that it is **actually received** by the Debtors' solicitation agent, Omni Agent Solutions, Inc. (the "Solicitation Agent") on or before the Voting Deadline.  ***A failure to follow such instructions may disqualify your vote***.

## CRITICAL INFORMATION REGARDING OBJECTING TO THE PLAN

> ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE VIII.D OF THE PLAN CONTAINS A THIRD-PARTY RELEASE**.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**Combined Hearing Objection Deadline**.  The deadline for filing objections to final approval of the Disclosure Statement and/or confirmation of the Plan, as applicable, is **December 16, 2024, at 4:00 p.m., prevailing Eastern Time** (the "Combined Hearing Objection Deadline").  All objections to the relief sought at the Combined Hearing **must**:  (a) be in writing; (b) conform to the Bankruptcy Code, Bankruptcy Rules, the Local Rules, and any orders of the Court; (c) state, with particularity, the basis and nature of any objection to final approval of the Disclosure Statement and/or confirmation of the Plan and, if practicable, a proposed modification to the Disclosure Statement and/or Plan that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) and served upon the counsel to the Debtors, the U.S. Trustee, counsel to the DIP Lenders, and counsel to the Committee so as to be **actually received** on or before the Combined Hearing Objection Deadline.

Please be advised that Article VIII of the Plan contains the following release, exculpation, and injunction provisions:[3]

Article VIII.C of the Plan provides for a release by the Debtors (the "<u>Debtor Release</u>"):

[**Notwithstanding anything contained in this Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by and on behalf of the Debtors, their Estates, and, if applicable, the Reorganized Debtors, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all claims and Causes of Action whatsoever (including any Avoidance Actions and any derivative claims asserted or assertable on behalf of the Debtors, their Estates, or the Reorganized Debtors), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors, their Estates, the Reorganized Debtors, if applicable, or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the management, ownership, or operation of the Debtors, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions, events, circumstances, acts, or omissions giving rise to, any Claim or Interest that is treated under this Plan, the business or contractual arrangements or interactions between the Debtors and any Released Party, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, any other in-court or out-of-court restructuring efforts of the Debtors, the negotiation, formulation, or preparation of the Restructuring Term Sheet, the Restructuring Transactions, the Prepetition Credit Documents, the New Organizational Documents, the DIP Documents, the DIP Orders, the Disclosure Statement, the Plan Supplement, this Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to this Plan, the New Takeback Facility Documents, the Rights Offering Documents, the New ABL Facility Documents, the New Organizational Documents, the Liquidating Trust Agreements, and all other Definitive Documents, and any other any act or omission,**

---

[3]  The Plan provisions referenced herein are for summary purposes only and do not include all provisions of the Plan that may affect your rights. If there is any inconsistency between the provisions set forth herein and the Plan, the Plan governs. The release provisions and related definitions in the Plan and set forth herein are subject to ongoing review, including as part of the Special Committee's independent investigation and its determination that releases should be provided.

transaction, agreement, event, or other occurrence taking place on or before the Effective Date; provided, however, that notwithstanding anything herein to the contrary, nothing in this Plan shall affect, limit, or release in any way any performance obligations of any party or Entity under this Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan; *provided*, *further*, that, nothing in Art. VIII.C shall be construed to release (i) the Released Parties from any criminal act or intentional fraud, willful misconduct, or gross negligence, in each case, as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in this Plan and, further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (i) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing this Plan; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interests of the Debtors and all Holders of Claims and Interests; (iv) fair, equitable, and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Debtors' Estates or, if applicable, the Reorganized Debtors, asserting any Claim or Cause of Action released pursuant to the Debtor Release provided, further, that, nothing in this Art. VIII.C shall be construed to release (i) the Released Parties from any criminal act or intentional fraud, willful misconduct, or gross negligence, in each case, as determined by a Final Order or (ii) any action included in the Schedule of Retained Causes of Action.][4]

Article VIII.D of the Plan provides for a third-party release by Holders of Claims and Interests (the "**Third-Party Release**"):

[Except as otherwise expressly set forth in this Plan or the Confirmation Order, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by the Releasing Parties, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non bankruptcy law, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or

---

[4]    The release provisions and related definitions in this Plan are subject to ongoing review and discussion with the AHG, and subject to review as part of the Special Committee's independent investigation and its determination that releases should be granted.

otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the management, ownership, or operation of the Debtors, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions, events, circumstances, acts, or omissions giving rise to, any Claim or Interest that is treated under this Plan, the business or contractual arrangements or interactions between the Debtors and any Released Party, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, any other in-court or out-of-court restructuring efforts of the Debtors, the negotiation, formulation, or preparation of the Restructuring Term Sheet, the Restructuring Transactions, the Prepetition Credit Documents, the New Organizational Documents, the DIP Documents, the DIP Orders, the Disclosure Statement, the Plan Supplement, this Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to this Plan, the New Takeback Facility Documents, the Rights Offering Documents, the New ABL Facility Documents, the New Organizational Documents, the Liquidating Trust Agreements, and all other Definitive Documents, and any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; provided, however, that notwithstanding anything herein to the contrary, nothing in this Plan shall affect, limit, or release in any way any performance obligations of any party or Entity under this Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan.  For the avoidance of doubt, nothing in Article VIII.D shall be construed to release the Released Parties from any criminal act, intentional fraud, willful misconduct, or gross negligence, in each case, as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third Party Release is:  (i) consensual; (ii) essential to the confirmation of this Plan; (iii) given in exchange for good and valuable consideration provided by the Released Parties; (iv) a good faith settlement and compromise of the Claims released by the Third-Party Release; (v) in the best interests of the Debtors and their Estates; (vi) fair, equitable, and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.][5]

---

[5]  The release provisions and related definitions in this Plan are subject to ongoing review and discussion with the AHG, and subject to review as part of the Special Committee's independent investigation and its determination that releases should be granted.

Definitions Related to the Debtor Release and the Third-Party Release:

UNDER THE PLAN, "*AVOIDANCE ACTIONS*" MEANS ANY AND ALL ACTUAL OR POTENTIAL CLAIMS AND CAUSES OF ACTION TO AVOID A TRANSFER OF PROPERTY OR AN OBLIGATION INCURRED BY THE DEBTORS ARISING UNDER CHAPTER 5 OF THE BANKRUPTCY CODE, INCLhrUDING SECTIONS 502(d), 542, 544, 545, 547, 548, 549, 550, 551, 552, AND 553(b) OF THE BANKRUPTCY CODE, AND APPLICABLE NON-BANKRUPTCY LAW.

UNDER THE PLAN, "*DEBTOR RELEASE*" MEANS THE RELEASE SET FORTH IN ARTICLE VIII.C OF THIS PLAN.

[UNDER THE PLAN, "*RELEASED PARTIES*" MEANS EACH OF, AND IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) EACH DEBTOR; (B) EACH REORGANIZED DEBTOR; (C) EACH HOLDER OF A TERM LOAN CLAIM; (D) EACH DIP LENDER AND HOLDER OF A DIP CLAIM; (E) EACH AGENT; (F) THE SPONSOR; (G) THE COMMITTEE AND EACH OF ITS MEMBERS, SOLELY IN THEIR RESPECTIVE CAPACITIES AS SUCH; (H) EACH RELEASING PARTY; (I) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSES (A) THROUGH THE FOLLOWING CLAUSE (J); (J) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (A) THROUGH THE PRECEDING CLAUSE (I); PROVIDED THAT IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASED PARTY IF IT:  (X) ELECTS NOT TO OPT IN TO THE RELEASES DESCRIBED IN ARTICLE VIII.D OF THIS PLAN; OR (Y) TIMELY OBJECTS TO THE RELEASES CONTAINED IN ARTICLE VIII.D OF THIS PLAN AND SUCH OBJECTION IS NOT RESOLVED BEFORE CONFIRMATION.][6]

[UNDER THE PLAN, "*RELEASING PARTIES*" MEANS EACH OF, AND IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) EACH HOLDER OF A TERM LOAN CLAIM; (D) EACH DIP LENDER AND HOLDER OF A DIP CLAIM; (E) EACH AGENT; (F) THE SPONSOR; (G) THE COMMITTEE AND EACH OF ITS MEMBERS, SOLELY IN THEIR RESPECTIVE CAPACITIES AS SUCH; (H) ALL HOLDERS OF CLAIMS THAT VOTE TO ACCEPT THIS PLAN; (I) ALL HOLDERS OF CLAIMS THAT ARE DEEMED TO ACCEPT THIS PLAN AND THAT AFFIRMATIVELY OPT IN TO THE RELEASES PROVIDED FOR IN THIS PLAN; (J) ALL HOLDERS OF CLAIMS THAT ABSTAIN FROM VOTING ON THIS PLAN AND THAT AFFIRMATIVELY OPT IN TO THE RELEASES PROVIDED FOR IN THIS PLAN; (K) ALL HOLDERS OF CLAIMS OR INTERESTS THAT VOTE TO REJECT THIS PLAN OR ARE DEEMED TO REJECT THIS PLAN AND THAT AFFIRMATIVELY OPT IN TO THE RELEASES PROVIDED FOR IN THIS PLAN; (L) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSES (A) THROUGH (K); AND (M) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (A) THROUGH (L) FOR WHICH SUCH ENTITY IS LEGALLY ENTITLED TO BIND SUCH RELATED PARTY TO THE RELEASES CONTAINED IN THIS PLAN UNDER APPLICABLE LAW; PROVIDED THAT, FOR THE AVOIDANCE OF

---

[6]    The release provisions and related definitions in this Plan are subject to ongoing review and discussion with the AHG, and subject to review as part of the Special Committee's independent investigation and its determination that releases should be granted.

DOUBT, AN ENTITY IN CLAUSE (I) THROUGH CLAUSE (L) SHALL NOT BE A RELEASING PARTY IF IT:   (X) ELECTS NOT TO OPT IN TO THE RELEASES CONTAINED IN ARTICLE VIII.D OF THIS PLAN; OR (Y) TIMELY OBJECTS TO THE RELEASES CONTAINED IN ARTICLE VIII.D OF THIS PLAN AND SUCH OBJECTION IS NOT RESOLVED BEFORE CONFIRMATION; PROVIDED, FURTHER, THAT EACH SUCH ENTITY THAT VALIDLY OBJECTS TO OR ELECTS NOT TO OPT IT TO THE RELEASES CONTAINED IN THIS PLAN, SUCH THAT IT IS NOT A RELEASING PARTY IN ITS CAPACITY AS A HOLDER OF A CLAIM OR INTEREST, SHALL NEVERTHELESS BE A RELEASING PARTY IN EACH OTHER CAPACITY APPLICABLE TO SUCH ENTITY.][7]

Article VIII.E of the Plan provides for an exculpation of certain parties (the "Exculpation"):

**To the fullest extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party will be released and exculpated from, any Claim or Cause of Action occurring between the Petition Date and the Effective Date in connection with or arising out of the administration of the Chapter 11 Cases, the negotiation and pursuit of the Restructuring Term Sheet, the Restructuring Transactions, the Prepetition Credit Documents, the New Organizational Documents, the DIP Documents, the DIP Orders, the Disclosure Statement, the Plan Supplement, this Plan and related agreements, instruments, and other documents, the New Takeback Facility Documents, the Rights Offering Documents, the New ABL Facility Documents, the Liquidating Trust Agreements, and all other Definitive Documents, the solicitation of votes for, or Confirmation of, this Plan, the funding of this Plan, the occurrence of the Effective Date, the administration of this Plan or the property to be distributed under this Plan, the issuance of Securities under or in connection with this Plan, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, if applicable, in connection with this Plan and the Restructuring Transactions, or the transactions in furtherance of any of the foregoing, other than Claims or Causes of Action in each case arising out of or related to any act or omission of an Exculpated Party that is a criminal act or constitutes actual fraud, willful misconduct, or gross negligence as determined by a Final Order, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan. The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of Securities pursuant to this Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan, including the issuance of Securities thereunder. The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability; _provided_, that notwithstanding anything herein to the contrary, nothing in this Plan shall affect, limit, or release in any way any performance obligations of any party or Entity under this Plan or any document, instrument, or**

---

[7]   The release provisions and related definitions in this Plan are subject to ongoing review and discussion with the AHG, and subject to review as part of the Special Committee's independent investigation and its determination that releases should be granted.

agreement (including those set forth in the Plan Supplement) executed to implement this Plan.

Article VIII.F of the Plan establishes an injunction (the "**Injunction**"):

Except as otherwise expressly provided in this Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to this Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date through and until the date upon which all remaining property of the Debtors' Estates vested in the Reorganized Debtors has been liquidated and distributed in accordance with the terms of this Plan, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (iii) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities released or settled pursuant to this Plan.

No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to Article VIII.C, Article VIII.D, or Article VIII.E hereof, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party.  At the hearing for the Bankruptcy Court to determine whether such Claim or Cause of Action represents a colorable Claim of any kind, the Bankruptcy Court may, or shall if any Debtor, Reorganized Debtor, Exculpated Party, Released Party, or other party in interest requests by motion (oral motion being sufficient), direct that such Person or Entity seeking to commence or pursue such Claim or Cause of Action file a proposed complaint with the Bankruptcy Court embodying such Claim or Cause of Action, such complaint satisfying the applicable Federal Rules of Civil Procedure, including, but not

limited to, Rule 8 and Rule 9 (as applicable), which the Bankruptcy Court shall assess before making a determination.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of this Plan. Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to this Plan, shall be deemed to have consented to the injunction provisions set forth in Article VIII.F of the Plan.

**Obtaining Solicitation Materials**. The materials in the Solicitation Package are intended to be self-explanatory. If you have received a Solicitation Package and have any questions or if you would like to obtain additional solicitation materials, please feel free to contact the Debtors' Claims and Solicitation Agent, by: (a) writing via first class mail, to Accuride Corporation Ballot Processing, c/o Omni Agent Solutions, Inc., 5955 De Soto Avenue, Suite 100, Woodland Hills, CA 91367; (b) writing via electronic mail to accurideinquiries@omniagnt.com; or (c) calling the Debtors' restructuring hotline at (866) 956-2136 (U.S. & Canada Toll-Free) or +1 (747) 263-0154 (International). You may also obtain copies of any pleadings filed in these chapter 11 cases (a) for a fee via PACER at: http://www.deb.uscourts.gov; or (b) at no charge from Omni Agent Solutions, Inc. by accessing the Debtors' restructuring website at https://omniagentsolutions.com/Accuride.

Please be advised that the Solicitation Agent is authorized to answer questions about, and provide additional copies of, solicitation materials, but may ***not*** advise you as to whether you should vote to accept or reject the Plan.

**The Plan Supplement**. The Debtors will file documents constituting the Plan Supplement (as defined in the Plan) on or prior to **the date that is seven (7) days prior to the Combined Hearing**, and will serve notice on all Holders of Claims entitled to vote on the Plan, which will: (a) inform parties that the Debtors filed the Plan Supplement; (b) list the information contained in the Plan Supplement; and (c) explain how parties may obtain copies of the Plan Supplement.

---

<u>BINDING NATURE OF THE PLAN</u>:

IF CONFIRMED, THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS OR INTERESTS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WHETHER OR NOT SUCH HOLDER WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, HAS FILED A PROOF OF CLAIM IN THESE CHAPTER 11 CASES, OR FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

---

*[Remainder of page intentionally left blank.]*

9

Dated: November 20, 2024
Wilmington, Delaware

/s/Draft
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Joseph Barry (Del. Bar No. 4221)
Kenneth J. Enos (Del. Bar No. 4544)
Jared W. Kochenash (Del. Bar No. 6557)
Andrew A. Mark (Del. Bar No. 6861)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:      (302) 571-6600
Facsimile:      (302) 571-1253
Email:          jbarry@ycst.com
                kenos@ycst.com
                jkochenash@ycst.com
                amark@ycst.com

*Co-Counsel for the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Ryan Blaine Bennett, P.C. (admitted *pro hac vice*)
Alexander D. McCammon (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          ryan.bennett@kirkland.com
                alex.mccammon@kirkland.com

-and-

Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          derek.hunter@kirkland.com

*Co-Counsel for the Debtors*
*and Debtors in Possession*

## Exhibit 7

**Form of Plan Supplement Notice**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ACCURIDE CORPORATION, *et al.*,[1] | ) | Case No. 24-12289 (JKS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

### NOTICE OF FILING OF PLAN SUPPLEMENT

**PLEASE TAKE NOTICE THAT** on November 20, 2024, the United States Bankruptcy Court for the District of Delaware (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"):  (a) authorizing the above-captioned debtors and debtors in possession (collectively, the "Debtors") to solicit votes on the *Amended Joint Plan of Reorganization of Accuride Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 301] (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) conditionally approving the *Disclosure Statement Relating to the Amended Joint Plan of Reorganization of Accuride Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 302] (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages; (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan; and (e) granting related relief.

**PLEASE TAKE FURTHER NOTICE THAT** as contemplated under the Plan and the Disclosure Statement Order, the Debtors filed the Plan Supplement on [●], 2024 [Docket No. [●]]. The Plan Supplement, as defined in the Plan, means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed by the Debtors, to the extent reasonably practicable, no later than seven (7) days before the deadline to vote to accept or reject the Plan or such later date as may be approved by the Bankruptcy Court on notice to parties in interest,

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Accuride Corporation (9077); Accuride Group Holdings, Inc. (4531); Accuride Intermediate Co., Inc. (9045); Accuride Distributing, LLC (3124); Accuride EMI, LLC (0389); Accuride Erie, L.P. (4862); Accuride Henderson Limited Liability Company (8596); AKW General Partner, L.L.C. (4861); AOT, LLC (3088); Armor Parent Corp. (6684); Bostrom Holdings, Inc. (9282); Bostrom Seating, Inc. (7179); Gunite Corporation (9803); KIC LLC (6356); Transportation Technologies Industries, Inc. (2791); and Truck Components, Inc. (5407).  The location of the Debtors' service address is:  38777 Six Mile Road, Suite 410, Livonia, MI 48152.

[2]   Capitalized terms used but not otherwise defined herein have the same meaning as ascribed to them in the Plan.

including the following, as applicable:  (a) the New Organizational Documents; (b) the identity and members of the New Board; (c) the Schedule of Retained Causes of Action; (d) the New Takeback Facility Documents; (e) the New ABL Facility Documents; (f) the Rights Offering Documents; (g) the Restructuring Transactions Memorandum; (h) the Schedule of Assumed Executory Contracts and Unexpired Leases; (i) the Liquidating Trust Agreements, and (j) additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider final approval of the Disclosure Statement and Confirmation of the Plan (the "Combined Hearing") will commence on **December 23, 2024, at 10:30 a.m., prevailing Eastern Time**, subject to the Court's availability, before the Honorable J. Kate Stickles, in the United States Bankruptcy Court for the District of Delaware, located at 824 North Market St. 3rd Floor, Courtroom 6, Wilmington, DE 19801.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to final approval of the Disclosure Statement and/or confirmation of the Plan, as applicable, is **December 16, 2024, at 4:00 p.m., prevailing Eastern Time** (the "Combined Hearing Objection Deadline").  Any objection to the Plan *must*:  (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Rules, and any orders of the Court; (c) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court and served upon the counsel to the Debtors, the U.S. Trustee, counsel to the DIP Lenders, and counsel to the Committee on or before the Combined Hearing Objection Deadline.

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Omni Agent Solutions, Inc., the claims and noticing retained by the Debtors in these chapter 11 cases (the "Solicitation Agent"), by:  (a) writing via first class mail, to Accuride Corporation Ballot Processing, c/o Omni Agent Solutions, Inc., 5955 De Soto Avenue, Suite 100, Woodland Hills, CA 91367; (b) writing via electronic mail to accurideinquiries@omniagnt.com; or (c) calling the Debtors' restructuring hotline at (866) 956-2136 (U.S. & Canada Toll-Free) or +1 (747) 263-0154 (International).  You may also obtain copies of any pleadings filed in these chapter 11 cases (a) for a fee via PACER at:  http://www.deb.uscourts.gov; or (b) at no charge from the Solicitation Agent by accessing the Debtors' restructuring website at https://omniagentsolutions.com/Accuride.

ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE VIII.D OF THE PLAN CONTAINS A THIRD-PARTY RELEASE**.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE SOLICITATION AGENT.**

Dated: [●] [●], 2024
Wilmington, Delaware

*/s/Draft*

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Joseph Barry (Del. Bar No. 4221)
Kenneth J. Enos (Del. Bar No. 4544)
Jared W. Kochenash (Del. Bar. No. 6557)
Andrew A. Mark (Del. Bar No. 6861)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:      (302) 571-6600
Facsimile:      (302) 571-1253
Email:          jbarry@ycst.com
                kenos@ycst.com
                jkochenash@ycst.com
                amark@ycst.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Ryan Blaine Bennett, P.C. (admitted *pro hac vice*)
Alexander D. McCammon (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          ryan.bennett@kirkland.com
                alex.mccammon@kirkland.com

-and-

Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          derek.hunter@kirkland.com

*Co-Counsel for the Debtors*
*and Debtors in Possession*

*Co-Counsel for the Debtors*
*and Debtors in Possession*

**Exhibit 8**

**Form of Notice of Assumption of Executory Contracts and Unexpired Leases**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ACCURIDE CORPORATION, *et al.*,[1] | ) | Case No. 24-12289 (JKS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF
(A) EXECUTORY CONTRACTS AND UNEXPIRED
LEASES TO BE ASSUMED OR ASSUMED AND ASSIGNED
BY THE DEBTORS PURSUANT TO THE PLAN, (B) CURE AMOUNTS,
IF ANY, AND (C) RELATED PROCEDURES IN CONNECTION THEREWITH**

**PLEASE TAKE NOTICE THAT** on November 20, 2024, the United States Bankruptcy Court for the District of Delaware (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"): (a) authorizing the above-captioned debtors and debtors in possession (collectively, the "Debtors") to solicit votes on the *Amended Joint Plan of Reorganization of Accuride Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 301] (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) conditionally approving the *Disclosure Statement Relating to the Amended Joint Plan of Reorganization of Accuride Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 302] (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages; (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan; and (e) granting related relief.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Accuride Corporation (9077); Accuride Group Holdings, Inc. (4531); Accuride Intermediate Co., Inc. (9045); Accuride Distributing, LLC (3124); Accuride EMI, LLC (0389); Accuride Erie, L.P. (4862); Accuride Henderson Limited Liability Company (8596); AKW General Partner, L.L.C. (4861); AOT, LLC (3088); Armor Parent Corp. (6684); Bostrom Holdings, Inc. (9282); Bostrom Seating, Inc. (7179); Gunite Corporation (9803); KIC LLC (6356); Transportation Technologies Industries, Inc. (2791); and Truck Components, Inc. (5407). The location of the Debtors' service address is: 38777 Six Mile Road, Suite 410, Livonia, MI 48152.

[2]     Capitalized terms used but not defined herein have the same meaning as ascribed to them in the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors filed the *Schedule of Assumed Executory Contracts and Unexpired Leases* (the "Assumed Executory Contracts and Unexpired Leases List") with the Court as part of the *Plan Supplement for the Amended Joint Plan of Reorganization of Accuride Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No.[●]] on [●], 2024 as contemplated under the Plan.  The Debtors' determination to assume or assume and assign under the Plan the agreements identified on the Assumed Executory Contracts and Unexpired Leases List is subject to the Debtors' reservation of rights under the Plan terms and ongoing review, revision, and further negotiation among the Debtors and interested parties with respect thereto.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider final approval of the Disclosure Statement and Confirmation of the Plan (the "Combined Hearing") will commence on **December 23, 2024, at 10:30 a.m., prevailing Eastern Time**, before the Honorable J. Kate Stickles, in the United States Bankruptcy Court for the District of Delaware, located at 824 North Market St., 3rd Floor, Courtroom 6, Wilmington, DE 19801.

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice because the Debtors' records reflect that you are a party to a contract that is listed on the Assumed Executory Contracts and Unexpired Leases List.  Therefore, you are advised to carefully review the information contained in this notice and the related provisions of the Plan, including the Assumed Executory Contracts and Unexpired Leases List.

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors are proposing to assume or assume and assign the Executory Contract(s) and Unexpired Lease(s) listed in **Exhibit A** attached hereto to which you are a party.[3]

**PLEASE TAKE FURTHER NOTICE THAT** section 365(b)(1) of the Bankruptcy Code requires a chapter 11 debtor to cure, or provide adequate assurance that it will promptly cure, any defaults under executory contracts and unexpired leases at the time of assumption.  Accordingly, the Debtors have conducted a thorough review of their books and records and have determined the amounts required to cure defaults, if any, under the Executory Contract(s) and Unexpired Lease(s), which amounts are listed in **Exhibit A**.  Please note that if no amount is stated for a particular Executory Contract or Unexpired Lease, the Debtors believe that there is no cure amount outstanding for such contract or lease.

**PLEASE TAKE FURTHER NOTICE THAT** any monetary defaults under an Assumed Executory Contract or Unexpired Lease identified in **Exhibit A**, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure in Cash on the Effective Date, subject to the limitations described in Article V.D of the Plan, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  If there is any dispute

---

[3]    Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Debtors or the Reorganized Debtors have any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease under the Plan.

regarding any Cure, the ability of the Reorganized Debtors, or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption (or assumption and assignment), then payment of such Cure shall occur as soon as reasonably practicable after entry of a Final Order (which may be the Confirmation Order) resolving such dispute, approving such assumption (and, if applicable, assumption and assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, and the counterparty to the Executory Contract or Unexpired Lease.[4]

 **PLEASE TAKE FURTHER NOTICE THAT**, pursuant to Article V.C of the Plan, any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or assumption and assignment or related cure amount must be Filed, served, and actually received by the Debtors by no later than fourteen (14) days after the Filing of the Schedule of Assumed Executory Contracts and Unexpired Leases, *provided* that, if the Debtors modify the Schedule of Assumed Executory Contracts and Unexpired Leases, any party affected by such modifications shall have fourteen (14) days to object to the proposed modified treatment from the date of their receipt of notice of such modification.

>  **PLEASE TAKE FURTHER NOTICE THAT any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, assumption and assignment, or cure amount will be deemed to have assented to such assumption, assumption and assignment, or cure amount.**

 **PLEASE TAKE FURTHER NOTICE THAT ASSUMPTION OR ASSUMPTION AND ASSIGNMENT OF ANY EXECUTORY CONTRACT OR UNEXPIRED LEASE PURSUANT TO THE PLAN OR OTHERWISE SHALL RESULT IN THE FULL RELEASE AND SATISFACTION OF ANY CLAIMS OR DEFAULTS, WHETHER MONETARY OR NONMONETARY, INCLUDING DEFAULTS OF PROVISIONS RESTRICTING THE CHANGE IN CONTROL OR OWNERSHIP INTEREST COMPOSITION OR OTHER BANKRUPTCY-RELATED DEFAULTS, ARISING UNDER ANY ASSUMED OR ASSUMED AND ASSIGNED EXECUTORY CONTRACT OR UNEXPIRED LEASE AT ANY TIME BEFORE THE DATE OF THE DEBTORS OR WIND-DOWN DEBTORS ASSUME OR ASSUME AND ASSIGN SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE.  ANY PROOFS OF CLAIM FILED WITH RESPECT TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT HAS BEEN ASSUMED OR ASSUMED AND ASSIGNED SHALL BE DEEMED DISALLOWED AND EXPUNGED, WITHOUT FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT.**

 **PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Omni Agent Solutions, Inc., the claims and noticing agent retained by the Debtors in these chapter 11 cases (the "<u>Claims and Noticing Agent</u>"), by:  (a) writing via first class mail, to Accuride

---

[4] The Plan provisions referenced herein are for summary purposes only and do not include all provisions of the Plan that may affect your rights.  If there is any inconsistency between the provisions set forth herein and the Plan, the Plan governs.

Corporation Ballot Processing, c/o Omni Agent Solutions, Inc., 5955 De Soto Avenue, Suite 100, Woodland Hills, CA 91367; (b) writing via electronic mail to accurideinquiries@omniagnt.com; or (c) calling the Debtors' restructuring hotline at (866) 956-2136 (U.S. & Canada Toll-Free) or +1 (747) 263-0154 (International).  You may also obtain copies of any pleadings filed in these chapter 11 cases (a) for a fee via PACER at:  http://www.deb.uscourts.gov; or (b) at no charge from Omni Agent Solutions, Inc. by accessing the Debtors' restructuring website at https://omniagentsolutions.com/Accuride.

---

ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE VIII.D OF THE PLAN CONTAINS A THIRD-PARTY RELEASE**.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE CLAIMS AND NOTICING AGENT.**

Dated: [●] [●], 2024
Wilmington, Delaware

*/s/Draft*

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Joseph Barry (Del. Bar No. 4221)
Kenneth J. Enos (Del. Bar No. 4544)
Jared W. Kochenash (Del. Bar No. 6557)
Andrew A. Mark (Del. Bar No. 6861)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:     (302) 571-6600
Facsimile:     (302) 571-1253
Email:         jbarry@ycst.com
               kenos@ycst.com
               jkochenash@ycst.com
               amark@ycst.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Ryan Blaine Bennett, P.C. (admitted *pro hac vice*)
Alexander D. McCammon (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:         ryan.bennett@kirkland.com
               alex.mccammon@kirkland.com

-and-

Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:         derek.hunter@kirkland.com

*Co-Counsel for the Debtors*
*and Debtors in Possession*

*Co-Counsel for the Debtors*
*and Debtors in Possession*

**Exhibit A**

**Schedule of Assumed Contracts and Leases and Proposed Cure Amounts**

## Exhibit 9

**Form of Notice Regarding Executory Contracts and Unexpired Leases to Be Rejected Pursuant to the Plan**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ACCURIDE CORPORATION, *et al.*,[1] | Case No. 24-12289 (JKS) |
| Debtors. | (Jointly Administered) |

## NOTICE REGARDING EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES TO BE REJECTED PURSUANT TO THE PLAN

**PLEASE TAKE NOTICE THAT** on November 20, 2024, the United States Bankruptcy Court for the District of Delaware (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"): (a) authorizing the above-captioned debtors and debtors in possession (collectively, the "Debtors") to solicit votes on the *Amended Joint Plan of Reorganization of Accuride Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 301] (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) conditionally approving the *Disclosure Statement Relating to the Amended Joint Plan of Reorganization of Accuride Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 302] (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages; (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan; and (e) granting related relief.

**PLEASE TAKE FURTHER NOTICE THAT** all Executory Contracts and Unexpired Leases that are not being assumed or assumed and assigned pursuant to the Plan are automatically rejected as of the Effective Date. Each Executory Contract and Unexpired Lease shall be deemed rejected, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code, unless such Executory Contract and Unexpired Lease: (i) is explicitly designated by the Plan or the Confirmation Order to be assumed or assumed and assigned, as applicable, in connection with Confirmation of the

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Accuride Corporation (9077); Accuride Group Holdings, Inc. (4531); Accuride Intermediate Co., Inc. (9045); Accuride Distributing, LLC (3124); Accuride EMI, LLC (0389); Accuride Erie, L.P. (4862); Accuride Henderson Limited Liability Company (8596); AKW General Partner, L.L.C. (4861); AOT, LLC (3088); Armor Parent Corp. (6684); Bostrom Holdings, Inc. (9282); Bostrom Seating, Inc. (7179); Gunite Corporation (9803); KIC LLC (6356); Transportation Technologies Industries, Inc. (2791); and Truck Components, Inc. (5407). The location of the Debtors' service address is: 38777 Six Mile Road, Suite 410, Livonia, MI 48152.

[2]    Capitalized terms used but not otherwise defined herein have the same meaning ascribed to them in the Plan.

Plan, (ii) is identified on the Schedule of Assumed Executory Contracts and Unexpired Leases; (iii) is subject to a pending motion to assume such Executory Contract or Unexpired Lease as of the Effective Date; (iv) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (v) is a D&O Liability Insurance Policy.

---

**PLEASE TAKE FURTHER NOTICE THAT YOU ARE RECEIVING THIS NOTICE BECAUSE THE DEBTORS' RECORDS REFLECT THAT YOU ARE A PARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT WILL BE REJECTED PURSUANT TO THE PLAN. THEREFORE, YOU ARE ADVISED TO CAREFULLY REVIEW THE INFORMATION CONTAINED IN THIS NOTICE AND THE RELATED PROVISIONS OF THE PLAN.[3]**

---

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider final approval of the Disclosure Statement and Confirmation of the Plan (the "Combined Hearing") will commence on **December 23, 2024, at 10:30 a.m. prevailing Eastern Time**, before the Honorable J. Kate Stickles, in the United States Bankruptcy Court for the District of Delaware, located at 824 North Market St., 3rd Floor, Courtroom 6, Wilmington, DE 19801.

**PLEASE TAKE FURTHER NOTICE THAT** proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the effective date of such rejection. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease with respect to which a Proof of Claim is not Filed with the Solicitation Agent within thirty (30) days after the effective date of such rejection will be automatically disallowed and forever barred from assertion and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, or their property without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged and shall be subject to the permanent injunction set forth in Article VIII.F of the Plan, notwithstanding anything in a Proof of Claim to the contrary.** All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as a General Unsecured Claim as set forth in Article III.B of the Plan and may be objected to in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to final approval of the Disclosure Statement and/or confirmation of the Plan, as applicable, is **December 16, 2024, at 4:00 p.m., prevailing Eastern Time** (the "Combined Hearing Objection Deadline"). Any objection to the Plan **must**: (a) be in writing; (b) conform to the Bankruptcy

---

[3] Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Debtors or the Reorganized Debtors have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease under the Plan.

Code, Bankruptcy Rules, the Local Rules, and any orders of the Court; (c) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court on or before the Combined Hearing Objection Deadline.

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Omni Agent Solutions, Inc., the claims and noticing agent retained by the Debtors in these chapter 11 cases (the "Solicitation Agent"), by: (a) writing via first class mail, to Accuride Corporation Ballot Processing, c/o Omni Agent Solutions, Inc., 5955 De Soto Avenue, Suite 100, Woodland Hills, CA 91367; (b) writing via electronic mail to accurideinquiries@omniagnt.com; or (c) calling the Debtors' restructuring hotline at (866) 956-2136 (U.S. & Canada Toll-Free) or +1 (747) 263-0154 (International). You may also obtain copies of any pleadings filed in these chapter 11 cases (a) for a fee via PACER at: http://www.deb.uscourts.gov; or (b) at no charge from Omni Agent Solutions, Inc. by accessing the Debtors' restructuring website at https://omniagentsolutions.com/Accuride.

---

ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE VIII.D OF THE PLAN CONTAINS A THIRD-PARTY RELEASE**. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE SOLICITATION AGENT.**

---

Dated: [●] [●], 2024
Wilmington, Delaware

/s/Draft

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Joseph Barry (Del. Bar No. 4221)
Kenneth J. Enos (Del. Bar No. 4544)
Jared W. Kochenash (Del. Bar No. 6557)
Andrew A. Mark (Del. Bar No. 6861)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:     (302) 571-6600
Facsimile:     (302) 571-1253
Email:         jbarry@ycst.com
               kenos@ycst.com
               jkochenash@ycst.com
               amark@ycst.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Ryan Blaine Bennett, P.C. (admitted *pro hac vice*)
Alexander D. McCammon (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:         ryan.bennett@kirkland.com
               alex.mccammon@kirkland.com

-and-

Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:         derek.hunter@kirkland.com

*Co-Counsel for the Debtors*
*and Debtors in Possession*

*Co-Counsel for the Debtors*
*and Debtors in Possession*